Electronically Filed
5/24/2021 5:05 PM
Steven D. Grierson
CLERK OF THE COURT

**COMP**
WRIGHT, FINLAY & ZAK, LLP
Darren T. Brenner, Esq.
Nevada Bar No. 8386
Christina V. Miller, Esq.
Nevada Bar No. 12448
Lindsay D. Robbins, Esq.
Nevada Bar No. 13474
7785 W. Sahara Ave., Suite 200
Las Vegas, NV 89117
(702) 637-2345; Fax: (702) 946-1345
lrobbins@wrightlegal.net
*Attorneys for Plaintiff, Wells Fargo Bank, N.A., as Trustee for Park Place Securities, Inc. Asset-Backed Pass-Through Certificates Series 2005-WHQ2*

CASE NO: A-21-835173-C
Department 26

**EIGHTH JUDICIAL DISTRICT COURT**
**CLARK COUNTY, NEVADA**

| | |
|---|---|
| WELLS FARGO BANK, N.A., AS TRUSTEE FOR PARK PLACE SECURITIES, INC. ASSET-BACKED PASS-THROUGH CERTIFICATES SERIES 2005-WHQ2,<br><br>              Plaintiff,<br><br>   vs.<br><br>FIDELITY NATIONAL TITLE GROUP, INC.; FIDELITY NATIONAL TITLE INSURANCE COMPANY; LAND TITLE OF NEVADA, INC.; DOE INDIVIDUALS I through X; and ROE CORPORATIONS XI through XX, inclusive,<br><br>              Defendants. | Case No.:<br>Dept. No.:<br><br>**COMPLAINT**<br><br>**ARBITRATION EXEMPT: ACTION FOR DECLARATORY RELIEF** |

Plaintiff Wells Fargo Bank, N.A., as Trustee for Park Place Securities, Inc. Asset-Backed Pass-Through Certificates Series 2005-WHQ2 ("Wells Fargo Trustee"), by and through its attorneys of record, Darren T. Brenner, Esq., Christina V. Miller, Esq. and Lindsay D. Robbins, Esq., of the law firm of Wright, Finlay & Zak, LLP, submits its Complaint against Fidelity National Title Group, Inc. ("Fidelity"), Fidelity National Title Insurance Company ("Fidelity National"), Land Title of Nevada, Inc. ("Land Title"); Doe Individuals I through X ("Does") and

Roe Corporations XI through XX, inclusive ("Roes") (collectively, "Defendants"), for breach of their obligations to defend and indemnify Wells Fargo Trustee under a title insurance policy issued to insure a deed of trust on real property located in Nevada.

Title insurers, like Defendants, have known since the early 1990's that homeowners associations in some states, including Nevada, impose liens that can attain superpriority over senior mortgages and deeds of trust. Title insurers are the experts on title, and lenders like Wells Fargo Trustee rely upon and pay them handsomely for their expertise and protection.

Title insurers, like Defendants, have acknowledged the coverage that Wells Fargo Trustee claims is due and owing in their manuals.  These insurers themselves developed the trade usage describing the endorsements at issue in this case as providing coverage to an insured lender for losses caused by the enforcement of an association's superpriority lien.

Fidelity and Fidelity National's coverage position in this specific case is directly at odds with the trade usage they developed globally.  This factual background must be considered when interpreting the title insurance contract drafted and issued by the insurers to Wells Fargo Trustee's predecessor-in-interest.

### *Parties, Jurisdiction and Venue*

1.      Plaintiff Wells Fargo Trustee is a national banking association as that term is defined in the National Bank Act. Wells Fargo Trustee has its main office in California and doing business in Clark County, Nevada.

2.      Defendant Fidelity is a Florida corporation with its principal place of business in Florida and doing business in Washoe County, Nevada.  Fidelity is a wholly owned subsidiary of FNTG Holdings, LLC, a Delaware limited liability company. FNTG Holdings is a 100% wholly owned subsidiary of Fidelity National Financial, Inc., a Delaware corporation that is publicly traded on the New York Stock Exchange under the ticker symbol "FNF."

3.      Defendant Fidelity National is a Nebraska corporation with its principal place of business in Florida and doing business in Clark County, Nevada.  Fidelity National is a wholly owned subsidiary of Fidelity. Fidelity National is the successor-in-interest to United Capital Title Insurance Company, who issued the policy.

4.      Defendant Land Title is a Nevada corporation with its principal place of business in Nevada, and doing business in Clark County, Nevada. Upon information and belief, Land Title is a wholly-owned subsidiary of Fidelity and Fidelity National.

5.      Wells Fargo Trustee does not know the true names, capacities or bases of liability of fictitious defendants sued as Does I through X and Roe Corporations XI through XX, inclusive (collectively "fictitious Defendants"). Each fictitiously named defendant is in some way liable to Wells Fargo Trustee. Wells Fargo Trustee will amend this Complaint to reflect the true names of said defendants when the same have been ascertained.

6.      This matter is exempt from Arbitration as Wells Fargo Trustee has requested a declaration that the Policy provided coverage for all losses or damages, up to the Amount of Insurance, sustained by Wells Fargo Trustee as a result of the HOA's foreclosure sale.

7.      This Court has personal jurisdiction over Defendants because they have engaged in the business of issuing title insurance policies insuring deeds of trust on land located in the State of Nevada and therefore have sufficient contacts with the State to have availed themselves of the State's jurisdiction.

8.      This Court has personal jurisdiction over Fidelity because it has purposefully availed itself of this forum by intentionally directing its subsidiaries to tortiously deny coverage under the insurance policies described below and by making or facilitating the coverage decisions of Fidelity National regarding thousands of claims upon policies affecting insured interests on real property located in Nevada.

9.      Venue is appropriate in this Court because this judicial district is where a substantial part of the events giving rise to Wells Fargo Trustee's claims took place, and it is the location of the property subject to the insured deed of trust that is at the core of this lawsuit.

### *Nature of Title Insurance*

10.      A title insurance policy is a contract through which the insurer is paid one sum in consideration for agreeing to indemnify the insured up to a specified amount against loss caused by encumbrances upon or defects in the title to real property in which the insured has an interest.

11.      Lenders such as Wells Fargo Trustee often seek to obtain title insurance policies in connection with loans they advance that are secured by interests in real property. The title insurance policy generally protects the lender against risks associated with loss of title or practical use of the property, subject to the policy's terms, exclusions, and conditions.

12.      This lawsuit concerns the issuance of a title insurance policy in favor of the original lender, Argent Mortgage Company LLC, its successors and assigns.[1] Wells Fargo Trustee is the insured entity under the Policy.

13.      Before 2014, Fidelity National, and other companies owned by Fidelity, issued to Wells Fargo Trustee (or Wells Fargo Trustee's predecessors-in-interest) a number of title insurance policies.

14.      The large majority of insurance policies issued by Fidelity National and its issuing agents, like Land Title, use standard forms promulgated by the American Land Title Association ("ALTA") and the California Land Title Association ("CLTA").

15.      ALTA and CLTA are trade groups made up of representatives from the major title insurance underwriters and issuers, including Fidelity National.

16.      These standard ALTA and CLTA forms are used by multiple title insurers, which publish guides concerning the coverage (and exceptions thereto) provided by the standard policy. The standard ALTA policy form has been revised from time to time, including changes in 1992, 2006, and 2012.

17.      There are a number of ALTA standardized endorsement forms that can be issued with the standard policy to modify the scope of coverage available.  Defendants have also used CLTA standardized endorsement forms from time to time.

18.      Non-party Chicago Title Insurance Company, who is also a subsidiary of Fidelity, issued a 2013 Endorsement Manual which states that "endorsements will provide additional

---

[1] A true and correct copy of the Title Insurance Policy is attached as **Exhibit 1**. *See id.* at pp. 2 and 5, Schedule A.

coverage for matters which would ordinarily be excluded by the Exclusions From Coverage, or excepted from coverage shown in Schedule B of" a title insurance policy.[2]

19. This is consistent with trade usage of the term "endorsement" among title insurers and their insureds. *See, e.g.*, Joyce D. Palomar, *Title Insurance Law* § 9:1 (2013-14 ed.) (explaining that endorsements serve two primary purposes: (1) "they may provide affirmative coverage for facts that exist in a transaction which standard title insurance policies have not traditionally addressed," or (2) they "may 'insure over' or modify the effect of preprinted policy exclusions or exceptions").

20. Lenders commonly request that title insurers issue ALTA Endorsement Form 9 ("Form 9"), or its CLTA equivalent, CLTA Endorsement Form 100 ("Form 100"). These "comprehensive" endorsements provide a range of guarantees to the insured relating to the existence of covenants, conditions, or restrictions affecting or governing the property which could cause damage to the insured lender's interest at the time the policy is issued or in the future.

21. Form 100 is the equivalent of Form 9.[3]

22. It is commonly understood between title insurers and their insureds that Form 9/Form 100 "[p]rovides comprehensive coverage for [an] insured ALTA lender against loss by reason of present *or future* [covenants, conditions and restrictions] violations[.]"[4]

23. Lenders also request that title insurers issue CLTA Endorsement Form 100.2 ("Form 100.2"). This endorsement also provides a range of guarantees to the insured relating to the existence of covenants, conditions, or restrictions affecting or governing the property which could cause damage to the insured lender's interest at the time the policy is issued or in the future.

24. Fidelity exerts control over its subsidiaries, including Fidelity National, by determining the terms and conditions upon which they will insure title to real property, dictating policies and procedures that govern how they will evaluate claims, and directing them to deny certain categories of claims.

---

[2] A true and correct copy of Chicago Title's 2013 Endorsement Manual is attached as **Exhibit 2**.
[3] *See id.* at 3.
[4] A true and correct copy of Fidelity's Endorsement Guide is attached as **Exhibit 3** (emphasis added).

25.     Fidelity's Claims Department is based out of two locations in Omaha, Nebraska and Jacksonville, Florida. The Claims Department processes claims submitted under title insurance policies underwritten by all of Fidelity's wholly owned subsidiaries, including Fidelity National. To promote consistent coverage positions among its subsidiaries, Fidelity provides its Claims Department with instructions and other claims handling guidance, including directives as to which position the subsidiaries should take as to coverage on a claim.

***Fidelity National and Land Title Issued Policies Understood to Cover Nevada Superpriority Liens***

26.     In 1982, the Uniform Law Commission promulgated the Uniform Common Interest Ownership Act ("UCIOA"). UCIOA provided a number of standardized terms governing the formation of common interest associations, including condominium associations and homeowners associations.

27.     As relevant here, UCIOA provided that homeowners associations' covenants, conditions, and restrictions included a "superpriority" lien for unpaid assessments, which came into existence when the association was formed (i.e., when its declaration of covenants, conditions, and restrictions were recorded), and would take priority over a subsequently recorded mortgage or deed of trust even if no assessments were due at the time the mortgage or deed of trust was recorded.

28.     In 1991, the Nevada Legislature adopted the 1982 version of UCIOA, codifying it in Chapter 116 of the Nevada Revised Statutes.

29.     Chapter 116 includes NRS 116.3116, which, at the time of the events relevant to this suit, stated in relevant part:

> 1.   The association has a lien on a unit for any construction penalty that is imposed against the unit's owner pursuant to NRS 116.310305, any assessment levied against that unit or any fines imposed against the unit's owner from the time the construction penalty, assessment or fine becomes due. . . .
>
> 2.   A lien under this section is prior to all other liens and encumbrances on a unit except:
> . . .

(b) A first security interest on the unit recorded before the date on which the assessment sought to be enforced became delinquent . . . ;

. . .

The lien is also prior to all security interests described in paragraph (b) to the extent of any charges incurred by the association on a unit pursuant to NRS 116.310312 and to the extent of the assessments for common expenses based on the periodic budget adopted by the association pursuant to NRS 116.3115 which would have become due in the absence of acceleration during the 9 months immediately preceding institution of an action to enforce the lien . . . .

. . .

4. Recording of the declaration constitutes record notice and perfection of the lien. No further recordation of any claim of lien for assessment under this section is required.

30.     Under NRS 116.3116, from the time an association's covenants, conditions, and restrictions are recorded, the properties governed by the association are encumbered by a lien that secures all assessments.  Chapter 116 does not require that an association record a separate lien before the lien is foreclosed.

31.     As part of its adoption of UCIOA, the Nevada Legislature also enacted NRS 116.1104:

Except as expressly provided in this chapter, [NRS 116's] provisions may not be varied by agreement, and rights conferred by it may not be waived. Except as otherwise provided in paragraph (b) of subsection 2 of NRS 116.12075, a declarant may not act under a power of attorney, or use any other device, to evade the limitations or prohibitions of this chapter or the declaration.

32.     The Nevada Legislature also enacted NRS 116.1206(1):

Any provision contained in a declaration, bylaw or other governing document of a common-interest community that violates the provisions of this chapter shall be deemed to conform with those provisions by operation of law, and any such declaration, bylaw or other governing document is not required to be amended to conform to those provisions.

33.     Defendants and other title insurers were aware of Nevada's adoption of NRS 116, including its provision of a "superpriority" lien in a homeowners association's covenants, conditions, and restrictions.

34.     Defendants and other title insurers believed they could be liable for an insured's losses caused by the enforcement of an association's superpriority lien if the policy at issue contained in Form 9/Form 100 and Form 100.2.

35.     On information and belief, between 1991 and 2014, Defendants provided instructions to their issuing agents to modify Form 9/Form 100 before issuing any policy in Nevada for a property governed by a homeowners association in recognition of the coverage provided under these forms.

36.     In 2007, non-party LandAmerica Financial Group, Inc. issued to its subsidiaries, subsidiaries which have since been acquired by Fidelity, an Underwriting Manual which quotes Paragraph 1(a) of Form 9 and provides the following underwriting guidelines for issuing a policy with Form 9:[5]

> 1.    Any incorrectness in the assurance that, at Date of Policy:
>
>    a)    There are no covenants, conditions or restrictions under which the lien of the mortgage referred to in Schedule A can be divested, subordinated or extinguished, or its validity, priority or enforceability impaired.
>
> To give this coverage, the underwriter must review all covenants, conditions and restriction listed in the title report to determine if there is language which could result in forfeiture, reversion or other impairment. Note that other impairment is added to traditional forfeiture or reversion. This includes a provision permitting a home owners or civic association to levy an assessment, secured by a lien with priority over the insured deed of trust. Under the Property Owners Association Act, 55-508, et seq., some owners associations can levy for limited purposes, with limited super-priority.

37.     Defendants have published and/or follow similar underwriting manuals and instructions indicating that Paragraph 1(a) of Form 9/Form 100 provides coverage for losses due to "provision[s] [in recorded covenants, conditions and restrictions] permitting a home owners or civic association to levy an assessment, secured by a lien with priority over the insured deed of trust."

38.     From 1991 until the present, Defendants have provided endorsement manuals for their issuing agents explaining the scope of coverage provided by Form 9/Form 100 and Form 100.2.

39.     On information and belief, Defendants' pre-2012 endorsement manuals informed their issuing agents that Form 9/Form 100 and Form 100.2 would provide coverage to an insured

---

[5] A true and correct copy of LandAmerica's Underwriting Manual is attached as **Exhibit 4**.

that suffered loss or damage due to an association's lien for assessments that became delinquent after the date of policy.

40.     Even after the amendments to Form 9/Form 100, however, Defendants have promulgated endorsement manuals indicating that the operative language in earlier versions of the forms – including the earlier version of Form 100 at issue in this case – would provide coverage to an insured for losses or damages suffered as a result of the enforcement of an association's superpriority lien.

41.     In the 2013 Endorsement Manual that Fidelity provided for the use of all of its subsidiary underwriters and their agents, Fidelity explained that certain language from Form 9/Form 100 should not be used in policies where "a FUTURE violation might result in the loss of priority or enforceability of the lien of the Insured Mortgage," indicating Fidelity's belief that the language created coverage for the insured.[6]

42.     Contemporary trade usage describing the terms and scope of Form 9/Form 100 indicates that those endorsements provide coverage for an insured lender in the event that covenants, conditions, and restrictions of record at the date of the policy allow an association's lien to take priority over the insured mortgage or deed of trust.  *See, e.g.*, Barlow Burke, LAW OF TITLE INSURANCE § 10.05[B] (3d ed., 2002 Supp.) (in describing Form 9: "A second type of endorsement of interest to an insured lender is one covering the loss of lien priority because of the enforcement of a private covenant applicable to the title. … The priority of these covenants, restrictions, and conditions is particularly important to mortgage lenders with loan policies because their supporting documents, also recorded, typically include the power to compel the payment of amounts for the maintenance and repair of the common facilities in a large subdivision.  Often the exercise of these maintenance and repair functions is put in the hands of a subdivision homeowner's association.  It also typically holds a lien to compel the payment of these amounts, and that lien also has priority over later recorded mortgage."); *id.* ("Future violations [of covenants, conditions, and restrictions] are also insured against, but only to the

---

[6] A true and correct copy of Fidelity's 2013 Endorsement Manual is attached as **Exhibit 5**. *Id.* at 66.

extent that the violations occur between the policy date and the acquisition of title in any foreclosure action, provided the violation causes the insured to be insecure or results in loss or damage to the title acquired by the insured in satisfaction of the secured debt, as where the insured takes a deed in lieu of foreclosure."  (citing ALTA Form 9 ¶¶ 1(a), 2)).

43.     Defendants represented to the public and to Wells Fargo Trustee's predecessor-in-interest that Form 9/Form 100 and Form 100.2 provided coverage against losses caused by an association's superpriority lien.

44.     Despite having actual knowledge of the possibility that Wells Fargo Trustee could lose its security interest in properties that were governed by homeowners associations, at no time did Defendants inform Wells Fargo Trustee or its predecessors-in-interest of the danger of losing its security interests in such properties.

45.     Defendants implemented patterns and practices which call for the denial of claims stemming from Nevada HOA foreclosure sales despite Defendants' actual knowledge that the claims fell under the insuring provisions and policy endorsements.

### *The Nevada Supreme Court Interprets NRS 116.3116*

46.     In *SFR Investments Pool 1, LLC v. U.S. Bank, N.A.*, 130 Nev. 742, 334 P.3d 408 (2014), the Nevada Supreme Court confirmed that a portion of the lien included in a Nevada homeowners association's covenants, conditions, and restrictions has superpriority over a recorded first deed of trust.

47.     The Court further held that NRS 116.1104 rendered inoperative clauses in associations' covenants, conditions, and restrictions that purported to allow senior deeds of trust to survive an association's foreclosure of the superpriority lien provided in its covenants, conditions, and restrictions.

48.     *SFR Investments* confirmed that the proper foreclosure of an association's superpriority lien extinguishes a recorded senior deed of trust on the same property.

49.     Following *SFR Investments*, non-party Stewart Title Guaranty Company ("Stewart Title") issued a bulletin to its agents in Nevada indicating that "in lieu of issuing a[] [Form 9] for

a lender's policy," its agents should "issue the ALTA 9.10."[7] Additionally, the underwriters were also instructed that "in lieu of issuing an ALTA 5 for a lender's policy" to issue the ALTA 5.1 instead."[8]

50.    Other title insurance companies have issued similar bulletins as a result of the decision in *SFR Investments*.

51.    Upon information and belief, Fidelity and Fidelity National sent similar bulletins to their agents following *SFR Investments*, indicating their belief that Form 9/Form 100 provided coverage for losses caused by superpriority liens.

52.    In *K&P Homes v. Christiana Trust*, 133 Nev. 364, 398 P.3d 292 (2017), the Nevada Supreme Court held that *SFR Investments* "did not create new law or overrule existing precedent; rather, that decision declared what NRS 116.3116 has required since the statute's inception" in 1991.

53.    Under controlling Nevada law, the covenants, conditions, and restrictions at issue here have provided the association with a lien that could attain priority over a senior deed of trust since 1991.

### *Facts Specific to this Case*

54.    This action concerns real property located at 1628 Cordoba Lane, Las Vegas, Nevada 89109, APN 139-19-410-023 ("Property").

55.    The Property is subject to Declaration of Covenants and Restrictions ("CC&Rs") for Wildwood Manor Owners Association ("HOA").[9]

56.    The CC&Rs, including Section 7 creates the HOA's lien and establishes that the owner of property governed by the HOA is liable for the debt of all assessments made pursuant to the Declaration.[10]

57.    Additionally, the Declaration recitals establish the HOA's intent that the covenants in the CC&RS are to run with the land:

---

[7] A true and correct copy of Stewart Title Bulletin NV2014002 is attached as **Exhibit 6**.
[8] *Id.*
[9] A true and correct copy of the HOA's CC&Rs are attached as **Exhibit 7**.
[10] Exhibit 7 at 3.

NOW THEREFOR, Declarant hereby declares that all of the property described shall be held, subject to the following covenants and restrictions, which will run with the land and be binding on Declarant, its successors and all subsequent owners and their successors…[.][11]

58.     Moreover, Section 7 of the CC&Rs specifically states: "The amount of the assessment plus interests, costs, including attorney's fees and paenalties [sic] shall be a lien upon the property assessed…."[12]

59.     Thus, pursuant to the CC&Rs, an owner of property governed by the HOA covenants to pay assessments, and those assessments constitute a charge on the land secured by a continuing lien that has encumbered the property since the CC&Rs were recorded.

60.     Additionally, Section 7 of the CC&Rs states that the lien for unpaid assessments may be enforced by sale by the HOA.[13]

61.     Even though the CC&Rs did not incorporate NRS 116.3116 by reference, the CC&Rs are deemed to "conform" and incorporate NRS 116.3116 by operation of law. *See* NRS 116.1206(1) ("Any provision contained in a declaration, bylaw or other governing document of a common-interest community that violates the provisions of this chapter shall be deemed to conform with those provisions by operation of law, and any such declaration, bylaw or other governing document is not required to be amended to conform to those provisions.").

62.     Thus, the CC&Rs provided the HOA with a superpriority lien over the lien of the insured mortgage as of the Date of Policy.

63.     On or about March 16, 2005, Argent Mortgage Company, LLC ("Lender") provided a $280,000.00 loan to Brian Hee ("Borrower") to finance the purchase of the Property.

64.     By purchasing the Property, Borrower covenanted "to pay to [the HOA] annual assessments or charges[.]"

65.     On March 16, 2005, Borrower executed a deed of trust ("Deed of Trust"), providing a security interest in the Property in favor of Lender.[14]

---

[11] *Id*. at 1.
[12] *Id.* at 3, Section 7.
[13] *Id.* at 4, Section 7.
[14] A true and correct copy of the recorded Deed of Trust is attached as **Exhibit 8**.

66.     The Deed of Trust, along with the promissory note and all indebtedness due thereunder, was subsequently assigned to Wells Fargo Trustee.[15]

67.     As part of the loan origination, Fidelity National and Land Title entered into a contractual relationship with Lender as the insured on a lender's title insurance policy, numbered A92 210014567 ("Policy"), to insure that the Deed of Trust was superior to competing liens, including the HOA's lien.[16]

68.     The Preliminary Title Report, issued by Land Title on its letterhead with a Las Vegas, Nevada, address, expressly states that "Land Title of Nevada, Inc. hereby reports that it is prepared to issue, or cause to be issued, as of the date hereof, a Policy or Policies of Title Insurance…insuring against loss which may be sustained by reason of any defect, lien or encumbrance not shown or referred to as an exception herein[.]"[17]

69.     Defendants are responsible for providing coverage that insured the Deed of Trust in first position over all other liens, and other representations contained in the Policy.

70.     On information and belief, Lender intended that the loan would be transferred to Wells Fargo Trustee shortly after origination and, therefore, intended that all rights, promises and protections guaranteed to it during the escrow and origination process, as reflected in the escrow and origination documents, including but not limited to the Preliminary Title Report, HUD-1 Settlement and Title Policy, would be for the benefit of Wells Fargo Trustee and would transfer to Wells Fargo Trustee as if Wells Fargo Trustee had been a party to the escrow and origination of the loan.

71.     The Policy obligates Fidelity National and Land Title to pay the costs, attorneys' fees, and expenses incurred in defense of the title or the lien of the Deed of Trust, as insured.[18]

72.     The Policy includes a standard endorsement Form 100.[19]

---

[15] A true and correct copy of the recorded Assignment of Deed of Trust is attached as **Exhibit 9**.
[16] *See* **Ex. 1** (Title Policy) at Schedule A.
[17] A true and correct copy of the Preliminary Title Report is attached as **Exhibit 10**.
[18] Ex. 1 at 1.
[19] *See id.* at 9.

73.     Pursuant to Form 100, Fidelity National and Land Title promised to insure Lender and its successors:

against loss or damages which the insured shall sustain by reason of:

1.     The existence of any of the following:

(a) Covenants, conditions, or restrictions under which the lien of the mortgage referred to in Schedule A can be cut off, subordinated, or otherwise impaired.

…

2.     (a) Any future violation on the Land of any covenants, conditions or restrictions occurring prior to acquisition of title to the estate or interest referred to in Schedule A by the insured, provided such violations result in impairment or loss of the lien of the mortgage referred to in Schedule A[.]

74.     The Policy includes a standard endorsement Form 100.2.[20]

75.     Pursuant to Form 100.2, Fidelity National and Land Title promised to insure Lender and its successors:

against loss or damages which the insured shall sustain by reason of:

1.     The existence at Date of Policy of any of the following:
(a) Covenants, conditions or restrictions under which the lien of the mortgage referred to in Schedule A can be divested, subordinated or extinguished, or its validity, priority or enforceability impaired.

2.     Any future violations on the land of any existing covenants, conditions or restrictions occurring prior to the acquisition of the title to the estate or interest in the land by the Insured, provided the violation results in:
(a) Invalidity, loss of priority, or unenforceability of the lien of the insured mortgage

76.     At the time it provided the Policy to Lender, Fidelity National and Land Title were aware of the HOA's CC&Rs, the HOA's lien for unpaid assessments, and the fact that the lien could take priority over the Deed of Trust pursuant to NRS Chapter 116.

77.     In or around 2012, Borrower ceased making payments to the HOA for monthly assessments, in violation of his covenant under Section 7 of the CC&Rs.

---

[20] *See id.* at 14.

78.     On June 12, 2012, the HOA, through its foreclosure agent, Homeowner Association Services, Inc. ("HAS"), recorded a Notice of Claim of Lien – Homeowners Association against the Property ("Notice of Delinquency").[21]  The Notice of Delinquency states that "PURSUANT TO THE PROVISIONS OF THE NEVADA REVISED STATUTES" the HOA "claims a lien" on the Property.[22]

79.     On November 6, 2013, HAS, on behalf of the HOA, recorded a Notice of Default and Election to Sell ("Notice of Default") against the Property.[23]

80.     On April 21, 2014, HAS, on behalf of the HOA, recorded a Notice of Sale.[24]

81.     On May 8, 2014, the HOA sold the Property at foreclosure, conveying it to Star Golden Enterprises, LLC ("HOA Buyer") for the amount of $30,000.00 ("HOA Sale").[25]  The Trustee's Deed Upon Sale confirms that the Property was conveyed to the HOA Buyer pursuant to NRS Chapter 116 and the CC&Rs.[26]

82.     On August 27, 2014, the HOA Buyer filed a Complaint against Wells Fargo Trustee in the Eighth Circuit District Court, Clark County Nevada, Case No. A-14-706221-C, seeking a declaration that the Deed of Trust was extinguished by the HOA Sale.[27] Wells Fargo Trustee filed an answer and counterclaims seeking a declaration that the Deed of Trust was not extinguished by the HOA Sale.[28] On August 3, 2015, the HOA Buyer filed a Motion for Summary Judgment which was granted. Wells Fargo Trustee subsequently appealed the district court's order granting HOA Buyer's Motion for Summary Judgment to the Nevada Supreme Court as Case No. 70637 ("Litigation").

83.     The litigation was subsequently settled and, as a result, Wells Fargo Trustee reconveyed its Deed of Trust.

---

[21] A true and correct copy of the Notice of Delinquency is attached as **Exhibit 11**.
[22] *See id.*
[23] A true and correct copy of the Notice of Default is attached as **Exhibit 12**.
[24] A true and correct copy of the Notice of Sale is attached as **Exhibit 13**.
[25] A true and correct copy of the Trustee's Deed Upon Sale is attached as **Exhibit 14**.
[26] *Id.*
[27] A true and correct copy of the Quiet Title Complaint is attached as **Exhibit 15**.
[28] A true and correct copy of Wells Fargo Trustee's Answer and Counterclaim is attached as **Exhibit 16.**

84.     As of the Date of Policy, there existed "[c]ovenants, conditions, or restrictions under which the [Deed of Trust] c[ould] be cut off, subordinated, or otherwise impaired,"[29] including the payment covenant contained in Sections 7 of the HOA's CC&Rs.

85.     The HOA Sale, conducted "pursuant to the powers conferred" by the HOA's CC&Rs, resulted in the purported extinguishment of the Deed of Trust.

86.     Wells Fargo Trustee has suffered losses or damages as a result of "future" (i.e., post-Date of Policy) "violation[s] on the land of" the HOA's CC&Rs – including Borrower's violation of his covenant to pay assessments[30] – which occurred prior to Wells Fargo Trustee's acquisition of title to the Property and resulted in the "impairment or loss of the lien" of the Deed of Trust.[31]

87.     Additionally, Wells Fargo Trustee has suffered loss or damage sustained by reason of the HOA's priority lien provided for in the HOA's CC&Rs over the Deed of Trust.

88.     On April 20, 2017 Wells Fargo Trustee submitted a claim under the Policy to Fidelity National's predecessor United Capital Title Insurance Company ("Claim").[32] In its Claim, Wells Fargo Trustee identified the Policy provisions that provided coverage for losses caused by the HOA's foreclosure of its purportedly senior lien and requested that the Company fulfill its obligations to cure the title issues and indemnify Wells Fargo Trustee against losses.[33]

89.     On May 25, 2017 Anneliese Czarnick Claims Counsel for Fidelity National and Fidelity, sent Wells Fargo Trustee's counsel a letter denying coverage based on Exclusion 3(d) of the Policy, that Form 100.2 was inapplicable, that the CC&Rs were excepted from coverage under Schedule B Exception No. 5, and that notice was not timely provided under Section 3 of the Policy.[34]

---

[29] *See* **Ex. 1** (Title Policy), at Paragraph 1(a) of Form 100.
[30] *See* **Ex. 7** (CC&Rs), at 18.
[31] *See* **Ex. 1** (Title Policy), at Paragraph 2(a) of Form 100.
[32] A true and correct copy of Wells Fargo Trustee's claim is attached as **Exhibit 17**.
[33] *Id.*
[34] A true and correct copy of Fidelity National and Fidelity's denial letter is attached as **Exhibit 18**.

90.     Nevada law and the CC&Rs establish that the HOA's priority lien arises upon the recording of the HOA's CC&Rs.

91.     Because the CC&Rs were recorded prior to Date of Policy, Paragraph 2(a) of Form 100 extends coverage of the Claim.

92.     Because the CC&Rs were recorded prior to the Date of Policy, Paragraph 1(a) and 2(a) of Form 100.2 extend coverage of the Claim.

93.     The Trustee's Deed stated the HOA's foreclosure sale was conducted "pursuant to the powers conferred" by NRS 116 and the HOA's CC&Rs.[35]

94.     Schedule B and Exclusion 3(d) cannot be interpreted to remove coverage provided by Form 100. *See Nat'l Union Fire Ins. Co. of the State of Pa., Inc. v. Reno's Exec. Air, Inc.*, 100 Nev. 360, 365 (1984) ("Clauses providing coverage are broadly interpreted so as to afford the greatest possible coverage to the insured, [and] clauses excluding coverage are interpreted narrowly against the insurer.").

95.     As stated above in Paragraphs 24 and 25, Fidelity's Claims Department handles claims submitted to each of Fidelity's subsidiaries, including Fidelity National. By managing the claims submitted to its subsidiaries, Fidelity effectively directs its subsidiaries' review of claims and its subsidiaries' coverage positions.

96.     On information and belief, Defendants developed specific coverage positions and claims handling guidance for claims related to Nevada association foreclosure sales.

97.     Defendants implemented and engaged in patterns and practices which call for the denial of claims stemming from Nevada HOA foreclosure sales despite Defendants' actual knowledge that the claims fell under the insuring provisions and policy endorsements.  These patterns and practices demonstrate that Defendants did not simply make a reasonable mistake, but engaged in a systemic and reckless and/or intentional practice of mishandling and denying otherwise valid claims in order to avoid their obligations.

---

[35] *See* **Ex. 13** (Foreclosure Deed).

98.     On information and belief, the coverage positions as to such claims nominally taken by Defendants and its affiliates reflect the claims handling and coverage positions adopted by Fidelity.

99.     Because Defendants disregard their status as distinct organizations in the handling of claims, Defendants are alter egos for the purpose of liability related to issuance of the Policy and their handling of Wells Fargo Trustee's Claim.

100.    Defendants are responsible for the acts and omissions related to the Policy because Defendants acted or failed to act at one another's direction. Additionally, because Fidelity National and Land Title entered into a contractual relationship with Wells Fargo Trustee's predecessor in interest to procure coverage of the priority of the Deed of Trust over the HOA's lien—to the extent coverage is not afforded under the Policy, Fidelity National and Land Title are the alter egos of Fidelity as a result of its failure to procure coverage as requested.

101.    Because Fidelity National and Land Title breached their contract with Wells Fargo Trustee's predecessor-in-interest and made material representations to the Insured, Fidelity National and Land Title are the alter egos of Fidelity for the purpose of liability.

102.    To the extent the Defendants are not alter-egos, Defendants were involved in a joint venture that subjects Fidelity and the other Defendants to liability equal to that of Fidelity National and Land Title. The individuals responsible for handling Wells Fargo Trustee's Claim were/are employed by or otherwise directed by Fidelity.  Fidelity has a vested pecuniary interest in the outcome of Fidelity National's claim decisions. Fidelity was further responsible for the development of Fidelity National and Land Title's claim-handling and/or underwriting practices, and for otherwise directing which policies were sold to whom and how claims were to be handled.

## FIRST CAUSE OF ACTION
### (Declaratory Judgment – all Defendants)

103.    The allegations in Paragraphs 1 through 102 above are expressly incorporated by reference.

104.    This Court has the power and authority to declare Wells Fargo Trustee's and Defendants' rights and legal relations in connection with the Policy.

105.     An actual controversy has arisen between Wells Fargo Trustee, on the one hand, and Defendants, on the other, as to whether the Policy provides coverage to Wells Fargo Trustee for losses caused by the HOA's foreclosure of its purportedly senior lien.

106.     The Policy states that Fidelity National and Land Title insured Lender and its successors, including Wells Fargo Trustee:

> against loss or damages which the insured shall sustain by reason of:
>
> 1.     The existence of any of the following:
>
> (a) Covenants, conditions, or restrictions under which the lien of the mortgage referred to in Schedule A can be cut off, subordinated, or otherwise impaired.
>
> …
>
> 2.     (a) Any future violation on the Land of any covenants, conditions or restrictions occurring prior to acquisition of title to the estate or interest referred to in Schedule A by the insured, provided such violations result in impairment or loss of the lien of the mortgage referred to in Schedule A[.]

107.     The Policy also states that Fidelity National and Land Title promised to insure Lender and its successors:

> against loss or damages which the insured shall sustain by reason of:
>
> 1.     The existence at Date of Policy of any of the following:
> (a) Covenants, conditions or restrictions under which the lien of the mortgage referred to in Schedule A can be divested, subordinated or extinguished, or its validity, priority or enforceability impaired.
>
> 2.     Any future violations on the land of any existing covenants, conditions or restrictions occurring prior to the acquisition of the title to the estate or interest in the land by the Insured, provided the violation results in:
> (a) Invalidity, loss of priority, or unenforceability of the lien of the insured mortgage

108.     The foreclosure of the superpriority portion of the HOA's lien imposed by the CC&Rs would "cut off" and "impair[]" the Deed of Trust.

109. Thus, as of the Date of Policy, there existed "[c]ovenants, conditions, or restrictions under which the [Deed of Trust]…[could] be divested, subordinated, or extinguished."[36]

110. After the Date of Policy, Borrower violated his covenant to pay HOA assessments. The CC&Rs states that a homeowner's covenant to pay assessments is an obligation that runs with the Property.[37]

111. The Borrower's post-Policy violation of his payment covenant thus constituted a "future violation[] on the land of [the HOA's] covenants, conditions or restrictions," which occurred "prior to the acquisition of title to the" Property by Wells Fargo Trustee.[38]

112. The foreclosure of that lien purportedly "result[ed] in impairment and loss" of the Deed of Trust.[39]

113. For these reasons, under Paragraphs 1(a) and 2(a) of Form 100, and Paragraphs 1(a) and 2(a) of Form 100.2, the Policy provides coverage for all losses and damages sustained by HSBC Bank Trustee as a result of the HOA Sale.

114. Additionally, the insured complied with all material obligations under the Policy, including Condition 3.

115. Fidelity National, acting at Fidelity's direction, nevertheless denied coverage under the Policy.[40]

116. When the Policy was issued, it was the intent of Wells Fargo Trustee's predecessor-in-interest, and Fidelity National and Land Title that Form 100 and Form 100.2 would provide coverage for losses or damages sustained as a result of the CC&Rs.

117. Contemporary trade usage describing the terms and scope of Form 100 indicates the endorsement provides coverage for an insured lender for losses and damages sustained as a result of covenants, conditions, and restrictions.

---

[36] *See* **Ex. 1** (Title Policy), at Paragraph 1(a) of Form 100.
[37] *See* **Ex. 7** (CC&Rs), at 2.
[38] *See* **Ex. 1** (Title Policy), at Paragraph 2(a) of Form 100.
[39] *See id.*
[40] *See* **Ex. 18** (Fidelity National's Denial Letter).

118.     The Schedule B Exceptions and the Exclusions under the Policy cannot be interpreted to remove coverage provided by Form 100.  *See Nat'l Union Fire Ins. Co. of the State of Pa., Inc. v. Reno's Exec. Air, Inc.*, 100 Nev. 360, 365 (1984) ("Clauses providing coverage are broadly interpreted so as to afford the greatest possible coverage to the insured, [and] clauses excluding coverage are interpreted narrowly against the insurer.").

119.     Wells Fargo Trustee is entitled to a declaration that the Policy provided coverage for all losses or damages, up to the Amount of Insurance, sustained by Wells Fargo Trustee as a result of the HOA's foreclosure sale.

120.     Wells Fargo Trustee was required to retain counsel to prosecute this action and is entitled to recover its corresponding attorneys' fees.

## SECOND CAUSE OF ACTION
### (Breach of Contract – all Defendants)

121.     The allegations in Paragraphs 1 through 120 above are expressly incorporated by reference.

122.     Wells Fargo Trustee is the insured under the Policy by reason of an assignment of all rights and interest under the Deed of Trust and indebtedness under the promissory note secured by the Deed of Trust.

123.     Wells Fargo complied with all material conditions under the Policy, including Condition 3.

124.     As described above, Fidelity National and Land Title issued the Policy Wells Fargo's Trustee's predecessor-in-interest, which provides coverage for any loss or damage sustained by Wells Fargo Trustee as a result of covenants, conditions, or restrictions under which the Deed of Trust could "be divested, subordinated or extinguished or its validity, priority or enforceability impaired," or "any future violations on the land of any covenants, conditions, or restrictions" which result in the impairment or loss of the Deed of Trust.

125.     The Policy, issued by Fidelity National and Land Title, also provides coverage for any loss or damage sustained by reason of the priority of the HOA's lien provided for in the CC&Rs over the lien of the insured mortgage.

126.    The Policy gave rise to a duty to defend Wells Fargo Trustee in any litigation arising from a challenge to the validity or priority of Wells Fargo Trustee's Deed of Trust and to either cure the defects on title or Wells Fargo Trustee for any losses it sustained as a result of the loss of priority or extinguishment of its Deed of Trust.

127.    As described above in Paragraphs 95-102, Defendants are alter egos for the purpose of liability for the handling and denial of Wells Fargo Trustee's Claim, or are otherwise engaged in a joint venture.

128.    Additionally, because Fidelity National and Land Title entered into a contractual relationship with Wells Fargo Trustee's predecessor-in-interest in order to insure the Deed of Trust in senior position over the HOA's Lien, to the extent coverage is *not afforded* under the Policy, Fidelity National and Land Title breached their contract with Wells Fargo Trustee's predecessor.

129.    As described above in Paragraphs 83-87, Wells Fargo Trustee has suffered an insured loss or damages under the Policy.

130.    Fidelity National – acting at Fidelity's direction – breached the Policy by refusing to continue to provide a defense to the Litigation, refusing to indemnify Wells Fargo Trustee for its covered losses, and refusing to attempt to cure the covered title defect.

131.    These breaches of the Policy at Fidelity's direction have proximately resulted in general and special damages to Wells Fargo Trustee, including attorneys' fees and litigation expenses, which Wells Fargo Trustee has incurred and will continue to incur.  Such damages and expenses should be paid by the Insurer under the Policy's terms.

132.    As a result of these breaches of the Policy at Fidelity's direction, Wells Fargo Trustee was required to retain counsel to prosecute this action and is entitled to recover its corresponding attorneys' fees.

### **THIRD CAUSE OF ACTION**
**(Bad Faith / Breach of the Covenant of Good Faith and Fair Dealing – all Defendants)**

133.    The allegations in Paragraphs 1 through 132 above are expressly incorporated by reference.

134.    As described above in Paragraphs 95-102, Defendants are alter egos for the purpose of liability for the handling of Wells Fargo Trustee's Claim, or are otherwise engaged in a joint venture.

135.    All Defendants owed Wells Fargo Trustee a duty to act in good faith and in a manner consistent with fair dealing in their considerations of Wells Fargo Trustee's claims under the Policy, including a duty of candor and to avoid denials of claims without reasonable basis.

136.    All Defendants knew that industry materials and expert commentators routinely described the "comprehensive" Form 100 endorsement as providing coverage for an insured that suffered a loss as a result of the enforcement of a superpriority lien provided for in an association's covenants, conditions, and restrictions at the time the Policy was issued.

137.    All Defendants knew that their own underwriting manuals, bulletins, and endorsement guides indicated that Form 100 and Form 100.2 provided coverage to an insured that suffered a loss as a result of the enforcement of a superpriority lien provided in an association's covenants, conditions, and restrictions at the time the Policy was issued.

138.    In light of the foregoing, and on information and belief, Fidelity National and Land Title issued the Policy with the belief that it would provide coverage if the Deed of Trust was impaired or extinguished by the enforcement of the HOA's lien.

139.    On information and belief, Defendants knew or had reason to know that Wells Fargo Trustee's predecessor purchased the Policy with the expectation that such coverage would be provided.

140.    On information and belief, Defendants knew or had reason to know that Wells Fargo Trustee's predecessor's expectation was reasonable in light of the trade usage and industry standards regarding Form 100 and Form 100.2.

141.    On information and belief, Defendants knew or had reason to know that the HOA's CC&Rs did not include a mortgage savings clause, yet represented to the Insured that the CC&Rs did protect the Deed of Trust from extinguishment by enforcement of the HOA's lien.

142.    All Defendants acted with malice, fraud, and/or oppression by allowing Wells Fargo Trustee's predecessor to obtain a title insurance policy that included an endorsement known

and described as providing coverage against the enforcement of an association's superpriority lien, then denying coverage for losses arising from the HOA's enforcement of its superpriority lien despite internal documents, guidelines, and bulletins indicating that coverage was due.

143.     Defendants have implemented and engaged in patterns and practices which call for the denial of claims stemming from Nevada HOA foreclosure sales despite Defendants' actual knowledge that the claims fell under the insuring provisions and policy endorsements, including Wells Fargo Trustee's Claim. These patterns and practices demonstrate that Defendants did not simply make a reasonable mistake, but engaged in a systemic and reckless and/or intentional practice of mishandling and denying otherwise valid claims in order to avoid their obligations.

144.     Defendants intentionally breached their duties and acted in bad faith by denying Wells Fargo Trustee's claims for coverage under the Policy.

145.     Wells Fargo Trustee has suffered damages as a result of Defendants' bad faith and breach of their duty of good faith and fair dealing.

146.     As a result of Defendants' bad faith, Wells Fargo Trustee was required to retain counsel to prosecute this action and is entitled to recover its corresponding attorneys' fees.

**FOURTH CAUSE OF ACTION**
**(Deceptive Trade Practices (NRS 41.600 and NRS 598.0915) – all Defendants)**

147.     The allegations in Paragraphs 1 through 146 above are expressly incorporated by reference.

148.     As described above in Paragraphs 95-102, Defendants are alter egos for the purpose of liability for the handling and denial of Wells Fargo Trustee's Claim, or are otherwise engaged in a joint venture.

149.     All Defendants received valuable consideration in exchange for providing the Policy to Wells Fargo Trustee's predecessor.

150.     All Defendants exchanged memoranda, bulletins, underwriting guides, and other communications indicating that Form 100 and Form 100.2 would provide coverage if an insured mortgage lien was impaired or otherwise affected by the enforcement of an association's superpriority lien.

151.    All Defendants knew that public descriptions of Form 100 and Form 100.2 indicated that coverage would be available if an insured mortgage lien was impaired or otherwise affected by the enforcement of an association's superpriority lien.

152.    Defendants knew the Property was subject to the HOA's CC&Rs.

153.    The Policy Wells Fargo Trustee's predecessor-in-interest obtained from Fidelity National and Land Title contained endorsement language plainly intended to provide coverage in the event the Deed of Trust lost priority or was otherwise impaired by operation of the HOA's CC&Rs.

154.    On information and belief, Fidelity National and Land Title knew or had reason to know that the HOA's CC&Rs did not include a mortgage savings clause, yet represented to the Insured that the CC&Rs did protect the Deed of Trust from extinguishment by enforcement of the HOA's lien.

155.    Wells Fargo Trustee relied to its detriment upon Defendant's representations that Form 100 would provide such coverage by originating the mortgage loan in reliance on those representations.

156.    Wells Fargo Trustee relied to its detriment upon Defendant's representations that the CC&Rs contained a mortgage savings clause when in fact the CC&Rs via operation of law and incorporation of NRS 116 by reference, provided that the HOA lien was superior to the Deed of Trust.

157.    By representing that Form 100 and Form 100.2 provided such coverage at origination, then failing to accept coverage under either Form 100 or Form 100.2, Defendants engaged in consumer fraud as that term is defined in NRS 598.0915(5), (15) and NRS 41.600(2)(e) by misrepresenting the quality and characteristics of the Policy furnished to Wells Fargo Trustee's predecessor and making false representations in the transaction.

158.    By representing that Deed of Trust was protected by the mortgage savings clause in the HOA's CC&Rs, then failing to accept coverage under the Policy, Defendants engaged in consumer fraud as that term is defined in NRS 598.0915(5), (15) and NRS 41.600(2)(e) by

misrepresenting the quality and characteristics of the Policy furnished to Wells Fargo Trustee's predecessor and making false representations in the transaction.

159.    Wells Fargo Trustee has suffered damages as a result of Defendants' consumer fraud, including the damages described above in Paragraphs 83-87.

160.    As a result of Defendants' deceptive practices, Wells Fargo Trustee was required to retain counsel to prosecute this action and is entitled to recover its corresponding attorneys' fees.

**FIFTH CAUSE OF ACTION**
**(Violation of NRS 686A.310 – all Defendants)**

161.    The allegations in Paragraphs 1 through 160 above are expressly incorporated by reference.

162.    On information and belief, Fidelity's Claims Department handles claims made on policies underwritten by all of its subsidiaries, including Fidelity National, and directs the coverage positions to be taken by its subsidiaries to promote consistency in claims handling.

163.    As described above in Paragraphs 95-102, Defendants are alter egos for the purpose of liability for the handling and denial of Wells Fargo Trustee's Claim.

164.    Defendants exchanged memoranda, bulletins, underwriting guides, and other communications indicating that Form 100 and Form 100.2 would provide coverage if an insured mortgage lien was impaired or otherwise affected by the enforcement of an association's superpriority lien.

165.    Defendants knew that public descriptions of Form 100 and Form 100.2 indicated that coverage would be available if an insured mortgage lien was impaired or otherwise affected by the enforcement of an association's superpriority lien.

166.    Defendants represented to the Insured that Form 100 and Form 100.2 provided coverage in the event that the Deed of Trust lost priority or was otherwise impaired by operation of the HOA's CC&Rs.

167.    Defendants represented to the Insured that the Deed of Trust was protected by the mortgage savings clause in the HOA's CC&Rs when in fact the CC&Rs provide for an HOA lien that could extinguish a first deed of trust.

168.    The Insured relied to its detriment upon Defendants' knowing misrepresentations regarding the protection afforded by the CC&Rs.

169.    The Insured relied to its detriment upon Defendant's knowing misrepresentations regarding the characteristics and scope of coverage provided by the Policy with Form 100 and Form 100.2 by originating the mortgage loan in reliance on those misrepresentations.

170.    By representing that Form 100 and Form 100.2 provided coverage in the event the Deed of Trust lost priority or was otherwise impaired by operation of the HOA's CC&Rs, and then denying coverage for losses related to the HOA's foreclosure sale, Defendants breached NRS 686A.310(1)(a).

171.    In light of Defendants' knowledge that Form 100 and Form 100.2 provided coverage in the event a senior deed of trust was impaired by a Nevada association's superpriority lien, Defendants were required to adopt and implement reasonable claims handling procedures to provide such coverage.  Defendants failed to do so, and instead implemented claims handling procedures that called for the denial of claims under policies with an endorsement Form 100 by insured lenders whose deeds of trust were impaired by Nevada association's liens, in violation of NRS 686A.310(1)(c).

172.    The Insurer's liability under the Policy for the extinguishment of the Deed of Trust was "reasonably clear," as shown by Defendants' internal memoranda, bulletins, underwriting guides, and other communications.  By failing "to effectuate [a] prompt, fair, and equitable settlement[]" of Wells Fargo Trustee's Claim, Defendants violated NRS 686A.310(1)(e).

173.    By compelling Wells Fargo Trustee "to institute litigation to recover amounts due under" the Policy, Defendants violated NRS 686A.310(1)(f).

174.    In light of Defendants' internal documents and representations that Form 100 provided coverage if an insured lien was impaired or otherwise affected by the enforcement of an association's superpriority lien, Defendants' violations of NRS 686A.310 arising for their denial of coverage under the Policy for that exact scenario have been oppressive, willful, and malicious.

175.    Indeed, Defendants implemented patterns and practices which call for the denial of claims stemming from Nevada HOA foreclosure sales, including Wells Fargo Trustee's Claim,

1   despite Defendants' actual knowledge that the claims fell under the insuring provisions and policy

2   endorsements.

3        176.    As a result of Defendants' deceptive practices, Wells Fargo Trustee was required

4   to retain counsel to prosecute this action and is entitled to recover its corresponding attorneys'

5   fees.

6                          **PRAYER FOR RELIEF**

7        WHEREFORE, HSBC Bank Trustee requests that this Court grant judgment in its favor

8   and against the Defendants, and award Wells Fargo Trustee:

9        A.      a declaration establishing (1) that the Policy provided coverage for all losses or

10  damages, up to the Amount of Insurance, sustained by Wells Fargo Trustee as a result of the

11  HOA's foreclosure sale; and (2) which of Defendants is responsible for coverage under the Policy;

12        B.      compensatory damages;

13        C.      punitive damages;

14        D.      attorneys' fees;

15        E.      costs; and

16        F.      any other relief deemed to be just.

17        DATED this 24th day of May, 2021.

18                          WRIGHT, FINLAY & ZAK, LLP

19                          */s/ Christina V. Miller, Esq.*

20                          Darren T. Brenner, Esq.
                               Nevada Bar No. 8386

21                          Christina V. Miller, Esq.
                               Nevada Bar No. 12448

22                          7785 W. Sahara Ave., Suite 200

23                          Las Vegas, NV 89117
                               *Attorneys for Plaintiff, Wells Fargo Bank, N.A., as*

24                          *Trustee for Park Place Securities, Inc. Asset-*
                               *Backed Pass-Through Certificates Series 2005-*

25                          *WHQ2*

26

27

28

# EXHIBIT 1

# EXHIBIT 1

*Hee, Brian*
*PPO54C*



**AMERICAN LAND TITLE ASSOCIATION**
**LOAN POLICY (10-17-92)**

Policy # -A92-  21 0014567

*7405195 4*

# Land Title of Nevada, Inc.

an Issuing Agent for:

U N I T E D   C A P I T A L   T I T L E   I N S U R A N C E   C O M P A N Y™

SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS FROM COVERAGE CONTAINED IN SCHEDULE B AND THE CONDITIONS AND STIPULATIONS, UNITED CAPITAL TITLE INSURANCE COMPANY™, a California corporation, herein called the Company, insures, as of Date of Policy shown in Schedule A, against loss or damage, not exceeding the Amount of Insurance stated in Schedule A, sustained or incurred by the insured by reason of:

1. Title to the estate or interest described in Schedule A being vested other than as stated therein;
2. Any defect in or lien or encumbrance on the title;
3. Unmarketability of the title;
4. Lack of a right of access to and from the land;
5. The invalidity or unenforceability of the lien of the insured mortgage upon the title;
6. The priority of any lien or encumbrance over the lien of the insured mortgage;
7. Lack of priority of the lien of the insured mortgage over any statutory lien for services, labor or material:
   (a) arising from an improvement or work related to the land which is contracted for or commenced prior to Date of Policy; or
   (b) arising from an improvement or work related to the land which is contracted for or commenced subsequent to Date of Policy and which is financed in whole or in part by proceeds of the indebtedness secured by the insured mortgage which at Date of Policy the insured has advanced or is obligated to advance;
8. The invalidity or unenforceability of any assignment of the insured mortgage, provided the assignment is shown in Schedule A, or the failure of the assignment shown in Schedule A to vest title to the insured mortgage in the named insured assignee free and clear of all liens.

The Company will also pay the costs, attorneys' fees and expenses incurred in defense of the title or the lien of the insured mortgage, as insured, but only to the extent provided in the Conditions and Stipulations.

## UNITED CAPITAL TITLE INSURANCE COMPANY™

## Land Title of Nevada, Inc.

an Issuing Agent for:
United Title Insurance Company

By: *Jm Smolen*    President

By: *Kenneth E Span*    Secretary

## EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1. (a) Any law, ordinance or governmental regulation (including but not limited to building and zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating to (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

   (b) Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or a notice of a defect, lien or encumbrance result ing from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

2. Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.

3. Defects, liens, encumbrances, adverse claims or other matters:

   (a) created, suffered, assumed or agreed to by the insured claimant;

   (b) not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy;

   (c) resulting in no loss or damage to the insured claimant;

   (d) attaching or created subsequent to Date of Policy (except to the extent that this policy insures the priority of the lien of the insured mortgage over any statutory lien for services, labor or material); or

   (e) resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the insured mortgage.

4. Unenforceability of the lien of the insured mortgage because of the inability or failure of the insured at Date of Policy, or the inability or failure of any subsequent owner of the indebtedness, to comply with applicable doing business laws of the state in which the land is situated.

5. Invalidity or unenforceability of the lien of the insured mortgage, or claim thereof, which arises out of the transaction evidenced by the insured mortgage and is based upon usury or any consumer credit protection or truth in lending law.

6. Any statutory lien for services, labor or materials (or the claim of priority of any statutory lien for services, labor or materials over the lien of the insured mortgage) aris ing from an improvement or work related to the land which is contracted for and commenced subsequent to Date of Policy and is not financed in whole or in part by pro ceeds of the indebtedness secured by the insured mortgage which at Date of Policy the insured has advanced or is obligated to advance.

7. Any claim, which arises out of the transaction creating the interest of the mortgagee insured by this policy, by reason of the operation of federal bankruptcy, state insol vency, or similar creditors' rights laws, that is based on:

   (a) the transaction creating the interest of the insured mortgagee being deemed a fraudulent conveyance or fraudulent transfer; or

   (b) the subordination of the interest of the insured mortgagee as a result of the application of the doctrine of equitable subordination; or

   (c) the transaction creating the interest of the insured mortgagee being deemed a preferential transfer except where the preferential transfer results from the failure:

      (i) to timely record the instrument of transfer; or

      (ii) of such recordation to impart notice to a purchaser for value or a judgment or lien creditor.

# CONDITIONS AND STIPULATIONS

**1. DEFINITION OF TERMS.**

The following terms when used in this policy mean:

(a) "insured": the insured named in Schedule A. The term "insured" also includes

(i) the owner of the indebtedness secured by the insured mortgage and each suc cessor in ownership of the indebtedness except a successor who is an obligor under the provisions of Section 12(c) of these Conditions and Stipulations (reserving, however, all rights and defenses as to any successor that the Company would have had against any predecessor insured, unless the successor acquired the indebtedness as a purchaser for value without knowledge of the asserted defect, lien, encumbrance, adverse claim or other matter insured against by this policy as affecting title to the estate or interest in the land);

(ii) any governmental agency or governmental instrumentality which is an insurer or guarantor under an insurance contract or guaranty insuring or guaranteeing the indebtedness secured by the insured mortgage, or any part thereof, whether named as an insured herein or not;

(iii) the parties designated in Section 2(a) of these Conditions and Stipulations.

(b) "insured claimant": an insured claiming loss or damage.

(c) "knowledge" or "known": actual knowledge, not constructive knowledge or notice which may be imputed to an insured by reason of the public records as defined in this policy or any other records which impart constructive notice of matters affecting the land.

(d) "land": the land described or referred to in Schedule A, and improvements affixed thereto which by law constitute real property. The term "land" does not include any property beyond the lines of the area described or referred to in Schedule A, nor any right, title, interest, estate or easement in abutting streets, roads, avenues, alleys, lanes, ways or waterways, but nothing herein shall modify or limit the extent to which a right of access to and from the land is insured by this policy.

(e) "mortgage": mortgage, deed of trust, trust deed, or other security instrument.

(f) "public records": records established under state statutes at Date of Policy for the purpose of imparting constructive notice of matters relating to real property to pur chasers for value and without knowledge. With respect to Section 1(a)(iv) of the Exclusions from Coverage, "public records" shall also include environmental protection

liens filed in the records of the clerk of the United States district court for the district in which the land is located.

(g) "unmarketability of the title": an alleged or apparent matter affecting the title to the land, not excluded or excepted from coverage, which would entitle a purchaser of the estate or interest described in Schedule A or the insured mortgage to be released from the obligation to purchase by virtue of a contractual condition requiring the delivery of marketable title.

**2. CONTINUATION OF INSURANCE**

(a) After Acquisition of Title. The coverage of this policy shall continue in force as of Date of Policy in favor of (i) an insured who acquires all or any part of the estate or inter est in the land by foreclosure, trustee's sale, conveyance in lieu of foreclosure, or other legal manner which discharges the lien of the insured mortgage; (ii) a transferee of the estate or interest so acquired from an insured corporation, provided the transferee is the parent or wholly-owned subsidiary of the insured corporation, and their corporate suc cessors by operation of law and not by purchase, subject to any rights or defenses the Company may have against any predecessor insureds; and (iii) any governmental agency or governmental instrumentality which acquires all or any part of the estate or interest pursuant to a contract of insurance or guaranty insuring or guaranteeing the indebted ness secured by the insured mortgage.

(b) After Conveyance of Title. The coverage of this policy shall continue in force as of Date of Policy in favor of an insured only so long as the insured retains an estate or inter est in the land, or holds an indebtedness secured by a purchase money mortgage given by a purchaser from the insured, or only so long as the insured shall have liability by rea son of covenants of warranty made by the insured in any transfer or conveyance of the estate or interest. This policy shall not continue in force in favor of any purchaser from the insured of either (i) an estate or interest in the land, or (ii) an indebtedness secured by a purchase money mortgage given to the insured.

(c) Amount of Insurance. The amount of insurance after the acquisition or after the conveyance shall in neither event exceed the least of:

(i) the Amount of Insurance stated in Schedule A;

(ii) the amount of the principal of the indebtedness secured by the insured mort

gage as of Date of Policy, interest thereon, expenses of foreclosure, amounts advanced pursuant to the insured mortgage to assure compliance with laws or to protect the lien of the insured mortgage prior to the time of acquisition of the estate or interest in the land and secured thereby and reasonable amounts expended to prevent deterioration of improvements, but reduced by the amount of all payments made; or

(iii) the amount paid by any governmental agency or governmental instrumentality, if the agency or instrumentality is the insured claimant, in the acquisition of the estate or interest in satisfaction of its insurance contract or guaranty.

**3. NOTICE OF CLAIM TO BE GIVEN BY INSURED CLAIMANT.**

The insured shall notify the Company promptly in writing (i) in case of any litigation as set forth in Section 4(a) below, (ii) in case knowledge shall come to an insured hereunder of any claim of title or interest which is adverse to the title to the estate or interest or the lien of the insured mortgage, as insured, and which might cause loss or damage for which the Company may be liable by virtue of this policy, or (iii) if title to the estate or interest or the lien of the insured mortgage, as insured, is rejected as unmarketable. If prompt notice shall not be given to the Company, then as to the insured all liability of the Company shall terminate with regard to the matter or matters for which prompt notice is required; provided, however, that failure to notify the Company shall in no case prejudice the rights of any insured under this policy unless the Company shall be prejudiced by the failure and then only to the extent of the prejudice.

**4. DEFENSE AND PROSECUTION OF ACTIONS; DUTY OF INSURED CLAIMANT TO COOPER-ATE.**

(a) Upon written request by the insured and subject to the options contained in Section 6 of these Conditions and Stipulations, the Company, at its own cost and without unreasonable delay, shall provide for the defense of an insured in litigation in which any third party asserts a claim adverse to the title or interest as insured, but only as to those stated causes of action alleging a defect, lien or encumbrance or other matter insured against by this policy. The Company shall have the right to select counsel of its choice (subject to the right of the insured to object for reasonable cause) to represent the insured as to those stated causes of action and shall not be liable for and will not pay the fees of any other counsel. The Company will not pay any fees, costs or expenses incurred by the insured in the defense of those causes of action which allege matters not insured against by this policy.

(b) The Company shall have the right, at its own cost, to institute and prosecute any action or proceeding or to do any other act which in its opinion may be necessary or desirable to establish the title to the estate or interest or the lien of the insured mortgage, as insured, or to prevent or reduce loss or damage to the insured. The Company may take any appropriate action under the terms of this policy, whether or not it shall be liable hereunder, and shall not thereby concede liability or waive any provision of this policy. If the Company shall exercise its rights under this paragraph, it shall do so diligently.

(c) Whenever the Company shall have brought an action or interposed a defense as required or permitted by the provisions of this policy, the Company may pursue any litigation to final determination by a court of competent jurisdiction and expressly reserves the right, in its sole discretion, to appeal from any adverse judgment or order.

(d) In all cases where this policy permits or requires the Company to prosecute or provide for the defense of any action or proceeding, the insured shall secure to the Company the right to so prosecute or provide defense in the action or proceeding, and all appeals therein, and permit the Company to use, at its option, the name of the insured for this purpose. Whenever requested by the Company, the insured, at the Company's expense, shall give the Company all reasonable aid (i) in any action or proceeding, securing evidence, obtaining witnesses, prosecuting or defending the action or proceeding, or effecting settlement, and (ii) in any other lawful act which in the opinion of the Company may be necessary or desirable to establish the title to the estate or interest or the lien of the insured mortgage, as insured. If the Company is prejudiced by the failure of the insured to furnish the required cooperation, the Company's obligations to the insured under the policy shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation, with regard to the matter or matters requiring such cooperation.

**5. PROOF OF LOSS OR DAMAGE.**

In addition to and after the notices required under Section 3 of these Conditions and Stipulations have been provided the Company, a proof of loss or damage signed and sworn to by the insured claimant shall be furnished to the Company within 90 days after the insured claimant shall ascertain the facts giving rise to the loss or damage. The proof of loss or damage shall describe the defect in, or lien or encumbrance on the title, or other matter insured against by this policy which constitutes the basis of loss or damage and shall state, to the extent possible, the basis of calculating the amount of the loss or damage. If the Company is prejudiced by the failure of the insured claimant to provide the required proof of loss or damage, the Company's obligations to the insured under the policy shall terminate, including any liability or obligation to defend, prosecute,

or continue any litigation, with regard to the matter or matters requiring such proof of loss or damage.

In addition, the insured claimant may reasonably be required to submit to examination under oath by any authorized representative of the Company and shall produce for examination, inspection and copying, at such reasonable times and places as may be designated by any authorized representative of the Company, all records, books, ledgers, checks, correspondence and memoranda, whether bearing a date before or after Date of Policy, which reasonably pertain to the loss or damage. Further, if requested by any authorized representative of the Company, the insured claimant shall grant its permission, in writing, for any authorized representative of the Company to examine, inspect and copy all records, books, ledgers, checks, correspondence and memoranda in the custody or control of a third party, which reasonably pertain to the loss or damage. All information designated as confidential by the insured claimant provided to the Company pursuant to this Section shall not be disclosed to others unless, in the reasonable judgment of the Company, it is necessary in the administration of the claim. Failure of the insured claimant to submit for examination under oath, produce other reasonably requested information or grant permission to secure reasonably necessary information from third parties as required in this paragraph, unless prohibited by law or governmental regulation, shall terminate any liability of the Company under this policy as to that claim.

**6. OPTIONS TO PAY OR OTHERWISE SETTLE CLAIMS; TERMINATION OF LIABILITY.**

In case of a claim under this policy, the Company shall have the following additional options:

**(a) To Pay or Tender Payment of the Amount of Insurance or to Purchase the Indebtedness.**

(i) to pay or tender payment of the amount of insurance under this policy together with any costs, attorneys' fees and expenses incurred by the insured claimant, which were authorized by the Company, up to the time of payment or tender of payment and which the Company is obligated to pay; or

(ii) to purchase the indebtedness secured by the insured mortgage for the amount owing thereon together with any costs, attorneys' fees and expenses incurred by the insured claimant which were authorized by the Company up to the time of purchase and which the Company is obligated to pay.

If the Company offers to purchase the indebtedness as herein provided, the owner of the indebtedness shall transfer, assign, and convey the indebtedness and the insured mortgage, together with any collateral security, to the Company upon payment therefor.

Upon the exercise by the Company of either of the options provided for in paragraphs a(i) or (ii), all liability and obligations to the insured under this policy, other than to make the payment required in those paragraphs, shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation.

**(b) To Pay or Otherwise Settle With Parties Other than the Insured or With the Insured Claimant.**

(i) to pay or otherwise settle with other parties for or in the name of an insured claimant any claim insured against under this policy, together with any costs, attorneys' fees and expenses incurred by the insured claimant which were authorized by the Company up to the time of payment and which the Company is obligated to pay; or

(ii) to pay or otherwise settle with the insured claimant the loss or damage provided for under this policy, together with any costs, attorneys' fees and expenses incurred by the insured claimant which were authorized by the Company up to the time of payment and which the Company is obligated to pay.

Upon the exercise by the Company of either of the options provided for in paragraphs b(i) or (ii), the Company's obligations to the insured under this policy for the claimed loss or damage, other than the payments required to be made, shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation.

**7. DETERMINATION AND EXTENT OF LIABILITY.**

This policy is a contract of indemnity against actual monetary loss or damage sustained or incurred by the insured claimant who has suffered loss or damage by reason of matters insured against by this policy and only to the extent herein described.

(a) The liability of the Company under this policy shall not exceed the least of:

(i) the Amount of Insurance stated in Schedule A, or, if applicable, the amount of insurance as defined in Section 2 (c) of these Conditions and Stipulations;

(ii) the amount of the unpaid principal indebtedness secured by the insured mortgage as limited or provided under Section 8 of these Conditions and Stipulations or as reduced under Section 9 of these Conditions and Stipulations, at the time the loss or damage insured against by this policy occurs, together with interest thereon; or

(iii) the difference between the value of the insured estate or interest as insured and the value of the insured estate or interest subject to the defect, lien or encumbrance insured against by this policy.

(b) In the event the insured has acquired the estate or interest in the manner described

in Section 2(a) of these Conditions and Stipulations or has conveyed the title, then the liability of the Company shall continue as set forth in Section 7(a) of these Conditions and Stipulations.

(c) The Company will pay only those costs, attorneys' fees and expenses incurred in accordance with Section 4 of these Conditions and Stipulations.

## 8. LIMITATION OF LIABILITY.

(a) If the Company establishes the title, or removes the alleged defect, lien or encumbrance, or cures the lack of a right of access to or from the land, or cures the claim of unmarketability of title, or otherwise establishes the lien of the insured mortgage, all as insured, in a reasonably diligent manner by any method, including litigation and the completion of any appeals therefrom, it shall have fully performed its obligations with respect to that matter and shall not be liable for any loss or damage caused thereby.

(b) In the event of any litigation, including litigation by the Company or with the Company's consent, the Company shall have no liability for loss or damage until there has been a final determination by a court of competent jurisdiction, and disposition of all appeals therefrom, adverse to the title or to the lien of the insured mortgage, as insured.

(c) The Company shall not be liable for loss or damage to any insured for liability voluntarily assumed by the insured in settling any claim or suit without the prior written consent of the Company.

(d) The Company shall not be liable for: (i) any indebtedness created subsequent to Date of Policy except for advances made to protect the lien of the insured mortgage and secured thereby and reasonable amounts expended to prevent deterioration of improvements; or (ii) construction loan advances made subsequent to Date of Policy, except construction loan advances made subsequent to Date of Policy for the purpose of financing in whole or in part the construction of an improvement to the land which at Date of Policy were secured by the insured mortgage and which the insured was and continued to be obligated to advance at and after Date of Policy.

## 9. REDUCTION OF INSURANCE; REDUCTION OR TERMINATION OF LIABILITY.

(a) All payments under this policy, except payments made for costs, attorneys' fees and expenses, shall reduce the amount of the insurance pro tanto. However, any payments made prior to the acquisition of title to the estate or interest as provided in Section 2(a) of these Conditions and Stipulations shall not reduce pro tanto the amount of the insurance afforded under this policy except to the extent that the pay-ments reduce the amount of the indebtedness secured by the in-sured mortgage.

(b) Payment in part by any person of the principal of the indebtedness, or any other obligation secured by the insured mortgage, or any voluntary partial satisfaction or release of the insured mortgage, to the extent of the payment, satisfaction or release, shall reduce the amount of insurance pro tanto. The amount of insurance may thereafter be increased by accruing interest and advances made to protect the lien of the insured mortgage and secured thereby, with interest thereon, provided in no event shall the amount of insurance be greater than the Amount of Insurance stated in Schedule A.

(c) Payment in full by any person or the voluntary satisfaction or release of the insured mortgage shall terminate all liability of the Company except as provided in Section 2(a) of these Conditions and Stipulations.

## 10. LIABILITY NONCUMULATIVE.

If the insured acquires title to the estate or interest in satisfaction of the indebtedness secured by the insured mortgage, or any part thereof, it is expressly understood that the amount of insurance under this policy shall be reduced by any amount the Company may pay under any policy insuring a mortgage to which exception is taken in Schedule B or to which the insured has agreed, assumed, or taken subject, or which is hereafter executed by an insured and which is a charge or lien on the estate or interest described or referred to in Schedule A, and the amount so paid shall be deemed a payment under this policy.

## 11. PAYMENT OF LOSS.

(a) No payment shall be made without producing this policy for endorsement of the payment unless the policy has been lost or destroyed, in which case proof of loss or destruction shall be furnished to the satisfaction of the Company.

(b) When liability and the extent of loss or damage has been definitely fixed in accordance with these Conditions and Stipulations, the loss or damage shall be payable within 30 days thereafter.

## 12. SUBROGATION UPON PAYMENT OR SETTLEMENT.

(a) The Company's Right of Subrogation.

Whenever the Company shall have settled and paid a claim under this policy, all right of subrogation shall vest in the Company unaffected by any act of the insured claimant.

The Company shall be subrogated to and be entitled to all rights and remedies which the insured claimant would have had against any person or property in respect to the claim had this policy not been issued. If requested by the Company, the insured claimant shall transfer to the Company all rights and remedies against any person or property necessary in order to perfect this right of subrogation. The insured claimant shall permit the Company to sue, compromise or settle in the name of the insured claimant and to use

the name of the insured claimant in any transaction or litigation involving these rights or remedies.

If a payment on account of a claim does not fully cover the loss of the insured claimant, the Company shall be subrogated to all rights and remedies of the insured claimant after the insured claimant shall have recovered its principal, interest, and costs of collection.

(b) The Insured's Rights and Limitations.

Notwithstanding the foregoing, the owner of the indebtedness secured by the insured mortgage, provided the priority of the lien of the insured mortgage or its enforceability is not affected, may release or substitute the personal liability of any debtor or guarantor, or extend or otherwise modify the terms of payment, or release a portion of the estate or interest from the lien of the insured mortgage, or release any collateral security for the indebtedness.

When the permitted acts of the insured claimant occur and the insured has knowledge of any claim of title or interest adverse to the title to the estate or interest or the priority or enforceability of the lien of the insured mortgage, as insured, the Company shall be required to pay only that part of any losses insured against by this policy which shall exceed the amount, if any, lost to the Company by reason of the impairment by the insured claimant of the Company's right of subrogation.

(c) The Company's Rights Against Non-insured Obligors.

The Company's right of subrogation against non-insured obligors shall exist and shall include, without limitation, the rights of the insured to indemnities, guaranties, other policies of insurance or bonds, notwithstanding any terms or conditions contained in those instruments which provide for subrogation rights by reason of this policy.

The Company's right of subrogation shall not be avoided by acquisition of the insured mortgage by an obligor (except an obligor described in Section 1(a)(ii) of these Conditions and Stipulations) who acquires the insured mortgage as a result of an indemnity, guarantee, other policy of insurance, or bond and the obligor will not be an insured under this policy, notwithstanding Section 1(a)(i) of these Conditions and Stipulations.

## 13. ARBITRATION.

Unless prohibited by applicable law, either the Company or the insured may demand arbitration pursuant to the Title Insurance Arbitration Rules of the American Arbitration Association. Arbitrable matters may include, but are not limited to, any controversy or claim between the Company and the insured arising out of or relating to this policy, any service of the Company in connection with its issuance or the breach of a policy provision or other obligation. All arbitrable matters when the Amount of Insurance is $1,000,000 or less shall be arbitrated at the option of either the Company or the insured. All arbitrable matters when the Amount of Insurance is in excess of $1,000,000 shall be arbitrated only when agreed to by both the Company and the insured. Arbitration pursuant to this policy and under the Rules in effect on the date the demand for arbitration is made or, at the option of the insured, the Rules in effect at Date of Policy shall be binding upon the parties. The award may include attorneys' fees only if the laws of the state in which the land is located permit a court to award attorneys' fees to a prevailing party. Judgment upon the award rendered by the Arbitrator(s) may be entered in any court having jurisdiction thereof.

The law of the situs of the land shall apply to an arbitration under the Title Insurance Arbitration Rules.

A copy of the Rules may be obtained from the Company upon request.

## 14. LIABILITY LIMITED TO THIS POLICY; POLICY ENTIRE CONTRACT.

(a) This policy together with all endorsements, if any, attached hereto by the Company is the entire policy and contract between the insured and the Company.  In interpreting any provision of this policy, this policy shall be construed as a whole.

(b) Any claim of loss or damage, whether or not based on negligence, and which arises out of the status of the lien of the insured mortgage or of the title to the estate or interest covered hereby or by any action asserting such claim, shall be restricted to this policy.

(c) No amendment of or endorsement to this policy can be made except by a writing endorsed hereon or attached hereto signed by either the President, a Vice President, the Secretary, an Assistant Secretary, or validating officer or authorized signatory of the Company.

## 15. SEVERABILITY.

In the event any provision of this policy is held invalid or unenforceable under applicable law, the policy shall be deemed not to include that provision and all other provisions shall remain in full force and effect.

## 16. NOTICES, WHERE SENT.

All notices required to be given the Company and any statement in writing required to be furnished the Company shall include the number of this policy and shall be addressed to the Company at the issuing office or to:

UNITED CAPITAL TITLE INSURANCE COMPANY™
Claims Department
3250 Wilshire Blvd., 18th Floor
Los Angeles, CA  90010

# LandTitle

## OF NEVADA, INC.

**as Issuing Agent for**
**United Capital Title Insurance Company**
**ALTA LOAN POLICY**

File No. 90500380-DW                                    Policy No.  A92 210014567

## SCHEDULE A

Date of Policy              March 23, 2005 at 09:14 a.m.

Amount of Insurance   $280,000.00                    Premium        $888.75

1.      Name of Insured:

Argent Mortgage Company, LLC, its successors and/or assigns

2.      The estate or interest in the land which is covered by this policy is:

Fee

3.      Title to the estate or interest in the land is vested in:

Brian Hee, a married man as his sole and separate property

4.      The insured mortgage and assignments thereof, if any, are described as follows:

Deed of Trust to secure an indebtedness in the amount shown below, and any other obligations secured thereby

Dated               : March 16, 2005
Trustor             : Brian Hee, a married man, as his sole and separate property
Trustee             : Town and Country Title Services, Inc.
Beneficiary         : Argent Mortgage Company, LLC
Amount              : $280,000.00
Recorded            : March 23, 2005
Book No.            : 20050323
Document No.        : 00845, Official Records.

## THIS POLICY VALID ONLY IF SCHEDULE B IS ATTACHED



**as Issuing Agent for**
**United Capital Title Insurance Company**
**ALTA LOAN POLICY**

File No. 90500380-DW                                   Policy No.  A92 210014567

## SCHEDULE B

## EXCEPTIONS FROM COVERAGE

This policy does not insure against loss or damage (and the Company will not pay costs, attorney's fees or expenses) which arrive by reason of:

### SCHEDULE B PART I

1.   Taxes for the fiscal year 2005-2006, a lien not yet due and payable.  Note: Amounts for this tax year are not yet available.

2.   The lien of Supplemental Taxes, if any, assessed pursuant to the provisions of N.R.S. 361.770, Statutes of the State of Nevada.  (None now due and payable)

3.   The hereinabove described property may be subject to charges and fees from the sanitation district and the water district in which said property is located, which charges and fees may be levied against said land. (None now due and payable)

     Inquiries should be made of the County or Municipality in which said property is located.

4.   Water rights, claims or title to water, whether or not shown by the public records.

5.   Covenants, conditions, restrictions, association lien rights, reservations and easements, if any affecting title, which may appear in the public record, including those shown on any recorded plat or survey, but deleting any covenant, condition or restriction indicating a preference, limitation or discrimination based on race, color, religion, sex, handicap, familial status, or national origin, to the extent such covenants, conditions or restrictions violate Title 42, Section 3604(c), of the United States Codes.

**\*\*\*\*END OF SCHEDULE B, PART I   \*\*\*\***



**as Issuing Agent for**
**United Capital Title Insurance Company**
**ALTA LOAN POLICY**

File No. 90500380-DW                                 Policy No.   A92 210014567

### SCHEDULE B - PART  II

In addition to the matters set forth in Part I of this Schedule, the title to the estate or interest in the land described or referred to in Schedule A is subject to the following matters, if any be shown, but the company insures that these matters are subordinate to the lien or charge of the insured mortgage upon the estate or interest:

NONE

countersigned

*J M Smolar*

_____
Authorized signatory

### ****END OF SCHEDULE B, PART II****



**as Issuing Agent for**
**United Capital Title Insurance Company**
**ALTA LOAN POLICY**

File No. 90500380-DW                        Policy No.  A92 210014567

## SCHEDULE C

LOT TWENTY THREE (23) IN BLOCK TWO (2), OF WILDWOOD MANOR AS SHOWN BY MAP
THEREOF ON FILE IN BOOK 20 OF PLATS, PAGE 76 IN THE OFFICE OF THE COUNTY
RECORDER OF CLARK COUNTY, NEVADA.



**LandTitle**
O F   N E V A D A ,   I N C .

as Issuing Agent for
United Capital Title Insurance Company
ALTA LOAN POLICY

File No. 90500380-DW                                    Policy No.   A92 210014567

## CLTA ENDORSEMENT 100

The Company hereby insures the owner of the indebtedness secured by the insured mortgage against loss or damage which the insured shall sustain by reason of any of the following matters:

1.     The existence of any of the following:

(a)     Covenants, conditions or restrictions under which the lien of the mortgage referred to in Schedule A can be cut off, subordinated, or otherwise impaired;

(b)     Present violations on the land of any enforceable covenants, conditions or restrictions;

(c)     Except as shown in Schedule B,   there are no encroachments of buildings, structures or improvements located on the land onto adjoining lands, or any encroachments onto the land of buildings, structures or improvements located on adjoining lands.

2.     (a)     Any future violations on the land of any covenants, conditions or restrictions occurring prior to acquisition of title to the estate or interest referred to in Schedule A by the insured, provided such violations result in impairment or loss of the lien of the mortgage referred to in Schedule A, or result in impairment or loss of the title to the estate or interest referred to in Schedule A if the insured shall acquire such title in satisfaction of the indebtedness secured by the insured mortgage;

(b)     Unmarketability of the title to the estate or interest referred to in Schedule A by reason of any violations on the land, occurring prior to acquisition of title to the estate or interest referred to in Schedule A by the insured, of any covenants, conditions or restrictions.

3.     Damage to existing improvements, including lawns, shrubbery or trees

(a)     Which are located or encroach upon that portion of the land subject to any easement shown in Schedule B, which damage results from the exercise of the right to use or maintain such easement for the purposes for which the same was granted or reserved;

(b)     Resulting from the exercise of any right to use the surface of the land for the extraction or development of the minerals excepted from the description of the land or shown as a reservation in Schedule B.

4.     Any final court order or judgment requiring removal from any land adjoining the land of any encroachment shown in Schedule B.

Wherever in this endorsement any or all the words "covenants, conditions or restrictions" appear, they shall not be deemed to refer to or include the terms, covenants, conditions or restrictions contained in any lease.



**LandTitle**
OF NEVADA, INC.

as Issuing Agent for
**United Capital Title Insurance Company**
**ALTA LOAN POLICY**

File No. 90500380-DW                                   Policy No.  A92 210014567

## CLTA ENDORSEMENT 100 (continued)

For purposes of this endorsement, the words "covenants," "conditions" or "restrictions" shall not be deemed to refer to or include any covenants, conditions or restrictions relating to environmental protection, except to the extent that a notice of a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy and is not excepted in Schedule B.

This endorsement is made a part of the policy and is subject to all of the terms and provisions thereof and of any prior endorsements thereto. Except to the extent expressly stated, it neither modifies any of the terms and provisions of the policy and any prior endorsements, nor does it extend the effective date of the policy and any prior endorsements, nor does it increase the face amount thereof.

Dated:  March 23, 2005

United Capital Title Insurance Company

*J M Smolar*

By_____
             Authorized signatory



**as Issuing Agent for**
**United Capital Title Insurance Company**
**ALTA LOAN POLICY**

File No. 90500380-DW                    Policy No.  A92 210014567

## CLTA ENDORSEMENT 116

The Company hereby insures the owner of the indebtedness secured by the insured mortgage against loss or damage which the insured shall sustain by reason of the failure of (i) a Four-Plex  known as 1628 Cordoba Lane, Las Vegas, Nevada  , to be located on the land at Date of Policy, or (ii) the map attached to this policy to correctly show the location and dimensions of the land according to the public records.

This endorsement is made a part of the policy and is subject to all of the terms and provisions thereof and of any prior endorsements thereto.  Except to the extent expressly stated, it neither modifies any of the terms and provisions of the policy and any prior endorsements, nor does it extend the effective date of the policy and any prior endorsements, nor does it increase the face amount thereof.

Dated:  March 23, 2005

United Capital Title Insurance Company

*J M Smolar*

By_____
        Authorized signatory



**LandTitle**
**O F   N E V A D A ,   I N C .**

as Issuing Agent for
**United Capital Title Insurance Company**
**ALTA LOAN POLICY**

File No. 90500380-DW                                    Policy No.   A92 210014567

## CLTA ENDORSEMENT 110.9

The insurance afforded by this endorsement is only effective if the land is used or is to be used primarily for residential purposes.

The Company insures the Insured against loss or damage sustained by reason of lack of priority of the lien of the Insured mortgage over:

(a)     any environmental protection lien which, at Date of Policy, is recorded in those records established under state statutes at Date of Policy for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without knowledge, or filed in the records of the clerk of the United States district court for the district in which the land is located, except as set forth in Schedule B; or

(b)     any environmental protection lien provided for by any state statute in effect at Date of Policy, except environmental protection liens provided for by the following state statutes:

[None]

This endorsement is made a part of the policy and is subject to all of the terms and provisions thereof and of any prior endorsements thereto.  Except to the extent expressly stated, it neither modifies any of the terms and provisions of the policy and any endorsements, nor does it extend the effective date of the policy and any prior endorsements, nor does it increase the face amount thereof.

Dated:  March 23, 2005

United Capital Title Insurance Company

*J M Smolar*

By_____
Authorized signatory



**Land Title**

O F   N E V A D A ,   I N C .

as Issuing Agent for
**United Capital Title Insurance Company**
**ALTA LOAN POLICY**

File No. 90500380-DW                              Policy No.  A92 210014567

## CLTA ENDORSEMENT 111.5

The Company insures the owner of the indebtedness secured by the insured mortgage against loss or damage sustained by reason of:

1.      The invalidity or unenforceability of the lien of the insured mortgage resulting from the provisions therein which provide for changes in the rate of interest.

2.      Loss of priority of the lien of the insured mortgage as security for the unpaid principal balance of the loan, together with interest as changed in accordance with the provisions of the insured mortgage, which loss of priority is caused by the changes in the rate of interest.

        "Changes in the rate of interest", as used in this endorsement, shall mean only those changes in the rate of interest calculated pursuant to the formula provided in the insured mortgage at Date of Policy.

This endorsement does not insure against loss or damage based upon

(a)      usury, or
(b)      any consumer credit protection or truth in lending law.

        This endorsement is made a part of the policy and is subject to all of the terms and provisions thereof and of any prior endorsements thereto, except that the insurance afforded by this endorsement is not subject to Section 3(d) of the Exclusions From Coverage.  Except to the extent expressly stated, it neither modifies any of the terms and provisions of the policy and any prior endorsements, nor does it extend the effective date of the policy and any prior endorsements, nor does it increase the face amount thereof.

Dated:  March 23, 2005

                              United Capital Title Insurance Company

                              *J M Smolar*

                              By_____
                                    Authorized signatory



**as Issuing Agent for**
**United Capital Title Insurance Company**
**ALTA LOAN POLICY**

File No. 90500380-DW                    Policy No.  A92 210014567

## CLTA ENDORSEMENT 100.2

The Company insures the owner of the indebtedness secured by the insured mortgage against loss or damage sustained by reason of:

1.    The existence at Date of Policy of any of the following:

(a)    Covenants, conditions or restrictions under which the lien of the mortgage referred to in Schedule A can be divested, subordinated or extinguished, or its validity, priority or enforceability impaired.

(b)    Unless expressly excepted in Schedule B:

(1)    Present violations on the land of any enforceable covenants, conditions or restrictions, nor do any existing improvements on the land violate any building setback lines shown on a plat of subdivision recorded or filed in the public records.

(2)    Any instrument referred to in Schedule B as containing covenants, conditions or restrictions on the land does not, in addition, (i) establish an easement on the land; (ii) provide a lien for liquidated damages; (iii) provide for a private charge or assessment; (iv) provide for an option to purchase, a right of first refusal or the prior approval of a future purchaser or occupant.

(3)    Any encroachment of existing improvements located on the land onto adjoining land, nor any encroachment onto the land of existing improvements located on adjoining land.

(4)    Any encroachment of existing improvements located on the land onto that portion of the land subject to any easement excepted in Schedule B.

(5)    Any notices of violation of covenants, conditions and restrictions relating to environmental protection recorded or filed in the public records.

2.    Any future violation on the land of any existing covenants, conditions or restrictions occurring prior to the acquisition of title to the estate or interest in the land by the Insured, provided the violation results in:

(a)    Invalidity, loss of priority, or unenforceability of the lien of the insured mortgage; or

(b)    loss of title to the estate or interest in the land if the Insured shall acquire title in satisfaction of the indebtedness secured by the insured mortgage.



**Land Title**

O F   N E V A D A ,   I N C .

as Issuing Agent for
**United Capital Title Insurance Company**
**ALTA LOAN POLICY**

File No. 90500380-DW                          Policy No.   A92 210014567

3.      Damage to existing improvements, including lawns, shrubbery or trees:

(a)      which are located on or encroach upon that portion of the land subject to any easement excepted in Schedule B, which damage results from the exercise of the right to maintain the easement for the purpose for which it was granted or reserved;

(b)      resulting from the future exercise of any right to use the surface of the land for the extraction or development of minerals excepted from the description of the land or excepted in Schedule B.

4.      Any final court order or judgment requiring the removal from any land adjoining the land of any encroachment excepted in Schedule B.

5.      Any final court order or judgment denying the right to maintain any existing improvements on the land because of any violation of covenants, conditions or restrictions or building setback lines shown on a plat of subdivision recorded or filed in the public records.

Wherever in this endorsement the words "covenants, conditions or restrictions" appear, they shall not be deemed to refer to or include the terms, covenants, conditions or limitations contained in an instrument creating a lease.

As used in paragraphs 1(b)(1) and 5, the words "covenants, conditions or restrictions" shall not be deemed to refer to or include any covenants, conditions or restrictions relating to environmental protection.

This endorsement is made a part of the policy and is subject to all of the terms and provisions thereof and any prior endorsements thereto.  Except to the extent expressly stated, it neither modifies any of the terms and provisions of the policy and any prior endorsements, nor does it extend the effective date of the policy and any prior endorsements, nor does it increase the face amount thereof.

Dated:  March 23, 2005

United Capital Title Insurance Company

*J M Smolar*

By_____
       Authorized signatory

File No. 90500380-DW

Policy No.  A92 210014567



This map is not a survey. It's merely a convenience to juxtapose the land and adjoining streets and other lands and not to guarantee any dimension, bearings, or acreage.

gage as of Date of Policy, interest thereon, expenses of foreclosure, amounts advanced pursuant to the insured mortgage to assure compliance with laws or to protect the lien of the insured mortgage prior to the time of acquisition of the estate or interest in the land and secured thereby and reasonable amounts expended to prevent deterioration of improvements, but reduced by the amount of all payments made; or

(iii) the amount paid by any governmental agency or governmental instrumentality, if the agency or instrumentality is the insured claimant, in the acquisition of the estate or interest in satisfaction of its insurance contract or guaranty.

### 3. NOTICE OF CLAIM TO BE GIVEN BY INSURED CLAIMANT.

The insured shall notify the Company promptly in writing (i) in case of any litigation as set forth in Section 4(a) below, (ii) in case knowledge shall come to an insured hereunder of any claim of title or interest which is adverse to the title to the estate or interest or the lien of the insured mortgage, as insured, and which might cause loss or damage for which the Company may be liable by virtue of this policy, or (iii) if title to the estate or interest or the lien of the insured mortgage, as insured, is rejected as unmarketable. If prompt notice shall not be given to the Company, then as to the insured all liability of the Company shall terminate with regard to the matter or matters for which prompt notice is required; provided, however, that failure to notify the Company shall in no case prejudice the rights of any insured under this policy unless the Company shall be prejudiced by the failure and then only to the extent of the prejudice.

### 4. DEFENSE AND PROSECUTION OF ACTIONS; DUTY OF INSURED CLAIMANT TO COOPERATE.

(a) Upon written request by the insured and subject to the options contained in Section 6 of these Conditions and Stipulations, the Company, at its own cost and without unreasonable delay, shall provide for the defense of an insured in litigation in which any third party asserts a claim adverse to the title or interest as insured, but only as to those stated causes of action alleging a defect, lien or encumbrance or other matter insured against by this policy. The Company shall have the right to select counsel of its choice (subject to the right of the insured to object for reasonable cause) to represent the insured as to those stated causes of action and shall not be liable for and will not pay the fees of any other counsel. The Company will not pay any fees, costs or expenses incurred by the insured in the defense of those causes of action which allege matters not insured against by this policy.

(b) The Company shall have the right, at its own cost, to institute and prosecute any action or proceeding or to do any other act which in its opinion may be necessary or desirable to establish the title to the estate or interest or the lien of the insured mortgage, as insured, or to prevent or reduce loss or damage to the insured. The Company may take any appropriate action under the terms of this policy, whether or not it shall be liable hereunder, and shall not thereby concede liability or waive any provision of this policy. If the Company shall exercise its rights under this paragraph, it shall do so diligently.

(c) Whenever the Company shall have brought an action or interposed a defense as required or permitted by the provisions of this policy, the Company may pursue any litigation to final determination by a court of competent jurisdiction and expressly reserves the right, in its sole discretion, to appeal from any adverse judgment or order.

(d) In all cases where this policy permits or requires the Company to prosecute or provide for the defense of any action or proceeding, the insured shall secure to the Company the right to so prosecute or provide defense in the action or proceeding, and all appeals therein, and permit the Company to use, at its option, the name of the insured for this purpose. Whenever requested by the Company, the insured, at the Company's expense, shall give the Company all reasonable aid (i) in any action or proceeding, securing evidence, obtaining witnesses, prosecuting or defending the action or proceeding, or effecting settlement, and (ii) in any other lawful act which in the opinion of the Company may be necessary or desirable to establish the title to the estate or interest or the lien of the insured mortgage, as insured. If the Company is prejudiced by the failure of the insured to furnish the required cooperation, the Company's obligations to the insured under the policy shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation, with regard to the matter or matters requiring such cooperation.

### 5. PROOF OF LOSS OR DAMAGE.

In addition to and after the notices required under Section 3 of these Conditions and Stipulations have been provided the Company, a proof of loss or damage signed and sworn to by the insured claimant shall be furnished to the Company within 90 days after the insured claimant shall ascertain the facts giving rise to the loss or damage. The proof of loss or damage shall describe the defect in, or lien or encumbrance on the title, or other matter insured against by this policy which constitutes the basis of loss or damage and shall state, to the extent possible, the basis of calculating the amount of the loss or damage. If the Company is prejudiced by the failure of the insured claimant to provide the required proof of loss or damage, the Company's obligations to the insured under the policy shall terminate, including any liability or obligation to defend, prosecute,

or continue any litigation, with regard to the matter or matters requiring such proof of loss or damage.

In addition, the insured claimant may reasonably be required to submit to examination under oath by any authorized representative of the Company and shall produce for examination, inspection and copying, at such reasonable times and places as may be designated by any authorized representative of the Company, all records, books, ledgers, checks, correspondence and memoranda, whether bearing a date before or after Date of Policy, which reasonably pertain to the loss or damage. Further, if requested by any authorized representative of the Company, the insured claimant shall grant its permission, in writing, for any authorized representative of the Company to examine, inspect and copy all records, books, ledgers, checks, correspondence and memoranda in the custody or control of a third party, which reasonably pertain to the loss or damage. All information designated as confidential by the insured claimant provided to the Company pursuant to this Section shall not be disclosed to others unless, in the reasonable judgment of the Company, it is necessary in the administration of the claim. Failure of the insured claimant to submit for examination under oath, produce other reasonably requested information or grant permission to secure reasonably necessary information from third parties as required in this paragraph, unless prohibited by law or governmental regulation, shall terminate any liability of the Company under this policy as to that claim.

### 6. OPTIONS TO PAY OR OTHERWISE SETTLE CLAIMS; TERMINATION OF LIABILITY.

In case of a claim under this policy, the Company shall have the following additional options:

**(a)  To Pay or Tender Payment of the Amount of Insurance or to Purchase the Indebtedness.**

(i) to pay or tender payment of the amount of insurance under this policy together with any costs, attorneys' fees and expenses incurred by the insured claimant, which were authorized by the Company, up to the time of payment or tender of payment and which the Company is obligated to pay; or

(ii) to purchase the indebtedness secured by the insured mortgage for the amount owing thereon together with any costs, attorneys' fees and expenses incurred by the insured claimant which were authorized by the Company up to the time of purchase and which the Company is obligated to pay.

If the Company offers to purchase the indebtedness as herein provided, the owner of the indebtedness shall transfer, assign, and convey the indebtedness and the insured mortgage, together with any collateral security, to the Company upon payment therefor.

Upon the exercise by the Company of either of the options provided for in paragraphs a(i) or (ii), all liability and obligations to the insured under this policy, other than to make the payment required in those paragraphs, shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation.

**(b)  To Pay or Otherwise Settle With Parties Other than the Insured or With the Insured Claimant.**

(i) to pay or otherwise settle with other parties for or in the name of an insured claimant any claim insured against under this policy, together with any costs, attorneys' fees and expenses incurred by the insured claimant which were authorized by the Company up to the time of payment and which the Company is obligated to pay; or

(ii) to pay or otherwise settle with the insured claimant the loss or damage provided for under this policy, together with any costs, attorneys' fees and expenses incurred by the insured claimant which were authorized by the Company up to the time of payment and which the Company is obligated to pay.

Upon the exercise by the Company of either of the options provided for in paragraphs b(i) or (ii), the Company's obligations to the insured under this policy for the claimed loss or damage, other than the payments required to be made, shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation.

### 7. DETERMINATION AND EXTENT OF LIABILITY.

This policy is a contract of indemnity against actual monetary loss or damage sustained or incurred by the insured claimant who has suffered loss or damage by reason of matters insured against by this policy and only to the extent herein described.

(a) The liability of the Company under this policy shall not exceed the least of:

(i) the Amount of Insurance stated in Schedule A, or, if applicable, the amount of insurance as defined in Section 2 (c) of these Conditions and Stipulations;

(ii) the amount of the unpaid principal indebtedness secured by the insured mortgage as limited or provided under Section 8 of these Conditions and Stipulations or as reduced under Section 9 of these Conditions and Stipulations, at the time the loss or damage insured against by this policy occurs, together with interest thereon; or

(iii) the difference between the value of the insured estate or interest as insured and the value of the insured estate or interest subject to the defect, lien or encumbrance insured against by this policy.

(b) In the event the insured has acquired the estate or interest in the manner described

in Section 2(a) of these Conditions and Stipulations or has conveyed the title, then the liability of the Company shall continue as set forth in Section 7(a) of these Conditions and Stipulations.

(c) The Company will pay only those costs, attorneys' fees and expenses incurred in accordance with Section 4 of these Conditions and Stipulations.

## 8. LIMITATION OF LIABILITY.

(a) If the Company establishes the title, or removes the alleged defect, lien or encumbrance, or cures the lack of a right of access to or from the land, or cures the claim of unmarketability of title, or otherwise establishes the lien of the insured mortgage, all as insured, in a reasonably diligent manner by any method, including litigation and the completion of any appeals therefrom, it shall have fully performed its obligations with respect to that matter and shall not be liable for any loss or damage caused thereby.

(b) In the event of any litigation, including litigation by the Company or with the Company's consent, the Company shall have no liability for loss or damage until there has been a final determination by a court of competent jurisdiction, and disposition of all appeals therefrom, adverse to the title or to the lien of the insured mortgage, as insured.

(c) The Company shall not be liable for loss or damage to any insured for liability voluntarily assumed by the insured in settling any claim or suit without the prior written consent of the Company.

(d) The Company shall not be liable for: (i) any indebtedness created subsequent to Date of Policy except for advances made to protect the lien of the insured mortgage and secured thereby and reasonable amounts expended to prevent deterioration of improvements; or (ii) construction loan advances made subsequent to Date of Policy, except construction loan advances made subsequent to Date of Policy for the purpose of financing in whole or in part the construction of an improvement to the land which at Date of Policy were secured by the insured mortgage and which the insured was and continued to be obligated to advance at and after Date of Policy.

## 9. REDUCTION OF INSURANCE; REDUCTION OR TERMINATION OF LIABILITY.

(a) All payments under this policy, except payments made for costs, attorneys' fees and expenses, shall reduce the amount of the insurance pro tanto. However, any payments made prior to the acquisition of title to the estate or interest as provided in Section 2(a) of these Conditions and Stipulations shall not reduce pro tanto the amount of the insurance afforded under this policy except to the extent that the pay-ments reduce the amount of the indebtedness secured by the in-sured mortgage.

(b) Payment in part by any person of the principal of the indebtedness, or any other obligation secured by the insured mortgage, or any voluntary partial satisfaction or release of the insured mortgage, to the extent of the payment, satisfaction or release, shall reduce the amount of insurance pro tanto. The amount of insurance may thereafter be increased by accruing interest and advances made to protect the lien of the insured mortgage and secured thereby, with interest thereon, provided in no event shall the amount of insurance be greater than the Amount of Insurance stated in Schedule A.

(c) Payment in full by any person or the voluntary satisfaction or release of the insured mortgage shall terminate all liability of the Company except as provided in Section 2(a) of these Conditions and Stipulations.

## 10. LIABILITY NONCUMULATIVE.

If the insured acquires title to the estate or interest in satisfaction of the indebtedness secured by the insured mortgage, or any part thereof, it is expressly understood that the amount of insurance under this policy shall be reduced by any amount the Company may pay under any policy insuring a mortgage to which exception is taken in Schedule B or to which the insured has agreed, assumed, or taken subject, or which is hereafter executed by an insured and which is a charge or lien on the estate or interest described or referred to in Schedule A, and the amount so paid shall be deemed a payment under this policy.

## 11. PAYMENT OF LOSS.

(a) No payment shall be made without producing this policy for endorsement of the payment unless the policy has been lost or destroyed, in which case proof of loss or destruction shall be furnished to the satisfaction of the Company.

(b) When liability and the extent of loss or damage has been definitely fixed in accordance with these Conditions and Stipulations, the loss or damage shall be payable within 30 days thereafter.

## 12. SUBROGATION UPON PAYMENT OR SETTLEMENT.

### (a) The Company's Right of Subrogation.

Whenever the Company shall have settled and paid a claim under this policy, all right of subrogation shall vest in the Company unaffected by any act of the insured claimant.

The Company shall be subrogated to and be entitled to all rights and remedies which the insured claimant would have had against any person or property in respect to the claim had this policy not been issued. If requested by the Company, the insured claimant shall transfer to the Company all rights and remedies against any person or property necessary in order to perfect this right of subrogation. The insured claimant shall permit the Company to sue, compromise or settle in the name of the insured claimant and to use

the name of the insured claimant in any transaction or litigation involving these rights or remedies.

If a payment on account of a claim does not fully cover the loss of the insured claimant, the Company shall be subrogated to all rights and remedies of the insured claimant after the insured claimant shall have recovered its principal, interest, and costs of collection.

### (b) The Insured's Rights and Limitations.

Notwithstanding the foregoing, the owner of the indebtedness secured by the insured mortgage, provided the priority of the lien of the insured mortgage or its enforceability is not affected, may release or substitute the personal liability of any debtor or guarantor, or extend or otherwise modify the terms of payment, or release a portion of the estate or interest from the lien of the insured mortgage, or release any collateral security for the indebtedness.

When the permitted acts of the insured claimant occur and the insured has knowledge of any claim of title or interest adverse to the title to the estate or interest or the priority or enforceability of the lien of the insured mortgage, as insured, the Company shall be required to pay only that part of any losses insured against by this policy which shall exceed the amount, if any, lost to the Company by reason of the impairment by the insured claimant of the Company's right of subrogation.

### (c) The Company's Rights Against Non-insured Obligors.

The Company's right of subrogation against non-insured obligors shall exist and shall include, without limitation, the rights of the insured to indemnities, guaranties, other policies of insurance or bonds, notwithstanding any terms or conditions contained in those instruments which provide for subrogation rights by reason of this policy.

The Company's right of subrogation shall not be avoided by acquisition of the insured mortgage by an obligor (except an obligor described in Section 1(a)(ii) of these Conditions and Stipulations) who acquires the insured mortgage as a result of an indemnity, guarantee, other policy of insurance, or bond and the obligor will not be an insured under this policy, notwithstanding Section 1(a)(i) of these Conditions and Stipulations.

## 13. ARBITRATION.

Unless prohibited by applicable law, either the Company or the insured may demand arbitration pursuant to the Title Insurance Arbitration Rules of the American Arbitration Association. Arbitrable matters may include, but are not limited to, any controversy or claim between the Company and the insured arising out of or relating to this policy, any service of the Company in connection with its issuance or the breach of a policy provision or other obligation. All arbitrable matters when the Amount of Insurance is $1,000,000 or less shall be arbitrated at the option of either the Company or the insured. All arbitrable matters when the Amount of Insurance is in excess of $1,000,000 shall be arbitrated only when agreed to by both the Company and the insured. Arbitration pursuant to this policy and under the Rules in effect on the date the demand for arbitration is made or, at the option of the insured, the Rules in effect at Date of Policy shall be binding upon the parties. The award may include attorneys' fees only if the laws of the state in which the land is located permit a court to award attorneys' fees to a prevailing party. Judgment upon the award rendered by the Arbitrator(s) may be entered in any court having jurisdiction thereof.

The law of the situs of the land shall apply to an arbitration under the Title Insurance Arbitration Rules.

A copy of the Rules may be obtained from the Company upon request.

## 14. LIABILITY LIMITED TO THIS POLICY; POLICY ENTIRE CONTRACT.

(a) This policy together with all endorsements, if any, attached hereto by the Company is the entire policy and contract between the insured and the Company. In interpreting any provision of this policy, this policy shall be construed as a whole.

(b) Any claim of loss or damage, whether or not based on negligence, and which arises out of the status of the lien of the insured mortgage or of the title to the estate or interest covered hereby or by any action asserting such claim, shall be restricted to this policy.

(c) No amendment of or endorsement to this policy can be made except by a writing endorsed hereon or attached hereto signed by either the President, a Vice President, the Secretary, an Assistant Secretary, or validating officer or authorized signatory of the Company.

## 15. SEVERABILITY.

In the event any provision of this policy is held invalid or unenforceable under applicable law, the policy shall be deemed not to include that provision and all other provisions shall remain in full force and effect.

## 16. NOTICES, WHERE SENT.

All notices required to be given the Company and any statement in writing required to be furnished the Company shall include the number of this policy and shall be addressed to the Company at the issuing office or to:

UNITED CAPITAL TITLE INSURANCE COMPANY™
Claims Department
3250 Wilshire Blvd., 18th Floor
Los Angeles, CA 90010



**AMERICAN LAND TITLE ASSOCIATION**
**LOAN POLICY (10-17-92)**

Policy # -A92-

# Land Title of Nevada, Inc.

an Issuing Agent for:

U N I T E D   C A P I T A L   T I T L E   I N S U R A N C E   C O M P A N Y™

SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS FROM COVERAGE CON-
TAINED IN SCHEDULE B AND THE CONDITIONS AND STIPULATIONS, UNITED CAPITAL TITLE
INSURANCE COMPANY™ , a California corporation, herein called the Company, insures, as of Date of Policy
shown in Schedule A, against loss or damage, not exceeding the Amount of Insurance stated in Schedule A,
sustained or incurred by the insured by reason of:

1. Title to the estate or interest described in Schedule A being vested other than as stated therein;
2. Any defect in or lien or encumbrance on the title;
3. Unmarketability of the title;
4. Lack of a right of access to and from the land;
5. The invalidity or unenforceability of the lien of the insured mortgage upon the title;
6. The priority of any lien or encumbrance over the lien of the insured mortgage;
7. Lack of priority of the lien of the insured mortgage over any statutory lien for services, labor or material:
   (a) arising from an improvement or work related to the land which is contracted for or commenced prior to
       Date of Policy; or
   (b) arising from an improvement or work related to the land which is contracted for or commenced subse-
       quent to Date of Policy and which is financed in whole or in part by proceeds of the indebtedness secured
       by the insured mortgage which at Date of Policy the insured has advanced or is obligated to advance;
8. The invalidity or unenforceability of any assignment of the insured mortgage, provided the assignment is
   shown in Schedule A, or the failure of the assignment shown in Schedule A to vest title to the insured
   mortgage in the named insured assignee free and clear of all liens.

The Company will also pay the costs, attorneys' fees and expenses incurred in defense of the title or the lien of the
insured mortgage, as insured, but only to the extent provided in the Conditions and Stipulations.


**UNITED CAPITAL TITLE INSURANCE COMPANY™**

## Land Title of Nevada, Inc.

an Issuing Agent for:
United Title Insurance Company



By: _J M Smolan_     President

By: _Kenneth E Span_     Secretary

## EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1. (a) Any law, ordinance or governmental regulation (including but not limited to building and zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating to (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

   (b) Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or a notice of a defect, lien or encumbrance result-ing from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

2. Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.

3. Defects, liens, encumbrances, adverse claims or other matters:
   (a) created, suffered, assumed or agreed to by the insured claimant;
   (b) not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy;
   (c) resulting in no loss or damage to the insured claimant;
   (d) attaching or created subsequent to Date of Policy (except to the extent that this policy insures the priority of the lien of the insured mortgage over any statutory lien for services, labor or material); or
   (e) resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the insured mortgage.

4. Unenforceability of the lien of the insured mortgage because of the inability or failure of the insured at Date of Policy, or the inability or failure of any subsequent owner of the indebtedness, to comply with applicable doing business laws of the state in which the land is situated.

5. Invalidity or unenforceability of the lien of the insured mortgage, or claim thereof, which arises out of the transaction evidenced by the insured mortgage and is based upon usury or any consumer credit protection or truth in lending law.

6. Any statutory lien for services, labor or materials (or the claim of priority of any statutory lien for services, labor or materials over the lien of the insured mortgage) aris-ing from an improvement or work related to the land which is contracted for and commenced subsequent to Date of Policy and is not financed in whole or in part by pro-ceeds of the indebtedness secured by the insured mortgage which at Date of Policy the insured has advanced or is obligated to advance.

7. Any claim, which arises out of the transaction creating the interest of the mortgagee insured by this policy, by reason of the operation of federal bankruptcy, state insol-vency, or similar creditors' rights laws, that is based on:
   (a) the transaction creating the interest of the insured mortgagee being deemed a fraudulent conveyance or fraudulent transfer; or
   (b) the subordination of the interest of the insured mortgagee as a result of the application of the doctrine of equitable subordination; or
   (c) the transaction creating the interest of the insured mortgagee being deemed a preferential transfer except where the preferential transfer results from the failure:
      (i) to timely record the instrument of transfer; or
      (ii) of such recordation to impart notice to a purchaser for value or a judgment or lien creditor.

## CONDITIONS AND STIPULATIONS

**1. DEFINITION OF TERMS**.

The following terms when used in this policy mean:

(a) "insured": the insured named in Schedule A. The term "insured" also includes

(i) the owner of the indebtedness secured by the insured mortgage and each suc-cessor in ownership of the indebtedness except a successor who is an obligor under the provisions of Section 12(c) of these Conditions and Stipulations (reserving, however, all rights and defenses as to any successor that the Company would have had against any predecessor insured, unless the successor acquired the indebtedness as a purchaser for value without knowledge of the asserted defect, lien, encumbrance, adverse claim or other matter insured against by this policy as affecting title to the estate or interest in the land);

(ii) any governmental agency or governmental instrumentality which is an insurer or guarantor under an insurance contract or guaranty insuring or guaranteeing the indebtedness secured by the insured mortgage, or any part thereof, whether named as an insured herein or not;

(iii) the parties designated in Section 2(a) of these Conditions and Stipulations.

(b) "insured claimant": an insured claiming loss or damage.

(c) "knowledge" or "known": actual knowledge, not constructive knowledge or notice which may be imputed to an insured by reason of the public records as defined in this policy or any other records which impart constructive notice of matters affecting the land.

(d) "land": the land described or referred to in Schedule A, and improvements affixed thereto which by law constitute real property. The term "land" does not include any property beyond the lines of the area described or referred to in Schedule A, nor any right, title, interest, estate or easement in abutting streets, roads, avenues, alleys, lanes, ways or waterways, but nothing herein shall modify or limit the extent to which a right of access to and from the land is insured by this policy.

(e) "mortgage": mortgage, deed of trust, trust deed, or other security instrument.

(f) "public records": records established under state statutes at Date of Policy for the purpose of imparting constructive notice of matters relating to real property to pur-chasers for value and without knowledge. With respect to Section 1(a)(iv) of the Exclusions From Coverage, "public records" shall also include environmental protection

liens filed in the records of the clerk of the United States district court for the district in which the land is located.

(g) "unmarketability of the title": an alleged or apparent matter affecting the title to the land, not excluded or excepted from coverage, which would entitle a purchaser of the estate or interest described in Schedule A or the insured mortgage to be released from the obligation to purchase by virtue of a contractual condition requiring the delivery of marketable title.

**2. CONTINUATION OF INSURANCE**

**(a) After Acquisition of Title.** The coverage of this policy shall continue in force as of Date of Policy in favor of (i) an insured who acquires all or any part of the estate or inter-est in the land by foreclosure, trustee's sale, conveyance in lieu of foreclosure, or other legal manner which discharges the lien of the insured mortgage; (ii) a transferee of the estate or interest so acquired from an insured corporation, provided the transferee is the parent or wholly-owned subsidiary of the insured corporation, and their corporate suc-cessors by operation of law and not by purchase, subject to any rights or defenses the Company may have against any predecessor insureds; and (iii) any governmental agency or governmental instrumentality which acquires all or any part of the estate or interest pursuant to a contract of insurance or guaranty insuring or guaranteeing the indebted-ness secured by the insured mortgage.

**(b) After Conveyance of Title.** The coverage of this policy shall continue in force as of Date of Policy in favor of an insured only so long as the insured retains an estate or inter-est in the land, or holds an indebtedness secured by a purchase money mortgage given by a purchaser from the insured, or only so long as the insured shall have liability by rea-son of covenants of warranty made by the insured in any transfer or conveyance of the estate or interest. This policy shall not continue in force in favor of any purchaser from the insured of either (i) an estate or interest in the land, or (ii) an indebtedness secured by a purchase money mortgage given to the insured.

**(c) Amount of Insurance.** The amount of insurance after the acquisition or after the conveyance shall in neither event exceed the least of:

(i) the Amount of Insurance stated in Schedule A;

(ii) the amount of the principal of the indebtedness secured by the insured mort-

# Land Title

## O F   N E V A D A ,   I N C .

**as Issuing Agent for**
**United Capital Title Insurance Company**
**ALTA LOAN POLICY**

File No. 90500380-DW                          Policy No.  A92 210014567

## SCHEDULE A

Date of Policy          March 23, 2005 at 09:14 a.m.

Amount of Insurance    $280,000.00          Premium       $888.75

1.    Name of Insured:

      Argent Mortgage Company, LLC, its successors and/or assigns

2.    The estate or interest in the land which is covered by this policy is:

      Fee

3.    Title to the estate or interest in the land is vested in:

      Brian Hee, a married man as his sole and separate property

4.    The insured mortgage and assignments thereof, if any, are described as follows:

      Deed of Trust to secure an indebtedness in the amount shown below, and any other obligations secured thereby

| | |
|---|---|
| Dated | : March 16, 2005 |
| Trustor | : Brian Hee, a married man, as his sole and separate property |
| Trustee | : Town and Country Title Services, Inc. |
| Beneficiary | : Argent Mortgage Company, LLC |
| Amount | : $280,000.00 |
| Recorded | : March 23, 2005 |
| Book No. | : 20050323 |
| Document No. | : 00845, Official Records. |

## THIS POLICY VALID ONLY IF SCHEDULE B IS ATTACHED



**as Issuing Agent for**
**United Capital Title Insurance Company**
**ALTA LOAN POLICY**

File No. 90500380-DW                                    Policy No.   A92 210014567

## SCHEDULE B

### EXCEPTIONS FROM COVERAGE

This policy does not insure against loss or damage (and the Company will not pay costs, attorney's fees or expenses) which arrive by reason of:

### SCHEDULE B PART I

1.      Taxes for the fiscal year 2005-2006, a lien not yet due and payable.  Note: Amounts for this tax year are not yet available.

2.      The lien of Supplemental Taxes, if any, assessed pursuant to the provisions of N.R.S. 361.770, Statutes of the State of Nevada.  (None now due and payable)

3.      The hereinabove described property may be subject to charges and fees from the sanitation district and the water district in which said property is located, which charges and fees may be levied against said land. (None now due and payable)

        Inquiries should be made of the County or Municipality in which said property is located.

4.      Water rights, claims or title to water, whether or not shown by the public records.

5.      Covenants, conditions, restrictions, association lien rights, reservations and easements, if any affecting title, which may appear in the public record, including those shown on any recorded plat or survey, but deleting any covenant, condition or restriction indicating a preference, limitation or discrimination based on race, color, religion, sex, handicap, familial status, or national origin, to the extent such covenants, conditions or restrictions violate Title 42, Section 3604(c), of the United States Codes.

### ****END OF SCHEDULE B, PART I   ****



**LandTitle**
**OF NEVADA, INC.**

as Issuing Agent for
**United Capital Title Insurance Company**
**ALTA LOAN POLICY**

File No. 90500380-DW

Policy No.   A92 210014567

### SCHEDULE B - PART  II

In addition to the matters set forth in Part I of this Schedule, the title to the estate or interest in the land described or referred to in Schedule A is subject to the following matters, if any be shown, but the company insures that these matters are subordinate to the lien or charge of the insured mortgage upon the estate or interest:

NONE

countersigned

*J M Smolar*

_____
Authorized signatory

**\*\*\*\*END OF SCHEDULE B, PART II\*\*\*\***



**Land Title**
O F   N E V A D A ,   I N C .

as Issuing Agent for
United Capital Title Insurance Company
**ALTA LOAN POLICY**

File No. 90500380-DW                                      Policy No.  A92 210014567

**SCHEDULE C**

LOT TWENTY THREE (23) IN BLOCK TWO (2), OF WILDWOOD MANOR AS SHOWN BY MAP
THEREOF ON FILE IN BOOK 20 OF PLATS, PAGE 76 IN THE OFFICE OF THE COUNTY
RECORDER OF CLARK COUNTY, NEVADA.



**as Issuing Agent for**
**United Capital Title Insurance Company**
**ALTA LOAN POLICY**

File No. 90500380-DW                    Policy No.  A92 210014567

## CLTA ENDORSEMENT 100

The Company hereby insures the owner of the indebtedness secured by the insured mortgage against loss or damage which the insured shall sustain by reason of any of the following matters:

1.      The existence of any of the following:

(a)     Covenants, conditions or restrictions under which the lien of the mortgage referred to in Schedule A can be cut off, subordinated, or otherwise impaired;

(b)     Present violations on the land of any enforceable covenants, conditions or restrictions;

(c)     Except as shown in Schedule B,  there are no encroachments of buildings, structures or improvements located on the land onto adjoining lands, or any encroachments onto the land of buildings, structures or improvements located on adjoining lands.

2.      (a)     Any future violations on the land of any covenants, conditions or restrictions occurring prior to acquisition of title to the estate or interest referred to in Schedule A by the insured, provided such violations result in impairment or loss of the lien of the mortgage referred to in Schedule A, or result in impairment or loss of the title to the estate or interest referred to in Schedule A if the insured shall acquire such title in satisfaction of the indebtedness secured by the insured mortgage;

(b)     Unmarketability of the title to the estate or interest referred to in Schedule A by reason of any violations on the land, occurring prior to acquisition of title to the estate or interest referred to in Schedule A by the insured, of any covenants, conditions or restrictions.

3.      Damage to existing improvements, including lawns, shrubbery or trees

(a)     Which are located or encroach upon that portion of the land subject to any easement shown in Schedule B, which damage results from the exercise of the right to use or maintain such easement for the purposes for which the same was granted or reserved;

(b)     Resulting from the exercise of any right to use the surface of the land for the extraction or development of the minerals excepted from the description of the land or shown as a reservation in Schedule B.

4.      Any final court order or judgment requiring removal from any land adjoining the land of any encroachment shown in Schedule B.

        Wherever in this endorsement any or all the words "covenants, conditions or restrictions" appear, they shall not be deemed to refer to or include the terms, covenants, conditions or restrictions contained in any lease.



**LandTitle**
O F   N E V A D A ,   I N C .

as Issuing Agent for
United Capital Title Insurance Company
**ALTA LOAN POLICY**

File No. 90500380-DW

Policy No.   A92 210014567

# CLTA ENDORSEMENT 100 (continued)

For purposes of this endorsement, the words "covenants," "conditions" or "restrictions" shall not be deemed to refer to or include any covenants, conditions or restrictions relating to environmental protection, except to the extent that a notice of a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy and is not excepted in Schedule B.

This endorsement is made a part of the policy and is subject to all of the terms and provisions thereof and of any prior endorsements thereto. Except to the extent expressly stated, it neither modifies any of the terms and provisions of the policy and any prior endorsements, nor does it extend the effective date of the policy and any prior endorsements, nor does it increase the face amount thereof.

Dated:  March 23, 2005

United Capital Title Insurance Company

*J M Smolar*

By_____
            Authorized signatory



**Land Title**
**OF NEVADA, INC.**

as Issuing Agent for
**United Capital Title Insurance Company**
**ALTA LOAN POLICY**

File No. 90500380-DW                    Policy No.  A92 210014567

## CLTA ENDORSEMENT 116

The Company hereby insures the owner of the indebtedness secured by the insured mortgage against loss or damage which the insured shall sustain by reason of the failure of (i) a Four-Plex  known as 1628 Cordoba Lane, Las Vegas, Nevada  , to be located on the land at Date of Policy, or (ii) the map attached to this policy to correctly show the location and dimensions of the land according to the public records.

This endorsement is made a part of the policy and is subject to all of the terms and provisions thereof and of any prior endorsements thereto.  Except to the extent expressly stated, it neither modifies any of the terms and provisions of the policy and any prior endorsements, nor does it extend the effective date of the policy and any prior endorsements, nor does it increase the face amount thereof.

Dated:  March 23, 2005

United Capital Title Insurance Company

*J M Smolar*

By_____
          Authorized signatory



**as Issuing Agent for**
**United Capital Title Insurance Company**
**ALTA LOAN POLICY**

File No. 90500380-DW

Policy No. A92 210014567

## CLTA ENDORSEMENT 110.9

The insurance afforded by this endorsement is only effective if the land is used or is to be used primarily for residential purposes.

The Company insures the Insured against loss or damage sustained by reason of lack of priority of the lien of the Insured mortgage over:

(a) any environmental protection lien which, at Date of Policy, is recorded in those records established under state statutes at Date of Policy for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without knowledge, or filed in the records of the clerk of the United States district court for the district in which the land is located, except as set forth in Schedule B; or

(b) any environmental protection lien provided for by any state statute in effect at Date of Policy, except environmental protection liens provided for by the following state statutes:

[None]

This endorsement is made a part of the policy and is subject to all of the terms and provisions thereof and of any prior endorsements thereto. Except to the extent expressly stated, it neither modifies any of the terms and provisions of the policy and any endorsements, nor does it extend the effective date of the policy and any prior endorsements, nor does it increase the face amount thereof.

Dated: March 23, 2005

United Capital Title Insurance Company

*J M Smolar*

By_____
        Authorized signatory



**Land Title**

**O F   N E V A D A ,   I N C .**

as Issuing Agent for
**United Capital Title Insurance Company**
**ALTA LOAN POLICY**

File No. 90500380-DW                              Policy No.  A92 210014567

# CLTA ENDORSEMENT 111.5

The Company insures the owner of the indebtedness secured by the insured mortgage against loss or damage sustained by reason of:

1.   The invalidity or unenforceability of the lien of the insured mortgage resulting from the provisions therein which provide for changes in the rate of interest.

2.   Loss of priority of the lien of the insured mortgage as security for the unpaid principal balance of the loan, together with interest as changed in accordance with the provisions of the insured mortgage, which loss of priority is caused by the changes in the rate of interest.

"Changes in the rate of interest", as used in this endorsement, shall mean only those changes in the rate of interest calculated pursuant to the formula provided in the insured mortgage at Date of Policy.

This endorsement does not insure against loss or damage based upon

(a)   usury, or
(b)   any consumer credit protection or truth in lending law.

This endorsement is made a part of the policy and is subject to all of the terms and provisions thereof and of any prior endorsements thereto, except that the insurance afforded by this endorsement is not subject to Section 3(d) of the Exclusions From Coverage.  Except to the extent expressly stated, it neither modifies any of the terms and provisions of the policy and any prior endorsements, nor does it extend the effective date of the policy and any prior endorsements, nor does it increase the face amount thereof.

Dated:  March 23, 2005

United Capital Title Insurance Company

*J M Smolar*

By_____
          Authorized signatory



**as Issuing Agent for**
**United Capital Title Insurance Company**
**ALTA LOAN POLICY**

File No. 90500380-DW                    Policy No.   A92 210014567

## CLTA ENDORSEMENT 100.2

The Company insures the owner of the indebtedness secured by the insured mortgage against loss or damage sustained by reason of:

1.      The existence at Date of Policy of any of the following:

(a)      Covenants, conditions or restrictions under which the lien of the mortgage referred to in Schedule A can be divested, subordinated or extinguished, or its validity, priority or enforceability impaired.

(b)      Unless expressly excepted in Schedule B:

(1)      Present violations on the land of any enforceable covenants, conditions or restrictions, nor do any existing improvements on the land violate any building setback lines shown on a plat of subdivision recorded or filed in the public records.

(2)      Any instrument referred to in Schedule B as containing covenants, conditions or restrictions on the land does not, in addition, (i) establish an easement on the land; (ii) provide a lien for liquidated damages; (iii) provide for a private charge or assessment; (iv) provide for an option to purchase, a right of first refusal or the prior approval of a future purchaser or occupant.

(3)      Any encroachment of existing improvements located on the land onto adjoining land, nor any encroachment onto the land of existing improvements located on adjoining land.

(4)      Any encroachment of existing improvements located on the land onto that portion of the land subject to any easement excepted in Schedule B.

(5)      Any notices of violation of covenants, conditions and restrictions relating to environmental protection recorded or filed in the public records.

2.      Any future violation on the land of any existing covenants, conditions or restrictions occurring prior to the acquisition of title to the estate or interest in the land by the Insured, provided the violation results in:

(a)      Invalidity, loss of priority, or unenforceability of the lien of the insured mortgage; or

(b)      loss of title to the estate or interest in the land if the Insured shall acquire title in satisfaction of the indebtedness secured by the insured mortgage.



**LandTitle**
O F   N E V A D A ,   I N C .

as Issuing Agent for
**United Capital Title Insurance Company**
**ALTA LOAN POLICY**

File No. 90500380-DW                    Policy No.  A92 210014567

3.      Damage to existing improvements, including lawns, shrubbery or trees:

(a)      which are located on or encroach upon that portion of the land subject to any easement excepted in
Schedule B, which damage results from the exercise of the right to maintain the easement for the purpose
for which it was granted or reserved;

(b)      resulting from the future exercise of any right to use the surface of the land for the extraction or
development of minerals excepted from the description of the land or excepted in Schedule B.

4.      Any final court order or judgment requiring the removal from any land adjoining the land of any
encroachment excepted in Schedule B.

5.      Any final court order or judgment denying the right to maintain any existing improvements on the land
because of any violation of covenants, conditions or restrictions or building setback lines shown on a plat of
subdivision recorded or filed in the public records.

Wherever in this endorsement the words "covenants, conditions or restrictions" appear, they shall not be
deemed to refer to or include the terms, covenants, conditions or limitations contained in an instrument creating a
lease.

As used in paragraphs 1(b)(1) and 5, the words "covenants, conditions or restrictions" shall not be deemed
to refer to or include any covenants, conditions or restrictions relating to environmental protection.

This endorsement is made a part of the policy and is subject to all of the terms and provisions thereof and
any prior endorsements thereto.  Except to the extent expressly stated, it neither modifies any of the terms and
provisions of the policy and any prior endorsements, nor does it extend the effective date of the policy and any prior
endorsements, nor does it increase the face amount thereof.

Dated:  March 23, 2005

United Capital Title Insurance Company

*J M Smolar*

By_____
      Authorized signatory

# EXHIBIT 2

# EXHIBIT 2



# CHICAGO TITLE
## NATIONAL COMMERCIAL SERVICES



National Commercial Services

# ENDORSEMENT GUIDE

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF



**ENDORSEMENTS**

Generally, endorsements will provide additional coverage for matters which would ordinarily be excluded by the Exclusions From Coverage, or excepted from coverage shown in Schedule B of the policy either by the regional general exceptions, if applicable, or by specific exceptions. A majority of the endorsements are not general in nature, but are specific as to items for which the insured desires coverage. Some are specifically designed for owner's policies and others for loan policies. Some endorsements are not available in all circumstances.

The issuance of any endorsement is conditioned upon the circumstances surrounding the property involved, and upon the fulfillment of the underwriting criteria established by Chicago Title Insurance Company is subject to the terms and conditions of the policy to which they are attached. The following descriptions do not define the complete coverage of the endorsements, which can only be determined by reading the same. This list is provided as a convenience in located the endorsement which may fit a particular set of facts. This list does not include all endorsements that may be filed in California, but rather includes the standard ALTA endorsements.

**All information is provided as a courtesy and is deemed reliable but not guaranteed. Please contact your local Sales Executive to learn more. **

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ALTA/CLTA ENDORSEMENT CONVERSION CHART AS OF 04-02-13**

| ALTA | CLTA | Description | Adoption (Rev.) |
|---|---|---|---|
| 1-06 | - | Street Assessments | 6-17-06 |
| 2-06 | 125-06 | Truth in Lending | 6-17-06 |
| 3-06 | 123.1-06 | Zoning – Unimproved Land | 6-17-06 |
| 3.1-06 | 123.2-06 | Zoning – Improved Land | (10-22-09) |
| 3.2-06 | 123.3-06 | Zoning – Land Under Development (OP or LP) | 04-02-12 (Tech. Correction 12-3-12) |
| 4-06 | 115.1-06 | Condominium | (02-03-10) |
| 4.1-06 | 115.3-06 | Condominium (for NV & HI not CA) | (10-16-08) |
| 5-06 | 115.2-06 | Planned Unit Development | (02-03-10) |
| 5.1-06 | 115.4-06 | Planned Unit Development (for NV & HI not CA) | (10-16-08) |
| 6-06 | 111.5-06 | Variable rate | (10-16-08) |
| 6.2-06 | 111.8-06 | Variable Rate - Negative Amortization | (10-16-08) |
| 7-06 | 116.5-06 | Manufactured Housing Unit | 6-17-06 |
| 7.1-06 | 116.5. 1-06 | Manufactured Housing Unit-Conversion; Loan | 6-17-06 |
| 7.2-06 | 116.5. 2-06 | Manufactured Housing Unit-Conversion; Owner's | 6-17-06 |
| 8.1-06 | 110.9-06 | Environmental Protection Lien | 6-17-06 |
| 8.2-06 | 110.9.1-06 | Commercial Environmental Protection Lien | 10-16-08 |
| 9-06 | 100.2-06 | Restrictions, Encroachments & Minerals-Loan | (04-02-12) |
| 9.1-06 | 100.9-06 | Covenants, Conditions and Restrictions (Owner's Policy - Unimproved Land) | (04-02-12) |
| 9.2-06 | 100.10-06 | Covenants, Conditions and Restrictions (Owner's Policy - Improved Land) | (04-02-12) |
| 9.3-06 | 100.2.1-06 | Covenants, Conditions and Restrictions-Loan | (04-02-12) |
| 9.4-06 | 100.2.2-06 | Restrictions, Encroachments, Minerals-Future Improvements re Minerals Extraction– OP-Unimproved Land | Withdrawn 04-02-12 |
| 9.5-06 | 100.2.3-06 | Restrictions, Encroachments, Minerals –Future Improvements re Minerals Extraction- OP– Improved Land | (Withdrawn 04-02-12) |
| **9.6-06** | **(100.2.6-06)** | **Private Rights - Loan** | **04-02-13** |
| 9.7-06 | (100.2.7-06) | Restrictions, Encroachments, Minerals – Land under Development-Loan | 04-02-12 |
| 9.8-06 | (100.2.8-06) | Covenants, Conditions and Restrictions-Land under Development-Owners | 04-02-12 (Tech. Correction 12-3-12) |
| **9.9-06** | **100.2.9-06** | **Private Rights – Owner's** | **(04-02-13)** |
| **9.10-06** | **100.2.10-06** | **Restrictions, Encroachments, Minerals – Current Violations - Loan** | **(04-02-13)** |
| 10-06 | 104.12-06 | Assignment of Mortgage | (02-03-10) |
| 10.1-06 | 104.13-06 | Assignment and Date Down | (02-03-10) |
| 11-06 | 110.11-06 | Mortgage Modification | 6-17-06 |
| 11.1-06 | 110.11.1-06 | Mortgage Modification with Subordination | 10-22-09 |
| **12-06** | **117-06** | **Aggregation - Loan** | **(04-02-12)** |
| **12.1-06** | **117.1-06** | **Aggregation – State Limits – Loan** | **04-02-13** |
| 13-06 | 119.5-06 | Leasehold – Owner's | 04-02-12 |
| 13.1-06 | 119.6-06 | Leasehold – Loan | 04-02-12 |
| 14-06 | 111.14-06 | Future Advance-Priority [Note: Version A gives ML Coverage: Version B Does Not] | (02-03-11) |
| 14.1-06 | 111.14.1-06 | Future Advance-Knowledge [See Note for ALTA 14] | (02-03-11) |
| 14.2-06 | 111.14.2-06 | Future Advance-Letter of Credit [See Note for ALTA 14] | (02-03-11) |
| 14.3-06 | 111.14.3 -06 | Future Advance-Reverse Mortgage [See Note for ALTA 14] | (02-03-11) (Tech. Correction 12-3-12) |
| 15-06 | 127-06 | Non-imputation-Full Equity Transfer [Owner's Policy Only] | 6-17-06 |
| 15.1-06 | 127.1-06 | Non-imputation-Additional Insured [Owner's Policy Only] | 6-17-06 |
| 15.2-06 | 127.2-06 | Non-imputation-Partial Equity Transfer [Owner's Policy Only] | 6-17-06 |
| 16-06 | 128-06 | Mezzanine Financing [Owner's Policy Only] | 6-17-06 |
| 17-06 | 103.11-06 | Access and Entry | 6-17-06 |
| 17.1-06 | 103.12-06 | Indirect Access and Entry | 6-17-06 |
| 17.2-06 | 103.13-06 | Utility Access | 10-16-08 |
| 18-06 | 129-06 | Single Tax Parcel | 6-17-06 |
| 18.1-06 | 129.1-06 | Multiple Tax Parcels | 6-17-06 |
| 19-06 | 116.4.1-06 | Contiguity-Multiple Parcels | 6-17-06 |
| 19.1-06 | 116.4-06 | Contiguity-Single Parcel | 6-17-06 |
| 20-06 | 130-06 | First Loss-(Multiple Parcels) Transaction [Loan Policy Only] | 6-17-06 |
| 21-06 | 131-06 | Creditors' Rights (Decertification effective 03-08-10) | 6-17-06 |
| 22-06 | 116.01-06 | Location | 6-17-06 |

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

| | | | |
|---|---|---|---|
| 22.1-06 | 116.02-06 | Location & Map | 6-17-06 |
| 23-06 | 114.3-06 | Co-Insurance – Single Policy (01-01-08) | 10-16-08 |
| 24-06 | 133-06 | Doing Business | 10-16-08 |
| 25-06 | 116.1-06 | Same as Survey | 10-16-08 |
| 25.1-06 | 116.1.2-06 | Same as Portion of Survey | 10-16-08 |
| 26-06 | 116.8-06 | Subdivision | 10-16-08 |
| 27-06 | 132-06 | Usury | 10-16-08 |
| 28-06 | 103.1-06 | Easement – Damage or Enforced Removal | 02-03-10 |
| 28.1-06 | 103.14-06 | Encroachments-Boundaries and Easements | 04-02-12 |
| **28.2-06** | **103.15-06** | **Encroachments-Boundaries and Easements – Described Improvements** | **04-02-12** |
| 29-06 | 134-06 | Interest Rate SWAP-Direct Obligation | 02-03-10 |
| 29.1-06 | 134.1-06 | Interest Rate SWAP-Additional Interest | 02-03-10 |
| 29.2-06 | 134.2-06 | Interest Rate SWAP-Direct Obligation – Defined Amount | 08-01-11 |
| 29.3-06 | 134.3-06 | Interest Rate SWAP-Additional Interest – Defined Amount | 08-01-11 |
| 30-06 | 135-06 | Shared Appreciation Mortgage | 07-26-10 |
| 30.1-06 | 135.1-06 | Commercial Participation Interest | 08-01-12 |
| 31-06 | 136-06 | Severable Improvements | 02-03-11 |
| 32-06 | 137-06 | Construction Loan – Loss of Priority | 02-03-11 |
| **32.1-06** | **137.1-06** | **Construction Loan – Loss of Priority – Direct Payment** | **(04-02-13)** |
| **32.2-06** | **137.2-06** | **Construction Loan – Loss of Priority – Insured's Direct Payment** | **(04-02-13)** |
| 33-06 | 138-06 | Disbursement Endorsement | 02-03-11 |
| 34-06 | 139-06 | Identified Risk Coverage | 08-01-11 |
| 35-06 | 140-06 | Minerals and Other Subsurface Substances – Buildings-OP or LP | 04-02-12 |
| 35.1-06 | 140.1-06 | Minerals and Other Subsurface Substances-Described Improvements –OP or LP | 04-02-12 |
| 35.2-06 | 140.2-06 | Minerals and Other Subsurface Substances-Improvements- OP or LP_ | 04-02-12 |
| 35.3-06 | 140.3-06 | Minerals and Other Subsurface Substances-Land Under Development-OP or LP | 04-02-12 |
| 36-06 | 141-06 | Energy Project-Leasehold/Easement-OP | 04-02-12 |
| 36.1-06 | 141.1-06 | Energy Project-Leasehold/Easement-LP | 04-02-12 |
| 36.2-06 | 141.2-06 | Energy Project-Leasehold-OP | 04-02-12 |
| 36.3-06 | 141.3-06 | Energy Project-Leasehold-LP | 04-02-12 |
| 36.4-06 | 141.4-06 | Energy Project- CC and Rs- Land Under Development-OP | 04-02-12 |
| 36.5-06 | 141.5-06 | Energy Project- CC and Rs- Land Under Development-LP | 04-02-12 |
| 36.6-06 | 141.6-06 | Energy Project-Encroachments- LP or OP | 04-02-12 |
| **37-06** | **104.6-06** | **Assignment of Rents or Leases** | **12-03-12** |
| **39-06** | **142-06** | **Policy Authentication** | **04-02-13** |
| JR 1 | | ALTA Res. Limited Cov.  Jr. Loan Policy | 08-01-12 |
| JR 2 | | ALTA Res. Limited Cov.  Jr. Loan Policy | 08-01-12 |

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**STREET ASSESSMENTS**
**ALTA ENDORSEMENT - FORM 1-06 (06-17-06)**

The repair and maintenance of public streets is either contracted for by a governmental body or done directly by government employees. The property owners adjoining the streets or in the generally benefited area are usually assessed the costs of the work on some basis. The governmental body is almost universally given a lien to secure the payment of this assessment.

This endorsement is concerned with the priority of that lien if the improvements are either in process or completed at the Date of Policy. If this lien is prior to the lien of the Insured Mortgage and the assessments are not paid by the borrower, the lender will have to pay them in order to stop a tax foreclosure. This endorsement covers the loss or damage which the lender may sustain by having to pay the assessments which have gained priority over the Insured Mortgage.

This endorsement is not filed in California.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company


The Company insures against loss or damage sustained by the Insured by reason of the lack of priority of the lien of the Insured Mortgage over the lien of any assessments for street improvements under construction or completed at Date of Policy.


This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.


[Witness Clause Optional]


DATED:

Chicago Title Insurance Company

BY:_____
    AUTHORIZED SIGNATORY


ALTA Endorsement Form 1-06
(Street Assessments) (6/17/06)
© American Land Title Association

**TRUTH-IN-LENDING**
**ALTA 2-06 (06-17-06)**

This endorsement is for loan policies only. It provides insurance against some losses the Insured may suffer if the borrower exercises a right of rescission under Regulation Z of the Federal Truth in Lending Act.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company insures against loss or damage sustained by the Insured by reason of:

any final judgment of a court of competent jurisdiction that either the lien of the Insured Mortgage has been terminated or the Title of an Insured, who has acquired all or any part of the Land by foreclosure, trustee's sale, conveyance in lieu of foreclosure, or other legal manner, which discharges the lien of the Insured Mortgage, has been defeated by a valid exercise of the right of rescission conferred by the Federal Truth-in-Lending Act and that the right or rights of rescission existed because neither the credit transaction evidenced by the Insured Mortgage nor the right of rescission was exempted or excepted by the provisions of Regulation Z (12 CFR 226).

   This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness Optional]

DATED:

Chicago Title Insurance Company

BY:_____
   AUTHORIZED SIGNATORY

ALTA Endorsement Form 2-06
(Truth in Lending) (6/17/06)
© American Land Title Association

**ZONING**
**ALTA 3-06 (06-17-06), 3.1-06 (10-22-09) and 3.2-06 (04-02-12)**

These forms are used to provide certain zoning coverage. They do not provide unlimited zoning insurance.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.      The Company insures against loss or damage sustained by the Insured in the event that, at Date of Policy,

a.      According to applicable zoning ordinances and amendments, the Land is not classified Zone *[FILL IN];*

b.      The following use or uses are not allowed under that classification:

*[FILL IN]*

2.      There shall be no liability under this endorsement based on

a.      Lack of compliance with any conditions, restrictions, or requirements contained in the zoning ordinances and amendments, including but not limited to the failure to secure necessary consents or authorizations as a prerequisite to the use or uses.  This paragraph 2.a. does not modify or limit the coverage provided in Covered Risk 5.

b.      The invalidity of the zoning ordinances and amendments until after a final decree of a court of competent jurisdiction adjudicating the invalidity, the effect of which is to prohibit the use or uses.

c.      The refusal of any person to purchase, lease or lend money on the estate or interest covered by this policy.

This endorsement is issued as part of the policy.  Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements to it.

[Witness Optional]

DATED:

Chicago Title Insurance Company

BY:_____
      AUTHORIZED SIGNATORY

ALTA Endorsement Form 3-06
(Zoning – Unimproved Land) (6/17/06)
©American Land Title Association

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.   The Company insures against loss or damage sustained by the Insured in the event that, at Date of Policy,

   a.   according to applicable zoning ordinances and amendments, the Land is not classified Zone FILL IN;
   b.   the following use or uses are not allowed under that classification:
        FILL IN
   c.   There shall be no liability under paragraph 1.b. if the use or uses are not allowed as the result of any lack of compliance with any conditions, restrictions, or requirements contained in the zoning ordinances and amendments, including but not limited to the failure to secure necessary consents or authorizations as a prerequisite to the use or uses. This paragraph 1.c. does not modify or limit the coverage provided in Covered Risk 5.

2.   The Company further insures against loss or damage sustained by the Insured by reason of a final decree of a court of competent jurisdiction either prohibiting the use of the Land, with any existing structure, as specified in paragraph 1.b. or requiring the removal or alteration of the structure, because, at Date of Policy, the zoning ordinances and amendments have been violated with respect to any of the following matters:

   a.   Area, width, or depth of the Land as a building site for the structure
   b.   Floor space area of the structure
   c.   Setback of the structure from the property lines of the Land
   d.   Height of the structure, or
   e.   Number of parking spaces.

3.   There shall be no liability under this endorsement based on:

   a.   the invalidity of the zoning ordinances and amendments until after a final decree of a court of competent jurisdiction adjudicating the invalidity, the effect of which is to prohibit the use or uses;
   b.   the refusal of any person to purchase, lease or lend money on the Title covered by this policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements to it.
[Witness Optional]

DATED:
Chicago Title Insurance Company
BY:_____
      AUTHORIZED SIGNATORY

ALTA Endorsement Form 3.1-06
(Zoning-Completed Structure) (rev. 10/22/09)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1. For purposes of this endorsement:
   a. "Improvement" means a building, structure, road, walkway, driveway, curb, subsurface utility or  water well existing at Date of Policy or to be built or constructed according to the Plans that is or  will be located on the Land, but excluding crops, landscaping, lawns, shrubbery, or trees.

   b. "Plans" means those site and elevation plans made by [*name of architect or engineer*] dated_____,  last revised_____, designated as [*name of project*] consisting of_____sheets.

2. The Company insures against loss or damage sustained by the Insured in the event that, at Date of  Policy
   a. according to applicable zoning ordinances and amendments, the Land is not classified Zone _____;

   b. the following use or uses are not allowed under that classification:

   c. There shall be no liability under paragraph 2.b. if the use or uses are not allowed as the result of  any lack of compliance with any condition, restriction, or requirement contained in the zoning  ordinances and amendments, including but not limited to the failure to secure necessary consents  or authorizations as a prerequisite to the use or uses.  This paragraph 2.c. does not modify or limit  the coverage provided in Covered Risk 5.

3. The Company further insures against loss or damage sustained by the Insured by reason of a final  decree of a court of competent jurisdiction either prohibiting the use of the Land, with any existing  Improvement, as specified in paragraph 2.b. or requiring the removal or alteration of the Improvement,  because of a violation of the zoning ordinances and amendments in effect at  Date of Policy with  respect to any of the following matters:
   a. Area, width, or depth of the Land as a building site for the Improvement

   b. Floor space area of the Improvement

   c. Setback of the Improvement from the property lines of the Land

   d. Height of the Improvement, or

   e. Number of parking spaces.

4. There shall be no liability under this endorsement based on:
   a. the invalidity of the zoning ordinances and amendments until after a final decree of a court of  competent jurisdiction adjudicating the invalidity, the effect of which is to prohibit the use or uses;

   b. the refusal of any person to purchase, lease or lend money on the Title covered by this policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and  provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of  Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of  this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of  the policy and of any prior endorsements.
[Witness Optional]

DATED:
Chicago Title Insurance Company
BY:_____
     AUTHORIZED SIGNATORY

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

ALTA Endorsement Form 3.1-06
(Zoning-Completed Structure) (rev. 10/22/09)
©American Land Title Association

**CONDOMINIUM**

**ALTA 4-06 (02-03-10) and 4.1-06 (10-16-08)**

These endorsements provide affirmative insurance to mortgage lenders loaning on the security of condominium units. There are seven matters selected for insurance in these endorsements. The ALTA 4.1-06 differs from the ALTA 4-06 only in hat there is no insurance of priority over future assessments in paragraph 4 of the endorsement. The ALTA 4.1-06 may be used with either an Owner's or Lender's Policy.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company insures against loss or damage sustained by the Insured by reason of:

1.      The failure of the unit identified in Schedule A and its common elements to be part of a condominium within the meaning of the condominium statutes of the jurisdiction in which the unit and its common elements are located.

2.      The failure of the documents required by the condominium statutes to comply with the requirements of the statutes to the extent that such failure affects the Title to the unit and its common elements.

3.      Present violations of any restrictive covenants that restrict the use of the unit and its common elements and that are contained in the condominium documents or the forfeiture or reversion of Title by reason of any provision contained in the restrictive covenants. As used in this paragraph 3, the words "restrictive covenants" do not refer to or include any covenant, condition, or restriction (a) relating to obligations of any type to perform maintenance, repair, or remediation on the Land, or (b) pertaining to environmental protection of any kind or nature, including hazardous or toxic matters, conditions, or substances, except to the extent that a notice of a violation or alleged violation affecting the Land has been recorded in the Public Records at Date of Policy and is not excepted in Schedule B.

4.      The priority of any lien for charges and assessments provided for in the condominium statutes and condominium documents at Date of Policy over the lien of any Insured Mortgage identified in Schedule A.

5.      The failure of the unit and its common elements to be entitled by law to be assessed for real property taxes as a separate parcel.

6.      Any obligation to remove any improvements that exist at Date of Policy because of any present encroachments or because of any future unintentional encroachment of the common elements upon any unit or of any unit upon the common elements or another unit.

7.      The failure of the Title by reason of a right of first refusal to purchase the unit and its common elements that was exercised or could have been exercised at Date of Policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]
DATED:
Chicago Title Insurance Company
BY:_____
        AUTHORIZED SIGNATORY

ALTA Endorsement Form 4-06
(Condominium) (Rev. 02/03/10)
©American Land Title Association

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company insures against loss or damage sustained by the Insured by reason of:

1.      The failure of the unit identified in Schedule A and its common elements to be part of a condominium within the meaning of the condominium statutes of the jurisdiction in which the unit and its common elements are located.

2.      The failure of the documents required by the condominium statutes to comply with the requirements of the statutes to the extent that such failure affects the Title to the unit and its common elements.

3.      Present violations of any restrictive covenants that restrict the use of the unit and its common elements and that are contained in the condominium documents or the forfeiture or reversion of Title by reason of any provision contained in the restrictive covenants.  As used in this paragraph 3, the words "restrictive covenants" do not refer to or include any covenant, condition, or restriction (a) relating to obligations of any type to perform maintenance, repair, or remediation on the Land, or (b) pertaining to environmental protection of any kind or nature, including hazardous or toxic matters, conditions, or substances, except to the extent that a notice of a violation or alleged violation affecting the Land has been recorded in the Public Records at Date of Policy and is not excepted in Schedule B.

4.      Any charges or assessments provided for in the condominium statutes and condominium documents due and unpaid at Date of Policy.

5.      The failure of the unit and its common elements to be entitled by law to be assessed for real property taxes as a separate parcel.

6.      Any obligation to remove any improvements that exist at Date of Policy because of any present encroachments or because of any future unintentional encroachment of the common elements upon any unit or of any unit upon the common elements or another unit.

7.      The failure of the Title by reason of a right of first refusal to purchase the unit and its common elements which was exercised or could have been exercised at Date of Policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]
DATED:
Chicago Title Insurance Company
BY:_____
      AUTHORIZED SIGNATORY

ALTA Endorsement Form 4.1-06
(Condominium) (Rev. 10/16/08)
©American Land Title Association

## PLANNED UNIT DEVELOPMENT
### ALTA 5-06 (02-03-10) and 5.1-06 (10-16-08)

These endorsements provide affirmative coverage for lenders loaning on the security of units in a Planned Unit Development, or PUD. Affirmative coverage is provided against loss caused by violation of restrictions or by the existence of certain kinds of restrictions. In addition, both cover loss from enforced removal of buildings by reason of encroachments and from failure of Title, as defined by the policies, caused by the exercise of any right of first refusal. The ALTA 5-06 insures against loss from lack of priority of the mortgage lien over the lien for homeowners' association assessments. The ALTA 5.1-06 differs in that there is no insurance of priority over future assessments in Paragraph 2 of the 5.1-06; instead it only covers unpaid assessments at date of policy.   The ALTA 5.1-06 may be used with either an Owner's or Lender's Policy.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company insures against loss or damage sustained by the Insured by reason of:

1.      Present violations of any restrictive covenants referred to in Schedule B that restrict the use of the Land or the forfeiture or reversion of Title by reason of any provision contained in the restrictive covenants. As used in this paragraph 1, the words "restrictive covenants" do not refer to or include any covenant, condition or restriction (a) relating to obligations of any type to perform maintenance, repair or remediation on the Land, or (b) pertaining to environmental protection of any kind or nature, including hazardous or toxic matters, conditions, or substances, except to the extent that a notice of a violation or alleged violation affecting the Land has been recorded in the Public Records at Date of Policy and is not excepted in Schedule B.

2.      The priority of any lien for charges and assessments in favor of any association of homeowners which are provided for in any document at Date of Policy referred to in Schedule B over the lien of any Insured Mortgage identified in Schedule A.

3.      The enforced removal of any existing structure on the Land (other than a boundary wall or fence) because it encroaches onto adjoining land or onto any easements.

4.      The failure of the Title by reason of a right of first refusal to purchase the Land which was exercised or could have been exercised at Date of Policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

Chicago Title Insurance Company

BY:_____

ALTA Endorsement Form 5-06
(Planned Unit Development) (Rev. 02/03/10)
© American Land Title Association

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company insures against loss or damage sustained by the Insured by reason of:

1.   Present violations of any restrictive covenants referred to in Schedule B that restrict the use of the Land or the forfeiture or reversion of Title by reason of any provision contained in the restrictive covenants. As used in this paragraph 1, the words "restrictive covenants" do not refer to or include any covenant, condition, or restriction (a) relating to obligations of any type to perform maintenance, repair, or remediation on the Land, or (b) pertaining to environmental protection of any kind or nature, including hazardous or toxic matters, conditions, or substances, except to the extent that a notice of a violation or alleged violation affecting the Land has been recorded in the Public Records at Date of Policy and is not excepted in Schedule B.

2.   Any charges or assessments in favor of any association of homeowners, which are provided for in any document referred to in Schedule B, due and unpaid at Date of Policy.

3.   The enforced removal of any existing structure on the Land (other than a boundary wall or fence) because it encroaches onto adjoining land or onto any easements.

4.   The failure of the Title by reason of a right of first refusal to purchase the Land that was exercised or could have been exercised at Date of Policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

Chicago Title Insurance Company

BY:_____ _____

ALTA Endorsement Form 5.1-06
(Planned Unit Development) (Rev. 10/16/08)
©American Land Title Association

**VARIABLE RATE MORTGAGE**
**ALTA 6-06 (10-16-08), and 6.2-06 (10-16-08)**

These endorsements were created to insure the validity and priority of the mortgage liens securing loans with variable interest rates. The ALTA 6-06 is the basic variable interest rate endorsement. The ALTA 6.1 is not filed in California and is designed for use where lenders face regulatory requirements which must be followed in order to make such loans. The ALTA 6.2-06 was created to insure the validity and priority of mortgage liens as security for interest at variable rates and as security for additional principal created by the negative amortization of unpaid interest.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company insures against loss or damage sustained by the Insured by reason of:

1.      The invalidity or unenforceability of the lien of the Insured Mortgage resulting from its provisions that provide for changes in the rate of interest.

2.      Loss of priority of the lien of the Insured Mortgage as security for the unpaid principal balance of the loan, together with interest as changed in accordance with the provisions of the Insured Mortgage, which loss of priority is caused by the changes in the rate of interest.

"Changes in the rate of interest", as used in this endorsement, shall mean only those changes in the rate of interest calculated pursuant to the formula provided in the documents secured by the Insured Mortgage at Date of Policy.

This endorsement does not insure against loss or damage based upon:

1.      usury, or

2.      any consumer credit protection or truth in lending law.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.


[Witness clause optional]
DATED:
Chicago Title Insurance Company
BY:_____
       AUTHORIZED SIGNATORY

ALTA Endorsement Form 6-06
(Variable Rate) (Rev. 10/16/08)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**For use with 1992 policies or older**

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company insures the owner of the indebtedness secured by the insured mortgage against loss or damage sustained by reason of:

1.  The invalidity or unenforceability of the lien of the insured mortgage resulting from the provisions therein which provide for changes in the rate of interest.

2.  Loss of priority of the lien of the insured mortgage as security for the unpaid principal balance of the loan, together with interest as changed in accordance with the provisions of the insured mortgage, which loss of priority is caused by the changes in the rate of interest.

"Changes in the rate of interest", as used in this endorsement, shall mean only those changes in the rate of interest calculated pursuant to the formula provided in the insured mortgage at Date of Policy.

This endorsement does not insure against loss or damage by reason of the failure of the insured to comply with the following statutes or regulations concerning variable rate mortgages:

This endorsement does not insure against loss or damage based upon (a) usury, or (b) any consumer credit protection or truth in lending law.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy or
(iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]
DATED:
Chicago Title Insurance Company
BY:_____
        AUTHORIZED SIGNATORY

ALTA Endorsement - Form 6.1
(Variable Rate Mortgage) (1/17/04)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company insures against loss or damage sustained by the Insured by reason of:

1.      The invalidity or unenforceability of the lien of the Insured Mortgage resulting from its provisions that provide for (a) interest on interest, (b) changes in the rate of interest, or (c) the addition of unpaid interest to the principal balance of the loan.

2.      Loss of priority of the lien of the Insured Mortgage as security for the principal balance of the loan, including any unpaid interest which was added to principal in accordance with the provisions of the Insured Mortgage, interest on interest, or interest as changed in accordance with the provisions of the Insured Mortgage, which loss of priority is caused by (a) changes in the rate of interest, (b) interest on interest, or (c) increases in the unpaid principal balance of the loan resulting from the addition of unpaid interest.

"Changes in the rate of interest", as used in this endorsement shall mean only those changes in the rate of interest calculated pursuant to the formula provided in the loan documents secured by the Insured Mortgage at Date of Policy.

This endorsement does not insure against loss or damage based upon:

        1.      usury, or

        2.      any consumer credit protection or truth in lending law.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]
DATED:
Chicago Title Insurance Company
BY:_____
        AUTHORIZED SIGNATORY

ALTA Endorsement Form 6.2-06
(Variable Rate, Negative Amortization) (Rev. 10/16/08)
©American Land Title Association

**MANUFACTURED HOUSING**
**ALTA 7-06 (06-17-06), 7.1-06 (06-17-06) and 7.2-06 (06-17-06)**

These endorsements clarify whether or not a manufactured housing unit ("MHU") located on the Land is covered by the insurance policy. The ALTA 7-06 adds the MHU to the definition of Land. In addition the ALTA 7.1-06 and the ALTA 7.2-06 insure against loss or damage if the MHU is not located on the subject premises, if there are UCC type liens filed against the MHU and if the MHU does not constitute real property under state law. The ALTA 7.1-06, which is the form to be used with a Loan Policy, also insures that the Insured Mortgage can be enforced in a single foreclosure action against both the MHU and the Land.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The term "Land" includes the manufactured housing unit located on the land described in Schedule A at Date of Policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]
DATED:
Chicago Title Insurance Company
BY:_____
     AUTHORIZED SIGNATORY

ALTA Endorsement Form 7-06
(Manufactured Housing Unit) (6/17/06)
©American Land Title Association

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1. The term "Land" as defined in this policy includes the manufactured housing unit located on the land described in Schedule A at Date of Policy.

2. Unless excepted in Schedule B, the Company insures against loss or damage sustained by the Insured if, at Date of Policy,

   (a)    A manufactured housing unit is not located on the land described in Schedule A.

   (b)    The manufactured housing unit located on the land is not real property under the law of the state where the Land described in Schedule A is located.

   (c)    The owner of the Land is not the owner of the manufactured housing unit.

   (d)    Any lien is attached to the manufactured housing unit as personal property, including

      (i)     a federal, state, or other governmental tax lien,

      (ii)    UCC security interest,

      (iii)   a motor vehicular lien,

      (iv)    other personal property lien.

   (e)    The lien of the Insured Mortgage is not enforceable against the Land.

   (f)    The lien of the Insured Mortgage is not enforceable in a single foreclosure procedure.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]
DATED:
Chicago Title Insurance Company
BY:_____
        AUTHORIZED SIGNATORY

ALTA Endorsement Form 7.1-06
(Manufactured Housing – Conversion; Loan) (6/17/06)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.      The term "Land" as defined in this policy includes the manufactured housing unit located on the land described in Schedule A at Date of Policy.

2.      Unless excepted in Schedule B, the Company insures against loss or damage, sustained by the Insured if, at Date of Policy

      (a)      A manufactured housing unit is not located on the Land described in Schedule A.

      (b)      The manufactured housing unit located on the Land is not real property under the law of the state where the Land described in Schedule A is located.

      (c)      The Insured is not the owner of the manufactured housing unit.

      (d)      Any lien is attached to the manufactured housing unit as personal property, including

            (i)      a federal, state, or other governmental tax lien,

            (ii)      UCC security interest,

            (iii)      a motor vehicular lien,

            (iv)      other personal property lien.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]
DATED:
Chicago Title Insurance Company
BY:_____
      AUTHORIZED SIGNATORY

ALTA Endorsement Form 7.2-06
(Manufactured Housing – Conversion; Owners) (6/17/06)
©American Land Title Association

**ENVIRONMENTAL PROTECTION LIEN COMMERCIAL ENVIRONMENTAL LIEN**
**ALTA 8.1-06 (06-17-06) and 8.2-06 (10-16-08)**

These endorsements provide affirmative insurance that the lien of the Insured Mortgage has priority over unrecorded or unfiled environmental protection liens.

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The insurance afforded by this endorsement is only effective if the Land is used or is to be used primarily for residential purposes.

The Company insures against loss or damage sustained by the Insured by reason of lack of priority of the lien of the Insured Mortgage over

(a) any environmental protection lien that, at Date of Policy, is recorded in those records established under state statutes at Date of Policy for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without knowledge, or is filed in the records of the clerk of the United States district court for the district in which the Land is located, except as set forth in Schedule B; or

(b) any environmental protection lien provided by any state statute in effect at Date of Policy, except environmental protection liens provided by the following state statutes:

FILL IN

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]
DATED:
Chicago Title Insurance Company
BY:_____
        AUTHORIZED SIGNATORY

ALTA Endorsement Form 8.1-06
(Environmental Protection Lien) (6/17/06)
©American Land Title Association

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company


The Company insures against loss or damage sustained by the Insured by reason of an environmental protection lien that, at Date of Policy, is recorded in the Public Records or filed in the records of the clerk of the United States district court for the district in which the Land is located, unless the environmental protection lien is set forth as an exception in Schedule B.


This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.


[Witness clause optional]
DATED:
Chicago Title Insurance Company
BY:_____
    AUTHORIZED SIGNATORY


ALTA Endorsement Form 8.2-06
(Commercial Environmental Lien) (10/16/08)
©American Land Title Association

**ALTA 9**
**SERIES 9**
**ALTA 9-06 to 9.10-06**
**[ALTA 9.4-06 AND 9.5-06 WITHDRAWN EFFECTIVE 4/2/2012]**

It is common for institutional lenders to require certain additional title insurance coverages for loans secured by first mortgages on improved real property when these mortgages are to be sold on the secondary market. The original ALTA Form 9 was designed to provide those coverages in a single, inclusive form. It afforded the lender various protections with respect to private property restrictions, building setback lines, encroachments and excepted minerals. Forms for use with owner's policies were subsequently adopted also.

In 2012 and 2013 ALTA completely revised all of the endorsements in the series, withdrawing the 9.4-06 and 9.5-06 and adding 5 new forms- the 9.6-06, 9.7-06,  9.8-06, 9.9-06 and 9.10-06.

# ALTA 9 Series Summary
**Actual Endorsement Availability Depends Upon Case by Case Title Insurer's Underwriting Analysis**

| | Coverage Requested | Loan Policy | Owners Policy |
|---|---|---|---|
| **A L T A 9 S E R I E S** | Restrictions, Encroachments, Minerals | **Use:** **ALTA 9-06[1]** for existing improvements, **ALTA 9.7-06[1]** for Land under Development, and **ALTA 9.10-06[1]** where a possibility of forfeiture exists but there is no current violation. | To get this coverage for: vacant land combine - ALTA **9.1-06[1], ALTA 28.1-06[2]** and ALTA **35.1-06**. improved land - combine ALTA **9.2-06[1]**, ALTA **28.1-06[2]** and ALTA **35.1-06**. |
| | Covenants, Conditions & Restrictions | **Use:** **ALTA 9.3-06[1]** (It has the same coverage as Section 3 of the ALTA 9-06, so the ALTA 9-06 is more inclusive with its encroachment and mineral coverages in Section 4). | **Use:** **ALTA 9.1-06[1]** for unimproved land, **ALTA 9.2-06[1]** available for improved Land, or **ALTA 9.8[2]** for Land Under Development |
| | Private Rights | **Use:** **ALTA 9.6-06** (A private charge or assessment, option, right of first refusal or right of prior approval). | **Use:** **ALTA 9.9-06 06** (An option, right of first refusal or right of prior approval). |

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1. The insurance provided by this endorsement is subject to the exclusions in Section 5 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2. For the purposes of this endorsement only:

   a. "Covenant" means a covenant, condition, limitation or restriction in a document or instrument in effect at Date of Policy.

   b. "Improvement" means an improvement, including any lawn, shrubbery, or trees, affixed to either the Land or adjoining land at Date of Policy that by law constitutes real property.

3. The Company insures against loss or damage sustained by the Insured by reason of:

   a. A violation of a Covenant that:

      i. divests, subordinates, or extinguishes the lien of the Insured Mortgage,
      ii. results in the invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage, or
      iii. causes a loss of the Insured's Title acquired in satisfaction or partial satisfaction of the Indebtedness;

   b. A violation on the Land at Date of Policy of an enforceable Covenant, unless an exception in Schedule B of the policy identifies the violation;

   c. Enforced removal of an Improvement located on the Land as a result of a violation, at Date of Policy, of a building setback line shown on a plat of subdivision recorded or filed in the Public Records, unless an exception in Schedule B of the policy identifies the violation; or

   d. A notice of a violation, recorded in the Public Records at Date of Policy, of an enforceable Covenant relating to environmental protection describing any part of the Land and referring to that Covenant, but only to the extent of the violation of the Covenant referred to in that notice, unless an exception in Schedule B of the policy identifies the notice of the violation.

4. The Company insures against loss or damage sustained by reason of:

   a. An encroachment of:

      i. an Improvement located on the Land, at Date of Policy, onto adjoining land or onto that portion of the Land subject to an easement; or

      ii. an Improvement located on adjoining land onto the Land at Date of Policy,

unless an exception in Schedule B of the policy identifies the encroachment otherwise insured against in Sections 4.a.i. or 4.a.ii.;

   b. A final court order or judgment requiring the removal from any land adjoining the Land of an encroachment identified in Schedule B; or

   c. Damage to an Improvement located on the Land, at Date of Policy:

      i. that is located on or encroaches onto that portion of the Land subject to an easement excepted in Schedule B, which damage results from the exercise of the right to maintain the easement for the purpose for which it was granted or reserved; or

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

ii.        resulting from the future exercise of a right to use the surface of the Land for the extraction or development of minerals or any other subsurface substances excepted from the description of the Land or excepted in Schedule B.

5.  This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:

    a.  any Covenant contained in an instrument creating a lease;

    b.  any Covenant relating to obligations of any type to perform maintenance, repair, or remediation on the Land;

    c.  except as provided in Section 3.d, any Covenant relating to environmental protection of any kind or nature, including hazardous or toxic matters, conditions, or substances;

    d.  contamination, explosion, fire, fracturing, vibration, earthquake or subsidence; or

    e.  negligence by a person or an Entity exercising a right to extract or develop minerals or other subsurface substances.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements

[Witness clause optional]
DATED:
Chicago Title Insurance Company
BY:_____
      AUTHORIZED SIGNATORY

ALTA Endorsement Form 9-06
(Restrictions, Encroachments, Minerals-Loan Policy) (Rev. 4/2/12)
©American Land Title Association

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.      The insurance provided by this endorsement is subject to the exclusions in Section 4 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2.      For the purposes of this endorsement only, "Covenant" means a covenant, condition, limitation or restriction in a document or instrument in effect at Date of Policy.

3.      The Company insures against loss or damage sustained by the Insured by reason of:

   a.   A violation on the Land at Date of Policy of an enforceable Covenant, unless an exception in Schedule B of the policy identifies the violation; or

   b.   A notice of a violation, recorded in the Public Records at Date of Policy, of an enforceable Covenant relating to environmental protection describing any part of the Land and referring to that Covenant, but only to the extent of the violation of the Covenant referred to in that notice, unless an exception in Schedule B of the policy identifies the notice of the violation.

4.      This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:

   a.   any Covenant contained in an instrument creating a lease;

   b.   any Covenant relating to obligations of any type to perform maintenance, repair, or remediation on the Land; or

   c.   except as provided in Section 3.b, any Covenant relating to environmental protection of any kind or nature, including hazardous or toxic matters, conditions, or substances.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

DATED:
Chicago Title Insurance Company
BY:_____
      AUTHORIZED SIGNATORY

ALTA Endorsement Form 9.1-06
(Covenants, Conditions and Restrictions-Unimproved Land – Owner's Policy–) (Rev. 4/2/12)
©American Land Title Association

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1. The insurance provided by this endorsement is subject to the exclusions in Section 4 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.
2. For the purposes of this endorsement only,
   a. "Covenant" means a covenant, condition, limitation or restriction in a document or instrument in effect at Date of Policy.
   b. "Improvement" means a building, structure located on the surface of the Land, road, walkway, driveway, or curb, affixed to the Land at Date of Policy and that by law constitutes real property, but excluding any crops, landscaping, lawn, shrubbery, or trees.
3. The Company insures against loss or damage sustained by the Insured by reason of:
   a. A violation on the Land at Date of Policy of an enforceable Covenant, unless an exception in Schedule B of the policy identifies the violation;
   b. Enforced removal of an Improvement as a result of a violation, at Date of Policy, of a building setback line shown on a plat of subdivision recorded or filed in the Public Records, unless an exception in Schedule B of the policy identifies the violation; or
   c. A notice of a violation, recorded in the Public Records at Date of Policy, of an enforceable Covenant relating to environmental protection describing any part of the Land and referring to that Covenant, but only to the extent of the violation of the Covenant referred to in that notice, unless an exception in Schedule B of the policy identifies the notice of the violation.
4. This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:
   a. any Covenant contained in an instrument creating a lease;
   b. any Covenant relating to obligations of any type to perform maintenance, repair, or remediation on the Land; or
   c. except as provided in Section 3.c., any Covenant relating to environmental protection of any kind, including hazardous or toxic matters, conditions, or substances.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]
DATED:
Chicago Title Insurance Company
BY:_____
    AUTHORIZED SIGNATORY

ALTA Endorsement Form 9.2-06
(Covenants, Conditions and Restrictions – Improved Land -Owner's Policy (Rev. 4/1/12)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.   The insurance provided by this endorsement is subject to the exclusions in Section 4 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2.   For the purposes of this endorsement only:

a.   "Covenant" means a covenant, condition, limitation or restriction in a document or instrument in effect at Date of Policy.

b.   "Improvement" means an improvement, including any lawn, shrubbery, or trees, affixed to the Land at Date of Policy that by law constitutes real property.

3.   The Company insures against loss or damage sustained by the Insured by reason of:

a.   A violation of a Covenant that:

i.   divests, subordinates, or extinguishes the lien of the Insured Mortgage,

ii.   results in the invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage, or

iii.   causes a loss of the Insured's Title acquired in satisfaction or partial satisfaction of the Indebtedness;

b.   A violation on the Land at Date of Policy of an enforceable Covenant, unless an exception in Schedule B of the policy identifies the violation;

c.   Enforced removal of an Improvement as a result of a violation, at Date of Policy, of a building setback line shown on a plat of subdivision recorded or filed in the Public Records, unless an exception in Schedule B of the policy identifies the violation; or

d.   A notice of a violation, recorded in the Public Records at Date of Policy, of an enforceable Covenant relating to environmental protection describing any part of the Land and referring to that Covenant, but only to the extent of the violation of the Covenant referred to in that notice, unless an exception in Schedule B of the policy identifies the notice of the violation.

4.   This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:

a.   any Covenant contained in an instrument creating a lease;

b.   any Covenant relating to obligations of any type to perform maintenance, repair, or remediation on the Land; or

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

c.   except as provided in Section 3.c, any Covenant pertaining to environmental protection of any kind or nature, including hazardous or toxic matters, conditions, or substances.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]
DATED:
Chicago Title Insurance Company
BY:_____
      AUTHORIZED SIGNATORY

ALTA Endorsement Form 9.3-06
(Covenants, Conditions and Restrictions-Loan Policy) (Rev. 4/2/12)
©American Land Title Association

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.   The insurance provided by this endorsement is subject to the exclusions in Section 4 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2.   For purposes of this endorsement only:

  a.   "Covenant" means a covenant, condition, limitation or restriction in a document or instrument in effect at Date of Policy.

  b.    "Private Right" means (i) a private charge or assessment; (ii) an option to purchase; (iii) a right of first refusal; or (iv) a right of prior approval of a future purchaser or occupant.

3.   The Company insures against loss or damage sustained by the Insured under this Loan Policy if enforcement of a Private Right in a Covenant affecting the Title at Date of Policy (a) results in the invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage, or (b) causes a loss of the Insured's Title acquired in satisfaction or partial satisfaction of the Indebtedness.

4.     This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:

  a.   any Covenant contained in an instrument creating a lease;

  b.   any Covenant relating to obligations of any type to perform maintenance, repair, or remediation on the Land;

  c.   any Covenant relating to environmental protection of any kind or nature, including hazardous or toxic matters, conditions, or substances; or

  d.   any Private Right in an instrument identified in Exception(s)_____in Schedule B.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]
DATED:
Chicago Title Insurance Company
BY:_____
      AUTHORIZED SIGNATORY

ALTA Endorsement Form 9.6-06
(Private Rights-Loan Policy) (Rev. 4/2/13)
©American Land Title Association

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.      The insurance provided by this endorsement is subject to the exclusions in Section 5 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2.      For purposes of this endorsement only:

a.      "Covenant" means a covenant, condition, limitation or restriction in a document or instrument in effect at Date of Policy.

b.      "Future Improvement" means a building, structure, road, walkway, driveway, curb, lawn, shrubbery or trees to be constructed on or affixed to the Land in the locations according to    the Plans and that by law will constitute real property.

c.      "Improvement" means an improvement, including any lawn, shrubbery, or trees, affixed to  either the Land or adjoining land at Date of Policy that by law constitutes real property.

d.      "Plans" means the survey, site and elevation plans or other depictions or drawings prepared by
(*insert name of architect or engineer*)  dated_____, last revised _____, designated as (*insert name of project or project number*)  consisting of_____sheets.

3.      The Company insures against loss or damage sustained by the Insured by reason of:

a.      A violation of a Covenant that:

i.      divests, subordinates, or extinguishes the lien of the Insured Mortgage,

ii.      results in the invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage, or

iii.      causes a loss of the Insured's Title acquired in satisfaction or partial satisfaction of the Indebtedness;

b.      A violation of an enforceable Covenant by an Improvement on the Land at Date of Policy or by a Future Improvement, unless an exception in Schedule B of the policy identifies the violation;

c.      Enforced removal of an Improvement located on the Land or of a Future Improvement as a result of a violation of a building setback line shown on a plat of subdivision recorded or filed in the Public Records at Date of Policy, unless an exception in Schedule B of the policy identifies the violation; or

d.      A notice of a violation, recorded in the Public Records at Date of Policy, of an enforceable Covenant relating to environmental protection describing any part of the Land and referring to that Covenant, but only to the extent of the violation of the Covenant referred to in that notice, unless an exception in Schedule B of the policy identifies the notice of the violation.

4.      The Company insures against loss or damage sustained by reason of:

a.      An encroachment of:

i.      an Improvement located on the Land at Date of Policy or a Future Improvement, onto adjoining land or onto that portion of the Land subject to an easement; or

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

       ii.        an Improvement located on adjoining land onto the Land at Date of Policy,

unless an exception in Schedule B of the policy identifies the encroachment otherwise insured against in Sections 4.a.i. or 4.a.ii.;

    b.      Damage to an Improvement located on the Land at Date of Policy or a Future Improvement:

       i.        that encroaches onto that portion of the Land subject to an easement excepted in Schedule B, which damage results from the exercise of the right to maintain the easement for the purpose for which it was granted or reserved; or

       ii.        resulting from the future exercise of a right to use the surface of the Land for the extraction or development of minerals or any other subsurface substances excepted from the description of the Land or excepted in Schedule B.

5.      This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:

    a.      any Covenant contained in an instrument creating a lease;

    b.      any Covenant relating to obligations of any type to perform maintenance, repair, or remediation on the Land;

    c.      except as provided in Section 3.d, any Covenant relating to environmental protection of     any kind or nature, including hazardous or toxic matters, conditions, or substance

    d.      contamination, explosion, fire, vibration, fracturing, earthquake or subsidence; or

    e.      negligence by a person or an Entity exercising a right to extract or develop minerals or other subsurface substances.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

DATED:
Chicago Title Insurance Company
BY:_____
      AUTHORIZED SIGNATORY

ALTA Endorsement Form 9.7-06
(Restrictions, Encroachments, Minerals-Land Under Development-Loan Policy) (4/2/12)
©American Land Title Association

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.      The insurance provided by this endorsement is subject to the exclusions in Section 4 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2.      For purposes of this endorsement only:

   a.      "Covenant" means a covenant, condition, limitation or restriction in a document or instrument in effect at Date of Policy.

   b.      "Future Improvement" means a building, structure, road, walkway, driveway, curb to be constructed on or affixed to the Land in the locations according to the Plans and that by law will constitute real property, but excluding any crops, landscaping, lawn, shrubbery, or trees.

   c.      "Improvement" means a building, structure located on the surface of the Land, road, walkway, driveway, or curb, affixed to the Land at Date of Policy and that by law constitutes real property, but excluding any crops, landscaping, lawn, shrubbery, or trees.

   d.      "Plans" means the survey, site and elevation plans or other depictions or drawings prepared by (*insert name of architect or engineer*) dated_____, last revised _____, designated as (*insert name of project or project number*) consisting of ____sheets.

3.      The Company insures against loss or damage sustained by the Insured by reason of:

   a.      A violation of an enforceable Covenant by an Improvement on the Land at Date of Policy or by a Future Improvement, unless an exception in Schedule B of the policy identifies the violation;

   b.      Enforced removal of an Improvement located on the Land or of a Future Improvement as a result of a violation of a building setback line shown on a plat of subdivision recorded or filed in the Public Records at Date of Policy, unless an exception in Schedule B of the   policy identifies the violation; or

   c.      A notice of a violation, recorded in the Public Records at Date of Policy, of an enforceable Covenant relating to environmental protection describing any part of the Land and referring to that Covenant, but only to the extent of the violation of the Covenant referred    to in that notice, unless an exception in Schedule B of the policy identifies the notice of the violation.

4.      This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:

   a.      any Covenant contained in an instrument creating a lease;

   b.      any Covenant relating to obligations of any type to perform maintenance, repair, or remediation on the Land; or

   c.      except as provided in Section 3.c, any Covenant relating to environmental protection of any kind or nature, including hazardous or toxic matters, conditions, or substances.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

DATED:
Chicago Title Insurance Company
BY:_____
     AUTHORIZED SIGNATORY

ALTA Endorsement Form 9.8-06
(Covenants, Conditions and Restrictions-Land Under Development-Owners Policy) (4/2/12)
©American Land Title Association

*[includes technical correction of 12-3-12]*

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.    The insurance provided by this endorsement is subject to the exclusions in Section 4 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2.    For purposes of this endorsement only:

    a.    "Covenant" means a covenant, condition, limitation or restriction in a document or instrument in effect at Date of Policy.

    b.    "Private Right" means (i) an option to purchase; (ii) a right of first refusal; or (iii) a right of prior approval of a future purchaser or occupant.

3.    The Company insures against loss or damage sustained by the Insured under this Owner's Policy if enforcement of a Private Right in a Covenant affecting the Title at Date of Policy based on a transfer of Title on or before Date of Policy causes a loss of the Insured's Title.

4.    This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from: restriction:

    a.    any Covenant  contained in an instrument creating a lease;

    b.    any Covenant relating to obligations of any type to perform maintenance, repair, or remediation on the Land;

    c.    any Covenant relating to environmental protection of any kind or nature, including hazardous or toxic matters, conditions, or substances; or

    d.    any Private Right in an instrument identified in Exception(s)_____in Schedule B.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

DATED:
Chicago Title Insurance Company
BY:_____
    AUTHORIZED SIGNATORY

ALTA Endorsement Form 9.9-06
(Private Rights-Owner's Policy) ( 4/2/13)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1. The insurance provided by this endorsement is subject to the exclusions in Section 5 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2. For the purposes of this endorsement only:

   a. "Covenant" means a covenant, condition, limitation or restriction in a document or instrument in effect at Date of Policy.

   b. "Improvement" means an improvement, including any lawn, shrubbery, or trees, affixed to either the Land or adjoining land at Date of Policy that by law constitutes real property.

3. The Company insures against loss or damage sustained by the Insured by reason of:

   a. A violation at Date of Policy of a Covenant that:

      i. divests, subordinates, or extinguishes the lien of the Insured Mortgage,

      ii. results in the invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage, or

      iii. causes a loss of the Insured's Title acquired in satisfaction or partial satisfaction of the Indebtedness;

   b. A violation on the Land at Date of Policy of an enforceable Covenant, unless an exception in Schedule B of the policy identifies the violation;

   c. Enforced removal of an Improvement located on the Land as a result of a violation, at Date of Policy, of a building setback line shown on a plat of subdivision recorded or filed in the Public Records, unless an exception in Schedule B of the policy identifies the violation; or

   d. A notice of a violation, recorded in the Public Records at Date of Policy, of an enforceable Covenant relating to environmental protection describing any part of the Land and referring to that Covenant, but only to the extent of the violation of the Covenant referred to in that notice, unless an exception in Schedule B of the policy identifies the notice of the violation.

4. The Company insures against loss or damage sustained by reason of:

   a. An encroachment of:

      i. an Improvement located on the Land, at Date of Policy, onto adjoining land or onto that portion of the Land subject to an easement; or

      ii. an Improvement located on adjoining land onto the Land at Date of Policy,

unless an exception in Schedule B of the policy identifies the encroachment otherwise insured against in Sections 4.a.i. or 4.a.ii.;

   b. A final court order or judgment requiring the removal from any land adjoining the Land of an encroachment identified in Schedule B; or

   c. Damage to an Improvement located on the Land, at Date of Policy:

      i. that is located on or encroaches onto that portion of the Land subject to an easement excepted in Schedule B, which damage results from the exercise of

the right to maintain the easement for the purpose for which it was granted or reserved; or

ii.   resulting from the future exercise of a right to use the surface of the Land  for the extraction or development of minerals or any other subsurface substances excepted from the description of the Land or excepted in Schedule B.

5.      This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:

a. any Covenant contained in an instrument creating a lease;

b. any Covenant relating to obligations of any type to perform maintenance, repair, or remediation on the Land;

c. except as provided in Section 3.d, any Covenant relating to environmental protection of any kind or nature, including hazardous or toxic matters, conditions, or substances;

d. contamination, explosion, fire, fracturing, vibration, earthquake or subsidence; or

e. negligence by a person or an Entity exercising a right to extract or develop minerals or other subsurface substances.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements

[Witness clause optional]

DATED:
Chicago Title Insurance Company
BY:_____
        AUTHORIZED SIGNATORY

ALTA Endorsement Form 9.10-06
(Restrictions, Encroachments, Minerals-Current Violations-Loan Policy) ( 4/2/13)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ASSIGNMENT OF MORTGAGE**
**ALTA 10-06 (02-03-10) AND 10.1-06 (02-03-10)**

The ALTA 10-06 endorsement insures the effectiveness of the assignment of the Insured Mortgage and that there have been no releases or reconveyances placed of record other than as shown. The ALTA 10.1-06 provides the same coverage as the 10-06 and gives additional coverage over only certain matters occurring after the original Date of Policy and before the Date of Endorsement, which is a defined term within the endorsement.

The policy is modified by naming the assignee under the assignment as the Insured. The endorsement provides additional affirmative coverage against the ineffectiveness of the assignment and the effect of any full or partial releases or reconveyances recorded after the Date of Policy and before the Date of Endorsement. In addition, the ALTA 10.1-06 provides coverage for the matters described above. Both forms of endorsement are conditioned upon the proper delivery and endorsement of the underlying notes.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1. The name of the Insured at Date of Endorsement and referred to in this endorsement as the "Assignee" is amended to read:

2. The Company insures against loss or damage sustained by the Assignee by reason of:

   a. The failure of the following assignment to vest title to the Insured Mortgage in the Assignee:

   b. Any modification, partial or full reconveyance, release, or discharge of the lien of the Insured Mortgage recorded on or prior to Date of Endorsement in the Public Records other than those shown in the policy or a prior endorsement, except:

This endorsement does not insure against loss or damage, and the Company will not pay costs, attorneys' fees, or expenses, by reason of any claim that arises out of the transaction creating the assignment by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws that is based on:

   1. the assignment being deemed a fraudulent conveyance or fraudulent transfer; or

   2. the assignment being deemed a preferential transfer.

This endorsement shall be effective provided that, at Date of Endorsement, (1) the note or notes secured by the lien of the Insured Mortgage have been properly endorsed and delivered to the Assignee, or (2) if the note or notes are transferable records, the Assignee has "control" of the single authoritative copy of each "transferable record" as these terms are defined by applicable electronic transaction laws.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Date of Endorsement_____

Chicago Title Insurance Company
BY:_____
    AUTHORIZED SIGNATORY

ALTA Endorsement Form 10-06
(Assignment) (Rev. 02/03/10)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.     The name of the Insured at Date of Endorsement and referred to in this endorsement as the "Assignee" is amended to read:

2.     The Company insures against loss or damage sustained by the Assignee by reason of:

    a.     The failure of the following assignment to vest title to the Insured Mortgage in the Assignee:

    b.     Any liens for taxes or assessments that are due and payable on Date of Endorsement, except:

    c.     Lack of priority of the lien of the Insured Mortgage over defects, liens, or encumbrances other than those shown in the policy or a prior endorsement, except:

    d.     Notices of federal tax liens or notices of pending bankruptcy proceedings affecting the Title and recorded subsequent to Date of Policy in the Public Records and on or prior to Date of Endorsement, except:

    e.     Any modification, partial or full reconveyance, release or discharge of the lien of the Insured Mortgage recorded on or prior to Date of Endorsement in the Public Records other than those shown in the policy or a prior endorsement, except:

This endorsement does not insure against loss or damage, and the Company will not pay costs, attorneys' fees, or expenses, by reason of any claim that arises out of the transaction creating the assignment by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws that is based on:

    1. the assignment being deemed a fraudulent conveyance or fraudulent transfer; or

    2. the assignment being deemed a preferential transfer.

This endorsement shall be effective provided that, at Date of Endorsement, (1) the note or notes secured by the lien of the Insured Mortgage have been properly endorsed and delivered to the Assignee, or (2) if the note or notes are transferable records, the Assignee has "control" of the single authoritative copy of each "transferable record" as these terms are defined by applicable electronic transaction laws.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or
(iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Date of Endorsement _____

[Witness clause optional]

Chicago Title Insurance Company

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

BY:_____
 AUTHORIZED SIGNATORY


ALTA Endorsement Form 10.1-06
(Assignment and Date Down) (Rev.02/03/10)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**MORTGAGE MODIFICATION**
**ALTA 11-06 (6-07-06) & 11.1-06 (10-22-09)**

These endorsements were created to insure lenders that the modification of the Insured Mortgage evidenced by the document referred to within the endorsement does not impair the validity, enforceability or priority of the Insured Mortgage as of the Date of Endorsement, which is a defined term within the endorsements. In addition, the 11.1-06 insures against loss based upon a specific matter not being subordinate to the lien of the Insured Mortgage.

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company insures against loss or damage sustained by the Insured by reason of:

1.      The invalidity or unenforceability of the lien of the Insured Mortgage upon the Title at Date of Endorsement as a result of the agreement dated ____ recorded ____ ("Modification"); and

2.      The lack of priority of the lien of the Insured Mortgage, at Date of Endorsement, over defects in or liens or encumbrances on the Title, except for those shown in the policy or any prior endorsement and except:      ADD EXCEPTIONS HERE

This endorsement does not insure against loss or damage, and the Company will not pay costs, attorneys' fees, or expenses, by reason of any claim that arises out of the transaction creating the Modification by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws that is based on:

1.      the Modification being deemed a fraudulent conveyance or fraudulent transfer; or

2.      the Modification being deemed a preferential transfer except where the preferential transfer results from the failure

        a.      to timely record the instrument of transfer; or

        b.      of such recordation to impart notice to a purchaser for value or to a judgment or lien creditor.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Date of Endorsement _____

[Witness clause optional]

Chicago Title Insurance Company
BY:_____
        AUTHORIZED SIGNATORY

ALTA Endorsement Form 11-06
(Mortgage Modification) (6/17/06)
©American Land Title Association

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company insures against loss or damage sustained by the Insured by reason of:

1.      The invalidity or unenforceability of the lien of the Insured Mortgage upon the Title at Date of Endorsement as a result of the agreement dated\_\_\_\_\_ , recorded\_\_\_\_\_, ("Modification"); and

2.      The lack of priority of the lien of the Insured Mortgage, at Date of Endorsement, over defects in or liens or encumbrances on the Title, except for those shown in the policy or any prior endorsement and except:      ADD EXCEPTIONS HERE

3.      The following matters not being subordinate to the lien of the Insured Mortgage:
         ADD SUBORDINATE MATTERS HERE

         This endorsement does not insure against loss or damage, and the Company will not pay costs, attorneys' fees, or expenses, by reason of any claim that arises out of the transaction creating the Modification by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws that is based on:

1.      the Modification being deemed a fraudulent conveyance or fraudulent transfer; or

2.      the Modification being deemed a preferential transfer except where the preferential transfer results from the failure

        a.      to timely record the instrument of transfer; or

        b.      of such recordation to impart notice to a purchaser for value or to a judgment or lien creditor.

        This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Date of Endorsement_____

[Witness clause optional]

Chicago Title Insurance Company

BY:_____

ALTA Endorsement Form 11.1-06
(Mortgage Modification with Subordination) (10/22/09)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**AGGREGATION (TIE-IN)**
**ALTA 12-06 (04-02-13) and 12.1-06 (04-12-13)**

Mortgages covering many parcels in different recording districts or jurisdictions may each be recorded for the full amount of the secured indebtedness, or the allocated collateral value of each site, or a combination of full and allocated values.

The allocated amount is often used in states which impose a mortgage tax.   In any case, the lender views the transaction as one debt and wants insurance coverage for the total amount of the secured indebtedness.   Instead of combining all of the parcels into one large loan policy, the aggregation endorsement allows an insurer to issue a number of policies for lesser amounts but to tie the policies together so that the Insured can aggregate the coverage and take advantage of any increases in the value of a particular parcel should there be a loss.  Form 12-06 can be used for aggregating policies on sites all located in a single state or sites located in multiple states none of which have state statutory limitations on the amount which can be insured.  Form 12.1-06 is intended to be used for aggregating policies in multiple states one or more of which have state statutory limitations on the amount which can be insured.

This endorsement changes the provisions of Conditions 8(a)(i) of the  ALTA Loan Policy so that the Amount of Insurance available to cover a loss is the aggregate of the Amount of Insurance available under the policy to which this endorsement is attached plus the Amounts of Insurance available under the other policies identified in this endorsement.  Effective April 2, 2013 Form 12-06 was modified by adding new paragraphs which change the provisions of Sections 7(a)(i), 8(a), 8(b), 10 of the Conditions of the ALTA Loan Policy.  New Form 12.1-06 also contains the new paragraphs.  These new paragraphs clarify the effect of the endorsement on the options of the Company under the policy in the event of a claim and the extent of the Company's liability.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.   The following policies are issued in conjunction with one another:

POLICY NUMBER:            STATE:            AMOUNT OF INSURANCE:

$

$

$

2.   The amount of insurance available to cover the Company's liability for loss or damage under this policy at the time of payment of loss shall be the Aggregate Amount of Insurance defined in Section 3 of this endorsement.

3.   Subject to the limits in Section 4 of this endorsement, the Aggregate Amount of Insurance under these policies is $_____.

4.   Section 7(a)(i) of the Conditions of this policy is amended to read:

### 7.   OPTIONS TO PAY OR OTHERWISE SETTLE CLAIMS; TERMINATION OF LIABILITY

In case of a claim under this policy, the Company shall have the following additional options:

(a)   to pay or tender payment of the lesser of the value of the Title as insured or the Aggregate Amount of Insurance applicable under this policy at the date the claim was made by the Insured Claimant, or to purchase the Indebtedness.

(i)   to pay or tender payment of the lesser of the value of the Title as insured at the date the claim was made by the Insured Claimant, or the Aggregate Amount of Insurance applicable under this policy together with any cost, attorneys' fees, and costs and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of payment or tender of payment and that the Company is obligated to pay; or

5.   Section 8(a) and 8(b) of the Conditions of this policy are amended to read:

### 8. DETERMINATION AND EXTENT OF LIABILITY

This policy is a contract of indemnity against actual monetary loss or damage sustained or incurred by the Insured Claimant who has suffered loss or damage by reason of matters insured against by this policy.

(a) The extent of liability of the Company for loss or damage under this policy shall not exceed the least of

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

(i)   the Aggregate Amount of Insurance,

(ii)   the Indebtedness,

(iii)   the difference between the value of the Title as insured and the value of the Title subject to the risk insured against by this policy, or

(iv)   if a government agency or instrumentality is the Insured Claimant, the amount it paid in the acquisition of the Title or the Insured Mortgage in satisfaction of its insurance contract or guaranty.

(b)   If the Company pursues its rights under Section 5 of these Conditions and is unsuccessful in establishing the Title or the lien of the Insured Mortgage, as insured, the Insured Claimant shall have the right to have the loss or damage determined either as of the date the claim was made by the Insured Claimant or as the date it is settled and paid.

6.   Section 10 of the Conditions of this policy is amended to read:

**10.   REDUCTION OF INSURANCE; REDUCTION OR TERMINATION OF LIABILITY**

(a)   All payments under this policy, except payments made for costs, attorneys' fees, and expenses, shall reduce the Aggregate Amount of Insurance by the amount of the payment.

(b)   However, any payments made prior to the acquisition of Title as provided in Section 2 of these Conditions shall not reduce the Aggregate Amount of Insurance afforded under this endorsement except to the extent that the payments reduce the Indebtedness.

(c)   The voluntary satisfaction or release of the Insured Mortgage shall terminate all liability of the Company under this policy, except as provided in Section 2 of these Conditions, but it will not reduce the Aggregate Amount of Insurance for the other policies identified in Section 1 of this endorsement.

This endorsement is issued as part of the policy.   Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance.   To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

DATED:
Chicago Title Insurance Company
BY:_____
      AUTHORIZED SIGNATORY

ALTA Endorsement Form 12-06
(Aggregation-Loan) (rev. 4/2/13)
© American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1. The following policies are issued in conjunction with one another:

| POLICY NUMBER: | STATE: | AMOUNT OF INSURANCE: |
|---|---|---|
| | | $ |
| | | $ |
| | | $ |

2. The amount of insurance available to cover the Company's liability for loss or damage under this policy at the time of payment of loss shall be the Aggregate Amount of Insurance defined in Section 3 of this endorsement.

3. The Aggregate Amount of Insurance under this policy is either:

   a. $_; or

   b. If the Land is located in one of the states identified in this subsection, then the Aggregate Amount of Insurance is restricted to the amount shown below:

| STATE | AGGREGATE AMOUNT OF INSURANCE |
|---|---|
| | $ |
| | $ |

4. Section 7(a)(i) of the Conditions of this policy is amended to read:

   **7.  OPTIONS TO PAY OR OTHERWISE SETTLE CLAIMS; TERMINATION OF LIABILITY**

   In case of a claim under this policy, the Company shall have the following additional options:

   (a)      to pay or tender payment of the lesser of the value of  the Title as insured or the Aggregate Amount of Insurance applicable under this policy at the date the claim was made by the Insured Claimant, or to purchase the Indebtedness.

   (i) To pay or tender payment of the lesser of the value of the Title as insured at the date the claim was made by the Insured Claimant, or the Aggregate Amount of Insurance applicable under this policy, together with any cost, attorneys' fees, and costs and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of payment or tender of payment and that the Company is obligated to pay; or

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

5.  Section 8(a) and 8(b) of the Conditions of this policy are amended to read:

**8. DETERMINATION AND EXTENT OF LIABILITY**

This policy is a contract of indemnity against actual monetary loss or damage sustained or incurred by the Insured Claimant who has suffered loss or damage by reason of matters insured against by this policy.

(a) The extent of liability of the Company for loss or damage under this policy shall not exceed the least of

(i)   the Aggregate Amount of Insurance for the State where the Land is located,

(ii)  the Indebtedness,

(iii) the difference between the value of the Title as insured and the value of the Title subject to the risk insured against by this policy, or

(iv)  if a government agency or instrumentality is the Insured Claimant, the amount it paid in the acquisition of the Title or the Insured Mortgage in satisfaction of its insurance contract or guaranty.

(b) If the Company pursues its rights under Section 5 of these Conditions and is unsuccessful in establishing the Title or the lien of the Insured Mortgage, as insured, the Insured Claimant shall have the right to have the loss or damage determined either as of the date the claim was made by the Insured Claimant or as the date it is settled and paid.

6.  Section 10 of the Conditions of this policy is amended to read:

**10. REDUCTION OF INSURANCE; REDUCTION OR TERMINATION OF LIABILITY**

(a) All payments under this policy, except payments made for costs, attorneys' fees, and expenses, shall reduce the applicable Aggregate Amount of Insurance by the amount of the payment.

(b) If this policy insures the Title to Land located in a state identified in Section 3 b. of this endorsement:

(i)   all payments under this policy, except payments made for costs, attorneys' fees, and expenses, shall reduce the Aggregate Amount of Insurance  by the amount of the payment; but

(ii)  a payment made for loss or damage on Land insured in one of the policies identified in Section 1 on Land located outside this state shall not reduce the Aggregate Amount of Insurance in Section 3.b. of this endorsement until the Aggregate Amount of Insurance in Section 3.a. is reduced below the  Aggregate Amount of Insurance in Section 3.b .

(c) However, any payments made prior to the acquisition of Title as provided in Section 2 of these Conditions shall not reduce the Aggregate Amount of Insurance afforded under this endorsement except to the extent that the payments reduce the Indebtedness.

(d) The voluntary satisfaction or release of the Insured Mortgage shall terminate all liability of the Company under this policy, except as

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

provided in Section 2 of these Conditions, but it will not reduce the Aggregate Amount of Insurance for the other policies identified in Section 1 of this endorsement.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

DATED:
Chicago Title Insurance Company
BY:_____
        AUTHORIZED SIGNATORY

ALTA Endorsement Form 12.1-06
(Aggregation- State Limits-Loan) (4/2/13)
© American Land Title Association

**LEASEHOLD-OWNER'S AND LEASEHOLD-LOAN**

**ALTA 13-06 (04-02-12) AND 13.1-06 (04-02-12)**

The ALTA Endorsement Forms 13-06 and 13.1-06 were created to be attached to the ALTA Owner's Policy and ALTA Loan Policy respectively. They were revised April 2, 2012. They are intended to be used either with policies covering only Leasehold Estates or for those that insure both Leasehold Estates and the ownership of improvements located on them.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.  As used in this endorsement, the following terms shall mean:

    a.  "Evicted" or "Eviction": (a) the lawful deprivation, in whole or in part, of the right of possession insured by this policy, contrary to the terms of the Lease or (b) the lawful prevention of the use of the Land or the Tenant Leasehold Improvements for the purposes permitted by the Lease, in either case as a result of a matter covered by this policy.
    b.  "Lease": the lease described in Schedule A.
    c.  "Leasehold Estate": the right of possession granted in the Lease for the Lease Term.
    d.  "Lease Term": the duration of the Leasehold Estate, as set forth in the Lease, including any renewal or extended term if a valid option to renew or extend is contained in the Lease.
    e.  "Personal Property":  property, in which and to the extent the Insured has rights, located on or affixed to the Land on or after Date of Policy that by law does not constitute real property because (i) of its character and manner of attachment to the Land and (ii) the property can be severed from the Land without causing material damage to it or to the Land.
    f.  "Remaining Lease Term": the portion of the Lease Term remaining after the Insured has been Evicted.
    g.  "Tenant Leasehold Improvements": Those improvements, in which and to the extent the Insured has rights, including landscaping, required or permitted to be built on the Land by the Lease that have been built at the Insured's expense or in which the Insured has an interest greater than the right to possession during the Lease Term.

2.  Valuation of Estate or Interest Insured:

If in computing loss or damage it becomes necessary to value the Title, or any portion of it, as the result of an Eviction of the Insured, then, as to that portion of the Land from which the Insured is Evicted, that value shall consist of the value for the Remaining Lease Term of the Leasehold Estate and any Tenant Leasehold Improvements existing on the date of the Eviction.  The Insured Claimant shall have the right to have the Leasehold Estate and the Tenant Leasehold Improvements affected by a defect insured against by the policy valued either as a whole or separately.  In either event, this determination of value shall take into account rent no longer required to be paid for the Remaining Lease Term.

3.  Additional items of loss covered by this endorsement:

If the Insured is Evicted, the following items of loss, if applicable to that portion of the Land from which the Insured is Evicted shall be included, without duplication, in computing loss or damage incurred by the Insured, but not to the extent that the same are included in the valuation of the Title determined pursuant to Section 2 of this endorsement, any other endorsement to the policy or Section 8(a)(ii) of the Conditions:

    a.  The reasonable cost of (i) removing and relocating any Personal Property that the Insured has the right to remove and relocate, situated on the Land at the time of Eviction,(ii) transportation of that Personal Property for the initial one hundred miles incurred in connection with the relocation,(iii) repairing the Personal Property damaged by reason of the removal and relocation, and (iv) restoring the Land to the extent damaged as a result of the removal and relocation of the Personal Property and required of the Insured solely because of the Eviction .

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

    b.   Rent or damages for use and occupancy of the Land prior to the Eviction that the Insured as owner of the Leasehold Estate may be obligated to pay to any person having paramount title to that of the lessor in the Lease.

    c.   The amount of rent that, by the terms of the Lease, the Insured must continue to pay to the lessor after Eviction with respect to the portion of the Leasehold Estate and Tenant Leasehold Improvements from which the Insured has been Evicted.

    d.   The fair market value, at the time of the Eviction, of the estate or interest of the Insured in any lease or sublease permitted by the Lease and made by Insured as lessor of all or part of the Leasehold Estate or the Tenant Leasehold Improvements.

    e.   Damages caused by the Eviction that the Insured is obligated to pay to lessees or sublessees on account of the breach of any lease or sublease permitted by the Lease and made by the Insured as lessor of all or part of the Leasehold Estate or the Tenant Leasehold Improvements.

    f.   The reasonable cost to obtain land use, zoning, building and occupancy permits, architectural and engineering services and environmental testing and reviews for leasehold reasonably equivalent to the Leasehold Estate.

    g.   If Tenant Leasehold Improvements are not substantially completed at the time of Eviction, the actual cost incurred by the Insured, less the salvage value, for the Tenant Leasehold Improvements up to the time of Eviction.  Those costs include costs incurred to obtain land use, zoning, building and occupancy permits, architectural and engineering services, construction management services, environmental testing and reviews, and landscaping.

4.  This endorsement does not insure against loss, damage or costs of remediation (and the Company will not pay cost, attorneys' fees or expenses) resulting from environmental damage or contamination.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

Chicago Title Insurance Company

BY:_____ _____

ALTA Endorsement Form 13-06
(Leasehold – Owners) (Rev. 4/2/12)
© American Land Title Association Association

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.

2.      As used in this endorsement, the following terms shall mean:

   a.    "Evicted" or "Eviction": (a) the lawful deprivation, in whole or in part, of the right of possession insured by this policy, contrary to the terms of the Lease or (b) the lawful prevention of the use of the Land or the Tenant Leasehold Improvements for the purposes permitted by the Lease, in either case as a result of a matter covered by this policy.

   b.    "Lease": the lease described in Schedule A.

   c.    "Leasehold Estate": the right of possession granted in the Lease for the Lease Term.

   d.    "Lease Term": the duration of the Leasehold Estate, as set forth in the Lease, including any renewal or extended term if a valid option to renew or extend is contained in the Lease.

   e.    "Personal Property": property, in which and to the extent the Insured has rights, located on or affixed to the Land on or after Date of Policy that by law does not constitute real property because (i) of its character and manner of attachment to the Land and (ii) the property can be severed from the Land without causing material damage to the property or to the Land.

   f.    "Remaining Lease Term": the portion of the Lease Term remaining after the Tenant has been Evicted.

   g.    "Tenant": the tenant under the Lease and, after acquisition of all or any part of the Title in accordance with the provisions of Section 2 of the Conditions of the policy, the Insured Claimant.

   h.    "Tenant Leasehold Improvements": Those improvements, in which and to the extent the Insured has rights, including landscaping, required or permitted to be built on the Land by the Lease that have been built at the Tenant's expense or in which the Tenant has an interest greater than the right to possession during the Lease Term.

3.      Valuation of Estate or Interest Insured:

If in computing loss or damage it becomes necessary to value the Title, or any portion of it, as the result of an Eviction of the Tenant, then, as to that portion of the Land from which the Tenant is Evicted, that value shall consist of the value for the Remaining Lease Term of the Leasehold Estate and any Tenant Leasehold Improvements existing on the date of the Eviction. The Insured Claimant shall have the right to have the Leasehold Estate and the Tenant Leasehold Improvements affected by a defect insured against by the policy valued either as a whole or separately. In either event, this determination of value shall take into account rent no longer required to be paid for the Remaining Lease Term.

4.      Additional items of loss covered by this endorsement:

If the Insured acquires all or any part of the Title in accordance with the provisions of Section 2 of the Conditions of this policy and thereafter is Evicted, the following items of loss, if applicable to that portion of the Land from which the Insured is Evicted shall be included, without duplication, in computing loss or damage incurred by the Insured, but not to the extent that the same are included in the valuation of the Title determined pursuant to Section 2 of this endorsement, any other endorsement to the policy, or Section 8(a)(iii) of the Conditions:

   a.       The reasonable cost of (i) removing and relocating any Personal Property that the Insured has the right to remove and relocate, situated on the Land at the time

of Eviction,(ii) transportation of that Personal Property for the initial one hundred miles incurred in connection with the relocation,(iii) repairing the Personal Property damaged by reason of the removal and relocation, and (iv) restoring the Land to the extent damaged as a result of the removal and relocation of the Personal Property and required of the Insured solely because of the Eviction

b.      Rent or damages for use and occupancy of the Land prior to the Eviction that the Insured as owner of the Leasehold Estate may be obligated to pay to any person having paramount title to that of the lessor in the Lease.

c.      The amount of rent that, by the terms of the Lease, the Insured must continue to pay to the lessor after Eviction with respect to the portion of the Leasehold Estate and Tenant Leasehold Improvements from which the Insured has been Evicted.

d.      The fair market value, at the time of the Eviction, of the estate or interest of the Insured in any lease or sublease permitted by the Lease and made by Tenant as lessor of all or part of the Leasehold Estate or the Tenant Leasehold Improvements.

e.      Damages caused by the Eviction that the Insured is obligated to pay to lessees or sublessees on account of the breach of any lease or sublease permitted by the Lease and made by the Tenant as lessor of all or part of the Leasehold Estate or the Tenant Leasehold Improvements.

f.      The reasonable cost to obtain land use, zoning, building and occupancy permits, architectural and engineering services and environmental testing and reviews for a replacement leasehold reasonably equivalent to the Leasehold Estate.

g.      If Tenant Leasehold Improvements are not substantially completed at the time of Eviction, the actual cost incurred by the Insured, less the salvage value, for the Tenant Leasehold Improvements up to the time of Eviction. Those costs include costs incurred to obtain land use, zoning, building and occupancy permits, architectural and engineering services, construction management services, environmental testing and reviews, and landscaping.

5.      This endorsement does not insure against loss, damages, or costs of remediation (and the Company will not pay cost, attorneys' fees or expenses) resulting from environmental damage or contamination.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]
DATED:
Chicago Title Insurance Company
BY:_____
        AUTHORIZED SIGNATORY

ALTA Endorsement Form 13.1-06
(Leasehold – Loan) (Rev. 4/1/12)
© American Land Title Association

**FUTURE ADVANCES ALTA ENDORSEMENT – FORMS 14-06 (02-03-11), 14.1-06 (02-03-11), 14.2-06 (02-03-11) and 14.3-06 (02-03-11 tech correction 12-03-12)**

These endorsements affirmatively insure the priority and enforceability of the lien of the Insured Mortgage with respect to future advances and repayments and re-advances of Indebtedness. In addition, they include coverage for the consequences of a variable rate, including possible negative amortization (or interest on interest), as discussed above in the ALTA 6-06 endorsement section. These endorsements also cover the effect on the priority and enforceability of the Insured Mortgage of the Indebtedness having been reduced to zero before being increased by subsequent advances ("zero-balance"), and state law requirements to secure these advances not having been met. Unique to the 14.3-06 (Reverse Mortgages) is additional coverage for failure of the Insured Mortgage to state a term or maximum dollar amount, and failure of the mortgagors to be at least 62 years old.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.  The insurance for Advances added by Sections 2 and 3 of this endorsement is subject to the exclusions in Section 4 of this endorsement and the Exclusions from Coverage in the Policy, except Exclusion 3(d), the provisions of the Conditions, and the exceptions contained in Schedule B.

    a.  "Agreement," as used in this endorsement, shall mean the note or loan agreement, the repayment of Advances under which is secured by the Insured Mortgage.

    b.  "Advance," as used in this endorsement, shall mean only an advance of principal made after the Date of Policy as provided in the Agreement, including expenses of foreclosure, amounts advanced pursuant to the Insured Mortgage to pay taxes and insurance, assure compliance with laws, or to protect the lien of the Insured Mortgage before the time of acquisition of the Title, and reasonable amounts expended to prevent deterioration of improvements, together with interest on those advances.

    c.  "Changes in the rate of interest," as used in this endorsement, shall mean only those changes in the rate of interest calculated pursuant to a formula provided in the Insured Mortgage or the Agreement at Date of Policy.

2.  The Company insures against loss or damage sustained by the Insured by reason of:

    a.  The invalidity or unenforceability of the lien of the Insured Mortgage as security for each Advance.

    b.  The lack of priority of the lien of the Insured Mortgage as security for each Advance over any lien or encumbrance on the Title.

    c.  The invalidity or unenforceability or lack of priority of the lien of the Insured Mortgage as security for the Indebtedness, Advances and unpaid interest resulting from (i) re-Advances and repayments of Indebtedness, (ii) earlier periods of no indebtedness owing during the term of the Insured Mortgage, or (iii) the Insured Mortgage not complying with the requirements of state law of the state in which the Land is located to secure Advances.

3.  The Company also insures against loss or damage sustained by the Insured by reason of:

    a.  The invalidity or unenforceability of the lien of the Insured Mortgage resulting from any provisions of the Agreement that provide for (i) interest on interest, (ii) changes in the rate of interest, or (iii) the addition of unpaid interest to the Indebtedness.

    b.  Lack of priority of the lien of the Insured Mortgage as security for the Indebtedness, including any unpaid interest that was added to principal in accordance with any provisions of the Agreement, interest on interest, or interest as changed in accordance with the provisions of the Insured Mortgage, which lack of priority is caused by (i) changes in the rate of interest, (ii) interest on

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

interest, or (iii) increases in the Indebtedness resulting from the addition of unpaid interest.

4.       This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:

a.       The invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as security for any Advance made after a Petition for Relief under the Bankruptcy Code (11 U.S.C.) has been filed by or on behalf of the mortgagor;

b.       The lien of real estate taxes or assessments on the Title imposed by governmental authority arising after Date of Policy;

c.       The lack of priority of the lien of the Insured Mortgage as security for any Advance to a federal tax lien, which Advance is made after the earlier of (i) actual knowledge of the Insured that a federal tax lien was filed against the mortgagor, or (ii) the expiration, after notice of a federal tax lien filed against the mortgagor, of any grace period for making disbursements with priority over the federal tax lien provided in the Internal Revenue Code (26 U.S.C.);

d.       Any federal or state environmental protection lien; [or]

e.       Usury, or any consumer credit protection or truth-in-lending law. *[; or*

f.       *Any mechanic's or materialmen's lien.]*

5.       The Indebtedness includes Advances.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

DATED:
Chicago Title Insurance Company
BY:_____
       AUTHORIZED SIGNATORY

ALTA Endorsement Form 14-06
(Future Advance - Priority) (Rev. 2/3/11)
© American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.  The insurance for Advances added by Sections 2 and 3 of this endorsement is subject to the exclusions in Section 4 of this endorsement and the Exclusions from Coverage in the Policy, except Exclusion 3(d), the provisions of the Conditions, and the exceptions contained in Schedule B.

    a.  "Agreement," as used in this endorsement, shall mean the note or loan agreement, the repayment of Advances under which is secured by the Insured Mortgage.

    b.  "Advance," as used in this endorsement, shall mean only an advance of principal made after the Date of Policy as provided in the Agreement, including expenses of foreclosure, amounts advanced pursuant to the Insured Mortgage to pay taxes and insurance, assure compliance with laws, or to protect the lien of the Insured Mortgage before the time of acquisition of the Title, and reasonable amounts expended to prevent deterioration of improvements, together with interest on those advances.

    c.  "Changes in the rate of interest," as used in this endorsement, shall mean only those changes in the rate of interest calculated pursuant to a formula provided in the Insured Mortgage or the Agreement at Date of Policy.

2.  The Company insures against loss or damage sustained by the Insured by reason of:

    a.  The invalidity or unenforceability of the lien of the Insured Mortgage as security for each Advance.

    b.  The lack of priority of the lien of the Insured Mortgage as security for each Advance over any lien or encumbrance on the Title.

    c.  The invalidity or unenforceability or lack of priority of the lien of the Insured Mortgage as security for the Indebtedness, Advances and unpaid interest resulting from (i) re-Advances and repayments of Indebtedness, (ii) earlier periods of no Indebtedness owing during the term of the Insured Mortgage, or (iii) the Insured Mortgage not complying with the requirements of state law of the state in which the Land is located to secure Advances.

3.  The Company also insures against loss or damage sustained by the Insured by reason of:

    a.  The invalidity or unenforceability of the lien of the Insured Mortgage resulting from any provisions of the Agreement that provide for (i) interest on interest, (ii) changes in the rate of interest, or (iii) the addition of unpaid interest to the Indebtedness.

    b.  Lack of priority of the lien of the Insured Mortgage as security for the Indebtedness, including any unpaid interest that was added to principal in accordance with any provisions of the Agreement, interest on interest, or interest as changed in accordance with the provisions of the Insured Mortgage, which

lack of priority is caused by (i) changes in the rate of interest, (ii) interest on interest, or (iii) increases in the Indebtedness resulting from the addition of unpaid interest.

4.     This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) resulting from:

   a.     The invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as security for any Advance made after a Petition for Relief under the Bankruptcy Code (11 U.S.C.) has been filed by or on behalf of the mortgagor;

   b.     The lien of real estate taxes or assessments on the Title imposed by governmental authority arising after Date of Policy;

   c.     The lack of priority of the lien of the Insured Mortgage as security for any Advance to a federal tax lien, which Advance is made after the earlier of (i) actual knowledge of the Insured that a federal tax lien was filed against the mortgagor, or (ii) the expiration, after notice of a federal tax lien filed against the mortgagor, of any grace period for making disbursements with priority over the federal tax lien provided in the Internal Revenue Code (26 U.S.C.);

   d.     Any federal or state environmental protection lien;

   e.     The lack of priority of any Advance made after the Insured has Knowledge of the existence of liens, encumbrances or other matters affecting the Land intervening between Date of Policy and the Advance, as to the intervening lien, encumbrance or other matter; [or]

   f.     Usury, or any consumer credit protection or truth-in-lending law. *[; or*

   g.     *Any mechanic's or materialmen's lien.]*

5.     The Indebtedness includes Advances.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

DATED:
Chicago Title Insurance Company
BY:_____
       AUTHORIZED SIGNATORY

ALTA Endorsement Form 14.1-06
(Future Advance - Knowledge) (Rev. 2/3/11)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1. The insurance for Advances added by Section 2 of this endorsement is subject to the exclusions in Section 3 of this endorsement and the Exclusions from Coverage in the Policy, except Exclusion 3(d), the provisions of the Conditions, and the exceptions contained in Schedule B.

   a. "Agreement," as used in this endorsement, shall mean the letter of credit and its reimbursement agreement, the repayment of Advances under which is secured by the Insured Mortgage.

   b. "Advance," as used in this endorsement, shall mean only an advance made after the Date of Policy as provided in the Agreement, including expenses of foreclosure, amounts advanced pursuant to the Insured Mortgage to pay taxes and insurance, assure compliance with laws, or to protect the lien of the Insured Mortgage before the time of acquisition of the Title, and reasonable amounts expended to prevent deterioration of improvements, together with interest on those advances.

2. The Company insures against loss or damage sustained by the Insured by reason of:

   a. The invalidity or unenforceability of the lien of the Insured Mortgage as security for each Advance.

   b. The lack of priority of the lien of the Insured Mortgage as security for each Advance over any lien or encumbrance on the Title.

   c. The invalidity or unenforceability or loss of priority of the lien of the Insured Mortgage as security for the Indebtedness, Advances and unpaid interest resulting from (i) re-Advances and repayments of Indebtedness, (ii) earlier periods of no indebtedness owing during the term of the Insured Mortgage, or (iii) the Insured Mortgage not complying with the requirements of state law of the state in which the Land is located to secure Advances.

3. This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) resulting from:

   a. The lien of real estate taxes or assessments on the Title imposed by governmental authority arising after Date of Policy; or

   b. Any federal or state environmental protection lien; or

   c. Limitations, if any, imposed under the Bankruptcy Code (11 U.S.C.) on the amount that may be recovered from the mortgagor's estate. *[; or*

   d. *Any mechanic's or materialmen's lien.]*

4. The Indebtedness includes Advances.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

DATED:
Chicago Title Insurance Company
BY:_____
          AUTHORIZED SIGNATORY

ALTA Endorsement Form 14.2-06
(Future Advance – Letter of Credit) (Rev. 2/3/11)
© American Land Title Association

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.  The insurance for Advances added by Sections 2 and 3 of this endorsement is subject to the exclusions in Section 4 of this endorsement and the Exclusions in the Policy, except Exclusion 3(d), the provisions of the Conditions, and the exceptions contained in Schedule B.

    a.  "Agreement," as used in this endorsement, shall mean the note or loan agreement, repayment of Advances under which is secured by the Insured Mortgage.

    b.  "Advance," as used in this endorsement, shall mean only an advance of principal made after the Date of Policy as provided in the Agreement, including expenses of foreclosure, amounts advanced pursuant to the Insured Mortgage to pay taxes and insurance, assure compliance with laws, or to protect the lien of the Insured Mortgage before the time of acquisition of the Title, and reasonable amounts expended to prevent deterioration of improvements, together with interest on those advances.

    c.  "Changes in the rate of interest," as used in this endorsement, shall mean only those changes in the rate of interest calculated pursuant to a formula provided in the Insured Mortgage or the Agreement at Date of Policy.

2.  The Company insures against loss or damage sustained by the Insured by reason of:

    a.  The invalidity or unenforceability of the lien of the Insured Mortgage as security for each Advance.

    b.  The lack of priority of the lien of the Insured Mortgage as security for each Advance over any lien or encumbrance on the Title.

    c.  The invalidity or unenforceability or lack of priority of the lien of the Insured Mortgage as security for the Indebtedness, Advances and unpaid interest resulting from (i) re-Advances and repayments of Indebtedness, (ii) earlier periods of no indebtedness owing during the term of the Insured Mortgage, (iii) the Insured Mortgage not complying with the requirements of state law of the state in which the Land is located to secure Advances, (iv) failure of the Insured Mortgage to state the term for Advances, or (v) failure of the Insured Mortgage to state the maximum amount secured by the Insured Mortgage.

    d.  The invalidity or unenforceability of the lien of the Insured Mortgage because of the failure of the mortgagors to be at least 62 years of age at Date of Policy.

3.  The Company also insures against loss or damage sustained by the Insured by reason of:

    a.  The invalidity or unenforceability of the lien of the Insured Mortgage resulting from any provisions of the Agreement that provide for (i) interest on interest, (ii) changes in the rate of interest, or (iii) the addition of unpaid interest to the principal portion of the Indebtedness.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

      b.      Lack of priority of the lien of the Insured Mortgage as security for the Indebtedness, including any unpaid interest that was added to principal in accordance with any provisions of the Agreement, interest on interest, or interest as changed in accordance with the provisions of the Insured Mortgage, which lack of priority is caused by (i) changes in the rate of interest, (ii) interest on interest, or (iii) increases in the Indebtedness resulting from the addition  of unpaid interest.

"Interest," as used in this Paragraph 3, shall include lawful interest based on appreciated value.

4.      This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:

      a.      The invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as security for any Advance made after a Petition for Relief under the Bankruptcy Code (11 U.S.C.) has been filed by or on behalf of the mortgagor;

      b.      The lien of real estate taxes or assessments on the Title imposed by governmental authority arising after Date of Policy;

      c.      The lack of priority of the lien of the Insured Mortgage as security for any Advance to a federal tax lien, which Advance is made after the earlier of (i) actual knowledge of the Insured that a federal tax lien was filed against the mortgagor, or (ii) the expiration, after notice of a federal tax lien filed against the mortgagor, of any grace period for making disbursements with priority over the federal tax lien provided in the Internal Revenue Code (26 U.S.C.);

      d.      Any federal or state environmental protection lien; [or]

      e.      Usury, or any consumer credit protection or truth-in-lending law. *[; or*

      f.      *Any mechanic's or materialmen's lien.]*

5.      The Indebtedness includes Advances.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

*[BRACKETED MATERIAL OPTIONAL]*

Chicago Title Insurance Company

BY:_____

ALTA Endorsement Form 14.3-06
(Future Advance – Reverse Mortgage) (Rev. 2/3/11)
© American Land Title Association                                         *[includes technical corrections of 12-3-12]*

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**NON-IMPUTATION**

**ALTA 15-06 (FULL-EQUITY TRANSFER) (06-17-06);**

**15.1-06 (ADDITIONAL INSURED) (06-17-06)**

**15.2-06 (PARTIAL EQUITY) (06-17-06)**

These ALTA forms give coverage over matters known to specified parties that would otherwise be excluded from coverage on the basis of imputed knowledge, but also over the consequences of the actions or inactions of those parties which affect the Title. Form 15-06 is to be used when the entire beneficial interest of the entity holding Title and named as the insured on Schedule A (e.g., partnership interest, corporate stock, membership interest of limited liability company) has been transferred for value. Form 15.1-06 is to be used when only a portion of the beneficial interest of the entity holding Title and named on Schedule A as the insured has been transferred and the incoming beneficial owner is identified on the form as an additional insured. Form 15.2-06 is to be used when the incoming beneficial owner requests to be the insured in its own policy, and its interest has been transferred for value.

Exclusions from Coverage 3(a) and (b) in the ALTA Owner's Policy and ALTA Loan Policy exclude from coverage matters created, suffered, assumed, or agreed to by the insured or known to the insured, but not to the Company, and not disclosed by the public records.

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company agrees that it will not assert the provisions of Exclusions from Coverage 3(a), (b), or (e) to deny liability for loss or damage otherwise insured against under the terms of the policy solely by reason of the action or inaction or Knowledge, as of Date of Policy, of_____ whether or not imputed to the Insured by operation of law, provided_____acquired  the Insured as a purchaser for value without Knowledge of the asserted defect, lien, encumbrance, adverse claim, or other matter insured against by the policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

Chicago Title Insurance Company

BY:_____

ALTA Endorsement Form 15-06
(Nonimputation – Full Equity Transfer) (6/17/06)
©American Land Title Association

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

For purposes of the coverage provided by this endorsement,_____ ("Additional Insured") is added as an Insured under the policy. By execution below, the Insured named in Schedule A acknowledges that any payment made under this endorsement shall reduce the Amount of Insurance as provided in Section 10 of the Conditions.

The Company agrees that it will not assert the provisions of Exclusions from Coverage 3(a), (b), or (e) to deny liability for loss or damage otherwise insured against under the terms of the policy solely by reason of the action or inaction or Knowledge, as of Date of Policy, of_____ whether or not imputed to the Additional Insured by operation of law, to the extent of the percentage interest in the Insured acquired by Additional Insured as a purchaser for value without Knowledge of the asserted defect, lien, encumbrance, adverse claim, or other matter insured against by the policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

AGREED AND CONSENTED TO:

_____
INSURED

[Witness clause optional]

Chicago Title Insurance Company

BY:_____

ALTA Endorsement Form 15.1-06
(Nonimputation – Additional Insured) (6/17/06)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company agrees that it will not assert the provisions of Exclusions from Coverage 3(a), (b), or (e) to deny liability for loss or damage otherwise insured against under the terms of the policy solely by reason of the action or inaction or Knowledge, as of Date of Policy, of_____ whether or not imputed to the entity identified in paragraph 3 of Schedule A or to the Insured by operation of law, but only to the extent that the Insured acquired the Insured's interest in entity as a purchaser for value without Knowledge of the asserted defect, lien, encumbrance, adverse claim, or other matter insured against by the policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

Chicago Title Insurance Company

BY:_____

ALTA Endorsement Form 15.2-06
(Nonimputation – Partial Equity Transfer) (6/17/06)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**MEZZANINE FINANCING**
**ALTA 16-06 (06-17-06)**

This endorsement provides insurance to a lender whose loan is secured not by a lien against the land but rather by some form of security against the beneficial interest of the business entity that owns the Land. The security may be a pledge of  and security interest in  the stock in a corporation, partnership interest in a partnership, or membership interest in a limited liability company. The endorsement is made a part of an Owner's Policy rather than a Loan Policy, because the lender's personal property security interest is not being insured so no Loan Policy is issued to the lender. The endorsement assigns the rights under the policy of the Insured owner of the Land to the defined Mezzanine Lender. The endorsement provides that the Company will not assert as a defense matters known to the Insured owner, as long as they were not known to the Mezzanine Lender. It further provides that the Company will not deny liability on the basis that ownership interests in the Insured have been transferred to or acquired by the Mezzanine Lender.

Conditions paragraph 7 (b) is amended to provide that the Company can terminate its liability under the policy by paying the Mezzanine Lender rather than the Insured. Exclusions from Coverage Nos. 3 (a), (b), (c) or (e) are amended with respect to defects, liens, encumbrances, adverse claims or other matters which were not known to the Mezzanine Lender, or failure of the Mezzanine Lender to pay value.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.   The Mezzanine Lender is:_____and each successor in ownership of its loan ("Mezzanine Loan") reserving, however, all rights and defenses as to any successor that the Company would have had against the Mezzanine Lender, unless the successor acquired the Indebtedness as a purchaser for value without Knowledge of the asserted defect, lien, encumbrance, adverse claim, or other matter insured against by this policy as affecting Title.

2.   The Insured

   a.   assigns to the Mezzanine Lender the right to receive any amounts otherwise payable to the Insured under this policy, not to exceed the outstanding indebtedness under the Mezzanine Loan; and

   b.   agrees that no amendment of or endorsement to this policy can be made without the written consent of the Mezzanine Lender.

3.   The Company does not waive any defenses that it may have against the Insured, except as expressly stated in this endorsement.

4.   In the event of a loss under the policy, the Company agrees that it will not assert the provisions of Exclusions from Coverage 3(a), (b) or (e) to refuse payment to the Mezzanine Lender solely by reason of the action or inaction or Knowledge, as of Date of Policy, of the Insured, provided

   a.   the Mezzanine Lender had no actual Knowledge of the defect, lien, encumbrance or other matter creating or causing loss on Date of Policy.

   b.   this limitation on the application of Exclusions from Coverage 3(a), (b) and (e) shall

      i.   apply whether or not the Mezzanine Lender has acquired an interest (direct or indirect) in the Insured either on or after Date of Policy, and

      ii.   benefit the Mezzanine Lender only without benefiting any other individual or entity that holds an interest (direct or indirect) in the Insured or the Land.

5.   In the event of a loss under the Policy, the Company also agrees that it will not deny liability to the Mezzanine Lender on the ground that any or all of the ownership interests (direct or indirect) in the Insured have been transferred to or acquired by the Mezzanine Lender, either on or after the Date of Policy.

6.   The Mezzanine Lender acknowledges

   a.   that the amount of insurance under this policy shall be reduced by any amount the Company may pay under any policy insuring a mortgage to which exception is taken in Schedule B or to which the Insured has agreed, assumed, or taken subject, or which is hereafter executed by an Insured and which is a charge or

lien on the estate or interest described or referred to in Schedule A, and the amount so paid shall be deemed a payment under this policy; and

    b.    that the Company shall have the right to insure mortgages or other conveyances of an interest in the Land, without the consent of the Mezzanine Lender.

7.    If the Insured, the Mezzanine Lender or others have conflicting claims to all or part of the loss payable under the Policy, the Company may interplead the amount of the loss into Court. The Insured and the Mezzanine Lender shall be jointly and severally liable for the Company's cost for the interpleader and subsequent proceedings, including attorneys' fees. The Company shall be entitled to payment of the sums for which the Insured and Mezzanine Lender are liable under the preceding sentence from the funds deposited into Court, and it may apply to the Court for their payment.

8.    Whenever the Company has settled a claim and paid the Mezzanine Lender pursuant to this endorsement, the Company shall be subrogated and entitled to all rights and remedies that the Mezzanine Lender may have against any person or property arising from the Mezzanine Loan. However, the Company agrees with the Mezzanine Lender that it shall only exercise these rights, or any right of the Company to indemnification, against the Insured, the Mezzanine Loan borrower, or any guarantors of the Mezzanine Loan after the Mezzanine Lender has recovered its principal, interest, and costs of collection.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

AGREED AND CONSENTED TO:

*(Name of Insured)*                    *(Name of Mezzanine Lender)*

By: _____    By: _____

[Witness clause optional]

Chicago Title Insurance Company

BY:_____

ALTA Endorsement Form 16-06
(Mezzanine Financing) (6/17/06)
©American Land Title Association

**ACCESS**
**ALTA 17-06 (Access & Entry) (06-17-06)**
**17.1-06 (Indirect Access & Entry) (06-17-06) and**
**17.2-06 (Utility Access) (10-16-08)**

These endorsements are designed to provide insurance against loss if the Land does not abut or have actual vehicular and pedestrian access to and from a specific open and publicly maintained street by way of existing curb cuts or entries. In addition, ALTA 17.1-06 provides the same coverage with respect to a specific easement insured in Schedule A which connects the Land to a specific public street. The ALTA 17.2-06 adopts a version of the generic "Utilities Facilities" endorsement which covers access to utility installations in a public street.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company insures against loss or damage sustained by the Insured if, at Date of Policy (i) the Land does not abut and have both actual vehicular and pedestrian access to and from FILL IN (the "Street"), (ii) the Street is not physically open and publicly maintained, or (iii) the Insured has no right to use existing curb cuts or entries along that portion of the Street abutting the Land.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

DATED:
Chicago Title Insurance Company
BY:_____
        AUTHORIZED SIGNATORY

ALTA Endorsement Form 17-06
(Access and Entry) (6/17/06)
©American Land Title Association

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company insures against loss or damage sustained by the Insured if, at Date of Policy (i) the easement identified as FILLIN in Schedule FILLIN (the "Easement") does not provide that portion of the Land identified as FILLIN in Schedule FILLIN both actual vehicular and pedestrian access to and from FILLIN (the "Street"), (ii) the Street is not physically open and publicly maintained, or (iii) the Insured has no right to use existing curb cuts or entries along that portion of the Street abutting the Easement.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

DATED:
Chicago Title Insurance Company
BY:_____
        AUTHORIZED SIGNATORY

ALTA Endorsement Form 17.1-06
(Indirect Access and Entry) (6/17/06)
©American Land Title Association

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company insures against loss or damage sustained by the Insured by reason of the lack of a right of access to the following utilities or services:  [CHECK ALL THAT APPLY]

☐ Water service          ☐ Natural gas service          ☐ Telephone service

☐ Electrical power service   ☐ Sanitary sewer            ☐ Storm water drainage

☐ _____   ☐ _____   ☐ _____

either over, under or upon rights-of-way or easements for the benefit of the Land because of:

(1) a gap or gore between the boundaries of the Land and the rights-of-way or easements;

(2)  a gap between the boundaries of the rights-of-way or easements; or

(3)  a termination by a grantor, or its successor, of the rights-of-way or easements.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

Chicago Title Insurance Company

BY:_____

ALTA Endorsement Form 17.2-06
(Utility Access)  (10/16/08)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**TAX PARCEL**
**ALTA 18-06 (Single) (06-17-06)**
**18.1 (Multiple) [with tax sale protection] (06-17-06)**

These endorsements cover the tax parcel or tax identification numbers often included in the policy for informational. Form 18-06 insures against loss if the tax number shown does not include all the Land described in the policy or includes land not described in the policy. Form 18.1-06 is for use when there are multiple parcels and multiple numbers. In addition, Form 18.1-06 insures that any easement included as an insured parcel in Schedule A or C will not be wiped out by the subsequent foreclosure of taxes on the servient tenement.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company insures against loss or damage sustained by the Insured by reason of the Land being taxed as part of a larger parcel of land or failing to constitute a separate tax parcel for real estate taxes.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

Chicago Title Insurance Company

BY:_____

ALTA Endorsement Form 18-06
(Single Tax Parcel) (6/17/06)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company insures against loss or damage sustained by the Insured by reason of:

1.      those portions of the Land identified below not being assessed for real estate taxes under
the listed tax identification numbers or those tax identification numbers including any
additional land:

Parcel:                                  PARCEL 1
Tax Identification Number(s):   TAX ID 1


Parcel:                                  PARCEL 2
Tax Identification Number(s):   TAX ID 2


Parcel:                                  PARCEL 3
Tax Identification Number(s):   TAX ID 3


2.      the easements, if any, described in Schedule A being cut off or disturbed by the
nonpayment of real estate taxes, assessments or other charges imposed on the servient
estate by a governmental authority.

This endorsement is issued as part of the policy. Except as it expressly states, it does not
(i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements,
(iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision
of the policy or a previous endorsement is inconsistent with an express provision of this
endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the
terms and provisions of the policy and of any prior endorsements.


[Witness clause optional]




Chicago Title Insurance Company

BY:_____


ALTA Endorsement Form 18.1-06
(Multiple Tax Parcel) (6/17/06)
©American Land Title Association

**CONTIGUITY**

**ALTA 19-06 (MULTIPLE PARCELS) [within Land] AND (06-17-06)**
**FORM 19.1-06 (SINGLE PARCEL) [with property other than Land] (06-17-06)**

ALTA Form 19-06 is designed to provide insurance that (1) each parcel, in a policy which insures multiple parcels, is contiguous to at least one other parcel insured by the policy, or (2) if some parcels are not contiguous to at least one other parcel, that certain parcels are contiguous to certain other parcels. The ALTA Form 19.1-06 provides coverage that the Land in the policy is contiguous to some other specific parcel not insured in the policy.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company insures against loss or damage sustained by the Insured by reason of:

1. The failure [of the _____ boundary line of Parcel A] of the Land to be contiguous to [the_____ boundary line of Parcel B] **[for more than two parcels, continue as follows: "; of [the_____boundary line of Parcel B] of the Land to be contiguous to [the _____boundary line of Parcel C] and so on until all contiguous parcels described in the policy have been accounted for]**; or

2. The presence of any gaps, strips, or gores separating any of the contiguous boundary lines described above.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

Chicago Title Insurance Company

BY:_____

ALTA Endorsement Form 19-06
(Contiguity – Multiple Parcels) (6/17/06)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company insures against loss or damage sustained by the Insured by reason of:

1.    The failure of the Land to be contiguous to **[describe the land that is contiguous to the Land by its legal description or by reference to a recorded instrument – e.g. ". . . that certain parcel of real property legally described in the deed recorded as Instrument No._____, records of _____ County, State of_____]** along the _____ boundary line[s]; or

2.    The presence of any gaps, strips, or gores separating the contiguous boundary lines described above.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

Chicago Title Insurance Company

BY:_____

ALTA Endorsement Form 19.1-06
(Contiguity – Single Parcel) (6/17/06)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**FIRST LOSS**
**ALTA 20-06 (06-17-06)**

This endorsement is designed to alter the established criteria for determining when a loss is recognized under a loan policy. Loss is normally the difference between the value of the property with or without the defect, lien or encumbrance insured against. Under normal circumstances, a loss would be difficult to determine until the land was sold after foreclosure. If the sale was for an amount less than the debt, and the difference between the sales price and the indebtedness was caused by a matter covered by the policy, the lender could claim a loss. Consequently, an insured lender would normally be required to foreclose to prove this loss before being able to make a claim. This endorsement, to be issued only when there is more than one insured parcel, allows a loss to be recognized whenever a title defect materially impairs the value of a parcel securing the loan without requiring acceleration of the debt and foreclosure against any of the parcels securing the loan.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

This endorsement is effective only if the Collateral includes at least two parcels of real property.

1.      For the purposes of this endorsement

   a.      "Collateral" means all property, including the Land, given as security for the Indebtedness.
   b.      "Material Impairment Amount" means the amount by which any matter covered by the policy for which a claim is made diminishes the value of the Collateral below the Indebtedness.

2.      In the event of a claim resulting from a matter insured against by the policy, the Company agrees to pay that portion of the Material Impairment Amount that does not exceed the extent of liability imposed by Section 8 of the Conditions without requiring

   a.      maturity of the Indebtedness by acceleration or otherwise,
   b.      pursuit by the Insured of its remedies against the Collateral, or
   c.      pursuit by the Insured of its remedies under any guaranty, bond or other insurance policy.

3.      Nothing in this endorsement shall impair the Company's right of subrogation. However, the Company agrees that its right of subrogation shall be subordinate to the rights and remedies of the Insured. The Company's right of subrogation shall include the right to recover the amount paid to the Insured pursuant to Section 2 of this endorsement from any debtor or guarantor of the Indebtedness, after payment or other satisfaction of the remainder of the Indebtedness and other obligations secured by the lien of the Insured Mortgage. The Company shall have the right to recoup from the Insured Claimant any amount received by it in excess of the Indebtedness up to the amount of the payment under Section 2.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

Chicago Title Insurance Company

BY:_____ _____

ALTA Endorsement Form 20-06
(First Loss – Multiple Parcel Transactions) (6/17/06)
©American Land Title Association

**CREDITORS' RIGHTS**

**ALTA ENDORSEMENT FORM 21-06**


**This endorsement was decertified by ALTA on 2/8/10 and is no longer available.**

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**LOCATION**
**ALTA 22-06**
**Form 22.1-06 (with map) (06-17-06)**

These endorsements insure against loss or damage if an improvement of the type identified in the endorsement having the address set forth in the endorsement is not located on the Land. In addition, the 22.1-06 insures that a copy of a recorded plat or map that may be attached as an exhibit to the endorsement accurately reflects the location and dimensions of the Land as shown in the public records.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company insures against loss or damage sustained by the Insured by reason of the failure of a FILL IN, known as FILL IN, to be located on the Land at Date of Policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

Chicago Title Insurance Company

BY:_____

ALTA Endorsement Form 22-06
(Location) (6/17/06)
©American Land Title Association

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company insures against loss or damage sustained by the Insured by reason of the failure of (i) a FILL IN, known as FILL IN, to be located on the Land at Date of Policy, or (ii) the map, if any, attached to this policy to correctly show the location and dimensions of the Land according to the Public Records.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

Chicago Title Insurance Company

BY:_____

ALTA Endorsement Form 22.1-06
(Location and Map) (6/17/06)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**CO-INSURANCE-SINGLE POLICY**
**ALTA 23-06 (10-16-08)**

This endorsement was designed to facilitate the delivery of a single policy when co-insurance with other underwriters is involved with allocation of liability by endorsement from each co-insurer.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No.[*lead policy*]
Issued by
[*lead policy issuer*](**"Issuing Co-Insurer"**)

CO-INSURANCE ENDORSEMENT

Attached to and made a part of Issuing Co-Insurer's Policy No. [*lead policy*] ("Co-Insurance Policy"). Each title insurance company executing this Co-Insurance Endorsement, other than the Issuing Co-Insurer, shall be referred to as "Co-Insurer." Issuing Co-Insurer and each Co-Insurer are collectively referred to as "Co-Insuring Companies".

1. By issuing this endorsement to the Co-Insurance Policy, each of the Co-Insuring Companies adopts the Co-Insurance Policy's Covered Risks, Exclusions, Conditions, Schedules and endorsements, subject to the limitations of this endorsement.

| Co-Insuring Companies | Name and Address | Policy Number [File Number] | Amount of Insurance | Percentage of Liability |
|---|---|---|---|---|
| Issuing Co-Insurer | | | $ | |
| Co-Insurer | | | $ | |
| Co-Insurer | | | $ | |
| Co-Insurer | | | $ | |
| Aggregate Amount of Insurance | | | $ | |

2. Each of the Co-Insuring Companies shall be liable to the Insured only for its Percentage of Liability of: (a) the total of the loss or damage under the Co-Insurance Policy, in no event greater than its respective Amount of Insurance set forth in this endorsement; and (b) costs, attorneys' fees and expenses provided for in the Conditions.

3. Any notice of claim and any other notice or statement in writing required to be given under the Co-Insurance Policy must be given to each of the Co-Insuring Companies at its address set forth above.

4. Any endorsement to the Co-Insurance Policy issued after the date of this Co-Insurance Endorsement must be signed on behalf of each Co-Insuring Company by its authorized officer or agent.

5. This Co-Insurance Endorsement is effective as of the Date of Policy of the Co-Insurance Policy. This Co-Insurance Endorsement may be executed in counterparts.

This endorsement is issued as part of the Co-insurance Policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements to it.

_ALTA 23-06 Continued_

[Witness Optional]

DATED:
Issuing Co-Insurer:

[lead underwriter]

BY:_____

Co-Insurer:

[BLANK] Title Insurance Company

By: _____

Co-Insurer:

[BLANK] Title Insurance Company

By: _____

Co-Insurer:

[BLANK] Title Insurance Company

By: _____

[Additional Co-Insurer signatures may be added if needed.]

ALTA Endorsement Form 23-06
(Co-Insurance - Single Policy) (Rev. 10/16/08)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**DOING BUSINESS**
**ALTA FORM 24-06 (10-16-08)**

This endorsement for a loan policy provides coverage to the lender concerning the consequences of the failure to comply with state "doing business" laws.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company insures against loss or damage sustained by the Insured by reason of the invalidity or unenforceability of the lien of the Insured Mortgage on the ground that making the loan secured by the Insured Mortgage constituted a violation of the "doing business" laws of the State where the Land is located because of the failure of the Insured to qualify to do business under those laws.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements to it.

[Witness Optional]

DATED:

Chicago Title Insurance Company

BY:_____
      AUTHORIZED SIGNATORY

ALTA Endorsement Form 24-06
(Doing Business) (10/16/08)
©American Land Title Association

**SAME AS SURVEY & SAME AS PORTION OF SURVEY**
**ALTA 25-06 (10-16-08)**
**25.1-06 (10-16-08)**

These endorsements expand policy coverage by providing insurance in the event the survey identified in the endorsement is not the same land a described in Schedule A(or C) of the policy.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company insures against loss or damage sustained by the Insured by reason of the failure of the Land as described in Schedule A to be the same as that identified on the survey made by _____dated_____  _, and designated Job No._____.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements to it.

[Witness Optional]

DATED:

Chicago Title Insurance Company

BY:_____
        AUTHORIZED SIGNATORY

ALTA Endorsement Form 25-06
(Same as Survey) (10/16/08)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company insures against loss or damage sustained by the Insured by reason of the failure of the Land as described in Schedule A to be the same as that identified as [Example:  Parcel A, B, C or Parcel 1, 2, 3] on the survey made by_____ dated _____, and designated Job No._____.

This endorsement is issued as part of the policy.  Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls.  Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements to it.

[Witness Optional]

DATED:

Chicago Title Insurance Company

BY:_____
    AUTHORIZED SIGNATORY

ALTA Endorsement Form 25.1-06
(Same as Portion of Survey) (10/16/08)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**SUBDIVISION**
**ALTA 26-06 (10-16-08)**

The ALTA Form 26-06 insures against loss based upon the Land described in Schedule A (or Schedule C) not constituting a legally created parcel pursuant to applicable state statutes or local governmental regulations.

This endorsement modifies exclusion 1(a)(iii) which excludes any law, ordinance, permit or governmental regulation which pertains to the subdivision of land.

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company insures against loss or damage sustained by the Insured by reason of the failure of the Land to constitute a lawfully created parcel according to the subdivision statutes and local subdivision ordinances applicable to the Land.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements to it.

[Witness Optional]

DATED:

Chicago Title Insurance Company

BY:_____
    AUTHORIZED SIGNATORY

ALTA Endorsement Form 26-06
(Subdivision) (10/16/08)
©American Land Title Association

**USURY ENDORSEMENT**
**ALTA 27-06 (10-16-08)**

This endorsement is for use with an ALTA loan policy. It provides insurance against loss the Insured may suffer if the Insured Mortgage is determined to be usurious under state statute.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company insures against loss or damage sustained by the Insured  by reason of the invalidity or unenforceability of the lien of the Insured Mortgage as security for the Indebtedness because the loan secured by the Insured Mortgage violates the usury law of the state where the Land is located.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

Chicago Title Insurance Company

BY:_____

ALTA Endorsement Form 27-06
(Usury) (10/16//08)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**EASEMENT - DAMAGE OR ENFORCED REMOVAL ENCROACHMENTS - BOUNDARIES AND EASEMENTS**
**ALTA 28-06 (02-03-10)**
**ALTA 28.1-06 (04-02-12)**
**ALTA 28.2-06 (04-02-13)**

**ALTA Endorsement Form 28-06 (EASEMENT - DAMAGE OR ENFORCED REMOVAL)**

Endorsement Form 28.06 was developed to insure against loss caused by the encroachment of a building located on the Land onto or over an easement shown as an exception in Schedule B, as disclosed by a survey or inspection of the Land. The loss must be based on an exercise of the easement and is only for damage to an existing building or enforced removal or alteration.

**ALTA 28.1-06 (ENCROACHMENTS - BOUNDARIES AND EASEMENTS)**
**ALTA 28.2-06 (ENCROACHMENTS – BOUNDARIES AND EASEMENTS – DESCRIBED IMPROVEMENTS)**

Endorsement Forms 28.1-06 and 28.2-06 were developed to provide coverage with respect to certain boundary and easement encroachments. This coverage was previously included in the former ALTA 9 series. It is no longer contained within those endorsements other than the revised ALTA 9-06 and the new ALTA 9.7-06 and 9.10-06 (which additionally afford coverage as to violations of covenants, violations of setbacks, and damage to existing improvements because of development of minerals). The Form 28.2-06 specifically covers only the Improvements described at item 2 of the endorsement.

**The coverage in these Endorsements include:**

• The loss occasioned by the existence of an encroachment by an Improvement onto a neighboring property or onto an easement area within the insured Land, other than as disclosed in Schedule B exceptions.

• The loss occasioned by the existence of an encroachment by a neighboring Improvement onto the insured Land, other than as disclosed in Schedule B exceptions.
• Enforced removal of an insured Improvement based upon the encroachment into the easement area or onto neighboring property.

These forms allow the exclusion of an encroachment raised as an exception in Schedule B from the enforced removal coverage by reference to the exception that describes it, if the title insurer elects not to include that encroachment within the coverage afforded by these endorsements.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company insures against loss or damage sustained by the Insured if the exercise of the granted or reserved rights to use or maintain the easement(s) referred to in Exception (s)_____ of Schedule B results in:

(1)     damage to an existing building located on the Land, or

(2)     enforced removal or alteration of an existing building located on the Land.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements to it.

[Witness Optional]

DATED:

Chicago Title Insurance Company

BY:_____
     AUTHORIZED SIGNATORY

ALTA Endorsement Form 28-06
(Easement-Damage or Enforced Removal) (rev. 02/03/10)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1. The insurance provided by this endorsement is subject to the exclusions in Section 4 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2. For purposes of this endorsement only, "Improvement" means an existing building, located on either the Land or adjoining land at Date of Policy and that by law constitutes real property.

3. The Company insures against loss or damage sustained by the Insured by reason of:

   a. An encroachment of any Improvement located on the Land onto adjoining land or onto that portion of the Land subject to an easement, unless an exception in Schedule B of the policy identifies the encroachment;

   b. An encroachment of any Improvement located on adjoining land onto the Land at Date of Policy, unless an exception in Schedule B of the policy identifies the encroachment;

   c. Enforced removal of any Improvement located on the Land as a result of an encroachment by the Improvement onto any portion of the Land subject to any easement, in the event that the owners of the easement shall, for the purpose of exercising the right of use or maintenance of the easement, compel removal or relocation of the encroaching Improvement; or

   d. Enforced removal of any Improvement located on the Land that encroaches onto adjoining land.

4. This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from the encroachments listed as Exceptions _____of Schedule B.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

DATED:

Chicago Title Insurance Company

BY:_____
      AUTHORIZED SIGNATORY

ALTA Endorsement Form 28.1-06
(Encroachments-Boundaries and Easements) (4/2/12)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.  The insurance provided by this endorsement is subject to the exclusions in Section 4 of this  endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in  Schedule B, and the Conditions in the policy.

2.  For purposes of this endorsement only, "Improvement" means each improvement  on the Land or  adjoining land at Date of Policy , itemized below:

.

3.  The Company insures against loss or damage sustained by the Insured by reason of:

    a. An encroachment of any Improvement located on the Land onto adjoining land or onto that  portion of the Land subject to an easement, unless  an exception in Schedule B of the policy  identifies the encroachment;

    b. An encroachment of any Improvement located on adjoining land onto the Land at Date of Policy,   unless an exception in Schedule B of the policy identifies the encroachment;

    c. Enforced removal of any Improvement located on the Land as a result of an encroachment by  the Improvement onto any portion of the Land subject to any easement, in the event that the  owners of the easement shall, for the purpose of exercising the right of use or maintenance of  the easement, compel removal or relocation of the encroaching Improvement; or

    d. Enforced removal of any Improvement located on the Land that encroaches onto adjoining land.

4.  Sections 3.c and 3.d. of this endorsement do not insure against loss or damage (and the Company  will not pay costs, attorneys' fees, or expenses) resulting from the following Exceptions, if any, listed  in Schedule B:

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of  the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or
(iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is  inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this   endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

DATED:
Chicago Title Insurance Company
BY:_____
        AUTHORIZED SIGNATORY

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

ALTA Endorsement Form 28.2-06
(Encroachments-Boundaries and Easements-Described Improvements) (4/2/13)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**SWAP ENDORSEMENT (INTEREST RATE EXCHANGE AGREEMENT SECURED BY INSURED MORTGAGE)**
**ALTA 29-06 (02-03-10)**
**ALTA 29.1-06 (02-03-10)**
**ALTA 29.2-06 (08-01-11)**
**ALTA 29.3-06 (08-01-11)**

Lenders occasionally request that the Loan Policy insure amounts which are described in an Interest Rate Exchange Agreement or Swap Agreement, the terms of which are contained in or referenced in the Insured Mortgage. Such agreements obligate the mortgagor for damages the lender may suffer under swap transactions it enters into on the borrower's behalf in order to achieve a favorable interest rate. If the borrower defaults on its loan, the lender becomes obligated itself under the swap loan for amounts known as breakage fees. This endorsement is designed to provide additional coverage for these amounts. These amounts are contingent and would accrue as an obligation of the borrower post-policy.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1. The insurance provided by this endorsement is subject to the exclusions in Section 3 of this endorsement, the Exclusions from Coverage in the Policy, the Exceptions from Coverage contained in Schedule B, and the Conditions. As used in this endorsement:

   a. The "Date of Endorsement" is_____; and

   b. "Swap Obligation" means a monetary obligation under the interest rate exchange agreement dated_____, between _____ and the Insured existing at Date of Endorsement and secured by the Insured Mortgage. The Swap Obligation is included as a part of the Indebtedness.

2. The Company insures against loss or damage sustained by the Insured by reason of the invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as security for the repayment of the Swap Obligation at Date of Endorsement.

3. This endorsement does not insure against loss or damage, and the Company will not pay costs, attorneys' fees, or expenses that arise by reason of:

   a. Rights or obligations set, created or confirmed after the Date of Endorsement under a master interest rate exchange agreement existing on or after Date of Endorsement;

   b. The stay, rejection or avoidance of the lien of the Insured Mortgage as security for the Swap Obligation, or a court order providing some other remedy, by the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws;

   c. The calculation of the amount, if any, determined by a court of competent jurisdiction as the amount of the Swap Obligation[; *or*]

   d. [*The invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as security for repayment of the Swap Obligation because all applicable mortgage recording or similar intangible taxes were not paid; or* ]

   e. [*If Date of Endorsement is after Date of Policy, add any necessary additional exceptions here*].

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements to it.

[Witness clause optional]
DATED:
Chicago Title Insurance Company
BY:_____
   AUTHORIZED SIGNATORY

ALTA Endorsement - Form 29 - 06
(Interest Rate Swap –Direct Obligations**)** (2/3/10)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.  The insurance provided by this endorsement is subject to the exclusions in Section 3 of this endorsement, the Exclusions from Coverage in the Policy, the Exceptions from Coverage contained in  Schedule B, and the Conditions. As used in this endorsement:

    a.  The "Date of Endorsement" is_____; and

    b.  "Swap Obligation" means a monetary obligation under the interest rate exchange                              . agreement dated ___, between_____and the Insured existing at Date of Endorsement and secured by the  Insured Mortgage.

    c.  "Additional Interest" means the additional interest calculated pursuant to the formula provided in the   loan documents secured by the Insured Mortgagee at Date of Endorsement.

2.  The Company insures against loss or damage sustained by the Insured by reason of the invalidity,   unenforceability or lack of priority of the lien of the Insured Mortgage as security for the repayment of  the Additional Interest at Date of Endorsement.

3.  This endorsement does not insure against loss or damage, and the Company will not pay costs,   attorneys' fees, or expenses that arise by reason of:

    a.  Rights or obligations set, created or confirmed after the Date of Endorsement under a master  interest rate exchange agreement existing on or after Date of Endorsement;

    b.  The stay, rejection or avoidance of the lien of the Insured Mortgage as security for the Swap  Obligation, or a court order providing some other remedy, by the operation of federal bankruptcy, state  insolvency, or similar creditors' rights laws;

    c.  The calculation of the amount, if any, determined by a court of competent jurisdiction as the amount  of the Additional Interest*[; or*]

    d.  [*The invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as security for  repayment of the Swap Obligation because all applicable mortgage recording or similar intangible taxes  were not paid; or* ]

    e.  [*If Date of Endorsement is after Date of Policy, add any necessary additional exceptions here*].

    This endorsement is issued as part of the policy. Except as it expressly states, it does not  (i)  modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date  of Policy or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls.  Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior  endorsements to it.

Dated:

By_____
        Authorized Signatory

ALTA Endorsement - Form 29.1 - 06

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

(Interest Rate Swap – Additional Interest) (2/3/10)
©American Land Title Association

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.      The insurance provided by this endorsement is subject to the exclusions in Section 3 of this endorsement, the Exclusions from Coverage in the Policy, the Exceptions from Coverage contained in Schedule B, and the Conditions. As used in this endorsement:

   a.      The "Date of Endorsement" is_____; and

   b.      "Swap Obligation" means a monetary obligation under the interest rate exchange agreement dated_____, between_____and the Insured existing at Date of Endorsement and secured by the Insured Mortgage. The Swap Obligation is included as a part of the Indebtedness.

   c. "Additional Amount of Insurance" is $_____that is in addition to the Amount of Insurance stated in Schedule A and is Applicable only to loss or damage under this endorsement.

2.      The Company insures against loss or damage sustained by the Insured by reason of the invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as security for the repayment of the Swap Obligation at Date of Endorsement.

3      This endorsement does not insure against loss or damage, and the Company will not pay costs, attorneys' fees, or expenses that arise by reason of:

   a.      Rights or obligations set, created or confirmed after the Date of Endorsement under a master interest rate exchange agreement existing on or after Date of Endorsement;

   b.      The stay, rejection or avoidance of the lien of the Insured Mortgage as security for the Swap Obligation, or a court order providing some other remedy, by the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws;

   c.      The calculation of the amount, if any, determined by a court of competent jurisdiction as the amount of the Swap Obligation[; *or*]

   d.      [*The invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as security for repayment of the Swap Obligation because all applicable mortgage recording or similar intangible taxes were not paid; or* ]

   e.      [*If Date of Endorsement is after Date of Policy, add any necessary additional exceptions here*].

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy or
(iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements to it.

Dated:

By_____
          Authorized Signatory

ALTA Endorsement - Form 29 .2 - 06
(Interest Rate Swap –Direct Obligations-Defined Amount) (8/01/11)
©American Land Title Association

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.  The insurance provided by this endorsement is subject to the exclusions in Section 3 of this endorsement, the Exclusions from Coverage in the Policy, the Exceptions from Coverage contained in  Schedule B, and the Conditions. As used in this endorsement:

    a.  The "Date of Endorsement" is_____; and

    b.  "Swap Obligation" means a monetary obligation under the interest rate exchange            .
    agreement dated
    ____, between_____and the Insured existing at Date of Endorsement and secured
    by the  Insured Mortgage.

    c.  "Additional Interest" means the additional interest calculated pursuant to the formula provided in the  loan documents secured by the Insured Mortgagee at Date of Endorsement.

    d.  "Additional Amount of Insurance" is $___that is in addition to the Amount of Insurance stated in  Schedule A and is applicable  only to loss or damage under this endorsement.

2.  The Company insures against loss or damage sustained by the Insured by reason of the invalidity,   unenforceability or lack of priority of the lien of the Insured Mortgage as security for the repayment of  the Additional Interest at Date of Endorsement.

3.  This endorsement does not insure against loss or damage, and the Company will not pay costs,   attorneys' fees, or expenses that arise by reason of:

    a.  Rights or obligations set, created or confirmed after the Date of Endorsement under a master  interest rate exchange agreement existing on or after Date of Endorsement;

    b.  The stay, rejection or avoidance of the lien of the Insured Mortgage as security for the Swap  Obligation, or a court order providing some other remedy, by the operation of federal bankruptcy, state  insolvency, or similar creditors' rights laws;

    c.  The calculation of the amount, if any, determined by a court of competent jurisdiction as the amount  of the Additional Interest*[; or]*

    d.  *[The invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as security for  repayment of the Swap Obligation because all applicable mortgage recording or similar intangible taxes  were not paid; or ]*

    e.  *[If Date of Endorsement is after Date of Policy, add any necessary additional exceptions here].*

    This  endorsement  is  issued  as  part  of  the  policy.  Except  as  it  expressly  states,  it does  not  (i)  modify  any  of  the  terms  and  provisions  of  the  policy,  (ii)  modify  any  prior endorsements, (iii) extend the Date  of  Policy or (iv) increase the Amount of Insurance. To the extent  a  provision  of  the  policy  or  a  previous  endorsement  is  inconsistent  with  an  express provision  of  this  endorsement,  this  endorsement  controls.   Otherwise,  this  endorsement  is subject  to  all  of  the  terms  and  provisions  of  the  policy  and  of  any  prior  endorsements to it.

Dated:

By_____
        Authorized Signatory

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

ALTA Endorsement - Form 29.3 - 06
(Interest Rate Swap – Additional Interest-Defined Amount) (8/01/11)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ONE TO FOUR FAMILY SHARED APPRECIATION MORTGAGE ENDORSEMENT**
**COMMERCIAL PARTICIPATION INTEREST**
**ALTA 30-06 (07-26-10)**
**ALTA 30.1-06 (08-01-12)**

These endorsements are designed to provide additional coverage to the lender when the loan documents provide that the lender will participate in the appreciation in value of the property or a share of the cash flow (as additional interest). The residential version (30-06) was developed for use with government programs that modified and reduced the outstanding debt of homeowners in the face of the downturn of the housing market. These programs allow the recapture of appreciation up to the amount of forgiveness of previously outstanding debt.  The commercial version (30.1-06) is for use only with commercial transactions and includes, in addition to the increase in the value of the property (appreciation), a share of the cash flow from the property and any increase in the equity of the borrower in the property.  These endorsements provide coverage in the event of an attack on the validity, priority or enforceability of the Insured Mortgage based upon the provisions regarding shared appreciation and participation.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The insurance afforded by this endorsement is only effective if the Land is a one to four family residence.

For the purposes of this endorsement, "Shared Appreciation" shall mean increases in the Indebtedness  secured by the Insured Mortgage by reason of shared equity or appreciation in the value of the Land.

The Company insures against loss or damage sustained by the Insured by reason of:

    (a)  The invalidity or unenforceability of the lien of the Insured Mortgage as security for the  Indebtedness caused by the provisions for Shared Appreciation; or

    (b)  Loss of priority of the lien of the Insured Mortgage as security for the Indebtedness caused by  the provisions for Shared Appreciation.

Nothing contained in this endorsement shall be construed as insuring against loss or damage sustained or   incurred by reason of:

    (a)  usury;

    (b)  any consumer credit protection or truth in lending law;

    (c)  costs, expenses or attorney's fees required to obtain a determination, by judicial proceedings  or otherwise, of the amount of the Shared Appreciation;

    (d)  failure to comply with applicable laws and regulations regarding Shared Appreciation;

    (e)  the stay, rejection or avoidance of the lien of the Insured Mortgage as security for the Shared  Appreciation, or a court order providing some other remedy, by the operation of federal  bankruptcy, state insolvency or similar creditors' rights laws; or

    (f)  the invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as security  for the Indebtedness because all applicable mortgage recording or similar intangible taxes  were not paid.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of  the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or
(iv) crease the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is  inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this   endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Dated:

By_____

    Authorized Signatory

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

ALTA Endorsement Form 30-06
(One to Four Family Shared Appreciation Mortgage) (7/26/10)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.      This endorsement is subject to the exclusions in Section 4 of this endorsement, the Exclusions  from Coverage in the policy, the Exceptions from Coverage contained in Schedule B, and the  Conditions.

2.      As used in this endorsement,

a.   "Loan Documents" means those documents, as they exist at Date of Policy, creating the  Indebtedness.

b.   "Participation Interest" means those elements of interest, established and calculated pursuant to  the formula provided in the Loan Documents, that are payable or allocated to the Insured based  upon:

      i.   the borrower's equity in the Title;
      ii.   the increase in value of the Title; or
      iii.   cash flow.

3.      The policy insures as of Date of Policy against loss or damage sustained by the Insured by  reason of:

a.   The invalidity or unenforceability of the lien of the Insured Mortgage resulting from the provisions in  the Insured Mortgage or in the Loan Documents which provide for Participation Interest.

b.   Lack of priority of the lien of the Insured Mortgage at Date of Policy as security for (i) the unpaid  principal balance of the loan and (ii) the interest on the loan, including the Participation Interest, if  any, which lack of priority is caused by the provisions in the Loan Documents for payment or  allocation to the Insured of any Participation Interest.

4.      The policy does not insure against loss or damage, and the Company will not pay costs,   attorneys' fees, or expenses that arise by reason of:

a.   usury; unconscionability; or any consumer credit protection or truth-in-lending law;
b.             disputes over the amount of Participation Interest;
c.                 failure to comply with applicable laws and regulations regarding Participation Interest;
d.   the invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as security for  the Participation Interest because all applicable mortgage recording or similar intangible taxes were   not paid; or
e.   any statutory lien for services provided, labor performed, or materials or equipment furnished   arising after Date of Policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of  the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or
(iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is  inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this   endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Dated:

By_____

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

Authorized Signatory

ALTA Endorsement Form 30.1-06
(Commercial Participation Interest) (8/1/12)
©American Land Title Association

**SEVERABLE IMPROVEMENTS**
**ALTA 31-06 (02-03-11)**

This endorsement adds, as a part of the calculation of the Insured's loss, the diminution in value of the Insured's interest in any defined Severable Improvement affixed to the Land, as well as the reasonable cost of removal or relocation of these. Severable Improvements are defined as property that by law does not constitute real property. Land is defined in the policy as land and improvements that by law constitute real property.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.  As used in this endorsement, "Severable Improvement" means property affixed to the Land on or after Date of Policy that by law does not constitute real property because:

    a.  of its character and manner of attachment to the Land; and

    b.  it can be severed from the Land without causing material damage to it or to the Land.

2.  In the event of a loss by reason of a defect, lien, encumbrance, or other matter covered by this Policy ("Defect"), the calculation of the loss shall include (but not to the extent that these items of loss are included in the valuation of the Title determined pursuant to Section 8 of the Conditions or any other endorsement to the Policy):

    a.  the diminution in value of the Insured's interest in any Severable Improvement resulting from the Defect, reduced by the salvage value of the Severable Improvement; and

    b.  the reasonable cost actually incurred by the Insured in connection with the removal or relocation of the Severable Improvement resulting from the Defect and the cost of transportation of that Severable Improvement for the initial one hundred miles incurred in connection with the relocation.

3.  This endorsement relates solely to the calculation of the Insured's loss resulting from a claim based on a defect, lien, encumbrance or other matter otherwise insured against by the Policy. This Policy does not insure against loss or damage (and the Company will not pay any costs, attorneys' fees or expenses) relating to:

    a.  the attachment, perfection or priority of any security interest in the Severable Improvement;

    b.  the vesting or ownership of title to or rights in any Severable Improvement;

    c.  any defect in or lien or encumbrance on the title to any Severable Improvement; or

    d.  the determination of whether any specific property is real or personal in nature.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

Dated:
Chicago Title Insurance Company
BY: _____
          AUTHORIZED SIGNATORY

ALTA Endorsement Form 31-06
(Severable Improvements) (2-3-11)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**CONSTRUCTION LOAN**
**ALTA 32-06 (Construction Loan – Loss of Priority) (02-03-11) ALTA 32.1-06 (Construction Loan – Loss of Priority-Direct Payment) (04-02-13)**
**ALTA 32.2-06 (Construction Loan –Loss of Priority- Insured's Direct Payment) (04-02-13)**

These endorsements, together with the 33-06 (Disbursement) replace the ALTA Construction Loan Policy and the Construction Loan Policy Endorsements A through D which have been decertified and are no longer available.

These endorsements were developed to give limited coverage where priority has been lost. They only give coverage to the extent of work that the lender has paid for, with the ALTA 32-06 and the ALTA 32.1-06 further limited to liens filed by parties that have been identified on a draw request either paid by the Insured or the Company. They do not give coverage over other inchoate liens that can prime the construction mortgage. The 32-06 covers payment as disclosed by a draw request.

ALTA Endorsement 32.1-06 is designed for loan policies during construction in situations where the mortgage or deed of trust can never have priority over mechanic's liens or where the mortgage or deed of trust has lost priority to mechanic's liens (e.g., due to commencement of work prior to the recording of the mortgage or deed of trust). However, this endorsement may also be used for situations where the mortgage or deed of trust has priority over mechanic's liens.

Specifically, the ALTA 32.1-06 insures only to the extent that direct payment to the Mechanic's Lien claimant has been made by the Company or by the Insured with the Company's written approval.  It does not insure against loss or damage by reason of any mechanic's lien arising from services, labor, material or equipment:

a Furnished after Date of Coverage; or
to the extent that a Mechanic's Lien claimant was not directly paid by the Company or by the Insured with the Company's written approval.

The endorsement contemplates that the Company or its agent will be involved in the direct payment to specific mechanic's lien claimants – either by making the payment or by approving it.

The ALTA 32.2-06 covers a lien filed for payment of previously paid amounts by the title insurer or with the title insurer's consent.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.  Covered Risk 11(a) of this policy is deleted.

2.  The insurance [for Construction Loan Advances] added by Section 3 of this endorsement is subject to the exclusions in Section 4 of this endorsement and the Exclusions from Coverage in the Policy, the provisions of the Conditions, and the exceptions contained in Schedule B. For the purposes of this endorsement and each subsequent Disbursement Endorsement:

    a.  "Date of Coverage" is_unless the Company sets a different Date of Coverage by an ALTA 33-06 Disbursement Endorsement issued at the discretion of the Company.

    b.  "Construction Loan Advance" shall mean an advance that constitutes Indebtedness made on or before Date of Coverage for the purpose of financing in whole or in part the construction of improvements on the Land.

    c.  "Mechanic's Lien" shall mean any statutory lien or claim of lien, affecting the Title, that arises from services provided, labor performed, or materials or equipment furnished.

3.  The Company insures against loss or damage sustained by the Insured by reason of:

    a.  The invalidity or unenforceability of the lien of the Insured Mortgage as security for each Construction Loan Advance made on or before the Date of Coverage;

    b.  The lack of priority of the lien of the Insured Mortgage as security for each Construction Loan Advance made on or before the Date of Coverage, over any lien or encumbrance on the Title recorded in the Public Records and not shown in Schedule B; and

    c.  The lack of priority of the lien of the Insured Mortgage, as security for each Construction Loan Advance made on or before the Date of Coverage over any Mechanic's Lien, if notice of the Mechanic's Lien is not filed or recorded in the Public Records, but only to the extent that the charges for the services, labor, materials or equipment for which the Mechanic's Lien is claimed were designated for payment in the documents supporting a Construction Loan Advance disbursed by or on behalf of the Insured on or before Date of Coverage.

4   This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) by reason of any Mechanic's Lien arising from services, labor, material or equipment:
    a.  furnished after Date of Coverage; or
    b.  not designated for payment in the documents supporting a Construction Loan Advance disbursed by or on behalf of the Insured on or before Date of Coverage.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Dated:
Chicago Title Insurance Company
BY: _____

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

AUTHORIZED  SIGNATORY

ALTA Endorsement Form 32-06
(Construction Loan-Loss of Priority) (2-3-11)
© American Land Title Association

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.  Covered Risk 11(a) of this policy is deleted.

2.  The insurance [for Construction Loan Advances] added by Section 3 of this endorsement is subject to the exclusions in Section 4 of this endorsement and the Exclusions from Coverage in the Policy, the provisions of the Conditions, and the exceptions contained in Schedule B. For the purposes of this endorsement and each subsequent Disbursement Endorsement:

    a.  "Date of Coverage" is_____unless the Company sets a different Date of Coverage by an ALTA 33-06 Disbursement Endorsement issued at the discretion of the Company.

    b.  "Construction Loan Advance" shall mean an advance that constitutes Indebtedness made on or before Date of Coverage for the purpose of financing in whole or in part the construction of improvements on the Land.

    c.  "Mechanic's Lien" shall mean any statutory lien or claim of lien, affecting the Title, that arises from services provided, labor performed, or materials or equipment furnished.

3.  The Company insures against loss or damage sustained by the Insured by reason of:

    a.  The invalidity or unenforceability of the lien of the Insured Mortgage as security for each Construction Loan Advance made on or before the Date of Coverage;

    b.  The lack of priority of the lien of the Insured Mortgage as security for each Construction Loan Advance made on or before the Date of Coverage, over any lien or encumbrance on the Title recorded in the Public Records and not shown in Schedule B; and

    c.  The lack of priority of the lien of the Insured Mortgage as security for each Construction Loan Advance made on or before the Date of Coverage over any Mechanic's Lien if notice of the Mechanic's Lien is not filed or recorded in the Public Records, but only to the extent that direct payment to the Mechanic's Lien claimant for the charges for the services, labor, materials or equipment for which the Mechanic's Lien is claimed has been made by the Company or by the Insured with the Company's written approval.

4.  This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) by reason of any Mechanic's Lien arising from services, labor, material or equipment:
    a.  furnished after Date of Coverage; or
    b.  to the extent that the Mechanic's Lien claimant was not directly paid by the Company or by the Insured with the Company's written approval.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or
(iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

DATED:

Chicago Title Insurance Company

BY:_____
         AUTHORIZED SIGNATORY

ALTA Endorsement Form 32.1-06
(Construction Loan-Loss of Priority-Direct Payment) (rev. 4-2-13)
 American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1. Covered Risk 11(a) of this policy is deleted.

2. The insurance [for Construction Loan Advances] added by Section 3 of this endorsement is subject to the exclusions in Section 4 of this endorsement and the Exclusions from Coverage in the Policy, the provisions of the Conditions, and the exceptions contained in Schedule B. For the purposes of this endorsement and each subsequent Disbursement Endorsement:

   a. "Date of Coverage" is[ unless the Company sets a different Date of Coverage by an ALTA 33-06 Disbursement Endorsement issued at the discretion of the Company.

   b. "Construction Loan Advance" shall mean an advance that constitutes Indebtedness made on or before Date of Coverage for the purpose of financing in whole or in part the construction of improvements on the Land.

   c. "Mechanic's Lien" shall mean any statutory lien or claim of lien, affecting the Title, that arises from services provided, labor performed, or materials or equipment furnished.

3. The Company insures against loss or damage sustained by the Insured by reason of:

   a. The invalidity or unenforceability of the lien of the Insured Mortgage as security for each Construction Loan Advance made on or before the Date of Coverage;

   b. The lack of priority of the lien of the Insured Mortgage as security for each Construction Loan Advance made on or before the Date of Coverage, over any lien or encumbrance on the Title recorded in the Public Records and not shown in Schedule B; and

   c. The lack of priority of the lien of the Insured Mortgage, as security for each Construction Loan Advance made on or before the Date of Coverage over any Mechanic's Lien, if notice of the Mechanic's Lien is not filed or recorded in the Public Records, but only to the extent that a direct payment to the Mechanic's Lien claimant for the charges for the services, labor, materials or equipment for which the Mechanic's Lien is claimed has been made by the Insured or on the Insured's behalf on or before Date of Coverage.

4 This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) by reason of any Mechanic's Lien arising from services, labor, material or equipment:
   a. furnished after Date of Coverage; or
   b. To the extent that the Mechanic's lien claimant was not directly paid by the Insured or on the Insured's behalf.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

DATED:

Chicago Title Insurance Company

BY:_____
         AUTHORIZED SIGNATORY

ALTA Endorsement Form 32.2-06
(Construction Loan-Loss of Priority-Insured's Direct Payment) (rev. 4/2/13)
© American Land Title Association

**CONSTRUCTION LOAN DISBURSEMENT**

**ALTA 33-06 (02-03-11)**

This endorsement is used in conjunction with ALTA Forms 32-06, 32.1-06 or 32.2-06 when the Date of Coverage to be extended.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.   The Date of Coverage is amended to _____.

    [a.   The current disbursement is: $_____]

    [b.   The aggregate amount, including the current disbursement, recognized by the Company
       as disbursed by the Insured is: $_____]

2.   Schedule A is amended as follows:

3.   Schedule B is amended as follows:

    [Part I]

    [Part II]

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i)
modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii)
extend the Date of Policy or (iv) increase the Amount of Insurance. To the extent a provision of
the policy or a previous endorsement is inconsistent with an express provision of this
endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the
terms and provisions of the policy and of any prior endorsements to it.

[Witness Optional]
[Bracketed material optional]

DATED:

Chicago Title Insurance Company

BY:_____
     AUTHORIZED SIGNATORY

ALTA Endorsement Form 33-06
(Disbursement) (2-3-11)
© American Land Title Association

**IDENTIFIED RISK COVERAGE**

**ALTA 34-06 (08-01-11)**

This endorsement should be used whenever we decide to assume a specific risk or "Identified Risk" as defined therein. Sometime this is referred to as "insuring over", especially when we have raised that risk in a commitment or policy.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.  As used in this endorsement "Identified Risk" means: [*insert description of the title defect, restriction encumbrance or other matter*] described in Exception _____of Schedule B.

2.  The Company insures against loss or damage sustained by the Insured by reason of:

    a.  A final order or decree enforcing the Identified Risk in favor of an adverse party; or

    b.  The release of a prospective purchaser or lessee of the Title or lender on the Title from the obligation to purchase, lease, or lend as a result of the Identified Risk, but only if

        i.   there is a contractual condition requiring the delivery of marketable title, and

        ii.  neither the Company nor any other title insurance company is willing to insure over the Identified Risk with the same conditions as in this endorsement.

3.  The Company will also pay the costs, attorneys' fees, and expenses incurred in defense of the Title by reason of the Identified Risk insured against by Paragraph 2 of this endorsement, but only to the extent provided in the Conditions.

4.  This endorsement does not obligate the Company to establish the Title free of the Identified Risk or to remove the Identified Risk, but if the Company does establish the Title free of the Identified Risk or removes it, Section 9(a) of the Conditions applies.

This endorsement is issued as part of the policy.  Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy or (iv) increase the Amount of Insurance.  To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls.  Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements to it.

[Witness Optional]

DATED:

Chicago Title Insurance Company

BY:_____
        AUTHORIZED SIGNATORY

ALTA Endorsement Form 34-06
(Identified Risk Coverage) (8-1-11)
© American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**MINERALS AND OTHER
SUBSURFACE
SUBSTANCES
ALTA 35-06 thru 35.3-06
(04.02.12)**

These endorsement forms were developed to provide coverage to lenders with respect to the enforced removal or alteration of improvements resulting from the extraction or development of minerals or other subsurface substances. This coverage was previously included in the former ALTA 9 series. It is no longer contained within those endorsements other than the revised ALTA 9-06 and the new ALTA 9.7-06.

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1. The insurance provided by this endorsement is subject to the exclusion in Section 4 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2. For purposes of this endorsement only, "Improvement" means a building on the Land at Date of Policy.

3. The Company insures against loss or damage sustained by the Insured by reason of the enforced removal or alteration of any Improvement resulting from the future exercise of any right existing at Date of Policy to use the surface of the Land for the extraction or development of minerals or any other subsurface substances excepted from the description of the Land or excepted in Schedule B.

4. This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:

   a. contamination, explosion, fire, vibration, fracturing, earthquake or subsidence; [or]

   b. negligence by a person or an Entity exercising a right to extract or develop minerals or other subsurface substances[; or

   c. the exercise of the rights described in (                )]. *

   * Instructional note:  identify the interest excepted from the description of the Land in Schedule A or excepted in Schedule B that you intend to exclude from this coverage.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

DATED:
Chicago Title Insurance Company
BY:_____
     AUTHORIZED SIGNATORY

ALTA Endorsement Form 35-06
(Minerals and other Subsurface Substances-Buildings) (4/2/12)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.  The insurance provided by this endorsement is subject to the exclusion in Section 4 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2.  For purposes of this endorsement only, "Improvement" means a building, structure located on the surface of the Land, and any paved road, walkway, parking area, driveway, or curb, affixed to the Land at Date of Policy and that by law constitutes real property, but excluding any crops, landscaping, lawn, shrubbery, or trees.

3.  The Company insures against loss or damage sustained by the Insured by reason of the enforced removal or alteration of any Improvement, resulting from the future exercise of any right existing at Date of Policy to use the surface of the Land for the extraction or development of minerals or any other subsurface substances excepted from the description of the Land or excepted in Schedule B.

4.  This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:

    a.  contamination, explosion, fire, vibration, fracturing, earthquake or subsidence; [or]

    b.  negligence by a person or an Entity exercising a right to extract or develop minerals or other subsurface substances[; or

    c.  the exercise of the rights described in (                    )]. *

        * Instructional note:  identify the interest excepted from the description of the Land in Schedule A or excepted in Schedule B that you intend to exclude from this coverage.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

DATED:
Chicago Title Insurance Company
BY:_____
      AUTHORIZED SIGNATORY

ALTA Endorsement Form 35.1-06
(Minerals and other Subsurface Substances-Improvements) (4/2/12)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1. The insurance provided by this endorsement is subject to the exclusion in Section 4 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2. For purposes of this endorsement only, "Improvement" means each improvement on the Land at Date of Policy itemized [on the exhibit attached to this endorsement] [below:]

3. The Company insures against loss or damage sustained by the Insured by reason of the enforced removal or alteration of any Improvement resulting from the future exercise of any right existing at Date of Policy to use the surface of the Land for the extraction or development of minerals or any other subsurface substances excepted from the description of the Land or excepted in Schedule B.

4. This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:

   a. contamination, explosion, fire, vibration, fracturing, earthquake or subsidence; [or]

   b. negligence by a person or an Entity exercising a right to extract or develop minerals or other subsurface substances[; or

   c. the exercise of the rights described in (                    )]. *

      * Instructional note:  identify the interest excepted from the description of the Land in Schedule A or excepted in Schedule B that you intend to exclude from this coverage.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

**Chicago Title Insurance Company**

By: _____
      Authorized Signatory

ALTA Endorsement Form 35.2-06
(Minerals and other Subsurface Substances-Described Improvements) (4/2/12)
©American Land Title Association

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1. The insurance provided by this endorsement is subject to the exclusion in Section 4 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2. For purposes of this endorsement only:

   a. "Improvement" means a building, structure located on the surface of the Land, and any paved road, walkway, parking area, driveway, or curb, affixed to the Land at Date of Policy and that by law constitutes real property, but excluding any crops, landscaping, lawn, shrubbery, or trees.

   b. "Future Improvement" means a building, structure, and any paved road, walkway, parking area, driveway, or curb to be constructed on or affixed to the Land in the locations according to the Plans and that by law will constitute real property, but excluding any crops, landscaping, lawn, shrubbery, or trees.

   c. "Plans" means the survey, site and elevation plans or other depictions or drawings prepared by *(insert name of architect or engineer)* dated_____, last revised__, designated as *(insert name of project or project number)* consisting of_sheets.

3. The Company insures against loss or damage sustained by the Insured by reason of the enforced removal or alteration of an Improvement or a Future Improvement, resulting from the future exercise of any right existing at Date of Policy to use the surface of the Land for the extraction or development of minerals or any other subsurface substances excepted from the description of the Land or excepted in Schedule B.

4. This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:

   a. contamination, explosion, fire, vibration, fracturing, earthquake or subsidence; [or]

   b. negligence by a person or an Entity exercising a right to extract or develop minerals or other subsurface substances[; or

   c. the exercise of the rights described in (          )]. *

   * Instructional note: identify the interest excepted from the description of the Land in Schedule A or excepted in Schedule B that you intend to exclude from this coverage.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or
(iv) crease the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

**Chicago Title Insurance Company**

By: _____
    Authorized Signatory

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

ALTA Endorsement Form 35.3-06
(Minerals and other Subsurface Substances-Land Under Development) (4/2/12)
©American Land Title Association

**ENERGY PROJECT Series**

**ALTA 36.06 thru 36.6-06 (04-02-12)**

The ALTA 36 series of endorsement forms were developed to provide coverages to energy project owners and lenders which use a leasehold or easement rights structure. Examples of such projects would include solar or wind farms.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1. The insurance provided by this endorsement is subject to the exclusions in Section 6 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2. For purposes of this endorsement only:

   a. "Constituent Parcel" means one of the parcels of Land described in Schedule A that together constitute one integrated project.

   b. "Easement" means each easement described in Schedule A.

   c. "Easement Interest" means the right of use granted in the Easement for the Easement Term.

   d. "Easement Term" means the duration of the Easement Interest, as set forth in the Easement, including any renewal or extended term if a valid option to renew or extend is contained in the Easement.

   e. "Electricity Facility" means an electricity generating facility which may include one or more of the following: a substation; a transmission, distribution or collector line; an interconnection, inverter, transformer, generator, turbine, array, solar panel, or module; a circuit breaker, footing, tower, pole, cross-arm, guy line, anchor, wire, control system, communications or radio relay system, safety protection facility, road, and other building, structure, fixture, machinery, equipment, appliance and item associated with or incidental to the generation, conversion, storage, switching, metering, step-up, step-down, inversion, transmission, conducting, wheeling, sale or other use or conveyance of electricity, on the Land at Date of Policy or to be built or constructed on the Land in the locations according to the Plans, that by law constitutes real property.

   f. "Evicted" or "Eviction" means (a) the lawful deprivation, in whole or in part, of the right of possession or use insured by this policy, contrary to the terms of any Lease or Easement or (b) the lawful prevention of the use of the Land or any Electricity Facility or Severable Improvement for the purposes permitted by the Lease or the Easement, as applicable, in either case as a result of a matter covered by this policy.

   g. "Lease" means each lease described in Schedule A.

   h. "Leasehold Estate" means the right of possession granted in the Lease for the Lease Term.

   i. "Lease Term" means the duration of the Leasehold Estate, as set forth in the Lease, including any renewal or extended term if a valid option to renew or extend is contained in the Lease.

   j. "Plans" means the survey, site and elevation plans or other depictions or drawings prepared by _(insert name of architect or engineer)_ dated, last revised_____,designated as _(insert name of project or project number)_ consisting of____sheets.

   k. "Remaining Term" means the portion of the Easement Term or the Lease Term remaining after the Insured has been Evicted.

   l. "Severable Improvement" means property affixed to the Land at Date of Policy or to be affixed in the locations according to the Plans, that would constitute an Electricity Facility but for its characterization as personal property, and that by law does not constitute real property because (a) of its character and manner of attachment to the Land and (b) the property can be severed from the Land without causing material damage to the property or to the Land.

3. Valuation of Title as an Integrated Project:

   a. If in computing loss or damage it becomes necessary to value the Title, or any portion of it, as the result of an Eviction, then, as to that portion of the Land from which the Insured is Evicted, that value shall consist of (i) the value of (A) the Leasehold Estate or the Easement Interest for the Remaining Term, as applicable, (B) any Electricity Facility existing on the date of the Eviction, and, if applicable, (ii) any reduction in value of another insured Lease or Easement as computed in Section 3(b) below.

   b. A computation of loss or damage resulting from an Eviction affecting any Constituent Parcel shall include loss or damage to the integrated project caused by the covered matter affecting the Constituent Parcel from which the Insured is Evicted.

   c. The Insured Claimant shall have the right to have the Leasehold Estate, the Easement Interest, and any Electricity Facility affected by a defect insured against by this policy valued either as a whole or separately. In either event, this determination of value shall take into account any rent or use payments no longer required to be paid for the Remaining Term.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

    d.    The provisions of this Section 3 shall not diminish the Insured's rights under any other endorsement to the policy; however, the calculation of loss or damage pursuant to this endorsement shall not allow duplication of recovery for loss or damage calculated pursuant to Section 8 of the Conditions or any other endorsement to the policy.

4.    Valuation of Severable Improvements:

    a.    In the event of an Eviction, the calculation of the loss shall include (but not to the extent that these items of loss are included in the valuation of the Title determined pursuant to Section 8 of the Conditions or any other provision of this or any other endorsement) the diminution in value of the Insured's interest in any Severable Improvement resulting from the Eviction, reduced by the salvage value of the Severable Improvement.

    b.    The policy does not insure against loss or damage (and the Company will not pay any costs, attorneys' fees or expenses) relating to:

        i.    the attachment, perfection or priority of any security interest in any Severable Improvement;

        ii.    the vesting or ownership of title to or rights in any Severable Improvement;

        iii.    any defect in or lien or encumbrance on the title to any Severable Improvement; or

        iv.    the determination of whether any specific property is real or personal in nature.

5.    Additional items of loss covered by this endorsement:

If the Insured is Evicted, the following items of loss, if applicable to that portion of the Land from which the Insured is Evicted, shall be included, without duplication, in computing loss or damage incurred by the Insured, but not to the extent that the same are included in the valuation of the Title determined pursuant to Section 3 of this endorsement, the valuation of Severable Improvements pursuant to Section 4 of this endorsement, or Section 8(a)(ii) of the Conditions.

    a.    The reasonable cost of: (i) disassembling, removing, relocating and reassembling any Severable Improvement that the Insured has the right to remove and relocate, situated on the Land at the time of Eviction, to the extent necessary to restore and make functional the integrated project; (ii) transportation of that Severable Improvement for the initial one hundred miles incurred in connection with the restoration or relocation; and (iii) restoring the Land to the extent damaged as a result of the disassembly, removal and relocation of the Severable Improvement and required of the Insured solely because of the Eviction.

    b.    Rent, easement payments or damages for use and occupancy of the Land prior to the Eviction that the Insured as owner of the Leasehold Estate or the Easement Interest, as applicable, may be obligated to pay to any person having paramount title to that of the lessor or the grantor in the Easement, as applicable.

    c.    The amount of rent, easement payments or damages that, by the terms of the Lease or the Easement, as applicable, the Insured must continue to pay to the lessor or grantor after Eviction with respect to the portion of the Leasehold Estate or Easement Interest, as applicable, from which the Insured has been Evicted.

    d.    The fair market value, at the time of the Eviction, of the estate or interest of the Insured in any lease, sublease or easement specifically permitted by the Lease or Easement, as applicable, and made by the Insured as lessor or grantor of all or part of the Leasehold Estate or Easement Interest, as applicable.

    e.    Damages caused by the Eviction that the Insured is obligated to pay to lessees or sublessees or easement or subeasement grantees on account of the breach of any lease or sublease or easement or subeasement specifically permitted by the Lease or the Easement, as applicable, and made by the Insured as lessor or grantor of all or part of the Leasehold Estate or Easement Interest, as applicable.

    f.    The reasonable cost to obtain land use, zoning, building and occupancy permits, architectural and engineering services and environmental testing and reviews for a replacement leasehold reasonably equivalent to the Leasehold Estate or a replacement easement reasonably equivalent to the Easement Interest, as applicable.

    g.    If any Electricity Facility is not substantially completed at the time of Eviction, the actual cost incurred by the Insured up to the time of Eviction, less the salvage value, for the Electricity Facility located on that portion of the Land from which the Insured is Evicted.  Those costs include costs incurred to construct and fabricate the Electricity Facility, obtain land use, zoning, building and occupancy permits, architectural and engineering services, construction management services, environmental testing and reviews, and landscaping, and cancellation fees related to the foregoing.

6.    This endorsement does not insure against loss, damage or costs of remediation (and the Company will not pay costs, attorneys' fees, or expenses) resulting from environmental damage or contamination.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

**Chicago Title Insurance Company**

By: _____
           Authorized Signatory

ALTA Endorsement Form 36-06
(Energy Project –Leasehold/Easement-Owners) (4/2/12)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1. The insurance provided by this endorsement is subject to the exclusions in Section 6 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2. For purposes of this endorsement only:

   a. "Constituent Parcel" means one of the parcels of Land described in Schedule A that together constitute one integrated project.

   b. "Easement" means each easement described in Schedule A.

   c. "Easement Interest" means the right of use granted in the Easement for the Easement Term.

   d. "Easement Term" means the duration of the Easement Interest, as set forth in the Easement, including any renewal or extended term if a valid option to renew or extend is contained in the Easement.

   e. "Electricity Facility" means an electricity generating facility which may include one or more of the following: a substation; a transmission, distribution or collector line; an interconnection, inverter, transformer, generator, turbine, array, solar panel, or module; a circuit breaker, footing, tower, pole, cross-arm, guy line, anchor, wire, control system, communications or radio relay system, safety protection facility, road, and other building, structure, fixture, machinery, equipment, appliance and item associated with or incidental to the generation, conversion, storage, switching, metering, step-up, step-down, inversion, transmission, conducting, wheeling, sale or other use or conveyance of electricity, on the Land at Date of Policy or to be built or constructed on the Land in the locations according to the Plans, that by law constitutes real property.

   f. "Evicted" or "Eviction" means (a) the lawful deprivation, in whole or in part, of the right of possession or use insured by this policy, contrary to the terms of any Lease or Easement or (b) the lawful prevention of the use of the Land or any Electricity Facility or Severable Improvement for the purposes permitted by the Lease or the Easement, as applicable, in either case as a result of a matter covered by this policy.

   g. "Lease" means each lease described in Schedule A.

   h. "Leasehold Estate" means the right of possession granted in the Lease for the Lease Term.

   i. "Lease Term" means the duration of the Leasehold Estate, as set forth in the Lease, including any renewal or extended term if a valid option to renew or extend is contained in the Lease.

   j. "Plans" means the survey, site and elevation plans or other depictions or drawings prepared by _(insert name of architect or engineer)_ dated, last revised_____,designated as _(insert name of project or project number)_ consisting of____sheets.

   k. "Remaining Term" means the portion of the Easement Term or the Lease Term remaining after the Insured has been Evicted.

   l. "Severable Improvement" means property affixed to the Land at Date of Policy or to be affixed in the locations according to the Plans, that would constitute an Electricity Facility but for its characterization as personal property, and that by law does not constitute real property because (a) of its character and manner of attachment to the Land and (b) the property can be severed from the Land without causing material damage to the property or to the Land.

   m. "Tenant" means the tenant under the Lease or a grantee under the Easement, as applicable, and, after acquisition of all or any part of the Title in accordance with the provisions of Section 2 of the Conditions of the policy, the Insured Claimant.

3. Valuation of Title as an Integrated Project:

   a. If in computing loss or damage it becomes necessary to value the Title, or any portion of it, as the result of an Eviction, then, as to that portion of the Land from which the Tenant is Evicted, that value shall consist of (i) the value of (A) the Leasehold Estate or the Easement Interest for the Remaining Term, as applicable, (B) any Electricity Facility existing on the date of the Eviction, and, if applicable, (ii) any reduction in value of another insured Lease or Easement as computed in Section 3(b) below.

   b. A computation of loss or damage resulting from an Eviction affecting any Constituent Parcel shall include loss or damage to the integrated project caused by the covered matter affecting the Constituent Parcel from which the Insured is Evicted.

   c. The Insured Claimant shall have the right to have the Leasehold Estate, the Easement Interest, and any Electricity Facility affected by a defect insured against by the policy valued either as a whole or separately.  In

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

either event, this determination of value shall take into account any rent or use payments no longer required to be paid for the Remaining Term.

d.  The provisions of this Section 3 shall not diminish the Insured's rights under any other endorsement to the policy; however, the calculation of loss or damage pursuant to this endorsement shall not allow duplication of recovery for loss or damage calculated pursuant to Section 8 of the Conditions or any other endorsement to the policy.

4.  Valuation of Severable Improvements:

a.  In the event of an Eviction, the calculation of the loss shall include (but not to the extent that these items of loss are included in the valuation of the Title determined pursuant to Section 8 of the Conditions or any other provision of this or any other endorsement) the diminution in value of the Insured's interest in any Severable Improvement resulting from the Eviction, reduced by the salvage value of the Severable Improvement.

b.  The policy does not insure against loss or damage (and the Company will not pay any costs, attorneys' fees or expenses) relating to:

i.  the attachment, perfection or priority of any security interest in any Severable Improvement;

ii.  the vesting or ownership of title to or rights in any Severable Improvement;

iii.  any defect in or lien or encumbrance on the title to any Severable Improvement; or

iv.  the determination of whether any specific property is real or personal in nature.

5.  Additional items of loss covered by this endorsement:

If the Insured acquires all or any part of the Title in accordance with the provisions of Section 2 of the Conditions of the policy and thereafter is Evicted, the following items of loss, if applicable to that portion of the Land from which the Insured is Evicted shall be included, without duplication, in computing loss or damage incurred by the Insured, but not to the extent that the same are included in the valuation of the Title determined pursuant to Section 3 of this endorsement, the valuation of Severable Improvements pursuant to Section 4 of this endorsement, or Section 8(a)(iii) of the Conditions:

a.  The reasonable cost of: (i) disassembling, removing, relocating and reassembling any Severable Improvement that the Insured has the right to remove and relocate, situated on the Land at the time of Eviction, to the extent necessary to restore and make functional the integrated project; (ii) transportation of that Severable Improvement for the initial one hundred miles incurred in connection with the restoration or relocation; and (iii) restoring the Land to the extent damaged as a result of the disassembly, removal and relocation of the Severable Improvement and required of the Insured solely because of the Eviction.

b.  Rent, easement payments or damages for use and occupancy of the Land prior to the Eviction that the Insured as owner of the Leasehold Estate or the Easement Interest, as applicable, may be obligated to pay to any person having paramount title to that of the lessor in the Lease or the grantor in the Easement, as applicable.

c.  The amount of rent, easement payments or damages that, by the terms of the Lease or the Easement, as applicable, the Insured must continue to pay to the lessor or grantor after Eviction with respect to the portion of the Leasehold Estate or Easement Interest, as applicable, from which the Insured has been Evicted.

d.  The fair market value, at the time of the Eviction, of the estate or interest of the Insured in any lease, sublease or easement specifically permitted by the Lease or Easement, as applicable, and made by the Tenant as lessor or grantor of all or part of the Leasehold Estate or Easement Interest, as applicable.

e.  Damages caused by the Eviction that the Insured is obligated to pay to lessees or sublessees or easement or subeasement grantees on account of the breach of any lease or sublease or easement or subeasement specifically permitted by the Lease or the Easement, as applicable, and made by the Tenant as lessor or grantor of all or part of the Leasehold Estate or Easement Interest, as applicable.

f.  The reasonable cost to obtain land use, zoning, building and occupancy permits, architectural and engineering services and environmental testing and reviews for a replacement leasehold reasonably equivalent to the Leasehold Estate or a replacement easement reasonably equivalent to the Easement Interest, as applicable.

g.  If any Electricity Facility is not substantially completed at the time of Eviction, the actual cost incurred by the Insured up to the time of Eviction, less the salvage value, for the Electricity Facility located on that portion of the Land from which the Insured is Evicted.  Those costs include costs incurred to construct and fabricate the Electricity Facility, obtain land use, zoning, building and occupancy permits, architectural and engineering services, construction management services, environmental testing and reviews, and landscaping, and cancellation fees related to the foregoing.

6.  This endorsement does not insure against loss, damage or costs of remediation (and the Company will not pay costs, attorneys' fees, or expenses) resulting from environmental damage or contamination.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]


Chicago Title Insurance Company


By: _____
          Authorized Signatory


ALTA Endorsement Form 36.1-06
(Energy Project –Leasehold/Easement-Loan) (4/2/12)
©American Land Title Association

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1. The insurance provided by this endorsement is subject to the exclusions in Section 6 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2. For purposes of this endorsement only:

   a. "Constituent Parcel" means one of the parcels of Land described in Schedule A that together constitute one integrated project.

   b. "Electricity Facility" means an electricity generating facility which may include one or more of the following: a substation; a transmission, distribution or collector line; an interconnection, inverter, transformer, generator, turbine, array, solar panel, or module; a circuit breaker, footing, tower, pole, cross-arm, guy line, anchor, wire, control system, communications or radio relay system, safety protection facility, road, and other building, structure, fixture, machinery, equipment, appliance and item associated with or incidental to the generation, conversion, storage, switching, metering, step-up, step-down, inversion, transmission, conducting, wheeling, sale or other use or conveyance of electricity, on the Land at Date of Policy or to be built or constructed on the Land in the locations according to the Plans, that by law constitutes real property.

   c. "Evicted" or "Eviction" means (a) the lawful deprivation, in whole or in part, of the right of possession insured by this policy, contrary to the terms of any Lease or (b) the lawful prevention of the use of the Land or any Electricity Facility or Severable Improvement for the purposes permitted by the Lease, in either case as a result of a matter covered by this policy.

   d. "Lease" means each lease described in Schedule A.

   e. "Leasehold Estate" means the right of possession granted in the Lease for the Lease Term.

   f. "Lease Term" means the duration of the Leasehold Estate, as set forth in the Lease, including any renewal or extended term if a valid option to renew or extend is contained in the Lease.

   g. "Plans" means the survey, site and elevation plans or other depictions or drawings prepared by _(insert name of architect or engineer)_ dated, last revised_____,designated as _(insert name of project or project number)_ consisting of____sheets.

   h. "Remaining Term" means the portion of the Lease Term remaining after the Insured has been Evicted.

   i. "Severable Improvement" means property affixed to the Land at Date of Policy or to be affixed in the locations according to the Plans, that would constitute an Electricity Facility but for its characterization as personal property, and that by law does not constitute real property because (a) of its character and manner of attachment to the Land and (b) the property can be severed from the Land without causing material damage to the property or to the Land.

3. Valuation of Title as an Integrated Project:

   a. If in computing loss or damage it becomes necessary to value the Title, or any portion of it, as the result of an Eviction, then, as to that portion of the Land from which the Insured is Evicted, that value shall consist of (i) the value of (A) the Leasehold Estate for the Remaining Term, (B) any Electricity Facility existing on the date of the Eviction, and, if applicable, (ii) any reduction in value of another insured Lease as computed in Section 3(b) below.

   b. A computation of loss or damage resulting from an Eviction affecting any Constituent Parcel shall include loss or damage to the integrated project caused by the covered matter affecting the Constituent Parcel from which the Insured is Evicted.

   c. The Insured Claimant shall have the right to have the Leasehold Estate and any Electricity Facility affected by a defect insured against by this policy valued either as a whole or separately.  In either event, this determination of value shall take into account any rent no longer required to be paid for the Remaining Term.

   d. The provisions of this Section 3 shall not diminish the Insured's rights under any other endorsement to the policy; however, the calculation of loss or damage pursuant to this endorsement shall not allow duplication of recovery for loss or damage calculated pursuant to Section 8 of the Conditions or any other endorsement to the policy.

4. Valuation of Severable Improvements:

   b. In the event of an Eviction, the calculation of the loss shall include (but not to the extent that these items of loss are included in the valuation of the Title determined pursuant to Section 8 of the Conditions or any other provision of this or any other endorsement) the diminution in value of the Insured's interest in any Severable Improvement resulting from the Eviction, reduced by the salvage value of the Severable Improvement.

     b.    The policy does not insure against loss or damage (and the Company will not pay any costs, attorneys' fees or expenses) relating to:

        i.    the attachment, perfection or priority of any security interest in any Severable Improvement;

        ii.    the vesting or ownership of title to or rights in any Severable Improvement;

        iii.    any defect in or lien or encumbrance on the title to any Severable Improvement; or

        iv.    the determination of whether any specific property is real or personal in nature.

5.    Additional items of loss covered by this endorsement:

If the Insured is Evicted, the following items of loss, if applicable to that portion of the Land from which the Insured is Evicted shall be included, without duplication, in computing loss or damage incurred by the Insured, but not to the extent that the same are included in the valuation of the Title determined pursuant to Section 3 of this endorsement, the valuation of Severable Improvements pursuant to Section 4 of this endorsement, or Section 8(a)(ii) of the Conditions.

     a.    The reasonable cost of: (i) disassembling, removing, relocating and reassembling any Severable Improvement that the Insured has the right to remove and relocate, situated on the Land at the time of Eviction, to the extent necessary to restore and make functional the integrated project; (ii) transportation of that Severable Improvement for the initial one hundred miles incurred in connection with the restoration or relocation; and (iii) restoring the Land to the extent damaged as a result of the disassembly, removal and relocation of the Severable Improvement and required of the Insured solely because of the Eviction.

     b.    Rent or damages for use and occupancy of the Land prior to the Eviction that the Insured as owner of the Leasehold Estate  may be obligated to pay to any person having paramount title to that of the lessor in the Lease.

     c.    The amount of rent or damages that, by the terms of the Lease , the Insured must continue to pay to the lessor after Eviction with respect to the portion of the Leasehold Estate from which the Insured has been Evicted.

     d.    The fair market value, at the time of the Eviction, of the estate or interest of the Insured in any lease or sublease specifically permitted by the Lease and made by the Insured as lessor of all or part of the Leasehold Estate.

     e.    Damages caused by the Eviction that the Insured is obligated to pay to lessees or sublessees on account of the breach of any lease or sublease specifically permitted by the Lease and made by the Insured as lessor of all or part of the Leasehold Estate.

     f.    The reasonable cost to obtain land use, zoning, building and occupancy permits, architectural and engineering services and environmental testing and reviews for a replacement leasehold reasonably equivalent to the Leasehold Estate.

     g.    If any Electricity Facility is not substantially completed at the time of Eviction, the actual cost incurred by the Insured up to the time of Eviction, less the salvage value, for the Electricity Facility located on that portion of the Land from which the Insured is Evicted.  Those costs include costs incurred to construct and fabricate the Electricity Facility, obtain land use, zoning, building and occupancy permits, architectural and engineering services, construction management services, environmental testing and reviews, and landscaping, and cancellation fees related to the foregoing.

6.    This endorsement does not insure against loss, damage or costs of remediation (and the Company will not pay costs, attorneys' fees, or expenses) resulting from environmental damage or contamination.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

Chicago Title Insurance

Company


By: _____
            Authorized Signatory


ALTA Endorsement Form 36.2-06
(Energy Project –Leasehold-Owners) (4/2/12)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.   The insurance provided by this endorsement is subject to the exclusions in Section 6 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2.   For purposes of this endorsement only:

   a.   "Constituent Parcel" means one of the parcels of Land described in Schedule A that together constitute one integrated project.

   b.   "Electricity Facility" means an electricity generating facility which may include one or more of the following: a substation; a transmission, distribution or collector line; an interconnection, inverter, transformer, generator, turbine, array, solar panel, or module; a circuit breaker, footing, tower, pole, cross-arm, guy line, anchor, wire, control system, communications or radio relay system, safety protection facility, road, and other building, structure, fixture, machinery, equipment, appliance and item associated with or incidental to the generation, conversion, storage, switching, metering, step-up, step-down, inversion, transmission, conducting, wheeling, sale or other use or conveyance of electricity, on the Land at Date of Policy or to be built or constructed on the Land in the locations according to the Plans, that by law constitutes real property.

   c.   "Evicted" or "Eviction" means (a) the lawful deprivation, in whole or in part, of the right of possession insured by this policy, contrary to the terms of any Lease or (b) the lawful prevention of the use of the Land or any Electricity Facility or Severable Improvement for the purposes permitted by the Lease, in either case as a result of a matter covered by this policy.

   d.   "Lease" means each lease described in Schedule A.

   e.   "Leasehold Estate" means the right of possession granted in the Lease for the Lease Term.

   f.   "Lease Term" means the duration of the Leasehold Estate, as set forth in the Lease, including any renewal or extended term if a valid option to renew or extend is contained in the Lease.

   g.   "Plans" means the survey, site and elevation plans or other depictions or drawings prepared by _(insert name of architect or engineer)_ dated, last revised_____,designated as _(insert name of project or project number)_ consisting of_____sheets.

   h.   "Remaining Term" means the portion of the Lease Term remaining after the Insured has been Evicted.

   i.   "Severable Improvement" means property affixed to the Land at Date of Policy or to be affixed in the locations according to the Plans, that would constitute an Electricity Facility but for its characterization as personal property, and that by law does not constitute real property because (a) of its character and manner of attachment to the Land and (b) the property can be severed from the Land without causing material damage to the property or to the Land.

   j.   "Tenant" means the tenant under the Lease  and, after acquisition of all or any part of the Title in accordance with the provisions of Section 2 of the Conditions of the policy, the Insured Claimant.

3.   Valuation of Title as an Integrated Project:

   a.   If in computing loss or damage it becomes necessary to value the Title, or any portion of it, as the result of an Eviction, then, as to that portion of the Land from which the Tenant is Evicted, that value shall consist of (i) the value of (A) the Leasehold Estate  for the Remaining Term,  (B) any Electricity Facility existing on the date of the Eviction, and, if applicable, (ii) any reduction in value of another insured Lease as computed in Section 3(b) below.

   b.   A computation of loss or damage resulting from an Eviction affecting any Constituent Parcel shall include loss or damage to the integrated project caused by the covered matter affecting the Constituent Parcel from which the Insured is Evicted.

   c.   The Insured Claimant shall have the right to have the Leasehold Estate and any Electricity Facility affected by a defect insured against by the policy valued either as a whole or separately.  In either event, this determination of value shall take into account any rent no longer required to be paid for the Remaining Term.

   d.   The provisions of this Section 3 shall not diminish the Insured's rights under any other endorsement to the policy; however, the calculation of loss or damage pursuant to this endorsement shall not allow duplication of recovery for loss or damage calculated pursuant to Section 8 of the Conditions or any other endorsement to the policy.

4.   Valuation of Severable Improvements:

   c.   In the event of an Eviction, the calculation of the loss shall include (but not to the extent that these items of loss are included in the valuation of the Title determined pursuant to Section 8 of the Conditions or any other

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

provision of this or any other endorsement) the diminution in value of the Insured's interest in any Severable Improvement resulting from the Eviction, reduced by the salvage value of the Severable Improvement.

b.   The policy does not insure against loss or damage (and the Company will not pay any costs, attorneys' fees or expenses) relating to:

i.   the attachment, perfection or priority of any security interest in any Severable Improvement;

ii.   the vesting or ownership of title to or rights in any Severable Improvement;

iii.   any defect in or lien or encumbrance on the title to any Severable Improvement; or

iv.   the determination of whether any specific property is real or personal in nature.

5.   Additional items of loss covered by this endorsement:
If the Insured acquires all or any part of the Title in accordance with the provisions of Section 2 of the Conditions of the policy and thereafter is Evicted, the following items of loss, if applicable to that portion of the Land from which the Insured is Evicted shall be included, without duplication, in computing loss or damage incurred by the Insured, but not to the extent that the same are included in the valuation of the Title determined pursuant to Section 3 of this endorsement, the valuation of Severable Improvements pursuant to Section 4 of this endorsement, or Section 8(a)(iii) of the Conditions:

a.   The reasonable cost of: (i) disassembling, removing, relocating and reassembling any Severable Improvement that the Insured has the right to remove and relocate, situated on the Land at the time of Eviction, to the extent necessary to restore and make functional the integrated project; (ii) transportation of that Severable Improvement for the initial one hundred miles incurred in connection with the restoration or relocation; and (iii) restoring the Land to the extent damaged as a result of the disassembly, removal and relocation of the Severable Improvement and required of the Insured solely because of the Eviction.

b.   Rent or damages for use and occupancy of the Land prior to the Eviction that the Insured as owner of the Leasehold Estate may be obligated to pay to any person having paramount title to that of the lessor in the Lease.

c.   The amount of rent or damages that, by the terms of the Lease , the Insured must continue to pay to the lessor after Eviction with respect to the portion of the Leasehold Estate  from which the Insured has been Evicted.

d.   The fair market value, at the time of the Eviction, of the estate or interest of the Insured in any lease or sublease specifically permitted by the Lease and made by the Tenant as lessor of all or part of the Leasehold Estate.

e.   Damages caused by the Eviction that the Insured is obligated to pay to lessees or sublessees on account of the breach of any lease or sublease specifically permitted by the Lease and made by the Tenant as lessor of all or part of the Leasehold Estate.

f.   The reasonable cost to obtain land use, zoning, building and occupancy permits, architectural and engineering services and environmental testing and reviews for a replacement leasehold reasonably equivalent to the Leasehold Estate.

g.   If any Electricity Facility is not substantially completed at the time of Eviction, the actual cost incurred by the Insured up to the time of Eviction, less the salvage value, for the Electricity Facility located on that portion of the Land from which the Insured is Evicted.  Those costs include costs incurred to construct and fabricate the Electricity Facility, obtain land use, zoning, building and occupancy permits, architectural and engineering services, construction management services, environmental testing and reviews, and landscaping, and cancellation fees related to the foregoing.

6.   This endorsement does not insure against loss, damage or costs of remediation (and the Company will not pay costs, attorneys' fees, or expenses) resulting from environmental damage or contamination.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]  DATED:
Chicago Title Insurance Company
BY:_____
      AUTHORIZED SIGNATORY

ALTA Endorsement Form 36.3-06
(Energy Project –Leasehold-Loan) (4/2/12)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance Company

1.  The insurance provided by this endorsement is subject to the exclusions in Section 4 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2.  For purposes of this endorsement only:
    a.  "Covenant" means a covenant, condition, limitation or restriction in a document or instrument in effect at Date of Policy.

    b.  "Electricity Facility" means an electricity generating facility that may include one or more of the following:  a substation; a transmission, distribution or collector line; an interconnection, inverter, transformer, generator, turbine, array, solar panel, or module; a circuit breaker, footing, tower, pole, cross-arm, guy line, anchor, wire, control system, communications or radio relay system, safety protection facility, road, and other building, structure, fixture, machinery, equipment, appliance and item associated with or incidental to the generation, conversion, storage, switching, metering, step-up, step-down, inversion, transmission, conducting, wheeling, sale or other use or conveyance of electricity, on the Land at Date of Policy or to be built or constructed on the Land in the locations according to the Plans, that by law constitutes real property.

    c.  "Plans" means the survey, site and elevation plans or other depictions or drawings prepared by _(insert name of architect or engineer)_ dated_____, last revised_____, designated as _(insert name of project or project number)_ consisting of____sheets.

    d.  "Severable Improvement" means property affixed to the Land at Date of Policy or to be affixed to the Land in the locations according to the Plans, that would constitute an Electricity Facility but for its characterization as personal property, and that by law does not constitute real property because (a) of its character and manner of attachment to the Land and (b) the property can be severed from the Land without causing material damage to the property or to the Land.

3.  The Company insures against loss or damage sustained by the Insured by reason of:
    i.  A violation of an enforceable Covenant by any Electricity Facility or Severable Improvement, unless an exception in Schedule B of the policy identifies  the violation;

    ii.  Enforced removal of any Electricity Facility or Severable Improvement as a result of a violation of a building setback line shown on a plat of subdivision recorded or filed in the Public Records, unless an exception in Schedule B of the policy identifies the violation; or

    iii.  A notice of a violation, recorded in the Public Records at Date of Policy, of an enforceable Covenant relating to environmental protection, describing any part of the Land and referring to that Covenant, but only to the extent of the violation of the Covenant referred to in that notice, unless an exception in Schedule B of the policy identifies the notice of the violation.

4.  This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:

    a.  any Covenant contained in an instrument creating a lease or easement;

    b.  any Covenant relating to obligations of any type to perform maintenance, repair, or remediation on the Land; or

    c.  except as provided in Section 3.c., any Covenant pertaining to environmental protection of any kind or nature, including hazardous or toxic matters, conditions, or substances.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]
DATED:
Chicago Title Insurance Company
BY:___
AUTHORIZED SIGNATORY

ALTA Endorsement Form 36.4-06
(Energy Project –Covenants, Conditions and Restrictions-Land Under Development-Owners) (4/2/12)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.    The insurance provided by this endorsement is subject to the exclusions in Section 4 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2.  For purposes of this endorsement only:

   a.  "Covenant" means a covenant, condition, limitation or restriction in a document or  instrument in effect at Date of Policy.

   b.  "Electricity Facility" means an electricity generating facility that may include one or more  of the following: a substation; a transmission, distribution or collector line; an interconnection, inverter, transformer, generator, turbine, array, solar panel, or module; a  circuit breaker, footing, tower, pole, cross-arm, guy line, anchor, wire, control system,  communications or radio relay system, safety protection facility, road, and other building,   structure, fixture, machinery, equipment, appliance and item associated with or incidental  to the generation, conversion, storage, switching, metering, step-up, step-down,  inversion, transmission, conducting, wheeling, sale or other use or conveyance of  electricity, on the Land at Date of Policy or to be built or constructed on the Land in the  locations according to the Plans, that by law constitutes real property.

   c.  "Plans" means the survey, site and elevation plans or other depictions or drawings  prepared by
    (*insert name of architect or engineer*)  dated_____, last revised _____ ,designated as
    (*insert name of project or project number*)  consisting of____sheets.

   d.  "Severable Improvement" means property affixed to the Land at Date of Policy or to be  affixed to the Land in the locations according to the Plans, that would constitute an  Electricity Facility but for its characterization as personal property, and that by law does  not constitute real property because (a) of its character and manner of attachment to the  Land and (b) the property can be severed from the Land without causing material  damage to the property or to the Land.

3.  The Company insures against loss or damage sustained by the Insured by reason of:

   a.  A violation of a Covenant that:

      i.   divests, subordinates, or extinguishes the lien of the Insured Mortgage;

      ii.  results in the invalidity, unenforceability, or lack of priority of the lien of the Insured  Mortgage; or

      iii.  causes a loss of the Insured's Title acquired in satisfaction or partial satisfaction of  the Indebtedness.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

    b.   A violation of an enforceable Covenant by any Electricity Facility or Severable Improvement, unless an exception in Schedule B of the policy identifies the violation;

    c.   Enforced removal of any Electricity Facility or Severable Improvement, as a result of a violation of a building setback line shown on a plat of subdivision recorded or filed in the Public Records, unless an exception in Schedule B of the policy identifies the violation; or

    d.   A notice of a violation, recorded in the Public Records at Date of Policy, of an enforceable Covenant relating to environmental protection, describing any part of the Land and referring to that Covenant, but only to the extent of the violation of the Covenant referred to in that notice, unless an exception in Schedule B of the policy identifies the notice of the violation.

4.   This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:

    a.   any Covenant contained in an instrument creating a lease or easement;

    b.   any Covenant relating to obligations of any type to perform maintenance, repair, or remediation on the Land; or

    c.   except as provided in Section 3.d., any Covenant pertaining to environmental protection of any kind or nature, including hazardous or toxic matters, conditions, or substances.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

**Chicago Title Insurance Company**

By: _____
           Authorized Signatory

ALTA Endorsement Form 36.5-06
(Energy Project –Covenants, Conditions and Restrictions-Land Under Development-Loan) (4/2/12)
©American Land Title Association

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.  The insurance provided by this endorsement is subject to the exclusions in Section 4 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2.  For purposes of this endorsement only:

    a.  "Electricity Facility" means an electricity generating facility that may include one or more of the following:  a substation; a transmission, distribution or collector line; an interconnection, inverter,  transformer, generator, turbine, array, solar panel, or module; a circuit breaker, footing, tower, pole, cross-arm, guy line, anchor, wire, control system, communications or radio relay system, safety protection facility, road, and other building, structure, fixture, machinery, equipment, appliance and item associated with or incidental to the generation, conversion, storage, switching, metering, step-up, step-down, inversion, transmission, conducting, wheeling, sale or other use or conveyance of electricity, on the Land at Date of Policy or to be built or constructed on the Land in the locations according to the Plans, that by law constitutes real property.

    b.  "Plans" means the survey, site and elevation plans or other depictions or drawings prepared by
        _(insert name of architect or engineer)_ dated_____, last revised _____, designated as
        _(insert name of project or project number)_ consisting of_____sheets.

    c.  "Severable Improvement" means property affixed to the Land at Date of Policy or to be affixed to the Land in the locations according to the Plans, that would constitute an Electricity Facility but for its characterization as personal property, and that by law does not constitute real property because (a) of its character and manner of attachment to the Land and (b) the property can be severed from the Land without causing material damage to the property or to the Land.

3.  The Company insures against loss or damage sustained by the Insured by reason of:

    a.  An encroachment of any Electricity Facility or Severable Improvement located on the Land onto adjoining land or onto that portion of the Land subject to an easement, unless an exception in Schedule B of the policy identifies the encroachment;

    b.  An encroachment of an improvement located on adjoining land onto the Land at Date of Policy, unless an exception in Schedule B of the policy identifies the encroachment;

    c.  Enforced removal of any Electricity Facility or Severable Improvement, as a result of an encroachment by the Electricity Facility or Severable Improvement onto any portion of the Land subject to any easement, in the event that the owners of the easement shall, for the purpose of exercising the right of use or maintenance of the easement, compel removal or relocation of the encroaching Electricity Facility or Severable Improvement; [or]

d.   Damage to any Electricity Facility or Severable Improvement that is located on or encroaches onto that portion of the Land subject to an easement excepted in Schedule B, which damage results from the exercise of the right to maintain the easement for the purpose for which it was granted or reserved [; or]

[e.   The coverage of Sections 3.c. and 3.d. shall not apply to the encroachments listed in Exception(s)_____of Schedule B].

4    This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from contamination, explosion, fire, vibration, fracturing, earthquake or subsidence.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

**Chicago Title Insurance Company**

By: _____
        Authorized Signatory

ALTA Endorsement Form 36.6-06
(Energy Project –Encroachments) (4/2/12)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ASSIGNMENT OF RENTS OR LEASES**

**ALTA 37-06 (12-03-12)**

Lenders occasionally request that the loan policy insure certain recorded interests that are taken as additional security for the loan primarily secured by the Insured Mortgage. The most common additional security, other than a security interest under the Uniform Commercial Code, is an assignment of rents or leases.

This endorsement is issued to provide certain coverages with respect to a separate assignment of rents or leases shown in Schedule B, Part II of the policy. This endorsement provides insurance that the assignment of rents or leases is properly executed, and that the Public Records do not disclose any prior assignments of these same rents or leases.

These endorsements do not amend or modify any specific policy provisions, but add additional coverage to the terms of the policy.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.  The insurance provided by this endorsement is subject to the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2.  The Company insures against loss or damage sustained by the Insured by reason of:

a. any defect in the execution of the [*Insert Title of Assignment of Rents or Leases Document*] referred to in paragraph_____[*of Part II*] of Schedule B; or

b. any assignment of the lessor's interest in any lease or leases or any assignment of rents affecting the Title and recorded in the Public Records at Date of Policy other than as set forth in any instrument referred to in Schedule B.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

Chicago Title Insurance Company
BY:_____

ALTA Endorsement Form 37-06
(Assignment of Rents or Leases) (12/03/12)
©American Land Title Association

**MORTGAGE TAX**

**ALTA ENDORSEMENT - FORM 38-06**

This endorsement provides coverage to the insured lender if there is a deficiency in the recordation tax paid at the time the Insured Mortgage is recorded that is subsequently paid. The endorsement provides that, if the deficiency is paid, the Company will provide coverage against the invalidity or unenforceability of the Insured Mortgage or the lack of priority of the Insured Mortgage, from the failure to pay at the time of recording any portion of the recording tax. The Company does not provide coverage if the insured lender fails to pay the recordation tax deficiency.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1. The insurance provided by this endorsement is subject to the exclusions in Sections 4 and 5 of this endorsement, the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2. For the purposes of this endorsement only, "Mortgage Tax" means a recordation, registration or related tax or charge required to be paid when the Insured Mortgage is recorded in the Public Records.

3. Upon payment of any deficiency in the Mortgage Tax, including interest and penalties, by the Insured, the Company insures against loss or damage sustained by the Insured by reason of:

   a. the invalidity or unenforceability of the lien of the Insured Mortgage as security for the Indebtedness resulting from the failure to pay, at the time of recording, any portion of the Mortgage Tax; or

   b. the lack of priority of the lien of the Insured Mortgage as security for the Indebtedness resulting from the failure to pay, at the time of recording, any portion of the Mortgage Tax.

4. The Company does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from the failure of the Insured to pay the Mortgage Tax deficiency, together with interest and penalties.

5. The Company is not liable for the payment of any portion of the Mortgage Tax, including interest or penalties

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

Chicago Title Insurance Company
BY:_____

ALTA Endorsement Form 38-06
(Mortgage Tax) (12/3/12)
©American Land Title Association

**POLICY AUTHENTICATION**
**ALTA 39-06 (04-02-13)**

This endorsement provides coverage to the insured lender if a policy is issued electronically, or does not have a signature which may be required by the form of policy cover used. This endorsement for the insured lender modifies the cover and Conditions 14 (c) of the Policy which requires an authentication by an authorized person. This typically would be the signature of a licensed employee or agent.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

When the policy is issued by the Company with a policy number and Date of Policy, the Company will not deny liability under the policy or any endorsements issued with the policy solely on the grounds that the policy or endorsements were issued electronically or lack signatures in accordance with the Conditions.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

Chicago Title Insurance Company
BY:_____

ALTA Endorsement Form 39-06
(Policy Authentication) (4/3/13)
©American Land Title Association

Endorsements descriptions and sample forms are provided as a courtesy only. Information is deemed reliable but not guaranteed. Please contact your local Sales Executive with questions.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF



© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

# EXHIBIT 3

# EXHIBIT 3



# Endorsements

## Common Endorsements requested by Residential Lenders

FORM DESCRIPTION
CLTA

*Generally, endorsements will provide additional coverage for matters which would ordinarily be excluded by the Exclusions from Coverage, or excepted from coverage either by the pre-printed exceptions, if any, or by the specific exceptions shown in Schedule B of the policy.*

*Because of this, most endorsements are not general in nature, but are specific as to items for which the insured desires coverage. Some are specifically designed for owner's policies and others for lender's policies.*

*The issuance of any endorsement is conditioned upon the circumstances surrounding the property involved, and upon the fulfillment of the underwriting criteria established by the Company.*

*The following descriptions do not define the coverage of the endorsement, which can only be determined by reading the same. This list is provided as a convenience in locating the endorsement which may fit a particular set of facts. CLTA Endorsement (with ALTA Equivalent) Numbers Available*

**100**   Provides comprehensive coverage for insured ALTA lender against loss by reason of present or future CC&Rs violations, the encroachment of improvements, or by reason of surface entry for mineral development.

Endorsement provides insurance that:

1. There are no CC&Rs under which the lien of the insured mortgage can be cut off, subordinated or impaired;

2. There are no present CC&R violations on the land; and

3. Except as shown in Schedule B, there are no encroachments of improvements on the land onto adjoining land, and no encroachments of improvements on adjoining land onto the land. Endorsement insures against loss by reason of:

I . Future violations of CC&Rs which result in loss of the insured mortgage lien or title to the land if the insured lender has acquired same by foreclosure or conveyance in lieu thereof;

2. Unmarketability of title by reason of CC&R violations occurring prior to acquisition of title by the insured lender;

3. Damage to improvements which encroach on any portion of the land subject to an easement excepted in Schedule B;

4. Damage to improvements resulting from the exercise of any right to use the surface of the land

for the extraction or development of excepted minerals; and

5. Final court order or judgment requiring removal from any land adjoining the land of any encroachment shown in Schedule B.

**100.12**   Provides insured lender with insurance concerning the enforceability of reverter rights found in CC&Rs.

**100.13**   Provides insured ALTA lender with insurance concerning the priority of a mortgage lien over maintenance or upkeep assessment liens.

**100.18**   Provides insured lender with coverage against loss by reason of the exercise or attempted exercise of reverter rights in CC&Rs.

**100.23**   Provides insured ALTA lender with coverage against loss by reason of the exercise of surface rights for the extraction or development of minerals leased under oil lease.

**100.24**   Provides insured ALTA lender with insurance that lessee under mineral lease does not have any right to enter on or use the surface of the land.

# FIDELITY NATIONAL TITLE

Template Copyright © 2009 EffectiveSolutions,LLC for HelpMyTitleRep.com members only

100.26 Provides insured ALTA lender with coverage against loss by reason of damage to proposed or completed improvements under FHA project, resulting from the exercise of surface or subsurface rights for the extraction or development of minerals excepted from the description of the land.

100.29 Provides insured owner or lender with coverage against loss by reason of the exercise of surface rights for the extraction or development of minerals excepted from the description of the land or shown as a reservation in Schedule B.

101.2 Provides insured construction lender with coverage against loss by reason of a lack of priority of the insured mortgage over statutory liens for services, labor or material arising out of a work of improvement referred to in a recorded notice of completion.

102.4 Provides insured construction lender with insurance that the foundations of the structure under construction are within the boundaries of the land and that their location docs not violate referenced CC&Rs.

102.5 Provides insured construction lender with insurance that the foundations of the structure under construction are within the boundaries of the land, that their location does not violate referenced CC&Rs and that they do not encroach upon referenced easements. (Broader coverage than Form 102.4).

103.1 Provides insured lender with coverage against loss by reason of the exercise of the right of use or maintenance of a particular easement by the easement holder.

103.1a  Provides insured lender with against loss resulting from (1) damage to the existing improvements, including lawns, shrubbery and trees, on the land, and (2) interference with the continuing use, as presently utilized, of the existing improvements on the land, arising from a particular easement described in Schedule B.

103.3 Provides insured lender with coverage against loss by reason of the forced removal of improvements which encroach upon a particular easement which easement right is presently being exercised

103.4 Provides insured owner or lender with insurance that an insured easement affords ingress and egress to and from a specified public street.

103.7 Provides insured owner or lender with assurance that the land described in Schedule A abuts upon a specific, physically- open public street.

104.1 Provides assignee of the insured mortgage with assurance concerning (a) validity of a recorded assignment to evidence transfer of the entire beneficial interest to the named assured assignee and (b) full or partial reconveyances, modification or subordination of the insured mortgage.

108.7 Provides insured CLTA lender with coverage against loss concerning vesting of title, subsistence and priority of insured mortgage lien insofar as same secures an additional (optional) advance and increases policy liability by the amount of the advance.

108.8 Provides insured ALTA lender with coverage against loss concerning vesting of title, subsistence and priority of insured mortgage lien insofar as same secures an additional (optional) advance and increases policy liability by the amount of the advance

110.5 Provides insured ALTA lender insurance concerning proper modification of the insured mortgage, including express priority coverage.

110.9 (ALTA form 8.1) Provides insured ALTA residential lender with coverage against loss by reason of lack of priority over (a) any federal or state environmental protection lien which is recorded in the public records, except as set forth in Schedule B, and (b) any state environmental protection lien provided for by any state statute in effect at Date of Policy, except as provided for by state statutes specified in the endorsement.

111.5 (ALTA Form 6) Provides insured ALTA variable rate mortgage lender with coverage against loss by reason of (1) invalidity or unenforceability of the insured mortgage resulting from terms therein providing for changes in the rate of interest, or (2) loss of priority of the insured mortgage lien caused by the changes in the rate of interest.

111.8 (ALTA Form 6.2) Provides insured ALTA variable rate mortgage lender with coverage against changes in the rate of interest, the addition of unpaid interest to principal and/or interest on interest, or (2) loss of priority of the insured mortgage lien caused by the changes in the rate of interest, unpaid interest added to principal and/or interest on interest.

111.9 Provides insured ALTA lender with insurance concerning the priority of a mortgage lien relating to FNMA Balloon mortgage, conditional right to refinance, extension of the loan term and change in the interest rate.

111.10 (Optional Advance) Provides insured lender with coverage against (1) loss by reason of invalidity or unenforceability of the insured mortgage or of (2) loss of priority of said mortgage for the unpaid balance together with interest caused by changes in the rate of interest in

# Endorsements

accordance with the terms of a specified loan agreement. Except as to intervening matters of which the insured has actual knowledge.

111.11 (Obligatory Advance) Provides insured lender with coverage against (1) loss by reason of invalidity or unenforceability of the insured mortgage or of (2) loss of priority of said mortgage for the unpaid balance together with interest caused by changes in the rate of interest in accordance with the terms of a specified loan agreement.

115 Provides insured lender with insurance that the estate or interest covered by the policy is a condominium, in fee, and is entitled to be assessed and taxed as a separate parcel.

115.1 Provides coverage for an insured ALTA lender against loss concerning statutory compliance. Violations of CC&Rs, homeowners association charges and assessments, the separate assessment of real property taxes , encroachments and the exercise of a right of first refusal to purchase, all with respect to a condominium unit within a condominium project.

115.2 Provides coverage for an insured ALTA lender against loss concerning violations of CC&Rs, homeowners association charges and assessments, encroachments and the exercise of a right of first refusal to purchase, all with respect to a parcel of land in a planned development.

116 Provides insured ALTA lender with insurance concerning the street address of designated improvements on the land; and, with respect to the sufficiency of the policy plat to show the record location and dimensions of that land.

116.1 Provides insured lender with insurance that the land described in the policy is the same as that delineated on plat of a survey

attached to and made a part of the policy.

116.2 Provides insured ALTA lender with insurance concerning the street address of designated separately-owned elements comprising pan of the insured condominium and with respect to the sufficiency of the referenced map or plan to show the exterior boundary of the condominium project as a whole.

116.7 Provides insured with insurance that the land described is a lawfully created parcel according to the California Subdivision Map Act and local ordinances adopted pursuant thereto.

122 Provides insured ALTA lender with insurance concerning obligatory advance made under the insured mortgage; liability limited to face amount of policy.

123.1 (ALTA form 3) Provides insured ALTA owner or lender with insurance concerning the zoning classification of the land and the broad, allowable use or uses under that classification.

123.2 (ALTA Form 3.I) Provides insured ALTA owner or lender with insurance concerning the zoning classification of the land, the allowable use or uses under that classification and with respect to the existing structure on the land, limited coverage concerning compliance with applicable provisions of the zoning ordinance.

124.1 Provides insured owner or lender with insurance concerning affirmative and/or negative covenants contained in a deed or agreement between landowners.

124.2 Provides insured owner or lender with insurance concerning affirmative covenants contained in a lease.

124.3 Provides insured owner or lender with insurance concerning negative covenants contained in a

lease.

125 Provides coverage for the insured ALTA lender against loss by reason of a judicial determination that (a) the insured mortgage lien (or the lender's title after foreclosure) has been defeated by a valid exercise of the right of rescission conferred by the Federal Truth in Lending Act, and that (b) such right of rescission existed because neither the loan transaction nor the right of rescission there of was exempted or excepted by the provision of Regulation Z.

126.1 Provides coverage for insured CLTA owner of a one-to-four family residence against defined loss by reason of lack of a right of access, rights to liens for services, labor or material, encroachments, zoning and restrictions violations and surface entry for mineral development.

126.2 Provides coverage for insured CLTA fee owner of a residential condominium against defined loss concerning the separate assessment of taxes, lack of a right of access, rights to liens for services, labor or material, encroachments, zoning and restrictions violations and surface entry for mineral development.

# EXHIBIT 4

# EXHIBIT 4

# Future Vernon of the Future - The ALTA 9

AUTHOR: Douglass W. Dewing

At its 1988 convention the American Land Title Association adopted the ALTA 9, which is a comprehensive endorsement similar to a form issued by the California Land Title Association, and similar to the "Comprehensive Endorsement" issued by LTIC for use in commercial transactions. As this endorsement provides affirmative insurance over most recorded exceptions to title, it is anticipated that many lenders, especially those selling their loans in the secondary market, will request the endorsement.

The endorsement has five numbered paragraphs and several of those have numbered subparagraphs. The lender **must** request the endorsement. Some lenders may request the endorsement on all loan policies, but that request will need to go through the Virginia State Office. The endorsement should **not** be issued automatically upon the lender's request. The issuing office must closely review all relevant documents, including easements, restrictions and surveys. The Company has not decided if the endorsement will carry a separate premium.

The endorsement should be issued **only** on loan policies. Because of references to matters excepted in Schedule B, it should not be used with the ALTA Short Form Residential Loan Policy (Policy series 121-xx-xxxxxx) or LTIC's Short Form Residential Loan Policy (Policy series 117-xx-xxxxxx). The endorsement should be used **only** on residential loan policies for one-to-four family residential properties with existing improvements. It must be issued at the time the policy is issued. Due to some language which could be construed as date-down coverage, title must be examined to the date of the request if the lender asks for the endorsement after the policy has been issued. **A current physical survey is mandatory.** If the coverage of one of the paragraphs cannot be given, the paragraph may be stricken, initialed by the underwriter, and the endorsement, as amended, may then be issued.

The Company insures the owner of the indebtedness secured by the insured mortgage against loss or damage sustained by reason of:

1.  Any incorrectness in the assurance that, at Date of Policy:

    a)  There are no covenants, conditions or restrictions under which the lien of the mortgage referred to in Schedule A can be divested, subordinated or extinguished, or its validity, priority or enforceability impaired.

To give this coverage, the underwriter must review all covenants, conditions and restriction listed in the title report to determine if there is language which could result in forfeiture, reversion or other impairment. Note that other impairment is added to traditional forfeiture or reversion. This includes a provision permitting a home owners or civic association to levy an assessment, secured by a lien with priority over the insured deed of trust. Under the Property Owners Association Act, 55-508, et seq., some owners associations can levy for limited purposes, with limited super-priority.

    b)  Unless excepted in Schedule B:

**NTLT 49**

Case 2:05-cv-00926-RB-DJA Document 93-23 Filed 10/13/10 Page 28 of 30

1) There are no present violations on the land of any enforceable covenants, conditions or restrictions, nor do any existing improvements on the land violated any building setback lines shown on a plat of subdivision recorded or filed in the public records.

2) Any instrument referred to in Schedule B as containing covenants, conditions or restrictions on the land does not, in addition, (i) establish an easement on the land; (ii) provide a lien for liquidated damages; (iii) provide for a private charge or assessment; (iv) provide for an option to purchase, a right of first refusal or the prior approval of a future purchaser or occupant.

3) There is not encroachment of existing improvements located on the land onto adjoining land, nor any encroachment onto the land of existing improvements located on adjoining land.

4) There is no encroachment of existing improvements located on the land onto that portion of the land subject to any easement excepted in Schedule B.

Paragraphs b) 1), 3), and 4) provide assurances that there are no violations or encroachments. To provide this assurance, all restrictions and conditions must be reviewed to determine if there has been a violation. Note that this does not say we insure against damage if there is a violation, it says there are none. Encroachments will only be found on the physical survey, but remember that some physical features may be shown on plats recorded in the records.

If we will be providing coverage over the violation, the policy will need to say so. The legal staff at the branch or state office will make this determination, as in the past. Review the underwriting manual sections on Encroachments and Restrictions for preliminary guidance. The phrasing of the endorsement says the coverage is there unless there is an exception in Schedule B. This implies that an omission of the exception for an encroachment in Schedule B, coupled with this endorsement, provides the coverage. But, in that case, we won't know if we assumed the risk, or if careless underwriting was involved, when facing a claim on that risk. To make the position clear, an exception with an affirmative statement that the Company is covering the risk should appear.

Obviously, these paragraphs must be deleted if 1) no survey is submitted; 2) if you do not have copies of the restrictions or 3) there is no attorneys' certificate stating there has been no violation.

2. Any future violation on the land of any existing covenants, conditions or restrictions occurring prior to the acquisition of title to the estate or interest in land by the insured, provided the violation results in:

   a) impairment or loss of the lien of the insured mortgage; or

   b) loss of title to the estate or interest in the land if the insured shall acquire title in satisfaction of the indebtedness secured by the insured mortgage.

This paragraph speaks only in terms of future violations of the restrictions. The underwriting for this section is comparable to that for paragraph 1(a).

3.   Damage to the existing improvements, including lawns, shrubbery or trees:

   a)   which are located on or encroach upon that portion of the land subject to any easement excepted in Schedule B, which damage results from the exercise of the right to maintain the easement for the purpose for which is was granted or reserved;

   b)   resulting from the future exercise of any right to use the surface of the land for the extraction or development of minerals excepted from the description of the land or excepted to in Schedule B.

This coverage is an extension of the coverage offered in paragraph 1(b)(4). Again, reference to the underwriting manual section on Encroachments will provide preliminary guidance. To provide affirmative coverage over encroachments, contact the legal staff.

The coverage against damage to lawns, shrubbery, or trees is extremely broad, but for our purposes, you should worry about that coverage only if the security includes such items. Examples would be orchards, vineyards, working farms, and historical properties with gardens, golf courses, and other similar properties.

Paragraph 3(b) can be given only if there is no reservation or conveyance of mineral rights. This would include oil and gas leases, coal, specific minerals or substances. If your property is being used as a borrow pit, this coverage should not be given. For exceptions or affirmative coverages, contact the legal staff.

4.   Any final court order or judgment required the removal from any land adjoining the land of any encroachment excepted in Schedule B.

This is an extension of paragraph 1(b)(3), and as in the case of future violation coverage, extends to something which will happen after the policy is issued. This provides coverage over encroachments from the insured land onto other land, including neighbors or public rights of way. There must be a physical survey, and if there are significant encroachments, the coverage must be deleted. For exceptions or affirmative coverages, contact the legal staff.

5.   Any final order or judgment denying the right to maintain any existing improvements on the land because of any violation of covenants, conditions or restrictions or building setback lines shown on a plat of subdivision recorded or filed in the public records.

This paragraph also speaks of a post-policy event, the entry of a court order denying the right to maintain the existing improvements because they violate the restrictions or setback lines. If there are any violations, or if you have not received a physical survey, then this coverage cannot be given without approval from the legal staff.

Wherever in this endorsement the words "covenants, conditions or restrictions" appear, they shall not be deemed to refer to or included the terms, covenants, conditions or limitations contained in an instrument creating a lease.

This endorsement is made a part of the policy and is subject to all the terms and provisions

NTLT 51

Case 2:21-cv-00996-APG-DJA Document 1-1 Filed 05/24/21 Page 238 of 732
Case 2:05-cv-00026-PR-DJA Document 13-1 Filed 10/13/10 Page 38 of 30

Endorsement of the                                                    Page 4 of 4

thereof and any prior endorsements thereto. Except to the extent expressly state, it neither modified any of terms and provisions of the policy and any prior endorsements, not does it extend the effective date of the policy and any prior endorsements, nor does it increase the face amount thereof.

These final two paragraphs limit the coverage to restrictions, which are called restrictions, and not covenants contained in a lease. The final paragraph is the standard language for endorsements intended to limit the effective date of the endorsement. Notwithstanding that language, the endorsement should not be issued for a previously issued policy without running the title current.

The following comments are my personal editorial and are not to be construed as company policy. This endorsement provides lenders with virtually every affirmative coverage they have asked for. It insures that they will suffer no loss or damage from matters which are of record and for which they have knowledge (because we told them about them). It ignores the reality of real property that people have been using and living on our land for over 300 years, and no title policy will be completely free of exceptions. It also ignores the fact that lenders receive interest payments to compensate them for their risk.

*Remember*, you are the underwriter. If you do not receive anything that you need to offer these coverages, you are entitled to, and I hope you will feel free to, delete all or any specific paragraph of coverage.

# EXHIBIT 5

# EXHIBIT 5

# ENDORSEMENT MANUAL

Foreword
Introduction
Table of Contents
CLTA/ALTA Conversion Charts

FIDELITY NATIONAL
TITLE GROUP, INC.

August 2013

**FOREWORD**

**PURPOSE OF ENDORSEMENT MANUAL**

This Endorsement Manual ("Manual") is prepared exclusively for the use of employees and agents of the Fidelity National Title Group, Inc. family of title insurance companies ("Company") which includes: Alamo Title Insurance, Chicago Title Insurance Company, Commonwealth Land Title Insurance Company, and Fidelity National Title Insurance Company.

The endorsement forms contained in the Manual are representative versions of acceptable forms generally in use.  Local practices and regulatory requirements may result in different versions of these forms.  No endorsement form, whether one contained in the Manual or any accepted version thereof in use in a particular area, should be modified at a customer's request without considering the state regulatory requirements for filing and approval of forms and discussing the request for modification with a Company underwriting advisor.

**CONFIDENTIALITY OF MANUAL**

All materials contained in the Manual are confidential communications from the Company to you. Under no circumstances are the instructions or any other part of the Manual to be given or communicated to anyone who is not an employee or agent of the Company.  However, the endorsement forms contained in the Manual may be duplicated and given to our customers as specimen copies in order to facilitate the issuance of our title insurance policies.  Such specimen copies must clearly indicate that they are specimens through the use of the words SPECIMEN COPY or other such words.

**ISSUANCE OF ENDORSEMENTS**

No endorsement in the Manual is to be issued unless the instructions associated with that endorsement are followed or any additional instructions or conditions that may be contained in other memos or directions from the Company are complied with.  When the instructions require approval by a Company underwriting advisor, such approval must be obtained and maintained in the file.  No endorsement to a policy may be issued without compliance with applicable state insurance statutes and regulations.

Several of the endorsements in the Manual provide insurance for matters not disclosed by the public records at the date the policy is issued.  Therefore, any time the Date of Policy of a policy containing any endorsement is updated or changed, consideration must be given to whether or not the new effective date will have an unintended consequence on the insurance provided by the endorsement.  When in doubt, contact a Company underwriting advisor.

© Copyright 1999-2013 Fidelity National Title Group, Inc.  All Rights Reserved.

# TABLE OF CONTENTS

Foreword
Introduction
CLTA/ALTA  conversion charts


SECTION:

1.  Street Assessments
    ALTA Form 1-06

2.  Truth-in-Lending
    ALTA Form 2-06

3.  Zoning
    ALTA Form 3-06 (Zoning)
    ALTA Form 3.1-06 (Zoning -Completed structure)
    ALTA Form 3.2-06 (Zoning-Land Under Development)

4.  Condominium
    ALTA Form 4-06
    ALTA Form 4.1-06 (no priority over subsequent HOA assessments)

5.  Planned Unit Development
    ALTA Form 5-06
    ALTA Form 5.1-06 (no priority over subsequent HOA assessments)

6.  Variable Rate Mortgage
    ALTA Form 6-06
    ALTA Form 6.2-06 (Negative Amortization)
    ALTA Form 6.1 [old form with statute blanks]

7.  Manufactured Housing
    ALTA Form 7-06 (expands definition only)
    ALTA Form 7.1-06 (Loan Policy)
    ALTA Form 7.2-06 (Owner's Policy)

8.  Environmental Protection Lien
    ALTA Form 8.1-06
    ALTA Form 8.2-06 (Commercial)

9.  Restrictions, Encroachments, Minerals
    ALTA Form 9-06 (REM-Loan Policy)
    ALTA Form 9.1-06 (CCR-Unimproved Land-Owner's Policy)
    ALTA Form 9.2-06 (CCR-Improved Land- Owner's Policy)
    ALTA Form 9.3-06 (CCR-Loan Policy)
    ALTA Form 9.6-06 (Private Rights – Loan Policy)
    ALTA Form 9.7-06 (REM –Land under Development-Loan Policy)
    ALTA Form 9.8-06 (CCR-Land Under Development – Owners Policy)
    ALTA Form 9.9-06 (Private Rights-Owner's Policy)
    ALTA Form 9.10-06 (REM-Current violations-Loan Policy)

10. Assignment of Mortgage
    ALTA Form 10-06
    ALTA Form 10.1-06 (With Date Down)

11. Mortgage Modification
    ALTA Form 11-06

© Copyright 1999-2013 Fidelity National Title Group, Inc.  All Rights Reserved.

ALTA Form 11.1-06 (With Subordination)

12.    Aggregation ("Tie-in")
ALTA Form 12-06 (Aggregation-Loan)
ALTA Form 12.1-06 (Aggregation-State Limits-Loan)

13.    Leasehold
ALTA Form 13-06 (Owner's)
ALTA Form 13.1-06 (Loan)

14.    Future Advances
ALTA Forms 14-06 (Priority)
ALTA Forms 14.1-06 (Knowledge)
ALTA Forms 14.2-06 (Letter of Credit)
ALTA Forms 14.3-06 (Reverse Mortgage)

15.    Non-Imputation
ALTA Form 15-06 (Full-Equity Transfer)
ALTA Form 15.1-06 (Additional Insured)
ALTA Form 15.2-06 (Partial Equity Transfer)

16.    Mezzanine Financing Endorsement
ALTA Form 16-06

17.    Access and Entry
ALTA Form 17-06 (Direct)
ALTA Form 17.1-06 (Indirect)
ALTA Form 17.2-06 (Utility Access)

18.    Tax Parcel
ALTA Form 18-06 (Single)
ALTA Form 18.1-06 (Multiple)[with tax sale protection]

19.    Contiguity
ALTA Form 19-06 (Multiple Parcels)[within Land]
ALTA Form 19.1-06 (Single Parcel)[with property other than Land]

20.    First Loss Endorsement [Contingent liability]
ALTA Form 20-06

21.    Creditors' Rights
ALTA Form 21-06 (Decertified)

22.    Location
ALTA Form 22-06
ALTA Form 22.1-06 (location with map)

23.    Coinsurance – Single Parcel
ALTA Form 23-06

24.    Doing Business
ALTA Form 24-06

25.    Same as Survey
ALTA Form 25-06
ALTA Form 25.1-06 (Portion of Survey)

© Copyright 1999-2013 Fidelity National Title Group, Inc.  All Rights Reserved.

26.   Subdivision
      ALTA Form 26-06

27.   Usury
      ALTA Form 27-06

28.   Easements and Encroachments
      ALTA Form 28-06 (Easement -Damage or Enforced Removal)
      ALTA Form 28.1-06 (Encroachments-Boundaries and Easements)
      ALTA Form 28.2-06 (Encroachments-Boundaries and Easements-Described Improvements)

29.   Interest Rate Swap
      ALTA Form 29-06 (Direct Obligation)
      ALTA Form 29.1-06 (Additional Interest)
      ALTA Form 29.2-06 (Direct Obligation – Defined Amount)
      ALTA Form 29.3-06 (Additional Interest – Defined Amount)

30.   Shared Appreciation Mortgage
      ALTA Form 30-06  (One to Four Family )
      ALTA Form 30.1-06 (Commercial Participation Interest)

31.   Severable Improvements
      ALTA Form 31-06

32.   Construction Loan
      ALTA Form 32-06 (Construction Loan –Loss of Priority)
      ALTA Form 32.1-06 (Construction Loan –Loss of Priority – Direct Payment)
      ALTA Form 32.2-06 (Construction Loan – Loss of Priority-Insured's Direct Payment)

33.   Disbursement (*to be used in conjunction with ALTA Forms 32-06 and 32.1-06*)
      ALTA Form 33-06

34.   Identified Risk Coverage
      ALTA Form 34-06

35.   Minerals and Other Subsurface Substances
      ALTA Form 35-06 (Buildings)
      ALTA Form 35.1-06 (Improvements)
      ALTA Form 35.2-06 (Described Improvements)
      ALTA Form 35.3-06 (Land Under Development)

36.   Energy Projects
      ALTA Form 36-06 (Leasehold/Easement-Owners Policy)
      ALTA Form 36.1-06 (Leasehold/Easement- Loan Policy)
      ALTA Form 36.2-06 (Leasehold- Owners Policy)
      ALTA Form 36.3-06 (Leasehold-Loan Policy)
      ALTA Form 36.4-06 (CCR-Land Under Development-Owners Policy)
      ALTA Form 36.5-06 (CCR-Land Under Development-Loan Policy)
      ALTA Form 36.6-06 (Encroachments)

37.   Assignment of Rents or Leases
      ALTA Form 37-06

38.   Mortgage Tax
      ALTA Form 38-06

39.   Policy Authentication
      ALTA Form 39-06

© Copyright 1999-2013 Fidelity National Title Group, Inc.  All Rights Reserved.

**[Nos.40 through 49 have been reserved for insertion of future ALTA Endorsements.]**

50.  CLTA Endorsement 100 - Comprehensive
     (Similar to ALTA Form 9)

51.  Shared Appreciation Mortgage Endorsement- Commercial
     Form A – Total Sum as Policy amount
     Form B – Separate Additional Insurance

52.  Share of Cash Flow (Additional Interest)

53.  Interest of Incoming Partner
     Form A – for use with 2006 Policy
     Form B – for use with the Former ALTA 1970(rev.84) Policy

54.  Excess Insurance Endorsement (for Use In Insuring Existing Partnership or Interest of New
     Partner in Existing Partnership)

55.  Option to Purchase Endorsements
     Form A – Option priority primed by intervening matters
     Form B – Option priority relates back

56.  Assignment of Rents Endorsement
     Contained in Insured Mortgage

57.  Issuance of Future Insurance Endorsement
     Form A - No pending Claims
     Form B - New Construction

58.  Covenants Run with the Land [shopping center]
     (Same as CLTA Endorsement No. 124.1)

59.  Revolving Credit Endorsements–Non-ALTA forms
     Form A – Obligatory Advance, Majority View
     Form B – Obligatory Advance, Minority View
     Form C - Optional Advance, Majority View
     Form D - Optional Advance, Minority View

60.  Last Dollar – for policies OTHER than ALTA 2006

61.  Tax Credit Benefit Endorsement

© Copyright 1999-2013 Fidelity National Title Group, Inc.  All Rights Reserved.

# INTRODUCTION

**What is an endorsement?**

"*A provision added to an insurance contract whereby the scope of its coverage is restricted or enlarged.*"

In order to understand what an endorsement is, we must first take a look at the underlying insurance policy. A title insurance policy is a contract of indemnity. The American Land Title Association ("ALTA") forms that we issue in the vast majority of states provide in Condition 8 of the Owners and the Loan policies:

> "This policy is a contract of indemnity against actual monetary loss or damage sustained or incurred by the Insured Claimant who has suffered loss or damage by reason of matters insured against by this policy."

We must be careful to support this definition in the construction of our endorsements. Why is this distinction so important?  In order to have our liability capped at the policy amount, the courts must determine our liability within the scope of the contract (the four corners of the instrument), under rules of contract law and not on the basis of tort liability (negligence).  In tort, the liability amounts might not be limited by the policy amount, but could be determined to be all damages, regardless of the amount of policy.  This opened ended liability is similar to what is sometimes referred to as "abstractors' liability".

A contract of indemnity, as used in our forms, insures against loss or damage occasioned by the risk we have identified. In response to a series of cases in the mid 1990's (called the "Alliance" cases) the endorsement forms were changed to conform the language to the indemnity structure of the policy. Previously, the format of some endorsements used the following style of language:

> ……*any inaccuracies in the following (or previous) statements*…..

The court held that this language made the endorsements *opinions* of title and therefore subject to a law suit in tort for negligence based upon a negligent rendering of that opinion. Because the action would be held to be in tort and not in contract, the limitation on liability in the policy would not be effective.

We should be specifying the risk we will undertake, not opining on the state of facts. A way to remember this is that we do not insure the sky is blue. We insure against loss or damage

© Copyright 1999-2013 Fidelity National Title Group, Inc.  All Rights Reserved.

occasioned by the sky not being blue. It may be difficult to see the difference at first. But the policies themselves are written in the same indemnity language:

> *"SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS FROM COVERAGE CANTAINED IN SCHEDULE B AND THE CONDITIONS…[The Company] insures….against loss or damage, ….sustained or incurred by the Insured by reason of:"*

The Covered Risks then listed are written in the indemnity language form:

> *"1. Title being vested other than as stated in Schedule A"*

We don't insure "title is vested as shown"; we insure against loss if title is not vested as shown, (vested in a different manner than is shown). Sometimes this language looks "negative" at first glance. But once again, it is important to utilize this language in endorsements to conform to the policy structure.

If you come across old endorsement language, or are requested to issue an endorsement utilizing that old format – DON'T USE IT!  Please discuss any such form or request with the Company's underwriting advisor.

**ALTA Policies**

In most states we issue policies that are promulgated by the American Land Title Association (usually referred to as ALTA).  This is the national professional organization for our industry.  Not all states issue ALTA policies.  In California, they also issue the CLTA (or California Land Title Association) forms. Texas, New Mexico and New York also issue their own type of policy.  Some states, such as Florida and Pennsylvania, issue ALTA Policies, but issue only a few of the hundreds of endorsements that are available nationwide. This manual contains forms that were prepared for use with the ALTA policy forms. Some endorsements were written by ALTA; they are designated as such and are located in the first part of the manual.  Each title company also writes its own endorsements which are sometimes referred to as "proprietary" or "non-ALTA" forms. These are shown after the ALTA form sections.

© Copyright 1999-2013 Fidelity National Title Group, Inc.  All Rights Reserved.

**Loan Policy vs. Owners Policy Endorsements**

As you look through the manual, you will see that some endorsement forms are available ONLY for Loan Policies, some ONLY for Owners Policies and some for both. There are usually more endorsements available for the lender because the risk is different than for an owner.

The equity an owner has in a piece of property is a buffer we benefit from when we insure the lender. In other words, if there is a loss, and the loss does not exceed the equity, the lender is not affected. The owner is harmed from dollar one of the loss, so the odds of there being a loss from any specific risk is always greater for an owner.

In addition, in order to prove a loss, the lender might have to go through foreclosure and not get sufficient proceeds to cover its debt, AND the loss has to be based on the title issue, not other economic market factors. That type of loss is harder to prove than the owners' loss. That is why one of the first questions the underwriter asks when discussing coverage requests is what type of policy is being issued. They need this information to assess the risk properly, again, because they are different risks.

**Rates and Forms**

The Forms contained in this manual are the standard forms that have been approved generally for use. If you are located in a state that has a forms filing requirement, you must verify that these forms have been filed for use. Some forms may have been modified in order to be filed. You must use the appropriate form filed for your state instead of the form shown here, if that is an issue for your state.

Rates are usually based upon the risk assumed, the work involved to analyze that risk and the market.

There are four approaches used throughout the country for the filing of rates and forms which the Company is subject to: Promulgated; Rating Bureaus; Filing required; No filing required.

In promulgated states, rates and forms are created legislatively, and are usually set forth in a state's Administrative Code. All companies issuing title insurance in promulgated states must adhere to the rates set forth in the Code and usually must use the forms prescribed by the Code. The three promulgated states are Florida, New Mexico and Texas. New Mexico and Texas prescribe all forms that must be used. Florida prescribes many forms, particularly endorsements, but title insurers may also individually file their own forms.

© Copyright 1999-2013 Fidelity National Title Group, Inc.  All Rights Reserved.

A Rating Bureau is comprised of a consortium of Title Insurers that, pursuant to statute, are permitted to set rates and, in most cases, prescribe forms for use in a particular state. All rates set by, and forms prescribed by, a rating bureau must be filed with and approved by the state agency that regulates the title insurance industry. The eight rating bureau states are Delaware, Louisiana, New Jersey, New York, North Carolina, Ohio, Oregon and Pennsylvania. All rating bureaus permit the filing of "additional" rates and forms by individual title insurers that are in addition to those filed by the rating bureau. Unless an "additional" rate or form is being used, all title insurers must charge the rates and use the forms created by the rating bureau.

Many states require that rates and/or forms be filed with and approved by the state agency that regulates the title insurance industry. Some states require that both rates and forms be filed, while others only require that rates or forms be filed. In all instances where a rate or form is required to be filed, title insurers must use the rate and/or form filed in that state. In a state that requires rates, but not forms, to be filed title insurers may not issue any title insurance products until there is a rate filed for those products. Conversely, in states that require forms to be filed, but not rates, no title insurance products can be issued until the applicable form has been filed. In all cases where a filing is required, the filed rate and/or form must be supported by the underwriter's filed rate manual.

A handful of states do not require that any rates or forms be filed. These states include District of Columbia, Illinois, Indiana, Massachusetts, Mississippi and Oklahoma. Even though filings are not required in these states, some have published rate manuals which must be followed when determining rates to be used and forms to be issued. Some of the states publish rates on a local or regional basis, which published rates should be followed when issuing title insurance products. Each underwriter in the non-filed states has a prescribed set of forms which are intended for use by all operations.

Questions about the application of rates or approved forms in any of the states should be discussed with the Company's underwriting advisor.

*REMEMBER:* We are prohibited from discussing or setting rates between companies outside of a Rating Bureau.  Rates may or may not be the same between companies.

© Copyright 1999-2013 Fidelity National Title Group, Inc.  All Rights Reserved.

***SAMPLE ENDORSEMENT*:**

ENDORSEMENT

*A*

Attached to and forming a part of

Policy of Insurance No. _____(File no_____)

Issued By

[FNTG BRAND] TITLE INSURANCE COMPANY

*B*

*C*

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls.  Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

*D*

Dated:

*E*          [FNTG BRAND] TITLE INSURANCE COMPANY

_____

*F*          Authorized signatory

**A**: Identify the policy

**B**: Describe the coverage

**C**: Integration or "boilerplate" clause

**D**: Date endorsement is issued, NOT the effective date of the coverage, unless specifically defined as such (see ALTA 10 and ALTA 11). If the endorsement is issued contemporaneously with the policy, it may be dated with the effective Date of Policy.

**E**: Identify Company

**F**: Signed by licensed agent or authorized party.

© Copyright 1999-2013 Fidelity National Title Group, Inc.  All Rights Reserved.

**Uses**

As was mentioned at the beginning of this introduction, an endorsement can be used to restrict or enlarge coverage. Most commonly they are to **increase** coverage, either by identifying additional risks assumed or deleting a limiting provision, such as an exception or exclusion. A caution on using an endorsement to decrease coverage: the endorsement may be easily removed from the policy. The policy might then be offered up as giving coverage where none was meant. An example - endorsing a commitment to add an exception such as an additional easement not contained in the original commitment. If the party issuing the final policy did not have or know about the endorsement, the policy would be issued without the additional exception, and this mistake could be carried forward in the future. The current insured buyer might be found to have had knowledge of the matter and be bound by it, but perhaps not its lender (if they had not seen the endorsement) and presumably not a future buyer.

A good rule of thumb is to use an endorsement to increase liability; amend the commitment or policy to decrease the liability. An endorsement reducing the Amount of Insurance after the claims process would be an exception to this rule.

**Drafting Endorsements Not Included in This Manual**

There are many instances in which the Company will agree to assume specific liability for matters not covered by any of the sample endorsements included within this manual. Where appropriate, for those endorsements containing affirmative insurance that we want to extend only after a court determination ( as opposed to giving the coverage against an assertion of an interest or challenge to the title before an action is commenced, as we sometimes may be willing to do) the following format is preferred:

> *The Company insures the Insured against loss or damage that the Insured shall sustain by reason of the entry of a final, non-appealable order or judgment finding ……*

 If you are an Agent, any requests for this type of coverage must be discussed with your Company underwriting advisor.

Return to Table of Contents

© Copyright 1999-2013 Fidelity National Title Group, Inc.  All Rights Reserved.

## CLTA to ALTA ENDORSEMENT CONVERSION CHART AS OF 04-02-13

| CLTA | ALTA | Description | Adoption (Rev.) |
|------|------|-------------|-----------------|
| | 38-06 | Mortgage Tax | 12-03-12 |
| | 1-06 | Street Assessments | 6-17-06 |
| (100.2.6-06) | 9.6-06 | Private Rights - Loan | 04-02-13 |
| (100.2.7-06) | 9.7-06 | Restrictions, Encroachments, Minerals – Land under Development-Loan | 04-02-12 |
| (100.2.8-06) | 9.8-06 | Covenants, Conditions and Restrictions-Land under Development-Owners | 04-02-12 (Tech. Correction 12-3-12) |
| 100.10-06 | 9.2-06 | Covenants, Conditions and Restrictions (Owner's Policy - Improved Land) | (04-02-12) |
| **100.2.10-06** | **9.10-06** | **Restrictions, Encroachments, Minerals – Current Violations - Loan** | **(04-02-13)** |
| 100.2.1-06 | 9.3-06 | Covenants, Conditions and Restrictions-Loan | (04-02-12) |
| 100.2.2-06 | 9.4-06 | Restrictions, Encroachments, Minerals-Future Improvements re Minerals Extraction– OP-Unimproved Land | Withdrawn 04-02-12) |
| 100.2.3-06 | 9.5-06 | Restrictions, Encroachments, Minerals –Future Improvements re Minerals Extraction- OP– Improved Land | (Withdrawn 04-02-12) |
| **100.2.9-06** | **9.9-06** | **Private Rights – Owner's** | **(04-02-13)** |
| 100.2-06 | 9-06 | Restrictions, Encroachments & Minerals-Loan | (04-02-12) |
| 100.9-06 | 9.1-06 | Covenants, Conditions and Restrictions (Owner's Policy - Unimproved Land) | (04-02-12) |
| 103.1-06 | 28-06 | Easement – Damage or Enforced Removal | 02-03-10 |
| 103.11-06 | 17-06 | Access and Entry | 6-17-06 |
| 103.12-06 | 17.1-06 | Indirect Access and Entry | 6-17-06 |
| 103.13-06 | 17.2-06 | Utility Access | 10-16-08 |
| 103.14-06 | 28.1-06 | Encroachments-Boundaries and Easements | 04-02-12 |
| **103.15-06** | **28.2-06** | **Encroachments-Boundaries and Easements – Described Improvements** | **04-02-13** |
| 104.12-06 | 10-06 | Assignment of Mortgage | (02-03-10) |
| 104.13-06 | 10.1-06 | Assignment and Date Down | (02-03-10) |
| **104.6-06** | **37-06** | **Assignment of Rents or Leases** | **12-03-12** |
| 110.11.1-06 | 11.1-06 | Mortgage Modification with Subordination | 10-22-09 |
| 110.11-06 | 11-06 | Mortgage Modification | 6-17-06 |
| 110.9.1-06 | 8.2-06 | Commercial Environmental Protection Lien | 10-16-08 |
| 110.9-06 | 8.1-06 | Environmental Protection Lien | 6-17-06 |
| 111.14.1-06 | 14.1-06 | Future Advance-Knowledge [See Note for ALTA 14] | (02-03-11) |
| 111.14.2-06 | 14.2-06 | Future Advance-Letter of Credit [See Note for ALTA 14] | (02-03-11) |
| 111.14.3 -06 | 14.3-06 | Future Advance-Reverse Mortgage [See Note for ALTA 14] | (02-03-11) (Tech. Correction 12-3-12) |
| 111.14-06 | 14-06 | Future Advance-Priority [Note: Version A gives ML Coverage: Version B Does Not] | (02-03-11) |
| 111.5-06 | 6-06 | Variable rate | (10-16-08) |
| 111.8-06 | 6.2-06 | Variable Rate - Negative Amortization | (10-16-08) |
| 114.3-06 | 23-06 | Co-Insurance – Single Policy (01-01-08) | 10-16-08 |
| 115.1-06 | 4-06 | Condominium | (02-03-10) |
| 115.2-06 | 5-06 | Planned Unit Development | (02-03-10) |
| 115.3-06 | 4.1-06 | Condominium (for NV & HI not CA) | (10-16-08) |
| 115.4-06 | 5.1-06 | Planned Unit Development (for NV & HI not CA) | (10-16-08) |
| 116.01-06 | 22-06 | Location | 6-17-06 |
| 116.02-06 | 22.1-06 | Location & Map | 6-17-06 |
| 116.1.2-06 | 25.1-06 | Same as Portion of Survey | 10-16-08 |
| 116.1-06 | 25-06 | Same as Survey | 10-16-08 |
| 116.4.1-06 | 19-06 | Contiguity-Multiple Parcels | 6-17-06 |
| 116.4-06 | 19.1-06 | Contiguity-Single Parcel | 6-17-06 |
| 116.5. 1-06 | 7.1-06 | Manufactured Housing Unit-Conversion; Loan | 6-17-06 |
| 116.5. 2-06 | 7.2-06 | Manufactured Housing Unit-Conversion; Owner's | 6-17-06 |
| 116.5-06 | 7-06 | Manufactured Housing Unit | 6-17-06 |
| 116.8-06 | 26-06 | Subdivision | 10-16-08 |
| **117.1-06** | **12.1-06** | **Aggregation – State Limits – Loan** | **04-02-13** |
| **117-06** | **12-06** | **Aggregation - Loan** | **(04-02-13)** |
| 119.5-06 | 13-06 | Leasehold – Owner's | 04-02-12 |
| 119.6-06 | 13.1-06 | Leasehold – Loan | 04-02-12 |
| 123.1-06 | 3-06 | Zoning – Unimproved Land | 6-17-06 |
| 123.2-06 | 3.1-06 | Zoning – Improved Land | (10-22-09) |

© Copyright 1999-2013 Fidelity National Title Group, Inc.  All Rights Reserved.

| 123.3-06 | 3.2-06 | Zoning – Land Under Development (OP or LP) | 04-02-12 (Tech. Correction 12-3-12) |
|----------|--------|---------------------------------------------|---------|
| 125-06 | 2-06 | Truth in Lending | 6-17-06 |
| 127.1-06 | 15.1-06 | Non-imputation-Additional Insured [Owner's Policy Only] | 6-17-06 |
| 127.2-06 | 15.2-06 | Non-imputation-Partial Equity Transfer [Owner's Policy Only] | 6-17-06 |
| 127-06 | 15-06 | Non-imputation-Full Equity Transfer [Owner's Policy Only] | 6-17-06 |
| 128-06 | 16-06 | Mezzanine Financing [Owner's Policy Only] | 6-17-06 |
| 129.1-06 | 18.1-06 | Multiple Tax Parcels | 6-17-06 |
| 129-06 | 18-06 | Single Tax Parcel | 6-17-06 |
| 130-06 | 20-06 | First Loss-(Multiple Parcels) Transaction [Loan Policy Only] | 6-17-06 |
| 131-06 | 21-06 | Creditors' Rights (Decertification effective 03-08-10) | 6-17-06 |
| 132-06 | 27-06 | Usury | 10-16-08 |
| 133-06 | 24-06 | Doing Business | 10-16-08 |
| 134.1-06 | 29.1-06 | Interest Rate SWAP-Additional Interest | 02-03-10 |
| 134.2-06 | 29.2-06 | Interest Rate SWAP-Direct Obligation – Defined Amount | 08-01-11 |
| 134.3-06 | 29.3-06 | Interest Rate SWAP-Additional Interest – Defined Amount | 08-01-11 |
| 134-06 | 29-06 | Interest Rate SWAP-Direct Obligation | 02-03-10 |
| 135.1-06 | 30.1-06 | Commercial Participation Interest | 08-01-12 |
| 135-06 | 30-06 | Shared Appreciation Mortgage | 07-26-10 |
| 136-06 | 31-06 | Severable Improvements | 02-03-11 |
| **137.1-06** | **32.1-06** | **Construction Loan – Loss of Priority – Direct Payment** | **(04-02-13)** |
| **137.2-06** | **32.2-06** | **Construction Loan – Loss of Priority – Insured's Direct Payment** | **(04-02-13)** |
| 137-06 | 32-06 | Construction Loan – Loss of Priority | 02-03-11 |
| 138-06 | 33-06 | Disbursement Endorsement | 02-03-11 |
| 139-06 | 34-06 | Identified Risk Coverage | 08-01-11 |
| 140.1-06 | 35.1-06 | Minerals and Other Subsurface Substances-Described Improvements –OP or LP | 04-02-12 |
| 140.2-06 | 35.2-06 | Minerals and Other Subsurface Substances-Improvements- OP or LP_ | 04-02-12 |
| 140.3-06 | 35.3-06 | Minerals and Other Subsurface Substances-Land Under Development-OP or LP | 04-02-12 |
| 140-06 | 35-06 | Minerals and Other Subsurface Substances – Buildings-OP or LP | 04-02-12 |
| 141.1-06 | 36.1-06 | Energy Project-Leasehold/Easement-LP | 04-02-12 |
| 141.2-06 | 36.2-06 | Energy Project-Leasehold-OP | 04-02-12 |
| 141.3-06 | 36.3-06 | Energy Project-Leasehold-LP | 04-02-12 |
| 141.4-06 | 36.4-06 | Energy Project- CC and Rs- Land Under Development-OP | 04-02-12 |
| 141.5-06 | 36.5-06 | Energy Project- CC and Rs- Land Under Development-LP | 04-02-12 |
| 141.6-06 | 36.6-06 | Energy Project-Encroachments- LP or OP | 04-02-12 |
| 141-06 | 36-06 | Energy Project-Leasehold/Easement-OP | 04-02-12 |
| **142-06** | **39-06** | **Policy Authentication** | **04-02-13** |

CLTA to ALTA Endorsement Conversion Chart (Rev. 04-02-13)

Return to Table of Contents

© Copyright 1999-2013 Fidelity National Title Group, Inc.  All Rights Reserved.

**ALTA to CLTA ENDORSEMENT CONVERSION CHART AS OF 04-02-13**

| ALTA | CLTA | Description | Adoption (Rev.) |
|------|------|-------------|-----------------|
| 1-06 | | Street Assessments | 6-17-06 |
| 2-06 | 125-06 | Truth in Lending | 6-17-06 |
| 3-06 | 123.1-06 | Zoning – Unimproved Land | 6-17-06 |
| 3.1-06 | 123.2-06 | Zoning – Improved Land | (10-22-09) |
| 3.2-06 | 123.3-06 | Zoning – Land Under Development (OP or LP) | 04-02-12 (Tech. Correction 12-3-12) |
| 4-06 | 115.1-06 | Condominium | (02-03-10) |
| 4.1-06 | 115.3-06 | Condominium (for NV & HI not CA) | (10-16-08) |
| 5-06 | 115.2-06 | Planned Unit Development | (02-03-10) |
| 5.1-06 | 115.4-06 | Planned Unit Development (for NV & HI not CA) | (10-16-08) |
| 6-06 | 111.5-06 | Variable rate | (10-16-08) |
| 6.2-06 | 111.8-06 | Variable Rate - Negative Amortization | (10-16-08) |
| 7-06 | 116.5-06 | Manufactured Housing Unit | 6-17-06 |
| 7.1-06 | 116.5. 1-06 | Manufactured Housing Unit-Conversion; Loan | 6-17-06 |
| 7.2-06 | 116.5. 2-06 | Manufactured Housing Unit-Conversion; Owner's | 6-17-06 |
| 8.1-06 | 110.9-06 | Environmental Protection Lien | 6-17-06 |
| 8.2-06 | 110.9.1-06 | Commercial Environmental Protection Lien | 10-16-08 |
| 9-06 | 100.2-06 | Restrictions, Encroachments & Minerals-Loan | (04-02-12) |
| 9.1-06 | 100.9-06 | Covenants, Conditions and Restrictions (Owner's Policy - Unimproved Land) | (04-02-12) |
| 9.2-06 | 100.10-06 | Covenants, Conditions and Restrictions (Owner's Policy - Improved Land) | (04-02-12) |
| 9.3-06 | 100.2.1-06 | Covenants, Conditions and Restrictions-Loan | (04-02-12) |
| 9.4-06 | 100.2.2-06 | Restrictions, Encroachments, Minerals-Future Improvements re Minerals Extraction– OP-Unimproved Land | Withdrawn 04-02-12) |
| 9.5-06 | 100.2.3-06 | Restrictions, Encroachments, Minerals –Future Improvements re Minerals Extraction- OP– Improved Land | (Withdrawn 04-02-12) |
| 9.6-06 | (100.2.6-06) | Private Rights - Loan | 04-02-12 |
| 9.7-06 | (100.2.7-06) | Restrictions, Encroachments, Minerals – Land under Development-Loan | 04-02-12 |
| 9.8-06 | (100.2.8-06) | Covenants, Conditions and Restrictions-Land under Development-Owners | 04-02-12 (Tech. Correction 12-3-12) |
| **9.9-06** | **100.2.9-06** | **Private Rights – Owner's** | **(04-02-13)** |
| **9.10-06** | **100.2.10-06** | **Restrictions, Encroachments, Minerals – Current Violations - Loan** | **(04-02-12)** |
| 10-06 | 104.12-06 | Assignment of Mortgage | (02-03-10) |
| 10.1-06 | 104.13-06 | Assignment and Date Down | (02-03-10) |
| 11-06 | 110.11-06 | Mortgage Modification | 6-17-06 |
| 11.1-06 | 110.11.1-06 | Mortgage Modification with Subordination | 10-22-09 |
| **12-06** | **117-06** | **Aggregation - Loan** | **(04-02-13)** |
| **12.1-06** | **117.1-06** | **Aggregation – State Limits – Loan** | **04-02-13** |
| 13-06 | 119.5-06 | Leasehold – Owner's | 04-02-12 |
| 13.1-06 | 119.6-06 | Leasehold – Loan | 04-02-12 |
| 14-06 | 111.14-06 | Future Advance-Priority [Note: Version A gives ML Coverage: Version B Does Not] | (02-03-11) |
| 14.1-06 | 111.14.1-06 | Future Advance-Knowledge [See Note for ALTA 14] | (02-03-11) |
| 14.2-06 | 111.14.2-06 | Future Advance-Letter of Credit [See Note for ALTA 14] | (02-03-11) |
| 14.3-06 | 111.14.3 -06 | Future Advance-Reverse Mortgage [See Note for ALTA 14] | (02-03-11) (Tech. Correction 12-3-12) |
| 15-06 | 127-06 | Non-imputation-Full Equity Transfer [Owner's Policy Only] | 6-17-06 |
| 15.1-06 | 127.1-06 | Non-imputation-Additional Insured [Owner's Policy Only] | 6-17-06 |
| 15.2-06 | 127.2-06 | Non-imputation-Partial Equity Transfer [Owner's Policy Only] | 6-17-06 |
| 16-06 | 128-06 | Mezzanine Financing [Owner's Policy Only] | 6-17-06 |
| 17-06 | 103.11-06 | Access and Entry | 6-17-06 |
| 17.1-06 | 103.12-06 | Indirect Access and Entry | 6-17-06 |
| 17.2-06 | 103.13-06 | Utility Access | 10-16-08 |
| 18-06 | 129-06 | Single Tax Parcel | 6-17-06 |
| 18.1-06 | 129.1-06 | Multiple Tax Parcels | 6-17-06 |
| 19-06 | 116.4.1-06 | Contiguity-Multiple Parcels | 6-17-06 |
| 19.1-06 | 116.4-06 | Contiguity-Single Parcel | 6-17-06 |
| 20-06 | 130-06 | First Loss-(Multiple Parcels) Transaction [Loan Policy Only] | 6-17-06 |
| 21-06 | 131-06 | Creditors' Rights (Decertification effective 03-08-10) | 6-17-06 |
| 22-06 | 116.01-06 | Location | 6-17-06 |

© Copyright 1999-2013 Fidelity National Title Group, Inc.  All Rights Reserved.

| 22.1-06 | 116.02-06 | Location & Map | 6-17-06 |
|---|---|---|---|
| 23-06 | 114.3-06 | Co-Insurance – Single Policy (01-01-08) | 10-16-08 |
| 24-06 | 133-06 | Doing Business | 10-16-08 |
| 25-06 | 116.1-06 | Same as Survey | 10-16-08 |
| 25.1-06 | 116.1.2-06 | Same as Portion of Survey | 10-16-08 |
| 26-06 | 116.8-06 | Subdivision | 10-16-08 |
| 27-06 | 132-06 | Usury | 10-16-08 |
| 28-06 | 103.1-06 | Easement – Damage or Enforced Removal | 02-03-10 |
| 28.1-06 | 103.14-06 | Encroachments-Boundaries and Easements | 04-02-12 |
| **28.2-06** | **103.15-06** | **Encroachments-Boundaries and Easements – Described Improvements** | **04-02-13** |
| 29-06 | 134-06 | Interest Rate SWAP-Direct Obligation | 02-03-10 |
| 29.1-06 | 134.1-06 | Interest Rate SWAP-Additional Interest | 02-03-10 |
| 29.2-06 | 134.2-06 | Interest Rate SWAP-Direct Obligation – Defined Amount | 08-01-11 |
| 29.3-06 | 134.3-06 | Interest Rate SWAP-Additional Interest – Defined Amount | 08-01-11 |
| 30-06 | 135-06 | Shared Appreciation Mortgage | 07-26-10 |
| 30.1-06 | 135.1-06 | Commercial Participation Interest | 08-01-12 |
| 31-06 | 136-06 | Severable Improvements | 02-03-11 |
| 32-06 | 137-06 | Construction Loan – Loss of Priority | 02-03-11 |
| **32.1-06** | **137.1-06** | **Construction Loan – Loss of Priority – Direct Payment** | **(04-02-13)** |
| **32.2-06** | **137.2-06** | **Construction Loan – Loss of Priority – Insured's Direct Payment** | **(04-02-13)** |
| 33-06 | 138-06 | Disbursement Endorsement | 02-03-11 |
| 34-06 | 139-06 | Identified Risk Coverage | 08-01-11 |
| 35-06 | 140-06 | Minerals and Other Subsurface Substances – Buildings-OP or LP | |
| 35.1-06 | 140.1-06 | Minerals and Other Subsurface Substances-Described Improvements –OP or LP | 04-02-12 |
| 35.2-06 | 140.2-06 | Minerals and Other Subsurface Substances-Improvements- OP or LP_ | 04-02-12 |
| 35.3-06 | 140.3-06 | Minerals and Other Subsurface Substances-Land Under Development-OP or LP | 04-02-12 |
| 36-06 | 141-06 | Energy Project-Leasehold/Easement-OP | 04-02-12 |
| 36.1-06 | 141.1-06 | Energy Project-Leasehold/Easement-LP | 04-02-12 |
| 36.2-06 | 141.2-06 | Energy Project-Leasehold-OP | 04-02-12 |
| 36.3-06 | 141.3-06 | Energy Project-Leasehold-LP | 04-02-12 |
| 36.4-06 | 141.4-06 | Energy Project- CC and Rs- Land Under Development-OP | 04-02-12 |
| 36.5-06 | 141.5-06 | Energy Project- CC and Rs- Land Under Development-LP | 04-02-12 |
| 36.6-06 | 141.6-06 | Energy Project-Encroachments- LP or OP | 04-02-12 |
| **37-06** | **104.6-06** | **Assignment of Rents or Leases** | **12-03-12** |
| **38-06** | | **Mortgage Tax** | **12-03-12** |
| **39-06** | **142-06** | **Policy Authentication** | **04-02-13** |

ALTA to CLTA Endorsement Conversion Chart (Rev. 04-02-13)
Prepared by Paul Flores

Return to Table of Contents

© Copyright 1999-2013 Fidelity National Title Group, Inc.  All Rights Reserved.

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 1**

**Return to Table of Contents**

**STREET ASSESSMENTS**

**ALTA ENDORSEMENT - FORM 1-06**

**PURPOSE**

The repair and maintenance of public streets is either contracted for by a governmental body or done directly by government employees.   The property owners adjoining the streets or in the generally benefited area are usually assessed the costs of the work on some basis.   The governmental body is almost universally given a lien to secure the payment of this assessment.

This endorsement is concerned with the priority of that lien if the improvements are either in process or completed at the Date of Policy.  If this lien is prior to the lien of the Insured Mortgage and the assessments are not paid by the borrower, the lender will have to pay them in order to stop a tax foreclosure.   This endorsement covers the loss or damage which the lender may sustain by having to pay the assessments which have gained priority over the Insured Mortgage. Whether the assessment lien has priority at the Date of Policy or gains that priority later is immaterial.  This endorsement covers the lender in either event.

**SECTION OF THE POLICY AMENDED BY ENDORSEMENT**

This endorsement is incorporated into the terms of the ALTA Loan Policy in use in some states, particularly in the West.   Those policies contain the note that they include "ALTA Form 1 Coverage."   The instructions set out below should be followed when issuing such a policy form or the Form 1-06 endorsement.

**BASIS FOR PROVIDING COVERAGE**

This endorsement may be issued to all ALTA Loan Policies under the following circumstances:

1.      Access to the Land is by a private easement and the land or easement does not adjoin a public street or generally benefited area.

2.      At Date of Policy, there are no street improvements under construction or recently completed which could generate a later assessment lien.

3.      The Insured Mortgage is recorded prior to the commencement of work on new subdivision streets or other streets adjoining the Land or in the generally benefited area.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

4.      All street improvements are currently complete and you have determined that the assessments for them have been fully paid.

5.      The lien securing the street assessments attaches to the title to the Land after the Insured Mortgage is recorded and does not relate back to a prior point in time.  While this is a possibility, it is very unlikely.  The law usually gives governmental units assessment liens the same priority as real estate tax liens.  Therefore, before proceeding on this basis, you must obtain the approval of the Company's underwriting adviser.

You must obtain the approval of the Company's underwriting adviser to issue this endorsement on any basis other than as specified above.


**MODIFICATION**


In the event that modification of an endorsement is requested, it is necessary to consider your state regulatory requirements for filing and approval of forms.  If the endorsement is modified, the endorsement is not an ALTA form and should not reference ALTA in the title.  You must obtain the approval of the Company's underwriting adviser before complying with any request for a modification.


Return to Table of Contents


© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**ENDORSEMENT**

Attached to Policy No._____
Issued by
[FNTG BRAND]


        The Company insures against loss or damage sustained by the Insured by reason of the lack of priority of the lien of the Insured Mortgage over the lien of any assessments for street improvements under construction or completed at Date of Policy.


        This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.


[Witness Clause Optional]


DATED:

[FNTG BRAND]

BY: _____
        AUTHORIZED SIGNATORY


ALTA Endorsement Form 1-06
(Street Assessments) (6/17/06)
© American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 2**

**Return to Table of Contents**

**TRUTH IN LENDING**
**ALTA ENDORSEMENT - FORM 2-06**

**PURPOSE**

This endorsement is for loan policies only.  It provides insurance against some losses the Insured may suffer if the borrower exercises a right of rescission under Regulation Z of the Federal Truth in Lending Act.  To be covered, the loss would have to come from a termination of the mortgage lien or the voiding of the Title of a mortgagee who acquired it in a proper foreclosure or workout.

**SECTION OF THE POLICY AMENDED BY ENDORSEMENT**

This endorsement amends Exclusions from Coverage No. 5 of the ALTA Loan Policy.  This section eliminates the policy coverage for enforceability of the Insured Mortgage if enforceability is denied because of usury, or violation of any consumer credit protection or truth-in-lending law.

**BASIS FOR PROVIDING COVERAGE**

**This endorsement is not to be issued on the basis of the lender's compliance with Regulation Z.**  It is to be issued only if the transaction is <u>not covered</u> by the regulation.  For our purposes, this includes only transactions in which:

The borrower is a corporation, partnership or governmental unit; or

The loan is for **non-agricultural** business or commercial purposes.

**CAUTION**:  LOANS SECURED BY OWNER OCCUPIED SINGLE FAMILY DWELLINGS CAN NEVER BE CONSIDERED LOANS FOR COMMERCIAL PURPOSES.

You must obtain the authority of the Company's underwriting adviser before honoring any request to issue this endorsement in any case not specified above.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**MODIFICATION**

In the event that modification of an endorsement is requested, it is necessary to consider your state regulatory requirements for filing and approval of forms.  If the endorsement is modified, the endorsement is not an ALTA form and should not reference that in the title.  You must obtain the approval of the Company's underwriting adviser before complying with any request for a modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**ENDORSEMENT**
Attached to Policy No._____
Issued by
[FNTG BRAND]

The Company insures against loss or damage sustained by the Insured by reason of:

any final judgment of a court of competent jurisdiction that either the lien of the Insured Mortgage has been terminated or the Title of an Insured, who has acquired all or any part of the Land by foreclosure, trustee's sale, conveyance in lieu of foreclosure, or other legal manner, which discharges the lien of the Insured Mortgage, has been defeated by a valid exercise of the right of rescission conferred by the Federal Truth-in-Lending Act and that the right or rights of rescission existed because neither the credit transaction evidenced by the Insured Mortgage nor the right of rescission was exempted or excepted by the provisions of Regulation Z (12 CFR 226).

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness Optional]

DATED:

[FNTG BRAND]

BY: _____
          AUTHORIZED SIGNATORY

ALTA Endorsement Form 2-06
(Truth in Lending) (6/17/06)
© American Land Title Association.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

Return to Table of Contents

**ZONING**

**ALTA ENDORSEMENT - FORMS 3-06, 3.1-06 and 3.2-06**

**CAUTION:**      ZONING INSURANCE CONSTITUTES AN EXTRA HAZARDOUS RISK. THEREFORE, NO ZONING ENDORSEMENT IS TO BE ISSUED WITHOUT THE EXPRESS AUTHORIZATION OF THE COMPANY'S UNDERWRITING ADVISER.

**PURPOSE**

These forms carefully select certain zoning issues for coverage.  They do not provide unlimited zoning insurance.

**ALTA Endorsement Form 3-06 (Zoning-Unimproved Land)**

This endorsement provides insurance with respect to the zoning classification covering the Land and the uses permitted on the Land in that zone.  It also insures against loss if any of those uses are prohibited by a court order that invalidates the zoning ordinance.  However, it does not insure against losses suffered because the Land can't be sold or mortgaged due to any zoning problem. This endorsement is appropriate for both vacant and improved land.

**ALTA Endorsement 3.1-06 (Zoning-Completed Structure)**

This endorsement provides the same coverage as Endorsement Form 3-06, above, and is subject to the same limitations.  It also insures against losses from court orders which:

> Prohibit use of the Land for specified purposes allowed by the zoning because certain physical characteristics of the Land violate the ordinance; and

> Require removal or modification of the structure located on the Land due to these violations.

This endorsement is issued for policies covering improved property.

**ALTA Endorsement 3.2-06 (Zoning – Land Under Development)**

This endorsement became effective on April 2, 2012 and extends the coverage available in the Endorsement Form 3.1-06. That coverage, previously only available for Land which contained

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

existing improvements, can now be given for Land on which proposed buildings are to be built or constructed, if the proposed building is built or constructed according to site and elevation plans identified therein.

This endorsement is issued for policies covering property upon which improvements are to be built or constructed. *[a technical correction to the language was made by ALTA 12-3-2012]*

## SECTION OF THE POLICY AMENDED BY THE ENDORSEMENT

These endorsements amend Exclusions from Coverage No. 1 (a) of the ALTA Owner's and Loan Policies.  Use with other policy versions must be approved by your Company's underwriting advisor.

## BASIS FOR PROVIDING COVERAGE

**CAUTION:**  A CERTIFICATE FROM A ZONING OR PLANNING AUTHORITY OR A LETTER FROM A MUNICIPALITY, A SO-CALLED MUNI-LETTER, IS **NOT** A SUFFICIENT BASIS FOR ANY DETERMINATION TO BE MADE BELOW.  THESE LETTERS DO NOT ESTOP THE AUTHORITY OR MUNICIPALITY IF THEY ARE INCORRECT.  FURTHERMORE, THEY DO NOT COVER CONSTITUTIONALITY CONCERNS OR SPOT ZONING PROBLEMS.

1.      We must determine the zone designation in which the Land lies from the **most recent, official** zoning maps.

All of the endorsements require this designation to be inserted in the space provided at paragraph No. 1(a) [for Forms 3-06 and 3.1-o6] or 2(a) [for Form 3.2-06].

The Land must fall clearly within the boundaries of the zone designation.  If the scale of the maps is too small, or the maps are too unclear to make this determination accurately, you must be able to determine it by the legal description in the ordinance or resolution, if it contains such a description.  Otherwise, we will not provide the insurance.

2.      We must be satisfied that the zoning ordinance or resolution is valid before these endorsements may be issued.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

This requirement can be satisfied by an attorney's opinion from an attorney **skilled in zoning matters.** This opinion must meet the following requirements:

a.   It must either be written to us or the attorney must give us a letter authorizing us to rely on it for the purposes of our zoning insurance.

b.   It must cover at least the following matters:

> The constitutionality of the zoning ordinance or resolution under the federal and state constitutions.

> The compliance with all state laws in the process of the adoption of the ordinance or resolution with respect to the land being insured.

> This includes, but is not limited to, an analysis of the following matters: (1) The propriety of notices for the hearing on the zoning change; (2) the compliance of the hearing with state "open meeting" or "sunshine" laws; (3) the presence of a quorum of the necessary officials; (4) the approval of the necessary majority of officials at that meeting; (5) the approval of any other officials or public bodies which may be necessary; (6) the recordation or filing of the ordinances with the county recorder or other body, if necessary; and (7) the expiration of all periods of appeal without appeal being taken.

c.   It must also address the susceptibility of the ordinance to attack because it constitutes spot zoning, contract zoning, or zoning which violates some public policy, such as zoning excluding the elderly.

Frequently, the Company's underwriting advisor will undertake to determine these matters. If this is the case, no separate attorney's opinion will be required. You should check with the underwriting adviser on this issue prior to requiring an attorney's opinion. In special situations such as newly enacted zoning, newly annexed property and in certain areas such as Washington, D.C., (and other areas of the Northeast) an opinion letter may still be necessary. Some areas have zoning that is extremely complex, requiring special expertise.

3.   We must determine the likelihood of an attack on the zoning we are asked to insure.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

This requires an assessment of the compatibility of the uses permitted under the ordinance or resolution with the use being made of the surrounding land.  Therefore, we must be informed by a reliable source of the public sentiment concerning the project. The number of persons objecting at the hearing to the imposition of the zoning, who they represented and the nature of their complaints are some indications of public sentiment. This factor is more critical in the case of newly changed zoning than where the zoning has been long standing.

4.       We must determine the uses permitted as a matter of right in the zone from the **most recent, official** zoning ordinances or resolutions.

If we issue Endorsement Form 3-06 or 3.1-06, these uses will be inserted in the space provided at the end of paragraph no. 1b of the forms.  If we issue Endorsement Form 3.2-06, these uses will be inserted in the space provided at the end of paragraph no. 2b of the form. When the uses are inserted, they must be inserted **exactly in the form in which they are set forth in the ordinance or resolution.**

Interpretation of the designated uses can be extremely dangerous.  For example, if the ordinance allows the use of the Land for "shopping centers," and the customer intends to build a department store on the property, you are not to insert "department stores" into the endorsement, but rather use the words "shopping centers" contained in the ordinance.

Requests for coverage of **conditional uses** must be approved by the Company's underwriting adviser on a case by case basis and require adjustment of the language of the endorsements.

5.       If the Endorsement Form 3.1-06 is requested, the following additional requirements must be met:

An analysis of the zoning ordinance or resolution, and of the site and elevation plans identified in paragraph 1b, to determine any restrictions, with respect to the following matters:

- Area, width or depth of the Land as a building site for the structure constructed on it.
- Floor space area of the structures on the Land.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

- Setback requirements for the structures on the Land.
- Height of the structures on the Land.
- Number of parking spaces striped.

If the ordinance or resolution contains any or all such restrictions, then we will require a current accurate survey from a reputable surveyor which includes the representation of any such matter in order to evaluate compliance with the restrictions.

It is not possible to say categorically just what the survey must contain.  For example, whether the Land contains sufficient area for the Improvements may depend upon more than just its area and the floor space of the building. Among other issues, parking, open space and landscaping requirements may also have to be considered.

6. If the Endorsement Form 3.2-06 is requested, the following additional requirements must be met:

An analysis of the zoning ordinance or resolution, and of the site and elevation plans identified in paragraph 1b, to determine any restrictions, with respect to the following matters:

- Area, width or depth of the Land as a building site for the Improvements to be built or constructed on it.
- Floor space area of the proposed Improvements on the Land.
- Setback requirements for the proposed Improvements on the Land.
- Height of the proposed Improvements on the Land.
- Number of parking spaces to be striped.

If the ordinance or resolution contains any or all such restrictions, then we will require the site and elevation plans identified in paragraph 1 (b) which must contain the same elements as those in a current, accurate survey, in order to evaluate compliance with the restrictions.

It is not possible to say categorically just what the Plans must contain.  For example, whether the Land contains sufficient area for the proposed Improvements may depend upon more than just its area and the floor space of the building. Among other issues, parking, open space and landscaping requirements may also have to be considered.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

Occasionally, you may receive requests to cover matters in addition to those above.  Requests to cover compliance with parking "requirements" are common, but not acceptable. We can count the number of spaces, but we do not want to analyze whether the spaces themselves are proper dimensions or include sufficient handicap spots.  Coverage requests for conditional uses and non-conforming uses are also frequent, but, as mentioned before, the language of the endorsements must be changed to accommodate those issues.  Before responding to such a request, you should contact the Company's underwriting advisor.

## MODIFICATION

In the event that modification of an endorsement is requested, it is necessary to consider your state regulatory requirements for filing and approval of forms. If the endorsement is modified, the endorsement may not be considered an ALTA form and should not reference ALTA in the title. You must obtain the approval of the Company's underwriting advisor before complying with any request for a modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**ENDORSEMENT**

Attached to Policy No._____
Issued by
[FNTG BRAND]

1.      The Company insures against loss or damage sustained by the Insured in the event that, at Date of Policy,

     a.      According to applicable zoning ordinances and amendments, the Land is not classified Zone *[FILL IN];*

     b.      The following use or uses are not allowed under that classification:

     *[FILL IN]*

2.      There shall be no liability under this endorsement based on

     a.      Lack of compliance with any conditions, restrictions, or requirements contained in the zoning ordinances and amendments, including but not limited to the failure to secure necessary consents or authorizations as a prerequisite to the use or uses.  This paragraph 2.a. does not modify or limit the coverage provided in Covered Risk 5.

     b.      The invalidity of the zoning ordinances and amendments until after a final decree of a court of competent jurisdiction adjudicating the invalidity, the effect of which is to prohibit the use or uses.

     c.      The refusal of any person to purchase, lease or lend money on the estate or interest covered by this policy.

This endorsement is issued as part of the policy.  Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy or (iv) increase the Amount of Insurance.  To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls.  Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements to it.

[Witness Optional]

DATED:

[FNTG BRAND]

BY: _____
     AUTHORIZED SIGNATORY

ALTA Endorsement Form 3-06
(Zoning – Unimproved Land) (6/17/06)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**ENDORSEMENT**

Attached to Policy No._____
Issued by
[FNTG BRAND]

1.   The Company insures against loss or damage sustained by the Insured in the event that, at Date of Policy,

    a.   according to applicable zoning ordinances and amendments, the Land is not classified Zone FILL IN;

    b.   the following use or uses are not allowed under that classification:
        FILL IN

    c.   There shall be no liability under paragraph 1.b. if the use or uses are not allowed as the result of any lack of compliance with any conditions, restrictions, or requirements contained in the zoning ordinances and amendments, including but not limited to the failure to secure necessary consents or authorizations as a prerequisite to the use or uses.  This paragraph 1.c. does not modify or limit the coverage provided in Covered Risk 5.

2.   The Company further insures against loss or damage sustained by the Insured by reason of a final decree of a court of competent jurisdiction either prohibiting the use of the Land, with any existing structure, as specified in paragraph 1.b. or requiring the removal or alteration of the structure, because, at Date of Policy, the zoning ordinances and amendments have been violated with respect to any of the following matters:

    a.   Area, width, or depth of the Land as a building site for the structure
    b.   Floor space area of the structure
    c.   Setback of the structure from the property lines of the Land
    d.   Height of the structure, or
    e.   Number of parking spaces.

3.   There shall be no liability under this endorsement based on:

    a.   the invalidity of the zoning ordinances and amendments until after a final decree of a court of competent jurisdiction adjudicating the invalidity, the effect of which is to prohibit the use or uses;

    b.   the refusal of any person to purchase, lease or lend money on the Title covered by this policy.

This endorsement is issued as part of the policy.  Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy or (iv) increase the Amount of Insurance.  To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls.  Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements to it.
[Witness Optional]

DATED:
[FNTG BRAND]
BY: _____
      AUTHORIZED SIGNATORY

ALTA Endorsement Form 3.1-06
(Zoning-Completed Structure) (rev. 10/22/09)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**ENDORSEMENT**

**Attached to Policy No. _____**

**Issued by**

***[FNTG BRAND]***

1. For purposes of this endorsement:
   a. "Improvement" means a building, structure, road, walkway, driveway, curb, subsurface utility or water well existing at Date of Policy or to be built or constructed according to the Plans that is or will be located on the Land, but excluding crops, landscaping, lawns, shrubbery, or trees.

   b. "Plans" means those site and elevation plans made by [*name of architect or engineer*] dated ____, last revised _____, designated as [*name of project*] consisting of ___sheets.

2. The Company insures against loss or damage sustained by the Insured in the event that, at Date of Policy
   a. according to applicable zoning ordinances and amendments, the Land is not classified Zone _____;

   b. the following use or uses are not allowed under that classification:

   c. There shall be no liability under paragraph 2.b. if the use or uses are not allowed as the result of any lack of compliance with any condition, restriction, or requirement contained in the zoning ordinances and amendments, including but not limited to the failure to secure necessary consents or authorizations as a prerequisite to the use or uses.  This paragraph 2.c. does not modify or limit the coverage provided in Covered Risk 5.

3. The Company further insures against loss or damage sustained by the Insured by reason of a final decree of a court of competent jurisdiction either prohibiting the use of the Land, with any existing Improvement, as specified in paragraph 2.b. or requiring the removal or alteration of the Improvement, because of a violation of the zoning ordinances and amendments in effect at  Date of Policy with respect to any of the following matters:
   a.            Area, width, or depth of the Land as a building site for the Improvement

   b.            Floor space area of the Improvement

   c.            Setback of the Improvement from the property lines of the Land

   d.            Height of the Improvement, or

   e.            Number of parking spaces.

4. There shall be no liability under this endorsement based on:
   a. the invalidity of the zoning ordinances and amendments until after a final decree of a court of competent jurisdiction adjudicating the invalidity, the effect of which is to prohibit the use or uses;

   b. the refusal of any person to purchase, lease or lend money on the Title covered by this policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

**[FNTG BRAND]**

**By: _____**
      **Authorized Signatory**

ALTA Endorsement Form 3.2-06
(Zoning-Land Under Development) (4/2/12)
©American Land Title Association

*[includes technical correction of 12-3-12]*

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                                    **SECTION 4**

**Return to Table of Contents**

**CONDOMINIUM**
**ALTA ENDORSEMENT FORMS 4-06 and 4.1-06**


**PURPOSE**

These endorsements provide affirmative insurance to mortgage lenders loaning on the security of condominium units.  There are seven matters selected for insurance in these endorsements. Some of them would be covered by the policy without these endorsements but they are stated anyway to facilitate the sale of mortgage loans in the secondary market. The ALTA 4.1-06 differs from the ALTA 4-06 only in that there is no insurance of priority over future assessments in paragraph 4 of the endorsement. Thus, the 4.1-06 is appropriate for use in states where insured second mortgages do not have priority, or where first mortgages are primed by certain assessments. The ALTA 4.1-06 is also the appropriate form to be used with an Owners Policy.


This endorsement is designed to be issued **only** after considering the relevant aspects of the condominium project in which the unit exists.  If the requirements presented below cannot be met, you must either decline to issue this endorsement or offer to issue a modified version deleting one or more insuring clauses.


**SECTION OF THE POLICY AMENDED BY ENDORSEMENT**


No specific section of the policy is amended by these endorsements; however additional affirmative coverages are added.


**BASIS FOR PROVIDING COVERAGE**


Insuring Paragraph Nos. 1 and 2 insure against loss if the unit is not part of a condominium regime or if Title to the unit is affected by any failure of the condominium documents to comply with applicable statutes.


**First**, the project must comply with all requirements of the condominium statutes in the state where it is located, including meeting all statutory requirements for form and content for the declaration, plat and any other required instruments or processes.


**Second**, the insured unit must be properly identified in the declaration and on the plat or map so as to be included within the project.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

Insuring Paragraph No. 3 insures against loss from the violation of covenants or restrictions contained in the condominium documents or the existence of rights of reverter or powers of termination in those documents.

**First**, the condominium declaration must not contain any provisions for the reversion of Title due to violation of the covenants contained in it.  Similarly, no power of termination must exist. To determine this, you must be sure that all of the restraints against use of the premises are in the form of covenants rather than conditions.  A declaration violates this requirement if it contains any statement that the unit is owned "on the condition that" certain acts not occur. Similarly, provisions that the unit may be owned "as long as" certain conditions exist or certain events do not occur should be viewed as violating this requirement.

**Second**, you must determine that there are no existing violations of covenants by the unit owner which affect the unit, the common elements, or any other physical improvements which are subject to the declaration.  A lender acquiring the unit in a foreclosure will suffer a loss if it has to spend money correcting these problems. Examples would be the removal of walls within the unit contrary to the provisions of the declaration, and the unauthorized modification of balconies which constitute limited common elements.  You are authorized to rely on an affidavit from the unit owner that no such unauthorized modifications exist where you are issuing the endorsement to a loan policy on **a residential condominium unit.**  You should consult with the Company's underwriting adviser where a commercial condominium is involved.

Insuring Paragraph No. 4 is where the two endorsements differ. In many states a properly imposed HOA assessment can have super lien priority, which means that it might be treated like the lien for taxes, and have priority over subsequently filed mortgages, or it might be inchoate or "hidden" like a mechanic's or construction lien and the priority of the assessment could date back to the passing of a resolution by the board approving work to be done or an assessment to be imposed, even though the contracts or actual assessments come later.

The ALTA 4-06 insures against loss if the assessment liens of the condominium association have priority over the lien of the Insured Mortgage. **In order to provide this coverage the declaration or state law must provide that the lien of the mortgage to be insured is prior to the lien for unpaid condominium assessments.**  In most cases the declaration or state

law will provide that only a **first** mortgage lender's lien is superior to the association's lien for charges assessed after the recording of the mortgage or deed of trust. In such cases, a second or lower priority lender would not be protected from assessment liens, and the 4-06 could not

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                                      SECTION 4

be given. In those situations you would need to issue the 4.1-06, which merely insures there are no liens *due and unpaid* on Date of Policy. The 4.1-06 is also the endorsement form to be used with an Owner's Policy.

To issue the ALTA 4.1-06, you must determine that all charges or assessments provided for in the condominium statutes and condominium documents, which are due, have been paid.  If there is a ground lease or recreation lease which the unit owner or association is obligated to pay, you must determine that all charges are current.

Insuring Paragraph No. 5 insures against loss if the condominium unit is not a separate parcel from all other units for real estate tax purposes.  If it is not a separate parcel, the payment of taxes which would otherwise discharge the tax lien on the unit and its share of the common elements each year will not do so.  An ensuing tax foreclosure would require payment of the taxes on the entire project in order to prevent the owner from losing title to the unit and the lender from losing its mortgage lien.  Moreover, the lender's ownership of the unit upon a foreclosure would leave the lender with the recurring problem of making payment of taxes due on the entire project in order to keep its unit.

**First**, the law of the state in which the condominium is located **must** provide for the separate taxation of all condominium units.  This is the usual case.  However, if the law does not so provide, then paragraph 5 must be deleted.

**Second**, you must determine that the local tax assessor is, in fact, assessing each unit in the condominium project as a separate tax parcel.

Insuring Paragraph No. 6 insures against loss because of both currently existing encroachments and those which may be unintentionally created in the future.  The problem of present encroachments results from the construction of the improvements after the filing of the declaration. If the structures are not built exactly in the places shown on the map, there can be an encroachment of common elements into the space provided for airspace units, and vice versa.  The conventional sort of encroachment of improvements over easements or over the property line can also result.

The future encroachment problem would result from the rebuilding of the condominium project after a fire or other casualty.  If the new structures are not built precisely where the map shows they should be, an encroachment into the airspace of one or more unit owners can result.  The units might also encroach into areas provided for common elements.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

The declaration must provide an easement for any projection of units onto common elements, or common elements into units.  This provision must be effective for both present problems and those which may arise in the future from rebuilding, expansion or alteration.

As to the ordinary kinds of encroachments noted above, you must have an adequate survey or inspection which shows no such problems exist.  If they do, you should modify the coverage of the endorsement so as to take exception to them.  One way to do this would be to raise exceptions for these matters in Schedule B, Part I of the policy and note on the endorsement that this paragraph is subject to those exceptions.

Insuring Paragraph No. 7 covers the right of first refusal which is often contained in condominium projects.  If the right is properly exercised, it may defeat the Title of a borrower who had not procured a waiver or relinquishment.  This, in turn, might extinguish the lien of the Insured Mortgage.

There must either be **no provision** in any of the condominium documents for a right of first refusal or you must require and receive a **proper waiver or relinquishment** of it before insuring the transaction.  If a waiver or relinquishment is involved, you must be sure it comes from the proper party or parties.  The waiver by the condominium association should not be relied on to accomplish a waiver by the unit owners, if the right runs in their favor.

## MODIFICATION

In the event that modification of an endorsement is requested, it is necessary to consider your state regulatory requirements for filing and approval of forms. If the endorsement is modified, the endorsement is not an ALTA form and should not reference ALTA in the title.  You must obtain the approval of the Company's underwriting adviser before complying with any request for a modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**ENDORSEMENT**

Attached to Policy No. _____

**Issued By**
**[FNTG BRAND]**

The Company insures against loss or damage sustained by the Insured by reason of:

1.   The failure of the unit identified in Schedule A and its common elements to be part of a condominium within the meaning of the condominium statutes of the jurisdiction in which the unit and its common elements are located.

2.   The failure of the documents required by the condominium statutes to comply with the requirements of the statutes to the extent that such failure affects the Title to the unit and its common elements.

3.   Present violations of any restrictive covenants that restrict the use of the unit and its common elements and that are contained in the condominium documents or the forfeiture or reversion of Title by reason of any provision contained in the restrictive covenants. As used in this paragraph 3, the words "restrictive covenants" do not refer to or include any covenant, condition, or restriction (a) relating to obligations of any type to perform maintenance, repair, or remediation on the Land, or (b) pertaining to environmental protection of any kind or nature, including hazardous or toxic matters, conditions, or substances, except to the extent that a notice of a violation or alleged violation affecting the Land has been recorded in the Public Records at Date of Policy and is not excepted in Schedule B.

4.   The priority of any lien for charges and assessments provided for in the condominium statutes and condominium documents at Date of Policy over the lien of any Insured Mortgage identified in Schedule A.

5.   The failure of the unit and its common elements to be entitled by law to be assessed for real property taxes as a separate parcel.

6.   Any obligation to remove any improvements that exist at Date of Policy because of any present encroachments or because of any future unintentional encroachment of the common elements upon any unit or of any unit upon the common elements or another unit.

7.   The failure of the Title by reason of a right of first refusal to purchase the unit and its common elements that was exercised or could have been exercised at Date of Policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]
[FNTG BRAND]

BY: _____

ALTA Endorsement Form 4-06
(Condominium) (Rev. 02/03/10)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**ENDORSEMENT**
Attached to Policy No. _____

**Issued By**
**[FNTG BRAND]**

The Company insures against loss or damage sustained by the Insured by reason of:

1.      The failure of the unit identified in Schedule A and its common elements to be part of a condominium within the meaning of the condominium statutes of the jurisdiction in which the unit and its common elements are located.

2.      The failure of the documents required by the condominium statutes to comply with the requirements of the statutes to the extent that such failure affects the Title to the unit and its common elements.

3.      Present violations of any restrictive covenants that restrict the use of the unit and its common elements and that are contained in the condominium documents or the forfeiture or reversion of Title by reason of any provision contained in the restrictive covenants.  As used in this paragraph 3, the words "restrictive covenants" do not refer to or include any covenant, condition, or restriction (a) relating to obligations of any type to perform maintenance, repair, or remediation on the Land, or (b) pertaining to environmental protection of any kind or nature, including hazardous or toxic matters, conditions, or substances, except to the extent that a notice of a violation or alleged violation affecting the Land has been recorded in the Public Records at Date of Policy and is not excepted in Schedule B.

4.      Any charges or assessments provided for in the condominium statutes and condominium documents due and unpaid at Date of Policy.

5.      The failure of the unit and its common elements to be entitled by law to be assessed for real property taxes as a separate parcel.

6.      Any obligation to remove any improvements that exist at Date of Policy because of any present encroachments or because of any future unintentional encroachment of the common elements upon any unit or of any unit upon the common elements or another unit.

7.      The failure of the Title by reason of a right of first refusal to purchase the unit and its common elements which was exercised or could have been exercised at Date of Policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]
[FNTG BRAND]

BY: _____

ALTA Endorsement Form 4.1-06
(Condominium) (Rev. 10/16/08)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL - Fidelity National Title Group, Inc.                    SECTION 5

**Return to Table of Contents**

**PLANNED UNIT DEVELOPMENT**

**ALTA ENDORSEMENT FORMS 5-06 and 5.1-06**

**PURPOSE**

These endorsements provide affirmative coverage for lenders loaning on the security of units in a Planned Unit Development, or PUD. While designed for policies on individual residences in PUDs, they can be used in any situation where a homeowners association agreement or other type of master agreement is recorded. Affirmative coverage is provided against loss caused by violation of restrictions or by the existence of certain kinds of restrictions. In addition, both cover loss from enforced removal of buildings by reason of encroachments and from failure of Title caused by the exercise of any right of first refusal. The ALTA 5-06 insures against loss from lack of priority of the mortgage lien over the lien for homeowners' association assessments. The ALTA 5.1-06 differs in that there is no insurance of priority over future assessments in Paragraph 2 of the 5.1-06; instead it only covers unpaid assessments at date of policy.  In that regard, the 5.1-06 is appropriate for use where the agreement or applicable law do not allow insurance of priority of the Insured Mortgage. The ALTA 5.1-06 is also the appropriate form for use with an Owners Policy.

**SECTION OF THE POLICY AMENDED BY ENDORSEMENT**

The provisions of these endorsements expand coverage of the policies as described below. The coverages do overlap coverages afforded in the CLTA 100 and ALTA Endorsement Series 9.

**BASIS FOR PROVIDING COVERAGE**

Insuring Clause No. 1 provides coverage against loss resulting from violation of restrictive covenants affecting the Land.  It also covers the lender against loss because covenants exist which would cause a forfeiture of the Title if violated.  **This latter coverage is effective whether or not the violation occurs.**  It is designed to cover losses by the lender if the loan cannot be sold due to the existence of such a covenant.

The coverage of this clause may be given only where one or more of the following circumstances exist:

1.        No covenant, condition or restriction appears in your title examination; **or**

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

2.      Any covenant or restriction which does appear does not contain any provision for reversion of Title or any power to terminate the Title upon violation;

**and** one or more of the following circumstances exists:

a.      None of the covenants or restrictions are enforceable under state or federal laws. **CAUTION: Extra-Hazardous Risk** is involved and you **must receive the approval of the Company's underwriting adviser** to use this as the basis of issuance **in any case other than covenants, conditions or restrictions based on race, color, religion, sex, handicap, familial status, or national origin.**

b.      The covenants and restrictions provide that the kind of mortgage lien you are insuring is protected against the effect of any violation.  NOTE:  MOST OFTEN, ONLY FIRST MORTGAGE LIENS ARE PROTECTED.

c.      The covenants or restrictions relate only to physical characteristics of the property or improvements on it and you have an adequate **current** survey or inspection which discloses there are no violations.

IF YOU FIND ANY **CONDITIONS** IN YOUR EXAMINATION OF TITLE, YOU MUST NOT ISSUE THIS ENDORSEMENT unless the condition is based upon race, color, religion, sex, handicap, familial status, or national origin, since   conditions based on these characteristics are not enforceable under state and  federal law.

Statements to the effect that the property is owned "on the condition that" certain things not occur or "as long as" a certain state of facts exist create conditions on the ownership of the Land. Though not commonly found in planned developments, they are **extremely dangerous** because of their effect on title.  If you are in doubt as to the existence of a **condition**, contact the Company's underwriting adviser.

Insuring Clause No. 2 is where the two endorsements differ.

The ALTA 5-06 provides coverage for the priority of the lien of the Insured Mortgage over the lien of assessments by a homeowner's association.  This would not be covered by the policy without an endorsement because the policy should have an exception in Schedule B for the covenants or restrictions which create the lien for these assessments.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL - Fidelity National Title Group, Inc.                              SECTION 5

This coverage may be given only if state law or the covenants and restrictions, which provide for the lien for assessments, also provide that the lien of the mortgage you are insuring is prior to the assessment lien. The usual provision is that a first mortgage lender's lien is superior to the association's lien for charges assessed after the recording of the mortgage or deed of trust. Such a provision would not protect a second or lower priority lender, and in those situations you would need to issue the 5.1-06, which merely insures there are no liens *due and unpaid* on Date of Policy. The 5.1-06 is also the appropriate form to issue with an Owner's Policy.

To issue the ALTA 5.1-06, you must determine that all charges or assessments provided for in any documents shown in Schedule B, which are due, have been paid. If there is a ground lease or recreation lease which the PUD owner or HOA association is obligated to pay, you must determine that all charges are current.

Insuring Clause No. 3 provides coverage against forced removal of improvements. This is an element of loss covered by the ALTA Loan policies which have no exceptions for survey matters in Schedule B.

This coverage should be given only when you have an adequate current survey or inspection of the Land and improvements which discloses there are no encroachments of improvements over boundary lines or easements. Since boundary walls and fences are excluded, you need not be concerned with them for purposes of issuing this endorsement. However, if you are issuing an ALTA Loan Policy without any exceptions for survey matters in Schedule B, you must be concerned with boundary walls and fences because the policy will provide coverage over them with or without this endorsement.

Insuring Clause No. 4 covers loss because of failure of Title of the borrower resulting from exercise of a right of first refusal which existed at the Date of Policy, whether such exercise was before or after that date. The consequent failure of Title to property acquired by the insured lender through foreclosure or deed-in-lieu-of-foreclosure would also be covered. The policy would not cover these matters without this endorsement because an exception should appear in Schedule B for the instrument or instruments creating this right.

You must determine that there are no provisions in any of the documents affecting the Title which create a right of first refusal to purchase the Land. This kind of provision might be included in the covenants and restrictions of the project itself. If you do find such a right, you must require a **proper waiver or relinquishment from the proper person or party** prior to issuing this

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL - Fidelity National Title Group, Inc.                    SECTION 5

endorsement.  A waiver by the homeowner's association is not likely to be sufficient as a waiver by any of the property owners if the right runs in their favor.  Similarly, an association's waiver would do no good where the right was in a governmental body, as is the case for certain low income multifamily housing developments.

## MODIFICATION

In the event that modification of an endorsement is requested, it is necessary to consider your state regulatory requirements for filing and approval of forms. If the endorsement is modified, the endorsement is not an ALTA form and should not reference ALTA in the title.  You must obtain the approval of the Company's underwriting adviser before complying with any request for a modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL - Fidelity National Title Group, Inc.                    SECTION 5

**ENDORSEMENT**

Attached to Policy No. _____

**Issued By**
**[FNTG BRAND]**

The Company insures against loss or damage sustained by the Insured by reason of:

1.      Present violations of any restrictive covenants referred to in Schedule B that restrict the use of the Land or the forfeiture or reversion of Title by reason of any provision contained in the restrictive covenants. As used in this paragraph 1, the words "restrictive covenants" do not refer to or include any covenant, condition or restriction (a) relating to obligations of any type to perform maintenance, repair or remediation on the Land, or (b) pertaining to environmental protection of any kind or nature, including  hazardous or toxic matters, conditions, or substances, except to the extent that a notice of a violation or alleged violation affecting the Land has been recorded in the Public Records at Date of Policy and is not excepted in Schedule B.

2.      The priority of any lien for charges and assessments in favor of any association of homeowners which are provided for in any document at Date of Policy referred to in Schedule B over the lien of any Insured Mortgage identified in Schedule A.

3.      The enforced removal of any existing structure on the Land (other than a boundary wall or fence) because it encroaches onto adjoining land or onto any easements.

4.      The failure of the Title by reason of a right of first refusal to purchase the Land which was exercised or could have been exercised at Date of Policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

[FNTG BRAND]

BY: _____

ALTA Endorsement Form 5-06
(Planned Unit Development) (Rev. 02/03/10)
© American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL - Fidelity National Title Group, Inc.                    SECTION 5

**ENDORSEMENT**

Attached to Policy No. _____

**Issued By**
**[FNTG BRAND]**

The Company insures against loss or damage sustained by the Insured by reason of:

1.      Present violations of any restrictive covenants referred to in Schedule B that restrict the use of the Land or the forfeiture or reversion of Title by reason of any provision contained in the restrictive covenants. As used in this paragraph 1, the words "restrictive covenants" do not refer to or include any covenant, condition, or restriction (a) relating to obligations of any type to perform maintenance, repair, or remediation on the Land, or (b) pertaining to environmental protection of any kind or nature, including hazardous or toxic matters, conditions, or substances, except to the extent that a notice of a violation or alleged violation affecting the Land has been recorded in the Public Records at Date of Policy and is not excepted in Schedule B.

2.      Any charges or assessments in favor of any association of homeowners, which are provided for in any document referred to in Schedule B, due and unpaid at Date of Policy.

3.      The enforced removal of any existing structure on the Land (other than a boundary wall or fence) because it encroaches onto adjoining land or onto any easements.

4.      The failure of the Title by reason of a right of first refusal to purchase the Land that was exercised or could have been exercised at Date of Policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

[FNTG BRAND]

BY: _____

ALTA Endorsement Form 5.1-06
(Planned Unit Development) (Rev. 10/16/08)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL - Fidelity National Title Group, Inc.                    **SECTION 6**

**Return to Table of Contents**

**VARIABLE RATE MORTGAGE**

**ALTA ENDORSEMENT - FORMS 6-06, 6.1 and 6.2-06**


**PURPOSE**


These endorsements were created to insure the validity and priority of the mortgage liens securing loans with variable interest rates. The ALTA 6-06 is the basic variable interest rate endorsement. The ALTA 6.1 is designed for use where lenders face regulatory requirements which must be followed in order to make such loans. (Note: there is no 2006 version of the ALTA Form 6.1). The ALTA 6.2-06 was created to the validity and priority of mortgage liens as security for interest at variable rates and as security for additional principal created by the negative amortization of unpaid interest.


**CAUTION:**     *THE LAW IN MANY STATES PROHIBITS OR GREATLY IMPAIRS THE ENFORCEMENT OF THE KINDS OF LOANS TO WHICH THE ALTA 6.2-06 ENDORSEMENT IS APPLICABLE.  THEREFORE, YOU SHOULD NOT ISSUE IT WITHOUT THE APPROVAL OF THE COMPANY'S UNDERWRITING ADVISER.*


**SECTION OF POLICY AMENDED BY ENDORSEMENT**


Section 3(d) of the Exclusions from Coverage of all of the ALTA Loan Policies is modified by each of these endorsements.

**BASIS FOR PROVIDING COVERAGE**


**Endorsement Form 6-06**


You are authorized to issue this endorsement only when **all** of the following requirements are met:


1.      The Insured Mortgage contains a clear statement that it secures interest at a variable rate**.**


2.      It is not sufficient for the mortgage or deed of trust to state merely that the interest secured is pursuant to the terms of the note or other security agreement.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

3.      The interest rate varies according to **a formula disclosed in the Insured Mortgage** which is **based on an index that cannot be easily manipulated by the lender** to change the rate of interest it receives.

> **Examples of indices which comply with this requirement are:**
>
>> Federal cost of funds indices,
>>
>> Treasury bill interest rates,
>>
>> The Prime rate of a substantial local, national or international bank other than the lender (if a bank); **and**
>>
>> The Prime rate of the lending bank (if a bank loan), if the bank is a large commercial bank.

4.      The documents comply with all requirements of any state statute which governs validity and priority of mortgages securing variable interest rate loans.

## Endorsement Form 6.1

The coverage of this endorsement is identical to the coverage of ALTA 6-06 except it adds an exception to coverage.  It does not cover loss resulting from the lender's failure to comply with statutes or regulations specified in the endorsement which govern the ability of the lender to make a variable interest rate mortgage.

While this endorsement has not been withdrawn by the ALTA, it is today mostly a matter of historical interest.  The relaxation of federal and state regulation on lending institutions with respect to variable interest rate mortgages has drastically reduced its utility.  Any request you receive for this endorsement should be discussed with the Company's underwriting adviser.

## Endorsement Form 6.2-06  (Variable Rate –Negative Amortization)
(See **CAUTION** at beginning of this Section 6)

*Preliminary Considerations*

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

This endorsement combines the provisions of ALTA 6-06 with provisions covering the security of negative amortization of interest.

Negative amortization is one name commonly given to a process which adds interest which is due and unpaid to the principal balance of the loan. It is also called "interest on interest". Amortization is the process which reduces the principal balance as payments are made on a loan.

Negative amortization loans are usually structured so that the principal balance increases rather than declining over time.  The most common arrangement is to allow the borrower to make its monthly payments as if the interest rate were lower than it actually is.  This produces a deficit in the interest payments which is then added to the principal.  Interest is then charged on the new principal amount, thus compounding interest.  The borrower makes lower payments in the initial years of the loan and higher payments at the end.  This may be a benefit to borrowers who are likely to have greater income in later years, such as first time home purchasers.

*Endorsement Coverage*

The coverage for the variable rate aspect of the Insured Mortgage is identical to that provided in the ALTA 6-06.

In addition, this endorsement provides the following coverage for the negative amortization aspects:

- coverage against loss if the lien of the Insured Mortgage is rendered unenforceable as a result of its negative amortization provisions

- coverage against loss if the lien of the Insured Mortgage loses its priority as security for the principal of the loan, including interest added through negative amortization because of its negative amortization provisions

This endorsement may be issued only if all of the following requirements are met:

1.      All of the requirements for issuing an ALTA 6-06 have been met.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL - Fidelity National Title Group, Inc.                    **SECTION 6**

2.      The Insured Mortgage clearly states that it secures a loan providing for negative amortization or adding unpaid interest to principal.

3.      The law of the state in which the Land lies does not prohibit the making of negative amortization loans or the compounding of interest.  This may be based on a different public policy than the one on which usury is based.

4.      The amount of interest which will be charged as a result of the negative amortization program does not appear to be unconscionably high as that determination is generally understood under state law.

If any transaction appears to you to require the payment of extreme rates or amounts of interest, you should contact the Company's underwriting adviser.

The policy is issued in a face amount which reflects the increased principal amount of the loan as a result of negative amortization, often up to 125% of the original principal amount of the mortgage, but not in excess of the amount allowed by any state insurance laws or regulations.

**MODIFICATION**

In the event that modification of an endorsement is requested, it is necessary to consider your state regulatory requirements for filing and approval of forms.  If the endorsement is modified, the endorsement is not an ALTA form and should not reference ALTA in the title.  You must obtain the approval of the Company's underwriting adviser before complying with any request for a modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL - Fidelity National Title Group, Inc.                    **SECTION 6**

**ENDORSEMENT**

Attached to Policy No. _____

**Issued By**
**[FNTG BRAND]**

The Company insures against loss or damage sustained by the Insured by reason of:

1.      The invalidity or unenforceability of the lien of the Insured Mortgage resulting from its provisions that provide for changes in the rate of interest.

2.      Loss of priority of the lien of the Insured Mortgage as security for the unpaid principal balance of the loan, together with interest as changed in accordance with the provisions of the Insured Mortgage, which loss of priority is caused by the changes in the rate of interest.

"Changes in the rate of interest", as used in this endorsement, shall mean only those changes in the rate of interest calculated pursuant to the formula provided in the documents secured by the Insured Mortgage at Date of Policy.

This endorsement does not insure against loss or damage based upon:

1.      usury, or

2.      any consumer credit protection or truth in lending law.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

[FNTG BRAND]

BY: _____

ALTA Endorsement Form 6-06
(Variable Rate) (Rev. 10/16/08)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL - Fidelity National Title Group, Inc.                    **SECTION 6**

**For use with 1992 policies or older**

## ENDORSEMENT

Attached to Policy No. _____

**Issued by**

**[FNTG BRAND]**

The Company insures the owner of the indebtedness secured by the insured mortgage against loss or damage sustained by reason of:

1.        The invalidity or unenforceability of the lien of the insured mortgage resulting from the provisions therein which provide for changes in the rate of interest.

2.        Loss of priority of the lien of the insured mortgage as security for the unpaid principal balance of the loan, together with interest as changed in accordance with the provisions of the insured mortgage, which loss of priority is caused by the changes in the rate of interest.

"Changes in the rate of interest", as used in this endorsement, shall mean only those changes in the rate of interest calculated pursuant to the formula provided in the insured mortgage at Date of Policy.

This endorsement does not insure against loss or damage by reason of the failure of the insured to comply with the following statutes or regulations concerning variable rate mortgages:

This endorsement does not insure against loss or damage based upon (a) usury, or (b) any consumer credit protection or truth in lending law.

This endorsement is issued as part of the policy.  Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy or (iv) increase the Amount of Insurance.  To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls.  Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

[FNTG BRAND]

BY:_____

ALTA Endorsement - Form 6.1
(Variable Rate Mortgage) (1/17/04)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL - Fidelity National Title Group, Inc.                                    **SECTION 6**

**ENDORSEMENT**

Attached to Policy No. _____

**Issued By**
**[FNTG BRAND]**

The Company insures against loss or damage sustained by the Insured by reason of:

1.      The invalidity or unenforceability of the lien of the Insured Mortgage resulting from its provisions that provide for (a) interest on interest, (b) changes in the rate of interest, or (c) the addition of unpaid interest to the principal balance of the loan.

2.      Loss of priority of the lien of the Insured Mortgage as security for the principal balance of the loan, including any unpaid interest which was added to principal in accordance with the provisions of the Insured Mortgage, interest on interest, or interest as changed in accordance with the provisions of the Insured Mortgage, which loss of priority is caused by (a) changes in the rate of interest, (b) interest on interest, or (c) increases in the unpaid principal balance of the loan resulting from the addition of unpaid interest.

"Changes in the rate of interest", as used in this endorsement shall mean only those changes in the rate of interest calculated pursuant to the formula provided in the loan documents secured by the Insured Mortgage at Date of Policy.

This endorsement does not insure against loss or damage based upon:

1.      usury, or

2.      any consumer credit protection or truth in lending law.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

[FNTG BRAND]

BY: _____

ALTA Endorsement Form 6.2-06
(Variable Rate, Negative Amortization) (Rev. 10/16/08)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 7**

**Return to Table of Contents**

**MANUFACTURED HOUSING**

**ALTA ENDORSEMENT – FORMS 7-06, 7.1-06 and 7.2-06**

**PURPOSE**

These endorsements clarify whether or not a manufactured housing unit ("MHU") located on the Land is covered by the insurance policy. The ALTA 7-06 adds the MHU to the definition of Land. In addition the ALTA 7.1-06 and the ALTA 7.2-06 insure against loss or damage if the MHU is not located on the subject premises, if there are UCC type liens filed against the MHU and if the MHU does not constitute real property under state law. The ALTA 7.1-06, which is the form to be used with a Loan Policy, also insures that the Insured Mortgage can be enforced in a single foreclosure action against both the MHU and the Land.

**SECTION OF POLICY AMENDED BY ENDORSEMENT**

These endorsements do not amend any section of the policy.  However, they do modify the impact on coverage of the definition of "Land" contained in Conditions No. 1(g) of the ALTA Owner's Policy and No. 1(i) of the ALTA Loan Policy.  Because of this definition, the policies normally only insure titles to or mortgage liens on a MHU if the MHU is considered a fixture under state law.  Issuance of these endorsements constitutes the Company's recognition that the MHU on the Land **is** covered by the policy, and, in the case of the ALTA 7.1-06 and the 7.2-06, against loss occasioned by the failure to meet state requirements for conversion of the MHU from personal to real property.

**BASIS FOR PROVIDING COVERAGE**

<u>**ALTA 7-06**</u> **(inclusion of MHU within the definition of Land)**

You may issue this endorsement if all of the following requirements are met:

1.        There must be no state law which would make it impossible for the MHU to become real property.

**CAUTION:**  THE COMPANY'S UNDERWRITING ADVISOR SHOULD BE CONSULTED FOR INSURABILITY IN YOUR STATE.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 7**

2.      You must determine that the owner of the underlying Land is the owner of the MHU.  This should be done by examining the **current** motor vehicle title certificate which was issued when the unit was purchased or registered in the last state of residence of the owner.

3.      You must determine that the MHU is actually located on the Land.

4.      You must determine that the unit is permanently affixed to the Land.  To be permanently affixed, the wheels and axles of the unit must have been removed.  It must also be hooked up to public utilities such as gas or electricity.

5.      You must determine whether any security interests encumbering the unit at the time it was affixed to the Land still exist.  If they do, you must require their release, or you must show them as an exception in Schedule B of any Owner's Policy and Schedule B, Part I of any ALTA Loan Policy which you issue and to which you  add the following:

> This is a matter covered under the Uniform Commercial Code or under the motor vehicle registration laws of the state of residence of the owner of the unit.

The problem of existing security interests is complex.  State law generally treats MHUs as motor vehicles, at least until they are affixed to a parcel of land.  While they are motor vehicles, liens which encumber them must be filed in the place designated for motor vehicles.  These are shown on the most current vehicle title certificates.  Even after becoming affixed, they may still retain their motor vehicle registration in some states.  Thus, examination of the vehicle title certificate may be required each time a transaction takes place after affixation to the land.  It is possible such laws may prevent the unit from ever being considered real property. Consult the Company's underwriting advisor for the status of the law in your state.

Prior to being permanently affixed, mobile homes are also personal property subject to Article 9 of the Uniform Commercial Code, which relates to security interests.  Therefore, a UCC search may have to be done both in the capitol of the state where the Land is located and, under some circumstances, in the capitol of the state where the unit was last registered.  For searching requirements, consult the Company's underwriting adviser.

6.      You must add a notation in the legal description in Schedule A identifying the mobile home unit as a part of the property insured. The unit's make and serial number should be included.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                                   **SECTION 7**

**ALTA 7.1-06 and 7.2-06** **Conversion**

You may issue this endorsement if all of the following requirements are met:

1.        There must be no state law which would make it impossible for the MHU to become real property.

**CAUTION:**  THE COMPANY'S UNDERWRITING ADVISOR SHOULD BE CONSULTED FOR INSURABILITY IN YOUR STATE**.**

2.        You must determine that the MHU has become real property under state law, *and that all procedures necessary for the conversion of the MHU from personal property to real property have been accomplished.* This could include the surrender and cancellation of the motor vehicle title.

**CAUTION:**  THE COMPANY'S UNDERWRITING ADVISOR SHOULD BE CONSULTED FOR INSURABILITY IN YOUR STATE.

3.        You must determine that the owner of the underlying Land is the owner of the MHU. This should be done by examining the **current** motor vehicle title certificate issued when the unit was purchased or registered in the last state of residence of the owner, or by verifying the chain of title since the conversion discussed at No. 2 above.

4.        You must determine that the MHU is actually located on the Land. Appraisal, survey, inspection, or affidavit are a few of the ways to accomplish this. Consult the Company's underwriting advisor for the specific requirements for your state.

5.        You must determine that the unit is permanently affixed to the Land.  To be permanently affixed, the wheels and axles of the unit must have been removed.  It must also be hooked up to public utilities such as gas or electricity.

6.        You must determine whether any security interests encumbering the unit at the time it was affixed to the Land still exist.  If they do, you must require their release, or you must show them as an exception in Schedule B of any Owner's Policy and Schedule B, Part I of any ALTA  Loan Policy which you issue, and add the following:

This is a matter covered under the Uniform Commercial Code or under the motor vehicle registration laws of the state of residence of the owner of the unit.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 7**

The problem of existing security interests is complex.  State law generally treats mobile homes as motor vehicles, at least until they are removed from the vehicle title registration scheme and/or affixed to a parcel of land.  While they are motor vehicles, liens which encumber them must be filed in the place designated for motor vehicles.  These are shown on the most current vehicle title certificates.  _Even after becoming affixed, they may still retain their motor vehicle registration in some states_.  Thus, examination of the vehicle title certificate may be required each time a transaction takes place after affixation to the Land.  _It is possible such laws may prevent the unit from ever being considered real property; consult the Company's underwriting advisor for the status of law in your state._

Prior to being permanently affixed, mobile homes are also personal property subject to Article 9 of the Uniform Commercial Code, which relates to security interests.  Therefore, a UCC search may have to be done both in the capitol of the state where the Land is located and, under some circumstances, in the capitol of the state where the unit was last registered.  For searching requirements, consult the Company's underwriting advisor.

7.      You may need to add a notation in the legal description in Schedule A identifying the MHU as a part of the property insured. The unit's make and serial number should be included. Refer to the Company's underwriting advisor for the specific requirements for your state.

8.       You must verify with the Company's underwriting adviser for your state that the Insured Mortgage will be enforceable against the MHU within any foreclosure action against the balance of the real property.

**MODIFICATION**

In the event that modification of an endorsement is requested, it is necessary to consider your state regulatory requirements for filing and approval of forms.  If the endorsement is modified, the endorsement is not an ALTA form and should not reference ALTA in the title.  You must obtain the approval of the Company's underwriting advisor before complying with any request for a modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 7**

ENDORSEMENT

Attached to Policy No. _____

**Issued By**
**[FNTG BRAND]**

The term "Land" includes the manufactured housing unit located on the land described in Schedule A at Date of Policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

[FNTG BRAND]

BY: _____

ALTA Endorsement Form 7-06
(Manufactured Housing Unit) (6/17/06)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT

Attached to Policy No. _____

**Issued By**
**[FNTG BRAND]**

1.      The term "Land" as defined in this policy includes the manufactured housing unit located on the land described in Schedule A at Date of Policy.

2.      Unless excepted in Schedule B, the Company insures against loss or damage sustained by the Insured if, at Date of Policy,

     (a)      A manufactured housing unit is not located on the land described in Schedule A.

     (b)      The manufactured housing unit located on the land is not real property under the law of the state where the Land described in Schedule A is located.

     (c)      The owner of the Land is not the owner of the manufactured housing unit.

     (d)      Any lien is attached to the manufactured housing unit as personal property, including

          (i)      a federal, state, or other governmental tax lien,

          (ii)      UCC security interest,

          (iii)      a motor vehicular lien,

          (iv)      other personal property lien.

     (e)      The lien of the Insured Mortgage is not enforceable against the Land.

     (f)      The lien of the Insured Mortgage is not enforceable in a single foreclosure procedure.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

[FNTG BRAND]

BY: _____
ALTA Endorsement Form 7.1-06
(Manufactured Housing – Conversion; Loan) (6/17/06)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT

Attached to Policy No. _____

**Issued By**
**[FNTG BRAND]**

1.      The term "Land" as defined in this policy includes the manufactured housing unit located on the land described in Schedule A at Date of Policy.

2.      Unless excepted in Schedule B, the Company insures against loss or damage, sustained by the Insured if, at Date of Policy

     (a)      A manufactured housing unit is not located on the Land described in Schedule A.

     (b)      The manufactured housing unit located on the Land is not real property under the law of the state where the Land described in Schedule A is located.

     (c)      The Insured is not the owner of the manufactured housing unit.

     (d)      Any lien is attached to the manufactured housing unit as personal property, including

          (i)      a federal, state, or other governmental tax lien,

          (ii)      UCC security interest,

          (iii)      a motor vehicular lien,

          (iv)      other personal property lien.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

[FNTG BRAND]

BY: _____

ALTA Endorsement Form 7.2-06
(Manufactured Housing – Conversion; Owners) (6/17/06)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                                    **SECTION 8**

**Return to Table of Contents**

**ENVIRONMENTAL PROTECTION LIEN**

**COMMERCIAL ENVIRONMENTAL LIEN**

**ALTA ENDORSEMENT FORMS 8.1-06 and 8.2-06**

**PURPOSE**

These endorsements provide affirmative insurance that the lien of the Insured Mortgage has priority over unrecorded or unfiled environmental protection liens.

**SECTION OF POLICY AMENDED BY ENDORSEMENT**

This endorsement reiterates the coverage afforded by Covered Risk 5 (d). In addition, the ALTA 8.1-06, for use with loan policies insuring residential mortgages, adds affirmative coverage against loss caused by priority over the Insured Mortgage of any environmental protection lien created by a state statute, if the statute is not disclosed in the endorsement or the lien is not shown as an exception in Schedule B of the policy. The ALTA 8.2-06, which was developed for commercial property, does not contain this additional coverage.

**BASIS FOR PROVIDING COVERAGE**

You may issue the ALTA 8.1-06 endorsement to any ALTA Loan Policy covering a **residential** mortgage loan (1 to 4 family)  if all of the following requirements are met:

1.      No environmental liens are recorded or filed which affect the Title to the Land which is described in the policy; or

2.      You have taken an exception in Schedule B to any environmental liens which have been recorded or filed.

3.      You must insert the citation to any state statute which creates secret or hidden environmental protection liens or environmental liens which have "super priority".  By this we mean a statute that either:

A. Does not require the filing of any notice of the lien in the county recorder's office where the land is located; or

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

B. Gives the lien a priority over all outstanding liens or encumbrances.

A space for this citation is provided at the end of paragraph (b) of the endorsement. If there are no citations for your state, indicate that by inserting the word "none" in the blank.

**You must consult the Company's underwriting adviser for instructions as to which, if any, citations are applicable.**

**CAUTION:** NOTICES OF FEDERAL ENVIRONMENTAL LIENS CREATED BY THE COMPREHENSIVE ENVIRONMENTAL RESPONSE, CLEANUP AND LIABILITY ACT (CERCLA) ARE REQUIRED TO BE <u>RECORDED</u> IN COUNTY RECORDERS' OFFICES **ONLY** IF THE STATE HAS ADOPTED THE UNIFORM FEDERAL LIEN REGISTRATION ACT OR SIMILAR STATUTE.   **OTHERWISE, CONSTRUCTIVE NOTICE OF THE LIENS EXISTS IF THE NOTICE IS <u>FILED</u> WITH THE CLERK OF THE U.S. DISTRICT COURT FOR THE DISTRICT IN WHICH THE LAND SUBJECT TO THE LIEN IS LOCATED.**

**Therefore,** if the state in which the Land lies has **not** adopted such an act, <u>you must search the records in the office of the Clerk of the U.S. District Court for such liens before issuing this endorsement.</u>

You may issue the ALTA 8.2-06 (Commercial Environmental Lien) endorsement to any ALTA Loan Policy covering a **commercial** mortgage loan (including multi-family residential), or an ALTA Owners Policy if all of the following requirements are met:

1.      You have checked BOTH the office you would normally check under state law *and* the **District Court** for the District in which the Land is located, even if your state has adopted the Uniform Federal Lien Registration Act or similar statute as discussed above.

2.      No environmental liens are recorded or filed which affect the Title to the Land which is described in the policy; or

3.      You have taken an exception in Schedule B to any environmental liens which have been recorded or filed.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

As mentioned earlier, the commercial form does not include the second coverage, and that should **not** be added without consulting your Company underwriting advisor.

## MODIFICATION

In the event that modification of an endorsement is requested, it is necessary to consider your state regulatory requirements for filing and approval of forms.  If the endorsement is modified, the endorsement is not an ALTA form and should not reference ALTA in the title.  You must obtain the approval of the Company's underwriting adviser before complying with any request for a modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 8**

ENDORSEMENT

Attached to Policy No. _____

**Issued By**
**[FNTG BRAND]**

The insurance afforded by this endorsement is only effective if the Land is used or is to be used primarily for residential purposes.

The Company insures against loss or damage sustained by the Insured by reason of lack of priority of the lien of the Insured Mortgage over

(a)     any environmental protection lien that, at Date of Policy, is recorded in those records established under state statutes at Date of Policy for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without knowledge, or is filed in the records of the clerk of the United States district court for the district in which the Land is located, except as set forth in Schedule B; or

(b)     any environmental protection lien provided by any state statute in effect at Date of Policy, except environmental protection liens provided by the following state statutes:

FILL IN

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

[FNTG BRAND]

BY: _____

ALTA Endorsement Form 8.1-06
(Environmental Protection Lien) (6/17/06)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT

Attached to Policy No. _____

**Issued By**
**[FNTG BRAND]**


The Company insures against loss or damage sustained by the Insured by reason of an environmental protection lien that, at Date of Policy, is recorded in the Public Records or filed in the records of the clerk of the United States district court for the district in which the Land is located, unless the environmental protection lien is set forth as an exception in Schedule B.


This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.


[Witness clause optional]




[FNTG BRAND]

BY: _____


ALTA Endorsement Form 8.2-06
(Commercial Environmental Lien) (10/16/08)
©American Land Title Association


© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                                    **SECTION 9**

**Return to Table of Contents**

**SERIES 9**

**ALTA ENDORSEMENTS 9-06 to 9.10-06**
**[THE ALTA 9.4-06 AND 9.5-06 HAVE BEEN WITHDRAWN EFFECTIVE 4/2/2012]**


**PURPOSE**

In General


It is common for institutional lenders to require certain additional title insurance coverages for loans secured by first mortgages on improved real property when these mortgages are to be sold on the secondary market.  The original ALTA Form 9 was designed to provide those coverages in a single, inclusive form. It afforded the lender various protections with respect to private property restrictions, building setback lines, encroachments and excepted minerals. Forms for use with owner's policies were subsequently adopted also.


In 2012 ALTA completely revised all of the endorsements in the series, withdrawing the 9.4-06 and 9.5-06 and adding 3 new forms- the 9.6-06, 9.7-06, and 9.8-06. In 2013 the 9.9-06 and the 9.10-06 were adopted. We will discuss each form and the corresponding underwriting requirements.


**SECTIONS OF POLICY AMENDED BY ENDORSEMENT**


These endorsements expand policy coverage by minimizing the risk to the Insured with respect to certain policy exclusions or exceptions.


**REMINDER:** All exceptions for documents in our standard form policies should be characterized appropriately. For example:


> *The matters contained in the document shown below which, among other things, contains or provides for: [establishment of easements] [liens for liquidated damages] [private charges or assessments]  [and] [option to purchase, a right of first refusal or the prior approval of a future purchaser or occupant] and covenants, conditions and restrictions but omitting any covenants or restrictions, if any, including, but not limited to those based upon race, color, religion, sex, sexual orientation, familial status, marital status, disability, handicap, national origin, ancestry, or source of income, as set forth in applicable state or federal laws, except to the extent that said covenant or restriction is permitted by applicable law.*

> *Entitled: ^*
> *Recording Date: ^*
> *Recording No: ^*

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

The form for showing exceptions varies from state to state, but it should always disclose any of the Private Rights (as discussed at ALTA 9.6-06 and 9.9-06  below) and other appropriate terms and provisions, and  include the mandated carve out for "omitted" provisions.

### BASIS FOR PROVIDING COVERAGE

**ALTA Form 9-06 (Restrictions, Encroachments, Minerals - Loan Policy)**
**ALTA Form 9.3-06 (Covenants, Conditions and Restrictions-Loan Policy)**
**ALTA Form 9.7-06 (Restrictions, Encroachments, Minerals-Land Under Development-Loan Policy)**
**ALTA Form 9.10-06 (Restrictions, Encroachments, Mineralt-Current Violations-Loan Policy**

Forms 9-06, 9.10-06  and 9.7-06 most closely resemble the coverages given under the old loan policy endorsement forms. The revised 9-06 is used for existing Improvements and the new 9.7-06 is used for Land under development, by expanding the coverages to Future Improvements, as defined therein. The 9.10-06 is used when violation of a Covenant could result in forfeiture or reversion, but there is no current violation. The revised 9.3-06 has no mineral or encroachment coverage found at section 4 in the other two endorsements.

The following is a discussion of the various provisions:

- 3.a. – All  give coverage for loss by reason of a violation of a Covenant that divests the lien of the Insured Mortgage or impairs the priority of the Insured Mortgage, or affects the Title of the lender after foreclosure. An example of such a loss would be as the result of forfeiture or reversion provisions in a covenant. Form 9.10-06 is used when a <u>future</u> violation could result in the forfeiture or reversion, there is <u>no current violation</u> of any such Covenants.

- 3.b.-Coverage is given over any violation of a Covenant **unless an exception in Schedule B identifies the violation.**

- 3.c. -Coverage is given for enforced removal for a building set back violation **unless an exception in Schedule B identifies the violation.**

- 3.d.-Coverage is given for notice of a violation of a Covenant that relates to environmental protection but only to the extent of the violation in the notice **unless an exception in Schedule B identifies the notice of violation.**

- 4.a.-[In Forms 9-06, 9.10-06 and 9.7-06 only] Coverage for an encroachment onto neighboring property, onto an easement, or onto our Land by a neighboring Improvement **unless an exception in Schedule B identifies any such encroachment.**

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

- 4.b.-[In Forms 9-06 and 9.10-06] Enforced removal of our Improvement if it encroaches over the boundary line (**even if such encroachment is shown on Schedule B).**

- 4.c.i. [in Form 9-06 and 9.10-06] or 4.b.i [in Form 9.7-06]-Damage to an Improvement that encroaches onto an easement resulting from the exercise of the right to maintain the easement (**even if such encroachment is shown on Schedule B).**

- 4.c.ii.[in Form 9-06and 9.10-06] or  4.b.ii. [in Form 9.7-06] Damage to an Improvement resulting from the exercise of any mineral rights excepted in the legal description or on Schedule B**.**

**UNDERWRITING GUIDELINES**

**For anything other than a policy insuring a residential 1-4 family loan an accurate current survey must be examined and reflected in the policy.**

*Coverage 3.a. may be given if any of the following situations apply:*

- There are no covenants, conditions or restrictions.

- The covenants, conditions or restrictions are not enforceable under state or federal law.

- The restrictions contain a clause protecting the lien of a mortgage made in good faith and for value against a violation.

- Rights to enforce the restrictions have been waived or are subordinated to the Insured Mortgage.

- If there is a no CURRENT violation that could result in Forfeiture or reversion, but a FUTURE violation might result in the loss of priority or enforceability of the lien of the Insured Mortgage, the 9.10-06 must be used.

*Coverage 3.b. may be given provided:*

- There are no covenants, conditions or restrictions or

-  it has been determined that either there are no violations that are enforceable, or

-  all enforceable violations that have been disclosed by inspection, survey or other means are identified and excepted in Schedule B.

*Coverage 3.c. may be given provided:*

- There are no building setback lines shown on a recorded or filed plat of subdivision or

-  it has been determined that either there are no violations that are enforceable, or

- all enforceable violations that have been disclosed by inspection, survey or other means are identified and excepted in Schedule B.

*Coverage 3.d. may be given provided:*

- Either there are no notices of violation of covenants, conditions and restrictions relating to environmental protection recorded or
- filed in the public records or the notices of violations are identified and excepted in Schedule B.

*Coverage 4.a.i.[in Form 9-06 , 9.10-06 and 9.7-06]  may be given if any of the following situations apply:*

- There are no encroachments onto adjoining land OR any such encroachments are identified in Schedule B.
- There are no easements excepted in Schedule B.
- There are no encroachments onto easements identified in Schedule B OR any such encroachments are identified in Schedule B.

*Coverage 4.a.ii.[in Form 9-06, 9.10-06 and 9.7-06] may be given if any of the following situations apply:*

- There are no encroachments onto the Land by neighbors' Improvements OR
- any such encroachments are identified in Schedule B.

*Coverage 4.b. Form 9-06 and 9.10-06 may be given if any of the following situations apply:*

- There are no encroachments of Improvements onto neighboring land.
- There is an encroachment identified in Schedule B and with respect to the encroachment, the Company's underwriting advisor has determined that it would be unlikely that there would be any attempted enforced removal or is satisfied that a state court would not deny the right to maintain the existing improvements because of adverse possession or other protections.

**[See also Section 28 for encroachment coverage]**

*Coverage 4.c.i [in Form 9-06 and 9.10-06] or Coverage 3.b.i.[in Form 9.7-06] may be given if any of the following situations apply:*

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

- There are no encroachments of an Improvement onto an easement
- The encroachment does not interfere with the right to maintain the easement for the purpose for which it was granted.

[See also Section 28 for encroachment coverage]

*Coverage 4.c.ii [in Form 9-06] or Coverage 3.b.ii [in Form 9.7-06] may be given if any of the following situations apply:*

- There is no separation of minerals from the surface estate by deed, lease or otherwise.
- There is a separate mineral estate but it does not include any rights of surface entry.
- Mineral rights, with rights of surface entry either expressed or implied, have been severed from the surface estate.  However, the land and surrounding area is entirely improved with residential development.  Under these circumstances, submit the request for coverage to the Company's underwriting advisor who will consider the risk based upon such things as the size of the parcel, use, (proposed or current), local zoning, ownership of minerals and the possibility of waiver of mineral rights.

**[See also - Section 35 for mineral rights coverage]**

**ALTA Form 9.1–06 (Covenants, Conditions and Restrictions-Unimproved Land–Owner's Policy)**
**ALTA Form 9.2–06 (Covenants, Conditions and Restrictions-Improved Land-Owner's Policy)**
**ALTA Form 9.8–06 (Covenants, Conditions and Restrictions-Land Under Improvement–Owner's**
    **Policy** *[technically corrected by ALTA 12-3-12]*

**An accurate current survey must be examined and reflected in the policy**

These 3 forms give various levels of coverage to an owner. They contain some but not all of the coverages in the loan policy forms. They do not contain coverage for encroachments or mineral rights. See Section 28 for encroachment coverage and Section 35 for mineral rights coverage. The following is a discussion of the various provisions:

- 3.a.-[in all Forms] Coverage is given over any violation of a Covenant **unless an exception in Schedule B identifies the violation.**

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                                      SECTION 9

- 3.b. [in Form 9.2-06 and 9.8-06 only]-Coverage is given for enforced removal for a building set back violation **unless an exception in Schedule B identifies the violation.**
- 3.c. [in Form 9.2-06 and 9.8-06, it is coverage 3.b. in Form 9.1-06]-Coverage is given for notice of a violation of a Covenant that relates to environmental protection but only to the extent of the violation in the notice **unless an exception in Schedule B identifies the notice of violation.**

*Coverage 3.a. may be given provided:*

- There are no covenants, conditions or restrictions; or
- it has been determined that either there are no violations that are enforceable, or
- all enforceable violations that have been disclosed by inspection, survey, or other means are identified and excepted by description of such matter in Schedule B.

*Coverage 3.b. [in Form 9.2-06 and 9.8-06] may be given provided:*

- There are no building setback lines shown on a recorded or filed plat of subdivision; or
- It has been determined that either there are no violations that are enforceable, or
- all enforceable violations that have been disclosed by inspection, survey or other means are identified and excepted in Schedule B.

*Coverage 3.c. [in Form 9.2-06 and 9.8-06] or 3.b. [in Form 9.1-06] may be given provided:*

- Either there are no notices of violations of covenants, conditions and restrictions relating to environmental protection recorded or filed in the public records, or
- the notices of violations are identified and excepted in Schedule B.

**ALTA Form 9.6–06 (Private Rights-Loan Policy)**
**ALTA Form 9.9-06 (Private Rights-Owners Policy)**

This form addresses the existence of Private Rights within instruments which provide for covenants, conditions or restrictions (CCRs) and are excepted on Schedule B. These Private Rights are defined as:

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

- Option to purchase
- Right of first refusal
- Right of prior approval of a future purchaser or occupant (often found in retail developments)
- Private Charge or assessment (such as home owners or other association fees or dues or private transfer fees, for example) NOTE: **The 9.9-06 for Owners Policies does not contain this coverage.**

The endorsement gives coverage over loss as a result of the enforcement of such a right as it affects the priority or enforceability of the lien of the Insured Mortgage, or affects the title of the lender after foreclosure.

*Coverage may be given provided if:*

- There are no recorded instruments that contain covenants, conditions or restrictions (CCRs) on the Land; or
- All recorded instruments which contain CCRs are examined and they contain no such Private Rights as shown above for Owners or Loan Policy usage. Do not rely upon the classification of the document in the commitment failing to identify such rights. All documents must be examined for these rights before the coverage can be given, or
- Any exception for an instrument that contains a Private Right is indicated in the blank at item 4. D. of the endorsement.
- If there are no such private rights in an instrument or there is no instrument as an exception,  the blank at item 4.d. should be filled in with the word "**NONE** "
- Also- See **REMINDER** at beginning of this Section.

## MODIFICATION

In the event that modification of an endorsement is requested, it is necessary to consider your state regulatory requirements for filing and approval of Forms.  If the endorsement is modified, the endorsement is not an ALTA Form and should not reference ALTA in the title.  You must obtain the approval of the Company's underwriting advisor before complying with any request for a modification.

**Charts:**

| ALTA Endorsement | Original Title | New Revision |
|---|---|---|
| 9-06 | REM (LP) | Restriction Encroachments Mineral (LP) |

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

| | | |
|---|---|---|
| 9.1-06 | REM (OP-Unimproved) | CCR (OP-Unimproved Land) |
| 9.2-06 | REM (OP-Improved) | CCR ((OP-Improved Land) |
| 9.3-06 | REM (LP) | CCR (LP) |
| 9.4-06 | Decertified | |
| 9.5-06 | Decertified | |
| 9.6-06 | New | Private Rights (LP) |
| 9.7-06 | New | REM (LP-Land under development) |
| 9.8-06 | New | CCR (OP-Land under Development) |
| 9.9-06 | New | Private Rights (OP) |
| 9.10-06 | New | REM-Current violations (LP) |

**Another way to classify the new forms:**

Restrictions, Encroachments, Minerals

      ALTA 9-06 Loan Policy

      ALTA 9.7-06 Loan Policy- Land Under Development

      ALTA 9.10-06 Loan Policy- Current Violations

Covenants, Conditions, Restrictions:

      ALTA 9.1-06 Owner - Unimproved

      ALTA 9.2-06 Owner - Improved

      ALTA 9.8-06 Owner - Land Under Development

      ALTA 9.3-06 Loan Policy

Private Rights

      ALTA 9.6-06 Loan Policy

      ALTA 9.9-06 Owner

[See Section 28 for Encroachment coverages and Section 35 for Mineral coverages.]

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT

Attached to Policy No. _____

**Issued By**

*[FNTG BRAND]*

1.  The insurance provided by this endorsement is subject to the exclusions in Section 5 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2.  For the purposes of this endorsement only:

    a.  "Covenant" means a covenant, condition, limitation or restriction in a document or instrument in effect at Date of Policy.

    b.  "Improvement" means an improvement, including any lawn, shrubbery, or trees, affixed to either the Land or adjoining land at Date of Policy that by law constitutes real property.

3.  The Company insures against loss or damage sustained by the Insured by reason of:

    a.  A violation of a Covenant that:

        i.   divests, subordinates, or extinguishes the lien of the Insured Mortgage,
        ii.  results in the invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage, or
        iii. causes a loss of the Insured's Title acquired in satisfaction or partial satisfaction of the Indebtedness;

    b.  A violation on the Land at Date of Policy of an enforceable Covenant, unless an exception in Schedule B of the policy identifies the violation;

    c.  Enforced removal of an Improvement located on the Land as a result of a violation, at Date of Policy, of a building setback line shown on a plat of subdivision recorded or filed in the Public Records, unless an exception in Schedule B of the policy identifies the violation; or

    d.  A notice of a violation, recorded in the Public Records at Date of Policy, of an enforceable Covenant relating to environmental protection describing any part of the Land and referring to that Covenant, but only to the extent of the violation of the Covenant referred to in that notice, unless an exception in Schedule B of the policy identifies the notice of the violation.

4.  The Company insures against loss or damage sustained by reason of:

    a.  An encroachment of:

        i.   an Improvement located on the Land, at Date of Policy, onto adjoining land or onto that portion of the Land subject to an easement; or

        ii.  an Improvement located on adjoining land onto the Land at Date of Policy,

    unless an exception in Schedule B of the policy identifies the encroachment otherwise insured against in Sections 4.a.i. or 4.a.ii.;

    b.  A final court order or judgment requiring the removal from any land adjoining the Land of an encroachment identified in Schedule B; or

    c.  Damage to an Improvement located on the Land, at Date of Policy:

        i.   that is located on or encroaches onto that portion of the Land subject to an easement excepted in Schedule B, which damage results from the exercise of the right to maintain the easement for the purpose for which it was granted or reserved; or

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

       ii.        resulting from the future exercise of a right to use the surface of the Land for the extraction or development of minerals or any other subsurface substances excepted from the description of the Land or excepted in Schedule B.

5. This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:

   a. any Covenant contained in an instrument creating a lease;

   b. any Covenant relating to obligations of any type to perform maintenance, repair, or remediation on the Land;

   c. except as provided in Section 3.d, any Covenant relating to environmental protection of any kind or nature, including hazardous or toxic matters, conditions, or substances;

   d. contamination, explosion, fire, fracturing, vibration, earthquake or subsidence; or

   e. negligence by a person or an Entity exercising a right to extract or develop minerals or other subsurface substances.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements

[Witness clause optional]

[FNTG BRAND]

BY: _____

ALTA Endorsement Form 9-06
(Restrictions, Encroachments, Minerals-Loan Policy) (Rev. 4/2/12)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**ENDORSEMENT**
**Attached to Policy No. _____**

**Issued By**
*[FNTG BRAND]*

1.      The insurance provided by this endorsement is subject to the exclusions in Section 4 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2.      For the purposes of this endorsement only, "Covenant" means a covenant, condition, limitation or restriction in a document or instrument in effect at Date of Policy.

3.      The Company insures against loss or damage sustained by the Insured by reason of:

      a.   A violation on the Land at Date of Policy of an enforceable Covenant, unless an exception in Schedule B of the policy identifies the violation; or

      b.   A notice of a violation, recorded in the Public Records at Date of Policy, of an enforceable Covenant relating to environmental protection describing any part of the Land and referring to that Covenant, but only to the extent of the violation of the Covenant referred to in that notice, unless an exception in Schedule B of the policy identifies the notice of the violation.

4.      This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:

      a.   any Covenant contained in an instrument creating a lease;

      b.   any Covenant relating to obligations of any type to perform maintenance, repair, or remediation on the Land; or

      c.   except as provided in Section 3.b, any Covenant relating to environmental protection of any kind or nature, including hazardous or toxic matters, conditions, or substances.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

[FNTG BRAND]

BY: _____

ALTA Endorsement Form 9.1-06
(Covenants, Conditions and Restrictions-Unimproved Land – Owner's Policy–) (Rev. 4/2/12)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                                    **SECTION 9**

**ENDORSEMENT**
**Attached to Policy No. _____**

**Issued By**

*[FNTG BRAND]*

1.  The insurance provided by this endorsement is subject to the exclusions in Section 4 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.
2.  For the purposes of this endorsement only,
    a.  "Covenant" means a covenant, condition, limitation or restriction in a document or instrument in effect at Date of Policy.
    b.  "Improvement" means a building, structure located on the surface of the Land, road, walkway, driveway, or curb, affixed to the Land at Date of Policy and that by law constitutes real property, but excluding any crops, landscaping, lawn, shrubbery, or trees.
3.  The Company insures against loss or damage sustained by the Insured by reason of:
    a.  A violation on the Land at Date of Policy of an enforceable Covenant, unless an exception in Schedule B of the policy identifies the violation;
    b.  Enforced removal of an Improvement as a result of a violation, at Date of Policy, of a building setback line shown on a plat of subdivision recorded or filed in the Public Records, unless an exception in Schedule B of the policy identifies the violation; or
    c.  A notice of a violation, recorded in the Public Records at Date of Policy, of an enforceable Covenant relating to environmental protection describing any part of the Land and referring to that Covenant, but only to the extent of the violation of the Covenant referred to in that notice, unless an exception in Schedule B of the policy identifies the notice of the violation.
4.  This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:
    a.  any Covenant contained in an instrument creating a lease;
    b.  any Covenant relating to obligations of any type to perform maintenance, repair, or remediation on the Land; or
    c.  except as provided in Section 3.c., any Covenant relating to environmental protection of any kind or nature, including hazardous or toxic matters, conditions, or substances.

        This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.
Witness clause optional]


 [FNTG BRAND]


BY: _____

ALTA Endorsement Form 9.2-06
(Covenants, Conditions and Restrictions – Improved Land -Owner's Policy (Rev. 4/1/12)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                                    **SECTION 9**

**ENDORSEMENT**
**Attached to Policy No. _____**
**Issued By**

**[FNTG BRAND]**

1.   The insurance provided by this endorsement is subject to the exclusions in Section 4 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2.   For the purposes of this endorsement only:

a.   "Covenant" means a covenant, condition, limitation or restriction in a document or instrument in effect at Date of Policy.

b.   "Improvement" means an improvement, including any lawn, shrubbery, or trees, affixed to the Land at Date of Policy that by law constitutes real property.

3.   The Company insures against loss or damage sustained by the Insured by reason of:

a.   A violation of a Covenant that:

i.   divests, subordinates, or extinguishes the lien of the Insured Mortgage,

ii.   results in the invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage, or

iii.   causes a loss of the Insured's Title acquired in satisfaction or partial satisfaction of the Indebtedness;

b.   A violation on the Land at Date of Policy of an enforceable Covenant, unless an exception in Schedule B of the policy identifies the violation;

c.   Enforced removal of an Improvement as a result of a violation, at Date of Policy, of a building setback line shown on a plat of subdivision recorded or filed in the Public Records, unless an exception in Schedule B of the policy identifies the violation; or

d.   A notice of a violation, recorded in the Public Records at Date of Policy, of an enforceable Covenant relating to environmental protection describing any part of the Land and referring to that Covenant, but only to the extent of the violation of the Covenant referred to in that notice, unless an exception in Schedule B of the policy identifies the notice of the violation.

4.   This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:

a.   any Covenant contained in an instrument creating a lease;

b.   any Covenant relating to obligations of any type to perform maintenance, repair, or remediation on the Land; or

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

c.   except as provided in Section 3.c, any Covenant pertaining to environmental protection of any kind or nature, including hazardous or toxic matters, conditions, or substances.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

[FNTG BRAND]

BY: _____

ALTA Endorsement Form 9.3-06
(Covenants, Conditions and Restrictions-Loan Policy) (Rev. 4/2/12)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**ENDORSEMENT**

**Attached to Policy No. _____**

**Issued by**

*[FNTG BRAND]*

1.   The insurance provided by this endorsement is subject to the exclusions in Section 4 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2.   For purposes of this endorsement only:

    a.   "Covenant" means a covenant, condition, limitation or restriction in a document or instrument in effect at Date of Policy.

    b.    "Private Right" means (i) a private charge or assessment; (ii) an option to purchase; (iii) a right of first refusal; or (iv) a right of prior approval of a future purchaser or occupant.

3.   The Company insures against loss or damage sustained by the Insured under this Loan Policy if enforcement of a Private Right in a Covenant affecting the Title at Date of Policy (a) results in the invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage, or (b) causes a loss of the Insured's Title acquired in satisfaction or partial satisfaction of the Indebtedness.

4.     This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:

    a.   any Covenant contained in an instrument creating a lease;

    b.   any Covenant relating to obligations of any type to perform maintenance, repair, or remediation on the Land;

    c.   any Covenant relating to environmental protection of any kind or nature, including hazardous or toxic matters, conditions, or substances; or

    d.   any Private Right in an instrument identified in Exception(s) _____ in Schedule B.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

[FNTG BRAND]

By: _____
          Authorized Signatory

ALTA Endorsement Form 9.6-06
(Private Rights-Loan Policy) (Rev. 4/2/13)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**ENDORSEMENT**

**Attached to Policy No. _____**

**Issued by**

*[FNTG BRAND]*

1.      The insurance provided by this endorsement is subject to the exclusions in Section 5 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2.      For purposes of this endorsement only:

   a.      "Covenant" means a covenant, condition, limitation or restriction in a document or instrument in effect at Date of Policy.

   b.      "Future Improvement" means a building, structure, road, walkway, driveway, curb, lawn, shrubbery or trees to be constructed on or affixed to the Land in the locations according to    the Plans and that by law will constitute real property.

   c.      "Improvement" means an improvement, including any lawn, shrubbery, or trees, affixed to  either the Land or adjoining land at Date of Policy that by law constitutes real property.

   d.      "Plans" means the survey, site and elevation plans or other depictions or drawings prepared by
   *(insert name of architect or engineer)*  dated _____, last revised _____, designated as *(insert name of project or project number)*  consisting of ____ sheets.

3.      The Company insures against loss or damage sustained by the Insured by reason of:

   a.      A violation of a Covenant that:

      i.      divests, subordinates, or extinguishes the lien of the Insured Mortgage,

      ii.      results in the invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage, or

      iii.      causes a loss of the Insured's Title acquired in satisfaction or partial satisfaction of the Indebtedness;

   b.      A violation of an enforceable Covenant by an Improvement on the Land at Date of Policy or by a Future Improvement, unless an exception in Schedule B of the policy identifies the violation;

   c.      Enforced removal of an Improvement located on the Land or of a Future Improvement as a result of a violation of a building setback line shown on a plat of subdivision recorded or filed in the Public Records at Date of Policy, unless an exception in Schedule B of the policy identifies the violation; or

   d.      A notice of a violation, recorded in the Public Records at Date of Policy, of an enforceable Covenant relating to environmental protection describing any part of the Land and referring to that Covenant, but only to the extent of the violation of the Covenant referred to in that notice, unless an exception in Schedule B of the policy identifies the notice of the violation.

4.      The Company insures against loss or damage sustained by reason of:

   a.      An encroachment of:

            i.      an Improvement located on the Land at Date of Policy or a Future Improvement, onto adjoining land or onto that portion of the Land subject to an easement; or

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 9**

        ii.        an Improvement located on adjoining land onto the Land at Date of Policy,

unless an exception in Schedule B of the policy identifies the encroachment otherwise insured against in Sections 4.a.i. or 4.a.ii.;

    b.        Damage to an Improvement located on the Land at Date of Policy or a Future Improvement:

        i.        that encroaches onto that portion of the Land subject to an easement excepted in Schedule B, which damage results from the exercise of the right to maintain the easement for the purpose for which it was granted or reserved; or

        ii.        resulting from the future exercise of a right to use the surface of the Land for the extraction or development of minerals or any other subsurface substances excepted from the description of the Land or excepted in Schedule B.

5.        This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:

    a.        any Covenant contained in an instrument creating a lease;

    b.        any Covenant relating to obligations of any type to perform maintenance, repair, or remediation on the Land;

    c.        except as provided in Section 3.d, any Covenant relating to environmental protection of     any kind or nature, including hazardous or toxic matters, conditions, or substance

    d.        contamination, explosion, fire, vibration, fracturing, earthquake or subsidence; or

    e.        negligence by a person or an Entity exercising a right to extract or develop minerals or other subsurface substances.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]


[FNTG BRAND]


By: _____

Authorized Signatory




ALTA Endorsement Form 9.7-06
(Restrictions, Encroachments, Minerals-Land Under Development-Loan Policy) (4/2/12)
 ©American Land Title Association



© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                                    **SECTION 9**

**ENDORSEMENT**

**Attached to Policy No. _____**

**Issued by**

*[FNTG BRAND]*

1.      The insurance provided by this endorsement is subject to the exclusions in Section 4 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2.      For purposes of this endorsement only:

  a.      "Covenant" means a covenant, condition, limitation or restriction in a document or instrument in effect at Date of Policy.

  b.      "Future Improvement" means a building, structure, road, walkway, driveway, curb to be constructed on or affixed to the Land in the locations according to the Plans and that by law will constitute real property, but excluding any crops, landscaping, lawn, shrubbery, or trees.

  c.      "Improvement" means a building, structure located on the surface of the Land, road, walkway, driveway, or curb, affixed to the Land at Date of Policy and that by law constitutes real property, but excluding any crops, landscaping, lawn, shrubbery, or trees.

  d.      "Plans" means the survey, site and elevation plans or other depictions or drawings prepared by (*insert name of architect or engineer*) dated _____, last revised _____, designated as (*insert name of project or project number*) consisting of ____ sheets.

3.   The Company insures against loss or damage sustained by the Insured by reason of:

  a.      A violation of an enforceable Covenant by an Improvement on the Land at Date of Policy or by a Future Improvement, unless an exception in Schedule B of the policy identifies the violation;

  b.      Enforced removal of an Improvement located on the Land or of a Future Improvement as a result of a violation of a building setback line shown on a plat of subdivision recorded or filed in the Public Records at Date of Policy, unless an exception in Schedule B of the   policy identifies the violation; or

  c.      A notice of a violation, recorded in the Public Records at Date of Policy, of an enforceable Covenant relating to environmental protection describing any part of the Land and referring to that Covenant, but only to the extent of the violation of the Covenant referred    to in that notice, unless an exception in Schedule B of the policy identifies the notice of the violation.

4.   This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:

  a.      any Covenant contained in an instrument creating a lease;

  b.      any Covenant relating to obligations of any type to perform maintenance, repair, or remediation on the Land; or

  c.      except as provided in Section 3.c, any Covenant relating to environmental protection of any kind or nature, including hazardous or toxic matters, conditions, or substances.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                          **SECTION 9**

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]


[FNTG BRAND]

By: _____

Authorized Signatory




ALTA Endorsement Form 9.8-06
(Covenants, Conditions and Restrictions-Land Under Development-Owners Policy) (4/2/12)
©American Land Title Association

*[includes technical correction of 12-3-12]*

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**ENDORSEMENT**

**Attached to Policy No. _____**

**Issued by**

*[FNTG BRAND]*

1.   The insurance provided by this endorsement is subject to the exclusions in Section 4 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2.   For purposes of this endorsement only:

    a.   "Covenant" means a covenant, condition, limitation or restriction in a document or instrument in effect at Date of Policy.

    b.   "Private Right" means (i) an option to purchase; (ii) a right of first refusal; or (iii) a right of prior approval of a future purchaser or occupant.

3.   The Company insures against loss or damage sustained by the Insured under this Owner's Policy if enforcement of a Private Right in a Covenant affecting the Title at Date of Policy based on a transfer of Title on or before Date of Policy causes a loss of the Insured's Title.

4.   This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from: restriction:

    a.   any Covenant  contained in an instrument creating a lease;

    b.   any Covenant relating to obligations of any type to perform maintenance, repair, or remediation on the Land;

    c.   any Covenant relating to environmental protection of any kind or nature, including hazardous or toxic matters, conditions, or substances; or

    d.   any Private Right in an instrument identified in Exception(s) _____ in Schedule B.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

[FNTG BRAND]

By: _____
        Authorized Signatory

ALTA Endorsement Form 9.9-06
(Private Rights-Owner's Policy) ( 4/2/13)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**ENDORSEMENT**

**Attached to Policy No. _____**
**Issued By**

*[FNTG BRAND]*

1. The insurance provided by this endorsement is subject to the exclusions in Section 5 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2. For the purposes of this endorsement only:

   a. "Covenant" means a covenant, condition, limitation or restriction in a document or instrument in effect at Date of Policy.

   b. "Improvement" means an improvement, including any lawn, shrubbery, or trees, affixed to either the Land or adjoining land at Date of Policy that by law constitutes real property.

3. The Company insures against loss or damage sustained by the Insured by reason of:

   a. A violation at Date of Policy of a Covenant that:

      i. divests, subordinates, or extinguishes the lien of the Insured Mortgage,

      ii. results in the invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage, or

      iii. causes a loss of the Insured's Title acquired in satisfaction or partial satisfaction of the Indebtedness;

   b. A violation on the Land at Date of Policy of an enforceable Covenant, unless an exception in Schedule B of the policy identifies the violation;

   c. Enforced removal of an Improvement located on the Land as a result of a violation, at Date of Policy, of a building setback line shown on a plat of subdivision recorded or filed in the Public Records, unless an exception in Schedule B of the policy identifies the violation; or

   d. A notice of a violation, recorded in the Public Records at Date of Policy, of an enforceable Covenant relating to environmental protection describing any part of the Land and referring to that Covenant, but only to the extent of the violation of the Covenant referred to in that notice, unless an exception in Schedule B of the policy identifies the notice of the violation.

4. The Company insures against loss or damage sustained by reason of:

   a. An encroachment of:

      i.   an Improvement located on the Land, at Date of Policy, onto adjoining land or onto that portion of the Land subject to an easement; or

      ii.  an Improvement located on adjoining land onto the Land at Date of Policy,

unless an exception in Schedule B of the policy identifies the encroachment otherwise insured against in Sections 4.a.i. or 4.a.ii.;

   b. A final court order or judgment requiring the removal from any land adjoining the Land of an encroachment identified in Schedule B; or

   c. Damage to an Improvement located on the Land, at Date of Policy:

      i.   that is located on or encroaches onto that portion of the Land subject to an easement excepted in Schedule B, which damage results from the exercise of

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

the right to maintain the easement for the purpose for which it was granted or reserved; or

ii. resulting from the future exercise of a right to use the surface of the Land  for the extraction or development of minerals or any other subsurface substances excepted from the description of the Land or excepted in Schedule B.

5.      This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:

a. any Covenant contained in an instrument creating a lease;

b. any Covenant relating to obligations of any type to perform maintenance, repair, or remediation on the Land;

c. except as provided in Section 3.d, any Covenant relating to environmental protection of any kind or nature, including hazardous or toxic matters, conditions, or substances;

d. contamination, explosion, fire, fracturing, vibration, earthquake or subsidence; or

e. negligence by a person or an Entity exercising a right to extract or develop minerals or other subsurface substances.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements

[Witness clause optional]

[FNTG BRAND]

BY: _____

ALTA Endorsement Form 9.10-06
(Restrictions, Encroachments, Minerals-Current Violations-Loan Policy) ( 4/2/13)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                              **SECTION 10**

**Return to Table of Contents**

## ASSIGNMENT OF MORTGAGE
## ALTA ENDORSEMENT - FORMS 10-06 AND 10.1-06


### PURPOSE

The ALTA 10-06 endorsement insures the effectiveness of the assignment of the Insured Mortgage and that there have been no releases or reconveyances placed of record other than as shown. The ALTA 10.1-06 provides the same coverage as the 10-06 and gives additional coverage over only certain matters occurring after the original Date of Policy and before the Date of Endorsement, which is a defined term within the endorsement, unless those matters are disclosed by filling in the blanks contained within the endorsement. These matters include:  real estate taxes or assessments; priority of intervening defects, liens or encumbrances; and federal tax liens or bankruptcy proceedings.

**Warning: These forms are not the equivalent of complete date-down endorsements. They provide coverage only for the matters discussed. Any request to add the assignment of the Insured Mortgage to Schedule A without doing a complete policy date down or by use of any other type of endorsement other than these forms must be approved by your Company underwriting advisor.**


### SECTION OF POLICY AMENDED BY ENDORSEMENT

The policy is modified by naming the assignee under the assignment as the Insured. The endorsement provides additional affirmative coverage against the ineffectiveness of the assignment and the effect of any full or partial releases or reconveyances recorded after the Date of Policy and before the Date of Endorsement. In addition, the ALTA 10.1-06 provides coverage for the matters described above. Both forms of endorsement are conditioned upon the proper delivery and endorsement of the underlying notes.

### BASIS FOR PROVIDING COVERAGE

Title must be examined **through** the "Date of Endorsement", which is a defined term in the endorsement and must cover the recording of the assignment of the Insured Mortgage. This requirement may vary from the normal procedure of dating an endorsement the day it is issued.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

The Date of Policy is **not** changed except to the extent of the liability assumed under the endorsement for matters specifically addressed in the endorsement. If you find a previous assignment to a different party, without a re-assignment back to the current Insured, you cannot issue this endorsement without approval of your Company underwriting advisor.

The name of the assignee as disclosed by the recorded assignment is to be inserted at item 1.

All modifications, releases or partial releases must be shown at Paragraph No. 2(b) of ALTA 10-06 and at Paragraph No. 2(e) of ALTA 10.1-06.

All taxes that are **due and payable** are shown at Paragraph No. 2(b) of ALTA 10.1-06.

All intervening matters that gain priority over the Insured Mortgage must be shown at Paragraph No. 2(c) of ALTA 10.1-06.

Any federal tax liens and/or notices of bankruptcy should be shown at Paragraph No. 2(d) of ALTA 10.1-06.  Please note that federal tax liens must be shown at 2(d) *even if you have determined that these liens are junior to the mortgage and therefore are not shown at 2(c*), since the existence of the notice of federal tax lien on the record does affect the title.

In addition, for this and any other type of endorsement or policy that insures a subsequent assignee of an Insured Mortgage the following requirements must be met if the Insured Mortgage is <u>more than one year old and the loan is **not known**</u> to be non-performing:

- If the Land is  one-to-four family residential property and the assignor is a non-institutional lender; OR
- If the land is commercial or multi-family (i.e., other than one to four family), regardless of the type of lender THEN

you must require an estoppel statement from the borrower acknowledging the existence of the debt and stating that the debt is still valid and free of all defenses in law and equity by use of this requirement:

> *A written sworn statement by the record owner of the land, stating that the lien of the mortgages(s) is (are) still good and valid, and in all respects, free from all defenses, both in law and in equity, should be furnished to the Company.*

For large portfolios this may be impractical for the assignor to obtain. Nonetheless we should not insure the assignment unless we have something which addresses the current status of the debt. Your Company underwriting advisor must be consulted for guidance.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

For insurance of assignments of loans **known to be non-performing**, which you might discover when you request an estoppel statement, you should raise the following exception, which addresses the possibility that the loan is so far past due as to be unenforceable and excepts the consequences of other actions of the lender that may be raised as defenses to the foreclosure.

*Consequences, if any, arising out of any inability to foreclose or delay in  foreclosing the Insured Mortgage(s) based upon the expiration of any statute of limitations, or challenges raised to the priority or enforceability of the Insured Mortgage based upon the acts or conduct of the original or subsequent lender.*

Any offer of an indemnity to cover these issues must be referred to Regional Counsel by your Company underwriting advisor.

## MODIFICATION

In the event that modification of an endorsement is requested, it is necessary to consider your state regulatory requirements for filing and approval of forms.  If the endorsement is modified, the endorsement is not an ALTA form and should not reference ALTA in the title.  You must obtain the approval of the Company's underwriting adviser before complying with any request for a modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

## ENDORSEMENT

Attached to Policy No. _____

**Issued By**
**[FNTG BRAND]**

1.        The name of the Insured at Date of Endorsement and referred to in this endorsement as the "Assignee" is amended to read:

2.        The Company insures against loss or damage sustained by the Assignee by reason of:

    a.        The failure of the following assignment to vest title to the Insured Mortgage in the Assignee:

    b.        Any modification, partial or full reconveyance, release, or discharge of the lien of the Insured Mortgage recorded on or prior to Date of Endorsement in the Public Records other than those shown in the policy or a prior endorsement, except:

This endorsement does not insure against loss or damage, and the Company will not pay costs, attorneys' fees, or expenses, by reason of any claim that arises out of of the transaction creating the  assignment by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws that is based on:

    1.  the assignment being deemed a fraudulent conveyance or fraudulent transfer; or

    2. the assignment being deemed a preferential transfer.

This endorsement shall be effective provided that, at Date of Endorsement, (1) the note or notes secured by the lien of the Insured Mortgage have been properly endorsed and delivered to the Assignee, or (2) if the note or notes are transferable records, the Assignee has "control" of the single authoritative copy of each "transferable record" as these terms are defined by applicable electronic transaction laws.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Date of Endorsement_____

[Witness clause optional]


[FNTG BRAND]


BY: _____

ALTA Endorsement Form 10-06
(Assignment) (Rev. 02/03/10)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                                    **SECTION 10**

**ENDORSEMENT**
Attached to Policy No. _____

**Issued By**
**[FNTG BRAND]**

1.       The name of the Insured at Date of Endorsement and referred to in this endorsement as the "Assignee" is amended to read:

2.       The Company insures against loss or damage sustained by the Assignee by reason of:

   a.       The failure of the following assignment to vest title to the Insured Mortgage in the Assignee:

   b.       Any liens for taxes or assessments that are due and payable on Date of Endorsement, except:

   c.       Lack of priority of the lien of the Insured Mortgage over defects, liens, or encumbrances other than those shown in the policy or a prior endorsement, except:

   d.       Notices of federal tax liens or notices of pending bankruptcy proceedings affecting the Title and recorded subsequent to Date of Policy in the Public Records and on or prior to Date of Endorsement, except:

   e.       Any modification, partial or full reconveyance, release or discharge of the lien of the Insured Mortgage recorded on or prior to Date of Endorsement in the Public Records other than those shown in the policy or a prior endorsement, except:

This endorsement does not insure against loss or damage, and the Company will not pay costs, attorneys' fees, or expenses, by reason of any claim that arises  out of the transaction creating the  assignment by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws that is based on:

   1.  the assignment being deemed a fraudulent conveyance or fraudulent transfer; or

   2. the assignment being deemed a preferential transfer.

This endorsement shall be effective provided that, at Date of Endorsement, (1) the note or notes secured by the lien of the Insured Mortgage have been properly endorsed and delivered to the Assignee, or (2) if the note or notes are transferable records, the Assignee has "control" of the single authoritative copy of each "transferable record" as these terms are defined by applicable electronic transaction laws.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Date of Endorsement _____

[Witness clause optional]

[FNTG BRAND]


BY: _____

ALTA Endorsement Form 10.1-06
(Assignment and Date Down) (Rev.02/03/10)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 11**

Return to Table of Contents

**MORTGAGE MODIFICATION**
**ALTA ENDORSEMENT - FORMS 11-06 & 11.1-06**


**PURPOSE**


These endorsements were created to insure lenders that the modification of the Insured Mortgage evidenced by the document referred to within the endorsement does not impair the validity, enforceability or priority of the Insured Mortgage as of the Date of Endorsement, which is a defined term within the endorsements. In addition, the 11.1-06 insures against loss based upon a specific matter not being subordinate to the lien of the Insured Mortgage.


**SECTION OF POLICY AMENDED BY ENDORSEMENT**


No specific sections of the policy are amended by these endorsements. However, additional affirmative coverages are added.


**BASIS FOR PROVIDING COVERAGE**


Title must be examined **through** the Date of Endorsement, which must cover the recording of the modification of the Insured Mortgage. This requirement may vary from the normal procedure of dating an endorsement the day it is issued. The Date of Policy is not changed except to the extent of the liability assumed under the endorsement for matters specifically addressed in the endorsement.


The modification agreement must be examined to determine that it does not contain anything which will impair the validity, enforceability or priority of the Insured Mortgage under state law. If anything is found in the agreement which will impair validity, enforceability or priority, then intervening matters such as liens or outstanding taxes must be shown in the space provided below Paragraph No. 2.  For example, if the law in your state provides that a modification of a mortgage that increases the principal will subject that additional principal to intervening matters, then all intervening matters disclosed by the title examination must be shown. If issuing the 11.1-06, any matter that is specifically subordinated to the Insured Mortgage by separate document or state law may be shown in the space following Paragraph No. 3.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

These endorsements do not extend the Date of Policy so as to bring forward coverages contained in any other endorsements that are a part of the policy. To the extent that the examination covering the recording of the modification agreement discloses any matter which affects the coverages afforded by other endorsements, they should be reflected on the office file for consideration by future examiners.

These endorsements contain a "creditors' rights" exception relating to the modification agreement.

This was included to cover those situations where "creditor's rights" coverage may have been given in the underlying policy based on the terms of the original mortgage or deed of trust and the structure of the original transaction. The modification could change those terms or structure.  Any request for coverage over or deletion of this provision of the endorsement must be referred to the Company's underwriting adviser.

## MODIFICATION

In the event that modification of an endorsement is requested, it is necessary to consider your state regulatory requirements for filing and approval of forms.  If the endorsement is modified, the endorsement is not an ALTA form and should not reference ALTA in the title.  You must obtain the approval of the Company's underwriting adviser before complying with any request for a modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT

Attached to Policy No. _____

**Issued By**
**[FNTG BRAND]**

The Company insures against loss or damage sustained by the Insured by reason of:

1.      The invalidity or unenforceability of the lien of the Insured Mortgage upon the Title at Date of Endorsement as a result of the agreement dated ___ recorded ____ ("Modification"); and

2.      The lack of priority of the lien of the Insured Mortgage, at Date of Endorsement, over defects in or liens or encumbrances on the Title, except for those shown in the policy or any prior endorsement and except:      ADD EXCEPTIONS HERE


This endorsement does not insure against loss or damage, and the Company will not pay costs, attorneys' fees, or expenses, by reason of any claim that arises out of the transaction creating the Modification by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws that is based on:

1.      the Modification being deemed a fraudulent conveyance or fraudulent transfer; or

2.      the Modification being deemed a preferential transfer except where the preferential transfer results from the failure

        a.      to timely record the instrument of transfer; or

        b.      of such recordation to impart notice to a purchaser for value or to a judgment or lien creditor.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Date of Endorsement _____

[Witness clause optional]


[FNTG BRAND]

BY: _____

ALTA Endorsement Form 11-06
(Mortgage Modification) (6/17/06)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT
Attached to Policy No. _____

**Issued By**
**[FNTG BRAND]**

The Company insures against loss or damage sustained by the Insured by reason of:

1.      The invalidity or unenforceability of the lien of the Insured Mortgage upon the Title at Date of Endorsement as a result of the agreement dated ____ , recorded ____, ("Modification"); and

2.      The lack of priority of the lien of the Insured Mortgage, at Date of Endorsement, over defects in or liens or encumbrances on the Title, except for those shown in the policy or any prior endorsement and except:      ADD EXCEPTIONS HERE

3.      The following matters not being subordinate to the lien of the Insured Mortgage: ADD SUBORDINATE MATTERS HERE

        This endorsement does not insure against loss or damage, and the Company will not pay costs, attorneys' fees, or expenses, by reason of any claim that arises out of the transaction creating the Modification by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws that is based on:

1.      the Modification being deemed a fraudulent conveyance or fraudulent transfer; or

2.      the Modification being deemed a preferential transfer except where the preferential transfer results from the failure

        a.      to timely record the instrument of transfer; or

        b.      of such recordation to impart notice to a purchaser for value or to a judgment or lien creditor.

        This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Date of Endorsment _____

[Witness clause optional]

[FNTG BRAND]

BY: _____

ALTA Endorsement Form 11.1-06
(Mortgage Modification with Subordination) (10/22/09)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**Return to Table of Contents**

**AGGREGATION**

**ALTA ENDORSEMENT - FORM 12-06**

**PURPOSE**

These endorsements are also known as "tie-in" endorsements.    Mortgages covering many parcels in different recording districts or jurisdictions may each be recorded for the full amount of the secured indebtedness, or the allocated collateral value of each site, or a combination of full and allocated values.    The allocated amount is often used in states which impose a mortgage tax.    In any case, the lender views the transaction as one debt and wants insurance coverage for the total amount of the secured indebtedness.    Instead of combining all of the parcels into one large loan policy, the aggregation endorsement allows an insurer to issue a number of policies for lesser amounts but to tie the policies together so that the Insured can aggregate the coverage and take advantage of any increases in the value of a particular parcel should there be a loss. Form 12-06 can be used for aggregating policies on sites all located in a single state or sites located in multiple states none of which have state statutory limitations on the amount which can be insured.  Form 12.1-06 is intended to be used for aggregating policies in multiple states one or more of which have state statutory limitations on the amount which can be insured.

**SECTIONS OF POLICY AMENDED BY ENDORSEMENT**

This endorsement changes the provisions of Conditions 8(a)(i) of the  ALTA Loan Policy so that the Amount of Insurance available to cover a loss is the aggregate of the Amount of Insurance available under the policy to which this endorsement is attached plus the Amounts of Insurance available under the other policies identified in this endorsement.  Effective April 2, 2013 Form 12-06 was modified by adding new paragraphs which change the provisions of Sections 7(a)(i), 8(a), 8(b), 10 of the Conditions of the ALTA Loan Policy.  New Form 12.1-06 also contains the new paragraphs.  These new paragraphs clarify the effect of the endorsement on the options of the Company under the policy in the event of a claim and the extent of the Company's liability.

**BASIS FOR PROVIDING COVERAGE**

If a Loan Policy is issued insuring more than one parcel, the liability for a Title defect affecting any one of the parcels is not limited by an apportioned amount of insurance allocated to that parcel. Therefore, the coverage can be shifted among the parcels from those which are not affected by a

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

defect causing a loss to a parcel affected by such a defect.   If the affected property has increased in value since the policy was issued, this shift of coverage provides protection up to the parcel's increased value without the face amount of the policy being increased.  This is basically the theory behind this coverage.

If one policy could be issued covering multiple parcels, an aggregation endorsement would not be necessary.   Since a single policy covering all parcels is often not feasible because policy forms, rates and other regulatory issues vary between states, or such a policy could result in a highly complex policy when attempting to cover multiple parcels, with all of their individual exceptions, even within the same state, the ALTA 12-06 was designed to reach the same results as a single policy insuring multiple parcels.

Example:  There is a mortgage securing a debt of $10 million.  The $10 million mortgage is recorded against a parcel in Illinois and a parcel in California. The Illinois and California policies are each to be issued for $5 million, based on the lender's evaluation. The tie-in endorsement would allow the lender to make a claim of up to $10 million against either parcel, if the parcel against which the claim is made had increased in value to that extent. In no event would the total liability under both policies be more than $10 million.

You may be asked to issue an alternative format in which both the Illinois and California policies would be issued for a face amount of $10 million but each would include an endorsement limiting our total liability to $10 million under both policies notwithstanding the fact that the sum of the two policies is $20 million. **This format is not acceptable**. We should never issue a policy with an Amount of Insurance that exceeds the amount for which premium was collected for the insured parcel.   In addition, this format could cause the Company to over-reserve based on the Amount of Insurance reported for each policy, and perhaps to pay additional premium tax that would not otherwise be due.

ALTA Form 12.1-06 was designed for multistate transactions involving one or more states with statutory limitations which are less than the aggregate amount of insurance under all the policies to be issued in the transaction.  This form allows the full amount of available coverage to be provided for sites in state in which the statutory limit is not a problem, while at the same time limiting coverage in states in which the statutory limit prevents the full amount of coverage from being provided.  This form may **not** be used without the approval of the Reinsurance Department in transactions in which the aggregate amount of insurance will exceed the self-imposed limit of the Fidelity family, or if a party to the transaction is requiring reinsurance from an outside company.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

Example:  The policies in a multistate transaction will aggregate $100 million.  The sites to be insured are located in states X, Y, and Z.  In state X the policy aggregate is $70 million, and there is no statutory limit; in state Y the policy aggregate is $20 million, and the state statutory limit is also $20 million; and in state Z the policy aggregate is $10 million and so is the statutory limit.  When Form 12.1-06 is completed, the Aggregate Amount of Insurance which will be shown in section 3.a. will be $100 million.  This will also be the amount of coverage available for the sites in state X since there is no statutory limit in that state.  In section 3.b. of the form state Y will be listed with an Aggregate Amount of Insurance of $20 million, as will state Z with an Aggregate Amount of Insurance of $10 million.  The net effect is to provide the full amount of coverage available under the policies to the sites in state X, while limiting coverage for the sites in states Y and Z to the applicable statutory limits.

The following conditions apply to the aggregation endorsements:

1.     All of the loan policies to which either of the endorsements will be attached must be of the same type.

2.     The loan amount must be secured by mortgages on two or more parcels.

3.     The Insured Mortgage must state that each secures the entire Indebtedness or the sum of the amounts secured by all of the Insured Mortgages must equal the entire Indebtedness.

4.     The Amount of Insurance shown on Schedule A of  any policy must be equal to the amount the Insured allocates to the property described in Schedule A and not to the total aggregate amount shown on the tie-in endorsement.

5.     Policies of other companies, including our sister companies, **cannot** be tied in with policies issued by any one particular company.

6.     If Form 12.1-06 is requested for a transaction in which the aggregate amount of insurance will exceed the self-imposed limit of the Fidelity family, or if a party to the transaction is requiring reinsurance from an outside the Fidelity family for any transaction, you must contact the Reinsurance Department before committing to issue the form.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                          **SECTION 12**

This endorsement is not available in all states.   You must verify it is available before agreeing to issue it.

## MODIFICATION

In the event that modification of an endorsement is requested, it is necessary to consider your state regulatory requirements for filing and approval of forms.  If the endorsement is modified, the endorsement is not an ALTA form and should not reference ALTA in the title.  You must obtain the approval of the Company's underwriting advisor before complying with any request for a modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                              **SECTION 12**

ENDORSEMENT

Attached to Policy No.   _____

**Issued By**

***[FNTG BRAND]***

1.  The following policies are issued in conjunction with one another:

    <u>POLICY NUMBER</u>:         <u>STATE</u>:         <u>AMOUNT OF INSURANCE</u>:

    _____  $ _____

    _____  $ _____

    _____  $ _____

2.  The amount of insurance available to cover the Company's liability for loss or damage under this policy at the time of payment of loss shall be the Aggregate Amount of Insurance defined in Section 3 of this endorsement.

3.  Subject to the limits in Section 4 of this endorsement, the Aggregate Amount of Insurance under these policies is $ _____.

4.  Section 7(a)(i) of the Conditions of this policy is amended to read:

    **7.  OPTIONS TO PAY OR OTHERWISE SETTLE CLAIMS; TERMINATION OF LIABILITY**

    In case of a claim under this policy, the Company shall have the following additional options:

    (a) to pay or tender payment of the lesser of the value of  the Title as insured or the Aggregate Amount of Insurance applicable under this policy at the date the claim was made by the Insured Claimant, or to purchase the Indebtedness.

    (i)  to pay or tender payment of the lesser of the value of the Title as insured at the date the claim was made by the Insured Claimant, or the Aggregate Amount of Insurance applicable under this policy together with any cost, attorneys' fees, and costs and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of payment or tender of payment and that the Company is obligated to pay; or

5.  Section 8(a) and 8(b) of the Conditions of this policy are amended to read:

    **8. DETERMINATION AND EXTENT OF LIABILITY**

    This policy is a contract of indemnity against actual monetary loss or damage sustained or incurred by the Insured Claimant who has suffered loss or damage by reason of matters insured against by this policy.

    (a) The extent of liability of the Company for loss or damage under this policy shall not exceed the least of

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

     (i)  the Aggregate Amount of Insurance,

     (ii)  the Indebtedness,

     (iii)  the difference between the value of the Title as insured and the value of the Title subject to the risk insured against by this policy, or

     (iv) if a government agency or instrumentality is the Insured Claimant, the amount it paid in the acquisition of the Title or the Insured Mortgage in satisfaction of its insurance contract or guaranty.

(b)  If the Company pursues its rights under Section 5 of these Conditions and is unsuccessful in establishing the Title or the lien of the Insured Mortgage, as insured, the Insured Claimant shall have the right to have the loss or damage determined either as of the date the claim was made by the Insured Claimant or as the date it is settled and paid.

6.   Section 10  of the Conditions of this policy is amended to read:

**10.  REDUCTION OF INSURANCE; REDUCTION OR TERMINATION OF LIABILITY**

(a)  All payments under this policy, except payments made for costs, attorneys' fees, and expenses, shall reduce the Aggregate Amount of Insurance by the amount of the payment.

(b) However, any payments made prior to the acquisition of Title as provided in Section 2 of these Conditions shall not reduce the Aggregate Amount of Insurance afforded under this endorsement except to the extent that the payments reduce the Indebtedness.

(c) The voluntary satisfaction or release of the Insured Mortgage shall terminate all liability of the Company under this policy, except as provided in Section 2 of these Conditions, but it will not reduce the Aggregate Amount of Insurance for the other policies identified in Section 1 of this endorsement.


      This endorsement is issued as part of the policy.   Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance.   To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls.   Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.


[Witness clause optional]


[FNTG BRAND]

BY: _____

ALTA Endorsement Form 12-06
(Aggregation-Loan) (rev. 4/2/13)
© American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**ENDORSEMENT**

**Attached to Policy No. _____**

**Issued By**

***[FNTG BRAND]***

1. The following policies are issued in conjunction with one another:

| POLICY NUMBER: | STATE: | AMOUNT OF INSURANCE: |
|---|---|---|
| | | $ |
| | | $ |
| | | $ |

2. The amount of insurance available to cover the Company's liability for loss or damage under this policy at the time of payment of loss shall be the Aggregate Amount of Insurance defined in Section 3 of this endorsement.

3. The Aggregate Amount of Insurance under this policy is either:

   a. $ _____; or

   b. If the Land is located in one of the states identified in this subsection, then the Aggregate Amount of Insurance is restricted to the amount shown below:

| STATE | AGGREGATE AMOUNT OF INSURANCE |
|---|---|
| | $ |
| | $ |

4. Section 7(a)(i) of the Conditions of this policy is amended to read:

   **7.  OPTIONS TO PAY OR OTHERWISE SETTLE CLAIMS; TERMINATION OF LIABILITY**

   In case of a claim under this policy, the Company shall have the following additional options:

   (a)      to pay or tender payment of the lesser of the value of  the Title as insured or the Aggregate Amount of Insurance applicable under this policy at the date the claim was made by the Insured Claimant, or to purchase the Indebtedness.

   (i) To pay or tender payment of the lesser of the value of the Title as insured at the date the claim was made by the Insured Claimant, or the Aggregate Amount of Insurance applicable under this policy, together with any cost, attorneys' fees, and costs and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of payment or tender of payment and that the Company is obligated to pay; or

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

5.   Section 8(a) and 8(b) of the Conditions of this policy are amended to read:

### 8. DETERMINATION AND EXTENT OF LIABILITY

This policy is a contract of indemnity against actual monetary loss or damage sustained or incurred by the Insured Claimant who has suffered loss or damage by reason of matters insured against by this policy.

(a) The extent of liability of the Company for loss or damage under this policy shall not exceed the least of

(i)   the Aggregate Amount of Insurance for the State where the Land is located,

(ii)   the Indebtedness,

(iii)   the difference between the value of the Title as insured and the value of the Title subject to the risk insured against by this policy, or

(iv)   if a government agency or instrumentality is the Insured Claimant, the amount it paid in the acquisition of the Title or the Insured Mortgage in satisfaction of its insurance contract or guaranty.

(b) If the Company pursues its rights under Section 5 of these Conditions and is unsuccessful in establishing the Title or the lien of the Insured Mortgage, as insured, the Insured Claimant shall have the right to have the loss or damage determined either as of the date the claim was made by the Insured Claimant or as the date it is settled and paid.

6.   Section 10 of the Conditions of this policy is amended to read:

### 10.   REDUCTION OF INSURANCE; REDUCTION OR TERMINATION OF LIABILITY

(a) All payments under this policy, except payments made for costs, attorneys' fees, and expenses, shall reduce the applicable Aggregate Amount of Insurance by the amount of the payment.

(b) If this policy insures the Title to Land located in a state identified in Section 3 b. of this endorsement:

(i)   all payments under this policy, except payments made for costs, attorneys' fees, and expenses, shall reduce the Aggregate Amount of Insurance  by the amount of the payment; but

(ii)   a payment made for loss or damage on Land insured in one of the policies identified in Section 1 on Land located outside this state shall not reduce the Aggregate Amount of Insurance in Section 3.b. of this endorsement until the Aggregate Amount of Insurance in Section 3.a. is reduced below the  Aggregate Amount of Insurance in Section 3.b .

(c) However, any payments made prior to the acquisition of Title as provided in Section 2 of these Conditions shall not reduce the Aggregate Amount of Insurance afforded under this endorsement except to the extent that the payments reduce the Indebtedness.

(d) The voluntary satisfaction or release of the Insured Mortgage shall terminate all liability of the Company under this policy, except as

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

provided in Section 2 of these Conditions, but it will not reduce the Aggregate Amount of Insurance for the other policies identified in Section 1 of this endorsement.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

[FNTG BRAND]

By: _____
          Authorized Signatory

ALTA Endorsement Form 12.1-06
(Aggregation- State Limits-Loan) (4/2/13)
© American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 13**

Return to Table of Contents

## LEASEHOLD-OWNER'S AND LEASEHOLD-LOAN
## ALTA ENDORSEMENT – FORMS 13-06 AND 13.1-06

### PURPOSE

The ALTA Endorsement Forms 13-06 and 13.1-06 were created to be attached to the ALTA Owner's Policy and ALTA Loan Policy respectively.   They were revised April 2, 2012. They are intended to be used either with policies covering only Leasehold Estates or for those that insure both Leasehold Estates and the ownership of improvements located on them.

### SECTIONS OF POLICY AMENDED BY ENDORSEMENT

The previous ALTA Leasehold Owner's and Leasehold Loan Policies were designed to provide insurance for space tenants that had no significant investment in Tenant Improvements.  As a result, these policies did not provide compensation for the loss of Tenant Improvements or for the value of the loss of use of the leasehold for legitimate purposes as the result of a matter covered by the policies.

The ALTA 13-06 and 13.1-06 provide all of the coverages previously provided by the former leasehold policy forms but in addition include the value of improvements in the calculation of losses resulting from eviction based on a matter insured by the current policy forms.  Similarly, improvement value is included if the Insured is unable to use the property for its intended purpose as a result of a matter covered by the policy, assuming the lease permits such a use.

Reimbursement to the Insured for specified out-of-pocket construction costs for improvements on the land that were not substantially completed at the time of eviction is also provided.  Similar coverage is provided to insured leasehold lenders for improvements they construct after they acquire the property by foreclosure or conveyance in lieu thereof.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

Finally, both endorsements also increase to 100 miles the distance for which the Company will pay the costs of relocating personal property.

The April 2, 2012 revision consists of:

- A revision of the definition of "Personal Property" to make it consistent with the use of the term in other endorsements such as the ALTA 36-06 (Energy Project – Leasehold/Easement –Owners) and the ALTA 36.2-06 (Energy Project –Leasehold-Owners).

- A revision of the definition of "Tenant Leasehold Improvements" to relate only to the extent the Insured has rights in such Improvements.

- A revision of the "Valuation of Estate or Interest Insured" to clarify that it covers the entire Title, or any portion of it, from which the Insured suffers eviction. In addition, it clarifies that the loss must come from a defect insured against by the policy.

- "Additional items of loss" is clarified to make coverage applicable to the portion of Land from which the Insured is Evicted, if it is not the entire Land, and references the Condition in the policy that determines the measure of loss (Owners Policy, Section 8(a)(ii) and Loan Policy, Section 8(a)(iii)).

- Adds the cost of restoring the property to the extent it is damaged because of Eviction.

- Adds a limitation that the coverage does not include loss resulting from environmental damage or contamination, to conform to policy provisions.

**BASIS FOR PROVIDING COVERAGE**

The ALTA Leasehold Owner's and Leasehold Loan Policies were withdrawn as official ALTA Forms.  The ALTA 13-06 and 13.1-06 were meant to replace the old policy forms.  Since these

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

endorsements give more coverage than the old policies, it is not expected that there will be any requests for the old forms, which now must be titled "formerly ALTA" to indicate that they have been withdrawn by ALTA.

These endorsements will be issued when the customer is seeking the additional coverages provided therein. The searching and examining procedures for insuring leaseholds remain the same, as does the modification of Schedule A. The estate or interest in the Land is not a Fee, but rather the Leasehold Estate created by and between the parties, with a reference to the underlying lease information. The entire lease must be examined, and many states require any short form lease or memorandum of the lease to <u>contain the signatures of both parties</u> to give effective constructive notice on the record of the tenants' rights and interests (if the full lease is not recorded).

Consult your Company underwriting advisor for instructions on how to correctly modify the fee policies for use with these endorsements.

## MODIFICATION

In the event that modification of an endorsement is requested, it is necessary to consider your state regulatory requirements for filing and approval of forms. If the endorsement is modified, the endorsement is not an ALTA form and should not reference ALTA in the title. You must obtain the approval of the Company's underwriting advisor before complying with any request for a modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    SECTION 13

ENDORSEMENT
Attached to Policy No. _____

**Issued By**
**[FNTG BRAND]**

1.  As used in this endorsement, the following terms shall mean:

    a.  "Evicted" or "Eviction": (a) the lawful deprivation, in whole or in part, of the right of
        possession insured by this policy, contrary to the terms of the Lease or (b) the lawful
        prevention of the use of the Land or the Tenant Leasehold Improvements for the
        purposes permitted by the Lease, in either case as a result of a matter covered by this
        policy.
    b.   "Lease": the lease described in Schedule A.
    c.  "Leasehold Estate": the right of possession granted in the Lease for the Lease Term.
    d.  "Lease Term": the duration of the Leasehold Estate, as set forth in the Lease, including
        any renewal or extended term if a valid option to renew or extend is contained in the
        Lease.
    e.  "Personal Property":  property, in which and to the extent the Insured has rights, located
        on or affixed to the Land on or after Date of Policy that by law does not constitute real
        property because (i) of its character and manner of attachment to the Land and (ii) the
        property can be severed from the Land without causing material damage to it or to the
        Land.
    f.  "Remaining Lease Term": the portion of the Lease Term remaining after the Insured has
        been Evicted.
    g.  "Tenant Leasehold Improvements": Those improvements, in which and to the extent the
        Insured has rights, including landscaping, required or permitted to be built on the Land by
        the Lease that have been built at the Insured's expense or in which the Insured has an
        interest greater than the right to possession during the Lease Term.

2.  Valuation of Estate or Interest Insured:

If in computing loss or damage it becomes necessary to value the Title, or any portion of it, as the
result of an Eviction of the Insured, then, as to that portion of the Land from which the Insured is
Evicted, that value shall consist of the value for the Remaining Lease Term of the Leasehold
Estate and any Tenant Leasehold Improvements existing on the date of the Eviction.  The
Insured Claimant shall have the right to have the Leasehold Estate and the Tenant Leasehold
Improvements affected by a defect insured against by the policy valued either as a whole or
separately.  In either event, this determination of value shall take into account rent no longer
required to be paid for the Remaining Lease Term.

3.  Additional items of loss covered by this endorsement:

If the Insured is Evicted, the following items of loss, if applicable to that portion of the Land from
which the Insured is Evicted shall be included, without duplication, in computing loss or damage
incurred by the Insured, but not to the extent that the same are included in the valuation of the
Title determined pursuant to Section 2 of this endorsement, any other endorsement to the policy
or Section 8(a)(ii) of the Conditions:

    a.  The reasonable cost of (i) removing and relocating any Personal Property that the
        Insured has the right to remove and relocate, situated on the Land at the time of
        Eviction,(ii) transportation of that Personal Property for the initial one hundred miles
        incurred in connection with the relocation,(iii) repairing the Personal Property damaged
        by reason of the removal and relocation, and (iv) restoring the Land to the extent
        damaged as a result of the removal and relocation of the Personal Property and required
        of the Insured solely because of the Eviction .

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

b.   Rent or damages for use and occupancy of the Land prior to the Eviction that the Insured as owner of the Leasehold Estate may be obligated to pay to any person having paramount title to that of the lessor in the Lease.

c.   The amount of rent that, by the terms of the Lease, the Insured must continue to pay to the lessor after Eviction with respect to the portion of the Leasehold Estate and Tenant Leasehold Improvements from which the Insured has been Evicted.

d.   The fair market value, at the time of the Eviction, of the estate or interest of the Insured in any lease or sublease permitted by the Lease and made by Insured as lessor of all or part of the Leasehold Estate or the Tenant Leasehold Improvements.

e.   Damages caused by the Eviction that the Insured is obligated to pay to lessees or sublessees on account of the breach of any lease or sublease permitted by the Lease and made by the Insured as lessor of all or part of the Leasehold Estate or the Tenant Leasehold Improvements.

f.   The reasonable cost to obtain land use, zoning, building and occupancy permits, architectural and engineering services and environmental testing and reviews for a leasehold reasonably equivalent to the Leasehold Estate.

g.   If Tenant Leasehold Improvements are not substantially completed at the time of Eviction, the actual cost incurred by the Insured, less the salvage value, for the Tenant Leasehold Improvements up to the time of Eviction.  Those costs include costs incurred to obtain land use, zoning, building and occupancy permits, architectural and engineering services, construction management services, environmental testing and reviews, and landscaping.

4.  This endorsement does not insure against loss, damage or costs of remediation (and the Company will not pay cost, attorneys' fees or expenses) resulting from environmental damage or contamination.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

[FNTG BRAND]

BY: _____

ALTA Endorsement Form 13-06
(Leasehold – Owners) (Rev. 4/2/12)
© American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT
Attached to Policy No. _____
**Issued By**
**[FNTG BRAND]**

1.      As used in this endorsement, the following terms shall mean:

    a.      "Evicted" or "Eviction": (a) the lawful deprivation, in whole or in part, of the right of possession insured by this policy, contrary to the terms of the Lease or (b) the lawful prevention of the use of the Land or the Tenant Leasehold Improvements for the purposes permitted by the Lease, in either case as a result of a matter covered by this policy.

    b.      "Lease": the lease described in Schedule A.

    c.      "Leasehold Estate": the right of possession granted in the Lease for the Lease Term.

    d.      "Lease Term": the duration of the Leasehold Estate, as set forth in the Lease, including any renewal or extended term if a valid option to renew or extend is contained in the Lease.

    e.      "Personal Property": property, in which and to the extent the Insured has rights, located on or affixed to the Land on or after Date of Policy that by law does not constitute real property because (i) of its character and manner of attachment to the Land and (ii) the property can be severed from the Land without causing material damage to the property or to the Land.

    f.      "Remaining Lease Term": the portion of the Lease Term remaining after the Tenant has been Evicted.

    g.      "Tenant": the tenant under the Lease and, after acquisition of all or any part of the Title in accordance with the provisions of Section 2 of the Conditions of the policy, the Insured Claimant.

    h.      "Tenant Leasehold Improvements": Those improvements, in which and to the extent the Insured has rights, including landscaping, required or permitted to be built on the Land by the Lease that have been built at the Tenant's expense or in which the Tenant has an interest greater than the right to possession during the Lease Term.

2.      Valuation of Estate or Interest Insured:

If in computing loss or damage it becomes necessary to value the Title, or any portion of it, as the result of an Eviction of the Tenant, then, as to that portion of the Land from which the Tenant is Evicted, that value shall consist of the value for the Remaining Lease Term of the Leasehold Estate and any Tenant Leasehold Improvements existing on the date of the Eviction.   The Insured Claimant shall have the right to have the Leasehold Estate and the Tenant Leasehold Improvements affected by a defect insured against by the policy valued either as a whole or separately.   In either event, this determination of value shall take into account rent no longer required to be paid for the Remaining Lease Term.

3.      Additional items of loss covered by this endorsement:

If the Insured acquires all or any part of the Title in accordance with the provisions of Section 2 of the Conditions of this policy and thereafter is Evicted, the following items of loss, if applicable to that portion of the Land from which the Insured is Evicted shall be included, without duplication, in computing loss or damage incurred by the Insured, but not to the extent that the same are included in the valuation of the Title determined pursuant to Section 2 of this endorsement, any other endorsement to the policy, or Section 8(a)(iii) of the Conditions:

    a.      The reasonable cost of (i) removing and relocating any Personal Property that the Insured has the right to remove and relocate, situated on the Land at the time

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

of Eviction,(ii) transportation of that Personal Property for the initial one hundred miles incurred in connection with the relocation,(iii) repairing the Personal Property damaged by reason of the removal and relocation, and (iv) restoring the Land to the extent damaged as a result of the removal and relocation of the Personal Property and required of the Insured solely because of the Eviction

b.    Rent or damages for use and occupancy of the Land prior to the Eviction that the Insured as owner of the Leasehold Estate may be obligated to pay to any person having paramount title to that of the lessor in the Lease.

c.    The amount of rent that, by the terms of the Lease, the Insured must continue to pay to the lessor after Eviction with respect to the portion of the Leasehold Estate and Tenant Leasehold Improvements from which the Insured has been Evicted.

d.    The fair market value, at the time of the Eviction, of the estate or interest of the Insured in any lease or sublease permitted by the Lease and made by Tenant as lessor of all or part of the Leasehold Estate or the Tenant Leasehold Improvements.

e.    Damages caused by the Eviction that the Insured is obligated to pay to lessees or sublessees on account of the breach of any lease or sublease permitted by the Lease and made by the Tenant as lessor of all or part of the Leasehold Estate or the Tenant Leasehold Improvements.

f.    The reasonable cost to obtain land use, zoning, building and occupancy permits, architectural and engineering services and environmental testing and reviews for a replacement leasehold reasonably equivalent to the Leasehold Estate.

g.    If Tenant Leasehold Improvements are not substantially completed at the time of Eviction, the actual cost incurred by the Insured, less the salvage value, for the Tenant Leasehold Improvements up to the time of Eviction.  Those costs include costs incurred to obtain land use, zoning, building and occupancy permits, architectural and engineering services, construction management services, environmental testing and reviews, and landscaping.

4.    This endorsement does not insure against loss, damages, or costs of remediation (and the Company will not pay cost, attorneys' fees or expenses) resulting from environmental damage or contamination.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

 [Witness clause optional]

[FNTG BRAND]

BY: _____

ALTA Endorsement Form 13.1-06
(Leasehold – Loan) (Rev. 4/1/12)
© American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

Return to Table of Contents

## FUTURE ADVANCES
## ALTA ENDORSEMENT – FORMS 14-06, 14.1-06, 14.2-06 and 14.3-06

### PURPOSE

These endorsements, like the Revolving Credit Endorsements discussed in Section 60, affirmatively insure the priority and enforceability of the lien of the Insured Mortgage with respect to future advances and repayments and re-advances of Indebtedness. In addition, they include coverage for the consequences of a variable rate, including possible negative amortization (or interest on interest), as discussed in Section 6. These endorsements also cover the effect on the priority and enforceability of the Insured Mortgage of the Indebtedness having been reduced to zero before being increased by subsequent advances ("zero-balance"), and state law requirements to secure these advances not having been met. Unique to the 14.3-06 (Reverse Mortgages) is additional coverage for failure of the Insured Mortgage to state a term or maximum dollar amount, and failure of the mortgagors to be at least 62 years old.

### SECTIONS OF POLICY AMENDED BY ENDORSEMENT

Each endorsement modifies Exclusions from Coverage No. 3(d) and Conditions No. 1 (d)(ii). They also expand the coverage granted by Covered Risks 9 and 10 to those amounts included within the definition of Indebtedness at Condition 1(d) by using and defining the term "Advances" to include those amounts.

### BASIS FOR PROVIDING COVERAGE

The underwriting issues discussed in Section 6 must be considered in order to issue the variable rate coverage included in all these forms. In addition, refer to Section 59 for a complete discussion of the various factors to take into consideration when analyzing which form of endorsement to use to cover revolving credit and future advances. These factors include:

**1. Preliminary Considerations**

*Security*

A mortgage or deed of trust will secure repayment of future advances of funds by the lender if it so provides.  It doesn't matter whether the loan provides for revolving credit or not. However, except in the case where the principal balance has been paid down to zero, the security instrument may not secure future advances unless the parties agree that it will.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

Under Section 549 of the Bankruptcy Code, the bankruptcy trustee of a borrower may have the power to avoid the lien of a mortgage or trust deed to the extent it secures advances made after the lender has notice of the bankruptcy.  The recording or filing of a copy of the petition, or a notice that the petition has been filed, is sufficient to give the lender that notice.  Therefore, draws against a revolving credit line and other loan advances which are funded after this point may be in jeopardy of being unsecured.

*Priority*

The priority of the mortgage or deed of trust as security for future advances depends upon the factors discussed below.  The problems arise where a lien or encumbrance is created or attaches after recording of the mortgage or trust deed but prior to a future advance.

**2. Ordinary Liens and Encumbrances**

*Notice*

To be prior, notice that the mortgage or trust deed secures future advances must be given to future holders of liens and encumbrances.  Therefore, the recorded mortgage must disclose that it secures future advances.

*Obligation to Advance*

Whether the lender is obligated to make the advance after an intervening party's lien or encumbrance attaches to the borrower's Title is important to priority in most states.  If the lender is legally obligated to make the advance ("obligatory advance"), the lien securing it is prior to the lien or encumbrance of the intervening party.  An advance is obligatory if the lender could be successfully sued for damages if it did not make it.  Therefore, any conditions on the lender's obligation to fund must not be under the lender's control.   If the lender is not obligated to fund after a lien or encumbrance attaches to the title, any advances made thereafter are optional ("optional advance"). The rule differs among the states as to whether a lien securing optional advances will have priority over an intervening lien or encumbrance:

> *Majority Rule:*  A future advance mortgage lien is prior if the lender does not have actual notice of the intervening interest at the time of the advance.

> *Minority Rule:*  A future advance mortgage lien is prior if the lender has neither actual nor constructive notice of the intervening interest at the time of the advance.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

Unless the agreement between the lender and borrower provides for a cure by the borrower, any advance made after a default by the borrower is an optional advance.  Where an obligatory advance agreement contains a cure provision, advances made after cure are again obligatory. Therefore they would be entitled to priority over encumbrances attaching after cure but before the advance.  Advances made after default and before cure would be treated as optional advances.

**3. Special Cases:   Federal Tax Liens, Mechanics' Liens and Environmental Protection Liens**

*Federal Tax Liens*

There is some argument about the priority of federal tax liens with respect to the lien for disbursements under a construction loan.  Under the worst case view, the construction loan mortgage lien has the same priority over federal tax liens as it would have over a judgment lien under state law. However, no advance made under a non-construction future advance mortgage is protected against a federal tax lien recorded after recording of the mortgage where the advance is made (1) more than 45 days after the recording of the tax lien notice or (2) after actual notice of the tax lien, whichever occurs first.  Whether the advance is optional or obligatory is immaterial.

*Mechanics' Liens*

The law of many states gives mechanics' liens priority over the lien of mortgages or trust deeds. In some states, this is limited to those mortgages or trust deeds which finance the construction out of which the liens arise.  Others treat mechanic's liens like other liens with respect to future advance mortgages if the mortgage was recorded before the visible commencement of construction. **The exception or carve out for Mechanics' Liens appears as bracketed optional material. Some states may require a separate form filing for each version of the endorsement (with or without the optional material). The version that may be available in your state will be determined by your Company underwriting advisor.**

*Environmental Protection Liens*

Currently, federal law and the laws of many states create governmental liens to secure repayment for the cost of cleaning the environment of toxic or hazardous waste.  These liens may also secure repayment for the damage done to the environment.  Under some state laws, these liens have priority over existing liens.  It is possible for them to be created without recording or filing in the local real estate records. The impact of such liens on the priority of future advances of loan proceeds is uncertain.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**Forms**

Form 14-06 is the broadest coverage and is only available where your state law provides absolute priority for the additional advances, without regard to the knowledge (even the actual knowledge) of the insured lender. All requirements of state law must be met, such as the inclusion of specific language on the face of the recorded mortgage. Paragraph No. 4 of the endorsement must include any other specific matter that primes the additional advance under your state law, such as construction or mechanics liens (which is shown as optional item f.)

Form 14.1-06 is comparable to Form C in Section 59.  The form excepts "actual knowledge", only, not constructive knowledge.  Therefore, this can only be issued in those jurisdictions where the law protects additional advances or re-advances made in the face of recorded matters of which the lender did not have *actual* knowledge, i.e., where constructive notice alone will not prime the advance. In other words, if an advance or re-advance is subordinate to intervening recorded matters, without regard to whether the lender had actual knowledge, you would not be able to issue this form of endorsement as it is written. It would be possible to issue this endorsement if an exception for such matters is included under Paragraph No. 4. For example:  "The loss of priority of any Advance made after the Insured has actual or constructive notice of the existence of liens, encumbrances or other matters affecting the Land intervening between Date of Policy and the Advance, as to the intervening lien, encumbrance or other matter."

Form 14.2-06 affords affirmative coverage for a mortgage which collateralizes the obligations of a borrower under a letter of credit.  Since those obligations will not arise until the letter is drawn on, the same kinds of factors will need to be analyzed under your state law to see what kind of priority these types of *possible* future advances might enjoy, and add to Paragraph No. 4 any additional matters that prime these types of future advances. The fact that these advances are, in a sense, conditional may mean that they do not enjoy the same priority as other types of future advances under your state law. This endorsement was revised by ALTA in 2009 and now it contains a bankruptcy carve-out, which is similar to older proprietary versions.

Form 14.3-06 deals with reverse mortgages, which are sometimes structured as a series of additional advances. It is comparable to Form C in Section 59.  The form excepts "actual knowledge", not constructive knowledge.  Therefore, like the 14.1-06, this can only be issued in those jurisdictions where the law protects additional advances or re-advances made in the face of recorded matters of which the lender did not have actual knowledge, i.e., where constructive notice alone will not prime the advance.  In addition, state law must be reviewed to determine if failure to state a length of term or maximum dollar amount in the Insured Mortgage will affect the

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

priority and enforceability of the Insured Mortgage. The endorsement was created to support the HUD approved form of reverse mortgage, and the statutory support and recognition of this type of loan product may be found in separate statutes passed after HUD began this program. Additionally, you must verify the mortgagors are at least 62 years old, which is another HUD requirement. [*technically corrected by ALTA 12-3-2012*]

## AUTHORITY FOR ISSUANCE OF THIS COVERAGE

These endorsements may not be issued without the approval of the Company's underwriting advisor.

## MODIFICATION

In the event that modification of an endorsement is requested, it is necessary to consider your state regulatory requirements for filing and approval of forms.  If the endorsement is modified, other than as discussed in this section, the endorsement is not an ALTA form and should not reference ALTA in the title.  You must obtain the approval of the Company's underwriting advisor before complying with any request for a modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**ENDORSEMEN**T

Attached to Policy No. _____

**Issued By
[FNTG BRAND]**

1.    The insurance for Advances added by Sections 2 and 3 of this endorsement is subject to the exclusions in Section 4 of this endorsement and the Exclusions from Coverage in the Policy, except Exclusion 3(d), the provisions of the Conditions, and the exceptions contained in Schedule B.

    a.    "Agreement," as used in this endorsement, shall mean the note or loan agreement, the repayment of Advances under which is secured by the Insured Mortgage.

    b.    "Advance," as used in this endorsement, shall mean only an advance of principal made after the Date of Policy as provided in the Agreement, including expenses of foreclosure, amounts advanced pursuant to the Insured Mortgage to pay taxes and insurance, assure compliance with laws, or to protect the lien of the Insured Mortgage before the time of acquisition of the Title, and reasonable amounts expended to prevent deterioration of improvements, together with interest on those advances.

    c.    "Changes in the rate of interest," as used in this endorsement, shall mean only those changes in the rate of interest calculated pursuant to a formula provided in the Insured Mortgage or the Agreement at Date of Policy.

2.    The Company insures against loss or damage sustained by the Insured by reason of:

    a.    The invalidity or unenforceability of the lien of the Insured Mortgage as security for each Advance.

    b.    The lack of priority of the lien of the Insured Mortgage as security for each Advance over any lien or encumbrance on the Title.

    c.    The invalidity or unenforceability or lack of priority of the lien of the Insured Mortgage as security for the Indebtedness, Advances and unpaid interest resulting from (i) re-Advances and repayments of Indebtedness, (ii) earlier periods of no indebtedness owing during the term of the Insured Mortgage, or (iii) the Insured Mortgage not complying with the requirements of state law of the state in which the Land is located to secure Advances.

3.    The Company also insures against loss or damage sustained by the Insured by reason of:

    a.    The invalidity or unenforceability of the lien of the Insured Mortgage resulting from any provisions of the Agreement that provide for (i) interest on interest, (ii) changes in the rate of interest, or (iii) the addition of unpaid interest to the Indebtedness.

    b.    Lack of priority of the lien of the Insured Mortgage as security for the Indebtedness, including any unpaid interest that was added to principal in accordance with any provisions of the Agreement, interest on interest, or interest as changed in accordance with the provisions of the Insured Mortgage, which lack of priority is caused by (i) changes in the rate of interest, (ii) interest on

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

interest, or (iii) increases in the Indebtedness resulting from the addition of unpaid interest.

4.      This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:

   a.      The invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as security for any Advance made after a Petition for Relief under the Bankruptcy Code (11 U.S.C.) has been filed by or on behalf of the mortgagor;

   b.      The lien of real estate taxes or assessments on the Title imposed by governmental authority arising after Date of Policy;

   c.      The lack of priority of the lien of the Insured Mortgage as security for any Advance to a federal tax lien, which Advance is made after the earlier of (i) actual knowledge of the Insured that a federal tax lien was filed against the mortgagor, or (ii) the expiration, after notice of a federal tax lien filed against the mortgagor, of any grace period for making disbursements with priority over the federal tax lien provided in the Internal Revenue Code (26 U.S.C.);

   d.      Any federal or state environmental protection lien; [or]

   e.      Usury, or any consumer credit protection or truth-in-lending law. *[; or*

   f.      *Any mechanic's or materialmen's lien.]*

5.      The Indebtedness includes Advances.

        This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.


[Witness clause optional]


*[BRACKETED MATERIAL OPTIONAL]*


[FNTG BRAND]

BY: _____


ALTA Endorsement Form 14-06
(Future Advance - Priority) (Rev. 2/3/11)
© American Land Title Association


© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    SECTION 14

## ENDORSEMENT

Attached to Policy No. _____

**Issued By**
**[FNTG BRAND]**

1.  The insurance for Advances added by Sections 2 and 3 of this endorsement is subject to the exclusions in Section 4 of this endorsement and the Exclusions from Coverage in the Policy, except Exclusion 3(d), the provisions of the Conditions, and the exceptions contained in Schedule B.

    a.  "Agreement," as used in this endorsement, shall mean the note or loan agreement, the repayment of Advances under which is secured by the Insured Mortgage.

    b.  "Advance," as used in this endorsement, shall mean only an advance of principal made after the Date of Policy as provided in the Agreement, including expenses of foreclosure, amounts advanced pursuant to the Insured Mortgage to pay taxes and insurance, assure compliance with laws, or to protect the lien of the Insured Mortgage before the time of acquisition of the Title, and reasonable amounts expended to prevent deterioration of improvements, together with interest on those advances.

    c.  "Changes in the rate of interest," as used in this endorsement, shall mean only those changes in the rate of interest calculated pursuant to a formula provided in the Insured Mortgage or the Agreement at Date of Policy.

2.  The Company insures against loss or damage sustained by the Insured by reason of:

    a.  The invalidity or unenforceability of the lien of the Insured Mortgage as security for each Advance.

    b.  The lack of priority of the lien of the Insured Mortgage as security for each Advance over any lien or encumbrance on the Title.

    c.  The invalidity or unenforceability or lack of priority of the lien of the Insured Mortgage as security for the Indebtedness, Advances and unpaid interest resulting from (i) re-Advances and repayments of Indebtedness, (ii) earlier periods of no Indebtedness owing during the term of the Insured Mortgage, or (iii) the Insured Mortgage not complying with the requirements of state law of the state in which the Land is located to secure Advances.

3.  The Company also insures against loss or damage sustained by the Insured by reason of:

    a.  The invalidity or unenforceability of the lien of the Insured Mortgage resulting from any provisions of the Agreement that provide for (i) interest on interest, (ii) changes in the rate of interest, or (iii) the addition of unpaid interest to the Indebtedness.

    b.  Lack of priority of the lien of the Insured Mortgage as security for the Indebtedness, including any unpaid interest that was added to principal in accordance with any provisions of the Agreement, interest on interest, or interest as changed in accordance with the provisions of the Insured Mortgage, which

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

lack of priority is caused by (i) changes in the rate of interest, (ii) interest on interest, or (iii) increases in the Indebtedness resulting from the addition of unpaid interest.

4.      This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) resulting from:

   a.      The invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as security for any Advance made after a Petition for Relief under the Bankruptcy Code (11 U.S.C.) has been filed by or on behalf of the mortgagor;

   b.      The lien of real estate taxes or assessments on the Title imposed by governmental authority arising after Date of Policy;

   c.      The lack of priority of the lien of the Insured Mortgage as security for any Advance to a federal tax lien, which Advance is made after the earlier of (i) actual knowledge of the Insured that a federal tax lien was filed against the mortgagor, or (ii) the expiration, after notice of a federal tax lien filed against the mortgagor, of any grace period for making disbursements with priority over the federal tax lien provided in the Internal Revenue Code (26 U.S.C.);

   d.      Any federal or state environmental protection lien;

   e.      The lack of priority of any Advance made after the Insured has Knowledge of the existence of liens, encumbrances or other matters affecting the Land intervening between Date of Policy and the Advance, as to the intervening lien, encumbrance or other matter; [or]

   f.      Usury, or any consumer credit protection or truth-in-lending law. *[; or*

   g.      *Any mechanic's or materialmen's lien.]*

5.      The Indebtedness includes Advances.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

*[BRACKETED MATERIAL OPTIONAL]*

[FNTG BRAND]

BY: _____

ALTA Endorsement Form 14.1-06
(Future Advance - Knowledge) (Rev. 2/3/11)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**ENDORSEMENT**
Attached to Policy No. _____

**Issued By**
**[FNTG BRAND]**

1.     The insurance for Advances added by Section 2 of this endorsement is subject to the exclusions in Section 3 of this endorsement and the Exclusions from Coverage in the Policy, except Exclusion 3(d), the provisions of the Conditions, and the exceptions contained in Schedule B.

     a.     "Agreement," as used in this endorsement, shall mean the letter of credit and its reimbursement agreement, the repayment of Advances under which is secured by the Insured Mortgage.

     b.     "Advance," as used in this endorsement, shall mean only an advance made after the Date of Policy as provided in the Agreement, including expenses of foreclosure, amounts advanced pursuant to the Insured Mortgage to pay taxes and insurance, assure compliance with laws, or to protect the lien of the Insured Mortgage before the time of acquisition of the Title, and reasonable amounts expended to prevent deterioration of improvements, together with interest on those advances.

2.     The Company insures against loss or damage sustained by the Insured by reason of:

     a.     The invalidity or unenforceability of the lien of the Insured Mortgage as security for each Advance.

     b.     The lack of priority of the lien of the Insured Mortgage as security for each Advance over any lien or encumbrance on the Title.

     c.     The invalidity or unenforceability or loss of priority of the lien of the Insured Mortgage as security for the Indebtedness, Advances and unpaid interest resulting from (i) re-Advances and repayments of Indebtedness, (ii) earlier periods of no indebtedness owing during the term of the Insured Mortgage, or (iii) the Insured Mortgage not complying with the requirements of state law of the state in which the Land is located to secure Advances.

3.     This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) resulting from:

     a.     The lien of real estate taxes or assessments on the Title imposed by governmental authority arising after Date of Policy; or

     b.     Any federal or state environmental protection lien; or

     c.     Limitations, if any, imposed under the Bankruptcy Code (11 U.S.C.) on the amount that may be recovered from the mortgagor's estate. *[; or*

     *d.     Any mechanic's or materialmen's lien.]*

4.     The Indebtedness includes Advances.

     This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

*[BRACKETED MATERIAL OPTIONAL]*

[FNTG BRAND]

BY: _____

ALTA Endorsement Form 14.2-06
(Future Advance – Letter of Credit) (Rev. 2/3/11)
© American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

## ENDORSEMENT

Attached to Policy No. _____

**Issued By**
**[FNTG BRAND]**

1.  The insurance for Advances added by Sections 2 and 3 of this endorsement is subject to the exclusions in Section 4 of this endorsement and the Exclusions in the Policy, except Exclusion 3(d), the provisions of the Conditions, and the exceptions contained in Schedule B.

    a.  "Agreement," as used in this endorsement, shall mean the note or loan agreement, repayment of Advances under which is secured by the Insured Mortgage.

    b.  "Advance," as used in this endorsement, shall mean only an advance of principal made after the Date of Policy as provided in the Agreement, including expenses of foreclosure, amounts advanced pursuant to the Insured Mortgage to pay taxes and insurance, assure compliance with laws, or to protect the lien of the Insured Mortgage before the time of acquisition of the Title, and reasonable amounts expended to prevent deterioration of improvements, together with interest on those advances.

    c.  "Changes in the rate of interest," as used in this endorsement, shall mean only those changes in the rate of interest calculated pursuant to a formula provided in the Insured Mortgage or the Agreement at Date of Policy.

2.  The Company insures against loss or damage sustained by the Insured by reason of:

    a.  The invalidity or unenforceability of the lien of the Insured Mortgage as security for each Advance.

    b.  The lack of priority of the lien of the Insured Mortgage as security for each Advance over any lien or encumbrance on the Title.

    c.  The invalidity or unenforceability or lack of priority of the lien of the Insured Mortgage as security for the Indebtedness, Advances and unpaid interest resulting from (i) re-Advances and repayments of Indebtedness, (ii) earlier periods of no indebtedness owing during the term of the Insured Mortgage, (iii) the Insured Mortgage not complying with the requirements of state law of the state in which the Land is located to secure Advances, (iv) failure of the Insured Mortgage to state the term for Advances, or (v) failure of the Insured Mortgage to state the maximum amount secured by the Insured Mortgage.

    d.  The invalidity or unenforceability of the lien of the Insured Mortgage because of the failure of the mortgagors to be at least 62 years of age at Date of Policy.

3.  The Company also insures against loss or damage sustained by the Insured by reason of:

    a.  The invalidity or unenforceability of the lien of the Insured Mortgage resulting from any provisions of the Agreement that provide for (i) interest on interest, (ii) changes in the rate of interest, or (iii) the addition of unpaid interest to the principal portion of the Indebtedness.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 14**

      b.      Lack of priority of the lien of the Insured Mortgage as security for the Indebtedness, including any unpaid interest that was added to principal in accordance with any provisions of the Agreement, interest on interest, or interest as changed in accordance with the provisions of the Insured Mortgage, which lack of priority is caused by (i) changes in the rate of interest, (ii) interest on interest, or (iii) increases in the Indebtedness resulting from the addition of unpaid interest.

      "Interest," as used in this Paragraph 3, shall include lawful interest based on appreciated value.

4.      This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:

      a.      The invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as security for any Advance made after a Petition for Relief under the Bankruptcy Code (11 U.S.C.) has been filed by or on behalf of the mortgagor;

      b.      The lien of real estate taxes or assessments on the Title imposed by governmental authority arising after Date of Policy;

      c.      The lack of priority of the lien of the Insured Mortgage as security for any Advance to a federal tax lien, which Advance is made after the earlier of (i) actual knowledge of the Insured that a federal tax lien was filed against the mortgagor, or (ii) the expiration, after notice of a federal tax lien filed against the mortgagor, of any grace period for making disbursements with priority over the federal tax lien provided in the Internal Revenue Code (26 U.S.C.);

      d.      Any federal or state environmental protection lien; [or]

      e.      Usury, or any consumer credit protection or truth-in-lending law. *[; or*

      f.      *Any mechanic's or materialmen's lien.]*

5.      The Indebtedness includes Advances.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

*[BRACKETED MATERIAL OPTIONAL]*

[FNTG BRAND]

BY: _____

ALTA Endorsement Form 14.3-06
(Future Advance – Reverse Mortgage) (Rev. 2/3/11)
© American Land Title Association)                                        *[includes technical corrections of 12-3-12]*

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 15**

**Return to Table of Contents**

**NON-IMPUTATION**

**ALTA ENDORSEMENT – FORMS 15-06 (FULL-EQUITY TRANSFER);**

**15.1-06 (ADDITIONAL INSURED) and 15.2-06 (PARTIAL EQUITY)**

**PURPOSE**

These ALTA forms give coverage over matters known to specified parties that would otherwise be excluded from coverage on the basis of imputed knowledge, but also over the consequences of the actions or inactions of those parties which affect the Title. Form 15-06 is to be used when the *entire beneficial interest* of the entity holding Title and named as the insured on Schedule A (e.g., partnership interest, corporate stock, membership interest of limited liability company) has been transferred for value. Form 15.1-06 is to be used when only a *portion of the beneficial interest* of the entity holding Title and named on Schedule A as the insured has been transferred and the incoming beneficial owner is identified on the form as an additional insured.  Form 15.2-06 is to be used when the incoming beneficial owner requests to be the insured in its own policy, and its interest has been transferred for value.

**SECTIONS OF POLICY AMENDED BY ENDORSEMENT**

Exclusions from Coverage 3(a) and (b) in the ALTA Owner's Policy and ALTA Loan Policy exclude from coverage matters created, suffered, assumed, or agreed to by the insured or known to the insured, but not to the Company, and not disclosed by the public records. With these endorsements, the Company agrees not to assert these Exclusions as defenses to coverage for matters that would be legally binding on a business entity under the law of imputed knowledge. The ALTA forms further clarify that the Company will not raise as a defense the failure to utilize the protection of recording acts, which is the purpose of Exclusion 3(e). These endorsements are usually requested in situations where no deed will be recorded, thereby precluding this protection.

**BASIS FOR PROVIDING COVERAGE**

These endorsements are only to be given when we have received adequate assurances in affidavit form that there are no matters known by the party or parties from whom knowledge is to be imputed to the insured entity, and we are provided a satisfactory indemnity from an appropriate indemnitor. Specimen affidavits are included at the end of this Section as Exhibits A and B and are to used only after the appropriate credit underwriting has been completed.  The affidavit must provide that the affiant has done proper due diligence to support the statements

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

made therein. When issuance of one of these endorsements is authorized, the endorsement must be completed so as to provide the coverage to the "innocent party" **only**.

**Underwriting considerations:**

*Owner's policy*

The knowledge of one party having an interest in an insured entity may be imputed by law to the entity and to other parties having an interest in the named entity. This means that if one partner knows about some off-record matter (such as the interest of a purchaser under a contract), the partnership and the other partners are held to "know" it. Since the partnership, in this example, is the Insured under the Policy, this may result in the denial of coverage as a matter known to the Insured and not known to the Company and not disclosed by the public records.

Unlike the ALTA 15-06, the coverage in the ALTA 15.1-06 and 15.2-06 is not designed to protect the Insured entity itself, but instead to protect one or more of the so-called "innocent parties" that have an interest in the named entity.

*Loan policy*

Because knowledge may be imputed to a lender through its agents, partners or other participating lenders, requests for this coverage may be made by the insured lender.  This is quite common where the lender, in addition to loaning money, participates directly or indirectly in the development entity.

Examples

*Example:*  Title is presently vested in A.  B has agreed to participate in a project with A to develop the land for an office building.  A will convey the land to a new partnership being formed between himself and B.  B is concerned that A may have knowledge or have done some act that B is unaware of that would be imputed to the new partnership.

*Example:*  In the example above, after A and B form their partnership they proceed to arrange financing for the project. A and B discover that the best deal they can structure involves lender C who will forego market interest rates in exchange for an equity participation interest for its wholly-owned subsidiary D.  Title is conveyed to a new partnership composed of the A&B partnership and D and the new partnership AB&D gets a loan from C.  D is concerned that knowledge by A

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

and B will be imputed to the A&B partnership which would then be imputed to the new partnership AB&D.

In the first example, coverage could be provided to B with regard to the knowledge of A *prior* to the conveyance to the A&B partnership.  This coverage would be provided by an owner's policy insuring A&B partnership and an ALTA 15.1-06 naming B as the additional insured.

In the second example, coverage could be provided to D with regard to the knowledge of A and B *prior* to the conveyance to AB&D partnership.  Again this coverage would be in an owner's policy insuring the partnership and an ALTA Form 15.1-06 naming the new partner as the additional insured, or an ALTA 15.2-06 attached to a policy wherein D is the named Insured for the partial ownership interest it has acquired in the partnership.

**Forms of Coverage**

For <u>ALTA Form 15-06</u>, the parties that need to be queried would be some or all of the outgoing beneficial owners. For a partnership, it would be all of the outgoing partners. For any other business entity, your underwriting advisor should be consulted as to the identity of the parties from whom we require assurances.

For <u>ALTA Form 15.1-06</u>, the parties to be questioned would be some or all of the outgoing beneficial owners. For a partnership, it would be all of the outgoing *and remaining* general partners. For any other business entity, your underwriting advisor should be consulted as to the identity of the parties from whom we require assurances.

For <u>ALTA Form 15.2-06</u>, the parties to be queried would be some or all of the outgoing beneficial owners. For a partnership, it would be all of the outgoing *and remaining general* partners. For any other business entity, your underwriting advisor should be consulted as to the identity of the parties from whom we require assurances

> **NOTE:** For Form 15.2-06 (but **not** for Form 15-06 or 15.1-06), it may be necessary to coordinate the benefits of the Owners Policy to which it is attached and any *other* Owner's Policy which the Company may have previously issued naming the entity vested with Title as the Insured on Schedule A.  This coordination may be accomplished with an exception on Schedule B of both policies that provides that the Company's liability thereunder is noncumulative. Such an exception might read as follows "It is understood that the Amount of Insurance under this policy shall be reduced by any amount the

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

Company may pay under [identify other Owner's Policy], and the amount so paid shall be deemed a payment under this policy to the Insured."  The question of the need for or the form of coordination of the policies must be referred to your underwriting advisor.

### AUTHORITY FOR ISSUANCE OF THIS COVERAGE

This endorsement may not be issued without the approval of the Company's underwriting advisor.

### MODIFICATION

In the event that modification of an endorsement is requested, it is necessary to consider your state regulatory requirements for filing and approval of forms.  If the endorsement is modified, the endorsement is not an ALTA form and should not reference ALTA in the title.  You must obtain the approval of the Company's underwriting adviser before complying with any request for a modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

# Exhibit A

[Affiant to be personally liable on indemnity, e.g., a general partner]

State of     _____)
                                                      )  ss.
County of   _____)


Affidavit and Indemnity

The undersigned, being first duly sworn, on oath, deposes and says the following:

1.     The undersigned is _____[*title or capacity*] of _____[*name of entity*]_____.

2.     To the best knowledge of the undersigned,

a.     There are presently no defects in or liens, encumbrances or other claims against the Title to the property described in the Commitment for Title Insurance No. _____, having an Effective Date of _____, issued by [*insert name of the insuring company* ] (hereinafter referred to as "the Company") other than as disclosed in exceptions Nos. _____on Schedule B - Section 2 of said commitment, other than the following: (If none, state "None"); and;

b.     There are presently no inchoate rights which may ripen into any defect, lien, encumbrance or claim against the Title to said property except as may be created by any instrument or action required in Schedule B - Section 1 of said commitment, other than the following: (If none, state "None")

3.     The undersigned makes these statements after having questioned all of the other partners and the employees and agents, if any, of [*name of entity*] who have had any substantial contact with any transaction or negotiation involving the property described in said commitment.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

4.      The undersigned hereby indemnifies the Company and agrees to hold it harmless against any loss which the Company may suffer by virtue of any valid claim made under the said endorsement based on the existence of any defect in or lien, encumbrance, right or claim against or with respect to the Title to the aforesaid property which was not disclosed above but which should have been so disclosed in order to make all statements above true and correct.

The undersigned understands such losses may include court costs and attorney's fees expended by the Company in defending the Title or interest of the insured against such lien, encumbrance, right or claim.

5.      The undersigned makes these statements and gives the aforesaid indemnity for the purpose of inducing the Company to issue the endorsement attached hereto as Exhibit A to one or more of the owner's or loan policies issued pursuant to the said Commitment for Title Insurance.

The undersigned further agrees to pay all court costs and reasonable attorney's fees which the Company may expend in enforcing the terms of this indemnity agreement.

Dated:_____

_____
        [Name of Affiant & Indemnitor]

[Standard form jurat.]

[Standard form acknowledgment, if useful.]

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

## **Exhibit B**

*[Affiant to be personally liable on indemnity, e.g,. a corporate partner]*


State of _____ )
                                                                          )  ss.
County of _____ )


Affidavit and Indemnity

The undersigned, being first duly sworn, on oath, deposes and says the following:

1.      The    undersigned    is    _____[*title    or    capacity*]    of
_____[*name of entity*].


2.      To the best knowledge of the undersigned,


a.      There are presently no defects in or liens, encumbrances or other claims against the Title
to the property described in the Commitment for Title Insurance No. _____, having an
Effective Date of _____, issued by [*insert the name of the company insuring*]
(hereinafter referred to as "the Company") other than as disclosed in exceptions Nos.
_____ on Schedule B - Section 2 of said commitment, other than the following: (If none,
state "None"); and


b.      There are presently no inchoate rights which may ripen into any defect, lien,
encumbrance or claim against the Title to said property except as may be created by any
instrument or action required in Schedule B - Section 1 of said commitment, other than
the following: (If none, state "None")


3.      The undersigned makes these statements after having questioned all of the other
officers, directors, employees, partners and agents, if any, of [name of entity] who have
had any substantial contact with any transaction or negotiation involving the property
described in said commitment.


© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

4.      The undersigned makes these statements for the purpose of inducing the Company to issue the endorsement attached hereto as Exhibit A to one or more of the owner's or loan policies issued pursuant to the said Commitment for Title Insurance.


Dated: _____


_____
              [Name of Affiant]


The following indemnity is given to the Company as a further inducement to it to issue the said endorsement, as aforesaid.


The undersigned hereby indemnifies the Company against any loss which the Company may suffer by virtue of any valid claim made under the said endorsement based on the existence of any defect in or lien, encumbrance, right or claim against or with respect to the Title to the aforesaid property which was not disclosed in the above affidavit but which should have been so disclosed in order to make all statements in the affidavit true and correct.  The undersigned understands such losses may include court costs and attorney's fees expended by the Company in defending the title or interest of the insured against such lien, encumbrance, right or claim.


The undersigned further agrees to pay all court costs and reasonable attorney's fees which the Company may expend in enforcing the terms of this indemnity agreement.


Dated: _____


[ Name of Company ]


By: _____
[Name and title of officer]

[Standard form jurat.]


[Standard form acknowledgment, if useful.]


© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 15**

ENDORSEMENT

Attached to Policy No. _____

**Issued By**
**[FNTG BRAND]**

The Company agrees that it will not assert the provisions of Exclusions from Coverage 3(a), (b), or (e) to deny liability for loss or damage otherwise insured against under the terms of the policy solely by reason of the action or inaction or Knowledge, as of Date of Policy, of _____ whether or not imputed to the Insured by operation of law, provided _____ acquired the Insured as a purchaser for value without Knowledge of the asserted defect, lien, encumbrance, adverse claim, or other matter insured against by the policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

[FNTG BRAND]

BY: _____

ALTA Endorsement Form 15-06
(Nonimputation – Full Equity Transfer) (6/17/06)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 15**

ENDORSEMENT

Attached to Policy No. _____

**Issued By
[FNTG BRAND]**

For purposes of the coverage provided by this endorsement, _____ ("Additional Insured") is added as an Insured under the policy.  By execution below, the Insured named in Schedule A acknowledges that any payment made under this endorsement shall reduce the Amount of Insurance as provided in Section 10 of the Conditions.

The Company agrees that it will not assert the provisions of Exclusions from Coverage 3(a), (b), or (e) to deny liability for loss or damage otherwise insured against under the terms of the policy solely by reason of the action or inaction or Knowledge, as of Date of Policy, of _____ whether or not imputed to the Additional Insured by operation of law, to the extent of the percentage interest in the Insured acquired by Additional Insured as a purchaser for value without Knowledge of the asserted defect, lien, encumbrance, adverse claim, or other matter insured against by the policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

AGREED AND CONSENTED TO:

_____
INSURED

[Witness clause optional]

[FNTG BRAND]

BY: _____

ALTA Endorsement Form 15.1-06
(Nonimputation – Additional Insured) (6/17/06)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 15**

ENDORSEMENT

Attached to Policy No. _____

**Issued By**
**[FNTG BRAND]**


The Company agrees that it will not assert the provisions of Exclusions from Coverage 3(a), (b), or (e) to deny liability for loss or damage otherwise insured against under the terms of the policy solely by reason of the action or inaction or Knowledge, as of Date of Policy, of _____ whether or not imputed to the entity identified in paragraph 3 of Schedule A or to the Insured by operation of law, but only to the extent that the Insured acquired the Insured's interest in entity as a purchaser for value without Knowledge of the asserted defect, lien, encumbrance, adverse claim, or other matter insured against by the policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.


[Witness clause optional]




[FNTG BRAND]

BY: _____




ALTA Endorsement Form 15.2-06
(Nonimputation – Partial Equity Transfer) (6/17/06)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    SECTION 16

**Return to Table of Contents**

**MEZZANINE FINANCING ENDORSEMENT**
**ALTA ENDORSEMENT- FORM 16-06**


**PURPOSE**

This endorsement provides insurance to a lender whose loan is secured not by a lien against the land but rather by some form of security against the beneficial interest of the business entity that owns the Land.  The security may be a pledge of and security interest in the stock in a corporation, partnership interest in a partnership, or membership interest in a limited liability company.  The endorsement is made a part of an Owner's Policy rather than a Loan Policy, because the lender's personal property security interest is not being insured so no Loan Policy is issued to the lender. The endorsement assigns the rights under the policy of the Insured owner of the Land to the defined Mezzanine Lender. The endorsement provides that the Company will not assert as a defense matters known to the Insured owner, as long as they were not known to the Mezzanine Lender (see also Non-Imputation Endorsements under Section 15). It further provides that the Company will not deny liability on the basis that ownership interests in the Insured have been transferred to or acquired by the Mezzanine Lender.


**SECTIONS OF POLICY AMENDED BY ENDORSEMENT**

Conditions paragraph 7 (b) is amended to provide that the Company can terminate its liability under the policy by paying the Mezzanine Lender rather than the Insured.  Exclusions from Coverage Nos. 3 (a), (b), (c) or (e) are amended with respect to defects, liens, encumbrances, adverse claims or other matters which were not known to the Mezzanine Lender, or failure of the Mezzanine Lender to pay value.


**BASIS FOR PROVIDING COVERAGE**

You may issue this endorsement to an ALTA Owner's Policy if all of the following requirements are met:

1.   The Insured (corporation, partnership, limited liability company or other business entity) has agreed to assign to the Mezzanine Lender the amounts payable under the policy as indicated by the Insured's  signature at the end of the Endorsement, and the terms of the endorsement are accepted by the Mezzanine Lender as  indicated by its signature on the Endorsement.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

2.   The requirements for issuance of a Non-Imputation Endorsement have been met (see Section 15). That is, we must receive adequate assurances that there are no matters known by the party or parties from whom knowledge is to be imputed. In most cases this assurance would be in the form of a sworn statement from the party together with a satisfactory indemnity.

3.   If the Insured is also insured by the Company under a different Owner's Policy, the benefits of that policy must be coordinated with the benefits of the policy to which the endorsement will be attached. This can be accomplished by adding to Schedule B of the already issued policy the following: "It is expressly understood that the amount of insurance under this policy shall be reduced by any amount the Company may pay under Owner's Policy Number [new policy], and the amount so paid shall be deemed a payment under this policy to the Insured owner."

## AUTHORITY FOR ISSUANCE OF THIS COVERAGE

This endorsement may not be issued without the approval of the Company's underwriting advisor.

## MODIFICATION

In the event that modification of an endorsement is requested, it is necessary to consider your state regulatory requirements for filing and approval of forms.  If the endorsement is modified, the endorsement is not an ALTA form and should not reference ALTA in the title.  You must obtain the approval of the Company's underwriting adviser before complying with any request for a modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**ENDORSEMENT**
Attached to Policy No. _____

**Issued By**
**[FNTG BRAND]**

1.    The Mezzanine Lender is: _____ and each successor in ownership of its loan ("Mezzanine Loan") reserving, however, all rights and defenses as to any successor that the Company would have had against the Mezzanine Lender, unless the successor acquired the Indebtedness as a purchaser for value without Knowledge of the asserted defect, lien, encumbrance, adverse claim, or other matter insured against by this policy as affecting Title.

2.    The Insured

    a.    assigns to the Mezzanine Lender the right to receive any amounts otherwise payable to the Insured under this policy, not to exceed the outstanding indebtedness under the Mezzanine Loan; and

    b.    agrees that no amendment of or endorsement to this policy can be made without the written consent of the Mezzanine Lender.

3.    The Company does not waive any defenses that it may have against the Insured, except as expressly stated in this endorsement.

4.    In the event of a loss under the policy, the Company agrees that it will not assert the provisions of Exclusions from Coverage 3(a), (b) or (e) to refuse payment to the Mezzanine Lender solely by reason of the action or inaction or Knowledge, as of Date of Policy, of the Insured, provided

    a.    the Mezzanine Lender had no actual Knowledge of the defect, lien, encumbrance or other matter creating or causing loss on Date of Policy.

    b.    this limitation on the application of Exclusions from Coverage 3(a), (b) and (e) shall

        i.    apply whether or not the Mezzanine Lender has acquired an interest (direct or indirect) in the Insured either on or after Date of Policy, and

        ii.    benefit the Mezzanine Lender only without benefiting any other individual or entity that holds an interest (direct or indirect) in the Insured or the Land.

5.    In the event of a loss under the Policy, the Company also agrees that it will not deny liability to the Mezzanine Lender on the ground that any or all of the ownership interests (direct or indirect) in the Insured have been transferred to or acquired by the Mezzanine Lender, either on or after the Date of Policy.

6.    The Mezzanine Lender acknowledges

    a.    that the amount of insurance under this policy shall be reduced by any amount the Company may pay under any policy insuring a mortgage to which exception is taken in Schedule B or to which the Insured has agreed, assumed, or taken subject, or which is hereafter executed by an Insured and which is a charge or

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

lien on the estate or interest described or referred to in Schedule A, and the amount so paid shall be deemed a payment under this policy; and

b.     that the Company shall have the right to insure mortgages or other conveyances of an interest in the Land, without the consent of the Mezzanine Lender.

7.     If the Insured, the Mezzanine Lender or others have conflicting claims to all or part of the loss payable under the Policy, the Company may interplead the amount of the loss into Court.  The Insured and the Mezzanine Lender shall be jointly and severally liable for the Company's cost for the interpleader and subsequent proceedings, including attorneys' fees.  The Company shall be entitled to payment of the sums for which the Insured and Mezzanine Lender are liable under the preceding sentence from the funds deposited into Court, and it may apply to the Court for their payment.

8.     Whenever the Company has settled a claim and paid the Mezzanine Lender pursuant to this endorsement, the Company shall be subrogated and entitled to all rights and remedies that the Mezzanine Lender may have against any person or property arising from the Mezzanine Loan. However, the Company agrees with the Mezzanine Lender that it shall only exercise these rights, or any right of the Company to indemnification, against the Insured, the Mezzanine Loan borrower, or any guarantors of the Mezzanine Loan after the Mezzanine Lender has recovered its principal, interest, and costs of collection.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.


AGREED AND CONSENTED TO:


*(Name of Insured)*                              *(Name of Mezzanine Lender)*



By: _____     By: _____

[Witness clause optional]


[FNTG BRAND]

BY: _____


ALTA Endorsement Form 16-06
(Mezzanine Financing) (6/17/06)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

Return to Table of Contents

**ACCESS**

**ALTA ENDORSEMENT - FORMS 17-06 (Access & Entry)**

**17.1-06 (Indirect Access & Entry)**

**and 17.2-06 (Utility Access)**

**PURPOSE**

These endorsements are designed to provide insurance against loss if the Land does not abut or have actual vehicular and pedestrian access to and from a specific open and publicly maintained street by way of existing curb cuts or entries. In addition, ALTA 17.1-06 provides the same coverage with respect to a specific easement insured in Schedule A which connects the Land to a specific public street. The ALTA 17.2-06 adopts a version of the generic "Utilities Facilities" endorsement which covers access to utility installations in a public street.

**SECTIONS OF POLICY AMENDED BY ENDORSEMENT**

The ALTA policies do not insure a particular means of access.  The policies do insure against loss or damage by reason of a lack of **"a right of access to and from the Land".** The policy, as written, does not address the extent of that access, nor the location or means by which that access is utilized.

The definition of "Land" contained in the policy specifically excludes property beyond the bounds of the area described in Schedule A.  Furthermore, Land is so defined as to not include any "right, title, interest, estate or easement in abutting streets".

These endorsements go quite a bit further.  They specifically address the location, use and quality of access. The ALTA 17.2-06 will be discussed separately.

**BASIS FOR PROVIDING COVERAGE (ALTA 17-06 and 17.1-06)**

These endorsements have more extensive requirements than the old "access" type endorsements, and include the need for a comprehensive survey. The examiner must verify:

1. The named street is in fact a **physically open** and **public** street;
2. The land **abuts** thereon; and

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

3. There is nothing to prohibit access from the Land either **legally or physically** (i.e., not only is there access as a matter of law, at the currently existing points of access, but there is also no physical impediment to access).

4. There are no limitations on access imposed at the local, county, state or federal levels, depending on who controls or maintains the street and how it was created.

> ***Example:*** A portion of Blackacre was condemned for an Interstate Highway. In the condemnation, the State also condemned all abutting rights of access. Because of the way the road was built, the owner of Blackacre can actually drive his car onto the highway at several points along this boundary.
>
> This is an example of a situation where there is a physical means of access, but **no legal right of access.** This endorsement could not be given in this situation.

The examiner must be very careful to determine which governmental authorities (which can include city, county, state and/or federal agencies) have jurisdiction over a particular street. The examiner must also check the surrounding land and the chain of title to determine if access was limited when the land was a part of a larger tract. If such a limitation exists, and all allowable curb cuts or points of access have been used in conjunction with other parts of the original tract, there may be no access for the land as it currently is described, even though it does abut an open and public street. A survey showing present, physically open access must be supplied to the Company. Any such request for any variation of the endorsement language or a request to issue the endorsement without a survey must be approved by the Company underwriting advisor.

In addition to compliance with items 1 through 4 above, in order to issue the ALTA 17.1-06, the examination and insurance of the easement in question must be undertaken pursuant to customary underwriting guidelines.

**CAUTION:** IF THE LAND ABUTS A PHYSICALLY OPEN <u>PRIVATE</u> STREET THIS COVERAGE MAY NOT BE GIVEN WITHOUT APPROVAL OF THE COMPANY'S UNDERWRITING ADVISOR.

### BASIS FOR PROVIDING COVERAGE for ALTA 17.2-06 (Utility Access)

What is commonly referred to as the "Utility Facility" endorsement requires us to do all of the following:

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

(1) Review the survey to ascertain that the Land adjoins the public way in which the utility lines are located with no gaps or gores in between.

(2) Determine the insurability of private easements (if any) providing services listed on the endorsement and verify they are shown on the survey and abut the property with no gaps or gores.

(3) Verify that the land is improved.

(4) Obtain an affidavit from the seller or borrower that the Land is serviced by all of the recited utilities.

Special attention should be paid to the possibility that although  other utilities are in place and service is provided by a lateral connection to installations in the public right of way,  a septic system is being utilized in lieu of connecting to a public sewer system, especially in newer industrial parks,  large commercial tracts or rural residential properties. If that is the factual situation, or any other listed utility is provided via any type of private easement that would otherwise not be insurable, you must leave the box on the endorsement which corresponds to such utility **unchecked**, thereby indicating that no access is being insured.

Even if you have not specifically insured the private easement rights in Schedule A, you must do the same search and analysis of the benefit to the Land as if you had insured them, including making sure they are still viable and have not been released or terminated either voluntarily or involuntarily through foreclosure or other process (i.e.,  tax sale, forfeiture, etc.) if you will be relying on a private easement to insure access to utilities.

## MODIFICATION

In the event that modification of an endorsement is requested, it is necessary to consider your state regulatory requirements for filing and approval of forms.  If the endorsement is modified, the endorsement is not an ALTA form and should not reference ALTA in the title.  You must obtain the approval of the Company's underwriting advisor before complying with any request for a modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                                    **SECTION 17**

ENDORSEMENT

Attached to Policy No. _____

**Issued By**
**[FNTG BRAND]**


The Company insures against loss or damage sustained by the Insured if, at Date of Policy (i) the Land does not abut and have both actual vehicular and pedestrian access to and from FILL IN (the "Street"), (ii) the Street is not physically open and publicly maintained, or (iii) the Insured has no right to use existing curb cuts or entries along that portion of the Street abutting the Land.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.


[Witness clause optional]




[FNTG BRAND]

BY: _____


ALTA Endorsement Form 17-06
(Access and Entry) (6/17/06)
©American Land Title Association


© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                                **SECTION 17**

ENDORSEMENT

Attached to Policy No. _____

**Issued By**
**[FNTG BRAND]**

The Company insures against loss or damage sustained by the Insured if, at Date of Policy (i) the easement identified as FILLIN in Schedule FILLIN (the "Easement") does not provide that portion of the Land identified as FILLIN in Schedule FILLIN both actual vehicular and pedestrian access to and from FILLIN (the "Street"), (ii) the Street is not physically open and publicly maintained, or (iii) the Insured has no right to use existing curb cuts or entries along that portion of the Street abutting the Easement.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

[FNTG BRAND]

BY: _____

ALTA Endorsement Form 17.1-06
(Indirect Access and Entry) (6/17/06)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 17**

ENDORSEMENT

Attached to Policy No. _____

**Issued By**
**[FNTG BRAND]**

The Company insures against loss or damage sustained by the Insured by reason of the lack of a right of access to the following utilities or services:  [CHECK ALL THAT APPLY]

☐ Water service          ☐ Natural gas service          ☐ Telephone service
☐ Electrical power service  ☐ Sanitary sewer              ☐ Storm water drainage
☐ _____   ☐ _____   ☐ _____

either over, under or upon rights-of-way or easements for the benefit of the Land because of:

    (1) a gap or gore between the boundaries of the Land and the rights-of-way or easements;

    (2) a gap between the boundaries of the rights-of-way or easements; or

    (3) a termination by a grantor, or its successor, of the rights-of-way or easements.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

[FNTG BRAND]

BY: _____

ALTA Endorsement Form 17.2-06
(Utility Access)  (10/16/08)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 18**

**Return to Table of Contents**

**TAX PARCEL**

**ALTA ENDORSEMENT - FORM 18-06 (Single)**

**AND 18.1 (Multiple) [with tax sale protection]**

**PURPOSE**

These endorsements cover the tax parcel or tax identification numbers often included in the policy for informational purposes. Form 18-06 insures against loss if the tax number shown does not include all the Land described in the policy or includes land not described in the policy.  Form 18.1-06 is for use when there are multiple parcels and multiple numbers. In addition, Form 18.1-06 insures that any easement included as an insured parcel in Schedule A or C will not be wiped out by the subsequent foreclosure of taxes on the servient tenement.  This endorsement does not provide coverage for the Insured it the easement itself is separately assessed and the Insured fails to pay such taxes.

**SECTIONS OF POLICY AMENDED BY ENDORSEMENT**

This endorsement for the Insured does not expressly amend any provisions of the Policy.  It does affect on paragraph 3(d) of the Exclusions from Coverage ("Defects, liens, encumbrances, adverse claims or other matters: ... attaching or created subsequent to Date of Policy...") in that the non-payment of real property taxes, or the foreclosure of the lien imposed by those taxes on the servient tenement over which the easement exists, will, in the majority of cases, be a post policy occurrence.

**BASIS FOR PROVIDING COVERAGE**

To issue ALTA Form 18-06, the above the legal description in Schedule A or C must be carefully compared to the legal description on the tax rolls to verify that they cover the exact same property, that neither includes additional lands, and that all tax parcel numbers are correctly shown. If the Land includes only a portion of a tax description, these endorsements may not be given.

To issue ALTA Form 18.1-06, the above comparison should be made for each parcel included.  In addition, to give the easement coverage, if appropriate, the following matters must be taken into consideration:

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

The easement referred to in this endorsement must be shown in the Policy in Schedule A or C as an insured parcel. This will insure that a complete search of title to the servient parcel encumbered by the easement, along with a determination of the status of taxes and assessments, has been done.

An absolute essential element will be the existence of state statutes or binding case law that specifically protects the validity of any properly created easement from the effects of any non-payment of taxes or the foreclosure of the lien of such taxes as imposed on the servient tenement. This protection must exist no matter when the easement is created or when the taxes are imposed.

The most common factual scenarios are:

1. Easement created. Taxes for the year in which easement is created are all paid. Taxes for subsequent years go into foreclosure. State law provides purchaser at tax sale takes subject to easement.

2. Same as 1, but state law provides purchaser at tax sale to get land free and clear of easement interest.

3. Outstanding taxes owed. Easement created. State law provides that foreclosure of taxes effectively forecloses easement rights. State law may not require notice of tax foreclosure to holder of easement rights.

4. Easement created. Taxes are assessed after the creation of the easement, but state law provides that the lien of the taxes dates back to a date preceding the creation of the easement. Again, state law provides that foreclosure of taxes effectively forecloses easement rights.

5. Taxes or special assessments may be scheduled to be paid off over a number of years in the future. In many jurisdictions these are called "bonds" or "future assessments". Even if the current year's liabilities are paid, the failure to pay any of the future bonds may result in a lien that dates back to the original creation of the liability which, if it predates the creation of the easement, could cause the easement to be foreclosed when those bond amounts are foreclosed.

Obviously, in examples 2, 3, 4 and 5 above we would not be able to issue this coverage.

If this coverage is requested by the Lender, the Insured Mortgage must be secured by the referenced easement.

## AUTHORITY FOR ISSUANCE OF ENDORSEMENT

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

If there is no binding authority in the state wherein the property lies, any request for this endorsement must be submitted to the Company's underwriting adviser for approval.

## MODIFICATION

In the event that modification of an endorsement is requested, it is necessary to consider your state regulatory requirements for filing and approval of forms. If the endorsement is modified, the endorsement is not an ALTA form and should not reference ALTA in the title. You must obtain the approval of the Company's underwriting adviser before complying with any request for a modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 18**

## ENDORSEMENT

Attached to Policy No. _____

**Issued By**
**[FNTG BRAND]**

The Company insures against loss or damage sustained by the Insured by reason of the Land being taxed as part of a larger parcel of land or failing to constitute a separate tax parcel for real estate taxes.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

[FNTG BRAND]

BY: _____

ALTA Endorsement Form 18-06
(Single Tax Parcel) (6/17/06)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**ENDORSEMENT**

Attached to Policy No. _____

**Issued By**
**[FNTG BRAND]**

The Company insures against loss or damage sustained by the Insured by reason of:

1.      those portions of the Land identified below not being assessed for real estate taxes under the listed tax identification numbers or those tax identification numbers including any additional land:

      Parcel:                            PARCEL 1
      Tax Identification Number(s):      TAX ID 1


      Parcel:                            PARCEL 2
      Tax Identification Number(s):      TAX ID 2


      Parcel:                            PARCEL 3
      Tax Identification Number(s):      TAX ID 3


2.      the easements, if any, described in Schedule A being cut off or disturbed by the nonpayment of real estate taxes, assessments or other charges imposed on the servient estate by a governmental authority.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.


[Witness clause optional]




[FNTG BRAND]

BY: _____


ALTA Endorsement Form 18.1-06
(Multiple Tax Parcel) (6/17/06)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**Return to Table of Contents**

## CONTIGUITY

### ALTA ENDORSEMENT - FORM 19-06 (MULTIPLE PARCELS) [within Land]
### AND FORM 19.1-06 (SINGLE PARCEL) [with property other than Land]

### PURPOSE

ALTA Form 19-06 is designed to provide insurance that (1) each parcel, in a policy which insures multiple parcels, is contiguous to at least one other parcel insured by the policy, or (2) if some parcels are not contiguous to at least one other parcel, that certain parcels are contiguous to certain other parcels. The ALTA Form 19.1-06 provides coverage that the Land in the policy is contiguous to some other specific parcel not insured in the policy.

### SECTION OF POLICY AMENDED BY ENDORSEMENT

The ALTA policies do not insure contiguity. These endorsements add an insuring provision and additional liability.

### BASIS FOR PROVIDING COVERAGE

A survey must be presented to the Company. The survey must adequately depict the absence of gaps, strips or gores insured against, and contain a statement by the surveyor that the parcels are contiguous. Providing the coverage on some other basis, for example because the parcels are adjacent lots in the same subdivision or because the line which separates them in a metes and bounds description has identical points of beginning and identical calls to describe that line, can only be done with the approval of your Company underwriting advisor.

The problem that often arises with the ALTA 19.1-06 is that there is not a single survey of both the Land included within the policy and the additional parcel as to which contiguity is being insured. Again, any request to issue this endorsement without a single survey showing both parcels with a certification by the surveyor that the parcels are contiguous must be referred to your Company underwriting advisor.

### MODIFICATION

In the event that modification of an endorsement is requested, it is necessary to consider your state regulatory requirements for filing and approval of forms.  If the endorsement is modified, the endorsement is not an ALTA form and should not reference ALTA in the title.  You must obtain the approval of the Company's underwriting adviser before complying with any request for a modification.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 19**

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 19**

**ENDORSEMENT**

Attached to Policy No. _____

**Issued By**
**[FNTG BRAND]**

The Company insures against loss or damage sustained by the Insured by reason of:

    1.    The failure [of the _____ boundary line of Parcel A] of the Land to be contiguous to [the _____ boundary line of Parcel B] **[for more than two parcels, continue as follows: "; of [the _____ boundary line of Parcel B] of the Land to be contiguous to [the _____ boundary line of Parcel C] and so on until all contiguous parcels described in the policy have been accounted for]**; or

    2.    The presence of any gaps, strips, or gores separating any of the contiguous boundary lines described above.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

[FNTG BRAND]

BY: _____

ALTA Endorsement Form 19-06
(Contiguity – Multiple Parcels) (6/17/06)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                                        **SECTION 19**

## ENDORSEMENT

Attached to Policy No. _____

**Issued By**
**[FNTG BRAND]**

The Company insures against loss or damage sustained by the Insured by reason of:

1.     The failure of the Land to be contiguous to **[describe the land that is contiguous to the Land by its legal description or by reference to a recorded instrument – e.g. ". . . that certain parcel of real property legally described in the deed recorded as Instrument No. _____, records of _____ County, State of _____]** along the _____ boundary line[s]; or

2.     The presence of any gaps, strips, or gores separating the contiguous boundary lines described above.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

[FNTG BRAND]

BY: _____

ALTA Endorsement Form 19.1-06
(Contiguity – Single Parcel) (6/17/06)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 20**

Return to Table of Contents

**FIRST LOSS**
**ALTA ENDORSEMENT FORM 20-06**

**PURPOSE**

This endorsement is designed to alter the established criteria for determining when a loss is recognized under a loan policy. Loss is normally the difference between the value of the property with or without the defect, lien or encumbrance insured against. Under normal circumstances, a loss would be difficult to determine until the land was sold after foreclosure.  If the sale was for an amount less than the debt, and the difference between the sales price and the indebtedness was caused by a matter covered by the policy, the lender could claim a loss.   Consequently, an insured lender would normally be required to foreclose to prove this loss before being able to make a claim. This endorsement, to be issued only when there is more than one insured parcel, allows a loss to be recognized whenever a title defect materially impairs the value of a parcel securing the loan without requiring acceleration of the debt and foreclosure against **any** of the parcels securing the loan. There was a technical correction of this endorsement by ALTA on 10/13/2011, but they did not change the ALTA adopted date.

**SECTION OF THE POLICY AMENDED BY THE ENDORSEMENT**

This endorsement allows assertion of loss on the basis of impairment of security as if we had insured separate loans secured by separate parcels, even though the insured transaction is actually a single loan secured by multiple parcels. The Company and the courts have applied Condition 8 to the determination of what is a loss in such a way that "loss", as described in the endorsement, would be considered an interim situation, contingent upon the remaining property failing to provide adequate security for the unpaid debt. For that reason, this endorsement is often described as Contingent Loss (First Loss).

**BASIS FOR PROVIDING COVERAGE**

While allowing the lender to claim a loss without foreclosing against any of the parcels, included in the endorsement form is an acknowledgement of the subrogation rights of the Company, which includes entitlement to reimbursement in a case where payment under the terms of this endorsement might result in a windfall for a lender who later was fully repaid from the remaining property.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                                          **SECTION 20**

**CAUTION:** YOU MUST CONFER WITH THE COMPANY'S UNDERWRITING ADVISOR TO DETERMINE THE COMPANY'S WILLINGNESS TO ISSUE THIS ENDORSEMENT IN A GIVEN STATE**.** A LENDER WHO IS ALERT TO THE ANTI-DEFICIENCY PROBLEM OF THIS COVERAGE MAY
DELIBERATELY HAVE THE BORROWER REMOVE WARRANTIES FROM THE SECURITY INSTRUMENT SO THAT ONLY PAYMENT DEFAULTS ARE ACTIONABLE. ADVISE THE COMPANY'S UNDERWRITING ADVISOR IF THIS IS THE CASE.

The coverage is not appropriate for loans with only one parcel.

**MODIFICATION**

In the event that modification of an endorsement is requested, it is necessary to consider your state regulatory requirements for filing and approval of forms.  If the endorsement is modified, the endorsement is not an ALTA form and should not reference ALTA in the title.  You must obtain the approval of the Company's underwriting adviser before complying with any request for a modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**ENDORSEMEN**T

Attached to Policy No. _____

**Issued By**
**[FNTG BRAND]**

This endorsement is effective only if the Collateral includes at least two parcels of real property.

1.      For the purposes of this endorsement

   a.      "Collateral" means all property, including the Land, given as security for the Indebtedness.
   b.      "Material Impairment Amount" means the amount by which any matter covered by the policy for which a claim is made diminishes the value of the Collateral below the Indebtedness.

2.      In the event of a claim resulting from a matter insured against by the policy, the Company agrees to pay that portion of the Material Impairment Amount that does not exceed the extent of liability imposed by Section 8 of the Conditions without requiring

   a.      maturity of the Indebtedness by acceleration or otherwise,
   b.      pursuit by the Insured of its remedies against the Collateral, or
   c.      pursuit by the Insured of its remedies under any guaranty, bond or other insurance policy.

3.      Nothing in this endorsement shall impair the Company's right of subrogation. However, the Company agrees that its right of subrogation shall be subordinate to the rights and remedies of the Insured. The Company's right of subrogation shall include the right to recover the amount paid to the Insured pursuant to Section 2 of this endorsement from any debtor or guarantor of the Indebtedness, after payment or other satisfaction of the remainder of the Indebtedness and other obligations secured by the lien of the Insured Mortgage. The Company shall have the right to recoup from the Insured Claimant any amount received by it in excess of the Indebtedness up to the amount of the payment under Section 2.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

[FNTG BRAND]

BY: _____

ALTA Endorsement Form 20-06
(First Loss – Multiple Parcel Transactions) (6/17/06)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 21**

Return to Table of Contents

**CREDITORS' RIGHTS**

**ALTA ENDORSEMENT FORM 21-06**

**This endorsement was decertified by ALTA on 2/8/10 and is no longer available.**

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 22**

**Return to Table of Contents**

**LOCATION**

**ALTA ENDORSEMENT – FORM 22-06**

**AND Form 22.1-06 (with map)**

**PURPOSE**

These endorsements insure against loss or damage if an improvement of the type identified in the endorsement having the address set forth in the endorsement is not located on the Land. In addition, the 22.1-06 insures that a copy of a <u>recorded</u> plat or map that may be attached as an exhibit to the endorsement accurately reflects the location and dimensions of the Land as shown in the public records.

**SECTIONS OF POLICY AMENDED BY ENDORSEMENT**

This endorsement does not expressly amend any provisions of the Policy.

**BASIS FOR PROVIDING COVERAGE**

There must be some type of independent verification of the information requested, usually from a survey or an appraisal. The address should also be verified from the tax records, as should the fact that the property is being taxed as improved. The description of the type of improvement ["dwelling", "residence" etc.] should be taken from the appraisal or survey, or determined by a direct inspection of the premises.

The use of the 22.1-06, to which a copy of a recorded plat or map may be attached, is not universal.  The document to be attached as an exhibit to the endorsement should be limited to copies of instruments, such as plat maps, taken directly from the public records. The use of a survey or a sketch taken from other sources that includes more or different information than the recorded plat could expose the Company to increased liability.

**AUTHORITY FOR ISSUANCE OF THIS COVERAGE**

The ALTA Form 22.1-06 endorsement may not be issued without the approval of the Company's underwriting advisor.

**MODIFICATION**

In the event that modification of an endorsement is requested, it is necessary to consider your state regulatory requirements for filing and approval of forms.  If the endorsement is modified, the endorsement is not an ALTA form and should not reference ALTA in the title.  You must obtain the approval of the Company's underwriting adviser before complying with any request for a modification.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc. **SECTION 22**

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**ENDORSEMENT**

Attached to Policy No. _____

**Issued By**
**[FNTG BRAND]**

The Company insures against loss or damage sustained by the Insured by reason of the failure of a FILL IN, known as FILL IN, to be located on the Land at Date of Policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

[FNTG BRAND]

BY: _____

ALTA Endorsement Form 22-06
(Location) (6/17/06)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**ENDORSEMENT**
Attached to Policy No. _____

**Issued By**
**[FNTG BRAND]**


The Company insures against loss or damage sustained by the Insured by reason of the failure of (i) a FILL IN, known as FILL IN, to be located on the Land at Date of Policy, or (ii) the map, if any, attached to this policy to correctly show the location and dimensions of the Land according to the Public Records.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.


[Witness clause optional]




[FNTG BRAND]

BY: _____


ALTA Endorsement Form 22.1-06
(Location and Map) (6/17/06)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**Return to Table of Contents**

**CO-INSURANCE-SINGLE POLICY**

**ALTA ENDORSEMENT – FORM 23-06**

**PURPOSE**

This endorsement was designed to facilitate the delivery of a single policy when co-insurance with other underwriters is involved with allocation of liability by endorsement from each co-insurer.

**SECTIONS OF POLICY AMENDED BY ENDORSEMENT**

It does not amend any section of the policy, but rather operates to incorporate the terms and conditions of another policy into our policy.

**BASIS FOR PROVIDING COVERAGE**

Many large transactions use the concept of Co-insurance to spread the risk between underwriters. Basically, co-insurers each share a percentage or dollar amount of any claim. Each is primarily liable for their share of risk which means they share in the risk from the first dollar of loss. This is accomplished by each company issuing a separate policy in the amount of risk they have undertaken, and each policy would have an exception or a note to acknowledge that other policies share these same risks. This differs from *Reinsurance*, in which one company issues a policy and is primarily liable for the whole amount but purchases reinsurance from other underwriters to spread that risk to secondary (and other) levels of liability. In reinsurance, the ALTA policy issued by the primary insurer is the source of coverage to the Insured. The liability of the Reinsurers is to the Ceder (the one who purchased the Reinsurance) under the terms of the Reinsurance Agreement. The terms of that agreement may allow direct access to the Reinsurers, but that is a different topic, and will not be discussed in this section.

Instead of having multiple policies from multiple underwriters, each in a percentage or fractional dollar amount, which in a multi-site deal could result in tens or hundreds of policies, the Insured may want to have just one policy for each site that all underwriters agree will act as their policy in form and substance. This can be accomplished by use of this endorsement attached to the original or copies of the policy written by what is sometimes called the "lead underwriter" or "Issuing Co-insurer".

*To issue this endorsement to some other underwriter's policy (when we are NOT the lead underwriter) you must do the following:*

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

1.  Open a file and produce a policy with our policy number on it. That policy must agree in all aspects, except amount, with the policy written by the lead underwriter. If you do not agree with any of the provisions or coverages issued by the lead underwriter, you cannot issue this endorsement.

2.  Prepare and deliver this endorsement (not our underlying policy) to the Insured. Often the endorsement will be prepared by the "Issuing Co-Insurer", who has collected all of the policy amounts and file information. If that is the case, you can sign the endorsement after verifying:

- The Issuing Co-Insurer's policy number is in the first blank in the heading.
- In the chart we are shown as one of the Co-Insurers. The Amount of Insurance, Percentage of Liability, policy information and claims address must be checked. The lead underwriter (or "Issuing Co-insurer" in the endorsement) may fill in the Amounts and Percentages for the policies and send it to you for our policy number and signature. Keep a copy of the signed endorsement in our policy file.

3.  Report and remit premium on the amount of <u>our policy</u> that you produced for the file.

*To issue this endorsement where we are the lead underwriter ("Issuing Co-Insurer") you must do the following:*

1.  Open a file and produce a policy with our policy number on it. <u>THE AMOUNT OF THIS POLICY IS **NOT** THE AGGREGATE POLICY AMOUNT ON THE ENDORSEMENT</u>. The Amount of Insurance on Schedule A of the Policy must be the Amount of Insurance allocated to us. It can be additionally shown as a percentage of the Aggregate Amount of Insurance amount reflected on the endorsement. The policy should contain a footnote similar to the following:

> "This policy is issued contemporaneously with the policies reflected on the Co-Insurance Endorsement attached hereto, which policies total the Aggregate Amount of Insurance as shown therein. It is understood and agreed that for all loss or aggregate losses against which said policies protect, the Company shall be liable only for the Percentage of Liability up to the Amount of Insurance as allocated to the Company therein. In no event shall the Company be liable for loss in excess of the Amount of Insurance as shown therein."

2.  Prepare a sample Endorsement with the information supplied by the other underwriters. Send to the other underwriters so they may fill in any of their missing policy information in the chart and execute.

3.  Report the policy.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 23**

**MODIFICATION**

In the event that modification of an endorsement is requested, it is necessary to consider your state regulatory requirements for filing and approval of forms.  If the endorsement is modified, the endorsement is not an ALTA form and should not reference ALTA in the title.  You must obtain the approval of the Company's underwriting adviser before complying with any request for a modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

## ENDORSEMENT

Attached to Policy No.[*lead policy*]
Issued by
[*lead policy issuer*](**"Issuing Co-Insurer"**)

CO-INSURANCE ENDORSEMENT

Attached to and made a part of Issuing Co-Insurer's Policy No. [*lead policy*] ("Co-Insurance Policy").  Each title insurance company executing this Co-Insurance Endorsement, other than the Issuing Co-Insurer, shall be referred to as "Co-Insurer."  Issuing Co-Insurer and each Co-Insurer are collectively referred to as "Co-Insuring Companies".

1.   By issuing this endorsement to the Co-Insurance Policy, each of the Co-Insuring Companies adopts the Co-Insurance Policy's Covered Risks, Exclusions, Conditions, Schedules and endorsements, subject to the limitations of this endorsement.

| Co-Insuring Companies | Name and Address | Policy Number [File Number] | Amount of Insurance | Percentage of Liability |
|---|---|---|---|---|
| Issuing Co-Insurer | | | $ | |
| Co-Insurer | | | $ | |
| Co-Insurer | | | $ | |
| Co-Insurer | | | $ | |
| Aggregate Amount of Insurance | | | $ | |

2. Each of the Co-Insuring Companies shall be liable to the Insured only for its Percentage of Liability of: (a) the total of the loss or damage under the Co-Insurance Policy, in no event greater than its respective Amount of Insurance set forth in this endorsement; and (b) costs, attorneys' fees and expenses provided for in the Conditions.

3. Any notice of claim and any other notice or statement in writing required to be given under the Co-Insurance Policy must be given to each of the Co-Insuring Companies at its address set forth above.

4. Any endorsement to the Co-Insurance Policy issued after the date of this Co-Insurance Endorsement must be signed on behalf of each Co-Insuring Company by its authorized officer or agent.

5. This Co-Insurance Endorsement is effective as of the Date of Policy of the Co-Insurance Policy.  This Co-Insurance Endorsement may be executed in counterparts.

This endorsement is issued as part of the Co-insurance Policy.  Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy or (iv) increase the Amount of Insurance.  To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls.  Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements to it.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 23**

*ALTA 23-06 Continued*

[Witness Optional]

DATED:
Issuing Co-Insurer:

[lead underwriter]

BY: _____


Co-Insurer:

[BLANK] Title Insurance Company

By: _____


Co-Insurer:

[BLANK] Title Insurance Company

By: _____


Co-Insurer:

[BLANK] Title Insurance Company

By: _____


[Additional Co-Insurer signatures may be added if needed.]

ALTA Endorsement Form 23-06
(Co-Insurance - Single Policy) (Rev. 10/16/08)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 24**

**Return to Table of Contents**

**DOING BUSINESS**

**ALTA ENDORSEMENT - FORM 24-06**

**PURPOSE**

This endorsement for a loan policy provides coverage to the lender concerning the consequences of the failure to comply with state "doing business" laws.

**SECTIONS OF POLICY AMENDED BY ENDORSEMENT**

Exclusions from Coverage 4 of the Loan Policy excludes from coverage any loss from unenforceability of the lien of the insured mortgage resulting from the lender's failure to comply with  any doing-business laws of the state where the Land is located.

**BASIS FOR PROVIDING COVERAGE**

Most states regulate the lending industry within the state. Many require lenders to be authorized to "do business" if they are chartered or incorporated in another state or jurisdiction. This type of regulation can be found in statutes or administrative/regulatory policies. The penalties for failure to follow these rules often include fines or the requirement to appoint a specific state agency (such as the secretary of state or financial regulatory agency) as agent of service of process, neither of which affects the priority or enforceability of the lien of the Insured Mortgage. HOWEVER, some states designate that the failure to comply with the regulations results in the mortgage or deed of trust being void or voidable. THEREFORE, you must ascertain that the state in which the Land is located does not have any statutory or regulatory policies or procedures that impact the priority or prohibit the enforcement of mortgages or deeds of trust held by lenders not authorized or licensed to do business in that state. Your Company underwriting advisor should be consulted for issuance within your state.

**MODIFICATION**

In the event that modification of an endorsement is requested, it is necessary to consider your state regulatory requirements for filing and approval of forms. If the endorsement is modified, the endorsement is not an ALTA form and should not reference ALTA in the title.  You must obtain the approval of the Company's underwriting adviser before complying with any request for a modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                                                          **SECTION 24**

**ENDORSEMENT**

Attached to Policy No._____

Issued by

[FNTG BRAND]

The Company insures against loss or damage sustained by the Insured by reason of the invalidity or unenforceability of the lien of the Insured Mortgage on the ground that making the loan secured by the Insured Mortgage constituted a violation of the "doing business" laws of the State where the Land is located because of the failure of the Insured to qualify to do business under those laws.

This endorsement is issued as part of the policy.  Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance.  To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls.  Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements to it.

[Witness Optional]

DATED:

[FNTG BRAND]

BY: _____
          AUTHORIZED SIGNATORY

ALTA Endorsement Form 24-06
(Doing Business) (10/16/08)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 25**

**Return to Table of Contents**

**SAME AS SURVEY & SAME AS PORTION OF SURVEY**

**ALTA ENDORSEMENT – FORMS 25-06 AND 25.1-06**

**PURPOSE**

These endorsements expand policy coverage by specifying that the description on Schedule A (or C) is legally identical to a description contained in a survey which incorporates differing language.

**SECTIONS OF POLICY AMENDED BY ENDORSEMENT**

No specific section of the policy is amended by these endorsements. However, additional coverage is added.

**BASIS FOR PROVIDING COVERAGE**

These endorsements are available for owner's and loan policies. They insure that the Land as described in Schedule A is **legally** identical with the land as described in the survey identified in the endorsement, despite the fact that there is different language in each of the descriptions. The endorsement is usually requested for loan policies when the mortgage being insured contains a legal description which varies slightly when compared with Schedule A of the Policy or the survey submitted for the file.

This endorsement may be issued only after a careful review of the relevant legal descriptions and a determination that the legal descriptions are not ambiguous and, in fact, delineate the identical property, and are legally sufficient to convey title under state law. It is customary in some areas to require the surveyor to certify that the legal descriptions are one and the same.

The ALTA 25-06 is used when the entire legal description is identical to the entire legal description on the survey.

The ALTA 25.1-06 is used when the legal description in the Policy is one or more parcels on a survey that contains additional parcels besides the ones being insured. This is normally only an issue in a new development where we are being asked to rely on a survey of a larger development to insure less than all of that development. Care must be taken that the survey

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

correctly reflects any internal improvements and dimensions, and includes sufficient information to make this determination.

## MODIFICATION

In the event that modification of an endorsement is requested, it is necessary to consider your state regulatory requirements for filing and approval of forms. If the endorsement is modified, the endorsement is not an ALTA form and should not reference ALTA in the title.  You must obtain the approval of the Company's underwriting adviser before complying with any request for a modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 25**

**ENDORSEMENT**
Attached to Policy No._____
Issued by
[FNTG BRAND]

The Company insures against loss or damage sustained by the Insured by reason of the failure of the Land as described in Schedule A to be the same as that identified on the survey made by _____ dated _____, and designated Job No. \_\_\_\_\_.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements to it.

[Witness Optional]

DATED:

[FNTG BRAND]

BY: _____
        AUTHORIZED SIGNATORY

ALTA Endorsement Form 25-06
(Same as Survey) (10/16/08)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**ENDORSEMENT**
Attached to Policy No._____
Issued by
[FNTG BRAND]

The Company insures against loss or damage sustained by the Insured by reason of the failure of the Land as described in Schedule A to be the same as that identified as [Example:  Parcel A, B, C or Parcel 1, 2, 3] on the survey made by _____ dated _____, and designated Job No. _____.

This endorsement is issued as part of the policy.  Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy or (iv) increase the Amount of Insurance.  To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls.  Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements to it.

[Witness Optional]

DATED:

[FNTG BRAND]

BY: _____
          AUTHORIZED SIGNATORY

ALTA Endorsement Form 25.1-06
(Same as Portion of Survey) (10/16/08)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    SECTION 26

**Return to Table of Contents**

## SUBDIVISION
## ALTA ENDORSEMENT - FORM 26-06

### PURPOSE

The ALTA Form 26-06 insures against loss based upon the Land described in Schedule A (or Schedule C) not constituting a legally created parcel pursuant to applicable state statutes or local governmental regulations.

### SECTIONS OF POLICY AMENDED BY ENDORSEMENT

This endorsement modifies exclusion 1(a)(iii) which excludes any law, ordinance, permit or governmental regulation which pertains to the subdivision of land.  Historically, the title policy and search did not address such restrictions on the subdivision of land since they did not constitute matters that affected title or the ability to convey. In some areas of the country (most notably on the west coast) there have been enacted statutes and ordinances which make it a criminal act to convey by or use a legal description not in conformance with subdivision laws.

### BASIS FOR PROVIDING COVERAGE

The issuance of this coverage is extra hazardous, and not to be taken lightly. You must have approval of your Company underwriting advisor. It requires the analysis of both  state statutes and local building and use ordinances or laws. We are experiencing a rise in the number of counties across the country that are seeking ways to increase their fees, and have started to challenge legal descriptions that have been in use for, in one instance, over 70 years!  You will need to have the following information to be able to discuss the matter with your Company underwriting advisor:

Items to consider:

1.      State Statute:

        What are the provisions of the appropriate statute(s) regarding legally created parcels?

        Are there any penalties if a parcel of land does not conform to the statute(s)?

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

How severe are the penalties? Are documents using the non-conforming description void or not recordable? Even if recorded, are they held to be insufficient to give constructive notice to subsequent parties under the recording acts or statute of frauds in place in the state? Are mortgages which use a non-conforming description held to be unenforceable?

Does our parcel conform to the statute? If not, how not?

2.      Local governmental regulations:

What are the provisions of the appropriate regulations regarding legally created parcels? These could be contained in the zoning ordinances, building use or permitting ordinances or anywhere in between.

Are there any penalties if a parcel of land does not conform to the regulations?

How severe are the penalties? Will the owner be unable to get a permit to build, modify, or re-hab? Will they (or the title company) be subject to civil fines or criminal action?

Does our parcel conform to the regulations? If not, how not?

3.      Understand exactly what coverage the proposed Insured is expecting to obtain by this endorsement.

NOTE:  *Be careful, in modifying this endorsement pursuant to customer requests, not to Broaden the endorsement to provide coverage for other matters, such as development and zoning issues, that were not intended to be provided by this endorsement.*

### MODIFICATION

In the event that modification of an endorsement is requested, it is necessary to consider your state regulatory requirements for filing and approval of forms. If the endorsement is modified, *as discussed in the Note above*, the endorsement is not an ALTA form and should not reference ALTA in the title.  You must obtain the approval of the Company's underwriting adviser before complying with any request for a modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 26**

**ENDORSEMENT**
Attached to Policy No._____
Issued by
[FNTG BRAND]

The Company insures against loss or damage sustained by the Insured by reason of the failure of the Land to constitute a lawfully created parcel according to the subdivision statutes and local subdivision ordinances applicable to the Land.

This endorsement is issued as part of the policy.  Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy or (iv) increase the Amount of Insurance.  To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls.  Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements to it.

[Witness Optional]

DATED:

[FNTG BRAND]

BY: _____
        AUTHORIZED SIGNATORY

ALTA Endorsement Form 26-06
(Subdivision) (10/16/08)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 27**

Return to Table of Contents

**USURY ENDORSEMENT**

**ALTA Form 27-06**

**PURPOSE**

This endorsement is for use with an ALTA loan policy. It provides insurance against loss the Insured may suffer if the Insured Mortgage is determined to be usurious under state statute.

**NOTE: *STATES WHERE USURY COVERAGE CANNOT BE GIVEN*:** ARKANSAS, FLORIDA, KANSAS, MISSOURI, NEW JERSEY, NEW MEXICO, NEW YORK, OREGON, PENNSYLVANIA, TEXAS, AND WYOMING.

**SECTION OF THE POLICY AMENDED BY THE ENDORSEMENT**

This endorsement amends Exclusions 5 of the ALTA Loan Policy.

**BASIS FOR PROVING COVERAGE**

.

The term "usury" refers to the charging of an excessive rate of "interest" upon a loan or for the forbearance of collection.  The existence of usury depends entirely upon the specific wording of the applicable statute or constitutional provision. This endorsement should be issued **only** if a state statute exempts the specific type of lender, borrower or type transaction from its usury laws. The endorsement cannot be issued if the exemption is based upon some type of mathematical formulae or limit of interest rate. A court might designate other fees or charges as "interest" and the result could provide an amount of interest that exceeds the statutory amount. The issuance of usury coverage is extra-hazardous and you **must** confer with the Company's underwriting advisor for authority to issue this endorsement.

The endorsement can not be used in the following states without modification (which would no longer make it an ALTA form) : Colorado, Georgia, Massachusetts, Michigan, and North Carolina. These states impose a limitation on the interest that can be charged on loans that are otherwise exempt from usury statutes. The following is additional language which **must** be added to the endorsement:

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**Colorado:**  …excepting any of said loss or damage as may be caused as a result of a determination that the interest rate as calculated is in excess of forty-five percent (45%) per annum.

**Georgia**:  …excepting any of said loss or damage as may be caused as a result of a determination that the interest rate as calculated is in excess of five percent (5%) per month.

**Massachusetts:**  …excepting any of said loss or damage as may be caused as a result of a determination that the interest rate as calculated is in excess of twenty percent (20%) per annum; unless notification is made to the Massachusetts Attorney General as required by Chapter 271, Section 49, Massachusetts General Laws.

**Michigan:**  …excepting any of said loss or damage as may be caused as a result of a determination that the interest rate as calculated is in excess of twenty-five percent (25%) per annum.

**North Carolina:  …**excepting any of said loss or damage as may be caused as a result of provisions for the charging of or payment of late charges as provided in Section 24-10.1 North Carolina statutes.

**MODIFICATION**

In the event that modification of an endorsement is requested, it is necessary to consider your state regulatory requirements for filing and approval of forms.  **If the endorsement is modified, as discussed above,  the endorsement is NOT an ALTA form and should not reference ALTA in the title**.  You must obtain the approval of the Company's underwriting adviser before complying with any request for a modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**ENDORSEMENT**

Attached to policy No. _____

**Issued by**
**[FNTG BRAND]**

The Company insures against loss or damage sustained by the Insured  by reason of the invalidity or unenforceability of the lien of the Insured Mortgage as security for the Indebtedness because the loan secured by the Insured Mortgage violates the usury law of the state where the Land is located.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

[FNTG BRAND]

BY: _____

ALTA Endorsement Form 27-06
(Usury) (10/16//08)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 28**

**Return to Table of Contents**

**EASEMENT - DAMAGE OR ENFORCED REMOVAL**

**ENCROACHMENTS - BOUNDARIES AND EASEMENTS**

**ALTA ENDORSEMENT FORMS 28-06; 28.1-06 and 28.2-06**


**PURPOSE**

**ALTA Endorsement Form 28-06 (Easement - Damage or Enforced Removal)**

Endorsement Form 28.06 was developed to insure against loss caused by the encroachment of a building located on the Land onto or over an easement shown as an exception in Schedule B, as disclosed by a survey or inspection of the Land. The loss must be based on an exercise of the easement and is only for damage to an existing building or enforced removal or alteration.

**ALTA Endorsement Form 28.1-06 (Encroachments - Boundaries and Easements)**

**ALTA Endorsement Form 28.2-06 (Encroachments - Boundaries and Easements-Described Improvements)**

Endorsement Forms 28.1-06 and 28.2 were developed to provide coverage with respect to certain boundary and easement encroachments. This coverage was previously included in the former ALTA 9 series. It is no longer contained within those endorsements other than the revised ALTA 9-06 and the new ALTA 9.7-06 and 9.10-06 (which additionally afford coverage as to violations of covenants, violations of setbacks, and damage to existing improvements because of development of minerals). The Endorsement Form 28.2-06 is used when the encroachment of a specific Improvement is meant to be covered and is specifically described at item 2. . You may have a situation when you are willing to give coverage over encroachments by one improvement and not another, perhaps because one has been in place without objection for a longer period of time.

The coverages in theses Endorsements include:

- The loss occasioned by the existence of an encroachment by an Improvement onto a neighboring property or onto an easement area within the insured Land, **other than as disclosed** in Schedule B exceptions.
- The loss occasioned by the existence of an encroachment by a neighboring Improvement onto the insured Land, **other than as disclosed** in Schedule B exceptions.
- Enforced removal of an insured Improvement based upon the encroachment into the easement area or onto neighboring property.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

These forms allow the exclusion of an encroachment raised as an exception in Schedule B from the enforced removal coverage by reference to the exception that describes it, if we choose not to include that encroachment within the coverage afforded by these endorsements.

## SECTIONS OF POLICY AMENDED BY ENDORSEMENT

No specific sections of the policy are amended by this endorsement; however additional coverages are added.

## BASIS FOR PROVIDING COVERAGE

### ALTA Form 28-06

**An accurate current survey or inspection of the Land is required for coverage**

The basis for giving these coverages can vary by local custom and law. You should always confer with your Company underwriting advisor to determine the appropriate risk. Some of the factors to take into consideration would be:

- Type and location of easement (Under ground? Overhead? Common utility? Residential or Commercial type of use [e.g., oil pipeline]?)
- Age of easement vs. age of improvement (Which came first?).  Age of improvement with no interference historically.
- Size or amount of encroachment (De minimis or substantial? Across small portion or entire width?).
- Can easement still be used with encroachment?  Are there other access points for maintenance?
- Cost of moving easement or improvement if the encroachment interferes with the maintenance and use of easement.

Note: The endorsement specifically covers only the "building" and not other improvements on the Land. Any request to expand this coverage must be discussed with your Company underwriting advisor.

### ALTA Form 28.1-06 and 28.2

**An accurate current survey of the Land is required for coverage on any policy other than a residential, 1-4 family Loan Policy.**

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

Coverage 3a may be given provided:

> For encroachments onto adjoining land
> - Any encroachments disclosed by inspection, survey or other means, are also expressly excepted by description of such matter in Schedule B.
>
> For encroachments onto easements located on the Land, either
> - there are no easements excepted in Schedule B; or
> - encroachments onto easements, disclosed by inspection, survey or other means, are also expressly excepted by description of such matter in Schedule B.

Coverage 3b may be provided if any of the following situations apply:

- for encroachments on the Land by a neighboring Improvement - any such encroachments disclosed by inspection, survey or other means, are expressly excepted by description of such matter in Schedule B.

Coverage 3c may be given if any of the following situations apply:

1. There are no easements excepted in Schedule B.
2. There are no encroachments onto easements excepted in Schedule B.
3. Encroachments shown are minor, would not interfere with maintenance of the easement and could not be forcibly removed under state law.

Coverage 3d may be given if any of the following situations apply:

1. There are no encroachments onto adjoining land excepted in Schedule B.
2. The encroachment is minor and could be removed at minimal cost.
3. The encroachment is minor; is not onto a parcel of vacant land; is not necessary to the support of the main structure; and your Company underwriting advisor is satisfied that a state court would not require its removal.

Note:

The Form 28.1-06 specifically covers only the "building" and not other improvements on the Land. Any request to expand this coverage must be discussed with your Company underwriting advisor.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

It allows all of the coverages to be denied for a specific named exception if you do not want to give coverage for that encroachment.

The Form 28.2-06 specifically covers only the Improvements described at item 2 of the endorsement. This allows you to choose which Improvements, and therefore which encroachments created by the specific improvement, for which you are granting coverage. Form 28.2 further varies in that it allows the coverage at 3.c and 3.d (enforced removal) only to be denied to matters specifically identified by exception numbers.

## MODIFICATION

In the event that modification of an endorsement is requested, it is necessary to consider your state regulatory requirements for filing and approval of forms. If the endorsement is modified, *as discussed in the Note above, or for any other reason*, the endorsement is not an ALTA form and should not reference ALTA in the title.   You must obtain the approval of the Company's underwriting adviser before complying with any request for a modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 28**

**ENDORSEMENT**

Attached to Policy No._____
Issued by
[FNTG BRAND]

The Company insures against loss or damage sustained by the Insured if the exercise of the granted or reserved rights to use or maintain the easement(s) referred to in Exception (s)_____ of Schedule B results in:

    (1)      damage to an existing building located on the Land, or

    (2)      enforced removal or alteration of an existing building located on the Land.

This endorsement is issued as part of the policy.  Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy or (iv) increase the Amount of Insurance.  To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls.  Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements to it.

[Witness Optional]

DATED:

[FNTG BRAND]

BY: _____
     AUTHORIZED SIGNATORY

ALTA Endorsement Form 28-06
(Easement-Damage or Enforced Removal) (rev. 02/03/10)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**ENDORSEMENT**

**Attached to Policy No. _____**

**Issued by**

*[FNTG BRAND]*

1.  The insurance provided by this endorsement is subject to the exclusions in Section 4 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2.  For purposes of this endorsement only, "Improvement" means an existing building, located on either the Land or adjoining land at Date of Policy and that by law constitutes real property.

3.  The Company insures against loss or damage sustained by the Insured by reason of:

    a.  An encroachment of any Improvement located on the Land onto adjoining land or onto that portion of the Land subject to a easement, unless an exception in Schedule B of the policy identifies the encroachment;

    b.  An encroachment of any Improvement located on adjoining land onto the Land at Date of Policy, unless an exception in Schedule B of the policy identifies the encroachment;

    c.  Enforced removal of any Improvement located on the Land as a result of an encroachment by the Improvement onto any portion of the Land subject to any easement, in the event that the owners of the easement shall, for the purpose of exercising the right of use or maintenance of the easement, compel removal or relocation of the encroaching Improvement; or

    d.  Enforced removal of any Improvement located on the Land that encroaches onto adjoining land.

4.  This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from the encroachments listed as Exceptions _____ of Schedule B.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]


[FNTG BRAND]


By: _____
        Authorized Signatory




ALTA Endorsement Form 28.1-06
(Encroachments-Boundaries and Easements) (4/2/12)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                                    **SECTION 28**

**ENDORSEMENT**
**Attached to Policy No. _____**
**Issued by**
*[FNTG BRAND]*

1.    The insurance provided by this endorsement is subject to the exclusions in Section 4 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2.    For purposes of this endorsement only, "Improvement" means each improvement  on the Land or adjoining land at Date of Policy , itemized below:

.

3.    The Company insures against loss or damage sustained by the Insured by reason of:

    a. An encroachment of any Improvement located on the Land onto adjoining land or onto that portion of the Land subject to an easement, unless an exception in Schedule B of the policy identifies the encroachment;

    b. An encroachment of any Improvement located on adjoining land onto the Land at Date of Policy, unless an exception in Schedule B of the policy identifies the encroachment;

    c. Enforced removal of any Improvement located on the Land as a result of an encroachment by the Improvement onto any portion of the Land subject to any easement, in the event that the owners of the easement shall, for the purpose of exercising the right of use or maintenance of the easement, compel removal or relocation of the encroaching Improvement; or

    d. Enforced removal of any Improvement located on the Land that encroaches onto adjoining land.

4.    Sections 3.c and 3.d. of this endorsement do not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from the following Exceptions, if any, listed in Schedule B:

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

[FNTG BRAND]

By: _____

        Authorized Signatory

ALTA Endorsement Form 28.2-06
(Encroachments-Boundaries and Easements-Described Improvements) (4/2/13)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 29**

**Return to Table of Contents**

**SWAP ENDORSEMENT**

**(INTEREST RATE EXCHANGE AGREEMENT SECURED BY**

**INSURED MORTGAGE)**

**ALTA ENDORSEMENT – FORMS 29-06, 29.1-06, 29.2-06 AND 29.3-06**


**PURPOSE**


Lenders occasionally request that the Loan Policy insure amounts which are described in an Interest Rate Exchange Agreement or Swap Agreement, the terms of which are contained in or referenced in the Insured Mortgage. Such agreements obligate the mortgagor for damages the lender may suffer under swap transactions it enters into on the borrower's behalf in order to achieve a favorable interest rate. If the borrower defaults on its loan, the lender becomes obligated itself under the swap loan for amounts known as breakage fees. This endorsement is designed to provide additional coverage for these amounts. These amounts are contingent and would accrue as an obligation of the borrower post-policy. Without an endorsement, it is questionable whether the definition of Indebtedness at Conditions number 1(d) would cover such obligations, whether they were characterized as additional principal or additional interest on the loan.


**SECTION OF POLICY AMENDED BY ENDORSEMENT**


Since the loan documents provide that the obligations described in the agreements may accrue in the future, this endorsement provides coverage for breakage fees paid by the insured lender post policy despite Exclusions from Coverage 3(d), which excludes "defects, liens, encumbrances, adverse claims, or other matters attaching or created subsequent to Date of Policy." That Exclusion expressly does not modify or limit the coverage provided under Covered Risk 11, 13, or 14, but none of those provisions would provide coverage for breakage fees. The definitions of Indebtedness at Condition 1(d) (ii) (principal disbursed subsequent to Date of Policy) and (iv) (interest on the loan) do not apply to those mortgages which provide that what is secured are amounts advanced to pay sums due under the agreements, which are neither principal disbursed nor additional interest. In states with a mortgage tax, these agreements are often structured so that the sums due are treated as additional interest, and in that case breakage fees might be treated as covered under Condition 1(d)(iv) for purposes of determining the **Amount of Insurance;** however, inclusion for such purpose would not result in coverage of the **validity, enforceability and priority** of  advances made to fund breakage fees.


© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

## BASIS FOR PROVIDING COVERAGE

1. **State Law – Obligatory advances; Incorporation by Reference.**

Many states have statutory or case law which provides that if the costs expended by the lender on behalf of the borrower under the swap agreement are obligatory, they may be afforded the same priority as if they had been expended at the date of the mortgage. For states in which this is the law, the loan documents must be reviewed to verify that the payment of breakage fees is obligatory.  For other states, the law must be reviewed by the Company's underwriting advisor to determine if the obligations of the lender will be afforded the same priority as if they had been expended at the date of the mortgage. Note that the endorsement specifically excludes coverage with respect to laws relating to bankruptcy, usury, unconscionability or unreasonableness. Further, the question of whether  a swap agreement referred to in a note, which itself is referred to in the Insured Mortgage,  is effectively incorporated by reference into the  Insured Mortgage so as to give notice to third parties, is a question of state law which must be referred to the Company's underwriting advisor.

2. **The mortgage must state the maximum amount secured by the agreement, in addition to the principal loan amount secured.**

The Insured Mortgage must state the additional amounts to be secured by reason of lender obligations under the swap or interest exchange agreements. Premium must be paid on these amounts.

3. **The swap or interest exchange agreement must be in place.**

State priority law will usually require either that the agreement be in place at the time of execution of the Insured Mortgage. The question of the sufficiency of a swap agreement not yet in place at Date of Policy should be referred to the Company's underwriting advisor.

4. **In states with a mortgage tax, swap enhanced loans may structure the swap obligations as additional interest. In such cases, provisions for treatment of the swap obligations as additional interest must be contained in the note and not merely in the interest rate exchange agreement.**

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 29**

For a number of reasons, including the imposition of taxes, the swap obligations to be secured by the Insured Mortgage may be defined as additional interest. If this is the situation, the provisions for this treatment must be contained in the note so as to give notice to intervening parties that the mortgage secures such additional interest (see State Law - Incorporation by Reference above). New York is one such state which has a specific form which must be used. Since normal additional interest is included in the Amount of Indebtedness, the breakage fees thus characterized would be included. Consideration should be given to the position that these special types of "additional interest" were not contemplated as normal components of liability when assessing the premium to be charged for this endorsement. Therefore, the endorsement merits a charge notwithstanding that at the time of issuance of the policy the amount of exposure for loss under the endorsement may be minimal or non-existent.

**OBLIGATORY ADVANCE – FORMS 29-06 and 29.2-06**

These forms treat the swap obligation amounts as additional principal. Form 29-06 requires the Insured to include the amount of any breakage fees in the face amount of the Insured Mortgage to provide for coverage as to those amounts. Form 29.2-06 allows the additional amount of liability to be separately shown in the endorsment. Additional premium would be collected on the amounts shown in the endorsement.

**ADDITIONAL INTEREST - FORM 29.1-06 and 29.3-06**

Form 29.1-06 treats the swap obligation amounts as additional interest. While Conditions 1 (d) (iv) of the 2006 ALTA Loan Policy includes "interest on the loan" as part of the definition of Indebtedness, the endorsement is still necessary in order to insure the validity, priority and enforceability of post-policy interest. Form 29.3-06 allows the additional amount of liability to be separately shown in the endorsment. Additional premium would be collected on the amounts shown in the endorsement.

**MODIFICATION**

In the event that modification of an endorsement is requested, it is necessary to consider your state regulatory requirements for filing and approval of forms.  If the endorsement is modified, the endorsement is not an ALTA form and should not reference ALTA in the title.  You must obtain the approval of the Company's underwriting adviser before complying with any request for a modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                                    **SECTION 29**

ENDORSEMENT

Attached to Policy No._____

**Issued by**
**[FNTG BRAND]**

1. The insurance provided by this endorsement is subject to the exclusions in Section 3 of this endorsement, the Exclusions from Coverage in the Policy, the Exceptions from Coverage contained in Schedule B, and the Conditions. As used in this endorsement:

   a. The "Date of Endorsement" is _____; and

   b. "Swap Obligation" means a monetary obligation under the interest rate exchange agreement dated _____, between _____ and the Insured existing at Date of Endorsement and secured by the Insured Mortgage. The Swap Obligation is included as a part of the Indebtedness.

2. The Company insures against loss or damage sustained by the Insured by reason of the invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as security for the repayment of the Swap Obligation at Date of Endorsement.

3. This endorsement does not insure against loss or damage, and the Company will not pay costs, attorneys' fees, or expenses that arise by reason of:

   a. Rights or obligations set, created or confirmed after the Date of Endorsement under a master interest rate exchange agreement existing on or after Date of Endorsement;

   b. The stay, rejection or avoidance of the lien of the Insured Mortgage as security for the Swap Obligation, or a court order providing some other remedy, by the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws;

   c. The calculation of the amount, if any, determined by a court of competent jurisdiction as the amount of the Swap Obligation[; *or*]

   d. [*The invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as security for repayment of the Swap Obligation because all applicable mortgage recording or similar intangible taxes  were not paid; or* ]

   e. [*If Date of Endorsement is after Date of Policy, add any necessary additional exceptions here*].

This endorsement is issued as part of the policy.  Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy or (iv) increase the Amount of Insurance.  To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls.  Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements to it.

Dated:

By_____
      Authorized Signatory
ALTA Endorsement - Form 29 - 06
(Interest Rate Swap –Direct Obligations**)** (2/3/10)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                                    **SECTION 29**

ENDORSEMENT
Attached to Policy No. _____
**Issued by**
**[FNTG BRAND]**

1.  The insurance provided by this endorsement is subject to the exclusions in Section 3 of this endorsement, the Exclusions from Coverage in the Policy, the Exceptions from Coverage contained in Schedule B, and the Conditions. As used in this endorsement:

    a.  The "Date of Endorsement" is _____; and

    b.  "Swap Obligation" means a monetary obligation under the interest rate exchange agreement dated _____, between _____ and the Insured existing at Date of Endorsement and secured by the Insured Mortgage.

    c.  "Additional Interest" means the additional interest calculated pursuant to the formula provided in the loan documents secured by the Insured Mortgagee at Date of Endorsement.

2.  The Company insures against loss or damage sustained by the Insured by reason of the invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as security for the repayment of the Additional Interest at Date of Endorsement.

3.  This endorsement does not insure against loss or damage, and the Company will not pay costs, attorneys' fees, or expenses that arise by reason of:

    a.  Rights or obligations set, created or confirmed after the Date of Endorsement under a master interest rate exchange agreement existing on or after Date of Endorsement;

    b.  The stay, rejection or avoidance of the lien of the Insured Mortgage as security for the Swap Obligation, or a court order providing some other remedy, by the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws;

    c.  The calculation of the amount, if any, determined by a court of competent jurisdiction as the amount of the Additional Interest*[; or]*

    d.  [*The invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as security for repayment of the Swap Obligation because all applicable mortgage recording or similar intangible taxes were not paid; or* ]

    e.  [*If Date of Endorsement is after Date of Policy, add any necessary additional exceptions here*].

    This endorsement is issued as part of the policy.  Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy or (iv) increase the Amount of Insurance.  To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls.  Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements to it.

Dated:

By_____
              Authorized Signatory

ALTA Endorsement - Form 29.1 - 06
(Interest Rate Swap – Additional Interest**)** (2/3/10)
©American Land Title Association

ENDORSEMENT

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                                    **SECTION 29**

Attached to Policy No._____

**Issued by**
**[FNTG BRAND]**

1.      The insurance provided by this endorsement is subject to the exclusions in Section 3 of this endorsement, the Exclusions from Coverage in the Policy, the Exceptions from     Coverage contained in Schedule B, and the Conditions. As used in this endorsement:

   a.      The "Date of Endorsement" is  _____; and

   b.      "Swap Obligation" means a monetary obligation under the interest rate exchange agreement dated _____, between _____ and the Insured existing at Date of Endorsement and secured by the Insured Mortgage.  The Swap Obligation is included as a part of the Indebtedness.

   c. "Additional Amount of Insurance" is $_____ that is in addition to the Amount of Insurance stated in Schedule A and is Applicable only to loss or damage under this endorsement.

2.      The Company insures against loss or damage sustained by the Insured by reason of the invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as security  for the repayment of the Swap Obligation at Date of Endorsement.

3       This endorsement does not insure against loss or damage, and the Company will not pay  costs, attorneys' fees, or expenses that arise by reason of:

   a.      Rights or obligations set, created or confirmed after the Date of Endorsement under a master interest rate exchange agreement existing on or after Date of Endorsement;

   b.      The stay, rejection or avoidance of the lien of the Insured Mortgage as security for the Swap Obligation, or a court order providing some other remedy, by the operation of         federal bankruptcy, state insolvency, or similar creditors' rights laws;

   c.      The calculation of the amount, if any, determined by a court of competent jurisdiction as the amount of the Swap Obligation[; or]

   d.      [*The invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as security for repayment of the Swap Obligation because all applicable mortgage recording  or similar intangible taxes  were not paid; or* ]

   e.      [*If Date of Endorsement is after Date of Policy, add any necessary additional exceptions here*].

This endorsement is issued as part of the policy.  Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy or (iv) increase the Amount of Insurance.  To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls.  Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements to it.

Dated:

By_____
         Authorized Signatory

ALTA Endorsement - Form 29 .2 - 06
(Interest Rate Swap –Direct Obligations-Defined Amount**)** (8/01/11)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT
Attached to Policy No. _____
**Issued by**
**[FNTG BRAND]**

1.  The insurance provided by this endorsement is subject to the exclusions in Section 3 of this endorsement, the Exclusions from Coverage in the Policy, the Exceptions from Coverage contained in Schedule B, and the Conditions. As used in this endorsement:

    a.   The "Date of Endorsement" is _____; and

    b.   "Swap Obligation" means a monetary obligation under the interest rate exchange agreement dated ____, between _____and the Insured existing at Date of Endorsement and secured by the Insured Mortgage.

    c.   "Additional Interest" means the additional interest calculated pursuant to the formula provided in the loan documents secured by the Insured Mortgagee at Date of Endorsement.

    d.   "Additional Amount of Insurance" is $ _____ that is in addition to the Amount of Insurance stated in Schedule A and is applicable  only to loss or damage under this endorsement.

2.  The Company insures against loss or damage sustained by the Insured by reason of the invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as security for the repayment of the Additional Interest at Date of Endorsement.

3.  This endorsement does not insure against loss or damage, and the Company will not pay costs, attorneys' fees, or expenses that arise by reason of:

    a.   Rights or obligations set, created or confirmed after the Date of Endorsement under a master interest rate exchange agreement existing on or after Date of Endorsement;

    b.   The stay, rejection or avoidance of the lien of the Insured Mortgage as security for the Swap Obligation, or a court order providing some other remedy, by the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws;

    c.   The calculation of the amount, if any, determined by a court of competent jurisdiction as the amount of the Additional Interest*[; or]*

    d.   *[The invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as security for repayment of the Swap Obligation because all applicable mortgage recording or similar intangible taxes were not paid; or ]*

    e.   *[If Date of Endorsement is after Date of Policy, add any necessary additional exceptions here].*

    This endorsement is issued as part of the policy.  Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy or (iv) increase the Amount of Insurance.  To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements to it.

Dated:

By_____
            Authorized Signatory

ALTA Endorsement - Form 29.3 - 06
(Interest Rate Swap – Additional Interest-Defined Amount**)** (8/01/11)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 30**

Return to Table of Contents

**ONE TO FOUR FAMILY SHARED APPRECIATION MORTGAGE ENDORSEMENT**

**COMMERCIAL PARTICIPATION INTEREST**

**ALTA ENDORSEMENT FORMS 30-06 and 30.1-06**


**PURPOSE**

These endorsements are designed to provide additional coverage to the lender when the loan documents provide that the lender will participate in the appreciation in value of the property or a share of the cash flow (as additional interest). The residential version (30-06) was developed for use with government programs that modified and reduced the outstanding debt of homeowners in the face of the downturn of the housing market. These programs allow the recapture of appreciation up to the amount of forgiveness of previously outstanding debt. The use of this endorsement for any other purpose must be approved by the Company's underwriting advisor.

The commercial version (30.1-06) is for use only with commercial transactions and includes, in addition to the increase in the value of the property (appreciation), a share of the cash flow from the property and any increase in the equity of the borrower in the property, and must be approved by the Company's underwriting advisor.  These endorsements provide coverage in the event of an attack on the validity, priority or enforceability of the Insured Mortgage based upon the provisions regarding shared appreciation and participation.


**SECTION OF POLICY AMENDED BY ENDORSEMENT**

Since any appreciation or additional interest will occur in the future, these endorsements specifically provide that the coverage is not subject to Section 3(d) of the Exclusions from Coverage which excludes "Defects, liens, encumbrances, adverse claims, or other matters . . . attaching or created subsequent to Date of Policy . . . ."


**BASIS FOR PROVIDING COVERAGE**

**ALTA Form 30-06: One To Four Family Shared Appreciation Mortgage Endorsement**

1.  **State Law:**  Many states have passed legislation specifically authorizing the lender to share in the appreciation of the property.   The state statute must be examined for provisions setting specific limits and formulas, and the loan documents must be reviewed to verify that the loan complies with those limits and formulas.   If the statute has no such limits or formulas, consideration should be given to the possibility that (a) the method of calculation used in the

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

Insured Mortgage, or (b) the extent to which certain additional obligations might continue even after the principal is paid, might be so weighted in the lender's favor as to "shock the conscience" of the court and perhaps render the shared appreciation provisions of the Insured Mortgage invalid, or which could lead to a claim of "clogging" the equity of redemption in a bankruptcy or foreclosure situation.

2. **Insured Mortgage must include the formula for calculation:**  The Insured Mortgage must <u>expressly</u> state that it is a Shared Appreciation Mortgage **and** include the actual formula or calculation method used to determine the lender's share.   The formula or calculation method **cannot** simply be incorporated by reference to the provisions of the note or loan agreement.

3.  **Loan is not a joint venture:**  Consideration must also be given to whether or not the loan is really a loan.  Could it be recharacterized as a joint venture arrangement with the borrower?  The terms and provisions of the loan documentation must be reviewed for a determination as to the nature and extent of control that the lender will have over the operations of the borrower.  If these controls are extensive and there is a risk that the loan will be recharacterized, then this endorsement should not be issued. Any such issues must be discussed with the Company underwriting advisor before this endorsement is offered.

This endorsement is designed for use with an ALTA Loan Policy issued in connection with a **<u>residential</u>** transaction. See Section 51 (Shared Appreciation Mortgage Endorsement-Commercial), Section 52 (Share of Cash Flow (Additional Interest) Endorsement) and the discussion of the ALTA 30.1-06 below for Commercial coverages.

**NOTE:**  THIS ENDORSEMENT MAY ONLY BE USED IN CONNECTION WITH LOANS ON ONE TO FOUR FAMILY RESIDENTIAL PROPERTIES.

**<u>ALTA FORM 30.1-06: Commercial Participation Interest</u>**

1.  **State Law:**  Some states have passed legislation specifically authorizing the charge of "additional interest" which is how the participation interest is designated. These statutes must be examined for provisions setting specific limits and formulas, and the loan documents must be reviewed to verify that the loan complies with those limits and formulas.  If the statute has no such limits or formulas, consideration should be given to the possibility that (a) the method of calculation used in the Insured Mortgage, or (b) the extent to which certain additional obligations might continue even after the principal is paid, might be so weighted in the lender's favor as to

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

"shock the conscience" of the court and perhaps render the shared appreciation provisions of the Insured Mortgage invalid or which could lead to a claim of "clogging" the equity of redemption in a bankruptcy or foreclosure situation.

2. **Insured Mortgage must include the formula for calculation:**  The Insured Mortgage must <u>expressly</u> state that it is a Shared Appreciation Mortgage (if that is what the statutes require)  **and** include the actual formula or calculation method used to determine the lender's additional interest.   The formula or calculation method **cannot** simply be incorporated by reference to the provisions of the note or loan agreement.

3.  **Loan is not a joint venture:**  Consideration must also be given to whether or not the loan is really a loan.  Could it be recharacterized as a joint venture arrangement with the borrower?  The terms and provisions of the loan documentation must be reviewed for a determination as to the nature and extent of control that the lender will have over the operations of the borrower.  If these controls are extensive and there is a risk that the loan will be recharacterized, then this endorsement should not be issued. Any such issues must be discussed with the Company Underwriting advisor before this endorsement is offered.

4.  **Amount of Insurance:** The minimum Policy Amount should be the sum of the principal debt plus a reasonable estimate of the amount of "shared appreciation interest". Usury, consumer credit protection or truth in lending laws, and costs required to obtain a determination of the amount of additional interest due are specifically mentioned to reinforce the idea that the express insurance does not cover these matters.

This endorsement is designed for use with an ALTA Loan Policy issued in connection with a **commercial** transaction.

## MODIFICATION

In the event that modification of an endorsement is requested, it is necessary to consider your state regulatory requirements for filing and approval of forms. If the endorsement is modified, the endorsement is not an ALTA form and should not reference ALTA in the title.  You must obtain the approval of the Company's underwriting advisor before complying with any request for a modification.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                              **SECTION 30**

ENDORSEMENT

Attached to Policy No.

**Issued by**

**[FNTG Brand]**

The insurance afforded by this endorsement is only effective if the Land is a one to four family residence.

For the purposes of this endorsement, "Shared Appreciation" shall mean increases in the Indebtedness secured by the Insured Mortgage by reason of shared equity or appreciation in the value of the Land.

The Company insures against loss or damage sustained by the Insured by reason of:

    (a)  The invalidity or unenforceability of the lien of the Insured Mortgage as security for the Indebtedness caused by the provisions for Shared Appreciation; or

    (b)  Loss of priority of the lien of the Insured Mortgage as security for the Indebtedness caused by the provisions for Shared Appreciation.

Nothing contained in this endorsement shall be construed as insuring against loss or damage sustained or incurred by reason of:

    (a)  usury;

    (b)  any consumer credit protection or truth in lending law;

    (c)  costs, expenses or attorney's fees required to obtain a determination, by judicial proceedings or otherwise, of the amount of the Shared Appreciation;

    (d)  failure to comply with applicable laws and regulations regarding Shared Appreciation;

    (e)  the stay, rejection or avoidance of the lien of the Insured Mortgage as security for the Shared Appreciation, or a court order providing some other remedy, by the operation of federal bankruptcy, state insolvency or similar creditors' rights laws; or

    (f)  the invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as security for the Indebtedness because all applicable mortgage recording or similar intangible taxes were not paid.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Dated:

By_____

  Authorized Signatory

ALTA Endorsement Form 30-06
(One to Four Family Shared Appreciation Mortgage) (7/26/10)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT

Attached to Policy No.

**Issued by**

**[FNTG Brand]**

1.      This endorsement is subject to the exclusions in Section 4 of this endorsement, the Exclusions from Coverage in the policy, the Exceptions from Coverage contained in Schedule B, and the Conditions.

2.      As used in this endorsement,

a.  "Loan Documents" means those documents, as they exist at Date of Policy, creating the Indebtedness.

b.  "Participation Interest" means those elements of interest, established and calculated pursuant to the formula provided in the Loan Documents, that are payable or allocated to the Insured based upon:

        i.   the borrower's equity in the Title;
       ii.   the increase in value of the Title; or
     iii.   cash flow.

3.      The policy insures as of Date of Policy against loss or damage sustained by the Insured by reason of:

a.  The invalidity or unenforceability of the lien of the Insured Mortgage resulting from the provisions in the Insured Mortgage or in the Loan Documents which provide for Participation Interest.

b.  Lack of priority of the lien of the Insured Mortgage at Date of Policy as security for (i) the unpaid principal balance of the loan and (ii) the interest on the loan, including the Participation Interest, if any, which lack of priority is caused by the provisions in the Loan Documents for payment or allocation to the Insured of any Participation Interest.

4.      The policy does not insure against loss or damage, and the Company will not pay costs, attorneys' fees, or expenses that arise by reason of:

a.        usury; unconscionability; or any consumer credit protection or truth-in-lending law;
b.        disputes over the amount of Participation Interest;
c.        failure to comply with applicable laws and regulations regarding Participation Interest;
d.  the invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as security for the Participation Interest because all applicable mortgage recording or similar intangible taxes were not paid; or
e.  any  statutory lien for services provided, labor performed, or materials or equipment furnished arising after Date of Policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Dated:


By_____

   Authorized Signatory

ALTA Endorsement Form 30.1-06
(Commercial Participation Interest) (8/1/12)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                                    SECTION 31

Return to Table of Contents

## SEVERABLE IMPROVEMENTS
## ALTA ENDORSEMENT - FORM 31-06

### PURPOSE

This endorsement adds, as a part of the calculation of the Insured's loss, the diminution in value of the Insured's interest in any defined Severable Improvement affixed to the Land, as well as the reasonable cost of removal or relocation of these. Severable Improvements are defined as property that by law does not constitute real property. Land is defined in the policy as land and improvements that by law constitute real property.

### SECTIONS OF POLICY AMENDED BY ENDORSEMENT

This endorsement amends Section 8 of the Conditions of the policy. However, it explicitly states that the calculation of loss under the endorsement shall not be in addition to valuations of the Title otherwise determined pursuant to Section 8 or any other endorsement to the Policy. For instance, ALTA Endorsements 13.0-06 and 13.1-06 already provide coverage for the reasonable costs of relocating personal property.

### BASIS FOR PROVIDING COVERAGE

**CAUTION:** THE COMPANY'S UNDERWRITING ADVISOR SHOULD BE CONSULTED FOR INSURABILITY IN YOUR STATE.

While the endorsement clearly indicates at paragraph 3 that it is **not** providing insurance with respect to the title to personal property, nonetheless the question of compliance with state mono-line regulations must be considered before agreeing to issue. The Amount of Insurance on Schedule A should be in excess of the amount which would otherwise be applicable pursuant to Section 8 of the Conditions of the policy if the endorsement were not to be issued.

### MODIFICATION

In the event that modification of an endorsement is requested, it is necessary to consider your state regulatory requirements for filing and approval of forms. If the endorsement is modified, the endorsement is not an ALTA form and should not reference ALTA in the title. You must obtain the approval of the Company's underwriting adviser before complying with any request for a modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**ENDORSEMENT**

Attached to Policy No._____
Issued by
[FNTG BRAND]

1.    As used in this endorsement, "Severable Improvement" means property affixed to the Land on or after Date of Policy that by law does not constitute real property because:

   a.    of its character and manner of attachment to the Land; and

   b.    it can be severed from the Land without causing material damage to it or to the Land.

2.    In the event of a loss by reason of a defect, lien, encumbrance, or other matter covered by this Policy ("Defect"), the calculation of the loss shall include (but not to the extent that these items of loss are included in the valuation of the Title determined pursuant to Section 8 of the Conditions or any other endorsement to the Policy):

   a.    the diminution in value of the Insured's interest in any Severable Improvement resulting from the Defect, reduced by the salvage value of the Severable Improvement; and

   b.    the reasonable cost actually incurred by the Insured in connection with the removal or relocation of the Severable Improvement resulting from the Defect and the cost of transportation of that Severable Improvement for the initial one hundred miles incurred in connection with the relocation.

3.    This endorsement relates solely to the calculation of the Insured's loss resulting from a claim based on a defect, lien, encumbrance or other matter otherwise insured against by the Policy. This Policy does not insure against loss or damage (and the Company will not pay any costs, attorneys' fees or expenses) relating to:

   a.    the attachment, perfection or priority of any security interest in the Severable Improvement;

   b.    the vesting or ownership of title to or rights in any Severable Improvement;

   c.    any defect in or lien or encumbrance on the title to any Severable Improvement; or

   d.    the determination of whether any specific property is real or personal in nature.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]
Dated:
[FNTG Brand]
BY: _____
              AUTHORIZED SIGNATORY

ALTA Endorsement Form 31-06
(Severable Improvements) (2-3-11)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 32**

**Return to Table of Contents**

**CONSTRUCTION LOAN**

**ALTA ENDORSEMENT – FORMS 32-06 (Construction Loan – Loss of Priority)**

**32.1-06 (Construction Loan – Loss of Priority-Direct Payment)**

**32.2-06 (Construction Loan –Loss of Priority- Insured's Direct Payment)**

**PURPOSE**

These endorsements, together with the 33-06 (Disbursement) replace the ALTA Construction Loan Policy and the Construction Loan Policy Endorsements A through D which have been decertified and are no longer available.

***The issuance of any construction lien or mechanic's lien coverage is extra-hazardous and all Company guidelines and authority limits must be strictly observed. The availability of these endorsements must be authorized by your Company underwriting advisor. Many states use state specific forms for these coverages and in all cases those state forms would be used unless directed to use this form by your Company underwriting advisor. This or similar coverage may not be available in your state.***

These endorsements were developed to give limited coverage where priority has been lost.  They only give coverage to the extent of work that the lender has paid for, with the ALTA 32-06 and the ALTA 32.1-06 further limited to liens filed by parties that have been identified on a draw request either paid by the Insured or the Company. They do not give coverage over other inchoate liens that can prime the construction mortgage. The 32-06 covers payment as disclosed by a draw request; the 32.1-06 is for use when payments are made directly to the sub-contractor or supplier, the 32.2 covers a lien filed for payment of previously paid amounts. Please see each section below for further guidance.

Each gives coverage over FILED mechanic's liens <u>if we have not disclosed them</u> in the policy or ALTA 33-06 (Disbursement) Endorsements which change the Date of Coverage as defined therein.

The issuance of these endorsements **requires** the following exception to be included in Schedule B of the policy in the place of the general mechanic's lien exception:

> ***Any statutory lien or claim of lien, affecting the Title, that arises from services provided, labor performed, or materials or equipment furnished, except as insured by the attached ALTA 32-06 Endorsement [or 32.1-06 or 32.2-06 whichever is used] as it may be revised by ALTA 33-06 (Disbursement) Endorsements.***

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                              **SECTION 32**

You may modify this exception to use local terminology. The important thing is to raise the exception for all other mechanic's lien issues not covered by these limited endorsements but carve out the coverage that is afforded by them.

ALTA ENDORSEMENT – FORM 32-06 (Construction Loan – Loss of Priority)

This endorsement insures the priority of a construction loan disbursement where the Insured Mortgage does not have priority over Construction or Mechanic's Liens (hereafter referred to as "mechanic's lien") to the extent that the mechanic's lien arises from a misdisbursement of funds to pay for services, labor or material that "…were designated for payment in the documents supporting a Construction Loan Advance disbursed by or on behalf of the Insured on or before Date of Coverage."  This misdisbursement coverage does not require the names of the parties providing the services, labor or material being paid for and covers lower tier derivative liens such as material suppliers of a paid subcontractor.    Note that the misdisbursement risk includes the risk of inadequate descriptions of who is doing the work and how much they were paid.  This endorsement is similar in coverage to the old ALTA Endorsement A type mechanic lien coverage, which has been withdrawn (decertified).

**SECTIONS OF POLICY AMENDED BY ENDORSEMENT**

The endorsement deletes Covered Risk 11(a) of the policy.

**BASIS FOR PROVIDING COVERAGE**

Coverage is provided based upon a combination of
- disclosure of any filed or recorded liens on the Land
- evidence of sufficiency of funds to pay for the cost of construction;
- draw by draw documentation indicating who is to be paid or what is to be paid  or what services, labor or material is being paid for and how much is to be paid as disclosed in the lender approved draw request and as supplemented by lower tier documentation as is appropriate;
- evidence of payment (usually in the form of lien waivers indicating payment);  and
- indemnification to cover misdisbursement or non-payment by any party at any level, since funds may flow from the owner to the contractor to a subcontractor to a sub-subcontractor to a material supplier for the defined work.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

The Company has specific departments which specialize in construction disbursing and documentation review.   Their use to review construction documentation when issuing this endorsement will often be required by underwriting.

Consider the typical scenario where the lender pays the general contractor ("GC") $20,000 for electric work.  While we should strive for statements and lien waivers showing that $20,000 (at times less the GC's overhead and profit) went to an electrician and its suppliers or went to the electrician who paid its suppliers, the indemnity covers the risk of the GC not paying all to the electrician or the electrician not paying an undisclosed supplier.

The ALTA 32-06 is often issued in conjunction with an ALTA 33-06, which extends the Date of Coverage as defined therein but should not be used to extend the Date of Policy.
The form does not lend itself to delayed draws without further modification. You must consult with your Company Underwriting Advisor for any variations.

This is a generic endorsement that would customarily be used in states where the construction lender could have obtained statutory priority but did not and the company is unwilling to insure the lender without a mechanic lien exception.  **REMEMBER: Any use of this endorsement must be approved by your Company underwriting advisor.**

ALTA ENDORSEMENT – FORM 32.1-06 (Construction Loan – Loss of Priority – Direct Payment)

This endorsement insures the priority of a construction loan disbursement where the Insured Mortgage does not have priority over any mechanic lien to the extent that the mechanic's lien arises from a misdisbursement of funds to pay for services, labor or material "…to the extent that direct payment to the Mechanic's Lien claimant has been made by the Company or by the Insured with the Company's written approval." The effective coverage given is as to that portion of a mechanic's lien claim due to amounts that we acknowledge as having been directly paid to the claimant, either by the Company or under an agreement with a third party to pay directly.   This coverage does not cover lower tier derivative liens such as material suppliers of a paid subcontractor. The customary payment practice of many lenders is to pay the general contractor ("GC") directly, and such payments would <u>not</u> be covered under this endorsement for mechanic's lien claims filed by parties claiming by, through or under the GC since only the GC received direct payment.  Payment directly to the owner for disbursement to the trades gives no mechanic's lien coverage to the Insured either.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

## SECTIONS OF POLICY AMENDED BY ENDORSEMENT

The endorsement deletes Covered Risk 11(a) of the policy.

## BASIS FOR PROVIDING COVERAGE

Coverage is provided based upon draw by draw documentation indicating who is to be paid what amount directly by the Company or by the Insured, and the collection of evidence, such as lien waivers, to support such payment and coverage.

The ALTA 32.1-06 is often issued in conjunction with an ALTA 33-06, which extends the Date of Coverage as defined therein. The policy and any subsequent endorsements must disclose any filed or recorded liens.

Note that while the coverage to the Insured lender is limited to those funds the Company has either paid directly or has agreed to recognize as paid by the Insured, additional documentation and indemnification to cover misdisbursement or non-payment by any party at any level will likely be required if mechanic's lien coverage is given either to a third party purchaser, a purchaser's lender or a permanent lender who pays off the construction loan where those insureds do not have statutory protections and liens may still be filed which affect their interests.

This is a generic endorsement that would customarily be used in states where the construction lender could have obtained statutory priority but did not and the company is unwilling to insure the lender without a mechanic lien exception.  **REMEMBER: Any use of this endorsement must be approved by your Company underwriting advisor.**

ALTA ENDORSEMENT – FORM 32.2-06 (Construction Loan – Loss of Priority – Insured's Direct Payment)

This endorsement insures the priority of a construction loan disbursement where the Insured Mortgage does not have priority over any mechanic's lien to the extent that the mechanic's lien arises from a disbursement of funds to pay for services, labor or material "…to the extent that direct payment to the Mechanic's Lien claimant has been made by the Insured or on the Insured's behalf". The effective coverage given is as to that portion of a mechanic's lien claim due to amounts that that the Insured actually paid directly to the claimant,  or actual payments made on behalf of the Insured  by a third party.   This coverage does not cover lower tier derivative liens such as material suppliers of a paid subcontractor. The customary payment practice of many

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

lenders is to pay the general contractor ("GC") directly, and such payments would <u>not</u> be covered under this endorsement for mechanic lien claims filed by parties claiming by, through or under the GC since only the GC received direct payment.  Payment directly to the owner for disbursement to the trades gives no mechanics lien coverage to the Insured either.

## SECTIONS OF POLICY AMENDED BY ENDORSEMENT

The endorsement deletes Covered Risk 11(a) of the policy.

## BASIS FOR PROVIDING COVERAGE

Coverage is provided based upon the a check of the Public Records for each extension of time under the issuance of an ALTA 33-06, which extends the Date of Coverage as defined therein. Any recorded liens would be raised in the ALTA 33-06.

Note that while the coverage to the Insured lender is limited to those funds the Insured has either paid directly or has had paid directly to the lien claimant on its behalf, additional documentation and indemnification to cover misdisbursement or non-payment by any party at any level will likely be required if mechanic's lien coverage is given either to a third party purchaser, a purchaser's lender or a permanent lender who pays off the construction loan where those insureds do not have statutory protections and liens may still be filed which affect their interests.

This is a generic endorsement that would customarily be used in states where the construction lender could have obtained statutory priority but did not and the company is unwilling to insure the lender without a mechanic lien exception.  **REMEMBER: Any use of this endorsement must be approved by your Company underwriting advisor.**

## MODIFICATION

In the event that modification of an endorsement is requested, it is necessary to consider your state regulatory requirements for filing and approval of forms. The ALTA has provided that the title underwriters "are free to use these endorsements, [32-06, 32.1-06 and 32.2-06] subject to any changes or limitations they …consider appropriate." You must obtain the approval of the Company's underwriting advisor before complying with any request for a modification.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 32**

**ENDORSEMENT**

**Attached to Policy No. _____**

**Issued by [FNTG BRAND]**

1.   Covered Risk 11(a) of this policy is deleted.

2.   The insurance [for Construction Loan Advances] added by Section 3 of this endorsement is subject to the exclusions in Section 4 of this endorsement and the Exclusions from Coverage in the Policy, the provisions of the Conditions, and the exceptions contained in Schedule B. For the purposes of this endorsement and each subsequent Disbursement Endorsement:

   a.   "Date of Coverage" is _____ unless the Company sets a different Date of Coverage by an ALTA 33-06 Disbursement Endorsement issued at the discretion of the Company.

   b.   "Construction Loan Advance" shall mean an advance that constitutes Indebtedness made on or before Date of Coverage for the purpose of financing in whole or in part construction of improvements on the Land.

   c.   "Mechanic's Lien" shall mean any statutory lien or claim of lien, affecting the Title, that arises from services provided, labor performed, or materials or equipment furnished.

3.   The Company insures against loss or damage sustained by the Insured by reason of:

   a.   The invalidity or unenforceability of the lien of the Insured Mortgage as security for each Construction Loan Advance made on or before the Date of Coverage;

   b.   The lack of priority of the lien of the Insured Mortgage as security for each Construction Loan Advance made on or before the Date of Coverage, over any lien or encumbrance on the Title recorded in the Public Records and not shown in Schedule B; and

   c.   The lack of priority of the lien of the Insured Mortgage, as security for each Construction Loan Advance made on or before the Date of Coverage over any Mechanic's Lien, if notice of the Mechanic's Lien is not filed or recorded in the Public Records, but only to the extent that the charges for the services, labor, materials or equipment for which the Mechanic's Lien is claimed were designated for payment in the documents supporting a Construction Loan Advance disbursed by or on behalf of the Insured on or before Date of Coverage.

4    This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) by reason of any Mechanic's Lien arising from services, labor, material or equipment:
   a.   furnished after Date of Coverage: or
   b.   not designated for payment in the documents supporting a Construction Loan Advance disbursed by or on behalf of the Insured on or before Date of Coverage.

This endorsement is issued as part of the policy.  Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance.  To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls.  Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

[Bracketed material optional]

 [FNTG BRAND]

BY: _____
           Authorized Signatory

ALTA Endorsement Form 32-06
(Construction Loan-Loss of Priority) (2-3-11)
© American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**ENDORSEMENT**

**Attached to Policy No. _____**

**Issued by [FNTG BRAND]**

1.  Covered Risk 11(a) of this policy is deleted.

2.  The insurance [for Construction Loan Advances] added by Section 3 of this endorsement is subject to the exclusions in Section 4 of this endorsement and the Exclusions from Coverage in the Policy, the provisions of the Conditions, and the exceptions contained in Schedule B. For the purposes of this endorsement and each subsequent Disbursement Endorsement:

    a.  "Date of Coverage" is_____ unless the Company sets a different Date of Coverage by an ALTA 33-06 Disbursement Endorsement issued at the discretion of the Company.

    b.  "Construction Loan Advance" shall mean an advance that constitutes Indebtedness made on or before Date of Coverage for the purpose of financing in whole or in part the construction of improvements on the Land.

    c.  "Mechanic's Lien" shall mean any statutory lien or claim of lien, affecting the Title, that arises from services provided, labor performed, or materials or equipment furnished.

3.  The Company insures against loss or damage sustained by the Insured by reason of:

    a.  The invalidity or unenforceability of the lien of the Insured Mortgage as security for each Construction Loan Advance made on or before the Date of Coverage;

    b.  The lack of priority of the lien of the Insured Mortgage as security for each Construction Loan Advance made on or before the Date of Coverage, over any lien or encumbrance on the Title recorded in the Public Records and not shown in Schedule B; and

    c.  The lack of priority of the lien of the Insured Mortgage as security for each Construction Loan Advance made on or before the Date of Coverage over any Mechanic's Lien if notice of the Mechanic's Lien is not filed or recorded in the Public Records, but only to the extent that direct payment to the Mechanic's Lien claimant for the charges for the services, labor, materials or equipment  for which the Mechanic's Lien is claimed  has been made by the Company or by the Insured with the Company's written approval.

4.  This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) by reason of any Mechanic's Lien arising from services, labor, material or equipment:
    a.  furnished after Date of Coverage; or
    b.  to the extent that the Mechanic's Lien claimant was not directly paid by the Company or by the Insured with the Company's written approval.

This endorsement is issued as part of the policy.  Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance.  To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls.  Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

 [Witness clause optional]

[Bracketed material optional]

[FNTG BRAND]

By: _____

ALTA Endorsement Form 32.1-06
(Construction Loan-Loss of Priority-Direct Payment) (rev. 4-2-13)
 American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                                    **SECTION 32**

**ENDORSEMENT**

**Attached to Policy No. _____**

**Issued by [FNTG BRAND]**

1.    Covered Risk 11(a) of this policy is deleted.

2.    The insurance [for Construction Loan Advances] added by Section 3 of this endorsement is subject to the exclusions in Section 4 of this endorsement and the Exclusions from Coverage in the Policy, the provisions of the Conditions, and the exceptions contained in Schedule B. For the purposes of this endorsement and each subsequent Disbursement Endorsement:

    a.    "Date of Coverage" is[_____ unless the Company sets a different Date of Coverage by an ALTA 33-06 Disbursement Endorsement issued at the discretion of the Company.

    b.    "Construction Loan Advance" shall mean an advance that constitutes Indebtedness made on or before Date of Coverage for the purpose of financing in whole or in part the construction of improvements on the Land.

    c.    "Mechanic's Lien" shall mean any statutory lien or claim of lien, affecting the Title, that arises from services provided, labor performed, or materials or equipment furnished.

3.    The Company insures against loss or damage sustained by the Insured by reason of:

    a.    The invalidity or unenforceability of the lien of the Insured Mortgage as security for each Construction Loan Advance made on or before the Date of Coverage;

    b.    The lack of priority of the lien of the Insured Mortgage as security for each Construction Loan Advance made on or before the Date of Coverage, over any lien or encumbrance on the Title recorded in the Public Records and not shown in Schedule B; and

    c.    The lack of priority of the lien of the Insured Mortgage, as security for each Construction Loan Advance made on or before the Date of Coverage over any Mechanic's Lien, if notice of the Mechanic's Lien is not filed or recorded in the Public Records, but only to the extent that a direct payment to the Mechanic's Lien claimant  for the charges for the services, labor, materials or equipment  for which the Mechanic's Lien is claimed  has been made by the Insured  or on the Insured's behalf on or before Date of Coverage.

4    This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) by reason of any Mechanic's Lien arising from services, labor, material or equipment:
    a.    furnished after Date of Coverage: or
    b.    To the extent that the Mechanic's lien claimant was not directly paid by the Insured  or on the Insured's behalf.

This endorsement is issued as part of the policy.  Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance.  To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls.  Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

[Bracketed material optional]

 [FNTG BRAND]

BY: _____
          Authorized Signatory

ALTA Endorsement Form 32.2-06
(Construction Loan-Loss of Priority-Insured's Direct Payment) (rev. 4/2/13)
© American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 33**

**Return to Table of Contents**

### CONSTRUCTION LOAN DISBURSEMENT
### ALTA ENDORSEMENT - FORM 33-06

#### PURPOSE

This endorsement is used in conjunction with ALTA Form 32-06 or 32.1-06 when the Date of Coverage to be extended.

***The issuance of any construction lien or mechanic lien coverage is extra-hazardous and all Company guidelines and authority limits must be strictly observed. The availability of this endorsement must be authorized by your Company underwriting advisor. Many states use state specific forms for this coverage and in all cases those forms would be used unless directed to use this form by your Company underwriting advisor.***

#### SECTIONS OF POLICY AMENDED BY ENDORSEMENT

As used with the Construction Loan forms discussed in Section 32, this endorsement modifies the Date of Coverage originally indicated in those forms.

#### BASIS FOR PROVIDING COVERAGE

A search of the Public Records according to state underwriting guidelines should be done before each draw and any matters disclosed by such a search should be added to the endorsement in the appropriate place. The Date of Coverage is the date through which we are willing to extend the liability for mechanic liens as discussed in Section 32. It may be the date of the draw request, but in all cases the title search must cover that date. It is especially important to verify that any ML notices or other instruments of that nature have been found and disclosed. If matters are added to Schedule A and B of the policy, care should be taken that all matters are shown appropriately.

**REMEMBER: Any use of this endorsement must be approved by your Company underwriting advisor.**

#### MODIFICATION

In the event that modification of an endorsement is requested, it is necessary to consider your state regulatory requirements for filing and approval of forms. The ALTA has provided that the title underwriters "are free to use [Form 33-06], subject to any changes or limitations they …consider appropriate." You must obtain the approval of the Company's underwriting advisor before complying with any request for a modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**ENDORSEMENT**

Attached to Policy No._____
Issued by
[FNTG BRAND]

1.  The Date of Coverage is amended to _____.

    [a.  The current disbursement is: $ _____ ]

    [b.  The aggregate amount, including the current disbursement, recognized by the Company
    as disbursed by the Insured is: $_____]

2.  Schedule A is amended as follows:

3.  Schedule B is amended as follows:

    [Part I]

    [Part II]

This endorsement is issued as part of the policy.  Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy or (iv) increase the Amount of Insurance.  To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls.  Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements to it.

[Witness Optional]
[Bracketed material optional]

DATED:

[FNTG BRAND]

BY: _____
        AUTHORIZED SIGNATORY

ALTA Endorsement Form 33-06
(Disbursement) (2-3-11)
© American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 34**

**Return to Table of Contents**

**IDENTIFIED RISK COVERAGE**

**ALTA ENDORSEMENT – FORM 34-06**

**PURPOSE**

This endorsement should be used whenever we decide to assume a specific risk or "Identified Risk" as defined therein. Sometime this is referred to as "insuring over", especially when we have raised that risk in a commitment or policy. It may also be referred to as "affirmative coverage".  There are many ways for the Company to assume the risk of a known title issue, and they vary in clarity and scope. Any such coverage should be granted in conformance with the structure of the commitment or policy, using indemnity language and limiting the scope to expressly identify the quantity of risk undertaken. Our willingness to give additional coverage is a matter to be discussed with your Company underwriting advisor.  Once we have decided what specific risks we will cover, the use of this endorsement is strongly recommended. The Company would like to standardize the format for the granting of this type of coverage. The use of the endorsement clarifies the impact of the coverage on the general marketability coverage afforded by the policy. It also clarifies that although we require a final court decree before loss can be determined, it does not relieve us of the duty to defend. If we are unwilling to include defense costs in our coverage, additional language and modifications must be made to the endorsement.

**SECTIONS OF POLICY AMENDED BY ENDORSEMENT**

The endorsement modifies the referenced exception, or Identified Risk. It modifies the definition of Covered Risk 3 (Unmarketable Title) to provide that, for the Identified Risk, only insurable title is being offered. In other words, loss can only be occasioned upon the refusal to subsequently insure with the limited coverage granted.

**BASIS FOR PROVIDING COVERAGE**

The underwriting for the granting of any type of additional coverage in reference to a specific exception must be according to Company guidelines and approved at the proper levels. Your Company underwriting advisor must be consulted. Typically, the description of the "Identified Risk" required in Item 1 of the endorsement would be the same as the exception shown in Schedule  B – "Mortgage from---to---…." or "Violation of Restriction …." Occasionally, such as with an encroachment, we should limit the Identified Risk to the enforced removal of that encroachment only, or consider the use of the ALTA Form 28-06 if the encroachment is onto an easement.  We don't intend to assume liability for any other type of loss that could be imposed by an encroachment, such as money damages, other rights imposed in lieu of enforced removal or

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

zoning issues. In the case of any type of encroachment that is being shown as an exception, we should describe the Identified Risk as the "enforced removal of the improvement" shown as the encroachment described in the exception.

## MODIFICATION

In the event that modification of an endorsement is requested, it is necessary to consider your state regulatory requirements for filing and approval of forms. If the endorsement is modified, the endorsement is not an ALTA form and should not reference ALTA in the title.  You must obtain the approval of the Company's underwriting adviser before complying with any request for a modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 34**

**ENDORSEMENT**
Attached to Policy No._____
Issued by
[FNTG BRAND]

1. As used in this endorsement "Identified Risk" means: [*insert description of the title defect, restriction encumbrance or other matter*] described in Exception _____ of Schedule B.

2. The Company insures against loss or damage sustained by the Insured by reason of:

   a. A final order or decree enforcing the Identified Risk in favor of an adverse party; or

   b. The release of a prospective purchaser or lessee of the Title or lender on the Title from the obligation to purchase, lease, or lend as a result of the Identified Risk, but only if

      i. there is a contractual condition requiring the delivery of marketable title, and

      ii. neither the Company nor any other title insurance company is willing to insure over the Identified Risk with the same conditions as in this endorsement.

3. The Company will also pay the costs, attorneys' fees, and expenses incurred in defense of the Title by reason of the Identified Risk insured against by Paragraph 2 of this endorsement, but only to the extent provided in the Conditions.

4. This endorsement does not obligate the Company to establish the Title free of the Identified Risk or to remove the Identified Risk, but if the Company does establish the Title free of the Identified Risk or removes it, Section 9(a) of the Conditions applies.

This endorsement is issued as part of the policy.  Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy or (iv) increase the Amount of Insurance.  To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls.  Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements to it.

[Witness Optional]

DATED:

[FNTG BRAND]

BY: _____
        AUTHORIZED SIGNATORY

ALTA Endorsement Form 34-06
(Identified Risk Coverage) (8-1-11)
© American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

Return to Table of Contents

## MINERALS AND OTHER SUBSURFACE SUBSTANCES

## ALTA ENDORSEMENT – FORMS 35-06, 35.1-06, 35.2-06, 35.3-06

### PURPOSE

These endorsement forms were originally  developed to provide coverage to lenders with respect to the enforced removal or alteration of improvements resulting from the extraction or development of minerals or other subsurface substances. This coverage was previously included in the former ALTA 9 series. It is no longer contained within those endorsements other than the revised ALTA 9-06 and the new ALTA 9.7-06. This coverage may be available in some areas for owners policies also.

### SECTIONS OF POLICY AMENDED BY ENDORSEMENT

No specific sections of the policy are amended by this endorsement; however additional coverages are added.

### BASIS FOR PROVIDING COVERAGE

These endorsements differ only in the definitions of "Improvement".

- Form 35-06 - "Improvement" means a building on the Land at Date of Policy.
- Form 35.1-06 -  "Improvement" means a building, structure located on the surface of the Land, and any paved road, walkway, parking area, driveway, or curb, affixed to the Land at Date of Policy and that by law constitutes real property, but excluding any crops, landscaping, lawn, shrubbery, or trees.
- Form 35.2-06 - "Improvement" means each improvement on the Land at Date of Policy specifically described and itemized on the exhibit attached to the endorsement.
- Form 35.3-06 - "Improvement" and "Future Improvement" are included in the coverage.

  o  "Improvement" means a building, structure located on the surface of the Land, and any paved road, walkway, parking area, driveway, or curb, affixed to the Land at Date of Policy and that by law constitutes real property, but excluding any crops, landscaping, lawn, shrubbery, or trees.

  o   "Future Improvement" means a building, structure, and any paved road, walkway, parking area, driveway, or curb to be constructed on or affixed to the Land in the locations according to certain Plans identified in the endorsement and that by law will constitute real property, but excluding any crops, landscaping, lawn, shrubbery, or trees.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

The insurance is afforded only for damage caused by the enforced removal based up the right to use the surface of the land to extract or develop mineral interests. It is not appropriate for other mineral interests. Coverage may be given provided:

- There is no separation of minerals from the surface estate by deed, lease or otherwise; or
- There is a separate mineral estate but it does not include any rights of surface entry; or
- Mineral rights, with rights of surface entry either expressed or implied, have been severed from the surface estate.  However, the land and surrounding area is entirely improved with residential development.  Under these circumstances, submit the request for coverage to the Company's underwriting advisor who will consider the risk based upon such things as the size of the parcel, use (proposed or current), local zoning, ownership of minerals and the possibility of waiver of mineral rights. The Company's underwriting advisor will review appropriate surveys, or site and elevations plans; or
- The instrument containing the rights includes the obligation of the mineral owner to not damage any existing buildings. Care must be taken to verify the current improvements were in existence at the time of the creation of the mineral interest. Form 35.3-06 would not be available in this instance.

The form allows you to identify any specific grants or reservations of mineral rights that you do NOT wish to give coverage over.

## MODIFICATION

In the event that modification of an endorsement is requested, it is necessary to consider your state regulatory requirements for filing and approval of forms. If the endorsement is modified, the endorsement is not an ALTA form and should not reference ALTA in the title.  You must obtain the approval of the Company's underwriting adviser before complying with any request for a modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 35**

**ENDORSEMENT**

**Attached to Policy No. _____**

**Issued by**

*[FNTG BRAND]*

1. The insurance provided by this endorsement is subject to the exclusion in Section 4 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2. For purposes of this endorsement only, "Improvement" means a building on the Land at Date of Policy.

3. The Company insures against loss or damage sustained by the Insured by reason of the enforced removal or alteration of any Improvement resulting from the future exercise of any right existing at Date of Policy to use the surface of the Land for the extraction or development of minerals or any other subsurface substances excepted from the description of the Land or excepted in Schedule B.

4. This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:

    a. contamination, explosion, fire, vibration, fracturing, earthquake or subsidence; [or]

    b. negligence by a person or an Entity exercising a right to extract or develop minerals or other subsurface substances[; or

    c. the exercise of the rights described in (                )]. *

        * Instructional note:  identify the interest excepted from the description of the Land in Schedule A or excepted in Schedule B that you intend to exclude from this coverage.


This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.


[Witness clause optional]


[FNTG BRAND]


By: _____

        Authorized Signatory


ALTA Endorsement Form 35-06
(Minerals and other Subsurface Substances-Buildings) (4/2/12)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**ENDORSEMENT**

**Attached to Policy No. _____**

**Issued by**

*[FNTG BRAND]*

1.  The insurance provided by this endorsement is subject to the exclusion in Section 4 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2.  For purposes of this endorsement only, "Improvement" means a building, structure located on the surface of the Land, and any paved road, walkway, parking area, driveway, or curb, affixed to the Land at Date of Policy and that by law constitutes real property, but excluding any crops, landscaping, lawn, shrubbery, or trees.

3.  The Company insures against loss or damage sustained by the Insured by reason of the enforced removal or alteration of any Improvement, resulting from the future exercise of any right existing at Date of Policy to use the surface of the Land for the extraction or development of minerals or any other subsurface substances excepted from the description of the Land or excepted in Schedule B.

4.  This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:

    a.  contamination, explosion, fire, vibration, fracturing, earthquake or subsidence; [or]

    b.  negligence by a person or an Entity exercising a right to extract or develop minerals or other subsurface substances[; or

    c.  the exercise of the rights described in (                    )]. *

        * Instructional note:  identify the interest excepted from the description of the Land in Schedule A or excepted in Schedule B that you intend to exclude from this coverage.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

[FNTG BRAND]

By: _____
        Authorized Signatory

ALTA Endorsement Form 35.1-06
(Minerals and other Subsurface Substances-Improvements) (4/2/12)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 35**

**ENDORSEMENT**

**Attached to Policy No. _____**

**Issued by**

*[FNTG BRAND]*

1. The insurance provided by this endorsement is subject to the exclusion in Section 4 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2. For purposes of this endorsement only, "Improvement" means each improvement on the Land at Date of Policy itemized [on the exhibit attached to this endorsement] [below:]

3. The Company insures against loss or damage sustained by the Insured by reason of the enforced removal or alteration of any Improvement resulting from the future exercise of any right existing at Date of Policy to use the surface of the Land for the extraction or development of minerals or any other subsurface substances excepted from the description of the Land or excepted in Schedule B.

4. This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:

   a. contamination, explosion, fire, vibration, fracturing, earthquake or subsidence; [or]

   b. negligence by a person or an Entity exercising a right to extract or develop minerals or other subsurface substances[; or

   c. the exercise of the rights described in (                    )]. *

      * Instructional note:  identify the interest excepted from the description of the Land in Schedule A or excepted in Schedule B that you intend to exclude from this coverage.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

**[FNTG BRAND]**

By: _____
          Authorized Signatory

ALTA Endorsement Form 35.2-06
(Minerals and other Subsurface Substances-Described Improvements) (4/2/12)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**ENDORSEMENT**

**Attached to Policy No. _____**

**Issued by**

*[FNTG BRAND]*

3.   The insurance provided by this endorsement is subject to the exclusion in Section 4 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

4.   For purposes of this endorsement only:

   a.   "Improvement" means a building, structure located on the surface of the Land, and any paved road, walkway, parking area, driveway, or curb, affixed to the Land at Date of Policy and that by law constitutes real property, but excluding any crops, landscaping, lawn, shrubbery, or trees.

   b.   "Future Improvement" means a building, structure, and any paved road, walkway, parking area, driveway, or curb to be constructed on or affixed to the Land in the locations according to the Plans and that by law will constitute real property, but excluding any crops, landscaping, lawn, shrubbery, or trees.

   c.   "Plans" means the survey, site and elevation plans or other depictions or drawings prepared by *(insert name of architect or engineer)* dated ____, last revised _____, designated as *(insert name of project or project number)* consisting of ___ sheets.

3.   The Company insures against loss or damage sustained by the Insured by reason of the enforced removal or alteration of an Improvement or a Future Improvement, resulting from the future exercise of any right existing at Date of Policy to use the surface of the Land for the extraction or development of minerals or any other subsurface substances excepted from the description of the Land or excepted in Schedule B.

4.   This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:

   a.   contamination, explosion, fire, vibration, fracturing, earthquake or subsidence; [or]

   b.   negligence by a person or an Entity exercising a right to extract or develop minerals or other subsurface substances[; or

   c.   the exercise of the rights described in (                    )]. *

      * Instructional note:  identify the interest excepted from the description of the Land in Schedule A or excepted in Schedule B that you intend to exclude from this coverage.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

**[FNTG BRAND]**

By: _____
         Authorized Signatory

ALTA Endorsement Form 35.3-06
(Minerals and other Subsurface Substances-Land Under Development) (4/2/12)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                                    **SECTION 36**

**Return to Table of Contents**

**ENERGY PROJECT Series**

**ALTA ENDORSEMENT – FORMS**

**36.06, 36.1-06, 36.2-06, 36.3-06, 36.4-06, 36.5-06, 36.6-06**

**PURPOSE**

The ALTA 36 series of endorsement forms were developed to provide coverages to energy project owners and lenders which use a leasehold or easement rights structure. Examples of such projects would include solar or wind farms.

**SECTIONS OF POLICY AMENDED BY ENDORSEMENT**

Forms 36.06 (Energy Project-Leasehold/Easement-Owners)

Form 36.1-06 (Energy Project-Leasehold/Easement-Loan)

 These endorsement forms provide coverage to an owner or a lender on an energy project which uses a leasehold **and** easement rights structure. They are similar to the ALTA 13-06 (Leasehold Owner's) and 13.1-06 (Leasehold-Loan) endorsements. In addition, these endorsement forms:

- Add specific energy project definitions
- Add coverage for insured easement interests that are a common component of energy projects
- Expand the "Valuation of Title" to clarify that loss on a single parcel shall include resulting loss to the integrated project as a whole
- Add coverage for "Severable Improvements" which is separately available with the previously filed ALTA 31-06 (Severable Improvements) form
- Modify the "Additional items of loss" section to include items appropriate to the energy project transaction
- Add a limitation that the coverage does not include loss resulting from environmental damage or contamination, to conform to policy provisions.

Form 36.2-06 (Energy Project-Leasehold-Owner's)

Form 36.3-06 (Energy Project-Leasehold-Loan)

These endorsement forms provide coverage to an owner or a lender on an energy project which uses only a leasehold structure. They are similar to the ALTA 13-06 (Leasehold Owner's) and 13.1-06 (Leasehold-Loan) endorsements. In addition, these endorsement forms:

- Add specific energy project definitions

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 36**

- Expand the "Valuation of title" to clarify that loss on a single parcel shall include resulting loss to the integrated project as a whole
- Add coverage for "Severable Improvements" which is separately available with the previously filed ALTA 31-06 (Severable Improvements)
- Modify the "Additional items of loss" section to include items appropriate to the energy project transaction
- Add a limitation that the coverage does not include loss resulting from environmental damage or contamination, to conform to policy provisions.

Form 36.4-06 (Energy Project-Covenants, Conditions and Restrictions-Land Under Development-Owners)

Form 36.5-06(Energy Project-Covenants, Conditions and Restrictions-Land Under Development-Loan)

These endorsement forms provide coverage to an owner or a lender on an energy project which is under development, with respect to covenants, conditions and restrictions. These forms are similar to the ALTA 9.8-06 (Covenants, Conditions and Restrictions – Land Under Development-Owners) and the ALTA 9.7-06 (Covenants, Conditions and Restrictions – Land Under Development-Loan) endorsement forms. In addition, these endorsement forms:

- Add specific energy project definitions

- Add coverage for violation of an enforceable Covenant unless shown in Schedule B

- Add coverage for enforced removal as a result of a building setback encroachment not shown as an exception on Schedule B

- Add coverage for loss occasioned by a recorded notice of a violation of a Covenant relating to environmental protection if not shown as an exception on Schedule B

- Include a limitation that the coverage does not include loss resulting from Covenants contained in an easement or lease, any obligation to perform maintenance, or any covenant pertaining to environmental damage or contamination.

Endorsement Form 36.6-06 (Energy Project-Encroachments): This endorsement form provides coverage to an owner or a lender on an energy project, such as a solar or wind farm, with respect to boundary line and easement encroachments. This form is similar to the ALTA 28.1-06 (Encroachments-Boundaries and Easements) endorsement form. This endorsement form:

- Adds specific energy project definitions

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

- Provides coverage for the loss occasioned by the existence of an encroachment by improvements onto a neighboring property or onto an easement area within the insured Land, other than as disclosed in Schedule B exceptions

- Provides coverage for the loss occasioned by the existence of an encroachment by a neighboring improvement onto the insured Land, other than as disclosed in Schedule B exceptions

- Provides coverage for the enforced removal of or damage to insured Improvements based upon an encroachment into the easement area or onto neighboring property.

This form also allows the exclusion of a listed encroachment from the enforced removal and damage coverage.

**BASIS FOR PROVIDING COVERAGE**

Endorsements 36.06, 36.1-06, 36.2-06 and 36.3-06 [Leasehold/ Easement and Leasehold]   are to be issued when the customer is seeking the additional coverages provided therein and the Land consists of leasehold interests only, or leasehold and easement interests. The searching and examining procedures for insuring leaseholds as discussed under Section 13 of this manual remain the same, as does the modification of Schedule A. In Forms 36.2-06 and 36.3-06, the estate or interest in the Land is not a Fee, but rather the Leasehold Estate created by and between the parties, with a reference to the underlying lease information. That is correct for Forms 36-06 and 36.1-06 also, which additionally have the easement interests as part of the Land. For all of these forms, the entire lease must be examined, and many states require any short form lease or memorandum of the lease (if the full lease is not recorded) to contain the signatures of both parties to give effective constructive notice on the record of the tenants' rights and interests. Additionally all underwriting guidelines for the search, examination and insurance of easement interests must be followed for Forms 36-06 and 36.1-06.

Consult your Company underwriting advisor for instructions on how to correctly modify the fee policies for use with these endorsements.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

Form 36.4-06 [CCR-Land under development-Owners]

**An accurate current survey of the Land and the Plans as defined therein is required for coverage. The survey may be incorporated into the Plans, if appropriate.**

Coverage 3.a. may be given provided:

- There are no covenants, conditions or restrictions, or
- it has been determined that either there are no violations that are enforceable, or
- all enforceable violations that have been disclosed by inspection, survey, or other means are identified and excepted by description of such matter in Schedule B.

Coverage 3.b. may be given provided:

- There are no building setback lines shown on a recorded or filed plat of subdivision, or
- It has been determined that either there are no violations that are enforceable, or
- All enforceable violations that have been disclosed by inspection, survey or other means are identified and excepted in Schedule B.

Coverage 3.c. may be given provided:

- Either there are no notices of violations of covenants, conditions and restrictions relating to environmental protection recorded or filed in the public records, or
- the notices of violations are identified and excepted in Schedule B.

Form36.5-06 [CCR-Land Under Development-Loan]

**An accurate current survey of the Land and the Plans as defined therein is required for coverage. The survey may be incorporated into the Plans, if appropriate.**

Coverage 3.a. may be given if any of the following situations apply:

- There are no covenants, conditions or restrictions.
- The covenants, conditions or restrictions are not enforceable under state or federal law.
- The restrictions contain a clause protecting the lien of a mortgage made in good faith and for value against a violation.
- Rights to enforce the restrictions have been waived or are subordinated to the Insured Mortgage.

Coverage 3.b. may be given provided:

- There are no covenants, conditions or restrictions, or

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 36**

- it has been determined that either there are no violations that are enforceable, or
- all enforceable violations that have been disclosed by inspection, survey or other means are identified and excepted in Schedule B.

Coverage 3.c. may be given provided:

- There are no building setback lines shown on a recorded or filed plat of subdivision, or
- it has been determined that either there are no violations that are enforceable, or
- all enforceable violations that have been disclosed by inspection, survey or other means are identified and excepted in Schedule B.

Coverage 3 (d) may be given provided:

- Either there are no notices of violation of covenants, conditions and restrictions relating to environmental protection recorded or filed in the public records, or
- the notices of violations are identified and excepted in Schedule B.

<u>Endorsement 36.6-06[Encroachments]:</u>

**An accurate current survey of the Land and the Plans as defined therein is required for coverage.**

Coverage 3.a. may be given provided:

For encroachments onto adjoining land
- Any encroachments disclosed by inspection, survey or other means, are also expressly excepted by description of such matter in Schedule B.

For encroachments onto easements located on the Land, either
- there are no easements excepted in Schedule B; or
- encroachments onto easements, disclosed by inspection, survey or other means, are also expressly excepted by description of such matter in Schedule B.

Coverage 3.b. may be provided if any of the following situations apply:

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

- for encroachments on the Land by a neighboring improvement- any such encroachments disclosed by inspection, survey or other means, are expressly excepted by description of such matter in Schedule B.

Coverage 3.c. may be given if any of the following situations apply:

- There are no easements excepted in Schedule B.
- There are no encroachments onto easements excepted in Schedule B.
- Encroachments shown are minor, would not interfere with the use or maintenance of the easement and your Company underwriting advisor is satisfied that the Electricity Facility or Severable Improvement could not be forcibly removed under state law.

Coverage 3.d. may be given if any of the following situations apply:

- There are no easements excepted in Schedule B.
- There are no encroachments onto easements excepted in Schedule B.
- The encroachment is minor; would not interfere with the maintenance of the easement and your Company underwriting advisor is satisfied that a state court would not require its removal.

The form allows you to list the encroachments for which you do not wish to give coverage.

## MODIFICATION

In the event that modification of an endorsement is requested, it is necessary to consider your state regulatory requirements for filing and approval of forms. If the endorsement is modified, the endorsement is not an ALTA form and should not reference ALTA in the title.  You must obtain the approval of the Company's underwriting adviser before complying with any request for a modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**ENDORSEMENT**

**Attached to Policy No. _____**

**Issued by**

*[FNTG BRAND]*

5.   The insurance provided by this endorsement is subject to the exclusions in Section 6 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2.   For purposes of this endorsement only:

a.   "Constituent Parcel" means one of the parcels of Land described in Schedule A that together constitute one integrated project.

b.   "Easement" means each easement described in Schedule A.

c.   "Easement Interest" means the right of use granted in the Easement for the Easement Term.

d.   "Easement Term" means the duration of the Easement Interest, as set forth in the Easement, including any renewal or extended term if a valid option to renew or extend is contained in the Easement.

e.   "Electricity Facility" means an electricity generating facility which may include one or more of the following: a substation; a transmission, distribution or collector line; an interconnection, inverter, transformer, generator, turbine, array, solar panel, or module; a circuit breaker, footing, tower, pole, cross-arm, guy line, anchor, wire, control system, communications or radio relay system, safety protection facility, road, and other building, structure, fixture, machinery, equipment, appliance and item associated with or incidental to the generation, conversion, storage, switching, metering, step-up, step-down, inversion, transmission, conducting, wheeling, sale or other use or conveyance of electricity, on the Land at Date of Policy or to be built or constructed on the Land in the locations according to the Plans, that by law constitutes real property.

f.   "Evicted" or "Eviction" means (a) the lawful deprivation, in whole or in part, of the right of possession or use insured by this policy, contrary to the terms of any Lease or Easement or (b) the lawful prevention of the use of the Land or any Electricity Facility or Severable Improvement for the purposes permitted by the Lease or the Easement, as applicable, in either case as a result of a matter covered by this policy.

g.   "Lease" means each lease described in Schedule A.

h.   "Leasehold Estate" means the right of possession granted in the Lease for the Lease Term.

i.   "Lease Term" means the duration of the Leasehold Estate, as set forth in the Lease, including any renewal or extended term if a valid option to renew or extend is contained in the Lease.

j.   "Plans" means the survey, site and elevation plans or other depictions or drawings prepared by _(insert name of architect or engineer)_ dated _____, last revised _____ ,designated as  _(insert name of project or project number)_ consisting of ____sheets.

k.   "Remaining Term" means the portion of the Easement Term or the Lease Term remaining after the Insured has been Evicted.

l.   "Severable Improvement" means property affixed to the Land at Date of Policy or to be affixed in the locations according to the Plans, that would constitute an Electricity Facility but for its characterization as personal property, and that by law does not constitute real property because (a) of its character and manner of attachment to the Land and (b) the property can be severed from the Land without causing material damage to the property or to the Land.

3.   Valuation of Title as an Integrated Project:

a.   If in computing loss or damage it becomes necessary to value the Title, or any portion of it, as the result of an Eviction, then, as to that portion of the Land from which the Insured is Evicted, that value shall consist of (i) the value of (A) the Leasehold Estate or the Easement Interest for the Remaining Term, as applicable, (B) any Electricity Facility existing on the date of the Eviction, and, if applicable, (ii) any reduction in value of another insured Lease or Easement as computed in Section 3(b) below.

b.   A computation of loss or damage resulting from an Eviction affecting any Constituent Parcel shall include loss or damage to the integrated project caused by the covered matter affecting the Constituent Parcel from which the Insured is Evicted.

c.   The Insured Claimant shall have the right to have the Leasehold Estate, the Easement Interest, and any Electricity Facility affected by a defect insured against by this policy valued either as a whole or separately.  In either event, this determination of value shall take into account any rent or use payments no longer required to be paid for the Remaining Term.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

    d.    The provisions of this Section 3 shall not diminish the Insured's rights under any other endorsement to the policy; however, the calculation of loss or damage pursuant to this endorsement shall not allow duplication of recovery for loss or damage calculated pursuant to Section 8 of the Conditions or any other endorsement to the policy.

4.    Valuation of Severable Improvements:

    a.    In the event of an Eviction, the calculation of the loss shall include (but not to the extent that these items of loss are included in the valuation of the Title determined pursuant to Section 8 of the Conditions or any other provision of this or any other endorsement) the diminution in value of the Insured's interest in any Severable Improvement resulting from the Eviction, reduced by the salvage value of the Severable Improvement.

    b.    The policy does not insure against loss or damage (and the Company will not pay any costs, attorneys' fees or expenses) relating to:

        i.    the attachment, perfection or priority of any security interest in any Severable Improvement;

        ii.    the vesting or ownership of title to or rights in any Severable Improvement;

        iii.    any defect in or lien or encumbrance on the title to any Severable Improvement; or

        iv.    the determination of whether any specific property is real or personal in nature.

5.    Additional items of loss covered by this endorsement:

If the Insured is Evicted, the following items of loss, if applicable to that portion of the Land from which the Insured is Evicted, shall be included, without duplication, in computing loss or damage incurred by the Insured, but not to the extent that the same are included in the valuation of the Title determined pursuant to Section 3 of this endorsement, the valuation of Severable Improvements pursuant to Section 4 of this endorsement, or Section 8(a)(ii) of the Conditions.

    a.    The reasonable cost of: (i) disassembling, removing, relocating and reassembling any Severable Improvement that the Insured has the right to remove and relocate, situated on the Land at the time of Eviction, to the extent necessary to restore and make functional the integrated project; (ii) transportation of that Severable Improvement for the initial one hundred miles incurred in connection with the restoration or relocation; and (iii) restoring the Land to the extent damaged as a result of the disassembly, removal and relocation of the Severable Improvement and required of the Insured solely because of the Eviction.

    b.    Rent, easement payments or damages for use and occupancy of the Land prior to the Eviction that the Insured as owner of the Leasehold Estate or the Easement Interest, as applicable, may be obligated to pay to any person having paramount title to that of the lessor in the Lease or the grantor in the Easement, as applicable.

    c.    The amount of rent, easement payments or damages that, by the terms of the Lease or the Easement, as applicable, the Insured must continue to pay to the lessor or grantor after Eviction with respect to the portion of the Leasehold Estate or Easement Interest, as applicable, from which the Insured has been Evicted.

    d.    The fair market value, at the time of the Eviction, of the estate or interest of the Insured in any lease, sublease or easement specifically permitted by the Lease or Easement, as applicable, and made by the Insured as lessor or grantor of all or part of the Leasehold Estate or Easement Interest, as applicable.

    e.    Damages caused by the Eviction that the Insured is obligated to pay to lessees or sublessees or easement or subeasement grantees on account of the breach of any lease or sublease or easement or subeasement specifically permitted by the Lease or the Easement, as applicable, and made by the Insured as lessor or grantor of all or part of the Leasehold Estate or Easement Interest, as applicable.

    f.    The reasonable cost to obtain land use, zoning, building and occupancy permits, architectural and engineering services and environmental testing and reviews for a replacement leasehold reasonably equivalent to the Leasehold Estate or a replacement easement reasonably equivalent to the Easement Interest, as applicable.

    g.    If any Electricity Facility is not substantially completed at the time of Eviction, the actual cost incurred by the Insured up to the time of Eviction, less the salvage value, for the Electricity Facility located on that portion of the Land from which the Insured is Evicted.  Those costs include costs incurred to construct and fabricate the Electricity Facility, obtain land use, zoning, building and occupancy permits, architectural and engineering services, construction management services, environmental testing and reviews, and landscaping, and cancellation fees related to the foregoing.

6.    This endorsement does not insure against loss, damage or costs of remediation (and the Company will not pay costs, attorneys' fees, or expenses) resulting from environmental damage or contamination.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 36**

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]


**[FNTG BRAND]**



By: _____
        Authorized Signatory




ALTA Endorsement Form 36-06
(Energy Project –Leasehold/Easement-Owners) (4/2/12)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**ENDORSEMENT**

**Attached to Policy No. _____**

**Issued by**

*[FNTG BRAND]*

1. The insurance provided by this endorsement is subject to the exclusions in Section 6 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2. For purposes of this endorsement only:

   a. "Constituent Parcel" means one of the parcels of Land described in Schedule A that together constitute one integrated project.

   b. "Easement" means each easement described in Schedule A.

   c. "Easement Interest" means the right of use granted in the Easement for the Easement Term.

   d. "Easement Term" means the duration of the Easement Interest, as set forth in the Easement, including any renewal or extended term if a valid option to renew or extend is contained in the Easement.

   e. "Electricity Facility" means an electricity generating facility which may include one or more of the following: a substation; a transmission, distribution or collector line; an interconnection, inverter, transformer, generator, turbine, array, solar panel, or module; a circuit breaker, footing, tower, pole, cross-arm, guy line, anchor, wire, control system, communications or radio relay system, safety protection facility, road, and other building, structure, fixture, machinery, equipment, appliance and item associated with or incidental to the generation, conversion, storage, switching, metering, step-up, step-down, inversion, transmission, conducting, wheeling, sale or other use or conveyance of electricity, on the Land at Date of Policy or to be built or constructed on the Land in the locations according to the Plans, that by law constitutes real property.

   f. "Evicted" or "Eviction" means (a) the lawful deprivation, in whole or in part, of the right of possession or use insured by this policy, contrary to the terms of any Lease or Easement or (b) the lawful prevention of the use of the Land or any Electricity Facility or Severable Improvement for the purposes permitted by the Lease or the Easement, as applicable, in either case as a result of a matter covered by this policy.

   g. "Lease" means each lease described in Schedule A.

   h. "Leasehold Estate" means the right of possession granted in the Lease for the Lease Term.

   i. "Lease Term" means the duration of the Leasehold Estate, as set forth in the Lease, including any renewal or extended term if a valid option to renew or extend is contained in the Lease.

   j. "Plans" means the survey, site and elevation plans or other depictions or drawings prepared by _(insert name of architect or engineer)_ dated _____, last revised _____ ,designated as _(insert name of project or project number)_ consisting of ____sheets.

   k. "Remaining Term" means the portion of the Easement Term or the Lease Term remaining after the Insured has been Evicted.

   l. "Severable Improvement" means property affixed to the Land at Date of Policy or to be affixed in the locations according to the Plans, that would constitute an Electricity Facility but for its characterization as personal property, and that by law does not constitute real property because (a) of its character and manner of attachment to the Land and (b) the property can be severed from the Land without causing material damage to the property or to the Land.

   m. "Tenant" means the tenant under the Lease or a grantee under the Easement, as applicable, and, after acquisition of all or any part of the Title in accordance with the provisions of Section 2 of the Conditions of the policy, the Insured Claimant.

3. Valuation of Title as an Integrated Project:

   a. If in computing loss or damage it becomes necessary to value the Title, or any portion of it, as the result of an Eviction, then, as to that portion of the Land from which the Tenant is Evicted, that value shall consist of (i) the value of (A) the Leasehold Estate or the Easement Interest for the Remaining Term, as applicable, (B) any Electricity Facility existing on the date of the Eviction, and, if applicable, (ii) any reduction in value of another insured Lease or Easement as computed in Section 3(b) below.

   b. A computation of loss or damage resulting from an Eviction affecting any Constituent Parcel shall include loss or damage to the integrated project caused by the covered matter affecting the Constituent Parcel from which the Insured is Evicted.

   c. The Insured Claimant shall have the right to have the Leasehold Estate, the Easement Interest, and any Electricity Facility affected by a defect insured against by the policy valued either as a whole or separately. In

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

either event, this determination of value shall take into account any rent or use payments no longer required to be paid for the Remaining Term.

d.    The provisions of this Section 3 shall not diminish the Insured's rights under any other endorsement to the policy; however, the calculation of loss or damage pursuant to this endorsement shall not allow duplication of recovery for loss or damage calculated pursuant to Section 8 of the Conditions or any other endorsement to the policy.

4.    Valuation of Severable Improvements:

a.    In the event of an Eviction, the calculation of the loss shall include (but not to the extent that these items of loss are included in the valuation of the Title determined pursuant to Section 8 of the Conditions or any other provision of this or any other endorsement) the diminution in value of the Insured's interest in any Severable Improvement resulting from the Eviction, reduced by the salvage value of the Severable Improvement.

b.    The policy does not insure against loss or damage (and the Company will not pay any costs, attorneys' fees or expenses) relating to:

i.     the attachment, perfection or priority of any security interest in any Severable Improvement;

ii.    the vesting or ownership of title to or rights in any Severable Improvement;

iii.   any defect in or lien or encumbrance on the title to any Severable Improvement; or

iv.   the determination of whether any specific property is real or personal in nature.

5.    Additional items of loss covered by this endorsement:

If the Insured acquires all or any part of the Title in accordance with the provisions of Section 2 of the Conditions of the policy and thereafter is Evicted, the following items of loss, if applicable to that portion of the Land from which the Insured is Evicted shall be included, without duplication, in computing loss or damage incurred by the Insured, but not to the extent that the same are included in the valuation of the Title determined pursuant to Section 3 of this endorsement, the valuation of Severable Improvements pursuant to Section 4 of this endorsement, or Section 8(a)(iii) of the Conditions:

a.    The reasonable cost of: (i) disassembling, removing, relocating and reassembling any Severable Improvement that the Insured has the right to remove and relocate, situated on the Land at the time of Eviction, to the extent necessary to restore and make functional the integrated project; (ii) transportation of that Severable Improvement for the initial one hundred miles incurred in connection with the restoration or relocation; and (iii) restoring the Land to the extent damaged as a result of the disassembly, removal and relocation of the Severable Improvement and required of the Insured solely because of the Eviction.

b.    Rent, easement payments or damages for use and occupancy of the Land prior to the Eviction that the Insured as owner of the Leasehold Estate or the Easement Interest, as applicable, may be obligated to pay to any person having paramount title to that of the lessor in the Lease or the grantor in the Easement, as applicable.

c.    The amount of rent, easement payments or damages that, by the terms of the Lease or the Easement, as applicable, the Insured must continue to pay to the lessor or grantor after Eviction with respect to the portion of the Leasehold Estate or Easement Interest, as applicable, from which the Insured has been Evicted.

d.    The fair market value, at the time of the Eviction, of the estate or interest of the Insured in any lease, sublease or easement specifically permitted by the Lease or Easement, as applicable, and made by the Tenant as lessor or grantor of all or part of the Leasehold Estate or Easement Interest, as applicable.

e.    Damages caused by the Eviction that the Insured is obligated to pay to lessees or sublessees or easement or subeasement grantees on account of the breach of any lease or sublease or easement or subeasement specifically permitted by the Lease or the Easement, as applicable, and made by the Tenant as lessor or grantor of all or part of the Leasehold Estate or Easement Interest, as applicable.

f.    The reasonable cost to obtain land use, zoning, building and occupancy permits, architectural and engineering services and environmental testing and reviews for a replacement leasehold reasonably equivalent to the Leasehold Estate or a replacement easement reasonably equivalent to the Easement Interest, as applicable.

g.    If any Electricity Facility is not substantially completed at the time of Eviction, the actual cost incurred by the Insured up to the time of Eviction, less the salvage value, for the Electricity Facility located on that portion of the Land from which the Insured is Evicted.  Those costs include costs incurred to construct and fabricate the Electricity Facility, obtain land use, zoning, building and occupancy permits, architectural and engineering services, construction management services, environmental testing and reviews, and landscaping, and cancellation fees related to the foregoing.

6.    This endorsement does not insure against loss, damage or costs of remediation (and the Company will not pay costs, attorneys' fees, or expenses) resulting from environmental damage or contamination.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 36**

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]


[FNTG BRAND]


By: _____

       Authorized Signatory

ALTA Endorsement Form 36.1-06
(Energy Project –Leasehold/Easement-Loan) (4/2/12)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**ENDORSEMENT**

**Attached to Policy No. _____**

**Issued by**

*[FNTG BRAND]*

1. The insurance provided by this endorsement is subject to the exclusions in Section 6 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2. For purposes of this endorsement only:

   a. "Constituent Parcel" means one of the parcels of Land described in Schedule A that together constitute one integrated project.

   b. "Electricity Facility" means an electricity generating facility which may include one or more of the following: a substation; a transmission, distribution or collector line; an interconnection, inverter, transformer, generator, turbine, array, solar panel, or module; a circuit breaker, footing, tower, pole, cross-arm, guy line, anchor, wire, control system, communications or radio relay system, safety protection facility, road, and other building, structure, fixture, machinery, equipment, appliance and item associated with or incidental to the generation, conversion, storage, switching, metering, step-up, step-down, inversion, transmission, conducting, wheeling, sale or other use or conveyance of electricity, on the Land at Date of Policy or to be built or constructed on the Land in the locations according to the Plans, that by law constitutes real property.

   c. "Evicted" or "Eviction" means (a) the lawful deprivation, in whole or in part, of the right of possession insured by this policy, contrary to the terms of any Lease or (b) the lawful prevention of the use of the Land or any Electricity Facility or Severable Improvement for the purposes permitted by the Lease, in either case as a result of a matter covered by this policy.

   d. "Lease" means each lease described in Schedule A.

   e. "Leasehold Estate" means the right of possession granted in the Lease for the Lease Term.

   f. "Lease Term" means the duration of the Leasehold Estate, as set forth in the Lease, including any renewal or extended term if a valid option to renew or extend is contained in the Lease.

   g. "Plans" means the survey, site and elevation plans or other depictions or drawings prepared by _(insert name of architect or engineer)_ dated ____, last revised _____ ,designated as _(insert name of project or project number)_ consisting of ___sheets.

   h. "Remaining Term" means the portion of the Lease Term remaining after the Insured has been Evicted.

   i. "Severable Improvement" means property affixed to the Land at Date of Policy or to be affixed in the locations according to the Plans, that would constitute an Electricity Facility but for its characterization as personal property, and that by law does not constitute real property because (a) of its character and manner of attachment to the Land and (b) the property can be severed from the Land without causing material damage to the property or to the Land.

3. Valuation of Title as an Integrated Project:

   a. If in computing loss or damage it becomes necessary to value the Title, or any portion of it, as the result of an Eviction, then, as to that portion of the Land from which the Insured is Evicted, that value shall consist of (i) the value of (A) the Leasehold Estate for the Remaining Term, (B) any Electricity Facility existing on the date of the Eviction, and, if applicable, (ii) any reduction in value of another insured Lease as computed in Section 3(b) below.

   b. A computation of loss or damage resulting from an Eviction affecting any Constituent Parcel shall include loss or damage to the integrated project caused by the covered matter affecting the Constituent Parcel from which the Insured is Evicted.

   c. The Insured Claimant shall have the right to have the Leasehold Estate and any Electricity Facility affected by a defect insured against by this policy valued either as a whole or separately. In either event, this determination of value shall take into account any rent no longer required to be paid for the Remaining Term.

   d. The provisions of this Section 3 shall not diminish the Insured's rights under any other endorsement to the policy; however, the calculation of loss or damage pursuant to this endorsement shall not allow duplication of recovery for loss or damage calculated pursuant to Section 8 of the Conditions or any other endorsement to the policy.

4. Valuation of Severable Improvements:

   b. In the event of an Eviction, the calculation of the loss shall include (but not to the extent that these items of loss are included in the valuation of the Title determined pursuant to Section 8 of the Conditions or any other provision of this or any other endorsement) the diminution in value of the Insured's interest in any Severable Improvement resulting from the Eviction, reduced by the salvage value of the Severable Improvement.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 36**

b.    The policy does not insure against loss or damage (and the Company will not pay any costs, attorneys' fees or expenses) relating to:

    i.    the attachment, perfection or priority of any security interest in any Severable Improvement;

    ii.    the vesting or ownership of title to or rights in any Severable Improvement;

    iii.    any defect in or lien or encumbrance on the title to any Severable Improvement; or

    iv.    the determination of whether any specific property is real or personal in nature.

5.    Additional items of loss covered by this endorsement:

If the Insured is Evicted, the following items of loss, if applicable to that portion of the Land from which the Insured is Evicted shall be included, without duplication, in computing loss or damage incurred by the Insured, but not to the extent that the same are included in the valuation of the Title determined pursuant to Section 3 of this endorsement, the valuation of Severable Improvements pursuant to Section 4 of this endorsement, or Section 8(a)(ii) of the Conditions.

a.    The reasonable cost of: (i) disassembling, removing, relocating and reassembling any Severable Improvement that the Insured has the right to remove and relocate, situated on the Land at the time of Eviction, to the extent necessary to restore and make functional the integrated project; (ii) transportation of that Severable Improvement for the initial one hundred miles incurred in connection with the restoration or relocation; and (iii) restoring the Land to the extent damaged as a result of the disassembly, removal and relocation of the Severable Improvement and required of the Insured solely because of the Eviction.

b.    Rent or damages for use and occupancy of the Land prior to the Eviction that the Insured as owner of the Leasehold Estate  may be obligated to pay to any person having paramount title to that of the lessor in the Lease.

c.    The amount of rent or damages that, by the terms of the Lease , the Insured must continue to pay to the lessor after Eviction with respect to the portion of the Leasehold Estate from which the Insured has been Evicted.

d.    The fair market value, at the time of the Eviction, of the estate or interest of the Insured in any lease or sublease specifically permitted by the Lease and made by the Insured as lessor of all or part of the Leasehold Estate.

e.    Damages caused by the Eviction that the Insured is obligated to pay to lessees or sublessees on account of the breach of any lease or sublease specifically permitted by the Lease and made by the Insured as lessor of all or part of the Leasehold Estate.

f.    The reasonable cost to obtain land use, zoning, building and occupancy permits, architectural and engineering services and environmental testing and reviews for a replacement leasehold reasonably equivalent to the Leasehold Estate.

g.    If any Electricity Facility is not substantially completed at the time of Eviction, the actual cost incurred by the Insured up to the time of Eviction, less the salvage value, for the Electricity Facility located on that portion of the Land from which the Insured is Evicted.  Those costs include costs incurred to construct and fabricate the Electricity Facility, obtain land use, zoning, building and occupancy permits, architectural and engineering services, construction management services, environmental testing and reviews, and landscaping, and cancellation fees related to the foregoing.

6.    This endorsement does not insure against loss, damage or costs of remediation (and the Company will not pay costs, attorneys' fees, or expenses) resulting from environmental damage or contamination.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

[FNTG BRAND]

By: _____
          Authorized Signatory

ALTA Endorsement Form 36.2-06
(Energy Project –Leasehold-Owners) (4/2/12)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT

**Attached to Policy No. _____**

**Issued by**

*[FNTG BRAND]*

1.  The insurance provided by this endorsement is subject to the exclusions in Section 6 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2.  For purposes of this endorsement only:

    a.  "Constituent Parcel" means one of the parcels of Land described in Schedule A that together constitute one integrated project.

    b.  "Electricity Facility" means an electricity generating facility which may include one or more of the following: a substation; a transmission, distribution or collector line; an interconnection, inverter, transformer, generator, turbine, array, solar panel, or module; a circuit breaker, footing, tower, pole, cross-arm, guy line, anchor, wire, control system, communications or radio relay system, safety protection facility, road, and other building, structure, fixture, machinery, equipment, appliance and item associated with or incidental to the generation, conversion, storage, switching, metering, step-up, step-down, inversion, transmission, conducting, wheeling, sale or other use or conveyance of electricity, on the Land at Date of Policy or to be built or constructed on the Land in the locations according to the Plans, that by law constitutes real property.

    c.  "Evicted" or "Eviction" means (a) the lawful deprivation, in whole or in part, of the right of possession insured by this policy, contrary to the terms of any Lease or (b) the lawful prevention of the use of the Land or any Electricity Facility or Severable Improvement for the purposes permitted by the Lease, in either case as a result of a matter covered by this policy.

    d.  "Lease" means each lease described in Schedule A.

    e.  "Leasehold Estate" means the right of possession granted in the Lease for the Lease Term.

    f.  "Lease Term" means the duration of the Leasehold Estate, as set forth in the Lease, including any renewal or extended term if a valid option to renew or extend is contained in the Lease.

    g.  "Plans" means the survey, site and elevation plans or other depictions or drawings prepared by _(insert name of architect or engineer)_ dated _____, last revised _____ ,designated as _(insert name of project or project number)_ consisting of ____sheets.

    h.  "Remaining Term" means the portion of the Lease Term remaining after the Insured has been Evicted.

    i.  "Severable Improvement" means property affixed to the Land at Date of Policy or to be affixed in the locations according to the Plans, that would constitute an Electricity Facility but for its characterization as personal property, and that by law does not constitute real property because (a) of its character and manner of attachment to the Land and (b) the property can be severed from the Land without causing material damage to the property or to the Land.

    j.  "Tenant" means the tenant under the Lease  and, after acquisition of all or any part of the Title in accordance the provisions of Section 2 of the Conditions of the policy, the Insured Claimant.

3.  Valuation of Title as an Integrated Project:

    a.  If in computing loss or damage it becomes necessary to value the Title, or any portion of it, as the result of an Eviction, then, as to that portion of the Land from which the Tenant is Evicted, that value shall consist of (i) the value of (A) the Leasehold Estate  for the Remaining Term,  (B) any Electricity Facility existing on the date of the Eviction, and, if applicable, (ii) any reduction in value of another insured Lease as computed in Section 3(b) below.

    b.  A computation of loss or damage resulting from an Eviction affecting any Constituent Parcel shall include loss or damage to the integrated project caused by the covered matter affecting the Constituent Parcel from which the Insured is Evicted.

    c.  The Insured Claimant shall have the right to have the Leasehold Estate and any Electricity Facility affected by a defect insured against by the policy valued either as a whole or separately.  In either event, this determination of value shall take into account any rent no longer required to be paid for the Remaining Term.

    d.  The provisions of this Section 3 shall not diminish the Insured's rights under any other endorsement to the policy; however, the calculation of loss or damage pursuant to this endorsement shall not allow duplication of recovery for loss or damage calculated pursuant to Section 8 of the Conditions or any other endorsement to the policy.

4.  Valuation of Severable Improvements:

    c.  In the event of an Eviction, the calculation of the loss shall include (but not to the extent that these items of loss are included in the valuation of the Title determined pursuant to Section 8 of the Conditions or any other

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

provision of this or any other endorsement) the diminution in value of the Insured's interest in any Severable Improvement resulting from the Eviction, reduced by the salvage value of the Severable Improvement.

b.   The policy does not insure against loss or damage (and the Company will not pay any costs, attorneys' fees or expenses) relating to:

   i.   the attachment, perfection or priority of any security interest in any Severable Improvement;

   ii.   the vesting or ownership of title to or rights in any Severable Improvement;

   iii.   any defect in or lien or encumbrance on the title to any Severable Improvement; or

   iv.   the determination of whether any specific property is real or personal in nature.

5.   Additional items of loss covered by this endorsement:
     If the Insured acquires all or any part of the Title in accordance with the provisions of Section 2 of the Conditions of the policy and thereafter is Evicted, the following items of loss, if applicable to that portion of the Land from which the Insured is Evicted shall be included, without duplication, in computing loss or damage incurred by the Insured, but not to the extent that the same are included in the valuation of the Title determined pursuant to Section 3 of this endorsement, the valuation of Severable Improvements pursuant to Section 4 of this endorsement, or Section 8(a)(iii) of the Conditions:

a.   The reasonable cost of: (i) disassembling, removing, relocating and reassembling any Severable Improvement that the Insured has the right to remove and relocate, situated on the Land at the time of Eviction, to the extent necessary to restore and make functional the integrated project; (ii) transportation of that Severable Improvement for the initial one hundred miles incurred in connection with the restoration or relocation; and (iii) restoring the Land to the extent damaged as a result of the disassembly, removal and relocation of the Severable Improvement and required of the Insured solely because of the Eviction.

b.   Rent or damages for use and occupancy of the Land prior to the Eviction that the Insured as owner of the Leasehold Estate may be obligated to pay to any person having paramount title to that of the lessor in the Lease.

c.   The amount of rent or damages that, by the terms of the Lease , the Insured must continue to pay to the lessor after Eviction with respect to the portion of the Leasehold Estate  from which the Insured has been Evicted.

d.   The fair market value, at the time of the Eviction, of the estate or interest of the Insured in any lease or sublease specifically permitted by the Lease and made by the Tenant as lessor of all or part of the Leasehold Estate.

e.   Damages caused by the Eviction that the Insured is obligated to pay to lessees or sublessees on account of the breach of any lease or sublease specifically permitted by the Lease and made by the Tenant as lessor of all or part of the Leasehold Estate.

f.   The reasonable cost to obtain land use, zoning, building and occupancy permits, architectural and engineering services and environmental testing and reviews for a replacement leasehold reasonably equivalent to the Leasehold Estate.

g.   If any Electricity Facility is not substantially completed at the time of Eviction, the actual cost incurred by the Insured up to the time of Eviction, less the salvage value, for the Electricity Facility located on that portion of the Land from which the Insured is Evicted.  Those costs include costs incurred to construct and fabricate the Electricity Facility, obtain land use, zoning, building and occupancy permits, architectural and engineering services, construction management services, environmental testing and reviews, and landscaping, and cancellation fees related to the foregoing.

6.   This endorsement does not insure against loss, damage or costs of remediation (and the Company will not pay costs, attorneys' fees, or expenses) resulting from environmental damage or contamination.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

[FNTG BRAND]

By: _____
           Authorized Signatory

ALTA Endorsement Form 36.3-06
(Energy Project –Leasehold-Loan) (4/2/12)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 36**

**ENDORSEMENT**

**Attached to Policy No. _____**

**Issued by**

**[FNTG BRAND]**

iii.  The insurance provided by this endorsement is subject to the exclusions in Section 4 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

iv.  For purposes of this endorsement only:

  a.  "Covenant" means a covenant, condition, limitation or restriction in a document or instrument in effect at Date of Policy.

  b.  "Electricity Facility" means an electricity generating facility that may include one or more of the following:  a substation; a transmission, distribution or collector line; an interconnection, inverter, transformer, generator, turbine, array, solar panel, or module; a circuit breaker, footing, tower, pole, cross-arm, guy line, anchor, wire, control system, communications or radio relay system, safety protection facility, road, and other building, structure, fixture, machinery, equipment, appliance and item associated with or incidental to the generation, conversion, storage, switching, metering, step-up, step-down, inversion, transmission, conducting, wheeling, sale or other use or conveyance of electricity, on the Land at Date of Policy or to be built or constructed on the Land in the locations according to the Plans, that by law constitutes real property.

  c.  "Plans" means the survey, site and elevation plans or other depictions or drawings prepared by _(insert name of architect or engineer)_ dated ____, last revised _____, designated as _(insert name of project or project number)_ consisting of ___sheets.

  d.  "Severable Improvement" means property affixed to the Land at Date of Policy or to be affixed to the Land in the locations according to the Plans, that would constitute an Electricity Facility but for its characterization as personal property, and that by law does not constitute real property because (a) of its character and manner of attachment to the Land and (b) the property can be severed from the Land without causing material damage to the property or to the Land.

v.  The Company insures against loss or damage sustained by the Insured by reason of:

  i.  A violation of an enforceable Covenant by any Electricity Facility or Severable Improvement, unless an exception in Schedule B of the policy identifies  the violation;

  ii.  Enforced removal of any Electricity Facility or Severable Improvement as a result of a violation of a building setback line shown on a plat of subdivision recorded or filed in the Public Records, unless an exception in Schedule B of the policy identifies the violation; or

  iii.  A notice of a violation, recorded in the Public Records at Date of Policy, of an enforceable Covenant relating to environmental protection, describing any part of the Land and referring to that Covenant, but only to the extent of the violation of the Covenant referred to in that notice, unless an exception in Schedule B of the policy identifies the notice of the violation.

4.  This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:

  a.  any Covenant contained in an instrument creating a lease or easement;

  b.  any Covenant relating to obligations of any type to perform maintenance, repair, or remediation on the Land; or

  c.  except as provided in Section 3.c., any Covenant pertaining to environmental protection of any kind or nature, including hazardous or toxic matters, conditions, or substances.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

[FNTG BRAND]

By: _____
          Authorized Signatory

ALTA Endorsement Form 36.4-06
(Energy Project –Covenants, Conditions and Restrictions-Land Under Development-Owners) (4/2/12)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**ENDORSEMENT**

**Attached to Policy No. _____**

**Issued by**

*[FNTG BRAND]*

1. The insurance provided by this endorsement is subject to the exclusions in Section 4 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

6. For purposes of this endorsement only:

    a. "Covenant" means a covenant, condition, limitation or restriction in a document or instrument in effect at Date of Policy.

    b. "Electricity Facility" means an electricity generating facility that may include one or more of the following: a substation; a transmission, distribution or collector line; an interconnection, inverter, transformer, generator, turbine, array, solar panel, or module; a circuit breaker, footing, tower, pole, cross-arm, guy line, anchor, wire, control system, communications or radio relay system, safety protection facility, road, and other building, structure, fixture, machinery, equipment, appliance and item associated with or incidental to the generation, conversion, storage, switching, metering, step-up, step-down, inversion, transmission, conducting, wheeling, sale or other use or conveyance of electricity, on the Land at Date of Policy or to be built or constructed on the Land in the locations according to the Plans, that by law constitutes real property.

    c. "Plans" means the survey, site and elevation plans or other depictions or drawings prepared by
     (*insert name of architect or engineer*)  dated _____, last revised _____ ,designated as
    (*insert name of project or project number*)  consisting of ___sheets.

    d. "Severable Improvement" means property affixed to the Land at Date of Policy or to be affixed to the Land in the locations according to the Plans, that would constitute an Electricity Facility but for its characterization as personal property, and that by law does not constitute real property because (a) of its character and manner of attachment to the Land and (b) the property can be severed from the Land without causing material damage to the property or to the Land.

7. The Company insures against loss or damage sustained by the Insured by reason of:

    a. A violation of a Covenant that:

        i. divests, subordinates, or extinguishes the lien of the Insured Mortgage;

        ii. results in the invalidity, unenforceability, or lack of priority of the lien of the Insured Mortgage; or

        iii. causes a loss of the Insured's Title acquired in satisfaction or partial satisfaction of the Indebtedness.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

b.  A violation of an enforceable Covenant by any Electricity Facility or Severable Improvement, unless an exception in Schedule B of the policy identifies the violation;

c.  Enforced removal of any Electricity Facility or Severable Improvement, as a result of a violation of a building setback line shown on a plat of subdivision recorded or filed in the Public Records, unless an exception in Schedule B of the policy identifies the violation; or

d.  A notice of a violation, recorded in the Public Records at Date of Policy, of an enforceable Covenant relating to environmental protection, describing any part of the Land and referring to that Covenant, but only to the extent of the violation of the Covenant referred to in that notice, unless an exception in Schedule B of the policy identifies the notice of the violation.

8.  This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:

a.  any Covenant contained in an instrument creating a lease or easement;

b.  any Covenant relating to obligations of any type to perform maintenance, repair, or remediation on the Land; or

c.  except as provided in Section 3.d., any Covenant pertaining to environmental protection of any kind or nature, including hazardous or toxic matters, conditions, or substances.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

**[FNTG BRAND]**

By: _____
            Authorized Signatory

ALTA Endorsement Form 36.5-06
(Energy Project –Covenants, Conditions and Restrictions-Land Under Development-Loan) (4/2/12)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**ENDORSEMENT**

**Attached to Policy No. _____**

**Issued by**

**BLANK TITLE INSURANCE COMPANY**

1.  The insurance provided by this endorsement is subject to the exclusions in Section 4 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2.  For purposes of this endorsement only:

    a.  "Electricity Facility" means an electricity generating facility that may include one or more of the following:  a substation; a transmission, distribution or collector line; an interconnection, inverter,  transformer, generator, turbine, array, solar panel, or module; a circuit breaker, footing, tower, pole, cross-arm, guy line, anchor, wire, control system, communications or radio relay system, safety protection facility, road, and other building, structure, fixture, machinery, equipment, appliance and item associated with or incidental to the generation, conversion, storage, switching, metering, step-up, step-down, inversion, transmission, conducting, wheeling, sale or other use or conveyance of electricity, on the Land at Date of Policy or to be built or constructed on the Land in the locations according to the Plans, that by law constitutes real property.

    b.  "Plans" means the survey, site and elevation plans or other depictions or drawings prepared by
        _(insert name of architect or engineer)_  dated ____, last revised _____ ,designated as
        _(insert name of project or project number)_  consisting of ___sheets.

    c.  "Severable Improvement" means property affixed to the Land at Date of Policy or to be affixed to the Land in the locations according to the Plans, that would constitute an Electricity Facility but for its characterization as personal property, and that by law does not constitute real property because (a) of its character and manner of attachment to the Land and (b) the property can be severed from the Land without causing material damage to the property or to the Land.

3.  The Company insures against loss or damage sustained by the Insured by reason of:

    a.  An encroachment of any Electricity Facility or Severable Improvement located on the Land onto adjoining land or onto that portion of the Land subject to an easement, unless an exception in Schedule B of the policy identifies the encroachment;

    b.  An encroachment of an improvement located on adjoining land onto the Land at Date of Policy, unless an exception in Schedule B of the policy identifies the encroachment;

    c.  Enforced removal of any Electricity Facility or Severable Improvement, as a result of an encroachment by the Electricity Facility or Severable Improvement onto any portion of the Land subject to any easement, in the event that the owners of the easement shall, for the purpose of exercising the right of use or maintenance of the easement, compel removal or relocation of the encroaching Electricity Facility or Severable Improvement; [or]

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

    d.    Damage to any Electricity Facility or Severable Improvement that is located on or encroaches onto that portion of the Land subject to an easement excepted in Schedule B, which damage results from the exercise of the right to maintain the easement for the purpose for which it was granted or reserved [; or]

    [e.    The coverage of Sections 3.c. and 3.d. shall not apply to the encroachments listed in Exception(s) _____ of Schedule B].

4    This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from contamination, explosion, fire, vibration, fracturing, earthquake or subsidence.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

**BLANK TITLE INSURANCE COMPANY**


By: _____
             Authorized Signatory


ALTA Endorsement Form 36.6-06
(Energy Project –Encroachments) (4/2/12)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 37**

**Return to Table of Contents**

## ASSIGNMENT OF RENTS OR LEASES ENDORSEMENT

## ALTA ENDORSEMENT FORM 37-06

### PURPOSE

Lenders occasionally request that the loan policy insure certain recorded interests that are taken as additional security for the loan primarily secured by the Insured Mortgage. The most common additional security, other than a security interest under the Uniform Commercial Code, is an assignment of rents or leases This endorsement is issued to provide certain coverages with respect to a separate assignment of rents or leases shown in Schedule B, Part II of the policy. This endorsement provides insurance that the assignment of rents or leases is properly executed, and that the Public Records do not disclose any prior assignments of these same rents or leases.

If you are asked to issue an endorsement to provide the above described coverages with respect to an assignment of rents or leases that is contained *within* the Insured Mortgage, please see **Section 56.**

### SECTIONS OF POLICY AMENDED BY ENDORSEMENT

These endorsements do not amend or modify any specific policy provisions, but add additional coverage to the terms of the policy.

### BASIS FOR PROVIDING COVERAGE

The assignment of rents or leases must be properly executed by the owner of the estate or interest covered by the Insured Mortgage, and there must not be any prior assignment of rents or leases of record. If a previously recorded assignment of rents or leases is found, it must be raised as an exception in Schedule B of the policy.

**NOTE: PRIOR MORTGAGES OR DEEDS OF TRUST MUST BE EXAMINED TO DETERMINE IF THEY CONTAIN ASSIGNMENTS OF RENTS OR LEASES. SEPARATE SCHEDULE B EXCEPTIONS SHOULD BE MADE FOR SUCH ASSIGNMENTS.**

### MODIFICATION

In the event that modification of this endorsement is requested, it is necessary to consider your state regulatory requirements for filing and approval of forms. If the endorsement is modified, the endorsement is not an ALTA form and should not reference ALTA in the title.  You must obtain the approval of the Company's underwriting adviser before complying with any request for a modification.   Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT

Attached to Policy No. _____

**Issued By**

**[FNTG BRAND]**


1.  The insurance provided by this endorsement is subject to the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.


2.   The Company insures against loss or damage sustained by the Insured by reason of:

   a. any defect in the execution of the [*Insert Title of Assignment of Rents or Leases Document*] referred to in paragraph _____ [*of Part II*] of Schedule B; or


   b. any assignment of the lessor's interest in any lease or leases or any assignment of rents affecting the Title and recorded in the Public Records at Date of Policy other than as set forth in any instrument referred to in Schedule B.


This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.


[Witness clause optional]


[FNTG BRAND]
BY: _____


ALTA Endorsement Form 37-06
(Assignment of Rents or Leases) (12/03/12)
©American Land Title Association

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 38**

**Return to Table of Contents**

**MORTGAGE TAX**

**ALTA ENDORSEMENT - FORM 38-06**

**PURPOSE**

This endorsement provides coverage to the insured lender if there is a deficiency in the recordation tax paid at the time the Insured Mortgage is recorded that is subsequently paid. The endorsement provides that, if the deficiency is paid, the Company will provide coverage against the invalidity or unenforceability of the Insured Mortgage or the lack of priority of the Insured Mortgage, from the failure to pay at the time of recording any portion of the recording tax. The Company does not provide coverage if the insured lender fails to pay the recordation tax deficiency.

**SECTIONS OF POLICY AMENDED BY ENDORSEMENT**

This endorsement for the insured lender does not expressly amend or modify any provisions of the Policy. It adds additional coverage to the terms of the policy.

**BASIS FOR PROVIDING COVERAGE**

To issue ALTA Form 38-06, you must confirm that there is no law or regulation in the state where the property lies that would adversely affect the lien of the Insured Mortgage by reason of the failure to correctly pay a recordation, registration, or related tax or charge required to be paid when the Insured Mortgage is recorded in the Public Records. If there is no binding authority in the state wherein the property lies, any request for this endorsement must be submitted to the Company's underwriting advisor for approval. If there is no law or regulation in the state in which the Land is located that contemplates a "Mortgage Tax" as defined in the endorsement, you may issue the endorsement if not regulatorily prohibited.

**MODIFICATION**

In the event that modification of an endorsement is requested, it is necessary to consider your state regulatory requirements for filing and approval of forms. If the endorsement is modified, the endorsement is not an ALTA form and should not reference ALTA in the title.  You must obtain the approval of the Company's underwriting adviser before complying with any request for a modification.

**Return to Table of Contents**

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 38**

ENDORSEMENT
Attached to Policy No. _____
Issued By
[FNTG BRAND]

1. The insurance provided by this endorsement is subject to the exclusions in Sections 4 and 5 of this endorsement, the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2. For the purposes of this endorsement only, "Mortgage Tax" means a recordation, registration or related tax or charge required to be paid when the Insured Mortgage is recorded in the Public Records.

3. Upon payment of any deficiency in the Mortgage Tax, including interest and penalties, by the Insured, the Company insures against loss or damage sustained by the Insured by reason of:

   a. the invalidity or unenforceability of the lien of the Insured Mortgage as security for the Indebtedness resulting from the failure to pay, at the time of recording, any portion of the Mortgage Tax; or

   b. the lack of priority of the lien of the Insured Mortgage as security for the Indebtedness resulting from the failure to pay, at the time of recording, any portion of the Mortgage Tax.

4. The Company does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from the failure of the Insured to pay the Mortgage Tax deficiency, together with interest and penalties.

5. The Company is not liable for the payment of any portion of the Mortgage Tax, including interest or penalties

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

[FNTG BRAND]
BY: _____

ALTA Endorsement Form 38-06
(Mortgage Tax) (12/3/12)
©American Land Title

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                                    **SECTION 39**

**Return to Table of Contents**

**POLICY AUTHENTICATION**

**ALTA ENDORSEMENT - FORM 39-06**

**PURPOSE**

This endorsement provides coverage to the insured lender if a policy is issued electronically, or does not have a signature which may be required by the form of policy cover used.

**SECTIONS OF POLICY AMENDED BY ENDORSEMENT**

This endorsement for the insured lender modifies the cover and Conditions 14 (c) of the Policy which requires an authentication by an authorized person. This typically would be the signature of a licensed (as necessary) employee or agent.

**BASIS FOR PROVIDING COVERAGE**

If the policy is issued electronically, it will not contain a "wet" signature, which is normally required by the language contained in the contract of insurance as indicated on the cover of the policy. The policy itself must be issued properly and all agency contract and Company underwriting guidelines must be followed before this endorsement can be issued. It is not the intent of the Company to include fraudulent or forged policies within this coverage.

**MODIFICATION**

In the event that modification of an endorsement is requested, it is necessary to consider your state regulatory requirements for filing and approval of forms. If the endorsement is modified, the endorsement is not an ALTA form and should not reference ALTA in the title.  You must obtain the approval of the Company's underwriting adviser before complying with any request for a modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                              **SECTION 39**

ENDORSEMENT
Attached to Policy No. _____
Issued By
**[FNTG BRAND]**


When the policy is issued by the Company with a policy number and Date of Policy, the Company will not deny liability under the policy or any endorsements issued with the policy solely on the grounds that the policy or endorsements were issued electronically or lack signatures in accordance with the Conditions.


This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]




[FNTG BRAND]
BY: _____


ALTA Endorsement Form 39-06
(Policy Authentication) (4/3/13)
©American Land Title

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 50**

**Return to Table of Contents**

## CLTA ENDORSEMENT 100-06
## (SIMILAR TO ALTA FORM 9 Series)

### PURPOSE

*__THIS ENDORSMENT IS NO LONGER AVAILABLE IN THIS FORMAT__*

In certain parts of the country, this endorsement is used quite frequently with the ALTA loan policies on both residential and commercial transactions.  In other parts of the country its use is limited to large commercial transactions. Similar in scope to the ALTA Form 9 series of endorsements, this endorsement is designed to afford the lender protection with respect to violations of private property restrictions which could impair the lien of the Insured Mortgage or the marketability of the Title.  It also insures against damage to improvements which could result from encroachments onto easements or adjacent property or because of development of minerals.  This endorsement is **not** suitable for use in policies insuring unimproved land.

### SECTIONS OF POLICY AMENDED BY ENDORSEMENT

This endorsement expands policy coverage by reducing the risk to the Insured with respect to certain Exclusions or Schedule B Exceptions.

### BASIS FOR PROVIDING COVERAGE

*Coverage 1(a) may be given if any of the following situations apply:*

1.      There are no covenants, conditions and restrictions.

2.      The covenants, conditions or restrictions are not enforceable under state law.

3.      The restrictions contain provisions that provide protections against impairment or loss of the mortgage lien where the lender is a good faith lender without knowledge of a violation.

4.      Rights to enforce the restrictions have been waived or are subordinate to the Insured Mortgage.

*Coverage 1(b) may be given if any of the following situations apply:*

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

1.      There are no covenants, conditions and restrictions.

2.      It has been determined that there are no violations of the covenants, conditions or restrictions.

3.      The statutory period for enforcement of restrictions has run or rights of enforcement of any violation have been properly waived.

*Coverage 1(c) may be given provided:*

Encroachments, if any, disclosed by survey, affidavit, inspection or otherwise are shown on Schedule B.

*Coverage 2(a) may be given if any of the following situations apply:*

Same as Items 1 through 4, under coverage 1(a)

*Coverage 2(b) may be given if any of the following situations apply:*

Same as Items 1 through 4,under coverage 1(a)

**CAUTION:**   IF ANY RESTRICTIONS ON SCHEDULE B CONTAIN PROVISION FOR FORFEITURE OR REVERSION OF TITLE ON THE OCCURRENCE OF A SPECIFIED CONDITION,   THE AFFIRMATIVE INSURANCE  GIVEN  UNDER **1(a) and (b) AND 2(a) and (b)** CANNOT BE GIVEN.   THOSE SECTIONS WILL HAVE TO BE DELETED FROM THE ENDORSEMENT.

*Coverage 3(a) may be given if any of the following situations apply:*

1.      No easements are shown in Schedule B.

2.      A survey or other reliable information confirms that existing improvements do not encroach upon any Schedule B easements.

3.      There is a minor encroachment of improvements onto a Schedule B easement, but after consulting with the Company's underwriting advisor, it is determined that the

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

encroachment would not interfere with maintenance of the easement and could not result in the forced removal of the improvements under state law.

*Coverage **3(b)** may be given if any of the following situations apply:*

1.      There is no separation of minerals from the surface estate by either deed or lease.

2.      There is a separate mineral estate but it does not include any rights of surface entry.

**CAUTION:**    IF MINERAL RIGHTS WITH RIGHTS OF SURFACE ENTRY HAVE BEEN SEVERED FROM THE SURFACE ESTATE, BUT THE LAND AND SURROUNDING AREA IS ENTIRELY IMPROVED WITH RESIDENTIAL DEVELOPMENT, YOU MUST SUBMIT THESE FACTS TO THE COMPANY'S UNDERWRITING ADVISER TO CONSIDER THE RISK BEFORE GIVING ANY COVERAGE UNDER 3(b).

*Coverage **4** may be given if any of the following situations apply:*

1.      There are no encroachments onto adjoining land shown in Schedule B.

2.      The encroachment is not onto vacant land, or is minor and could be removed at minimal cost.

3.      The encroachment is minor; is not onto vacant land; is not necessary to the support of the main structure; and the Company's underwriting advisor, being so advised by you, is satisfied that a state court would not require its removal.

## MODIFICATION

This form is a uniform form in California.  In the event that modification of this endorsement or your state form is requested, it is necessary to consider the state regulatory requirements for filing and approval of forms.  You must obtain the approval of the Company's underwriting advisor before complying with any request for modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 50**

ENDORSEMENT

Attached to Policy No._____

**Issued By**
**[FNTG Brand]**

The Company insures against loss or damage sustained by reason of:

1.        The existence, at Date of Policy, of any of the following:

   (a)        Covenants, conditions or restrictions under which the lien of the Insured Mortgage can be cut off, subordinated, or otherwise impaired;

   (b)        Present violations on the Land of any enforceable covenants, conditions or restrictions;

   (c)        Except as shown in Schedule B, encroachments of buildings, structures or improvements located on the Land onto adjoining lands, or any encroachments onto the Land of buildings, structures or improvements located on adjoining lands.

2.        (a)        Any future violations on the Land of any covenants, conditions or restrictions occurring prior to acquisition of the Title by the Insured, provided such violations result in impairment or loss of the lien of the Insured Mortgage, or result in impairment or loss of the Title if the Insured shall acquire the Title in satisfaction of the Indebtedness;

   (b)        Unmarketability of the Title by reason of any violations on the Land, occurring prior to acquisition of the Title by the Insured, of any covenants, conditions or restrictions.

3.        Damage to existing improvements, including lawns, shrubbery or trees

   (a)        That are located or encroach upon that portion of the Land subject to any easement shown in Schedule B, which damage results from the exercise of the right to use or maintain such easement for the purposes for which the same was granted or reserved;

   (b)        Resulting from the exercise of any right to use the surface of the Land for the extraction or development of the minerals excepted from the description of the Land or shown as a reservation in Schedule B.

4.        Any final court order or judgment requiring removal from any land adjoining the Land of any encroachment shown in Schedule B.

As used in this endorsement, the words "covenants, conditions or restrictions" do not refer to or include the terms, covenants, conditions or restrictions contained in any lease.

As used in this endorsement, the words "covenants, conditions or restrictions" do not refer to or

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 50**

include any covenant, condition or restriction  (a) relating to obligations of any type to perform maintenance, repair or remediation on the Land, or (b) pertaining to environmental protection of any kind or nature, including hazardous or toxic matters, conditions or substances except to the extent that a notice of a violation or alleged violation affecting the Land has been recorded in the Public Records at Date of Policy and is not excepted in Schedule B.

This endorsement is issued as part of the policy.  Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance.  To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls.  Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.


DATED:


BY: _____
          AUTHORIZED SIGNATURE




CLTA Form 100-06 (03-09-07)
ALTA – Loan Policy

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 51**

Return to Table of Contents

**SHARED APPRECIATION MORTGAGE ENDORSEMENT - COMMERCIAL**

**PURPOSE**

This endorsement is designed to provide additional coverage to the lender when the loan documents provide that the lender will participate in the appreciation in value of the property. This endorsement provides coverage in the event of an attack on the validity, priority or enforceability of the Insured Mortgage based upon the provisions regarding shared appreciation. The coverage also includes the value of the shared appreciation pursuant to the formula contained in the loan documentation.

***NOTE:*** *THIS ENDORSEMENT SHOULD NOT BE USED IN CONNECTION WITH LOANS ON ONE TO FOUR FAMILY RESIDENTIAL PROPERTIES. (See Section 30 for a form to be used with residential mortgage programs.)*

**SECTION OF POLICY AMENDED BY ENDORSEMENT**

Since any appreciation will occur in the future, this endorsement specifically provides that the coverage is not subject to Section 3(d) of the Exclusions from Coverage which excludes "Defects, liens, encumbrances, adverse claims or other matters . . . attaching or created subsequent to Date of Policy . . . ."

**BASIS FOR PROVIDING COVERAGE**

1. **State Law:** Many states have passed legislation specifically authorizing the lender to share in the appreciation of the property. The state statute must be examined for provisions setting specific limits and formulas, and the loan documents must be reviewed to verify that the loan complies with those limits and formulas. If the statute has no such limits or formulas, consideration should be given to the possibility that (a) the method of calculation used in the Insured Mortgage, or (b) the extent to which certain additional obligations might continue even after the principal is paid, might be so weighted in the lender's favor as to "shock the conscience" of the court and perhaps render the shared appreciation provisions of the Insured Mortgage invalid, or which could lead to a claim of "clogging" the equity of redemption in a bankruptcy or foreclosure situation.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

2. **Insured Mortgage must include the formula for calculation:**  The Insured Mortgage must <u>expressly</u> state that it is a Shared Appreciation Mortgage **and** include the actual formula or calculation method used to determine the lender's share.   The formula or calculation method **cannot** simply be incorporated by reference to the provisions of the note or loan agreement.

3.  **Loan is not a joint venture:**  Consideration must also be given to whether or not the loan is really a loan.  Could it be recharacterized as a joint venture arrangement with the borrower?  The terms and provisions of the loan documentation must be reviewed for a determination as to the nature and extent of control that the lender will have over the operations of the borrower.  If these controls are extensive and there is a risk that the loan will be recharacterized, then this endorsement should not be issued. Any such issues must be discussed with the Company Underwriting advisor before this endorsement is offered.

This endorsement is designed for use with an ALTA Loan Policy issued in connection with a **commercial** transaction.

## FORM A

When this form is provided, the minimum amount of insurance as stated in the policy shall be the sum of the principal debt plus a reasonable estimate of the amount of "shared appreciation interest".

## FORM B

When this form is provided, a reasonable estimation of the amount of "shared appreciation interest" is added in the second paragraph as additional insurance.  Usury, consumer credit protection or truth in lending laws, and costs required to obtain a determination of the amount of additional interest due are specifically mentioned to reinforce the idea that the express insurance does not cover these matters.

## MODIFICATION

These forms are not uniform forms.  In the event that modification of one or more of these forms or your state form is requested, it is necessary to consider the state regulatory requirements for filing and approval of forms.  You must obtain the approval of the Company's underwriting adviser before complying with any request for modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 51**

**Form A – Appreciation amounts included within Amount of Insurance**

ENDORSEMENT

Attached to Policy No._____

**Issued by**

**[FNTG BRAND]**

The Company insures the Insured against loss or damage by reason of:

1.        The invalidity or unenforceability of the lien of the Insured Mortgage resulting from the

provisions therein which provide for a Shared Appreciation Interest in the increase in value of the

Land subsequent to Date of Policy.

2.        Loss of priority of the lien of the Insured Mortgage as security for (i) the unpaid principal
balance of the loan; (ii) the Stated Interest; and (iii) the Shared Appreciation Interest, which loss
of priority is caused by the provisions in the Insured Mortgage for payment or allocation to the
Insured Mortgage for payment or allocation to the Insured of any Shared Appreciation Interest.

"Stated Interest" as used in this endorsement, shall mean only the fixed percent per annum
interest on the unpaid principal balance of the loan provided in the Insured Mortgage at Date of
Policy.

"Shared Appreciation Interest", as used in this endorsement shall mean only those amounts
(calculated pursuant to the formula provided in the Insured Mortgage) payable or allocated to the
Insured, out of the amount, if any, by which the Land has appreciated in value as established
pursuant to the provisions of the Insured Mortgage at Date of Policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not
(i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements,
(iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision
of the policy or a previous endorsement is inconsistent with an express provision of this
endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the
terms and provisions of the policy and of any prior endorsements.

Date:

By _____
     Authorized Signatory

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                                     **SECTION 51**

**Form B- Appreciation amounts added by endorsement**

ENDORSEMENT

Attached to Policy No.

**Issued by**

**[FNTG Brand]**

The Company insures the Insured against loss or damage that the Insured shall sustain by reason of the entry of a final, non-appealable order or judgment finding that the lien of the Insured Mortgage as security for the additional interest based on appreciated value of the Land:

        (a)     is invalid or unenforceable, or

        (b)     does not, at the Date of Policy, share the same priority in relation to any other claims or liens against the Land as is afforded the principal of the loan secured by the Insured Mortgage.

In the event of a loss compensable under this endorsement, the coverage afforded hereunder is in addition to and not included in the Amount of Insurance stated in Schedule A of the policy. Such additional insurance shall not exceed the sum of $_____ (amount to be agreed upon prior to issue.)

Nothing contained in this endorsement shall be construed as insuring against loss or damage sustained or incurred by reason of:

        (a)     usury,

        (b)     any consumer credit protection or truth in lending law, or

        (c)     costs, expenses or attorney's fees required to obtain a determination, by judicial proceedings or otherwise, of the amount of any additional interest due.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Dated:

By_____

  Authorized Signatory

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**Return to Table of Contents**

## SHARE OF CASH FLOW (ADDITIONAL INTEREST) ENDORSEMENT

## PURPOSE

This endorsement is designed to provide additional coverage to the lender when the loan documents provide that the lender is entitled to a share of the cash flow or income (net of normal expenses) from the property or business of the borrower as "Additional Interest". The term "Additional Interest" refers to a charge for the use of money other than the percentage rate that is applied to the principal indebtedness. Like the Shared Appreciation Endorsement, it provides not only for monetary loss protection to the lender, but also for the cost of defense against an attack on the validity, priority or enforceability of the lien of the Insured Mortgage upon the net cash flow. The coverage also includes the value of the share of cash flow pursuant to the formula contained in the loan documentation.

## SECTION OF POLICY AMENDED BY ENDORSEMENT

Since the loan documents provide that the additional interest will accrue in the future, the coverage provided by this endorsement is not subject to Section 3(d) of the Exclusions from Coverage which excludes "Defects, liens, encumbrances, adverse claims or other matters ... attaching or created subsequent to Date of Policy...."

## BASIS FOR PROVIDING COVERAGE

1. **State Law**

Some states have passed statutes specifically providing for the charging of "Additional Interest". These statutes must be examined for specific requirements with regard to limits and authorized formulas. If the statute has no such limits or formulas, consideration should be given to the possibility that (a) the method of calculation used in the Insured Mortgage, or (b) the extent to which certain additional obligations might continue even after the principal is paid, might be so weighted in the lender's favor as to "shock the conscience" of the court and perhaps render the shared cash flow provisions of the Insured Mortgage invalid, or which could lead to a claim of "clogging" the equity of redemption in a bankruptcy or foreclosure situation.

2. **Insured Mortgage Must Include The Formula for Calculation**

The Insured Mortgage must state that it secures the payment of the lenders share of cash flow as "Additional Interest" and it must contain the formula for calculation. These requirements **cannot**

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

be accomplished simply by incorporation by reference to the provisions of the note or loan agreement.

3. **Loan is Not a Joint Venture**

Consideration must be given to whether or not the loan is really a loan. Could it be recharacterized as a joint venture arrangement with the borrower? The terms and provisions of the loan documentation must be reviewed for a determination as to the nature and extent of control that the lender will have over the operations of the borrower. If these controls are extensive and there is a risk that the loan will be recharacterized, then this endorsement should not be issued.

Instructions for use

This endorsement is designed for use with the 2006 ALTA Loan Policy insuring mortgages on **commercial** transactions.

**NOTE:** THIS ENDORSEMENT SHOULD NOT BE USED IN CONNECTION WITH LOANS ON ONE TO FOUR FAMILY RESIDENTIAL PROPERTIES.

When this coverage is provided, the minimum Amount of Insurance as stated in the policy shall be the sum of the principal debt plus a reasonable estimate of the amount of additional interest which will be due to the Insured. Some forms of this endorsement may be filed which add the insurance incrementally as the additional interest accrues with a capping amount of additional insurance. Such an endorsement would contain language substantially as follows:

> *In the event of loss compensable under this endorsement, the coverage afforded hereunder is in addition to and not included in the Amount of Insurance stated in Schedule A of the policy. Such additional insurance shall not exceed the sum of $_____ (amount to be agreed upon prior to issue).*

### MODIFICATION

This form is not a uniform form. In the event that modification of this endorsement or your state form is requested, it is necessary to consider the state regulatory requirements for filing and approval of forms. You must obtain the approval of the Company's underwriting advisor before complying with any request for modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**Share of cash flow (additional interest)**

ENDORSEMENT
Attached to Policy No. _____

**Issued by**
**[FNTG BRAND]**

The Company insures the Insured against loss or damage that the Insured shall sustain by reason of the entry of a final, non-appealable order or judgment finding that the lien of the Insured Mortgage as security for the additional interest based on a share of cash flow as described in paragraph _____ of the Insured Mortgage:

      (a)     is invalid or unenforceable, or

      (b)     does not, at the Date of Policy, share the same priority in relation to other claims or liens against the Land as is afforded the principal of the loan secured by the Insured Mortgage.

 Nothing contained in this endorsement shall be construed as insuring against loss or damage sustained or incurred by reason of:

      (a)     Usury,

      (b)     Any consumer credit protection or truth in lending law, or

      (c)     Costs, expenses or attorney's fees required to obtain a determination, by judicial proceedings or otherwise, of the amount of any additional Interest due.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Dated:

By_____
      Authorized Signatory

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 53**

**Return to Table of Contents**

**ENDORSEMENT INSURING THE INTEREST OF INCOMING PARTNER**

**Form A - for use with 2006 Policy**

**Form B – for use with Former ALTA 1970 (rev. 84) Policy**

**PURPOSE**

This endorsement is to be used when providing coverage to a person or entity that is acquiring an interest as a general partner in a general partnership.  The incoming partner wishes to secure title insurance in its favor to the extent of its investment in the partnership.  This endorsement limits liability for loss to the percentage interest being acquired by the incoming partner in the partnership.

**SECTION OF POLICY AMENDED BY ENDORSEMENT**

This endorsement amends Condition 8(a) of the ALTA Owner's Policy (2006) to limit the liability of the Company with regard to payment of loss.

**CAUTION:** PLEASE REFER TO FORM B FOR THE ENDORSEMENT TO BE USED WITH THE FORMER ALTA 1970 (rev. 84) OWNER'S POLICY.

**BASIS FOR PROVIDING COVERAGE**

Coverage in favor of the new partner may only be given when a full copy of the original partnership agreement and any and all amendments have been reviewed to determine that the partnership was  originally formed in compliance with local law, and the agreement provides  for the substitution and addition of new partners.  Any procedures required by the agreement and local law must be observed.  Also, the addition of new partners cannot cause a dissolution of the partnership under local law.

This endorsement does not increase coverage but limits the payment of loss.  The issuance of this endorsement is a condition to the issuance of the Policy. The Amount of Insurance is to be the proportionate interest in the partnership being acquired by the incoming partner and the Policy should be written observing the following guidelines:

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

a.   The Amount of Insurance would be the market value of the percentage interest being acquired by the new general partner.

b.   The Insured would be shown as "[*new partner*], owner of a [    ]% interest in the partnership shown as the vestee in this Policy".

c.   The partnership would be shown as the vestee.

d.   Schedule B and the legal description would be shown in the normal manner.

This endorsement may not be issued without the approval of the Company's underwriting advisor.

.

## MODIFICATION

These forms are not uniform forms.  In the event that modification of one or more of these forms or your state form is requested, it is necessary to consider the state regulatory requirements for filing and approval of forms.  You must obtain the approval of the Company's underwriting advisor before complying with any request for modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 53**

**Form A – For use with the ALTA  Owners Policy (2006)**

ENDORSEMENT
Attached to Policy No. _____

**Issued by**
**[FNTG BRAND]**

Section 8(a) of the Conditions is amended to read as follows:

The extent of liability of the Company for loss or damage under this Policy shall not exceed the least of:

(i)   _____% of the actual loss of _____ (of which the Insured Claimant is a partner), or if the interest of the Insured in said partnership is reduced below _____%, such lesser proportion of the actual loss of said partnership; or

(ii)  The Amount of Insurance; or

(iii)  _____% of the difference between the value of the Title as insured and the value of the Title subject to the risk insured against by this policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Date:

BY:_____
            Authorized Signatory

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**Form B- For use with Policy Formerly known as  ALTA 1970 (rev. 84) Policy Form**

ENDORSEMENT

Attached to Policy No. _____

**Issued by**

[**FNTG BRAND**]

Section 6(a) of the Conditions and Stipulations is amended to read as follows:

The liability of the Company under this policy shall not exceed the least of:

(i)   _____% of the actual loss of _____ (of which the insured claimant is a partner), or if the interest of the insured in said partnership is reduced below _____%, such lesser proportion of the actual loss of said partnership; or

(ii)  The amount of insurance stated in Schedule A.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Date:

BY:_____

          Authorized Signatory

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                                    **SECTION 54**

**Return to Table of Contents**

## EXCESS INSURANCE ENDORSEMENT FOR USE IN INSURING EXISTING PARTNERSHIP OR INTEREST OF NEW PARTNER IN EXISTING PARTNERSHIP

### PURPOSE

This endorsement is to be used in situations where there is an existing policy in favor of a partnership which was issued by another company or brand.  We are being asked to insure either the partnership currently in title at present market value upon acquisition of a new partnership interest by a new partner *or* the interest of the new partner.  In either event the new Insured is willing to let the Company treat the previous insurance as primary coverage making the new coverage "excess insurance".  This endorsement is designed to accomplish this result.

### SECTION OF POLICY AMENDED BY ENDORSEMENT

This endorsement modifies the policy to provide that loss is recoverable under the policy only to the extent that it exceeds the Insured's recovery under a prior policy.

### BASIS FOR PROVIDING COVERAGE

This endorsement must be made a part of all owners policies insuring continuing partnerships or new partners in continuing partnerships when the Company is accepting the risk under a new policy as an "excess insurer".  The examiner must be satisfied that the partnership was properly formed originally, that the partnership agreement provides for the substitution and/or addition of new partners and that the documentation intended to accomplish the change complies with the requirements of applicable law. A copy of the primary policy must be obtained and examined, and a determination must be made that there are no claims pending based upon the coverage granted thereunder.

### MODIFICATION

This form is not a uniform form.  In the event that modification of this endorsement or your state form is requested, it is necessary to consider the state regulatory requirements for filing and approval of forms.  You must obtain the approval of the Company's underwriting advisor before complying with any request for modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 54**

**Excess Insurance**

ENDORSEMENT

Attached to Policy No. _____

**Issued by**
**[FNTG BRAND]**

The following paragraph 1A is added to the Conditions of this policy:

1A.     THIS IS INSURANCE COVERAGE IN EXCESS OF PREVIOUSLY ISSUED TITLE
POLICY OR POLICIES COVERING THE SAME INSURANCE RISK

     (a)     The Title is insured by the following prior title policy or policies:

        1.     Type of policy (owner's-loan) and Date of Policy:_____
             Insurer:
             Insured:
             Policy No.:
             Amount of Insurance:

        2.     [*Continue same format if more than one prior policy issued.*]

     (b)     It is understood and agreed between the Company and the Insured that the title
policy (or policies) referred to in paragraph 1A (a) of these Conditions is primary
insurance coverage and that this policy constitutes "excess insurance".  Insurance
coverage under this policy which insures a risk insured under any prior policy shall only
be available to the Insured for loss in excess of the Insured's recovery under such prior
policy.

     (c)     Nothing contained herein shall be construed to preclude the filing of a claim of
loss under this policy prior to recovery under a prior policy referred to in Paragraph 1A (a)
of these Conditions nor to relieve the Company of its obligations under this policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not
(i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements,
(iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision
of the policy or a previous endorsement is inconsistent with an express provision of this
endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the
terms and provisions of the policy and of any prior endorsements.

Dated:

By: _____
       Authorized Signatory

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                                    **SECTION 55**

Return to Table of Contents

**OPTION TO PURCHASE ENDORSEMENT**
**FORM A – Option primed by intervening matters**
**FORM B – Option priority relates back**

**PURPOSE**

Form A of this endorsement is designed to provide insurance that **at the date of the endorsement** the option to purchase the Land is valid and that the rights of the optionee thereunder are vested in the Insured, subject to the terms of the option agreement. As explained more fully below, Form A provides no coverage for the priority of the option.

Form B of this  endorsement is designed to provide insurance as to the priority, validity and enforceability  of an option to purchase the Land and that the rights of the optionee thereunder are vested in the Insured as of the date of the endorsement, subject to the terms of the option agreement.

**SECTION OF POLICY AMENDED BY ENDORSEMENT**

Form A does not specifically amend any portion of the policy, although it does provide limited coverage to the optionee as to the validity of the option.

Form B of this endorsement does not specifically amend any portion of the policy. It does provide additional coverage to the optionee as to the validity, priority and enforceability of the option, and also provides for payment of costs and attorneys' fees incurred in defending against an attack on the validity, priority or enforceability of the option.  However, this endorsement excludes coverage for costs and attorneys' fees incurred in connection with exercising the option.

**BASIS FOR PROVIDING COVERAGE**

*Considerations*

For Form A: This endorsement is designed to be issued in those states where (1) it is uncertain as to whether Title received at the time of the exercise of the option will relate back to the granting of the option or (2) it is clear that it will **not** relate back.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 55**

<u>For Form B</u>: This endorsement is designed to be issued in those states where it is clear that the option is a recordable instrument and that upon conveyance of the Land pursuant to the option, Title will relate back to the recording of the option.

<u>For Both Forms</u>

The option document must be recorded.

An option to purchase land may be subject to the Rule Against Perpetuities.  Some jurisdictions have exceptions for certain types of options to purchase, such as an option contained in a lease where the option can be exercised during the term of the lease.  However, the majority rule is that an option to purchase is subject to the rule.  This endorsement should **only** be given when it is clear that the option does not violate the rule.

When an option is obtained by a lender as part of a loan transaction, consideration must be given to state law prohibitions against clogging of the equity of redemption.  This should include considering whether the option itself is void or whether, when coupled with the option, the lien of the mortgage might be rendered void or voidable.

Consideration must also be given to whether a lease containing an option to purchase is in fact what it appears to be.  The land records may disclose that the optionee is the previous owner of the Land and the transaction is in fact a sale/leaseback with option to purchase.  Care must be taken to make sure the lease states that it is a true lease and the relationship between the parties is as lessor and lessee only.  Any concern over provisions of the lease must be discussed with the Company underwriting advisor.

*Instructions for Use*

This endorsement may be issued in connection with an ALTA Owner's Policy or an ALTA Owner's Policy with the ALTA 13-06 Leasehold endorsement attached insuring a lessee's interest under a lease.  When used with an ALTA Owner's Policy, the Insured will be the optionee but Title to the fee estate will be shown as being vested in the present owner.  You should **not** describe the option interest as being the estate or interest insured.  In the case of coverage by use of an ALTA Owner's Policy modified to insure a lease, the estate insured will be the Leasehold and Title will be shown as being vested in the name of the lessee of the leasehold estate, which normally will be the same entity that is the optionee.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 55**

## AUTHORITY FOR ISSUANCE OF THIS ENDORSEMENT

This endorsement may not be issued without the approval of the Company's underwriting advisor, who will consider the issues, including the recharacterization and the clogging problems mentioned above.

## MODIFICATION

This form is not a uniform form.  In the event that modification of this endorsement or your state form is requested, it is necessary to consider the state regulatory requirements for filing and approval of forms.  You must obtain the approval of the Company's underwriting advisor before complying with any request for modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

<u>**Option Form A**</u>

ENDORSEMENT

Attached to Policy No. _____

**Issued by**
**[FNTG BRAND]**

The Company insures the Insured against loss or damage that the Insured shall sustain by reason of the entry of a final, non-appealable order or judgment finding that the rights of the Insured in the Option described in paragraph ____of Schedule B ("Option") are at the date hereof invalid, and that the rights of the optionee under the Option are not vested in the Insured subject to the terms and provisions thereof.

The insurance contained herein and in the policy of which this endorsement is a part shall cease and terminate upon the exercise of the Option or on _____, whichever occurs first.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Dated:

By:_____
           Authorized Signatory

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                                    **SECTION 55**

**Option Form B**

ENDORSEMENT

Attached to Policy No. _____

**Issued by
[FNTG BRAND]**


The Company insures the Insured against loss or damage that the Insured shall sustain by reason of the entry of a final, non-appealable order or judgment finding that  the rights of the Insured in the Option described in paragraph ____of Schedule B ("Option") are not vested in the Insured subject to the terms and provisions thereof.

The Company further insures against loss or damage which the Insured shall sustain by reason of:

1.      The unenforceability of the right to exercise the Option except to the extent that such unenforceability or claim thereof is based on the failure of the Insured to have fulfilled the terms and conditions of the Option.

2.      The priority over the Option of any conveyance made of the fee simple estate in the Land or of any liens or encumbrances created thereon after the Date of Policy, excepting such liens or encumbrances that would affect the Insured had the Insured been the owner of the fee simple Title instead of an Option as of Date of Policy, including, without limitation, real estate taxes, special assessments, demolition liens, drainage liens and water liens.

3.      The entry of a final non-appealable order or judgment that requires the Insured, as condition to receiving specific performance of the Option, to pay a sum in excess of the Option price, other than attorneys' fees and costs of litigation.

Nothing contained in this endorsement shall be construed as insuring the Insured against loss or damage sustained or incurred by reason of:

(a)      Rejection of the Option under the provisions of the Federal Bankruptcy Code or state insolvency laws.


© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

(b)      The failure of the Insured to receive all or part of an award entered in a condemnation proceeding unless failure to share in said award stems solely by reason of the entry of a final, non-appealable order or judgment that finds the option invalid or incapable of specific performance.

(c)      The failure of the Insured at the time of payment of the Option price either to have obtained proper conveyances and releases from all persons then having an interest in said Land or a lien or encumbrance thereon (the determination as to the identity of such persons and the nature of the interest, lien or encumbrance owned or claimed to be at the expense of the Insured) or to have obtained a final, non-appealable order or judgment that finds those persons and interests entitled to receive the option price.

(d)      Attorneys' fees and costs in connection with the proceedings mentioned in subparagraph (c) immediately above or in connection with an action to enforce the Option, excluding attorneys' fees incurred to defend an attack on the validity or enforceability of said Option.

(e)       Any lien, or right to a lien, for services, labor or material heretofore or hereafter furnished and imposed by law.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Dated:

By: _____
         Authorized Signatory

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                                    **SECTION 56**

**Return to Table of Contents**

**ASSIGNMENT OF RENTS ENDORSEMENT-**

**CONTAINED WITHIN INSURED MORTGAGE**

**PURPOSE**

Lenders occasionally request that the loan policy insure certain recorded interests that are taken as additional security for the loan primarily secured by the Insured Mortgage.  The most common additional security, other than a security interest under the Uniform Commercial Code, is an assignment of rents (leases).

This endorsement is to be issued to provide certain coverages with respect to an assignment of rents (leases) that is contained within the Insured Mortgage. This endorsement provides insurance that the Public Records do not disclose any prior assignments of these same rents (leases).  Please see Section **37** for the issuance of an endorsement insuring a separately recorded assignment of rents (leases).

**SECTION OF POLICY AMENDED BY ENDORSEMENT**

This endorsement does not amend or modify any specific policy provisions, but adds additional coverage to the terms of the policy.

**BASIS FOR PROVIDING COVERAGE**

Verify that the Public Records do not disclose any prior assignments of rents (leases). If a previously recorded assignment of rents (leases) is found, it must be raised as an exception in Schedule B of the policy.

**NOTE:**  PRIOR MORTGAGES OR DEEDS OF TRUST MUST BE EXAMINED TO DETERMINE IF THEY CONTAIN ASSIGNMENTS OF RENTS (LEASES) WITHIN THEM.  SEPARATE SCHEDULE B EXCEPTIONS SHOULD BE MADE FOR SUCH ASSIGNMENTS.

**MODIFICATION**

This form is not a uniform form.  In the event that modification of this endorsement or your state form is requested, it is necessary to consider the state regulatory requirements for filing and approval of forms.  You must obtain the approval of the Company's underwriting advisor before complying with any request for modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 56**

**<u>Assignment of rents (leases) contained in Mortgage</u>**

**ENDORSEMENT**

Attached to Policy No. _____

**Issued by**
**[FNTG BRAND]**

The Company insures the Insured against loss which said Insured shall sustain by reason of the existence, as shown by the Public Records, of any assignment of the rents (leases) prior to the assignment of rents (leases) contained in the Insured Mortgage, other than as set forth in Schedule B.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 57**

**Return to Table of Contents**

## ISSUANCE OF FUTURE INSURANCE

### PURPOSE

This endorsement is designed to provide assurance that within a stipulated period of time we will increase the Amount of Insurance under the current policy or issue a new policy to a party designated by the Insured, subject only to then current underwriting practices and subsequent matters of record, and only if there are no claims or adverse title matters pending.

### SECTION OF POLICY AMENDED BY THE ENDORSEMENT

This endorsement does not amend or modify any section of the policy.

### BASIS FOR PROVIDING COVERAGE

This endorsement may be issued when the Insured will be acquiring a new interest or entering into a new security arrangement at a later date.  It is **not** to be used as a substitute for a binder or commitment.  Application for this endorsement **must** state the subsequent transaction for which the Insured desires insurance.  This endorsement **must** contain a time limitation on the right of the insured to request the issuance of a new policy.

### FORM A

This form does **not** obligate the Company to increase the amount of insurance in the face of a previously existing unknown defect in title, and is the **preferred form** for use in other than new construction.

### FORM B

This form obligates the Company to increase the Amount of Insurance and is to be used only in new construction situations where the original Amount of Insurance represents the value of the raw land and there is no construction loan to be insured. The new policy or endorsement should raise any matters which were created, first appeared in the Public Records, attached or  became Known to either the Insured or the Company subsequent to the date of the original policy, which could include pending claim matters. The form also obligates the Insured to apply for an increase in the Amount of Insurance either upon completion of the construction or within five years from the Date of Policy, whichever first occurs.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 57**

## MODIFICATION

These forms are not uniform forms.  In the event that modification of one or more of these forms or your state form is requested, it is necessary to consider the state regulatory requirements for filing and approval of forms.  You must obtain the approval of the Company's underwriting advisor before complying with any request for modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**FORM A**

**ENDORSEMENT**

Attached to Policy No. _____

**Issued by**
**[FNTG BRAND]**

The Company agrees that if, within _____ years after the Date of  Policy, application is made to increase the Amount of Insurance or to issue a new policy, it will issue additional title insurance policies, or increase the Amount of Insurance of this policy insuring such Title or interest as may then exist in the Insured or the Insured's designee.  The Amount of Insurance to be issued will not exceed the amount of the mortgage to be placed on the Land or the fair market value of the Land at the date of the application.  In the event a claim has been made or is pending against the Company, or a defect in Title has been discovered, the Company shall not be required to issue insurance for an amount greater than the face amount of this policy as to the defect discovered or resulting in said claim.  Upon receipt of the application to issue a subsequent policy or increase the Amount of Insurance of this policy, the Company will extend its examination of the Title to the then current date, and will then issue its policy or increase the Amount of Insurance of this policy, subject to such matters created, first appearing in the Public Records, or attaching subsequent to the effective date of this policy, or which have become Known to either the Insured or the Company.

The insurance to be issued shall be subject to underwriting practices, rules, regulations and rates in effect at the date the subsequent insurance coverage is issued.  The Company shall not be obligated to issue additional insurance coverage which would exceed the amount of the usual reinsurance retention of the Company if, after the exercise of reasonable effort, the Company is unable to obtain reinsurance or coinsurance as may be required in order for it to issue the full amount of additional insurance for which application is made.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                                    SECTION 57

**FORM B**

# ENDORSEMENT

Attached to Policy No. _____

**Issued by**
**[FNTG BRAND**]

The Insured agrees to apply for an increase in the Amount of Insurance to cover the value of the actual improvements constructed on the Land and pay the charges then applicable for such increased insurance upon completion of construction of such improvements or within 5 years after the Date of Policy, whichever first occurs.  The Company agrees that when such application is made to increase the Amount of Insurance  and/or to issue a new policy to the then Insured under the policy, and/or to issue a policy to such mortgagee(s), trustee(s) under deed(s) of trust, beneficiary(s) of deed(s) of trust, parties to sales and leasebacks or other types of financial transactions (hereinafter severally and collectively, as indicated by the context, referred to as "Lending Institution(s)") as may be designated by the present Insured or the then Insured under the policy, it will issue additional title insurance coverage insuring such Title and/or interest as may then exist in the Insured and/or Lending Institution in and to said premises in an amount equal to the value of the Land on the date of said application; provided the Company may then extend its examination of the Title to the then current date and, subject to such matters, if any, created, first appearing in the Public Records, attaching and/or which have become Known to either the Insured or the Company subsequent to the effective date of this policy, will increase its liability to the requested amount upon payment of its usual charges for such additional insurance coverage; and further provided, however, that the Company shall not be obligated to issue additional insurance coverage which would exceed the amount of the usual reinsurance retention of the Company if, after the exercise of its reasonable efforts, it is unable to obtain such reinsurance or coinsurance as may be required in order for it to issue the full amount of additional insurance for which application is made. The insurance to be issued shall be subject to underwriting practices, rules, regulations and rates in effect at the date the subsequent insurance coverage is issued.


This endorsement is issued as part of the policy. Except as it expressly states, it does not
(i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements,
(iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 58**

Return to Table of Contents

**COVENANTS RUNNING WITH THE LAND**

**(CLTA ENDORSEMENT NO. 124.1)**

**PURPOSE**

This endorsement is sometimes called a "shopping center endorsement" or CLTA 124.1 and is typically requested in connection with multiple owner shopping center developments.  Normally, the owners of the various parcels of property within a shopping center will enter into an agreement under which covenants will be made for each other's benefit to do or not to do certain acts with regard to the use, repair, maintenance or improvement of, or payment of taxes and assessments on the property of the respective covenantors. This endorsement provides assurance that conforming covenants will be binding upon the covenantors and their successors in ownership, subject to the limitations contained in the endorsement. In other words, the instrument containing the covenants will give constructive notice to subsequent owners and lenders of the other parcels that there are burdens on their parcels. It does NOT insure the enforceability of those covenants, and any request for that type of coverage should be refused.

**SECTION OF POLICY AMENDED BY ENDORSEMENT**

This endorsement does not amend any section of the title policy.  It expands the coverage of the policy by insuring the binding effect of both negative and affirmative covenants benefiting the insured Land and burdening other lands **not** included within the insured Land.

**BASIS FOR PROVIDING COVERAGE**

This endorsement is only available in those states which have sufficient legal precedent establishing criteria essential for creation of covenants that run with the land and are binding upon subsequent owners.  Counsel must tailor insurance requirements including the form of insurance coverage to fit state law requirements.

**AUTHORITY FOR ISSUANCE OF THIS COVERAGE**

This endorsement shall not be issued without approval by the Company's underwriting advisor.

**<u>No insurance shall be issued in a form which would insure enforceability or compliance with any such covenants.</u>**

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                           **SECTION 58**

## MODIFICATION

This form is not a uniform form.  In the event that modification of this endorsement or your state form is requested, it is necessary to consider the state regulatory requirements for filing and approval of forms.  You must obtain the approval of the Company's underwriting advisor before complying with any request for modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT

Attached to Policy No.____

**Issued By**

**[FNTG BRAND]**

The Company insures against loss or damage sustained by reason of the failure of the covenants of the covenantor in favor of the covenantee set out in Section(s) _____ of the instrument recorded _____ to do or refrain from doing some act relating to the use, repair or maintenance of the improvements , or payment of taxes and assessments on the real property, or some part thereof, described as (description of burdened land of covenantor) to be binding upon the covenantor and each successive owner, during his ownership of any portion of such real property, and upon each person having any interest therein derived from the covenantor or through any such successive owner thereof, except a mortgagee of a mortgage, or the trustee or beneficiary of a deed of trust, while not in possession of such real property in such capacity.

Provided, however, that no insurance coverage is provided by this Endorsement should such covenants fail to bind a successive owner who derives Title through: a) a tax deed; b) a foreclosure of a bond or assessment; c) enforcement of a federal tax lien; d) a bankruptcy, as trustee or otherwise; e) a right or lien existing prior to the date of recording of the instrument containing said covenants.

This endorsement does not insure against loss or damage which the Insured may sustain by reason of the non-performance of any said covenants.

This endorsement is issued as part of the policy.  Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance.  To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls.  Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

DATED:

BY: _____
            AUTHORIZED SIGNATURE

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

CLTA FORM 124.1-06 (03-09-07)

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                              **SECTION 59**

Return to Table of Contents

## REVOLVING CREDIT MORTGAGE ENDORSEMENTS

### PURPOSE

These endorsements provide coverage for the enforceability and priority of the lien of the Insured Mortgage as security for revolving credit loan advances.  There are four endorsements.  Each is designed to apply to one of the four general legal patterns for future advance mortgages in the United States. See also Section 14 for ALTA endorsements that may be used, if appropriate, to insure the priority of advances made under a revolving credit facility.

### SECTION OF THE POLICY AMENDED BY ENDORSEMENT

Each endorsement modifies Exclusions from Coverage No. 3(d) and Conditions No. 1 (d)(ii). They also expand the coverage granted by Covered Risks 9 and 10 to those amounts included within the definition of Indebtedness at Condition 1(d) by using and defining the term "Advances" to include those amounts.

### BASIS FOR PROVIDING COVERAGE

**Preliminary Considerations**

*Security*

To secure repayment of *future advances* of funds by the lender, the mortgage or deed of trust must provide for such future advances.  The mortgage does not need to provide for revolving credit unless the principal balance could be paid down to zero and then funds could be re-advanced under the note. If that happens (which is not unusual in a revolving line of credit) the security instrument may not secure subsequent future advances (or re-advances) unless the parties agree that it will.

Under Section 549 of the Bankruptcy Code, the bankruptcy trustee of a borrower may have the power to avoid the lien of a mortgage or trust deed to the extent it secures advances made after the lender has notice of the bankruptcy.  The recording or filing of a copy of the petition, or a notice that the petition has been filed, is sufficient to give the lender that notice. The courts have construed notice very broadly. Therefore, draws against a revolving credit line and other loan advances which are funded after a bankruptcy filing may be in jeopardy of being unsecured.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                                    **SECTION 59**

*Priority*

The priority of the mortgage or deed of trust as security for future advances depends upon the factors discussed below.  The problems arise where a lien or encumbrance is created or attaches after recording of the mortgage or trust deed but prior to a future advance.

**Ordinary Liens and Encumbrances**

*Notice*

In order for a future advance to have priority over an intervening matter, the mortgage or trust deed must have given notice at the time it was originally recorded that it would secure future advances. For purposes of this coverage, which deals with future advances, repayment and re-advances, the Insured Mortgage must contain whatever language about future advances or revolving credit that may be required under state law to give constructive notice and establish priority.

*Obligation to Advance*

Whether the lender is obligated to make the advance at the time the intervening party's lien or encumbrance attaches to the borrower's Title is important to priority in most states.  If the lender is legally obligated to make the advance at the time ("**obligatory advance**"), the lien securing it is prior to the lien or encumbrance of the intervening party.  An advance is obligatory if the lender could be successfully sued for damages if it did not make it. The obligation to advance may have some conditions ("the borrower must be alive", "the borrower must still own the property"), but these conditions must be objective and not subjective on the part of the lender.  Therefore, any conditions on the lender's obligation to fund must <u>not</u> be under the lender's control. If the lender is not obligated to fund after any lien or encumbrance attaches to the Title, advances made after the attachment of such a lien are optional ("optional advance").  An advance can start as obligatory, but if a lender chooses to advance when a condition has not been met the advance becomes optional. The rule differs among the states as to the priority of an optional advance over an intervening matter:

<u>Majority Rule</u>:  A future advance mortgage lien is prior if the lender does not have **actual** notice of the intervening matter at the time of the advance. Thus the advance will have priority over intervening matters even if recorded so long as the lender does not have actual knowledge of them.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

_Minority Rule_:   A future advance mortgage lien is prior if the lender has neither **actual** nor **constructive** notice of the intervening matter at the time of the advance. A future advance will lose priority to either an unrecorded intervening matter of which the lender has knowledge or an intervening matter which has been recorded which is not known to the lender.

Unless the agreement between the lender and borrower provides for a cure by the borrower, any advance made after a default by the borrower is an optional advance.  Where an obligatory advance agreement contains a cure provision, advances made after cure are again obligatory. Therefore they would be entitled to priority over encumbrances attaching after cure but before the advance.  Advances made after default and before cure would be treated as optional advances.

**Special Cases:  Federal Tax Liens, Mechanics' Liens and Environmental Protection Liens**

_Federal Tax Liens_

There is some argument about the priority of federal tax liens with respect to the security for disbursements under a construction loan.  Under the worst case view, the construction loan mortgage lien has the same priority over federal tax liens as it would have over a judgment lien under state law.

However, **no advance** made under an ordinary future advance mortgage is protected against a federal tax lien recorded after the mortgage where the advance is made (1) more than 45 days after the recording of the tax lien notice or (2) after **actual** notice of the tax lien, whichever occurs first.  Whether the advance is optional or obligatory is immaterial.

_Mechanics' Liens (Construction Liens)_

The law of many states would give mechanics' liens priority over the lien of the Insured Mortgage. In some states, this is limited to those mortgages or trust deeds which finance the construction out of which the liens arise.  Other states may treat mechanic's liens like other types of liens with respect to future advance mortgages if the mortgage was recorded before the visible commencement of construction. The effect of mechanics' liens on the priority of future advances must always be considered.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

*Environmental Protection Liens*

Currently, federal law and the laws of many states create governmental liens to secure repayment for the cost of cleaning the environment of toxic or hazardous waste.  These liens may also secure repayment for the damage done to the environment.  Under some state laws, these liens have priority over existing liens.  It is possible for them to be created without recording or filing in the local real estate records. The impact of such liens on the priority of future advances is uncertain.

**Forms of Coverage**

Subject to any state regulatory requirements which may exist, the following endorsements are preferred for providing of revolving credit advances:

For *obligatory* advance loans:
> Revolving Credit Endorsement A
> Revolving Credit Endorsement B

For *optional* advance loans:
> Revolving Credit Endorsement C
> Revolving Credit Endorsement D

**Effect of the Endorsements**

*Common features*

All of the endorsements relax the limitation of liability imposed by the Conditions and Exclusions from Coverage noted above, to the extent of the insurance they provide.  However, they do not cover disbursements made after the borrower no longer has Title to the Land.  All of these forms eliminate coverage for advances made after notice that the borrower has become a debtor in a bankruptcy case.

*Differences*

*These endorsements differ only in the scope of the exclusion from coverage in* **Paragraph e**. *of the Endorsement.*

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

<u>Endorsements A and B cover obligatory advance agreements.</u>

**Paragraph e**. excludes from priority only those advances made after the lender is no longer obligated to fund them. After that point, the law will treat advances as optional.    The endorsements differ from each other in their treatment of advances made after default or some other event excusing the lender from its funding obligations.

Endorsement A is for use in the majority law states. (Lender must have actual knowledge of intervening matter).

Endorsement B is tailored for the minority view. (Lender has actual or constructive knowledge of intervening matter).

<u>Endorsements C and D cover optional advance agreements</u>.

Endorsement C is for optional advance loans in those states applying the majority rule.  It gives no insurance of priority over matters Known (which under the policy means *actually known*) to the insured before the advance of funds.

Endorsement D is for optional advance loans in those states adopting the minority position.  It denies priority coverage against intervening encumbrances either actually or constructively known to the Insured before the advance of funds. In other words, it does not insure priority over subsequently recorded liens.

*Instructions for Issuance*

**You must check with the Company's underwriting advisor to see which forms are available in your state and whether any modification of these instructions is necessary.**  While the forms here should be sufficient for the majority of states, there may be statutes or court decisions in some states which have not been considered.   If no modification is required, you are authorized to proceed as follows:

1.      Determine that the Insured Mortgage clearly states that it secures future advances.  The statement that it secures a revolving line of credit or a revolving credit agreement is sufficient.  You must not issue any of these endorsements if the Insured Mortgage is not clear on this point.

2.      Determine whether or not it is possible for the lender to make advances after the loan balance is paid down to zero ("zero balance").  If it is, then either the Insured Mortgage must stipulate that advances made thereafter are secured or the law in your state must

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

so provide.  If neither is the case, you must either require that the Insured Mortgage be modified to provide for this or decline to issue the endorsement.

3.      Determine whether the state where the land lies applies the majority or minority rule on priority of **optional** advances.  **Consult the Company's underwriting advisor when making this determination.**

**If the minority rule is applied, you must not issue Endorsements A or C.**  If there is no law on which rule will be applied, then you may issue Endorsements A or C **only to loan policies insuring second or lower priority mortgages or deeds of trust on individual single family residential houses or condominiums.**  However, Endorsement A may only be issued if the lender is obligated to make the future advances.  (See No. 4, below)

4.      Determine whether the advances are initially obligatory or optional.  **If they are optional, neither Endorsement A nor Endorsement B may be issued.**  Agreements ("insecurity clauses,") which provide that lender is not obligated to fund if, at any point, it believes the borrower has become incapable of repaying the loan, should be considered optional advance agreements.  If in doubt, advances should be treated as optional.

If advances are initially obligatory, Endorsements A or B may be issued.  Endorsement A should be issued in states which apply the majority law on optional advances.  Endorsement B should be used in those states applying the minority law.  However, if one or more events other than a default by the borrower excuses the lender's obligation to make a further advance, those events must be added at the end of paragraph **e**. in these endorsements. If the agreement characterizes the only events relieving the lender's obligation as events of default, then no additional language is necessary in the endorsement.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 59**

**Selection of endorsement-summary table**

State law on **optional** advances                              <u>Nature of Advances</u>

|  | Obligatory | Optional |
|---|---|---|
| Majority Law | A, B*, C*, D* | C,D* |
| Minority Law | B, D* | D |
| Law unsettled | A**, B | C**, D |

* Provides less than the maximum coverage available.

**For use only with second or lower priority mortgages on single family residences (see instructions, above.)

5.      You are authorized to delete the exception for mechanic's liens (paragraph **d.**) from any of these endorsements issued to loan policies covering second or lower priority mortgages on single family residence, where advances are obligatory.  **Contact the Company's underwriting advisor to determine if deletion of this exception is appropriate under any other circumstances.**

6.      If you are asked to extend the coverage of Endorsements A or B to disbursements made after a cure of a default or other event which excused the lender's obligation to fund, you may add the following language to the end of **Paragraph e**. after you have made the determination stated below:

> **but prior to a cure of said default [or other event eliminating lender's obligation to fund (if applicable)].**

To do this, you must determine that either the note or the revolving credit agreement <u>reobligates</u> the lender to fund after the occurrence of some stated event which cures the default.  The most usual event would be the borrower bringing his account current within a certain period of time.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**Any questions you may have about these instructions should be directed to the Company's underwriting advisor.**

## MODIFICATION

These forms are not uniform forms.  In the event that modification of one or more of these forms or your state form is requested, it is necessary to consider the state regulatory requirements for filing and approval of forms.  You must obtain the approval of the Company's underwriting advisor before complying with any request for modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

### Revolving Credit Endorsement A - Obligatory Advances – [Majority Law]

**ENDORSEMENT**

Attached to Policy No. _____

**Issued by**
**[FNTG BRAND]**

Any advance made by the Insured after Date of Policy is included within the coverage of this policy if:

1.      The advance is made pursuant to [name of future agreement], according to its terms at Date of Policy, and

2.      The party shown in Schedule A as vested in Title is so vested at the time of the advance and is not at that time a debtor in a bankruptcy case of which the Insured has actual or constructive notice.

The Company insures the Insured against loss the Insured shall sustain by reason of the priority of any lien or encumbrance over the lien of the Insured Mortgage as security for any such advance, except for any of the following:

      a.      Any lien or encumbrance which appears in Schedule B.

      b      Any tax or assessment which becomes a lien after Date of Policy.

      c.      Federal tax liens of which the Insured has actual or constructive notice arising subsequent to Date of Policy and prior to the making of the advance.

      d.      Any lien, or right to a lien, which is imposed by law to secure payment for labor, services or materials supplied after Date of Policy.

      e.      Any lien or encumbrance, arising after Date of Policy and prior to the making of the advance, of which the Insured has actual notice at the time the advance is made, if the advance is made after an event of default by the borrower or after [indicate other event eliminating lender's obligation to fund].

      f.      Any environmental protection lien arising after Date of Policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

<u>**Revolving Credit Endorsement B - Obligatory Advances – [Minority Law]**</u>

**ENDORSEMENT**

Attached to Policy No. \_\_\_\_\_

**Issued by
[FNTG BRAND]**

Any advance made by the Insured after Date of Policy is included within the coverage of this policy if:

1.      The advance is made pursuant to [name of future agreement], according to its terms at Date of Policy, and

2.      The party shown in Schedule A as vested in Title is so vested at the time of the advance and is not at that time a debtor in a bankruptcy case of which the Insured has actual or constructive notice.

The Company insures the Insured against loss the Insured shall sustain by reason of the priority of any lien or encumbrance over the lien of the Insured Mortgage as security for any such advance, except for any of the following:

   a.      Any lien or encumbrance which appears in Schedule B.

   b.      Any tax or assessment which becomes a lien after Date of Policy.

   c.      Federal tax liens of which the Insured has actual or constructive notice arising subsequent to Date of Policy and prior to the making of the advance.

   d.      Any lien, or right to a lien, which is imposed by law to secure payment for labor, services or materials supplied after Date of Policy.

   e.      Any lien or encumbrance, arising after Date of Policy and prior to the making of the advance, of which the Insured has actual or constructive notice at the time the advance is made, if the advance is made after an event of default by the borrower or after [indicate other event eliminating lender's obligation to fund].

   f.      Any environmental protection lien arising after Date of Policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                                  **SECTION 59**

<u>**Revolving Credit Endorsement C - Optional Advances -[Majority Law]**</u>

**ENDORSEMENT**

Attached to Policy No. \_\_\_\_\_

**Issued by
[FNTG BRAND]**

Any advance made by the Insured after Date of Policy is included within the coverage of this policy if:

1.      The advance is made pursuant to [name of future agreement], according to its terms at Date of Policy, and

2.      The party shown in Schedule A as vested in Title is so vested at the time of the advance and is not at that time a debtor in a bankruptcy case of which the Insured has actual or constructive notice.

The Company insures the Insured against loss the Insured shall sustain by reason of the priority of any lien or encumbrance over the lien of the Insured Mortgage as security for any such advance, except for any of the following:

a.      Any lien or encumbrance which appears in Schedule B.

b.      Any tax or assessment which becomes a lien after Date of Policy.

c.      Federal tax liens of which the Insured has actual or constructive notice arising subsequent to Date of Policy and prior to the making of the advance.

d.      Any lien, or right to a lien, which is imposed by law to secure payment for labor, services or materials supplied after Date of Policy.

e.      Any lien or encumbrance, arising after Date of Policy and prior to the making of the advance, of which the Insured has actual notice at the time the advance is made.

f.      Any environmental protection lien arising after Date of Policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

### Revolving Credit Endorsement D - Optional Advances – [Minority Law]

**ENDORSEMENT**

Attached to Policy No. _____

**Issued by**
**[FNTG BRAND]**

Any advance made by the Insured after Date of Policy is included within the coverage of this policy if:

1.      The advance is made pursuant to [name of future agreement], according to its terms at Date of Policy, and

2.      The party shown in Schedule A as vested in Title is so vested at the time of the advance and is not at that time a debtor in a bankruptcy case of which the Insured has actual or constructive notice.

The Company insures the Insured against loss the Insured shall sustain by reason of the priority of any lien or encumbrance over the lien of the Insured Mortgage as security for any such advance, except for any of the following:

a.      Any lien or encumbrance which appears in Schedule B.

b.      Any tax or assessment which becomes a lien after Date of Policy.

c.      Federal tax liens of which the Insured has actual or constructive notice arising subsequent to Date of Policy and prior to the making of the advance.

d.      Any lien, or right to a lien, which is imposed by law to secure payment for labor, services or materials supplied after Date of Policy.

e.      Any lien or encumbrance, arising after Date of Policy and prior to the making of the advance, of which the Insured has actual or constructive notice at the time the advance is made.

f.      Any environmental protection lien arising after Date of Policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                                    **SECTION 60**

**Return to Table of Contents**

**LAST DOLLAR ENDORSEMENT**

**(FOR USE WITH POLICY FORMS OTHER THAN THE ALTA 2006 LOAN POLICY)**

**PURPOSE**

This endorsement is designed to provide coverage to the lender in a situation where the loan amount exceeds the value of the real property.  This situation commonly occurs, for example, in the financing of an ongoing business.  The real property is often only a small part of the purchase price that is being borrowed. [Without this coverage, the liability under the policy could be reduced to zero by the repayment of the principal long before the entire debt is retired.]

**SECTION OF POLICY AMENDED BY ENDORSEMENT**

Condition and Stipulation 9 REDUCTION OF INSURANCE of the 1987, 1990 and 1992 ALTA Loan Policy (Section 8 in 1970 version) provides for the reduction of liability by the repayment of the principal of the indebtedness.  Condition and Stipulation 7 DETERMINATION AND EXTENT OF LIABILITY (Section 6 in 1970 version) defines the loss under the loan policy as the unpaid principal indebtedness as reduced under the Condition and Stipulation 9 (Section 8 in the 1970 version).  This endorsement amends these two sections to provide that the repayment of the debt will first be applied to reduce the amount of the indebtedness **in excess** of the liability under the policy.  This would result in the insurance provided under the policy not being reduced by repayment until the outstanding balance of the debt equals the amount of liability under the policy.  At that point, the liability would be reduced, *pro tanto* (or dollar for dollar), by subsequent repayment of the debt.  The policy would then provide coverage to the *last dollar* of indebtedness.

ALTA structured the 2006 Loan Policy in such a way that this endorsement is no longer needed. Condition 9. LIMITATION OF LIABILITY no longer contains the provision that the Amount of Insurance is reduced by the repayment of principal *pro tanto*.  Rather, the definition of Indebtedness under Conditions 1. (d) provides that the amount of the Indebtedness (not the Amount of Insurance)  is reduced by the total of all payments and by any amount forgiven. The result is that as long as the Indebtedness does not fall below the Amount of Insurance, coverage will not be reduced by repayment of principal.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 60**

## BASIS FOR PROVIDING COVERAGE

**This endorsement cannot be used with the ALTA 2006 Policy Form.**

Care must be taken to make sure that the form and/or rate is filed in those states that require filing.

If the mortgage collateralizes a revolving line of credit, this endorsement should be modified to reflect that it covers money paid and repaid under the revolving credit agreement.

## MODIFICATION

This form is not a uniform form.  In the event that modification of this endorsement or your state form is requested, it is necessary to consider the state regulatory requirements for filing and approval of forms.  You must obtain the approval of the Company's underwriting advisor before complying with any request for modification.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                        **SECTION 60**

**Last Dollar Endorsement (For 1987, 1990 and 1992 versions)**

**ENDORSEMENT**

Attached to Policy No. _____

**Issued by**

**[FNTG Brand]**

The Company has been advised by the insured that the mortgage insured herein secures an indebtedness to the insured in an amount in excess of the amount of this policy.  The Company agrees that in calculating the amount of indebtedness secured by the insured mortgage under paragraphs 7 and 9 of the Conditions and Stipulations of this policy, payments made to reduce the amount of said indebtedness (except payments made by the Company pursuant to provisions of this policy) shall be deemed applied first to the portion of said indebtedness that is in excess of the amount of insurance stated in Schedule A.

Furthermore, it is agreed that the books and records of the insured with respect to the payment of the indebtedness secured by the mortgage shall be conclusive evidence of the application of payments of the indebtedness.  Said books and records shall be kept according to any proper and recognized method of accounting for payment of secured obligations.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Dated:

By:_____
        Authorized Signatory

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 61**

**Return to Table of Contents**

## TAX CREDIT BENEFIT ENDORSEMENT

### PURPOSE

These endorsements are often requested in conjunction with the issuance of an Owners Policy covering Land that has been developed in such a way as to afford the owners or the investors certain tax credits, such as Low Income Housing Tax Credits, under the IRS Code.

### SECTIONS OF POLICY AMENDED BY ENDORSEMENT

These endorsements indirectly modify Condition 8 of the Owners Policy by recognizing the value of the loss of the tax benefit as a basis for loss under the policy. Without these endorsements, the value of the Title may not take into consideration any value of the Tax Benefit that was lost due to a title issue. The market value of the Land may be enhanced by the special tax treatment that the owner enjoys.

### BASIS FOR PROVIDING COVERAGE

There are 3 forms of Endorsement attached.

- The Tax Benefit Endorsement-Insured which runs to the benefit of the named Insured
- The Tax Benefit Endorsement [*limited partner/member*] which runs to the benefit of a specific investor in the Insured.
- The Tax Benefit Endorsement – No Increase in Amount of Insurance benefits the named Insured

The first two endorsements shown contain a separate amount of insurance which is in addition to the Amount of Insurance afforded under the Policy and for which a separate premium based on the specific increased amount of liability  needs to be charged and collected at the current rates. The third endorsement expands the basis for loss under the policy generally, and should have a risk premium attached to it, even though the Amount of Insurance is not increased, since this is additional coverage that would not be afforded by the policy without the endorsement.

The Tax Benefit Endorsement-[*limited partner/member*] should be customized to name the investor  and describe the specific type of investor (member or limited partner) and then name the entity that is being insured in the underlying Policy. The Additional Insured under this endorsement is different party than the Insured under the Policy.

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

ENDORSEMENT MANUAL – Fidelity National Title Group, Inc.                    **SECTION 61**

**MODIFICATION**

This form is not a uniform form.  In the event that modification of this endorsement or your state form is requested, it is necessary to consider the state regulatory requirements for filing and approval of forms.  You must obtain the approval of the Company's underwriting advisor before complying with any request for modification, including the referencing of other sections of the Tax Code.

Return to Table of Contents

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**Tax Benefit Endorsement-Insured**

**ENDORSEMENT**
Attached to Policy No._____

**Issued by**
**[FNTG BRAND]**

**Amount of Insurance: $**_____

For purposes of this Endorsement, the following general provisions shall apply:

(a)      The term "Tax Benefit" shall mean the Low Income Housing Credit pursuant to Section 42 of the Internal Revenue Code of 1986, as amended (the "Low Income Housing Credit"). The Company acknowledges that Improvements constructed upon the land described in Schedule A may be treated by the Insured as low-income buildings pursuant to said Section 42.

(b)      The term "Tax Benefit Loss" shall mean that, as a result of a matter falling within the insuring provisions of the Policy, subject to the Exclusions, Exceptions and Conditions of the Policy, the Insured is not able to claim the Low Income Housing Tax Credit or is required to recapture all or any portion of the Low Income Housing Tax Credit.

If a defect in the Title insured against in the Policy results in a Tax Benefit Loss, the Company agrees to pay to the Insured the amount which the Insured is required to pay, and does pay, or which the Insured is unable to claim, by reason of the application of the Internal Revenue Code of 1986, as amended, now and hereafter in effect.  The Company's obligations to pay the Insured under this Endorsement: (a) does not affect or modify and is in addition to the Company's obligations to pay the Insured under the Policy for any loss or damage incurred by the Insured under the Policy: (b) does not reduce the Amount of Insurance of the Policy; and (c) is limited to the amount of insurance stated above on this Endorsement. Any payment under this Endorsement shall reduce the Company's liability hereunder and the amount of insurance under this Endorsement shall be reduced by a corresponding amount.

The Company shall not be obligated for any costs, attorneys' fees or expenses incurred by any Insured under the Policy or this Endorsement in defending or establishing the Tax Benefit.

This endorsement is issued as part of the policy.  Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy or (iv) increase the Amount of Insurance.  To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls.  Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements to it.

[Witness Optional]

DATED:

[FNTG BRAND]

BY: _____
        AUTHORIZED SIGNATORY

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**Tax Benefit Endorsement- [*limited partner/ member*]**

**ENDORSEMENT**

Attached to Policy No._____

**Issued by**

**[FNTG BRAND]**

**Amount of Insurance: $**_____

The Company acknowledges that _____, which is the [*limited partner/member*] of _____ (the ["*Partnership or "LLC"™*]), is an Additional Insured ("Additional Insured") under this Policy but only for and limited to the specific dollar amount of coverage expressed above in this Endorsement.

For purposes of this Endorsement, the following general provisions shall apply:

   (a)  The term "Tax Benefit" shall mean the Low Income Housing Credit pursuant to Section 42 of the Internal Revenue Code of 1986, as amended (the "Low Income Housing Credit"). The Company acknowledges that Improvements constructed upon the land described in Schedule A may be treated by the Additional Insureds as low-income buildings pursuant to said Section 42.

   (b)  The term "Tax Benefit Loss" shall mean that, as a result of a matter falling within the insuring provisions of the policy, subject to the Exclusions, Exceptions and Conditions of the Policy, the [*Partnership/LLC*] is not able to claim the Low Income Housing Tax Credit or is required to recapture all or any portion of the Low Income Housing Tax Credit.

Except to the extent of reimbursement received by them from the [*Partnership/LLC*], if a defect in the Title insured against in the Policy results in a Tax Benefit Loss, the Company agrees to pay, to the Additional Insured named in this Endorsement,  the amount which they, or any of them are required to pay, and do pay, or which they, or any of them, are unable to claim, by reason of the application of the Internal Revenue Code of 1986, as amended, now and hereafter in effect.  The Company's obligations to pay the Additional Insured named herein to and under this Endorsement: (a) does not affect or modify and is in addition to the Company's obligations to pay the Insured under the Policy for any loss or damage incurred by the Insured under the Policy: (b) does not reduce the Amount of Insurance of the Policy: and (c) is limited to the amount of insurance stated above on this Endorsement. Any payment under this Endorsement shall reduce the Company's liability hereunder and the amount of insurance under this Endorsement shall be reduced by a corresponding amount.

The Company shall not be obligated for any costs, attorneys' fees or expenses incurred by any Insured under the Policy or this Endorsement in defending or establishing the Tax Benefit.

This endorsement is issued as part of the policy.  Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy or (iv) increase the Amount of Insurance.  To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls.  Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements to it.

[Witness Optional]

DATED:

[FNTG BRAND]

BY: _____
        AUTHORIZED SIGNATORY

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

**Tax Benefit Endorsement – no increase in Amount of Insurance**

**ENDORSEMENT**

Attached to Policy No._____

**Issued by**
**[FNTG BRAND]**


The Company hereby insures the Insured that in the event of any occurrence, defect, lien or encumbrance otherwise insured against by this policy, the loss or damage incurred by the Insured shall be deemed to be the difference between (1) the value of the Title as insured under this policy taking into consideration the tax credit status of the Insured pursuant to applicable sections of the Internal Revenue Code in effect at the Date of Policy (the "Value of the Title") prior to such occurrence, defect, lien or encumbrance, and (2) the Value of the Title after such defect, occurrence, lien or encumbrance.


This endorsement is issued as part of the policy.  Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy or (iv) increase the Amount of Insurance.  To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls.  Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements to it.


[Witness Optional]


DATED:

[FNTG BRAND]

BY: _____
       AUTHORIZED SIGNATORY

© 1999-2013 Fidelity National Title Group, Inc. All Rights Reserved

# EXHIBIT 6

# EXHIBIT 6

# Bulletin : NV2014002

**Date:** November 06, 2014

**To:** All Nevada Issuing Offices

**RE:** RATES AND/OR FORMS UPDATE - Use of the ALTA 9.10, the ALTA 4.1, and the ALTA 5.1

_____

Dear Associates:

Due to the recent decision by the Nevada Supreme Court in the case of SFR Investments Pool 1 LLC vs. US Bank, questions have arisen regarding the issuance of loan policies and endorsements to lenders making loans secured by condominiums, planned unit developments, or other common interest developments with a homeowners association. At this time, the only changes to our underwriting procedures are that 1) in lieu of issuing an ALTA 9 (or a CLTA 100) for a lender's policy, issue the ALTA 9.10; 2) in lieu of issuing an ALTA 4 for a lender's policy, issue the ALTA 4.1, and; 3) in lieu of issuing an ALTA 5 for a lender's policy, issue the ALTA 5.1.

If you have any questions relating to this or other bulletins, please contact a Stewart Title Guaranty Company underwriter.

For on-line viewing of this and other bulletins, please log onto www.vuwriter.com.

# References

**Bulletins Replaced :** None

**Related Bulletins :** None

**Underwriting Manual :** None

**Exceptions Manual :** None

**Forms :** None

# EXHIBIT 7

# EXHIBIT 7

BOOK 836

795584
4-1

DECLARATION OF COVENANTS AND RESTRICTIONS

THIS DECLARATION, made this ___25___ day of January, 1978,
by M. L. ENTERPRISES, INCORPORATED, a Nevada corporation, hereinafter
referred to as "Declarant",

W I T N E S S E T H

WHEREAS, Declarant is the owner of certain real property in
the County of Clark, State of Nevada, which is more particularly
described as follows:

All lots in Wildwood Manor as
recorded in Book _20_ of Plats,
Page __76__, in the Office of the
County Recorder, Clark County,
Nevada; and

WHEREAS, Declarant has improved or intends to improve the
described property by constructing on each of 30 lots, a 4-unit
multi-family residential structure, each of which has been or
will be constructed substantially in accordance with the approved
plans and specifications;

NOW THEREFORE, Declarant hereby declares that all of the
property described shall be held, subject to the following
covenants and restrictions, which will run with the land and be
binding on Declarant, its successors and all subsequent owners
and their successors for a period of 30 years from the date this
declaration is recorded and shall be automatically extended for
successive periods of 10 years, unless the then record owners of
16 lots, have signed and recorded an amendment for termination
of this declaration.

1. Owners Association:

There shall be created the Wildwood Manor Owners
Association which shall consist of every record owner of a lot
and a 4-unit multi-family residential structure, and each such
owner as a member of the Association shall be entitled to one
vote for each parcel of property owned. The Association shall

BOOK 866

795584

adopt reasonable rules and regulations for the benefit of Wildwood
Manor to implement these covenants and restrictions. The Association
shall have the power to levy a periodic assessment applicable to
all members. Any such assessment shall represent the fee for
complete insurance coverage exclusive of life insurance on
Wildwood Manor buildings and grounds, lawn and shrubbery maintenance,
garbage collection and trash pick up in the carport areas.

2.  Architectural Control:

It is hereby created an Architectural Control Committee,
to be composed of not less than 3 nor more than 5 owners to
provide for architectural control and design to provide a pleasant,
well-kept neighborhood. The members of the Architectural Control
Committee shall be designated by the Association, one of whom shall
be designated chairman. At any time the then record owners of
the majority of the lots shall have the power to change the
membership of the Committee to fill vacancies. It shall be
the duty of the Association to maintain a functioning Architectural
Control Committee at all times. The names and address of
said Committee shall be promptly furnished to all Association
members.

3.  Structure:

No structures shall be erected, altered or permitted
to remain on any of the lots other than one 4-unit multi-family
residential structure with carport, said dwelling not to exceed
two stories in height.

4.  Use:

Each residential structure shall be used for such
purpose and not for the conduct of business, nor for any other
activity which would create a nuisance.

5.  Signs:

No signs of any kind shall be displayed to the public
view on any lot, except one professional sign advertising the
property for sale or rent.

-2-

BOOK 836

795584
4-3

6.  Repairs and Maintenance:

Each record owner covenants to promptly repair and
maintain the property in good order and in conformity with the
Architectural Control Committee.

7.  Failure to Repair, Repaint or Maintain:

In the event any owner shall fail, after being requested
to do so in writing, to repair, repaint or maintain his building
and premises by the Architectural Control Committee or the
Association, shall enable the Association to make the required
repairs or other maintenance at the expense of the defaulting
owner.  Such expenses on a pro rata basis as incurred by the
Association shall create a lien with the power of sale against
the property.  Any reasonable assessment so levied shall be a
debt of the owner at the time the assessment is made.  The amount
of the assessment plus interests, costs, including attorney's
fees, and panealties shall be a lien upon the property assessed,
when the Association causes it to be recorded with the Clark
County Recorder.  A Notice of Assessment which shall state:

a.  The amount of the assessment and interests, costs and
pena'ties.

b.  A description of the property, against which the same
has been assessed.

c.  The name of the record owner of the property.
Such notice shall be signed by an authorized representative of
the Association or as otherwise agreed.  Upon payment of
satisfaction, of the assessment and charges, the Association
shall cause to be recorded a further notice stating the satisfaction
and the release of lien.

The lien shall be prior to property taxes and assessments
recorded subsequent to the recordation of the Notice of
Assessment.  Unless sooner satisfied and released, or its
enforcement initiated, the lien shall expire and be of no further
force or effect, two years from the date of recordation, of the
Notice of Assessment, but the two year period may be extended
by the Association for not to exceed two additional years by
recording a written extension thereof.

-3-

BOOK 836

795584
4-4

The lien may be enforced by sale by the Association, its agents, or attorney after failure of the owner to pay such assessment in accordance with its terms.  Such sales shall be conducted in accordance with the provisions of Covenants Nos. 6, 7, and 8 of NRS. 107.030 and 107.090, insofar as they are consistent with the provisions of NRS 280A.146 or any other manner permitted by law, unless otherwise provided by agreement. The Association shall have the power to bid in the property at foreclosure sale and to hold, lease, mortgage and convey the same.

   8.  Enforcement:

        Enforcement shall be by proceedings at law or in equity against any person or persons violating or attempting to violate any covenant, either to restrain violation or to recover damages.

   9.  Severability:

        Invalidation of any one of these covenants by Judgment or court order shall in no way affect any of the other provisions which shall remain in full force and effect.

STATE OF NEVADA }
COUNTY OF Clark } ss.

On this 18th day of January 1978 personally appeared before me a Notary Public in and for said County and State Carlos L. Deal

known to me to be the person described in and who executed the foregoing instrument, who acknowledged to me that he executed the same freely and voluntarily and for the uses and purposes therein mentioned.

Notary Public State of Nevada
Clark County
LOIS K.
My Commission Expires May 20, 1980

_____
Notary Public

0288   INDIVIDUAL ACKNOWLEDGMENT

MiL. ENTEPRISES, INCORPORATED,
a Nevada corporation

BY: _____
    CARLOS L. DEAL   PRES.

BY: _____

INST. NO. 795584
OFFICIAL RECORD BOOK NO. 836
RECORDED AT REQUEST OF
STEWART TITLE INSURANCE OF NEVADA
JAN 18   2 59 PM '78
CLARK COUNTY NEVADA
JOAN L. SWIFT RECORDER
FEE 6.00 DEPUTY

A-1827                    -4-

Return to Stewart Title ins.

# EXHIBIT 8

# EXHIBIT 8

Branch :FLV,User :CON2                    Comment:                              Station Id :BMAG

20050323-0000845

Assessor's Parcel Number:
139-19-410-023
Return To:
Argent Mortgage Company, LLC
P.O. Box 5047 Rolling Meadows, IL 60008

Prepared By:Argent Mortgage Company, LLC
Heather Heiman
2603 Main Street,Irvine, CA 92614

Recording Requested By:
Argent Mortgage Company, LLC

Fee: $36.00
N/C Fee: $0.00

03/23/2005            09:14:14
T20050051828
Requestor:
    LAND TITLE OF NEVADA
Frances Deane                   JKA
Clark County Recorder    Pgs: 23

90500380
18

—————[Space Above This Line For Recording Data]—————

23

# DEED OF TRUST

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated March 16, 2005
together with all Riders to this document.
(B) "Borrower" is BRIAN HEE, A Married Man, As His Sole and Separate Property

Borrower is the trustor under this Security Instrument.
(C) "Lender" is Argent Mortgage Company, LLC

Lender is a Limited Liability Company
organized and existing under the laws of Delaware

0074051954 - 9504

NEVADA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3029  1/01

-6(NV) (0005)
Page 1 of 15                          Initials: _____

VMP MORTGAGE FORMS - (800)521-7291

03/14/2005 1:37:43

Lender's address is One City Boulevard West  Orange, CA 92868

Lender is the beneficiary under this Security Instrument.
**(D) "Trustee"** is Town and Country Title Services, Inc.

**(E) "Note"** means the promissory note signed by Borrower and dated March 16, 2005
The Note states that Borrower owes Lender two hundred eighty thousand and 00/100

Dollars
(U.S. $280,000.00          ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than April 1, 2035
**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in the
Property."
**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
**(H) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [x] Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | [x] 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | ☐ Other(s) [specify] |

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
**(J) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
**(K) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.
**(L) "Escrow Items"** means those items that are described in Section 3.
**(M) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
**(O) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.
**(P) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to
time, or any additional or successor legislation or regulation that governs the same subject matter. As used
in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard

0074051954 - 9504
Initials: [signature]

-6(NV) (0005)                    Page 2 of 15    03/14/2005 1:37:43   Form 3029  1/01

to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the County of CLARK :

[Type of Recording Jurisdiction]            [Name of Recording Jurisdiction]

LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF:

Parcel ID Number: 139-19-410-023                which currently has the address of
1628 CORDOBA LANE                                                            [Street]
LAS VEGAS                                       [City], Nevada 89108          [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items

0074051954 - 9504
Initials:
-6(NV) (0005)                        Page 3 of 15      03/14/2005 1:37:43  Form 3029  1/01

pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be

0074051954 - 9504
Initials: _____

-6(NV) (0005)                          Page 4 of 15            03/14/2005 1:37:43   Form 3029   1/01

in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than twelve monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than twelve monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

0074051954 - 9504
Initials: _____

-6(NV) (9904).03                    Page 5 of 15      03/14/2005 1:37:43   Form 3029  3/99

Branch :FLV,User :CON2                    Comment:                              Station Id :BMAG

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with



Branch :FLV,User :CON2                    Comment:                              Station Id :BMAG

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

0074051954 - 9504
Initials: _____

  -6(NV) (0005)                    Page 7 of 16        03/14/2005 1:37:43   Form 3029  1/01

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

0074051954 - 9504
Initials: ___

LMP ®-6(NV) (0005)          Page 8 of 15     03/14/2005  1:37:43    Form 3029  1/01

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

0074051954 - 9504
Initials: _____

-6(NV) (0005)                              Page 9 of 15          03/14/2005 1:37:43   Form 3029   1/01

Branch :FLV,User :CON2                    Comment:                                    Station Id :BMAG

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

0074051954 - 9504
Initials: 

-6(NV) (0005)                    Page 10 of 15    03/14/2005  1:37:43    Form 3029  1/01

Branch :FLV,User :CON2                    Comment:                                    Station Id :BMAG

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be

0074051954 - 9504
Initials: [signature]

-6(NV) (0005)                Page 11 of 15      03/14/2005 1:37:43    Form 3029   1/01

Branch :FLV,User :CON2                    Comment:                    Station Id :BMAG

one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

0074051954 - 9504
Initials: _____

 -6(NV) (0005)                    Page 12 of 15        03/14/2005 1:37:43   Form 3029   1/01

CLARK,NV                         Page 12 of 23                 Printed on 9/2/2014 10:50:57 PM
Document: DOT 2005.0323.845

Branch :FLV,User :CON2                    Comment:                              Station Id :BMAG

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option, and without further demand, may invoke the power of sale, including the right to accelerate full payment of the Note, and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold, and shall cause such notice to be recorded in each county in which any part of the Property is located. Lender shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. **Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Such person or persons shall pay any recordation costs. Lender may charge such person or persons a fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law.

24. **Substitute Trustee.** Lender at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

25. **Assumption Fee.** If there is an assumption of this loan, Lender may charge an assumption fee of U.S. $0.00

0074051954 - 9504
Initials: ___
-6(NV) (0005)                    Page 13 of 15    03/14/2005 1:37:43    Form 3029   1/01

Branch :FLV,User :CON2                    Comment:                                    Station Id :BMAG

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____                    _____ (Seal)
                                                                    -Borrower
D. Moss                                             BRIAN HEE


_____                    _____ (Seal)
                                                                        -Borrower


_____ (Seal)                     _____ (Seal)
              -Borrower                                                 -Borrower


_____ (Seal)                     _____ (Seal)
              -Borrower                                                 -Borrower


_____ (Seal)                     _____ (Seal)
              -Borrower                                                 -Borrower


0074051954 - 9504

-6(NV) (0005)                    Page 14 of 15  03/14/2005  1:37:43 PM  Form 3029   1/01

STATE OF NEVADA *Calif.*
COUNTY OF *SF*

This instrument was acknowledged before me on _____3-16-05_____ _____ by
                                                                    Day/Month/Year

_____ *Brian Hee* _____   _____   _____

_____   _____   _____   _____

_____   _____   _____   _____



Notary Public

My Commission Expires: *11-7-08*

D. MOSS
COMM. # 1624934
NOTARY PUBLIC – CALIFORNIA
SAN FRANCISCO COUNTY
My Comm. Expires NOV 07, 2006



400-15NV (4/02)            Page 15 of 15            0074051954 - 9504
                                                    03/14/2005 1:37:43 PM

# PRELIMINARY REPORT
Order No. 90500380-DW

**Legal Description**

LOT TWENTY THREE (23) IN BLOCK TWO (2), OF WILDWOOD MANOR AS SHOWN BY MAP THEREOF ON FILE IN BOOK 20 OF PLATS, PAGE 76 IN THE OFFICE OF THE COUNTY RECORDER OF CLARK COUNTY, NEVADA.

Page 5 of 11

## ADJUSTABLE RATE RIDER
### (LIBOR Six-Month-Index (As Published in the Wall Street Journal)- Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this 16th day of March , 2005   and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to Argent Mortgage Company, LLC (the "Lender") of the same date and covering the property described in the Security Instrument and located at:

1628 CORDOBA LANE, LAS VEGAS, NV  89108
[Property Address]

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A.   INTEREST RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for an initial interest rate of  7.725 %. The Note provides for changes in the interest rate and the monthly payments, as follows:

**4.   INTEREST RATE AND MONTHLY PAYMENT CHANGES**
**(A) Change Dates**
The interest rate I will pay may change on the first day of April, 2008  , and on that day every sixth  month thereafter. Each date on which my interest rate could change is called a "Change Date."

**(B) The Index**
Beginning with the first Change Date, my interest rate will be based on an Index.  The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in the Wall Street Journal. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information.  The Note Holder will give me notice of this choice.

Initials _____

Loan Number:  0074051954 - 9504

03/14/2005 1:37:43 PM

**(C) Calculation of Changes**
Before each Change Date, the Note Holder will calculate my new interest rate by adding **six** percentage points ( **6.000** %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the maturity date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**
The interest rate I am required to pay at the first Change Date will not be greater than **9.725% or less than 7.725%.** Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than One( **1.000** %) from the rate of interest I have been paying for the preceding  six months. My interest rate will never be greater than 13.725% or less than 7.725)%.

**(E) Effective Date of Changes**
My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**
The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**
Section 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

Initials _____

Loan Number: 0074051954 - 9504

610-2 (Rev 1/01)                    Page 2 of 3

03/14/2005 1:37:43 PM

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by federal law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing. If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)     _____ (Seal)
Borrower BRIAN HEE                    Borrower


_____ (Seal)     _____ (Seal)
Borrower                              Borrower


Loan Number:  0074051954 - 9504


510-3 (Rev 1/01)                    Page 3 of 3

                                                       03/14/2005 1:37:43 PM

# 1-4 FAMILY RIDER
### (Assignment of Rents)

THIS 1-4 FAMILY RIDER is made this **16th**           day of **March, 2005**                      ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or
Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to
secure Borrower's Note to **Argent Mortgage Company, LLC**

                                                                                                      (the
"Lender") of the same date and covering the Property described in the Security Instrument and located at:
                 **1628 CORDOBA LANE, LAS VEGAS, NV  89108**

[Property Address]

**1-4 FAMILY COVENANTS.** In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

**A. ADDITIONAL PROPERTY SUBJECT TO THE SECURITY INSTRUMENT.** In addition to
the Property described in the Security Instrument, the following items now or hereafter attached to the
Property to the extent they are fixtures are added to the Property description, and shall also constitute the
Property covered by the Security Instrument: building materials, appliances and goods of every nature
whatsoever now or hereafter located in, on, or used, or intended to be used in connection with the
Property, including, but not limited to, those for the purposes of supplying or distributing heating,
cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and
access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves,
refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens,
blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling and attached floor coverings,
all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the
Property covered by the Security Instrument. All of the foregoing together with the Property described in
the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to
in this 1-4 Family Rider and the Security Instrument as the "Property."

0074051954

MULTISTATE 1- 4 FAMILY RIDER - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Initials: ___
Page 1 of 4                                                              Form 3170 1/01
-57R (0008)          VMP MORTGAGE FORMS - (800)521-7291    03/14/2005 1:37:43 PM

**B. USE OF PROPERTY; COMPLIANCE WITH LAW.** Borrower shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Borrower shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

**C. SUBORDINATE LIENS.** Except as permitted by federal law, Borrower shall not allow any lien inferior to the Security Instrument to be perfected against the Property without Lender's prior written permission.

**D. RENT LOSS INSURANCE.** Borrower shall maintain insurance against rent loss in addition to the other hazards for which insurance is required by Section 5.

**E. "BORROWER'S RIGHT TO REINSTATE" DELETED.** Section 19 is deleted.

**F. BORROWER'S OCCUPANCY.** Unless Lender and Borrower otherwise agree in writing, Section 6 concerning Borrower's occupancy of the Property is deleted.

**G. ASSIGNMENT OF LEASES.** Upon Lender's request after default, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph G, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**H. ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.** Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower shall receive the Rents until: (i) Lender has given Borrower notice of default pursuant to Section 22 of the Security Instrument, and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of default to Borrower: (i) all Rents received by Borrower shall be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii)

03/14/2005 1:37:43 PM

0074051954

Initials: _____

Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorney's fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by the Security Instrument pursuant to Section 9.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and has not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

**I. CROSS-DEFAULT PROVISION.** Borrower's default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

03/14/2005 1:37:43 PM

0074051954

Initials: _GJh_

-57R (0008)                    Page 3 of 4                    Form 3170 1/01

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this 1-4 Family Rider.

_____ (Seal)        _____ (Seal)
BRIAN HEE                -Borrower                              -Borrower

_____ (Seal)        _____ (Seal)
                         -Borrower                              -Borrower

_____ (Seal)        _____ (Seal)
                         -Borrower                              -Borrower

_____ (Seal)        _____ (Seal)
                         -Borrower                              -Borrower

                                                            0074051954

-57R (0008)                    Page 4 of 4              Form 3170 1/01
                                                    03/14/2005 1:37:43 PM

# EXHIBIT 9

# EXHIBIT 9

When recorded, mail to:
Argent Mortgage Company, LLC
P.O. Box 14130,
Orange, CA 92863-1530
APN# 139-19-410-023
Loan Number: 0074051954 - 9504

11-16199                27

245046

Inst #: 201201190002545
Fees: $18.00
N/C Fee: $25.00
01/19/2012 01:00:06 PM
Receipt #: 1040308
Requestor:
CLARK RECORDING SERVICE
Recorded By: CDE  Pgs: 2
DEBBIE CONWAY
CLARK COUNTY RECORDER

## ASSIGNMENT OF DEED OF TRUST
BY BENEFICIARY

FOR VALUE RECEIVED, Argent Mortgage Company, LLC
the beneficiary, under that certain Deed of Trust dated 03/16/05 and delivered by
BRIAN HEE, A Married Man, As His Sole and Separate Property

Trustor to  Town and Country Title Services, Inc.  Trustee,
and recorded as Instrument No. ✕ 20050323-0000845  on 03/23/05
in Book — at page — of the Official Records  in the
office of the County Recorder of  CLARK County, State of Nevada hereby
grants, assigns, transfers and sets over to  Wells Fargo Bank, DA, as Trustee for
the said Deed of Trust, and all right, title and interest in and to the real property thereby conveyed,
together with the Deed of Trust Note therein mentioned and all monies due or that may hereafter become
due thereunder, subject only to the provisions as said Deed of Trust specified.

PROPERTY DESCRIBED AS:
      "LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF"

IN WITNESS WHEREOF, Argent Mortgage Company, LLC, has caused this instrument to be executed
by its duly authorized officer MICHAEL POWELL,
This  03/22/2005.

Argent Mortgage Company, LLC

✕ the Pooling and Servicing
Agreement dated as of
April 1, 2005 Asset-Backed
Pass-Through Certificates
Series 2005-WHQ2.

By: _____
      MICHAEL POWELL - AGENT
      Michael Powell
      State of  California
      County of  Orange

On   03/22/2005   before me,  MALI WRIGHT
personally appeared   MICHAEL POWELL

personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose
name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed
the same in his/her/their authorized capacity(ies), and that  by his/her/their signature(s) on the instrument
the person(s) or the entity upon behalf of which is the person(s) acted,  executed the instrument.

WITNESS my hand and official seal.

_____ (Seal)
MALI WRIGHT

MALI CALEB WRIGHT
Commission # 1480595
Notary Public - California
Orange County
My Comm Expires May 15 2008

May 15, 2008

**Legal Description**

LOT TWENTY THREE (23) IN BLOCK TWO (2), OF WILDWOOD MANOR AS
SHOWN BY MAP THEREOF ON FILE IN BOOK 20 OF PLATS, PAGE 76 IN THE
OFFICE OF THE COUNTY RECORDER OF CLARK COUNTY, NEVADA.

Case 2:21-cv-00996-APG-DJA    Document 1-1    Filed 05/24/21    Page 571 of 732

Inst #: 201402250000246
Fees: $18.00
N/C Fee: $25.00
02/25/2014 08:02:21 AM
Receipt #: 1942056
Requestor:
PREMIUM TITLE TSG
Recorded By: GWC   Pgs: 2

DEBBIE CONWAY
CLARK COUNTY RECORDER

APN #: 139-19-410-023
Prepared by: Fred Jeune
When Recorded Mail To:
Mail Tax statements to:
Ocwen Loan Servicing, LLC
5720 Premier Park Dr.
West Palm Beach, FL 33407
Phone Number: 561-682-8835

### ASSIGNMENT OF DEED OF TRUST
### NEVADA

This **ASSIGNMENT OF DEED OF TRUST** from WELLS FARGO BANK, N.A., AS TRUSTEE FOR THE POOLING AND SERVICING AGREEMENT DATED AS OF APRIL 1, 2005, ASSET-BACKED PASS-THROUGH CERTIFICATES SERIES 2005-WHQ2, whose address is 9062 Old Annapolis Road Columbia, MD 21045. ("Assignor") to **WELLS FARGO BANK, N.A., AS TRUSTEE FOR THE POOLING AND SERVICING AGREEMENT DATED AS OF APRIL 1, 2005 PARK PLACE SECURITIES, INC. ASSET-BACKED PASS-THROUGH CERTIFICATES SERIES 2005-WHQ2**, whose address is c/o Ocwen Loan Servicing, LLC. 5720 Premier Park Dr, West Palm Beach, FL 33407 ("Assignee").

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Assignor does by these presents hereby grant, bargain, sell, transfer and set over unto the Assignee, its successors, transferees and assigns forever, in trust, all of the right, title and interest of said Assignor in and to the following deed of trust describing land therein, duly recorded in the Office of the County Recorder of **CLARK** County, State of **NEVADA**, as follows;

Trustor: **BRIAN HEE**
Trustee: **TOWN AND COUNTRY TITLE SERVICES, INC.**
Beneficiary: **ARGENT MORTGAGE COMPANY, LLC**
Document Date: **MARCH 16, 2005**
Amount: **$ 280,000.00**
Date Recorded: **MARCH 23, 2005**
Book NO: **20050323**          Document/Instrument/Entry Number: **0000845**
Property Address: **1628 CORDOBA LANE, LAS VEGAS NV 89108**
*Property more particularly described in the above referenced recorded Deed of Trust*

1628 CORDOBA LANE, LAS VEGAS NV 89108

APN #: 139-19-410-023
Prepared by:  Fred Jeune
When Recorded Mail To:
Mail Tax statements to:
Ocwen Loan Servicing, LLC
5720 Premier Park Dr,
West Palm Beach, FL 33407
Phone Number: 561-682-8835

This Assignment is made without recourse, representation or warranty.

DATED: FEBRUARY 14, 2014.

**WELLS FARGO BANK, N.A., AS TRUSTEE FOR THE POOLING
AND SERVICING AGREEMENT DATED AS OF APRIL 1, 2005,
ASSET-BACKED PASS-THROUGH CERTIFICATES SERIES 2005-WHQ2
BY ITS ATTORNEY IN FACT
OCWEN LOAN SERVICING, LLC.**

BY:
NAME:                    Leticia N. Arias
TITLE:  Contract Manager

**Power of Attorney recorded on : AUGUST 26, 2005
Book: 20050826
Instrument number : 180**

STATE OF FLORIDA                     )
                                     )SS.
COUNTY OF PALM BEACH                 )

On FEBRUARY 14, 2014, before me, the undersigned, a Notary Public in and for said State, personally appeared _____ Leticia N. Arias _____ Contract Manager at Ocwen Loan Servicing, LLC, **ATTORNEY IN FACT FOR WELLS FARGO BANK, N.A., AS TRUSTEE FOR THE POOLING AND SERVICING AGREEMENT DATED AS OF APRIL 1, 2005, ASSET-BACKED PASS-THROUGH CERTIFICATES SERIES 2005-WHQ2** personally known to me to be the person whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her authorized capacity, and that by his/her signature on the instrument the entity upon behalf of which the person acted, executed the instrument.

Witness my hand and official seal.

Notary Signature      Ivelka Angeles

1628 CORDOBA LANE, LAS VEGAS NV 89108

IVELKA ANGELES
Notary Public - State of Florida
My Comm. Expires Jul 23, 2016
Commission # EE 218470
Bonded Through National Notary Assn.

# EXHIBIT 10

# EXHIBIT 10

Mar 01 2005 12:58PM   WTL   AML                    9494889712                P.7



# Land Title
### OF NEVADA, INC.

720 S. Seventh Street, Suite 200 ♦ Las Vegas, Nevada 89101

## *Preliminary Title Report*

Order No.: 90500380-DW

**When Replying Please Contact**
Land Title Of Nevada, Inc.
720 S. Seventh Street, Suite 200
Las Vegas, Nevada 89101
Phone: 702-474-3300
Fax: 702-598-0815
Attn: Darren Walters

United Title Company
3111 N. Tustin Ave., Suite 270
Orange, CA 92865
Attn: Amy Wilkins
E-Mail: AWilkins@unitedtitle.com

Buyer / Borrower: Brian Hee

In response to the application for a Policy of Title Insurance, Land Title Of Nevada, Inc. hereby reports that it is prepared to issue, or cause to be issued, as of the date hereof, a Policy or Policies of Title Insurance describing the land and the estate or interest therein hereinafter set forth, insuring against loss which may be sustained by reason of any defect, lien or encumbrance not shown or referred to as an exception herein and/or not excluded from coverage pursuant to the printed exceptions and exclusions of said Policy forms.

The printed exceptions and exclusions from the coverage of said Policy or Policies of Title Insurance set forth in Addendum A attached. Copies of the Policy forms should be read. They are available from the office which issued this report.

**Please read the exceptions shown or referred to herein and the exceptions and exclusions set forth in Addendum A of this report carefully. The exceptions and exclusions are meant to provide you with notice of matters which are not covered under the terms of the Policy or Policies of Title Insurance and should be carefully considered.**

**It is important to note that this preliminary report is not a written representation as to the condition of title and may not list all liens, defects and encumbrances affecting title to the land.**

This report (and any supplement or amendments thereto) is issued solely for the purpose of facilitating the issuance of a Policy or Policies of Title Insurance and no liability is assumed hereby. If it is desired that liability be assumed prior to the issuance of a Policy or Policies of Title Insurance, a Binder of Commitment should be requested.

Dated as of February 15, 2005, at 7:30 a.m.

*Darren Walters*
Darren Walters Title Officer

Mar 01 2005 12:58PM  WTL  AML                    9494889712                    p.8

## PRELIMINARY REPORT
Order No. 90500380-DW

### Estate and Vesting
The estate or interest in the land hereinafter described or referred to covered by this report is:

Fee

Title to said estate or interest at the date hereof is vested in:

Brian Hee, a married man as his sole and separate property

### Printed Exceptions
Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records.

Proceedings by a public agency which may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the public records.

Any facts, rights, interest or claims which are not shown by the public records but which could be ascertained by an inspection of the land or which may be asserted by persons in possession thereof.

Easements, liens or encumbrances, or claims thereof, which are not shown by the public records.

Discrepancies, conflicts in boundary lines, shortages in area, encroachments, or any other facts which a correct survey would disclose and which are not shown by the public records.

### Exceptions

At the date hereof, exceptions to coverage in addition to the printed exceptions contained in said policy form and as shown above would be as follows:

1.  Taxes for the fiscal year 2004-2005, plus any supplemental taxes currently assessed in the total amount of $1,963.85.
    1st installment, due the third Monday of August. PAID
    2nd installment, due the first Monday of October. PAID
    3rd installment, due first Monday of January. DELINQUENT
    4th installment, due first Monday of March.

    If an installment is not paid within 10 days following the due date, penalties and interest will be added.

2.  The lien of Supplemental Taxes, if any, assessed pursuant to the provisions of N.R.S. 361.770, Statutes of the State of Nevada.

3.  The hereinabove described property may be subject to charges and fees from the sanitation district and the water district in which said property is located, which charges and fees may be levied against said land.

    Inquiries should be made of the County or Municipality in which said property is located.

Mar 01 2005 12:58PM   WTL   AML                              9494889712                    P.9

## PRELIMINARY REPORT
### Order No. 90500380-DW

4.    Water rights, claims or title to water, whether or not shown by the public records.

5.    Covenants, conditions, restrictions, association lien rights, reservations and easements, if any affecting title, which may appear in the public record, including those shown on any recorded plat or survey, but deleting any covenant, condition or restriction indicating a preference, limitation or discrimination based on race, color, religion, sex, handicap, familial status, or national origin, to the extent such covenants, conditions or restrictions violate Title 42, Section 3604©, of the United States Codes.

6.    Any facts, rights, interests, or claims which are not shown by those public records in the County in which said land is situated which impart constructive notice of matters relating to such land, but which could be ascertained by an inspection of said land, or by making inquiry of persons in possession thereof or by a correct survey.

      NOTE: IF THIS PROPERTY IS IN A GATED COMMUNITY, PLEASE PROVIDE GATE CODE OR MAKE ARRANGEMENTS FOR OUR INSPECTOR TO GAIN ENTRY TO THE PROPERTY IN ORDER FOR US TO COMPLETE THE INSPECTION. THIS INSPECTION MUST BE DONE PRIOR TO CLOSING.

7.    The rights and interest of parties in possession of the premises described herein under any unrecorded leases and/or agreements, the terms and conditions of which are unknown.

      Note:  No transfers or agreements to transfer the property described herein appear of record within 24 months of the date of this report except:

      | | | |
      |---|---|---|
      | Instrument | : | Grant, Bargain, Sale Deed |
      | Dated | : | December 31, 2003 |
      | From | : | The Secretary of Housing and Urban Development of Washington D.C., and/or His/Her Successors and/or Assigns |
      | To | : | Janet Hee, a married woman as her sole and separate property |
      | Recorded | : | January 28, 2004 |
      | Book No. | : | 20040128 |
      | Document No. | : | 02552, Official Records |

      And by:

      | | | |
      |---|---|---|
      | Instrument | : | Grant, Bargain, Sale Deed |
      | Dated | : | January 16, 2003. |
      | From | : | Brian Hee, spouse of the grantee |
      | To | : | Janet Hee, a married woman as her sole and separate property |
      | Recorded | : | January 28, 2004 |
      | Book No. | : | 20040128 |
      | Document No. | : | 02553, Official Records |

## PRELIMINARY REPORT
### Order No. 90500380-DW

| | | |
|---|---|---|
| And by: | | |
| Instrument | : | Grant, Bargain, Sale Deed |
| Dated | : | February 2, 2005 |
| From | : | Janet Hee, a married woman as her sole and separate property and spouse of the grantee herein |
| To | : | Brian Hee, a married man as his sole and separate property |
| Recorded | : | February 7, 2005 |
| Book No. | : | 20050207 |
| Document No. | : | 0002462, Official Records |

NOTE: The following information was obtained from the Clark County Assessor's Office.  Land Title assumes no liability or responsibility as to the accuracy of said information:

| | | |
|---|---|---|
| District No. | : | 200 |
| Parcel No. | : | 139-19-410-023 |
| Address | : | 1628 Cordoba Lane, Las Vegas, Nevada |
| Land Use | : | 1-40 Four-Plex |

If this order was opened up by a street address only, please verify the legal description in this Preliminary Report prior to executing any loan or conveyancing documents.

Mm February 28, 2005

Mar 01 2005 12:59PM  WTL  AML                    9494889712              p.12

## PRELIMINARY REPORT
Order No. 90500380-DW

### Legal Description

LOT TWENTY THREE (23) IN BLOCK TWO (2), OF WILDWOOD MANOR AS SHOWN BY MAP THEREOF ON FILE IN BOOK 20 OF PLATS, PAGE 76 IN THE OFFICE OF THE COUNTY RECORDER OF CLARK COUNTY, NEVADA.

**PRELIMINARY REPORT**
Order No. 90500380-DW



This map is not a survey. It's merely a convenience to juxtapose the land and adjoining streets and other lands and not to guarantee any dimension, bearings, or acreage.

# EXHIBIT 11

# EXHIBIT 11

Inst #: 201206120001303
Fees: $19.00
N/C Fee: $0.00
06/12/2012 11:19:26 AM
Receipt #: 1194522
Requestor:
DOCUMENT PROCESSING SOLUTI(
Recorded By: SAO   Pgs: 3
**DEBBIE CONWAY**
CLARK COUNTY RECORDER

APN:  139-19-410-023

Order No.: H-17041
6751933-AT

Document Type:

Accomodation
Notice of Claim of Lien-Homeowner Assessment

**Recording Requested by:**

HOMEOWNER ASSOCIATION SERVICES, INC.

**Return Documents to:**

HOMEOWNER ASSOCIATION SERVICES, INC.

3513 E. Russell Road

Las Vegas, Nevada 89120

This page added to provide additional information required by NRS 111.312
Section 1-2

(An additional recording fee of S1.00 will apply)

This cover page must be typed or printed clearly in black ink only.

**APN: 139-19-410-023**
**Order No.: H- 17041**
675933-AJ

### NOTICE OF CLAIM OF LIEN-HOMEOWNERS ASSESSMENT

Notice is hereby given that ___WILDWOOD MANOR OWNERS ASSOCIATION___, a Nevada non-profit corporation, hereinafter called Association, formed to provide the maintenance, preservation, and architectural control of the residence lots and common area of the Association homeowners in the County of Clark, State of Nevada, AND PURSUANT TO THE PROVISIONS OF THE NEVADA REVISED STATUTES, claims a lien upon the real property and buildings, improvements or structures thereon described as follows:

    Lot ___23___ Block ___2___ of _____ ___WILDWOOD MANOR___ as shown on the map thereof filed in the Office of the County Recorder of Clark County, State of Nevada in Book ___20___ of Plats, Page ___76___.
Commonly known as: ___1628 Cordoba Lane, Las Vegas, NV 89108___.

And that the whole of said real estate upon which the buildings are situated is reasonably necessary for the convenient use and occupancy of said buildings.

That ___BRIAN HEE___ is/are the name (s) of the owner (s) and reputed owner (s) of said real property and improvements herein above described.

That the prorata assessment which shall constitute a lien against the above described property amounts to $280.00, per month, as provided in the COVENANTS, CONDITIONS, and RESTRICTIONS which were recorded on January 18, 1978, in Book 836, as Document No. 795584, and all AMENDMENTS and ANNEXATIONS et. seq., of Official Records of Clark County, Nevada, at Page n/a, and which have been supplied to and agreed to by said owner and reputed owner. That the Association had made demand for payment of the total amount due and owing, but said sum has not been paid.

**THAT THE AMOUNT OWING AND UNPAID TOTALS** $940.00 . as of May 1, 2012 and INCREASES each month at a rate of $280.00 per month **plus LATE CHARGES** at the rate of $25.00 per month. **PLUS INTEREST** at the rate of 5.25 % per annum. **PLUS ATTORNEY FEES and the FEES of the AGENT FOR THE MANAGEMENT BODY** incurred in connection with preparation, recording, and foreclosure of this lien.

WILDWOOD MANOR OWNERS ASSOCIATION

BY: _____

    Robin L. Lundin, Community Manager

          NOTARY: PLEASE SEE ATTACHED EXHIBIT "A"

**APN: 139-19-410-023**
**Order No.: H- 17041**

## EXHIBIT "A"

STATE OF NEVADA   )
                    ) SS.:
COUNTY OF CLARK   )

On this 22ND day of __MAY_____, 2012, before me, the undersigned Notary Public, duly commissioned and sworn, personally appeared _Robin L. Lundin_, known to me, or proved on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument as _Community Manager_, and who acknowledged to me that she executed the same freely and voluntarily, and for the uses and purposes therein mentioned.

SIGNATURE: _Owen G Barlow_
            (Notary Public)

WHEN RECORDED RETURN TO:
Homeowner Association Services, Inc.
3513 E. Russell Road
Las Vegas, Nevada 89120
Phone: (702) 312-9150
Fax:   (702) 312-9156

> OWEN G. BARLOW
> Notary Public, State of Nevada
> Appointment No. 08-8151-1
> My Appt. Expires Aug. 14, 2012

MY APPT EXPIRES AUG, 14 2012

# EXHIBIT 12

# EXHIBIT 12

Case 2:21-cv-00996-APG-DJA   Document 1-1   Filed 05/24/21   Page 585 of 732

Inst #: 201311060001785
Fees: $19.00
N/C Fee: $0.00
11/06/2013 01:09:52 PM
Receipt #: 1834459
Requestor:
FIRST AMERICAN NATIONAL DEF
Recorded By: DHG   Pge: 3
DEBBIE CONWAY
CLARK COUNTY RECORDER

APN:  139-19-410-023

Order No.: H-17041

*6451933*

Document Type:


Notice of Default and Election to Sell


Recording Requested by:


HOMEOWNER ASSOCIATION SERVICES, INC.


Return Documents to:

HOMEOWNER ASSOCIATION SERVICES, INC.

3513 E. Russell Road

Las Vegas, Nevada 89120


This page added to provide additional information required by NRS 111.312
Section 1-2

        (An additional recording fee of $1.00 will apply)

This cover page must be typed or printed clearly in black ink only.

APN: 139-19-410-023
Order No.:   H-17041

NOTICE OF DEFAULT AND ELECTION TO SELL

## WARNING!  IF YOU FAIL TO PAY THE AMOUNT SPECIFIED IN THIS NOTICE YOU COULD LOSE YOUR HOME, EVEN IF THE AMOUNT IS IN DISPUTE!

TO:     BRIAN HEE

Pursuant to NEVADA REVISED STATUTES,
**WILDWOOD MANOR OWNERS ASSOCIATION**
does hereby give you NOTICE OF YOUR DEFAULT, AND DOES HEREBY ELECT TO SELL, OR CAUSE THE SALE, to satisfy the obligation owing and arising out of your failure to pay your Homeowners Assessments.

The LIEN of **WILDWOOD MANOR OWNERS ASSOCIATION**
recorded June 12, 2012, in Book 20120612, as Document No. 0001303, in the Office of County Recorder of Clark County, State of Nevada, securing the obligation of the assessments which was a deficiency in the sum of $940.00, as of the date of the LIEN, PLUS ACCRUING ASSESSMENTS SINCE THAT TIME, INTEREST, COSTS, and ATTORNEYS FEES or FEES of the AGENT for the MANAGEMENT BODY.

The TOTAL DUE AS OF THIS DATE is  $6,410.76, PLUS COSTS, and ATTORNEYS FEES or FEES of the AGENT for the MANAGEMENT BODY. To find out the amount you must pay, or arrange for payment to stop the foreclosure, or if your property is in foreclosure for any other reason, contact Homeowner Association Services, Inc.

PURSUANT TO NEVADA REVISED STATUTES, the SALE will be held if this obligation is not completely satisfied, and paid within NINETY (90) DAYS from the day of recording of this NOTICE OF DEFAULT AND ELECTION TO SELL, on the real property described as follows:

>     Lot 23 Block 2 of WILDWOOD MANOR as shown on the map
>     thereof filed in the Office of the County Recorder of Clark County,
>     State of Nevada in Book 20 of Plats, Page 76.
>     Commonly known as: **1628 Cordoba Lane, Las Vegas, NV 89108.**

DATED: October 21, 2013

### NOTARY: PLEASE SEE ATTACHED EXHIBIT "A

APN: 139-19-410-023
Order No.:   H-17041

EXHIBIT "A"

WILDWOOD MANOR OWNERS ASSOCIATION

BY: _____
        Robin L. Lundin, Community Manager

STATE OF NEVADA  )
                               ) SS.:
COUNTY OF CLARK )

On this 29TH day of OCTOBER , 2013 before me, the undersigned Notary Public, duly commissioned and sworn, personally appeared Robin L. Lundin, known to me, or proved on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument as Community Manager, and who acknowledged to me that she executed the same freely and voluntarily, and for the uses and purposes therein mentioned.

SIGNATURE: _____
                      (Notary Public)

WHEN RECORDED RETURN TO:
Homeowner Association Services, Inc.
3513 E. Russell Road
Las Vegas, Nevada  89120
Phone: (702) 312-9150
Fax #: (702) 312-9156

OWEN G. BARLOW
NOTARY PUBLIC
STATE OF NEVADA
My Commission Expires: 8-14-2016
Certificate No: 08-8151-1

# EXHIBIT 13

# EXHIBIT 13

Inst #: **20140421-0000836**
Fees: $19.00
N/C Fee: $0.00
04/21/2014 11:39:18 AM
Receipt #: 1999091
Requestor:
**PREMIER AMERICAN TITLE**
Recorded By: COJ   Pgs: 3
**DEBBIE CONWAY**
**CLARK COUNTY RECORDER**

<u>**APN: 139-19-410-023**</u>

<u>**Order No.: H-17041**</u>

**Document Type:**

<u>**Notice of Sale**</u>

**Recording Requested by:**

      **HOMEOWNER ASSOCIATION SERVICES, INC.**

**Return Documents to:**

      **HOMEOWNER ASSOCIATION SERVICES, INC.**

      **3513 E. Russell Road**

      **Las Vegas, Nevada 89120**

**This page added to provide additional information required by NRS 111.312 Section 1-2**

        **(An additional recording fee of $1.00 will apply)**

     **This cover page must be typed or printed clearly in black ink only.**

Branch :FLV,User :CON2                    Comment:                         Station Id :BMAG

## NOTICE OF SALE

APN:    139-19-410-023

Order No: 11- 17041

**WARNING!    A SALE OF YOUR PROPERTY IS IMMINENT! UNLESS YOU PAY THE AMOUNT SPECIFIED IN THIS NOTICE BEFORE THE SALE DATE, YOU COULD LOSE YOUR HOME, EVEN IF THE AMOUNT IS IN DISPUTE.  YOU MUST ACT BEFORE THE SALE DATE.  IF YOU HAVE ANY QUESTIONS, PLEASE CALL: SALE TRUSTEE, HOMEOWNER ASSOCIATION SERVICES, INC. (702) 312-9150.   IF YOU NEED ASSISTANCE, PLEASE CALL THE OMBUDSMAN'S OFFICE, NEVADA REAL ESTATE DIVISION, AT toll-free telephone number (877) 829-9907 IMMEDIATELY.**

On     May 08, 2014    , at   1:00   o'clock  P . M. HOMEOWNER ASSOCIATION SERVICES, INC., as Agent for  WILDWOOD MANOR OWNERS ASSOCIATION   under and pursuant to the Notice of Claim of Lien-Homeowners Assessment dated May 22nd , 20 12, executed by  Robin L. Lundin, Community Manager , and recorded on  June 12, 2012 , in Book  20120612 , of OFFICIAL RECORDS, as Document No. 0001303, of  Clark  County, Nevada, such lien being properly assessed and recorded pursuant to NEVADA REVISED STATUTES, in favor of   WILDWOOD MANOR OWNERS ASSOCIATION  by reason of the breach of assessment obligations secured thereby, Notice of Default and Election to Sell, which was recorded on  November 06, 2013 , in Book  20131106 , of OFFICIAL RECORDS, as Document No. 0001785 , of  Clark  , County, Nevada, will sell at PUBLIC AUCTION to the highest bidder, for lawful money of the United States of America, at the FRONT ENTRANCE OF THE NEVADA LEGAL NEWS  for  WILDWOOD MANOR OWNERS ASSOCIATION , located at 930 South Fourth Street, Las Vegas, Nevada  89101, without covenant or warranty, express or implied, regarding title, possession or encumbrances, all right, title and interest of the owner, without equity or right of redemption, the real property situated in the County of  Clark , State of Nevada, described as follows:

Owner of Record:     BRIAN HEE                                                        .

Commonly known as:   1628 Cordoba Lane, Las Vegas, NV 89108                       .

CONTINUED ON PAGE 2

PAGE 2
NOTICE OF SALE
APN:    139-19-410-023

Order No: H- 17041

LOT TWENTY-THREE (23) IN BLOCK TWO (2) OF WILDWOOD MANOR, AS SHOWN BY MAP THEREOF ON FILE IN BOOK 20 OF PLATS, PAGE 76, IN THE OFFICE OF THE COUNTY RECORDER OF CLARK COUNTY, NEVADA.

For the purpose of satisfying the assessment obligations secured by said assessment lien, to wit: $   11,300.78   ; with interest from    05-01-2012   , as is provided by law, any subsequent monthly Homeowners Association dues, fees, charges, expenses, and advances, if any, of the Homeowners Association and its Agent, under the terms of the Assessment Lien.

DATED:    April 17, 2014

HOMEOWNER ASSOCIATION SERVICES, INC.
As Agent for:
WILDWOOD MANOR OWNERS ASSOCIATION

By:    _____
       Mike Randolph, Certified Manager
       Phone: (702) 312-9150
       Fax: (702) 312-9156

DO NOT PUBLISH BELOW THIS LINE_____
Land Situated in    LAS VEGAS 8TH_____Judicial Township
Publish Notice of Sale in NEVADA LEGAL NEWS
Three (3) times on April 17, 2014; April 24, 2014 and May 01, 2014_____.

# EXHIBIT 14

# EXHIBIT 14



Inet #: 20140619-0002246
Fees: $19.00 N/C Fee: $0.00
RPTT: $908.35 Ex: #
06/19/2014 01:00:43 PM
Receipt #: 2062511
Requestor:
STAR GOLDEN ENTERPRISES LLC
Recorded By: ARO   Pgs: 4
**DEBBIE CONWAY**
CLARK COUNTY RECORDER

APN:  139-19-410-023

Order No.: H-17041

Document Type:


**Foreclosure Deed Upon Sale**


**Recording Requested by:**


**STAR GOLDEN ENTERPRISES, LLC**


**Return Documents to:**

**STAR GOLDEN ENTERPRISES, LLC**

**572 Siciliano Street**

**Las Vegas, Nevada 89138**


**This page added to provide additional information required by NRS 111.312
Section 1-2**

**(An additional recording fee of $1.00 will apply)**

**This cover page must be typed or printed clearly in black ink only.**

RPTT:            $_____
APN:             139-19-410-023
File No.:        6751933-AJ
ORDER NO.:       H-17041

        WHEN RECORDED, MAIL TO:
STAR GOLDEN ENTERPRISES, LLC
572 SICILIANO ST
LAS VEGAS NV 89138


        MAIL TAX STATEMENTS TO:
STAR GOLDEN ENTERPRISES, LLC
572 SICILIANO ST
LAS VEGAS NV 89138


_____     Space above this line for recorder's use     _____

### FORECLOSURE DEED UPON SALE

HOMEOWNER ASSOCIATION SERVICES, INC., AS DESIGNATED AGENT FOR WILDWOOD MANOR OWNERS ASSOCIATION, a Nevada non-profit corporation (herein called Grantor) does hereby grant and convey, but without covenant or warranty, express or implied, to STAR GOLDEN ENTERPRISES, LLC, (herein called Grantee) the real property in the County of Clark, State of Nevada, described as follows:


LOT TWENTY-THREE (23) IN BLOCK TWO (2) OF WILDWOOD MANOR, AS SHOWN BY MAP THEREOF ON FILE IN BOOK 20 OF PLATS, PAGE 76, IN THE OFFICE OF THE COUNTY RECORDER OF CLARK COUNTY, NEVADA.


Commonly known as:       1628 Cordoba Lane, Las Vegas, NV 89108

This conveyance is made pursuant to the authority and powers vested in Grantor pursuant to NEVADA REVISED STATUTES, and the provisions of the ENABLING DECLARATION ESTABLISHING A PLAN FOR THE EFFICIENT PRESERVATION OF THE VALUES AND AMENITIES IN SAID COMMUNITY FOR WILDWOOD MANOR OWNERS ASSOCIATION, recorded on January 18, 1978, in Book 836, as Document No. 795584, and all AMENDMENTS and ANNEXATIONS et. seq., of the Official Records of the Clark County Recorder, Nevada, said Grantor having complied with all applicable statutory requirements of the State of Nevada, and performed all duties required by such Declaration.

APN:              139-19-410-023
File No.:          6751933-AJ
ORDER NO.:     H-17041

A Notice of Assessment Delinquency and Claim of Lien was recorded on June 12, 2012, in Book 20120612, Document No. 0001303, of the Official Records of the Clark County Recorder, Nevada; a Notice of Default and Election to Sell was recorded on November 06, 2013, in Book 20131106, Document No. 0001785, of Official Records, Clark County, Nevada; and a Notice of Sale was published once a week for three consecutive weeks commencing on April 17, 2014, in the Nevada Legal News, a legal newspaper, and at least twenty days before the date fixed therein for sale, a copy of said Notice of Sale was posted by Nevada Legal News, in three public places in Las Vegas Township namely (1) Nevada Legal News 930 S. Fourth Street; (2) Clark County Court House 200 Lewis Street; and (3) Clark County Building 309 S. 3rd Street, the time and place fixed in said Notice of Sale, Grantor by and through its agent, did sell said property above described at public auction on May 8th, 2014, at 1:00 P.M.  to Grantee (s), they being the highest bidder therefore, for $ 30,000.00 cash, lawful money of the United States, in full satisfaction of the indebtedness secured by Grantor's lien.

IN WITNESS WHEREOF, HOMEOWNER ASSOCIATION SERVICES, INC., AS DESIGNATED AGENT FOR WILDWOOD MANOR OWNERS ASSOCIATION, this day, caused its corporate name to be affixed hereto and this instrument to be executed by its authorized officer.

DATED this 8th day of   May , 2014

HOMEOWNER ASSOCIATION SERVICES, INC..

BY:  _____
      Michael W. Randolph, Designated Agent

STATE OF NEVADA                    )
                                            ) SS.:
COUNTY OF CLARK                  )
On   May 28th , 20 14 . before me, the undersigned, a Notary Public in and for said State, personally appeared ____Michael W. Randolph____, known to me to be an Authorized Officer of HOMEOWNER ASSOCIATION SERVICES, INC.   the corporation that executed the within instrument on behalf of the corporation therein named, and acknowledged to me that such corporation executed the same.

WITNESS my hand and official seal.

_____
Notary Public

LESLIE LAMBETH
NOTARY PUBLIC
STATE OF NEVADA
My Commission Expires: 11-04-17
Certificate No: 13-12324-1

Branch :FLV,User :CON2                    Comment:                              Station Id :BMAG

**STATE OF NEVADA**
**DECLARATION OF VALUE**

1. Assessor Parcel Number(s)
   a. 139-19-410-023
   b. _____
   c. _____
   d. _____

2. Type of Property:
   a. ☐ Vacant Land      b. ☐ Single Fam. Res.
   c. ☐ Condo/Twnhse    d. ☐ 2-4 Plex
   e. ☐ Apt. Bldg        f. ☐ Comm'l/Ind'l
   g. ☐ Agricultural     h. ☐ Mobile Home
      ☐ Other

| FOR RECORDERS OPTIONAL USE ONLY |
|---|
| Book_____ Page:_____ |
| Date of Recording: _____ |
| Notes: |

3.a. Total Value/Sales Price of Property          $  158,166
   b. Deed in Lieu of Foreclosure Only (value of property (_____)
   c. Transfer Tax Value:                         $
   d. Real Property Transfer Tax Due              $  808.35

4. **If Exemption Claimed:**
   a. Transfer Tax Exemption per NRS 375.090, Section_____
   b. Explain Reason for Exemption: _____

5. Partial Interest: Percentage being transferred: _____ %

The undersigned declares and acknowledges, under penalty of perjury, pursuant to NRS 375.060
and NRS 375.110, that the information provided is correct to the best of their information and belief,
and can be supported by documentation if called upon to substantiate the information provided herein.
Furthermore, the parties agree that disallowance of any claimed exemption, or other determination of
additional tax due, may result in a penalty of 10% of the tax due plus interest at 1% per month. Pursuant
to NRS 375.030, the Buyer and Seller shall be jointly and severally liable for any additional amount owed.

Signature _____   Capacity: Designated Agent

Signature _____   Capacity: _____

| SELLER (GRANTOR) INFORMATION (REQUIRED) | BUYER (GRANTEE) INFORMATION (REQUIRED) |
|---|---|
| Print Name: Wildwood Manor Owners Assn. | Print Name: Star Golden Enterprises, LLC |
| Address: 1626 Cordoba Lane | Address: 572 Siciliano Street |
| City: Las Vegas | City: Las Vegas |
| State: Nevada          Zip: 89108 | State: Nevada          Zip: 89138 |

**COMPANY/PERSON REQUESTING RECORDING (Required if not seller or buyer)**

| Print Name: Homeowner Assn. Services, Inc. | Escrow # H-17041 |
|---|---|
| Address: 3513 E. Russell Road | |
| City: Las Vegas | State:Nevada     Zip: 89120 |

AS A PUBLIC RECORD THIS FORM MAY BE RECORDED/MICROFILMED

# EXHIBIT 15

# EXHIBIT 15

A-14-706221-C

## DISTRICT COURT CIVIL COVER SHEET X X I
_____ County, Nevada

Case No. _____
(Assigned by Clerk's Office)

**I. Party Information** *(provide both home and mailing addresses if different)*

| Plaintiff(s) (name/address/phone): | Defendant(s) (name/address/phone): |
|---|---|
| STAR GOLDEN ENTERPRISES, LLC | WELLS FARGO BANK, N.A., AS TRUSTEE FOR THE POOLING AND |
| | SERVICING AGREEMENT DATED AS OF APRIL 1, 2005 PARK PLACE SECURITIES, |
| | INC. ASSET-BACKED PASS THROUGH CERTIFICATES SERIES 2005-WHQ2; |
| | WESTERN PROGRESSIVE - NEVADA INC.; AND BRIAN HEE |
| Attorney (name/address/phone): | Attorney (name/address/phone): |
| Robert B. Noggle, Esq. | N/A |
| 376 E. Warm Springs Rd., Ste. 140 | |
| Las Vegas, NV 89119 | |
| (702) 450-6300 | |

**II. Nature of Controversy** *(please select the one most applicable filing type below)*

**Civil Case Filing Types**

| Real Property | Negligence | Torts |
|---|---|---|
| **Landlord/Tenant** | **Negligence** | **Other Torts** |
| ☐ Unlawful Detainer | ☐ Auto | ☐ Product Liability |
| ☐ Other Landlord/Tenant | ☐ Premises Liability | ☐ Intentional Misconduct |
| **Title to Property** | ☐ Other Negligence | ☐ Employment Tort |
| ☐ Judicial Foreclosure | **Malpractice** | ☐ Insurance Tort |
| ☑ Other Title to Property | ☐ Medical/Dental | ☐ Other Tort |
| **Other Real Property** | ☐ Legal | |
| ☐ Condemnation/Eminent Domain | ☐ Accounting | |
| ☐ Other Real Property | ☐ Other Malpractice | |

| Probate | Construction Defect & Contract | Judicial Review/Appeal |
|---|---|---|
| **Probate** *(select case type and estate value)* | **Construction Defect** | **Judicial Review** |
| ☐ Summary Administration | ☐ Chapter 40 | ☐ Foreclosure Mediation Case |
| ☐ General Administration | ☐ Other Construction Defect | ☐ Petition to Seal Records |
| ☐ Special Administration | **Contract Case** | ☐ Mental Competency |
| ☐ Set Aside | ☐ Uniform Commercial Code | **Nevada State Agency Appeal** |
| ☐ Trust/Conservatorship | ☐ Building and Construction | ☐ Department of Motor Vehicle |
| ☐ Other Probate | ☐ Insurance Carrier | ☐ Worker's Compensation |
| **Estate Value** | ☐ Commercial Instrument | ☐ Other Nevada State Agency |
| ☐ Over $200,000 | ☐ Collection of Accounts | **Appeal Other** |
| ☐ Between $100,000 and $200,000 | ☐ Employment Contract | ☐ Appeal from Lower Court |
| ☐ Under $100,000 or Unknown | ☐ Other Contract | ☐ Other Judicial Review/Appeal |
| ☐ Under $2,500 | | |

| Civil Writ | | Other Civil Filing |
|---|---|---|
| **Civil Writ** | | **Other Civil Filing** |
| ☐ Writ of Habeas Corpus | ☐ Writ of Prohibition | ☐ Compromise of Minor's Claim |
| ☐ Writ of Mandamus | ☐ Other Civil Writ | ☐ Foreign Judgment |
| ☐ Writ of Quo Warrant | | ☐ Other Civil Matters |

*Business Court filings should be filed using the Business Court civil coversheet.*

8-27-2014
Date

_Signature of initiating party or representative_

*See other side for family-related case filings.*

Electronically Filed
08/27/2014 03:16:03 PM

**CLERK OF THE COURT**

1  **COMP**
   Robert B. Noggle, Esq.
2  Nevada Bar No.: 11427
   NOGGLE LAW PLLC
3  376 East Warm Springs Rd., Ste. 140
   Las Vegas, Nevada 89119
4  PH: 702-450-6300/Fax: 702-642-9766
5  Attorney for Plaintiff

6                    DISTRICT COURT
7                CLARK COUNTY, NEVADA

8  STAR GOLDEN ENTERPRISES, LLC,          CASE NO.: A- 1 4 - 7 0 6 2 2 1 - C
9                    Plaintiff,           DEPT NO.:  XXI

10 vs.                                    **Exempt From Arbitration: Concerns Title to Property**
11 WELLS FARGO BANK, N.A., AS TRUSTEE
12 FOR THE POOLING AND SERVICING
   AGREEMENT DATED AS OF APRIL 1, 2005
13 PARK PLACE SECURITIES, INC. ASSET-
   BACKED PASS-THROUGH CERTIFICATES
14 SERIES 2005-WHQ2; WESTERN
15 PROGRESSIVE – NEVADA, INC.; AND
   BRIAN HEE,
16
17                   Defendants.

18                    **COMPLAINT**
19
       Plaintiff, Star Golden Enterprises, LLC, by and through its attorney, Robert B. Noggle, Esq.,
20
21 alleges as follows:

22     1.  Plaintiff is the owner of the real property commonly known as 1628 Cordoba Lane, Las
23 Vegas, Nevada 89108.

24     2.  Plaintiff obtained title by way of foreclosure deed recorded on June 19, 2014.
25
26     3.  The plaintiff's title derives from a foreclosure deed arising from a delinquency in
27 assessments due from the former owner to Wildwood Manor Owners Association, pursuant to NRS
28 Chapter 116.

                              - 1 -

1       4.  Defendant Wells Fargo Bank, N.A., as Trustee for the Pooling and Servicing Agreement

2   Dated as of April 1, 2005 Park Place Securities, Inc. Asset-Backed Pass-Through Certificates Series

3   2005-WHQ2 is the current beneficiary of a deed of trust which was recorded as an encumbrance to

4   the subject property on March 23, 2005.

5       5.  Defendant Western Progressive – Nevada, Inc. is the trustee on the deed of trust.

6

7       6.  Brian Hee is the former owner of the subject real property.

8       7.  The interest of each of the defendants has been extinguished by reason of the foreclosure

9   sale resulting from a delinquency in assessments due from the former owner, Brian Hee to the

10  Wildwood Manor Owners Association, pursuant to NRS Chapter 116.

11

12      8.  Nonetheless, defendant Western Progressive – Nevada Inc. has recorded a notice of default

13  and election to sell under its deed of trust pursuant to NRS 107.080.

14      9.  Plaintiff is entitled to an injunction prohibiting the foreclosure sale from proceeding.

15      10.  The plaintiff is entitled to an award of attorney's fees and costs.

16  **FIRST CLAIM FOR RELIEF**

17

18      11.  Plaintiff repeats the allegations contained in paragraphs 1 through 10.

19      12.  Plaintiff is entitled to a determination from this court, pursuant to NRS 40.010 that the

20  plaintiff is the rightful owner of the property and that the defendants have no right, title, interest or

21  claim to the subject property.

22      13.  The plaintiff is entitled to an award of attorney's fees and costs.

23  **SECOND CLAIM FOR RELIEF**

24

25      14.  Plaintiff repeats the allegations contained in paragraphs 1 through 13.

26      15.  Plaintiff seeks a declaration from this court, pursuant to NRS 40.010, that title in the

27  property is vested in plaintiff free and clear of all liens and encumbrances, that the defendants herein

28

have no estate, right, title or interest in the property, and that defendants are forever enjoined from asserting any estate, title, right, interest, or claim to the subject property adverse to the plaintiff.

16. The plaintiff is entitled to an award of attorney's fees and costs.

WHEREFORE, plaintiff prays for Judgment as follows:

1. For a determination and declaration that plaintiff is the rightful holder of title to the property, free and clear of all liens, encumbrances, and claims of the defendants.

2. For a determination and declaration that the defendants have no estate, right, title, interest or claim in the property.

3. For a judgment forever enjoining the defendants from asserting any estate, right, title, interest or claim in the property; and

4. For such other and further relief as the Court may deem just and proper.

DATED this 27th day of August, 2014.

NOGGLE LAW PLLC


By:  / s / Robert B. Noggle, Esq. /
Robert B. Noggle, Esq.
376 East Warm Springs Road, Ste. 140
Las Vegas, Nevada 89119
Attorney for Plaintiff

**VERIFICATION**

STATE OF NEVADA    )
                          ) ss:
COUNTY OF CLARK   )

      Robert Goldsmith, being first duly sworn, deposes and says: that he is a managing member for

Star Golden Enterprises, LLC and the plaintiff in the above-entitled action.  He has read the

foregoing complaint and knows the contents thereof; that the same is true of his own knowledge,

except as to those matters therein alleged on information and belief, and as to those matters, he

believes them to be true.

Dated this 21st _____ day of August, 2014

~~By: Robert Goldsmith~~

BERNADETTE LYNN CRUTO
Notary Public State of Nevada
No. 12-8888-1
My Appt. Exp. Aug. 20, 2016

SUBSCRIBED and SWORN to before me
this 21st day of AUGUST , 2014

NOTARY
BERNADETTE LYNN CRUTO

# EXHIBIT 16

# EXHIBIT 16

Electronically Filed
04/29/2015 08:14:16 PM

**CLERK OF THE COURT**

AANC
WRIGHT, FINLAY & ZAK, LLP
Dana Jonathon Nitz, Esq.
Nevada Bar No. 000050
Edgar C. Smith, Esq.
Nevada Bar No. 5506
7785 W. Sahara Ave.
Suite 200
Las Vegas, NV 89117
(702) 475-7967; Fax: (702) 946-1345
dnitz@wrightlegal.net
esmith@wrightlegal.net
*Attorneys for Defendants Wells Fargo Bank, N.A., As Trustee for the Pooling and Servicing Agreement Dated as of April 1, 2005 Park Place Securities, Inc. Asset Backed Pass-Through Certificate, Series 2005-WHQ2 and Western Progressive-Nevada, Inc.*

## DISTRICT COURT

## CLARK COUNTY, NEVADA

| | |
|---|---|
| STAR GOLDEN ENTERPRISES, LLC,<br><br>    Plaintiff,<br><br>vs.<br><br>WELLS FARGO BANK, N.A., AS TRUSTEE FOR THE POOLING AND SERVICING AGREEMENT DATED AS OF APRIL 1, 2005 PARK PLACE SECURITIES, INC. ASSET-BACKED PASS-THROUGH CERTIFICATES, SERIES 2005-WHQ2; WESTERN PROGRESSIVE-NEVADA, INC.; AND BRIAN HEE,<br>                    Defendants | Case No.:   A-14-706221-C<br>Dept. No.:  XXI<br><br>**ANSWER TO COMPLAINT AND COUNTERCLAIM BY WELLS FARGO BANK, N.A., AS TRUSTEE FOR THE POOLING AND SERVICING AGREEMENT DATED AS OF APRIL 1, 2005 PARK PLACE SECURITIES, INC. ASSET-BACKED PASS-THROUGH CERTIFICATE, SERIES 2005-WHQ2**<br><br>**[EXEMPT FROM ARBITRATION: INVOLVES TITLE TO REAL PROPERTY]** |
| WELLS FARGO BANK, N.A., AS TRUSTEE FOR THE POOLING AND SERVICING AGREEMENT DATED AS OF APRIL 1, 2005, PARK PLACE SECURITIES, INC. ASSET-BACKED PASS-THROUGH CERTIFICATES, SERIES 2005-WHQ2,<br><br>    Counter-claimant,<br><br>  vs. | |

| |
|---|
| STAR GOLDEN ENTERPRISES, LLC; WILDWOOD MANOR OWNERS ASSOCIATION, a business entity, form unknown; HOMEOWNER ASSOCIATION SERVICES, INC., a Nevada corporation; DOES I through X, inclusive, and ROE CORPORATIONS I through X, inclusive, <br><br> Counter-defendants |

Defendant WELLS FARGO BANK, N.A., AS TRUSTEE FOR THE POOLING AND SERVICING AGREEMENT DATED AS OF APRIL 1, 2005 PARK PLACE SECURITIES, INC. ASSET-BACKED PASS-THROUGH CERTIFICATES, SERIES 2005-WHQ2 ("Wells Fargo") by and through its attorneys of record, Dana Jonathon Nitz, Esq., and Edgar C. Smith, Esq., of the law firm of Wright, Finlay & Zak, LLP, hereby submit its Answer to the Plaintiff Star Golden Enterprises, LLC's ("Plaintiff") Complaint as follows:

**PARTIES, JURISDICTION AND VENUE**

1.      Wells Fargo lacks information sufficient to admit or deny the allegations in Paragraph 1 of the Complaint; therefore, Wells Fargo denies said allegations.

2.      Wells Fargo lacks information sufficient to admit or deny the allegations in Paragraph 2 of the Complaint; therefore, Wells Fargo denies said allegations.

3.      Wells Fargo lacks information sufficient to admit or deny the allegations in Paragraph 3 of the Complaint; therefore, Wells Fargo denies said allegations.

4.      Wells Fargo admits the allegations in Paragraph 4 of the Complaint.

5.      Wells Fargo admits the allegations in Paragraph 5 of the Complaint.

6.      Wells Fargo admits that Brian Hee is identified in the public records for Clark County as a former owner of the property.  Except as expressly admitted, Wells Fargo lack information sufficient to admit or deny the allegations in Paragraph 6 of the Complaint; therefore, Wells Fargo denies said allegations.

7.      Wells Fargo denies that Wells Fargo's interest in the property described in the Complaint was extinguished by the alleged foreclosure sale, or by any other cause, or at all, in answering the allegations in Paragraph 7 of the Complaint.

8.      Wells Fargo admits that Western Progressive – Nevada, Inc. has recorded a notice of default and election to sell under Wells Fargo's deed of trust, in answering the allegation in Paragraph 8 of the Complaint.

9.      Wells Fargo denies the allegations in Paragraph 9 of the Complaint.

10.      Wells Fargo denies the allegations in Paragraph 10 of the Complaint.

## FIRST CLAIM FOR RELIEF

11.      Answering Paragraph 11 of the Complaint, Wells Fargo hereby repeats, realleges and incorporates by this reference each of their admissions, denials, or other responses to the paragraphs referenced herein as if set forth at length and in full.

12.      Wells Fargo denies the allegations in Paragraph 12 of the Complaint.

13.      Wells Fargo denies the allegations in Paragraph 13 of the Complaint.

## SECOND CLAIM FOR RELIEF

14.      Answering Paragraph 14 of the Complaint, Wells Fargo hereby repeats, realleges and incorporates by this reference each of its admissions, denials, or other responses to the paragraphs referenced herein as if set forth at length and in full.

15.      Wells Fargo avers that the allegations in Paragraph 15 of the Complaint constitute a request for relief to which no response is required.  To whatever extent a response is required, Wells Fargo denies the allegations in Paragraph 15 of the Complaint.

16.      Wells Fargo denies the allegations in Paragraph 16 of the Complaint.

## WELLS FARGO ASSERTS THE FOLLOWING AFFIRMATIVE DEFENSES

## FIRST AFFIRMATIVE DEFENSE

### (Failure to State a Claim)

Plaintiff fails to state a claim upon which relief can be granted against the Defendants, or either of them.

## SECOND AFFIRMATIVE DEFENSE

### (Priority)

Plaintiff took title of the Property subject to Wells Fargo, as Trustee's first priority Deed of Trust, thereby forestalling any enjoinment/extinguishment of Wells Fargo, as Trustee's interest in the Property.

## THIRD AFFIRMATIVE DEFENSE

### (Assumption of Risk)

Plaintiff, at all material times, calculated, knew and understood the risks inherent in the situations, actions, omissions, and transactions upon which it now bases its various claims for relief, and with such knowledge, Plaintiff undertook and thereby assumed such risks and is consequently barred from all recovery by such assumption of risk.

## FOURTH AFFIRMATIVE DEFENSE

### (Commercial Reasonableness and Violation of Good Faith - NRS 116.1113)

The HOA lien foreclosure sale by which Plaintiff took its interest was commercially unreasonable if it extinguished Wells Fargo, as Trustee's Deed of Trust, as Plaintiff contends. The sales price, when compared to the outstanding balance of Wells Fargo, as Trustee's Note and Deed of Trust and the fair market value of the Property, demonstrates that the sale was not conducted in good faith as a matter of law. The circumstances of sale of the property violated the HOA's obligation of good faith under NRS 116.1113 and duty to act in a commercially reasonable manner.

## FIFTH AFFIRMATIVE DEFENSE

### (Equitable Doctrines)

Plaintiff's claims are barred by the equitable doctrines of laches, unclean hands, and failure to do equity.

## SIXTH AFFIRMATIVE DEFENSE

### (Acceptance)

Any acceptance of any portion of the excess proceeds does not "satisfy" the amount due and owing on the Wells Fargo, as Trustee's loan and would not constitute a waiver of its rights

under the loan and/or the Deed of Trust, or statute.

### SEVENTH AFFIRMATIVE DEFENSE

### (Waiver and Estoppel)

Plaintiff has waived its rights and is estopped from asserting its claims against these Defendants because of its acts and omissions.

### EIGHTH AFFIRMATIVE DEFENSE

### (Void for Vagueness)

To the extent that Plaintiff's interpretation of NRS 116.3116 is accurate, the statute and Chapter 116 as a whole are void for vagueness as applied to this matter.

### NINTH AFFIRMATIVE DEFENSE

### (Due Process Violations)

A senior deed of trust beneficiary cannot be deprived of its property interest in violation of the Procedural Due Process Clause of the 14 Amendment of the United States Constitution and Article 1, Sec. 8, of the Nevada Constitution.

### TENTH AFFIRMATIVE DEFENSE

### (Violation of Procedural Due Process)

The HOA sale is void or otherwise does not operate to extinguish the first Deed of Trust pursuant to the Due Process Clause of the Nevada Constitution and United States Constitution.

### ELEVENTH AFFIRMATIVE DEFENSE

### (Supremacy Clause)

The HOA sale is void or otherwise does not operate to extinguish the first Deed of Trust pursuant to the Supremacy Clause of the United States Constitution.

### TWELFTH AFFIRMATIVE DEFENSE

### (Property Clause)

The HOA sale is void or otherwise does not operate to extinguish the first Deed of trust pursuant to the Property Clause of the United States Constitution.

///

///

## THIRTEENTH AFFIRMATIVE DEFENSE

### (Satisfaction of Super-Priority Lien)

The claimed super-priority lien was satisfied prior to the homeowner's association foreclosure under the doctrines of tender, estoppel, laches, or waiver.

## FOURTEENTH AFFIRMATIVE DEFENSE

### (Contracts Clause)

The HOA sale is void or otherwise does not operate to extinguish the first Deed of Trust pursuant to the Contracts Clause of both the United States Constitution and the Nevada Constitution.

## FIFTEENTH AFFIRMATIVE DEFENSE

### (Additional Affirmative Defenses)

Defendants reserve the right to assert additional affirmative defenses if discovery and/or investigation indicate additional affirmative defenses are applicable.

## PRAYER

Wherefore, Wells Fargo pray for judgment against the Plaintiff, as follows:

1.     That the Complaint be dismissed, with prejudice, and that Plaintiff take nothing by way of its complaint;

2.     For a declaration and determination that Wells Fargo, as Trustee's interest under its Deed of Trust encumbers the Property, and that it was not extinguished by the HOA Sale;

3.     For attorney's fees;

4.     For costs of suit incurred herein, including post-judgment costs;

5.     For any and all further relief deemed appropriate by this Court.

///

///

///

///

///

///

## WELLS FARGO BANK, N.A., AS TRUSTEE'S COUNTERCLAIM

Counterclaimant WELLS FARGO BANK, N.A. AS TRUSTEE FOR THE POOLING AND SERVICING AGREEMENT DATED AS OF APRIL 1, 2005 PARK PLACE SECURITIES, INC. ASSET-BACKED PASS-THROUGH CERTIFICATES, SERIES 2005-WHQ2,  ("WELLS FARGO, AS TRUSTEE") by and through their attorneys of record, Dana Jonathon Nitz, Esq. and Edgar C. Smith, Esq. of the law firm of Wright, Finlay & Zak, LLP, and hereby submit their Counterclaim against STAR GOLDEN ENTERPRISES, LLC, a Nevada limited liability company; WILDWOOD MANOR OWNERS ASSOCIATION, a business entity, form unknown; HOMEOWNER ASSOCIATION SERVICES, INC.  a Nevada corporation; DOES I through X, and ROE CORPORATIONS I through X (collectively, "Counter-Defendants").

## INTRODUCTION

1.      This action is within the jurisdictional limits of this Court and this Venue is appropriate because the Property involved is located within the jurisdiction of this Court. Plaintiff is also authorized to bring this action in the State of Nevada by NRS 40.430.

2.      The real property which is the subject of this civil action consists of a residence commonly known as 1628 Cordoba Lane, Las Vegas, Nevada 89108, A.P.N. #139-19-410-023 (hereinafter the "Property").

## JURISDICTION AND VENUE

3.      Venue and jurisdiction is proper in this judicial district because Defendants reside in this district; a substantial part of the events or omissions giving rise to Defendants' claims occurred in this district; and the property that is the subject of this action is situated in this district, in Henderson, Clark County, Nevada.

## PARTIES

4.      WELLS FARGO BANK, N.A., AS TRUSTEE is a national banking association chartered under the laws of the United States with its main office in the State of Ohio.

5.      Upon information and belief Counter-defendant WILDWOOD MANOR OWNERS ASSOCIATION ("HOA") is a business entity of unknown form doing business

within this County.

6.      Upon information and belief, Counter-Defendant STAR GOLDEN ENTERPRISES, LLC (hereinafter "Buyer"), is a Nevada limited liability company.

7.      Upon information and belief, Counter-Defendant HOMEOWNER ASSOCIATION SERVICES, INC. ("HOA Trustee") is a Nevada corporation, conducting business within Clark County, Nevada.

8.      WELLS FARGO BANK, N.A., AS TRUSTEE, does not know the true names, capacities or bases of liability of Counter-Defendants sued as Does I-X and Roe Corporations I-X, inclusive.  Each fictitiously named Counter-Defendant is in some way liable to Counter-Claimant or claims some rights, title, or interest in the Property that is junior and subordinate to the rights and interest of WELLS FARGO BANK, N.A., AS TRUSTEE.  Counter-Claimant will amend this complaint to reflect the true names of said Counter-Defendants when the same have been ascertained.

9.      Upon information and belief, HOA Trustee and one or more fictitious defendants are the agents of the HOA, and the HOA is responsible for their acts and omissions under the doctrine of respondeat superior.

## FACTUAL BACKGROUND

10.     On February 7, 2005 Brian H. Hee, a married man as his sole and separate property, acquired title to the Property by grant deed from Janet Hee ("Hee").[1]

11.     Hee financed the purchase of the Property by a loan in the principal sum of $280,000.00 ("Hee Loan").  The loan was evidenced by a promissory note, and repayment was secured by a deed of trust encumbering the title to the Property.  Hee was the trustor under the deed of trust; Town and Country Title Services, Inc.  was the trustee, and Argent Mortgage Company, LLC, was the beneficiary. The Deed of Trust was recorded in the official records of

---

[1] A true and correct copy of the Grant, Bargain, Sale Deed recorded in the Clark County Recorder's Office as Book and Instrument Number 20050207-0002462 is attached hereto as **Exhibit 1**.  All other recordings stated hereafter are recorded in the same manner.

Clark County, Nevada on March 23, 2005 ("Deed of Trust.")[2]

12.     On January 19, 2012, Argent Mortgage Company, LLC assigned the Deed of Trust and conveyed the Hee Loan to WELLS FARGO BANK, N.A. AS TRUSTEE FOR THE POOLING AND SERVICING AGREEMENT DATED AS OF APRIL 1, 2005, ASSET-BACKED PASS-THROUGH CERTIFICATES SERIES 2005-WHQ2.[3]

13.     On February 25, 2014, said entity assigned the Deed of Trust and conveyed the Hee Loan to WELLS FARGO BANK, AS TRUSTEE.[4]

14.     The Property is subject to a Declaration of Covenants, Conditions and Restrictions for Wildwood Manor Owners Association (the "CC&Rs"). The CC&Rs were recorded in the Official Records of the Clark County Recorder on or about January 18, 1978, as Instrument Number 795584, in Book 836.

15.     On June 12, 2012, a Notice of Claim of Lien for Delinquent Assessments was recorded purportedly on behalf of HOA by HOA Trustee.[5]

16.     On November 6, 2013, a Notice of Default was recorded against the Property purportedly on behalf of HOA by HOA Trustee.[6]

17.     On April 21, 2014, a Notice of Sale was recorded against the Property by HOA Trustee.[7]

18.     Upon information and belief, a foreclosure sale was conducted on or about May 8, 2014 by HOA Trustee (hereinafter the "HOA Sale"), whereby Buyer acquired its interest in the Property, if any, for $30,000.00.

---

[2] A true and correct copy of the Deed of Trust recorded as Book and Instrument Number 20050323-0000845 is attached hereto as **Exhibit 2**.
[3] A true and correct copy of the Assignment of Deed of Trust recorded as Book and Instrument Number 20120119-0002545 is attached hereto as **Exhibit 3.**
[4] A true and correct copy of the Assignment of Deed of Trust recorded as Book and Instrument Number 20140225-0000246 is attached hereto as **Exhibit 4.**
[5] A true and correct copy of the Notice of Delinquent Assessment Lien recorded as Book and Instrument Number 20120612-0001303 is attached hereto as **Exhibit 5.**
[6] A true and correct copy of the Notice of Default recorded as Book and Instrument Number 20131106-0001785 is attached hereto as **Exhibit 6.**
[7] A true and correct copy of the Notice of Sale recorded as Book and Instrument Number 20140421-0000836 is attached hereto as **Exhibit 7.**

19.     On June 19, 2014, a Foreclosure Deed was recorded by which Buyer claims its interest.[8]

20.     A homeowner's association sale conducted pursuant to NRS Chapter 116 must comply with all notice provisions as stated in NRS 116.31162 through NRS 116.31168 and NRS 107.090.

21.     WELLS FARGO BANK, N.A., AS TRUSTEE or its predecessor in interest, or the loan servicers of either of them (collectively, "Lender"), has a right to cure a delinquent homeowner's association lien in order to protect the Deed of Trust.

22.     The CC&Rs were recorded prior to the effective date of NRS Chapter 116.

23.     The CC&R's do not authorize or empower the HOA or the HOA Trustee to sell the Property free and clear of the Deed of Trust encumbering the title to the Property, but instead grants priority only to "property taxes and assessments recorded subsequent to the recordation of the Notice of Assessment.".

24.     The CC&R's provide for creation of a lien for "Failure to Repair, Repaint or Maintain" the unit owner's premises, wherein the lien arises if:

   a.   Any owners shall fail, after being requested to do so in writing, to repair, repaint or maintain his building and premises;

   b.   Then the Association that makes the required repairs or other maintenance at the expense of the defaulted owner;

   c.   Gives rise to a lien in favor of the Association for such expenses, together with interest, costs, penalties, and attorney's fees.

25.     The CC&R's do not purport to create any lien rights for unpaid monthly assessments.  Nor do the CC&R's purport to create any lien rights for collection costs, except for attorney's fees.

26.     According to the recitals in the Notice of Lien, the lien consisted of prorate assessments of $280.00 per month, and which totaled $940.00 as of May 1, 2012, and for

---

[8] A true and correct copy of the Foreclosure Deed recorded as Book and Instrument Number 20140619-0002246  is attached hereto as **Exhibit 8.**

$280.00 for each month thereafter, plus late charges at the rate of $25.00 per month, plus interest at the rate of 5.25% per annum, plus attorney's fees and the fees of the "agent for the management body incurred in connection with preparation, recording and foreclosure of this lien."

27.   According to the recitals in the Notice of Default, the amount owed by the owner as of October 21, 2013 was $6,410.76, plus costs, and attorney's fees and fees of the agent, presumably the HOA Trustee.

28.   According to the recitals in the Notice of Sale, the foreclosure sale was conducted "for the purpose of satisfying the assessment obligations secured by said assessment lien, to wit: $11,300.78 with interest from May 1, 2012, as is provided by law, any subsequent monthly Homeowners Association dues, fees, charges, expenses and advances, if any, of the Homeowners Association and its Agent, under the terms of the Assessment Lien."

29.   Upon information and belief, the amount(s) demanded in the Notice of Lien, Notice of Default, and Notice of Sale exceeded the amount permitted to be charged as a lien under the CC&R's.

30.   Upon information and belief, the HOA, and the HOA Trustee, did not comply with all mailing and noticing requirements as set forth in NRS Chapter 107, nor the provisions of NRS 116.31162 through NRS 116.31168.

31.   A recorded notice of default must "describe the deficiency in payment."

32.   The HOA Sale occurred without notice to Lender what portion of the lien, if any, that HOA and HOA Trustee claimed constituted a "super-priority" lien, if any.

33.   The HOA Sale occurred without notice to Lender whether HOA was foreclosing on the "super-priority" portion of its lien, if any, or under the non-super-priority portion of the lien.

34.   The HOA Sale occurred without notice to Lender of a right to cure the delinquent assessment and the super-priority lien, if any.

35.   The HOA Sale violated Lender's rights to due process because it was not given proper, adequate notice and the opportunity to cure the deficiency or default in the payment of

the HOA's assessments that would constitute a super-priority lien, if any.

36.     The HOA Sale was an invalid sale and could not have extinguished WELLS FARGO BANK, N.A., AS TRUSTEE'S secured interest because of defects in the notices given to Lender, if any and the self-created limitations on the right of lien priority under the CC&R's.

37.     Extinguishment of WELLS FARGO BANK, N.A., AS TRUSTEE'S Deed of Trust would deprive it of its right to due process because, upon information and belief, the HOA included amounts in its lien not authorized by the CC&R's, and fines, late fees, interest, dues, and costs of collection that are not allowed to be included in its super-priority lien, if any, under Nevada law, and failed to give adequate notice of the sale to Lender.

38.     Extinguishment of WELLS FARGO BANK, N.A., AS TRUSTEE'S Deed of Trust would deprive it of its right to due process because the HOA Trustee failed to describe the deficiency in payment as required by Nevada law and failed to give Lender any reasonable opportunity to satisfy the super-priority lien, if any.

39.     Under NRS Chapter 116, a lien under NRS 116.3116(1) can only include costs and fees that are specifically enumerated in the statute.

40.     Notwithstanding the limitations in the CC&R's, which predate enactment of NRS Chapter 116, a homeowner's association may only collect as a part of the super priority lien (a) nuisance abatement charges incurred by the association pursuant to NRS 116.310312 and (b) nine months of common assessments which became due prior to the institution of an action to enforce the lien (unless Fannie Mae and Freddie Mac regulations require a shorter period of not less than six months).

41.     Upon information and belief, the HOA Foreclosure Notices included improper fees and costs in the amount demanded.

42.     The attorney's fees and the costs of collecting on a homeowner's association lien cannot be included in the super-priority lien.

43.     Upon information and belief, the HOA assessment lien and foreclosure notices included fines, interest, late fees, dues, attorney's fees, and costs of collection that are not properly included in a super-priority lien under Nevada law and that are not permissible under

NRS 116.3102 et seq.

44. The HOA Sale is unlawful and void under NRS 116.3102 et seq. and in equity.

45. The HOA Sale deprived Lender of its right to due process because the foreclosure notices failed to identify the super-priority amount, to adequately describe the deficiency in payment, to provide WELLS FARGO BANK, N.A., AS TRUSTEE notice of the correct super-priority amount, and to provide a reasonable opportunity to satisfy that amount.

46. A homeowner's association sale must be done in a commercially reasonable manner and in good faith.

47. At the time of the HOA Sale, the amount owed on the Hee Loan exceeded $275,000.00.

48. Upon information and belief, at the time of the HOA Sale, the fair market value of the Property exceeded $200,000..

49. The amount paid at the HOA Sale allegedly totaled $30,000.00.

50. The sales price at the HOA Sale is not commercially reasonable, and not done in good faith, when compared to the debt owed to WELLS FARGO BANK, N.A., AS TRUSTEE on the Hee Loan and the fair market value of the Property.

51. The HOA Sale by which Buyer took its interest was commercially unreasonable if it extinguished WELLS FARGO BANK, N.A., AS TRUSTEE'S Deed of Trust.

52. In the alternative, the HOA Sale was an invalid sale and could not have extinguished WELLS FARGO BANK, N.A., AS TRUSTEE'S secured interest because it was not a commercially reasonable sale.

53. Without providing WELLS FARGO BANK, N.A., AS TRUSTEE, or its predecessors, agents, servicers or trustees, notice of the correct super-priority amount and a reasonable opportunity to satisfy that amount, including its failure to identify the super-priority amount and its failure to adequately describe the deficiency in payment as required by Nevada law, the HOA Sale is commercially unreasonable and deprived WELLS FARGO BANK, N.A., AS TRUSTEE, or its predecessor, of its right to due process.

54. Because WELLS FARGO BANK, N.A., AS TRUSTEE, or its predecessors,

agents, servicers or trustees, was not given proper notice that the HOA intended to foreclose on the super-priority portion of the dues owing, WELLS FARGO BANK, N.A., AS TRUSTEE did not know that it had to attend the HOA Sale to protect its security interest.

55.     Because proper notice that the HOA intended to foreclose on the super-priority portion of the dues owing was not given, prospective bidders did not appear for the HOA Sale, making the HOA Sale commercially unreasonable.

56.     Buyer, HOA, and HOA Trustee knew that WELLS FARGO BANK, N.A., AS TRUSTEE, or its predecessors, agents, servicers or trustees, would not know that HOA was foreclosing on super-priority amounts because of the failure of HOA and HOA Trustee to provide such notice. WELLS FARGO BANK, N.A., AS TRUSTEE'S absence from the HOA Sale allowed Buyer to appear at the HOA Sale and purchase the Property for a fraction of market value, making the HOA Sale commercially unreasonable.

57.     Buyer, HOA, and HOA Trustee knew that prospective bidders would be less likely to attend the HOA Sale because the public at large did not receive notice, constructive or actual, that HOA was foreclosing on a super-priority portion of its lien because HOA and HOA Trustee improperly failed to provide such notice.  The general public's belief therefore was that a buyer at the HOA Sale would take title to the Property subject to WELLS FARGO BANK, N.A., AS TRUSTEE'S Deed of Trust.  This general belief resulted in the absence of prospective bidders at the HOA Sale, which allowed Buyer to appear at the HOA Sale and purchase the Property for a fraction of market value, making the HOA Sale commercially unreasonable.

58.     The circumstances of the HOA Sale of the Property breached the HOA's and the HOA Trustee's obligations of good faith under NRS 116.1113 and their duty to act in a commercially reasonable manner.

59.     WELLS FARGO BANK, N.A., AS TRUSTEE is informed and believes that Buyer is a professional foreclosure property purchaser.

60.     The circumstances of the HOA Sale of the Property and the Buyer's status as a professional foreclosure property purchaser prevents Buyer from being deemed a bona fide purchaser for value.

61.     Upon information and belief, Buyer had actual, constructive or inquiry notice of WELLS FARGO BANK, N.A., AS TRUSTEE'S first Deed of Trust, which prevents Buyer from being deemed a bona fide purchaser for value.

62.     If WELLS FARGO BANK, N.A., AS TRUSTEE'S interest in the Property is not reaffirmed or restored, WELLS FARGO BANK, N.A., AS TRUSTEE will then have suffered damages in the amount of the fair market value of the Property or the unpaid balance of the Hee Loan and Deed of Trust, at the time of the HOA Sale, whichever is greater, as a proximate result of defendants' acts and omissions.

### FIRST CAUSE OF ACTION
**(Quiet Title/Declaratory Relief Pursuant to NRS 30.010 et seq. and NRS 40.010 et seq. versus Buyer and all fictitious Counter-Defendants)**

63.     WELLS FARGO BANK, N.A., AS TRUSTEE incorporates and re-alleges all previous paragraphs, as if fully set forth herein.

64.     Pursuant to NRS 30.010 et seq. and NRS 40.010, this Court has the power and authority to declare WELLS FARGO BANK, N.A., AS TRUSTEE'S rights and interests in the Property and to resolve Counter-Defendants' adverse claims in the Property.

65.     Further, pursuant to NRS 30.010 et seq., this Court has the power and authority to declare the rights and interest of the parties following the acts and omissions of the HOA and HOA Trustee in foreclosing the Property.

66.     WELLS FARGO BANK, N.A., AS TRUSTEE'S Deed of Trust is a first secured interest on the Property as intended by NRS 116.3116(2)(b).

67.     As the current beneficiary under the Deed of Trust and Hee Loan, WELLS FARGO BANK, N.A., AS TRUSTEE'S interest still encumbers the Property and retains its first position status in the chain of title for the Property after the HOA Sale and is superior to the interest, if any, acquired by Buyer or held or claimed by any other party.

68.     Upon information and belief, Buyer claims an interest in the Property that is adverse to the WELLS FARGO BANK, N.A., AS TRUSTEE'S interest.

69.     Upon information and belief, the HOA, the HOA Trustee and the fictitious Counter-Defendants failed to provide proper, adequate notices required by Nevada statutes, the

CC&R's and due process to WELLS FARGO BANK, N.A., AS TRUSTEE and/or its predecessors, and therefore the HOA Sale is void and should be set aside or rescinded.

70.     Based on the adverse claims being asserted by the parties, WELLS FARGO BANK, N.A., AS TRUSTEE is entitled to a judicial determination regarding the rights and interests of the respective parties to the case.

71.     For all the reasons set forth above and in the Factual Background, WELLS FARGO BANK, N.A., AS TRUSTEE is entitled to a determination from this Court, pursuant to NRS 40.010, that WELLS FARGO BANK, N.A., AS TRUSTEE is the beneficiary of a first position Deed of Trust which still encumbers the Property and is superior to the interest held by Buyer, and all other parties, if any.

72.     In the alternative, for all the reasons set forth above and in the Factual Background, WELLS FARGO BANK, N.A., AS TRUSTEE is entitled to a determination from this Court, pursuant to NRS 40.010, the HOA Sale was unlawful and void.

73.     WELLS FARGO BANK, N.A., AS TRUSTEE has furthermore been required to retain counsel and is entitled to recover reasonable attorney's fees for having brought the underlying action.

## SECOND CAUSE OF ACTION

### (Permanent and Preliminary Injunction versus Buyer)

74.     WELLS FARGO BANK, N.A., AS TRUSTEE incorporates by reference the allegations of all previous paragraphs, as if fully set forth herein.

75.     As set forth above, Buyer claims an ownership interest in the Property that is adverse to WELLS FARGO BANK, N.A., AS TRUSTEE.

76.     Any sale or transfer of the Property, prior to a judicial determination concerning the respective rights and interests of the parties to the case, may be rendered invalid if WELLS FARGO BANK, N.A., AS TRUSTEE'S Deed of Trust still encumbers the Property in first position and was not extinguished by the HOA Sale.

77.     WELLS FARGO BANK, N.A., AS TRUSTEE has a reasonable probability of success on the merits of the Complaint, for which compensatory damages will not compensate

WELLS FARGO BANK, N.A., AS TRUSTEE for the irreparable harm of the loss of title to a bona fide purchaser or loss of the first position priority status secured by the Property.

78.     WELLS FARGO BANK, N.A., AS TRUSTEE has no adequate remedy at law due to the uniqueness of the Property involved in the case.

79.     WELLS FARGO BANK, N.A., AS TRUSTEE is entitled to a preliminary and permanent injunction prohibiting Buyer, their successors, assigns, and agents from conducting a sale, transfer or encumbrance of the Property if it is claimed to be superior to WELLS FARGO BANK, N.A., AS TRUSTEE'S Deed of Trust or not subject to that Deed of Trust.

80.     WELLS FARGO BANK, N.A., AS TRUSTEE is entitled to a preliminary injunction requiring Buyer to pay all taxes, insurance and homeowner's association dues during the pendency of this action and to name WELLS FARGO BANK, N.A. AS TRUSTEE as additional insured and loss payee..

81.     WELLS FARGO BANK, N.A., AS TRUSTEE is entitled to a preliminary injunction requiring Buyer to segregate and deposit all rents with the Court or a Court-approved trust account over which Buyer has no control during the pendency of this action.

82.     WELLS FARGO BANK, N.A., AS TRUSTEE has been required to retain counsel to prosecute this action and is entitled to recover reasonable attorney's fees to prosecute this action.

### THIRD CAUSE OF ACTION
**(Wrongful Foreclosure versus the HOA, HOA Trustee, and
The fictitious Counter-Defendants)**

83.     WELLS FARGO BANK, N.A., AS TRUSTEE incorporates by reference the allegations of all previous paragraphs, as if fully set forth herein.

84.     Because the HOA, HOA Trustee, and fictitious Counter-Defendants did not give Lender the proper, adequate notice and the opportunity to cure the deficiency or default in the payment of the HOA's assessments and super-priority lien (if any) required by Nevada statutes, the CC&Rs and due process, the HOA Sale was wrongfully conducted and should be set aside.

85.     Because the CC&R's predate enactment of NRS Chapter 116, and provide no right of priority for an association lien over a lender's senior position deed of trust, the HOA Sale

either did not disturb the priority of the Deed of Trust, or was wrongfully conducted and should be set aside.

86.     Because the HOA Sale was not conducted in accordance with Nevada statutes and the CC&Rs, the HOA Sale was wrongfully conducted and should be set aside.

87.     Because, upon information and belief, the HOA Foreclosure Notices included improper and unauthorized fees and costs in the amount demanded, the HOA Sale was wrongfully conducted and should be set aside.

88.     As a proximate result of HOA, HOA Trustee, and fictitious Counter-Defendants' wrongful foreclosure of the Property by the HOA Sale, as more particularly set forth above and in the Factual Background, WELLS FARGO BANK, N.A., AS TRUSTEE has suffered general and special damages in an amount not presently known.  WELLS FARGO BANK, N.A., AS TRUSTEE will seek leave of court to assert said amounts when they are determined.

89.     If WELLS FARGO BANK, N.A., AS TRUSTEE'S Deed of Trust has been extinguished by the HOA Sale as a proximate result of HOA, HOA Trustee, and fictitious Counter-Defendants' wrongful foreclosure of the Property by the HOA Sale, WELLS FARGO BANK, N.A., AS TRUSTEE has suffered general damages in excess of Ten Thousand Dollars, and special damages in the amount equal to the fair market value of the Property or the unpaid balance of the Hee Loan, plus interest, at the time of the HOA Sale, whichever is greater, in an amount not presently known.  WELLS FARGO BANK, N.A., AS TRUSTEE will seek leave of court to assert said amounts when they are determined.

90.     WELLS FARGO BANK, N.A., AS TRUSTEE has been required to retain counsel to prosecute this action and is entitled to recover reasonable attorney's fees to prosecute this action.

## FOURTH CAUSE OF ACTION
### (Negligence versus HOA, HOA Trustee, and the fictitious Counter-Defendants)

91.     WELLS FARGO BANK, N.A., AS TRUSTEE incorporates by reference the allegations of all previous paragraphs, as if fully set forth herein.

92.     The HOA, the HOA Trustee, and fictitious Counter-Defendants owed a duty to

WELLS FARGO BANK, N.A., AS TRUSTEE and subordinate lienholders to conduct the HOA foreclosure sale at issue in this case properly and in a manner that would fairly allow them an opportunity to protect their interest and cure the super-priority lien threatening their security interests.

93.     The HOA, the HOA Trustee, and fictitious Counter-Defendants breached their duty by failing to disclose the amount of the super-priority lien, by failing to specify that it was foreclosing on the super-priority portion of its lien as opposed to the non-super-priority portion, and by failing to provide notice that WELLS FARGO BANK, N.A., AS TRUSTEE and subordinate lienholders had an opportunity to cure.

94.     As a proximate result of the HOA, the HOA Trustee, and fictitious Counter-Defendants' breaches of their duties, WELLS FARGO BANK, N.A., AS TRUSTEE was unable to cure by tendering a pay-off of the lien amount that threatens its security interest.

95.     As a proximate result of the HOA, the HOA Trustee, and fictitious Counter-Defendants' breaches of their duties, WELLS FARGO BANK, N.A., AS TRUSTEE has incurred general and special damages in an amount in excess of $10,000.00.

96.     If WELLS FARGO BANK, N.A., AS TRUSTEE is found to have lost its first secured interest in the Property, it was the proximate result of the HOA, the HOA Trustee, and fictitious Counter-Defendants' breaches of their duties, and WELLS FARGO BANK, N.A., AS TRUSTEE has thereby suffered general and special damages in an amount in excess of $10,000.00.

97.     WELLS FARGO BANK, N.A., AS TRUSTEE has been required to retain counsel to prosecute this action and is entitled to recover reasonable attorney's fees to prosecute this action.

### FIFTH CAUSE OF ACTION
**(Negligence Per Se versus HOA, HOA Trustee, and the fictitious Counter-Defendants)**

98.     WELLS FARGO BANK, N.A., AS TRUSTEE incorporates by reference the allegations of all previous paragraphs, as if fully set forth herein.

99.     NRS Chapter 116 imposes a duty on HOAs to conduct HOA foreclosure sales in a

manner that is consistent with its provisions and, by reference, the provisions of NRS 107.090.

100.    HOA, HOA Trustee, and fictitious Counter-Defendants breached the statutory duties imposed by NRS Chapter 116 concerning notice.

101.    HOA, HOA Trustee, and fictitious Counter-Defendants violated NRS Chapter 116 by failing to provide the proper, adequate notice and the opportunity to cure the deficiency or default in the payment of the HOA's assessments and super-priority lien (if any) required by Nevada statutes, including without limitation, NRS 116.31162(1)(b)(1) by failing to describe the deficiency in payment of a super-priority lien.

102.    WELLS FARGO BANK, N.A., AS TRUSTEE is a member of the class of persons whom NRS Chapter 116 is intended to protect.

103.    The injury that WELLS FARGO BANK, N.A., AS TRUSTEE faces— extinguishment of its first-position Deed of Trust—is the type against which NRS Chapter 116 is intended to protect.

104.    As a proximate result of HOA, HOA Trustee, and the fictitious Counter-Defendants' breaches of their statutory duties, WELLS FARGO BANK, N.A., AS TRUSTEE was unable to cure by tendering a pay-off of the super-priority lien threatening its security interest.

105.    As a proximate result of the breach of their duties by HOA, HOA Trustee and the fictitious Counter-Defendants, WELLS FARGO BANK, N.A., AS TRUSTEE has incurred general and special damages in an amount in excess of $10,000.00.

106.    If WELLS FARGO BANK, N.A., AS TRUSTEE is found to have lost its first secured interest in the Property, it was the proximate result of HOA's, HOA Trustee's, and the fictitious Counter-Defendants' breaches of their statutory duties, and WELLS FARGO BANK, N.A., AS TRUSTEE has thereby suffered general and special damages in an amount in excess of $10,000.00.

107.    WELLS FARGO BANK, N.A., AS TRUSTEE has been required to retain counsel to prosecute this action and is entitled to recover reasonable attorney's fees to prosecute this action.

## SIXTH CAUSE OF ACTION
### (Breach of Contract versus the HOA, HOA Trustee
### And Fictitious Counter-Defendants)

108.    WELLS FARGO BANK, N.A., AS TRUSTEE incorporates by reference the allegations of all previous paragraphs, as if fully set forth herein.

109.    WELLS FARGO BANK, N.A., AS TRUSTEE was an intended beneficiary of the HOA's CC&Rs in that the CC&R's did not purport to create a right of priority over the Deed of Trust..

110.    The HOA, the HOA Trustee, and fictitious Counter-Defendants breached the obligations, promises, covenants and conditions of the CC&Rs owed to WELLS FARGO BANK, N.A., AS TRUSTEE by the circumstances under which they conducted the HOA Sale of the Property.

111.    The HOA, the HOA Trustee, and fictitious Counter-Defendants' breaches of the obligations, promises, covenants and conditions of the CC&Rs proximately caused WELLS FARGO BANK, N.A., AS TRUSTEE general and special damages in an amount in excess of $10,000.00.

112.    WELLS FARGO BANK, N.A., AS TRUSTEE has been required to retain counsel to prosecute this action and is entitled to recover reasonable attorney's fees to prosecute this action.

## SEVENTH CAUSE OF ACTION
### (Misrepresentation versus the HOA)

113.    WELLS FARGO BANK, N.A., AS TRUSTEE incorporates by reference the allegations of all previous paragraphs, as if fully set forth herein.

114.    WELLS FARGO BANK, N.A., AS TRUSTEE is within the class or persons or entities the HOA intended or had reason to expect to act or to refrain from action in reliance upon the provisions of the CC&Rs.

115.    WELLS FARGO BANK, N.A., AS TRUSTEE, and its predecessors in interest, justifiably relied upon the provisions of the CC&Rs and NRS 116.3116(2)(b) in giving consideration for the Deed of Trust, and the Hee Loan it secures, and the HOA intended or had

reason to expect their conduct would be influenced.

**116.** The HOA's representations in the provisions of the CC&Rs were false.

**117.** The HOA had knowledge or a belief that the representations in the provisions of the CC&Rs were false or it had an insufficient basis for making the representations.

**118.** The HOA had a pecuniary interest in having WELLS FARGO BANK, N.A., AS TRUSTEE and its predecessors in interest rely on the provisions of the CC&Rs.

**119.** The HOA failed to exercise reasonable care or competence in communicating the information within the provisions of the CC&Rs, which was false or it had an insufficient basis for making.

**120.** The HOA, the HOA Trustee, and fictitious Counter-Defendants acted in contravention to the provisions of the CC&Rs, when they conducted the HOA Sale in a manner that could extinguish WELLS FARGO BANK, N.A., AS TRUSTEE'S Deed of Trust.

**121.** WELLS FARGO BANK, N.A., AS TRUSTEE suffered general and special damages in an amount in excess of $10,000.00 as a proximate result of its reliance.

**122.** WELLS FARGO BANK, N.A., AS TRUSTEE has been required to retain counsel to prosecute this action and is entitled to recover reasonable attorney's fees to prosecute this action.

## EIGHTH CAUSE OF ACTION
### (Unjust Enrichment versus Buyer, the HOA, HOA Trustee, and fictitious Counter-Defendants)

**123.** WELLS FARGO BANK, N.A., AS TRUSTEE incorporates and re-alleges all previous paragraphs, as if fully set forth herein.

**124.** WELLS FARGO BANK, N.A., AS TRUSTEE, or its predecessor, has been deprived of the benefit of its secured deed of trust by the actions of Buyer, the HOA, HOA Trustee, and fictitious Counter-Defendants.

**125.** Buyer, the HOA, HOA Trustee, and fictitious Counter-Defendants have benefitted from the unlawful HOA Sale and nature of the real property.

**126.** Buyer, the HOA, HOA Trustee, and fictitious Counter-Defendants have benefitted from WELLS FARGO BANK, N.A., AS TRUSTEE'S payment of taxes, insurance or

homeowner's association assessments since the time of the HOA Sale.

127.     Should WELLS FARGO BANK, N.A., AS TRUSTEE'S Complaint be successful in quieting title against Buyer, the HOA, and HOA Trustee and setting aside the HOA Sale, Buyer, the HOA, the HOA Trustee, and fictitious Counter-Defendants will have been unjustly enriched by the HOA Sale and usage of the Property.

128.     WELLS FARGO BANK, N.A., AS TRUSTEE will have suffered damages if Buyer, the HOA, HOA Trustee, and fictitious Counter-Defendants are allowed to retain their interests in the Property and the funds received from the HOA Sale.

129.     WELLS FARGO BANK, N.A., AS TRUSTEE will have suffered damages if Buyer, the HOA, HOA Trustee, and fictitious Counter-Defendants are allowed to retain their interests in the Property and WELLS FARGO BANK, N.A., AS TRUSTEE'S payment of taxes, insurance or homeowner's association assessments since the time of the HOA Sale.

130.     WELLS FARGO BANK, N.A., AS TRUSTEE is entitled to general and special damages in excess of $10,000.00.

131.     WELLS FARGO BANK, N.A., AS TRUSTEE has furthermore been required to retain counsel and is entitled to recover reasonable attorney's fees for having brought the underlying action.

## NINTH CAUSE OF ACTION
### (Breach of the Covenant of Good Faith and Fair Dealing versus the HOA, HOA Trustee, and the fictitious Counter-Defendants)

132.     Plaintiff incorporates by reference the allegations of all previous paragraphs, as if fully set forth herein.

133.     Implicit in every contract in the state of Nevada is an implied covenant of good faith and fair dealing.

134.     Plaintiff was an intended beneficiary of the HOA's CC&Rs.

135.     The HOA, HOA Trustee, and fictitious Counter-Defendants breached the duties, obligations, promises, covenants and conditions, express and implied, in the CC&Rs owed to Plaintiff by the circumstances under which they conducted the HOA Sale of the Property.

136.     The HOA, HOA Trustee, and fictitious Counter-Defendants took affirmative

action to re-convey the Property a third party, in direct contravention of the HOA's duties to Plaintiff as promised in the CC&Rs.

137.  The HOA, HOA Trustee, and fictitious Counter-Defendants' breaches of the obligations, promises, covenants and conditions of the CC&Rs, and to act in good faith regarding same, proximately caused Plaintiff general and special damages in an amount in excess of $10,000.00.

138.  Plaintiff has been required to retain counsel to prosecute this action and is entitled to recover reasonable attorney's fees to prosecute this action.

## PRAYER

Wherefore, WELLS FARGO BANK, N.A., AS TRUSTEE prays for judgment against the Counter-Defendants, jointly and severally, as follows:

1.  For a declaration and determination that WELLS FARGO BANK, N.A., AS TRUSTEE'S interest is secured against the Property, and that WELLS FARGO BANK, N.A., AS TRUSTEE'S first Deed of Trust was not extinguished by the HOA Sale;

2.  For a declaration and determination that WELLS FARGO BANK, N.A., AS TRUSTEE'S interest is superior to the interest, if any, acquired by the Buyer, and all other fictitious Counter-Defendants;

3.  For a declaration and determination that the HOA Sale was invalid to the extent it purports to convey the Property free and clear to Buyer;

4.  In the alternative, for a declaration and determination that the HOA Sale was invalid and conveyed no legitimate interest to Buyer;

5.  For a preliminary and permanent injunction that Buyer, its successors, assigns, and agents are prohibited from conducting a sale, transfer or encumbrance of the Property if it is claimed to be superior to WELLS FARGO BANK, N.A., AS TRUSTEE'S Deed of Trust or not subject to that Deed of Trust;

6.  For a preliminary injunction that Buyer pay all taxes, insurance and homeowner's association dues during the pendency of this action.

7. For a preliminary injunction that Buyer be required to segregate and deposit all rents with the Court or a Court-approved trust account over which Buyer has no control during the pendency of this action.

8. If it is determined that WELLS FARGO BANK, N.A., AS TRUSTEE'S Deed of Trust has been extinguished by the HOA Sale, for special damages in the amount of the fair market value of the Property or the unpaid balance of the Hee Loan and Deed of Trust, at the time of the HOA Sale, whichever is greater;

9. For general and special damages in excess of $10,000.00.

10. For attorney's fees;

11. For costs of incurred herein, including post-judgment costs;

12. For any and all further relief deemed appropriate by this Court.

DATED this 29th day of April, 2015

WRIGHT, FINLAY & ZAK, LLP

/s/ Edgar C. Smith
Dana Jonathon Nitz, Esq.
Nevada Bar No. 000050
Edgar C. Smith, Esq.
Nevada Bar No. 5506
7785 W. Sahara Ave.
Suite 200
Las Vegas, NV 89117
(702) 475-7967; Fax: (702) 946-1345
dnitz@wrightlegal.net
esmith@wrightlegal.net
*Attorneys for Defendant Wells Fargo Bank, N.A., As Trustee for the Pooling and Servicing Agreement Dated as of April 1, 2005 Park Place Securities, Inc. Asset Backed Pass-Through Certificate, Series 2005-WHQ2 and Western Progressive-Nevada, Inc.*

///

///

///

///

///

## AFFIRMATION

Pursuant to NRS 239B.030

The undersigned does hereby affirm that the preceding **ANSWER TO COMPLAINT AND COUNTERCLAIM** filed in Case No. A-14-706221-C **does not** contain the social security number of any person.

DATED this 29th day of April, 2015

WRIGHT, FINLAY & ZAK, LLP

/s/ *Edgar C. Smith*
Dana Jonathon Nitz, Esq.
Nevada Bar No. 000050
Edgar C. Smith, Esq.
Nevada Bar No. 5506

# EXHIBIT 17

# EXHIBIT 17

ROBIN P. WRIGHT*
T. ROBERT FINLAY
JONATHAN M. ZAK++++
GWEN H. RIBAR
JONATHAN D. FINK
CHARLES C. MCKENNA
DANA JONATHON NITZ**
NICHOLAS G. HOOD
PATRICIA L. PENNY
JAMES J. RAMOS
MAGDALENA D. KOZINSKA
NICHOLE L. GLOWIN
RUBY J. CHAVEZ
NICOLE S. DUNN
JOSHUA R. HERNANDEZ
KATHRYN A. MOORER
TODD E. CHVAT
LUKASZ I. WOZNIAK**+*
BRADFORD E. KLEIN*/**/^**/

MICHAEL J. GILLIGAN
CHELSEA A. CROWTON**
JOY B. THOMAS*/**
KIM R. LEPORE***
KRISTINA M. PELLETIER
JENNIFER A. BRADY
R. SAMUEL EHLERS**/+++
MICHAEL R. ASATOURIAN
MARVIN B. ADVIENTO
RICHARD J. LEE+
ROBERT A. OLSON
SCOTT S. POLLARD++++
OLIVIER J. LABARRE
JOAN C. SPAEDER-YOUNKIN
TALINE M. KESHISHIAN
PATERNO C. JURANI**
CORI B. JONES
JAMIN S. NEIL***
SARAH GREENBERG

**INKU NAM
**SHADD A. WADE
**VICTORIA L. HIGHTOWER
***/**NATALIE C. LEHMAN
**EDGAR C. SMITH
**REGINA A. HABERMAS
*CHRISTOPHER A.J. SWIFT
SHANNON C. WILLIAMS
I*RYAN M. CARSON
KAELEE M. GIFFORD
**CHRISTINA V. MILLER
****MICHELLE A. MIERZWA
**ROCK K. JUNG
**ERIC S. POWERS
**/+++AARON D. LANCASTER
**/+++MICHAEL S. KELLEY
**J. STEPHEN DOLEMBO
JOHN J. DALLER
CORBIN S. MOORE

**YANXIONG LI
**/*ROBERT A. RIETHER
**JAMIE S. HENDRICKSON
**PATRICK J. DAVIS
**LAURA N. COUGHLIN

*Also Admitted in Nevada
**Admitted only in Nevada
***Also Admitted in Arizona
****Also Admitted in Washington
++Also Admitted in Hawaii
+Licensed Patent Attorney
+++Also Admitted in Utah
^Also Admitted in Oregon
~Admitted only in Arizona
^Also Admitted in New Mexico
~Admitted only in Washington
|Admitted in Washington & Nevada
++++Of Counsel



**WRIGHT FINLAY & ZAK** LLP
**ATTORNEYS AT LAW**
Main Office
4665 MacArthur Court, Suite 200
Newport Beach, CA 92660
Main Phone: (949) 477-5050
Email Fax: (949) 608-9142

www.wrightlegal.net

Direct Dial: (702) 637-2235
Email: yli@wrightlegal.net

April 20, 2017

United Capital Title Insurance Company
Attn: Claims Department
601 Riverside Avenue
Jacksonville, Florida 32204

<u>**NOTICE OF TITLE INSURANCE CLAIM**</u>

Re:   Case Name   : *Star Golden Enterprises, LLC v. Wells Fargo Bank, N.A., As Trustee for the Pooling and Servicing Agreement Dated as of April 1, 2005 Park Place Securities, Inc. Asset Backed Pass-Through Certificates, Series 2005-WHQ2, et al.*
        District Court of Clark County, Nevada
        Case No.        : A-14-706221-C
        Borrower        : Brian Hee
        Property Address : 1628 Cordoba Lane, Las Vegas, Nevada 89108
        Title Policy No.  : A92-210014567
        WFZ Case No.    : 614-2014198 (Hee, Brian II)

<u>**Privileged Work Product Communications**</u>

Dear United Capital Title Insurance Company:

This firm represents Ocwen Loan Servicing, LLC, attorney-in-fact and loan servicer for **Wells Fargo Bank, N.A., As Trustee for the Pooling and Servicing Agreement Dated as of April 1, 2005 Park Place Securities, Inc. Asset Backed Pass-Through Certificates, Series 2005-WHQ2** (hereinafter, the "Insured"), in the above-entitled lawsuit. We are, by this letter, making a claim against the above-mentioned title policy, requesting indemnity and tendering defense of all our clients in this action.

A title insurance problem has arisen from a non-judicial foreclosure sale initiated by a homeowner's association ("HOA"). The HOA sold the above-referenced Property ("Property") on or about May 8, 2014 for $30,000.00 in an attempt to satisfy a homeowner's association lien on the Property. The HOA's most recently recorded Notice of Sale indicates that the amount of the assessment lien was $11,300.78 with interest as of May 1, 2012. The third-party purchaser at the HOA Sale then sold the Property to Bruce Hartshorn and Ginger Hartshorn, Trustees, or their

Nevada Office
7785 W. Sahara Ave., Suite 200
Las Vegas, NV 89117
Main Phone: (702) 475-7964
Main Fax: (702) 946-1345

Arizona Office
16427 N. Scottsdale Road, Suite 300
Scottsdale, AZ 85254
Main Phone: (949) 477-5050

Washington Office
3600 15th Ave W., Suite 200
Seattle, WA 98119
Main Phone: (949) 477-5050

Utah Office
2975 W. Executive Pkwy, Suite 125
Mailbox 155
Lehi, UT 84043
Main Phone: (801) 893-4901
Main Fax (702) 946-1345

Successors in Interest, of the Hartshorn Family Trust, Dated March 18, 2013, who claim to be the current titleholder of the Property.

The Insured is the current beneficiary on a Note and Deed of Trust, executed by the above referenced borrower(s). The Deed of Trust was recorded on March 23, 2005, in the official records of the Clark County Recorder's Office as Book & Instrument Number 20050323-0000845 (the "Deed of Trust"), securing the Property in first credit-priority position. The Deed of Trust encumbers the above-stated Property. Attached is a copy of the Complaint, the Insured's policy of insurance, the Deed of Trust and any assignment(s) of the Deed of Trust for your reference.

As you know, on September 18, 2014, the Nevada Supreme Court ruled in *SFR Investments Pool 1, LLC v. U.S Bank N.A,* 130 Nev. Adv. Op. 75 (2014), against Banks and Lenders who are similarly situated to the Insured on the HOA lien priority issue. The opinion obviously prejudices the Insured's secured position in the Property, and may very well result in the loss of the Insured's Deed of Trust, which evidences the validity of this title claim. It is the Insured's position that the date of this opinion – September 18, 2014 – is that date when the Insured first became aware that its secured interest in the Property and Deed of Trust were in danger of being extinguished because, up until this date, the real estate industry (including the title companies) was unaware that an HOA lien could cut off and become prior to the insured's Deed of Trust. A copy of the opinion is attached for your reference.

Pursuant to the Property's current recorded title and based on the recent Nevada Supreme Court decision, the third-party purchaser at the HOA Sale claims that the HOA lien is superior to the Deed of Trust and foreclosure on it extinguishes that first Deed of Trust. This HOA lien priority is directly contrary to terms contained in the title policy issued by United Capital Title Insurance Company.

The subject title policy, along with CLTA Endorsement 100, was written with the understanding that the Insured's Deed of Trust would take priority over all other liens and encumbrances against the Property, including those liens arising from the HOA's CC&Rs. The title policy specifically insures against "loss or damage which the insured shall sustain by reason of… 1) the existence of any… (a) covenants, conditions or restrictions under which the lien of the mortgage referred to in Schedule A can be cut off, subordinated, or otherwise impaired." The title policy also does not state or list the Insured's first position status in the chain of title being subordinate to or impaired by the CC&Rs running with the land or association liens for assessments thereunder.

We request that United Capital Title Insurance Company take the necessary steps to cure the title issues and indemnify the Insured without exception to the title defect caused by this challenge to the Insured's first lien position.

The Insured reserves any and all rights under the title policy and common law, as we are acting in an effort to mitigate our client's losses. The Insured requests that United Capital Title Insurance Company provide a coverage determination within 30 days of the date of this letter.

Please contact me immediately to discuss coverage for our client's claim.

Sincerely,

**WRIGHT, FINLAY & ZAK, LLP**

Yanxiong "Michael" Li, Esq.
YL/jjd

Enclosures:     Title Policy of Insurance
                Deed of Trust
                Assignment(s) of Deed of Trust
                *SFR Investments v. US Bank*



*Hee, Brian*

**AMERICAN LAND TITLE ASSOCIATION**
**LOAN POLICY (10-17-92)**   *PP054C*

| Policy # -A92- | 21 0014567 |
|---|---|

# Land Title of Nevada, Inc.

### an Issuing Agent for:

## U N I T E D   C A P I T A L   T I T L E   I N S U R A N C E   C O M P A N Y™

SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS FROM COVERAGE CONTAINED IN SCHEDULE B AND THE CONDITIONS AND STIPULATIONS, UNITED CAPITAL TITLE INSURANCE COMPANY™, a California corporation, herein called the Company, insures, as of Date of Policy shown in Schedule A, against loss or damage, not exceeding the Amount of Insurance stated in Schedule A, sustained or incurred by the insured by reason of:

1. Title to the estate or interest described in Schedule A being vested other than as stated therein;
2. Any defect in or lien or encumbrance on the title;
3. Unmarketability of the title;
4. Lack of a right of access to and from the land;
5. The invalidity or unenforceability of the lien of the insured mortgage upon the title;
6. The priority of any lien or encumbrance over the lien of the insured mortgage;
7. Lack of priority of the lien of the insured mortgage over any statutory lien for services, labor or material:
  (a) arising from an improvement or work related to the land which is contracted for or commenced prior to Date of Policy; or
  (b) arising from an improvement or work related to the land which is contracted for or commenced subsequent to Date of Policy and which is financed in whole or in part by proceeds of the indebtedness secured by the insured mortgage which at Date of Policy the insured has advanced or is obligated to advance;
8. The invalidity or unenforceability of any assignment of the insured mortgage, provided the assignment is shown in Schedule A, or the failure of the assignment shown in Schedule A to vest title to the insured mortgage in the named insured assignee free and clear of all liens.

The Company will also pay the costs, attorneys' fees and expenses incurred in defense of the title or the lien of the insured mortgage, as insured, but only to the extent provided in the Conditions and Stipulations.

## UNITED CAPITAL TITLE INSURANCE COMPANY™

**Land Title of Nevada, Inc.**

an Issuing Agent for:
United Title Insurance Company



By: *JM Smolan*

President

By: *Kenneth E Speer*

Secretary

## EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1. (a) Any law, ordinance or governmental regulation (including but not limited to building and zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating to (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

   (b) Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

2. Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.

3. Defects, liens, encumbrances, adverse claims or other matters:
   (a) created, suffered, assumed or agreed to by the insured claimant;
   (b) not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy;
   (c) resulting in no loss or damage to the insured claimant;
   (d) attaching or created subsequent to Date of Policy (except to the extent that this policy insures the priority of the lien of the insured mortgage over any statutory lien for services, labor or material); or
   (e) resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the insured mortgage.

4. Unenforceability of the lien of the insured mortgage because of the inability or failure of the insured at Date of Policy, or the inability or failure of any subsequent owner of the indebtedness, to comply with applicable doing business laws of the state in which the land is situated.

5. Invalidity or unenforceability of the lien of the insured mortgage, or claim thereof, which arises out of the transaction evidenced by the insured mortgage and is based upon usury or any consumer credit protection or truth in lending law.

6. Any statutory lien for services, labor or materials (or the claim of priority of any statutory lien for services, labor or materials over the lien of the insured mortgage) arising from an improvement or work related to the land which is contracted for and commenced subsequent to Date of Policy and is not financed in whole or in part by proceeds of the indebtedness secured by the insured mortgage which at Date of Policy the insured has advanced or is obligated to advance.

7. Any claim, which arises out of the transaction creating the interest of the mortgagee insured by this policy, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that is based on:
   (a) the transaction creating the interest of the insured mortgagee being deemed a fraudulent conveyance or fraudulent transfer; or
   (b) the subordination of the interest of the insured mortgagee as a result of the application of the doctrine of equitable subordination; or
   (c) the transaction creating the interest of the insured mortgagee being deemed a preferential transfer except where the preferential transfer results from the failure:
      (i) to timely record the instrument of transfer; or
      (ii) of such recordation to impart notice to a purchaser for value or a judgment or lien creditor.

## CONDITIONS AND STIPULATIONS

### 1. DEFINITION OF TERMS.

The following terms when used in this policy mean:

(a) "insured": the insured named in Schedule A. The term "insured" also includes

(i) the owner of the indebtedness secured by the insured mortgage and each successor in ownership of the indebtedness except a successor who is an obligor under the provisions of Section 12(c) of these Conditions and Stipulations (reserving, however, all rights and defenses as to any successor that the Company would have had against any predecessor insured, unless the successor acquired the indebtedness as a purchaser for value without knowledge of the asserted defect, lien, encumbrance, adverse claim or other matter insured against by this policy as affecting title to the estate or interest in the land);

(ii) any governmental agency or governmental instrumentality which is an insurer or guarantor under an insurance contract or guaranty insuring or guaranteeing the indebtedness secured by the insured mortgage, or any part thereof, whether named as an insured herein or not;

(iii) the parties designated in Section 2(a) of these Conditions and Stipulations.

(b) "insured claimant": an insured claiming loss or damage.

(c) "knowledge" or "known": actual knowledge, not constructive knowledge or notice which may be imputed to an insured by reason of the public records as defined in this policy or any other records which impart constructive notice of matters affecting the land.

(d) "land": the land described or referred to in Schedule A, and improvements affixed thereto which by law constitute real property. The term "land" does not include any property beyond the lines of the area described or referred to in Schedule A, nor any right, title, interest, estate or easement in abutting streets, roads, avenues, alleys, lanes, ways or waterways, but nothing herein shall modify or limit the extent to which a right of access to and from the land is insured by this policy.

(e) "mortgage": mortgage, deed of trust, trust deed, or other security instrument.

(f) "public records": records established under state statutes at Date of Policy for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without knowledge. With respect to Section 1(a)(iv) of the Exclusions from Coverage, "public records" shall also include environmental protection liens filed in the records of the clerk of the United States district court for the district in which the land is located.

(g) "unmarketability of the title": an alleged or apparent matter affecting the title to the land, not excluded or excepted from coverage, which would entitle a purchaser of the estate or interest described in Schedule A or the insured mortgage to be released from the obligation to purchase by virtue of a contractual condition requiring the delivery of marketable title.

### 2. CONTINUATION OF INSURANCE

(a) After Acquisition of Title. The coverage of this policy shall continue in force as of Date of Policy in favor of (i) an insured who acquires all or any part of the estate or interest in the land by foreclosure, trustee's sale, conveyance in lieu of foreclosure, or other legal manner which discharges the lien of the insured mortgage; (ii) a transferee of the estate or interest so acquired from an insured corporation, provided the transferee is the parent or wholly-owned subsidiary of the insured corporation, and their corporate successors by operation of law and not by purchase, subject to any rights or defenses the Company may have against any predecessor insureds; and (iii) any governmental agency or governmental instrumentality which acquires all or any part of the estate or interest pursuant to a contract of insurance or guaranty insuring or guaranteeing the indebtedness secured by the insured mortgage.

(b) After Conveyance of Title. The coverage of this policy shall continue in force as of Date of Policy in favor of an insured only so long as the insured retains an estate or interest in the land, or holds an indebtedness secured by a purchase money mortgage given by a purchaser from the insured, or only so long as the insured shall have liability by reason of covenants of warranty made by the insured in any transfer or conveyance of the estate or interest. This policy shall not continue in force in favor of any purchaser from the insured of either (i) an estate or interest in the land, or (ii) an indebtedness secured by a purchase money mortgage given to the insured.

(c) Amount of Insurance. The amount of insurance after the acquisition or after the conveyance shall in neither event exceed the least of:
   (i) the Amount of Insurance stated in Schedule A;
   (ii) the amount of the principal of the indebtedness secured by the insured mort-



# LandTitle
## OF NEVADA, INC.

**as Issuing Agent for**
. **United Capital Title Insurance Company**
**ALTA LOAN POLICY**

File No. 90500380-DW                     Policy No.  A92 210014567

## SCHEDULE A

Date of Policy            March 23, 2005 at 09:14 a.m.

Amount of Insurance    $280,000.00            Premium      $888.75

1.      Name of Insured:

        Argent Mortgage Company, LLC, its successors and/or assigns

2.      The estate or interest in the land which is covered by this policy is:

        Fee

3.      Title to the estate or interest in the land is vested in:

        Brian Hee, a married man as his sole and separate property

4.      The insured mortgage and assignments thereof, if any, are described as follows:

        Deed of Trust to secure an indebtedness in the amount shown below, and any other obligations secured
        thereby
        Dated                    : March 16, 2005
        Trustor                  : Brian Hee, a married man, as his sole and separate property
        Trustee                  : Town and Country Title Services, Inc.
        Beneficiary              : Argent Mortgage Company, LLC
        Amount                   : $280,000.00
        Recorded                 : March 23, 2005
        Book No.                 : 20050323
        Document No.             : 00845, Official Records.

## THIS POLICY VALID ONLY IF SCHEDULE B IS ATTACHED



**as Issuing Agent for**
**United Capital Title Insurance Company**
**ALTA LOAN POLICY**

File No. 90500380-DW                    Policy No.  A92 210014567

## SCHEDULE B

### EXCEPTIONS FROM COVERAGE

This policy does not insure against loss or damage (and the Company will not pay costs, attorney's fees or expenses) which arrive by reason of:

### SCHEDULE B PART I

1.  Taxes for the fiscal year 2005-2006, a lien not yet due and payable.  Note: Amounts for this tax year are not yet available.

2.  The lien of Supplemental Taxes, if any, assessed pursuant to the provisions of N.R.S. 361.770, Statutes of the State of Nevada.  (None now due and payable)

3.  The hereinabove described property may be subject to charges and fees from the sanitation district and the water district in which said property is located, which charges and fees may be levied against said land. (None now due and payable)

    Inquiries should be made of the County or Municipality in which said property is located.

4.  Water rights, claims or title to water, whether or not shown by the public records.

5.  Covenants, conditions, restrictions, association lien rights, reservations and easements, if any affecting title, which may appear in the public record, including those shown on any recorded plat or survey, but deleting any covenant, condition or restriction indicating a preference, limitation or discrimination based on race, color, religion, sex, handicap, familial status, or national origin, to the extent such covenants, conditions or restrictions violate Title 42, Section 3604(c), of the United States Codes.

****END OF SCHEDULE B, PART I  ****



**OF NEVADA, INC.**

as Issuing Agent for
**United Capital Title Insurance Company**
**ALTA LOAN POLICY**

File No. 90500380-DW                    Policy No.  A92 210014567

### SCHEDULE B - PART  II

In addition to the matters set forth in Part I of this Schedule, the title to the estate or interest in the land described or referred to in Schedule A is subject to the following matters, if any be shown, but the company insures that these matters are subordinate to the lien or charge of the insured mortgage upon the estate or interest:

NONE

countersigned

*J M Smolar*

_____ _____
Authorized signatory

### ****END OF SCHEDULE B, PART II****



as Issuing Agent for
**United Capital Title Insurance Company**
**ALTA LOAN POLICY**

File No. 90500380-DW                    Policy No.  A92 210014567

## SCHEDULE C

LOT TWENTY THREE (23) IN BLOCK TWO (2), OF WILDWOOD MANOR AS SHOWN BY MAP THEREOF ON FILE IN BOOK 20 OF PLATS, PAGE 76 IN THE OFFICE OF THE COUNTY RECORDER OF CLARK COUNTY, NEVADA.



as Issuing Agent for
**United Capital Title Insurance Company**
**ALTA LOAN POLICY**

File No. 90500380-DW                                    Policy No.  A92 210014567

## CLTA ENDORSEMENT 100

The Company hereby insures the owner of the indebtedness secured by the insured mortgage against loss or damage which the insured shall sustain by reason of any of the following matters:

1.      The existence of any of the following:

(a)     Covenants, conditions or restrictions under which the lien of the mortgage referred to in Schedule A can be cut off, subordinated, or otherwise impaired;

(b)     Present violations on the land of any enforceable covenants, conditions or restrictions;

(c)     Except as shown in Schedule B,  there are no encroachments of buildings, structures or improvements located on the land onto adjoining lands, or any encroachments onto the land of buildings, structures or improvements located on adjoining lands.

2.      (a)     Any future violations on the land of any covenants, conditions or restrictions occurring prior to acquisition of title to the estate or interest referred to in Schedule A by the insured, provided such violations result in impairment or loss of the lien of the mortgage referred to in Schedule A, or result in impairment or loss of the title to the estate or interest referred to in Schedule A if the insured shall acquire such title in satisfaction of the indebtedness secured by the insured mortgage;

(b)     Unmarketability of the title to the estate or interest referred to in Schedule A by reason of any violations on the land, occurring prior to acquisition of title to the estate or interest referred to in Schedule A by the insured, of any covenants, conditions or restrictions.

3.      Damage to existing improvements, including lawns, shrubbery or trees

(a)     Which are located or encroach upon that portion of the land subject to any easement shown in Schedule B, which damage results from the exercise of the right to use or maintain such easement for the purposes for which the same was granted or reserved;

(b)     Resulting from the exercise of any right to use the surface of the land for the extraction or development of the minerals excepted from the description of the land or shown as a reservation in Schedule B.

4.      Any final court order or judgment requiring removal from any land adjoining the land of any encroachment shown in Schedule B.

Wherever in this endorsement any or all the words "covenants, conditions or restrictions" appear, they shall not be deemed to refer to or include the terms, covenants, conditions or restrictions contained in any lease.



## LandTitle
### O F   N E V A D A ,   I N C .

as Issuing Agent for
**United Capital Title Insurance Company**
**ALTA LOAN POLICY**

File No. 90500380-DW                    Policy No.  A92 210014567

## CLTA ENDORSEMENT 100 (continued)

For purposes of this endorsement, the words "covenants," "conditions" or "restrictions" shall not be deemed to refer to or include any covenants, conditions or restrictions relating to environmental protection, except to the extent that a notice of a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy and is not excepted in Schedule B.

This endorsement is made a part of the policy and is subject to all of the terms and provisions thereof and of any prior endorsements thereto. Except to the extent expressly stated, it neither modifies any of the terms and provisions of the policy and any prior endorsements, nor does it extend the effective date of the policy and any prior endorsements, nor does it increase the face amount thereof.

Dated:  March 23, 2005

United Capital Title Insurance Company

*J M Smolar*

By_____
                Authorized signatory



**as Issuing Agent for**
**United Capital Title Insurance Company**
**ALTA LOAN POLICY**

File No. 90500380-DW                              Policy No.  A92 210014567

## CLTA ENDORSEMENT 116

    The Company hereby insures the owner of the indebtedness secured by the insured mortgage against loss or damage which the insured shall sustain by reason of the failure of (i) a Four-Plex  known as 1628 Cordoba Lane, Las Vegas, Nevada  , to be located on the land at Date of Policy, or (ii) the map attached to this policy to correctly show the location and dimensions of the land according to the public records.

    This endorsement is made a part of the policy and is subject to all of the terms and provisions thereof and of any prior endorsements thereto.  Except to the extent expressly stated, it neither modifies any of the terms and provisions of the policy and any prior endorsements, nor does it extend the effective date of the policy and any prior endorsements, nor does it increase the face amount thereof.

Dated:  March 23, 2005

United Capital Title Insurance Company

*J M Smolar*

By_____
Authorized signatory



**OF NEVADA, INC.**

as Issuing Agent for
**United Capital Title Insurance Company**
**ALTA LOAN POLICY**

File No. 90500380-DW                    Policy No.  A92 210014567

## CLTA ENDORSEMENT 110.9

The insurance afforded by this endorsement is only effective if the land is used or is to be used primarily for residential purposes.

The Company insures the Insured against loss or damage sustained by reason of lack of priority of the lien of the Insured mortgage over:

(a)    any environmental protection lien which, at Date of Policy, is recorded in those records established under state statutes at Date of Policy for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without knowledge, or filed in the records of the clerk of the United States district court for the district in which the land is located, except as set forth in Schedule B; or

(b)    any environmental protection lien provided for by any state statute in effect at Date of Policy, except environmental protection liens provided for by the following state statutes:

[None]

This endorsement is made a part of the policy and is subject to all of the terms and provisions thereof and of any prior endorsements thereto.  Except to the extent expressly stated, it neither modifies any of the terms and provisions of the policy and any endorsements, nor does it extend the effective date of the policy and any prior endorsements, nor does it increase the face amount thereof.

Dated: March 23, 2005

United Capital Title Insurance Company

*J M Smolar*

By_____
                    Authorized signatory



**as Issuing Agent for**
**United Capital Title Insurance Company**
**ALTA LOAN POLICY**

File No. 90500380-DW

Policy No.  A92 210014567

## CLTA ENDORSEMENT 111.5

The Company insures the owner of the indebtedness secured by the insured mortgage against loss or damage sustained by reason of:

1.    The invalidity or unenforceability of the lien of the insured mortgage resulting from the provisions therein which provide for changes in the rate of interest.

2.    Loss of priority of the lien of the insured mortgage as security for the unpaid principal balance of the loan, together with interest as changed in accordance with the provisions of the insured mortgage, which loss of priority is caused by the changes in the rate of interest.

    "Changes in the rate of interest", as used in this endorsement, shall mean only those changes in the rate of interest calculated pursuant to the formula provided in the insured mortgage at Date of Policy.

This endorsement does not insure against loss or damage based upon

(a)    usury, or
(b)    any consumer credit protection or truth in lending law.

    This endorsement is made a part of the policy and is subject to all of the terms and provisions thereof and of any prior endorsements thereto, except that the insurance afforded by this endorsement is not subject to Section 3(d) of the Exclusions From Coverage.  Except to the extent expressly stated, it neither modifies any of the terms and provisions of the policy and any prior endorsements, nor does it extend the effective date of the policy and any prior endorsements, nor does it increase the face amount thereof.

Dated:  March 23, 2005

United Capital Title Insurance Company

*J M Smolar*

By_____
    Authorized signatory



**LandTitle**
**O F   N E V A D A ,   I N C .**

as Issuing Agent for
**United Capital Title Insurance Company**
**ALTA LOAN POLICY**

File No. 90500380-DW                                    Policy No.  A92 210014567

## CLTA ENDORSEMENT 100.2

The Company insures the owner of the indebtedness secured by the insured mortgage against loss or damage sustained by reason of:

1.       The existence at Date of Policy of any of the following:

(a)      Covenants, conditions or restrictions under which the lien of the mortgage referred to in Schedule A can be divested, subordinated or extinguished, or its validity, priority or enforceability impaired.

(b)      Unless expressly excepted in Schedule B:

(1)      Present violations on the land of any enforceable covenants, conditions or restrictions, nor do any existing improvements on the land violate any building setback lines shown on a plat of subdivision recorded or filed in the public records.

(2)      Any instrument referred to in Schedule B as containing covenants, conditions or restrictions on the land does not, in addition, (i) establish an easement on the land; (ii) provide a lien for liquidated damages; (iii) provide for a private charge or assessment; (iv) provide for an option to purchase, a right of first refusal or the prior approval of a future purchaser or occupant.

(3)      Any encroachment of existing improvements located on the land onto adjoining land, nor any encroachment onto the land of existing improvements located on adjoining land.

(4)      Any encroachment of existing improvements located on the land onto that portion of the land subject to any easement excepted in Schedule B.

(5)      Any notices of violation of covenants, conditions and restrictions relating to environmental protection recorded or filed in the public records.

2.       Any future violation on the land of any existing covenants, conditions or restrictions occurring prior to the acquisition of title to the estate or interest in the land by the Insured, provided the violation results in:

(a)      Invalidity, loss of priority, or unenforceability of the lien of the insured mortgage; or

(b)      loss of title to the estate or interest in the land if the Insured shall acquire title in satisfaction of the indebtedness secured by the insured mortgage.



**OF NEVADA, INC.**

as Issuing Agent for
**United Capital Title Insurance Company**
**ALTA LOAN POLICY**

File No. 90500380-DW                                   Policy No.  A92 210014567

3.      Damage to existing improvements, including lawns, shrubbery or trees:

(a)     which are located on or encroach upon that portion of the land subject to any easement excepted in Schedule B, which damage results from the exercise of the right to maintain the easement for the purpose for which it was granted or reserved;

(b)     resulting from the future exercise of any right to use the surface of the land for the extraction or development of minerals excepted from the description of the land or excepted in Schedule B.

4.      Any final court order or judgment requiring the removal from any land adjoining the land of any encroachment excepted in Schedule B.

5.      Any final court order or judgment denying the right to maintain any existing improvements on the land because of any violation of covenants, conditions or restrictions or building setback lines shown on a plat of subdivision recorded or filed in the public records.

Wherever in this endorsement the words "covenants, conditions or restrictions" appear, they shall not be deemed to refer to or include the terms, covenants, conditions or limitations contained in an instrument creating a lease.

As used in paragraphs 1(b)(1) and 5, the words "covenants, conditions or restrictions" shall not be deemed to refer to or include any covenants, conditions or restrictions relating to environmental protection.

This endorsement is made a part of the policy and is subject to all of the terms and provisions thereof and any prior endorsements thereto.  Except to the extent expressly stated, it neither modifies any of the terms and provisions of the policy and any prior endorsements, nor does it extend the effective date of the policy and any prior endorsements, nor does it increase the face amount thereof.

Dated: March 23, 2005

United Capital Title Insurance Company

*J M Smolar*

By_____
            Authorized signatory

File No. 90500380-DW

Policy No.  A92 210014567



This map is not a survey. It's merely a convenience to juxtapose the land and adjoining streets and other lands and not to guarantee any dimension, bearings, or acreage.

gage as of Date of Policy, interest thereon, expenses of foreclosure, amounts advanced pursuant to the insured mortgage to assure compliance with laws or to protect the lien of the insured mortgage prior to the time of acquisition of the estate or interest in the land and secured thereby and reasonable amounts expended to prevent deterioration of improvements, but reduced by the amount of all payments made; or

(iii) the amount paid by any governmental agency or governmental instrumentality, if the agency or instrumentality is the insured claimant, in the acquisition of the estate or interest in satisfaction of its insurance contract or guaranty.

### 3. NOTICE OF CLAIM TO BE GIVEN BY INSURED CLAIMANT.

The insured shall notify the Company promptly in writing (i) in case of any litigation as set forth in Section 4(a) below, (ii) in case knowledge shall come to an insured hereunder of any claim of title or interest which is adverse to the title to the estate or interest or the lien of the insured mortgage, as insured, and which might cause loss or damage for which the Company may be liable by virtue of this policy, or (iii) if title to the estate or interest or the lien of the insured mortgage, as insured, is rejected as unmarketable. If prompt notice shall not be given to the Company, then as to the insured all liability of the Company shall terminate with regard to the matter or matters for which prompt notice is required; provided, however, that failure to notify the Company shall in no case prejudice the rights of any insured under this policy unless the Company shall be prejudiced by the failure and then only to the extent of the prejudice.

### 4. DEFENSE AND PROSECUTION OF ACTIONS; DUTY OF INSURED CLAIMANT TO COOPERATE.

(a) Upon written request by the insured and subject to the options contained in Section 6 of these Conditions and Stipulations, the Company, at its own cost and without unreasonable delay, shall provide for the defense of an insured in litigation in which any third party asserts a claim adverse to the title or interest as insured, but only as to those stated causes of action alleging a defect, lien or encumbrance or other matter insured against by this policy. The Company shall have the right to select counsel of its choice (subject to the right of the insured to object for reasonable cause) to represent the insured as to those stated causes of action and shall not be liable for and will not pay the fees of any other counsel. The Company will not pay any fees, costs or expenses incurred by the insured in the defense of those causes of action which allege matters not insured against by this policy.

(b) The Company shall have the right, at its own cost, to institute and prosecute any action or proceeding or to do any other act which in its opinion may be necessary or desirable to establish the title to the estate or interest or the lien of the insured mortgage, as insured, or to prevent or reduce loss or damage to the insured. The Company may take any appropriate action under the terms of this policy, whether or not it shall be liable hereunder, and shall not thereby concede liability or waive any provision of this policy. If the Company shall exercise its rights under this paragraph, it shall do so diligently.

(c) Whenever the Company shall have brought an action or interposed a defense as required or permitted by the provisions of this policy, the Company may pursue any litigation to final determination by a court of competent jurisdiction and expressly reserves the right, in its sole discretion, to appeal from any adverse judgment or order.

(d) In all cases where this policy permits or requires the Company to prosecute or provide for the defense of any action or proceeding, the insured shall secure to the Company the right to so prosecute or provide defense in the action or proceeding, and all appeals therein, and permit the Company to use, at its option, the name of the insured for this purpose. Whenever requested by the Company, the insured, at the Company's expense, shall give the Company all reasonable aid (i) in any action or proceeding, securing evidence, obtaining witnesses, prosecuting or defending the action or proceeding, or effecting settlement, and (ii) in any other lawful act which in the opinion of the Company may be necessary or desirable to establish the title to the estate or interest or the lien of the insured mortgage, as insured. If the Company is prejudiced by the failure of the insured to furnish the required cooperation, the Company's obligations to the insured under the policy shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation, with regard to the matter or matters requiring such cooperation.

### 5. PROOF OF LOSS OR DAMAGE.

In addition to and after the notices required under Section 3 of these Conditions and Stipulations have been provided the Company, a proof of loss or damage signed and sworn to by the insured claimant shall be furnished to the Company within 90 days after the insured claimant shall ascertain the facts giving rise to the loss or damage. The proof of loss or damage shall describe the defect in, or lien or encumbrance on the title, or other matter insured against by this policy which constitutes the basis of loss or damage and shall state, to the extent possible, the basis of calculating the amount of the loss or damage. If the Company is prejudiced by the failure of the insured claimant to provide the required proof of loss or damage, the Company's obligations to the insured under the policy shall terminate, including any liability or obligation to defend, prosecute,

or continue any litigation, with regard to the matter or matters requiring such proof of loss or damage.

In addition, the insured claimant may reasonably be required to submit to examination under oath by any authorized representative of the Company and shall produce for examination, inspection and copying, at such reasonable times and places as may be designated by any authorized representative of the Company, all records, books, ledgers, checks, correspondence and memoranda, whether bearing a date before or after Date of Policy, which reasonably pertain to the loss or damage. Further, if requested by any authorized representative of the Company, the insured claimant shall grant its permission, in writing, for any authorized representative of the Company to examine, inspect and copy all records, books, ledgers, checks, correspondence and memoranda in the custody or control of a third party, which reasonably pertain to the loss or damage. All information designated as confidential by the insured claimant provided to the Company pursuant to this Section shall not be disclosed to others unless, in the reasonable judgment of the Company, it is necessary in the administration of the claim. Failure of the insured claimant to submit for examination under oath, produce other reasonably requested information or grant permission to secure reasonably necessary information from third parties as required in this paragraph, unless prohibited by law or governmental regulation, shall terminate any liability of the Company under this policy as to that claim.

### 6. OPTIONS TO PAY OR OTHERWISE SETTLE CLAIMS; TERMINATION OF LIABILITY.

In case of a claim under this policy, the Company shall have the following additional options:

(a)  **To Pay or Tender Payment of the Amount of Insurance or to Purchase the Indebtedness.**

(i) to pay or tender payment of the amount of insurance under this policy together with any costs, attorneys' fees and expenses incurred by the insured claimant, which were authorized by the Company, up to the time of payment or tender of payment and which the Company is obligated to pay; or

(ii) to purchase the indebtedness secured by the insured mortgage for the amount owing thereon together with any costs, attorneys' fees and expenses incurred by the insured claimant which were authorized by the Company up to the time of purchase and which the Company is obligated to pay.

If the Company offers to purchase the indebtedness as herein provided, the owner of the indebtedness shall transfer, assign, and convey the indebtedness and the insured mortgage, together with any collateral security, to the Company upon payment therefor.

Upon the exercise by the Company of either of the options provided for in paragraphs a(i) or (ii), all liability and obligations to the insured under this policy, other than to make the payment required in those paragraphs, shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation.

(b)  **To Pay or Otherwise Settle With Parties Other than the Insured or With the Insured Claimant.**

(i) to pay or otherwise settle with other parties for or in the name of an insured claimant any claim insured against under this policy, together with any costs, attorneys' fees and expenses incurred by the insured claimant which were authorized by the Company up to the time of payment and which the Company is obligated to pay; or

(ii) to pay or otherwise settle with the insured claimant the loss or damage provided for under this policy, together with any costs, attorneys' fees and expenses incurred by the insured claimant which were authorized by the Company up to the time of payment and which the Company is obligated to pay.

Upon the exercise by the Company of either of the options provided for in paragraphs b(i) or (ii), the Company's obligations to the insured under this policy for the claimed loss or damage, other than the payments required to be made, shall terminate, including any liability or obligation to defend, prosecute or continue any litigation.

### 7. DETERMINATION AND EXTENT OF LIABILITY.

This policy is a contract of indemnity against actual monetary loss or damage sustained or incurred by the insured claimant who has suffered loss or damage by reason of matters insured against by this policy and only to the extent herein described.

(a) The liability of the Company under this policy shall not exceed the least of:

(i) the Amount of Insurance stated in Schedule A, or, if applicable, the amount of insurance as defined in Section 2 (c) of these Conditions and Stipulations;

(ii) the amount of the unpaid principal indebtedness secured by the insured mortgage as limited or provided under Section 8 of these Conditions and Stipulations or as reduced under Section 9 of these Conditions and Stipulations, at the time the loss or damage insured against by this policy occurs, together with interest thereon; or

(iii) the difference between the value of the insured estate or interest as insured and the value of the insured estate or interest subject to the defect, lien or encumbrance insured against by this policy.

(b) In the event the insured has acquired the estate or interest in the manner described

in Section 2(a) of these Conditions and Stipulations or has conveyed the title, then the liability of the Company shall continue as set forth in Section 7(a) of these Conditions and Stipulations.

(c) The Company will pay only those costs, attorneys' fees and expenses incurred in accordance with Section 4 of these Conditions and Stipulations.

## 8. LIMITATION OF LIABILITY.

(a) If the Company establishes the title, or removes the alleged defect, lien or encumbrance, or cures the lack of a right of access to or from the land, or cures the claim of unmarketability of title, or otherwise establishes the lien of the insured mortgage, all as insured, in a reasonably diligent manner by any method, including litigation and the completion of any appeals therefrom, it shall have fully performed its obligations with respect to that matter and shall not be liable for any loss or damage caused thereby.

(b) In the event of any litigation, including litigation by the Company or with the Company's consent, the Company shall have no liability for loss or damage until there has been a final determination by a court of competent jurisdiction, and disposition of all appeals therefrom, adverse to the title or to the lien of the insured mortgage, as insured.

(c) The Company shall not be liable for loss or damage to any insured for liability voluntarily assumed by the insured in settling any claim or suit without the prior written consent of the Company.

(d) The Company shall not be liable for: (i) any indebtedness created subsequent to Date of Policy except for advances made to protect the lien of the insured mortgage and secured thereby and reasonable amounts expended to prevent deterioration of improvements; or (ii) construction loan advances made subsequent to Date of Policy, except construction loan advances made subsequent to Date of Policy for the purpose of financing in whole or in part the construction of an improvement to the land which at Date of Policy were secured by the insured mortgage and which the insured was and continued to be obligated to advance at and after Date of Policy.

## 9. REDUCTION OF INSURANCE; REDUCTION OR TERMINATION OF LIABILITY.

(a) All payments under this policy, except payments made for costs, attorneys' fees and expenses, shall reduce the amount of the insurance pro tanto. However, any payments made prior to the acquisition of title to the estate or interest as provided in Section 2(a) of these Conditions and Stipulations shall not reduce pro tanto the amount of the insurance afforded under this policy except to the extent that the pay-ments reduce the amount of the indebtedness secured by the in-sured mortgage.

(b) Payment in part by any person of the principal of the indebtedness, or any other obligation secured by the insured mortgage, or any voluntary partial satisfaction or release of the insured mortgage, to the extent of the payment, satisfaction or release, shall reduce the amount of insurance pro tanto. The amount of insurance may thereafter be increased by accruing interest and advances made to protect the lien of the insured mortgage and secured thereby, with interest thereon, provided in no event shall the amount of insurance be greater than the Amount of Insurance stated in Schedule A.

(c) Payment in full by any person or the voluntary satisfaction or release of the insured mortgage shall terminate all liability of the Company except as provided in Section 2(a) of these Conditions and Stipulations.

## 10.  LIABILITY NONCUMULATIVE.

If the insured acquires title to the estate or interest in satisfaction of the indebtedness secured by the insured mortgage, or any part thereof, it is expressly understood that the amount of insurance under this policy shall be reduced by any amount the Company may pay under any policy insuring a mortgage to which exception is taken in Schedule B or to which the insured has agreed, assumed, or taken subject, or which is hereafter executed by an insured and which is a charge or lien on the estate or interest described or referred to in Schedule A, and the amount so paid shall be deemed a payment under this policy.

## 11.  PAYMENT OF LOSS.

(a) No payment shall be made without producing this policy for endorsement of the payment unless the policy has been lost or destroyed, in which case proof of loss or destruction shall be furnished to the satisfaction of the Company.

(b) When liability and the extent of loss or damage has been definitely fixed in accordance with these Conditions and Stipulations, the loss or damage shall be payable within 30 days thereafter.

## 12.  SUBROGATION UPON PAYMENT OR SETTLEMENT.

### (a) The Company's Right of Subrogation.

Whenever the Company shall have settled and paid a claim under this policy, all right of subrogation shall vest in the Company unaffected by any act of the insured claimant.

The Company shall be subrogated to and be entitled to all rights and remedies which the insured claimant would have had against any person or property in respect to the claim had this policy not been issued. If requested by the Company, the insured claimant shall transfer to the Company all rights and remedies against any person or property necessary in order to perfect this right of subrogation. The insured claimant shall permit the Company to sue, compromise or settle in the name of the insured claimant and to use

the name of the insured claimant in any transaction or litigation involving these rights or remedies.

If a payment on account of a claim does not fully cover the loss of the insured claimant, the Company shall be subrogated to all rights and remedies of the insured claimant after the insured claimant shall have recovered its principal, interest, and costs of collection.

### (b) The Insured's Rights and Limitations.

Notwithstanding the foregoing, the owner of the indebtedness secured by the insured mortgage, provided the priority of the lien of the insured mortgage or its enforceability is not affected, may release or substitute the personal liability of any debtor or guarantor, or extend or otherwise modify the terms of payment, or release a portion of the estate or interest from the lien of the insured mortgage, or release any collateral security for the indebtedness.

When the permitted acts of the insured claimant occur and the insured has knowledge of any claim of title or interest adverse to the title to the estate or interest or the priority or enforceability of the lien of the insured mortgage, as insured, the Company shall be required to pay only that part of any losses insured against by this policy which shall exceed the amount, if any, lost to the Company by reason of the impairment by the insured claimant of the Company's right of subrogation.

### (c) The Company's Rights Against Non-insured Obligors.

The Company's right of subrogation against non-insured obligors shall exist and shall include, without limitation, the rights of the insured to indemnities, guaranties, other policies of insurance or bonds, notwithstanding any terms or conditions contained in those instruments which provide for subrogation rights by reason of this policy.

The Company's right of subrogation shall not be avoided by acquisition of the insured mortgage by an obligor (except an obligor described in Section 1(a)(ii) of these Conditions and Stipulations) who acquires the insured mortgage as a result of an indemnity, guarantee, other policy of insurance, or bond and the obligor will not be an insured under this policy, notwithstanding Section 1(a)(i) of these Conditions and Stipulations.

## 13.  ARBITRATION.

Unless prohibited by applicable law, either the Company or the insured may demand arbitration pursuant to the Title Insurance Arbitration Rules of the American Arbitration Association. Arbitrable matters may include, but are not limited to, any controversy or claim between the Company and the insured arising out of or relating to this policy, any service of the Company in connection with its issuance or the breach of a policy provision or other obligation. All arbitrable matters when the Amount of Insurance is $1,000,000 or less shall be arbitrated at the option of either the Company or the insured. All arbitrable matters when the Amount of Insurance is in excess of $1,000,000 shall be arbitrated only when agreed to by both the Company and the insured.  Arbitration pursuant to this policy and under the Rules in effect on the date the demand for arbitration is made or, at the option of the insured, the Rules in effect at Date of Policy shall be binding upon the parties. The award may include attorneys' fees only if the laws of the state in which the land is located permit a court to award attorneys' fees to a prevailing party. Judgment upon the award rendered by the Arbitrator(s) may be entered in any court having jurisdiction thereof.

The law of the situs of the land shall apply to an arbitration under the Title Insurance Arbitration Rules.

A copy of the Rules may be obtained from the Company upon request.

## 14.  LIABILITY LIMITED TO THIS POLICY; POLICY ENTIRE CONTRACT.

(a) This policy together with all endorsements, if any, attached hereto by the Company is the entire policy and contract between the insured and the Company.  In interpreting any provision of this policy, this policy shall be construed as a whole.

(b) Any claim of loss or damage, whether or not based on negligence, and which arises out of the status of the lien of the insured mortgage or of the title to the estate or interest covered hereby or by any action asserting such claim, shall be restricted to this policy.

(c) No amendment of or endorsement to this policy can be made except by a writing endorsed hereon or attached hereto signed by either the President, a Vice President, the Secretary, an Assistant Secretary, or validating officer or authorized signatory of the Company.

## 15.  SEVERABILITY.

In the event any provision of this policy is held invalid or unenforceable under applicable law, the policy shall be deemed not to include that provision and all other provisions shall remain in full force and effect.

## 16.  NOTICES, WHERE SENT.

All notices required to be given the Company and any statement in writing required to be furnished the Company shall include the number of this policy and shall be addressed to the Company at the issuing office or to:

UNITED CAPITAL TITLE INSURANCE COMPANY™
Claims Department
3250 Wilshire Blvd., 18th Floor
Los Angeles, CA  90010



**AMERICAN LAND TITLE ASSOCIATION
LOAN POLICY (10-17-92)**

Policy # -A92-

# Land Title of Nevada, Inc.
### an Issuing Agent for:

UNITED   CAPITAL   TITLE   INSURANCE   COMPANY™

SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS FROM COVERAGE CONTAINED IN SCHEDULE B AND THE CONDITIONS AND STIPULATIONS, UNITED CAPITAL TITLE INSURANCE COMPANY™, a California corporation, herein called the Company, insures, as of Date of Policy shown in Schedule A, against loss or damage, not exceeding the Amount of Insurance stated in Schedule A, sustained or incurred by the insured by reason of:

1. Title to the estate or interest described in Schedule A being vested other than as stated therein;
2. Any defect in or lien or encumbrance on the title;
3. Unmarketability of the title;
4. Lack of a right of access to and from the land;
5. The invalidity or unenforceability of the lien of the insured mortgage upon the title;
6. The priority of any lien or encumbrance over the lien of the insured mortgage;
7. Lack of priority of the lien of the insured mortgage over any statutory lien for services, labor or material:
   (a) arising from an improvement or work related to the land which is contracted for or commenced prior to Date of Policy; or
   (b) arising from an improvement or work related to the land which is contracted for or commenced subsequent to Date of Policy and which is financed in whole or in part by proceeds of the indebtedness secured by the insured mortgage which at Date of Policy the insured has advanced or is obligated to advance;
8. The invalidity or unenforceability of any assignment of the insured mortgage, provided the assignment is shown in Schedule A, or the failure of the assignment shown in Schedule A to vest title to the insured mortgage in the named insured assignee free and clear of all liens.

The Company will also pay the costs, attorneys' fees and expenses incurred in defense of the title or the lien of the insured mortgage, as insured, but only to the extent provided in the Conditions and Stipulations.

UNITED CAPITAL TITLE INSURANCE COMPANY™

## Land Title of Nevada, Inc.

an Issuing Agent for:
United Title Insurance Company



By: *[signature]* J M Smolen

President

By: *[signature]* Kenneth E Span

Secretary

## EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1. (a) Any law, ordinance or governmental regulation (including but not limited to building and zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating to (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

   (b) Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

2. Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.

3. Defects, liens, encumbrances, adverse claims or other matters:

   (a) created, suffered, assumed or agreed to by the insured claimant;

   (b) not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy;

   (c) resulting in no loss or damage to the insured claimant;

   (d) attaching or created subsequent to Date of Policy (except to the extent that this policy insures the priority of the lien of the insured mortgage over any statutory lien for services, labor or material); or

   (e) resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the insured mortgage.

4. Unenforceability of the lien of the insured mortgage because of the inability or failure of the insured at Date of Policy, or the inability or failure of any subsequent owner of the indebtedness, to comply with applicable doing business laws of the state in which the land is situated.

5. Invalidity or unenforceability of the lien of the insured mortgage, or claim thereof, which arises out of the transaction evidenced by the insured mortgage and is based upon usury or any consumer credit protection or truth in lending law.

6. Any statutory lien for services, labor or materials (or the claim of priority of any statutory lien for services, labor or materials over the lien of the insured mortgage) arising from an improvement or work related to the land which is contracted for and commenced subsequent to Date of Policy and is not financed in whole or in part by proceeds of the indebtedness secured by the insured mortgage which at Date of Policy the insured has advanced or is obligated to advance.

7. Any claim, which arises out of the transaction creating the interest of the mortgagee insured by this policy, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that is based on:

   (a) the transaction creating the interest of the insured mortgagee being deemed a fraudulent conveyance or fraudulent transfer; or

   (b) the subordination of the interest of the insured mortgagee as a result of the application of the doctrine of equitable subordination; or

   (c) the transaction creating the interest of the insured mortgagee being deemed a preferential transfer except where the preferential transfer results from the failure:

      (i) to timely record the instrument of transfer; or

      (ii) of such recordation to impart notice to a purchaser for value or a judgment or lien creditor.

## CONDITIONS AND STIPULATIONS

**1. DEFINITION OF TERMS.**

The following terms when used in this policy mean:

(a) "insured": the insured named in Schedule A. The term "insured" also includes

   (i) the owner of the indebtedness secured by the insured mortgage and each successor in ownership of the indebtedness except a successor who is an obligor under the provisions of Section 12(c) of these Conditions and Stipulations (reserving, however, all rights and defenses as to any successor that the Company would have had against any predecessor insured, unless the successor acquired the indebtedness as a purchaser for value without knowledge of the asserted defect, lien, encumbrance, adverse claim or other matter insured against by this policy as affecting title to the estate or interest in the land);

   (ii) any governmental agency or governmental instrumentality which is an insurer or guarantor under an insurance contract or guaranty insuring or guaranteeing the indebtedness secured by the insured mortgage, or any part thereof, whether named as an insured herein or not;

   (iii) the parties designated in Section 2(a) of these Conditions and Stipulations.

(b) "insured claimant": an insured claiming loss or damage.

(c) "knowledge" or "known": actual knowledge, not constructive knowledge or notice which may be imputed to an insured by reason of the public records as defined in this policy or any other records which impart constructive notice of matters affecting the land.

(d) "land": the land described or referred to in Schedule A, and improvements affixed thereto which by law constitute real property. The term "land" does not include any property beyond the lines of the area described or referred to in Schedule A, nor any right, title, interest, estate or easement in abutting streets, roads, avenues, alleys, lanes, ways or waterways, but nothing herein shall modify or limit the extent to which a right of access to and from the land is insured by this policy.

(e) "mortgage": mortgage, deed of trust, trust deed, or other security instrument.

(f) "public records": records established under state statutes at Date of Policy for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without knowledge. With respect to Section 1(a)(iv) of the Exclusions From Coverage, "public records" shall also include environmental protection liens filed in the records of the clerk of the United States district court for the district in which the land is located.

(g) "unmarketability of the title": an alleged or apparent matter affecting the title to the land, not excluded or excepted from coverage, which would entitle a purchaser of the estate or interest described in Schedule A or the insured mortgage to be released from the obligation to purchase by virtue of a contractual condition requiring the delivery of marketable title.

**2. CONTINUATION OF INSURANCE**

(a) After Acquisition of Title. The coverage of this policy shall continue in force as of Date of Policy in favor of (i) an insured who acquires all or any part of the estate or interest in the land by foreclosure, trustee's sale, conveyance in lieu of foreclosure, or other legal manner which discharges the lien of the insured mortgage; (ii) a transferee of the estate or interest so acquired from an insured corporation, provided the transferee is the parent or wholly-owned subsidiary of the insured corporation, and their corporate successors by operation of law and not by purchase, subject to any rights or defenses the Company may have against any predecessor insureds; and (iii) any governmental agency or governmental instrumentality which acquires all or any part of the estate or interest pursuant to a contract of insurance or guaranty insuring or guaranteeing the indebtedness secured by the insured mortgage.

(b) After Conveyance of Title. The coverage of this policy shall continue in force as of Date of Policy in favor of an insured only so long as the insured retains an estate or interest in the land, or holds an indebtedness secured by a purchase money mortgage given by a purchaser from the insured, or only so long as the insured shall have liability by reason of covenants of warranty made by the insured in any transfer or conveyance of the estate or interest. This policy shall not continue in force in favor of any purchaser from the insured of either (i) an estate or interest in the land, or (ii) an indebtedness secured by a purchase money mortgage given to the insured.

(c) Amount of Insurance. The amount of insurance after the acquisition or after the conveyance shall in neither event exceed the least of:

   (i) the Amount of Insurance stated in Schedule A;

   (ii) the amount of the principal of the indebtedness secured by the insured mort-



**OF NEVADA, INC.**

as Issuing Agent for
**United Capital Title Insurance Company**
**ALTA LOAN POLICY**

File No. 90500380-DW                                      Policy No.  A92 210014567

## SCHEDULE A

Date of Policy          March 23, 2005 at 09:14 a.m.

Amount of Insurance     $280,000.00          Premium     $888.75

1.      Name of Insured:

        Argent Mortgage Company, LLC, its successors and/or assigns

2.      The estate or interest in the land which is covered by this policy is:

        Fee

3.      Title to the estate or interest in the land is vested in:

        Brian Hee, a married man as his sole and separate property

4.      The insured mortgage and assignments thereof, if any, are described as follows:

        Deed of Trust to secure an indebtedness in the amount shown below, and any other obligations secured
        thereby
        Dated               : March 16, 2005
        Trustor             : Brian Hee, a married man, as his sole and separate property
        Trustee             : Town and Country Title Services, Inc.
        Beneficiary         : Argent Mortgage Company, LLC
        Amount              : $280,000.00
        Recorded            : March 23, 2005
        Book No.            : 20050323
        Document No.        : 00845, Official Records.

### THIS POLICY VALID ONLY IF SCHEDULE B IS ATTACHED



**as Issuing Agent for**
**United Capital Title Insurance Company**
**ALTA LOAN POLICY**

File No. 90500380-DW                              Policy No.  A92 210014567

**SCHEDULE B**

**EXCEPTIONS FROM COVERAGE**

This policy does not insure against loss or damage (and the Company will not pay costs, attorney's fees or expenses) which arrive by reason of:

**SCHEDULE B PART I**

1.    Taxes for the fiscal year 2005-2006, a lien not yet due and payable.  Note: Amounts for this tax year are not yet available.

2.    The lien of Supplemental Taxes, if any, assessed pursuant to the provisions of N.R.S. 361.770, Statutes of the State of Nevada.  (None now due and payable)

3.    The hereinabove described property may be subject to charges and fees from the sanitation district and the water district in which said property is located, which charges and fees may be levied against said land. (None now due and payable)

Inquiries should be made of the County or Municipality in which said property is located.

4.    Water rights, claims or title to water, whether or not shown by the public records.

5.    Covenants, conditions, restrictions, association lien rights, reservations and easements, if any affecting title, which may appear in the public record, including those shown on any recorded plat or survey, but deleting any covenant, condition or restriction indicating a preference, limitation or discrimination based on race, color, religion, sex, handicap, familial status, or national origin, to the extent such covenants, conditions or restrictions violate Title 42, Section 3604(c), of the United States Codes.

****END OF SCHEDULE B, PART I   ****



**LandTitle**
O F   N E V A D A ,   I N C .

as Issuing Agent for
**United Capital Title Insurance Company**
**ALTA LOAN POLICY**

File No. 90500380-DW                              Policy No.  A92 210014567

## SCHEDULE B - PART  II

In addition to the matters set forth in Part I of this Schedule, the title to the estate or interest in the land described or referred to in Schedule A is subject to the following matters, if any be shown, but the company insures that these matters are subordinate to the lien or charge of the insured mortgage upon the estate or interest:

NONE

countersigned

*J M Smolar*

Authorized signatory

## ****END OF SCHEDULE B, PART II****



**LandTitle**
**O F   N E V A D A ,   I N C .**

as Issuing Agent for
**United Capital Title Insurance Company**
**ALTA LOAN POLICY**

File No. 90500380-DW                                    Policy No.  A92 210014567

## SCHEDULE C

LOT TWENTY THREE (23) IN BLOCK TWO (2), OF WILDWOOD MANOR AS SHOWN BY MAP
THEREOF ON FILE IN BOOK 20 OF PLATS, PAGE 76 IN THE OFFICE OF THE COUNTY
RECORDER OF CLARK COUNTY, NEVADA.



**as Issuing Agent for**
**United Capital Title Insurance Company**
**ALTA LOAN POLICY**

File No. 90500380-DW                                    Policy No.  A92 210014567

## CLTA ENDORSEMENT 100

The Company hereby insures the owner of the indebtedness secured by the insured mortgage against loss or damage which the insured shall sustain by reason of any of the following matters:

1.     The existence of any of the following:

(a)    Covenants, conditions or restrictions under which the lien of the mortgage referred to in Schedule A can be cut off, subordinated, or otherwise impaired;

(b)    Present violations on the land of any enforceable covenants, conditions or restrictions;

(c)    Except as shown in Schedule B,  there are no encroachments of buildings, structures or improvements located on the land onto adjoining lands, or any encroachments onto the land of buildings, structures or improvements located on adjoining lands.

2.     (a)    Any future violations on the land of any covenants, conditions or restrictions occurring prior to acquisition of title to the estate or interest referred to in Schedule A by the insured, provided such violations result in impairment or loss of the lien of the mortgage referred to in Schedule A, or result in impairment or loss of the title to the estate or interest referred to in Schedule A if the insured shall acquire such title in satisfaction of the indebtedness secured by the insured mortgage;

(b)    Unmarketability of the title to the estate or interest referred to in Schedule A by reason of any violations on the land, occurring prior to acquisition of title to the estate or interest referred to in Schedule A by the insured, of any covenants, conditions or restrictions.

3.     Damage to existing improvements, including lawns, shrubbery or trees

(a)    Which are located or encroach upon that portion of the land subject to any easement shown in Schedule B, which damage results from the exercise of the right to use or maintain such easement for the purposes for which the same was granted or reserved;

(b)    Resulting from the exercise of any right to use the surface of the land for the extraction or development of the minerals excepted from the description of the land or shown as a reservation in Schedule B.

4.     Any final court order or judgment requiring removal from any land adjoining the land of any encroachment shown in Schedule B.

       Wherever in this endorsement any or all the words "covenants, conditions or restrictions" appear, they shall not be deemed to refer to or include the terms, covenants, conditions or restrictions contained in any lease.



**LandTitle**
**O F   N E V A D A ,   I N C .**

as Issuing Agent for
**United Capital Title Insurance Company**
**ALTA LOAN POLICY**

File No. 90500380-DW                    Policy No.  A92 210014567

## CLTA ENDORSEMENT 100 (continued)

For purposes of this endorsement, the words "covenants," "conditions" or "restrictions" shall not be deemed to refer to or include any covenants, conditions or restrictions relating to environmental protection, except to the extent that a notice of a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy and is not excepted in Schedule B.

This endorsement is made a part of the policy and is subject to all of the terms and provisions thereof and of any prior endorsements thereto. Except to the extent expressly stated, it neither modifies any of the terms and provisions of the policy and any prior endorsements, nor does it extend the effective date of the policy and any prior endorsements, nor does it increase the face amount thereof.

Dated:  March 23, 2005

United Capital Title Insurance Company

*J M Smolar*

By_____
Authorized signatory



**as Issuing Agent for**
**United Capital Title Insurance Company**
**ALTA LOAN POLICY**

File No. 90500380-DW                          Policy No.  A92 210014567

## CLTA ENDORSEMENT 116

The Company hereby insures the owner of the indebtedness secured by the insured mortgage against loss or damage which the insured shall sustain by reason of the failure of (i) a Four-Plex  known as 1628 Cordoba Lane, Las Vegas, Nevada  , to be located on the land at Date of Policy, or (ii) the map attached to this policy to correctly show the location and dimensions of the land according to the public records.

This endorsement is made a part of the policy and is subject to all of the terms and provisions thereof and of any prior endorsements thereto.  Except to the extent expressly stated, it neither modifies any of the terms and provisions of the policy and any prior endorsements, nor does it extend the effective date of the policy and any prior endorsements, nor does it increase the face amount thereof.

Dated:  March 23, 2005

United Capital Title Insurance Company

*J M Smolar*

By_____
            Authorized signatory



**OF NEVADA, INC.**

as Issuing Agent for
**United Capital Title Insurance Company**
**ALTA LOAN POLICY**

File No. 90500380-DW                              Policy No.  A92 210014567

## CLTA ENDORSEMENT 110.9

The insurance afforded by this endorsement is only effective if the land is used or is to be used primarily for residential purposes.

The Company insures the Insured against loss or damage sustained by reason of lack of priority of the lien of the Insured mortgage over:

(a)     any environmental protection lien which, at Date of Policy, is recorded in those records established under state statutes at Date of Policy for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without knowledge, or filed in the records of the clerk of the United States district court for the district in which the land is located, except as set forth in Schedule B; or

(b)     any environmental protection lien provided for by any state statute in effect at Date of Policy, except environmental protection liens provided for by the following state statutes:

[None]

This endorsement is made a part of the policy and is subject to all of the terms and provisions thereof and of any prior endorsements thereto.  Except to the extent expressly stated, it neither modifies any of the terms and provisions of the policy and any endorsements, nor does it extend the effective date of the policy and any prior endorsements, nor does it increase the face amount thereof.

Dated:  March 23, 2005

United Capital Title Insurance Company

*J M Smolar*

By_____
               Authorized signatory



**OF NEVADA, INC.**

as Issuing Agent for
United Capital Title Insurance Company
ALTA LOAN POLICY

File No. 90500380-DW                                      Policy No.  A92 210014567

## CLTA ENDORSEMENT 111.5

The Company insures the owner of the indebtedness secured by the insured mortgage against loss or damage sustained by reason of:

1.     The invalidity or unenforceability of the lien of the insured mortgage resulting from the provisions therein which provide for changes in the rate of interest.

2.     Loss of priority of the lien of the insured mortgage as security for the unpaid principal balance of the loan, together with interest as changed in accordance with the provisions of the insured mortgage, which loss of priority is caused by the changes in the rate of interest.

        "Changes in the rate of interest", as used in this endorsement, shall mean only those changes in the rate of interest calculated pursuant to the formula provided in the insured mortgage at Date of Policy.

This endorsement does not insure against loss or damage based upon

(a)     usury, or
(b)     any consumer credit protection or truth in lending law.

        This endorsement is made a part of the policy and is subject to all of the terms and provisions thereof and of any prior endorsements thereto, except that the insurance afforded by this endorsement is not subject to Section 3(d) of the Exclusions From Coverage.  Except to the extent expressly stated, it neither modifies any of the terms and provisions of the policy and any prior endorsements, nor does it extend the effective date of the policy and any prior endorsements, nor does it increase the face amount thereof.

Dated: March 23, 2005

United Capital Title Insurance Company

*J M Smolar*

By_____
        Authorized signatory



**Land Title**
**O F   N E V A D A ,   I N C .**

as Issuing Agent for
**United Capital Title Insurance Company**
**ALTA LOAN POLICY**

File No. 90500380-DW                                Policy No.  A92 210014567

## CLTA ENDORSEMENT 100.2

The Company insures the owner of the indebtedness secured by the insured mortgage against loss or damage sustained by reason of:

1.       The existence at Date of Policy of any of the following:

(a)       Covenants, conditions or restrictions under which the lien of the mortgage referred to in Schedule A can be divested, subordinated or extinguished, or its validity, priority or enforceability impaired.

(b)       Unless expressly excepted in Schedule B:

(1)       Present violations on the land of any enforceable covenants, conditions or restrictions, nor do any existing improvements on the land violate any building setback lines shown on a plat of subdivision recorded or filed in the public records.

(2)       Any instrument referred to in Schedule B as containing covenants, conditions or restrictions on the land does not, in addition, (i) establish an easement on the land; (ii) provide a lien for liquidated damages; (iii) provide for a private charge or assessment; (iv) provide for an option to purchase, a right of first refusal or the prior approval of a future purchaser or occupant.

(3)       Any encroachment of existing improvements located on the land onto adjoining land, nor any encroachment onto the land of existing improvements located on adjoining land.

(4)       Any encroachment of existing improvements located on the land onto that portion of the land subject to any easement excepted in Schedule B.

(5)       Any notices of violation of covenants, conditions and restrictions relating to environmental protection recorded or filed in the public records.

2.       Any future violation on the land of any existing covenants, conditions or restrictions occurring prior to the acquisition of title to the estate or interest in the land by the Insured, provided the violation results in:

(a)       Invalidity, loss of priority, or unenforceability of the lien of the insured mortgage; or

(b)       loss of title to the estate or interest in the land if the Insured shall acquire title in satisfaction of the indebtedness secured by the insured mortgage.



**LandTitle**
O F   N E V A D A ,   I N C .

as Issuing Agent for
**United Capital Title Insurance Company**
**ALTA LOAN POLICY**

File No. 90500380-DW                    Policy No.  A92 210014567

3.      Damage to existing improvements, including lawns, shrubbery or trees:

(a)     which are located on or encroach upon that portion of the land subject to any easement excepted in Schedule B, which damage results from the exercise of the right to maintain the easement for the purpose for which it was granted or reserved;

(b)     resulting from the future exercise of any right to use the surface of the land for the extraction or development of minerals excepted from the description of the land or excepted in Schedule B.

4.      Any final court order or judgment requiring the removal from any land adjoining the land of any encroachment excepted in Schedule B.

5.      Any final court order or judgment denying the right to maintain any existing improvements on the land because of any violation of covenants, conditions or restrictions or building setback lines shown on a plat of subdivision recorded or filed in the public records.

Wherever in this endorsement the words "covenants, conditions or restrictions" appear, they shall not be deemed to refer to or include the terms, covenants, conditions or limitations contained in an instrument creating a lease.

As used in paragraphs 1(b)(1) and 5, the words "covenants, conditions or restrictions" shall not be deemed to refer to or include any covenants, conditions or restrictions relating to environmental protection.

This endorsement is made a part of the policy and is subject to all of the terms and provisions thereof and any prior endorsements thereto. Except to the extent expressly stated, it neither modifies any of the terms and provisions of the policy and any prior endorsements, nor does it extend the effective date of the policy and any prior endorsements, nor does it increase the face amount thereof.

Dated: March 23, 2005

United Capital Title Insurance Company

*J M Smolar*

By_____
        Authorized signatory

File No. 90500380-DW

Policy No.  A92 210014567



This map is not a survey. It's merely a convenience to juxtapose the land and adjoining streets and other lands and not to guarantee any dimension, bearings, or acreage.

gage as of Date of Policy, interest thereon, expenses of foreclosure, amounts advanced pursuant to the insured mortgage to assure compliance with laws or to protect the lien of the insured mortgage prior to the time of acquisition of the estate or interest in the land and secured thereby and reasonable amounts expended to prevent deterioration of improvements, but reduced by the amount of all payments made; or

(ii) the amount paid by any governmental agency or governmental instrumentality, if the agency or instrumentality is the insured claimant, in the acquisition of the estate or interest in satisfaction of its insurance contract or guaranty.

### 3. NOTICE OF CLAIM TO BE GIVEN BY INSURED CLAIMANT.

The insured shall notify the Company promptly in writing (i) in case of any litigation as set forth in Section 4(a) below, (ii) in case knowledge shall come to an insured hereunder of any claim of title or interest which is adverse to the title to the estate or interest or the lien of the insured mortgage, as insured, and which might cause loss or damage for which the Company may be liable by virtue of this policy, or (iii) if title to the estate or interest or the lien of the insured mortgage, as insured, is rejected as unmarketable. If prompt notice shall not be given to the Company, then as to the insured all liability of the Company shall terminate with regard to the matter or matters for which prompt notice is required; provided, however, that failure to notify the Company shall in no case prejudice the rights of any insured under this policy unless the Company shall be prejudiced by the failure and then only to the extent of the prejudice.

### 4. DEFENSE AND PROSECUTION OF ACTIONS; DUTY OF INSURED CLAIMANT TO COOPERATE.

(a) Upon written request by the insured and subject to the options contained in Section 6 of these Conditions and Stipulations, the Company, at its own cost and without unreasonable delay, shall provide for the defense of an insured in litigation in which any third party asserts a claim adverse to the title or interest as insured, but only as to those stated causes of action alleging a defect, lien or encumbrance or other matter insured against by this policy. The Company shall have the right to select counsel of its choice (subject to the right of the insured to object for reasonable cause) to represent the insured as to those stated causes of action and shall not be liable for and will not pay the fees of any other counsel. The Company will not pay any fees, costs or expenses incurred by the insured in the defense of those causes of action which allege matters not insured against by this policy.

(b) The Company shall have the right, at its own cost, to institute and prosecute any action or proceeding or to do any other act which in its opinion may be necessary or desirable to establish the title to the estate or interest or the lien of the insured mortgage, as insured, or to prevent or reduce loss or damage to the insured. The Company may take any appropriate action under the terms of this policy, whether or not it shall be liable hereunder, and shall not thereby concede liability or waive any provision of this policy. If the Company shall exercise its rights under this paragraph, it shall do so diligently.

(c) Whenever the Company shall have brought an action or interposed a defense as required or permitted by the provisions of this policy, the Company may pursue any litigation to final determination by a court of competent jurisdiction and expressly reserves the right, in its sole discretion, to appeal from any adverse judgment or order.

(d) In all cases where this policy permits or requires the Company to prosecute or provide for the defense of any action or proceeding, the insured shall secure to the Company the right to so prosecute or provide defense in the action or proceeding, and all appeals therein, and permit the Company to use, at its option, the name of the insured for this purpose. Whenever requested by the Company, the insured, at the Company's expense, shall give the Company all reasonable aid (i) in any action or proceeding, securing evidence, obtaining witnesses, prosecuting or defending the action or proceeding, or effecting settlement, and (ii) in any other lawful act which in the opinion of the Company may be necessary or desirable to establish the title to the estate or interest or the lien of the insured mortgage, as insured. If the Company is prejudiced by the failure of the insured to furnish the required cooperation, the Company's obligations to the insured under the policy shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation, with regard to the matter or matters requiring such cooperation.

### 5. PROOF OF LOSS OR DAMAGE.

In addition to and after the notices required under Section 3 of these Conditions and Stipulations have been provided the Company, a proof of loss or damage signed and sworn to by the insured claimant shall be furnished to the Company within 90 days after the insured claimant shall ascertain the facts giving rise to the loss or damage. The proof of loss or damage shall describe the defect in, or lien or encumbrance on the title, or other matter insured against by this policy which constitutes the basis of loss or damage and shall state, to the extent possible, the basis of calculating the amount of the loss or damage. If the Company is prejudiced by the failure of the insured claimant to provide the required proof of loss or damage, the Company's obligations to the insured under the policy shall terminate, including any liability or obligation to defend, prosecute,

or continue any litigation, with regard to the matter or matters requiring such proof of loss or damage.

In addition, the insured claimant may reasonably be required to submit to examination under oath by any authorized representative of the Company and shall produce for examination, inspection and copying, at such reasonable times and places as may be designated by any authorized representative of the Company, all records, books, ledgers, checks, correspondence and memoranda, whether bearing a date before or after Date of Policy, which reasonably pertain to the loss or damage. Further, if requested by any authorized representative of the Company, the insured claimant shall grant its permission, in writing, for any authorized representative of the Company to examine, inspect and copy all records, books, ledgers, checks, correspondence and memoranda in the custody or control of a third party, which reasonably pertain to the loss or damage. All information designated as confidential by the insured claimant provided to the Company pursuant to this Section shall not be disclosed to others unless, in the reasonable judgment of the Company, it is necessary in the administration of the claim. Failure of the insured claimant to submit for examination under oath, produce other reasonably requested information or grant permission to secure reasonably necessary information from third parties as required in this paragraph, unless prohibited by law or governmental regulation, shall terminate any liability of the Company under this policy as to that claim.

### 6. OPTIONS TO PAY OR OTHERWISE SETTLE CLAIMS; TERMINATION OF LIABILITY.

In case of a claim under this policy, the Company shall have the following additional options:

(a)  **To Pay or Tender Payment of the Amount of Insurance or to Purchase the Indebtedness.**

(i) to pay or tender payment of the amount of insurance under this policy together with any costs, attorneys' fees and expenses incurred by the insured claimant, which were authorized by the Company, up to the time of payment or tender of payment and which the Company is obligated to pay; or

(ii) to purchase the indebtedness secured by the insured mortgage for the amount owing thereon together with any costs, attorneys' fees and expenses incurred by the insured claimant which were authorized by the Company up to the time of purchase and which the Company is obligated to pay.

If the Company offers to purchase the indebtedness as herein provided, the owner of the indebtedness shall transfer, assign, and convey the indebtedness and the insured mortgage, together with any collateral security, to the Company upon payment therefor.

Upon the exercise by the Company of either of the options provided for in paragraphs a(i) or (ii), all liability and obligations to the insured under this policy, other than to make the payment required in those paragraphs, shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation.

(b)  **To Pay or Otherwise Settle With Parties Other than the Insured or With the Insured Claimant.**

(i) to pay or otherwise settle with other parties for or in the name of an insured claimant any claim insured against under this policy, together with any costs, attorneys' fees and expenses incurred by the insured claimant which were authorized by the Company up to the time of payment and which the Company is obligated to pay; or

(ii) to pay or otherwise settle with the insured claimant the loss or damage provided for under this policy, together with any costs, attorneys' fees and expenses incurred by the insured claimant which were authorized by the Company up to the time of payment and which the Company is obligated to pay.

Upon the exercise by the Company of either of the options provided for in paragraphs b(i) or (ii), the Company's obligations to the insured under this policy for the claimed loss or damage, other than the payments required to be made, shall terminate, including any liability or obligation to defend, prosecute or continue any litigation.

### 7. DETERMINATION AND EXTENT OF LIABILITY.

This policy is a contract of indemnity against actual monetary loss or damage sustained or incurred by the insured claimant who has suffered loss or damage by reason of matters insured against by this policy and only to the extent herein described.

(a) The liability of the Company under this policy shall not exceed the least of:

(i) the Amount of Insurance stated in Schedule A, or, if applicable, the amount of insurance as defined in Section 2 (c) of these Conditions and Stipulations;

(ii) the amount of the unpaid principal indebtedness secured by the insured mortgage as limited or provided under Section 8 of these Conditions and Stipulations or as reduced under Section 9 of these Conditions and Stipulations, at the time the loss or damage insured against by this policy occurs, together with interest thereon; or

(iii) the difference between the value of the insured estate or interest as insured and the value of the insured estate or interest subject to the defect, lien or encumbrance insured against by this policy.

(b) In the event the insured has acquired the estate or interest in the manner described

in Section 2(a) of these Conditions and Stipulations or has conveyed the title, then the liability of the Company shall continue as set forth in Section 7(a) of these Conditions and Stipulations.

(c) The Company will pay only those costs, attorneys' fees and expenses incurred in accordance with Section 4 of these Conditions and Stipulations.

## 8. LIMITATION OF LIABILITY.

(a) If the Company establishes the title, or removes the alleged defect, lien or encumbrance, or cures the lack of a right of access to or from the land, or cures the claim of unmarketability of title, or otherwise establishes the lien of the insured mortgage, all as insured, in a reasonably diligent manner by any method, including litigation and the completion of any appeals therefrom, it shall have fully performed its obligations with respect to that matter and shall not be liable for any loss or damage caused thereby.

(b) In the event of any litigation, including litigation by the Company or with the Company's consent, the Company shall have no liability for loss or damage until there has been a final determination by a court of competent jurisdiction, and disposition of all appeals therefrom, adverse to the title or to the lien of the insured mortgage, as insured.

(c) The Company shall not be liable for loss or damage to any insured for liability voluntarily assumed by the insured in settling any claim or suit without the prior written consent of the Company.

(d) The Company shall not be liable for: (i) any indebtedness created subsequent to Date of Policy except for advances made to protect the lien of the insured mortgage and secured thereby and reasonable amounts expended to prevent deterioration of improvements; or (ii) construction loan advances made subsequent to Date of Policy, except construction loan advances made subsequent to Date of Policy for the purpose of financing in whole or in part the construction of an improvement to the land which at Date of Policy were secured by the insured mortgage and which the insured was and continued to be obligated to advance at and after Date of Policy.

## 9. REDUCTION OF INSURANCE; REDUCTION OR TERMINATION OF LIABILITY.

(a) All payments under this policy, except payments made for costs, attorneys' fees and expenses, shall reduce the amount of the insurance pro tanto. However, any payments made prior to the acquisition of title to the estate or interest as provided in Section 2(a) of these Conditions and Stipulations shall not reduce pro tanto the amount of the insurance afforded under this policy except to the extent that the payments reduce the amount of the indebtedness secured by the in-sured mortgage.

(b) Payment in part by any person of the principal of the indebtedness, or any other obligation secured by the insured mortgage, or any voluntary partial satisfaction or release of the insured mortgage, to the extent of the payment, satisfaction or release, shall reduce the amount of insurance pro tanto. The amount of insurance may thereafter be increased by accruing interest and advances made to protect the lien of the insured mortgage and secured thereby, with interest thereon, provided in no event shall the amount of insurance be greater than the Amount of Insurance stated in Schedule A.

(c) Payment in full by any person or the voluntary satisfaction or release of the insured mortgage shall terminate all liability of the Company except as provided in Section 2(a) of these Conditions and Stipulations.

## 10. LIABILITY NONCUMULATIVE.

If the insured acquires title to the estate or interest in satisfaction of the indebtedness secured by the insured mortgage, or any part thereof, it is expressly understood that the amount of insurance under this policy shall be reduced by any amount the Company may pay under any policy insuring a mortgage to which exception is taken in Schedule B or to which the insured has agreed, assumed, or taken subject, or which is hereafter executed by an insured which is a charge or lien on the estate or interest described or referred to in Schedule A, and the amount so paid shall be deemed a payment under this policy.

## 11. PAYMENT OF LOSS.

(a) No payment shall be made without producing this policy for endorsement of the payment unless the policy has been lost or destroyed, in which case proof of loss or destruction shall be furnished to the satisfaction of the Company.

(b) When liability and the extent of loss or damage has been definitely fixed in accordance with these Conditions and Stipulations, the loss or damage shall be payable within 30 days thereafter.

## 12. SUBROGATION UPON PAYMENT OR SETTLEMENT.

(a) The Company's Right of Subrogation.

Whenever the Company shall have settled and paid a claim under this policy, all right of subrogation shall vest in the Company unaffected by any act of the insured claimant.

The Company shall be subrogated to and be entitled to all rights and remedies which the insured claimant would have had against any person or property in respect to the claim had this policy not been issued. If requested by the Company, the insured claimant shall transfer to the Company all rights and remedies against any person or property necessary in order to perfect this right of subrogation. The insured claimant shall permit the Company to sue, compromise or settle in the name of the insured claimant and to use

the name of the insured claimant in any transaction or litigation involving these rights or remedies.

If a payment on account of a claim does not fully cover the loss of the insured claimant, the Company shall be subrogated to all rights and remedies of the insured claimant after the insured claimant shall have recovered its principal, interest, and costs of collection.

(b) The Insured's Rights and Limitations.

Notwithstanding the foregoing, the owner of the indebtedness secured by the insured mortgage, provided the priority of the lien of the insured mortgage or its enforceability is not affected, may release or substitute the personal liability of any debtor or guarantor, or extend or otherwise modify the terms of payment, or release a portion of the estate or interest from the lien of the insured mortgage, or release any collateral security for the indebtedness.

When the permitted acts of the insured claimant occur and the insured has knowledge of any claim of title or interest adverse to the title to the estate or interest or the priority or enforceability of the lien of the insured mortgage, as insured, the Company shall be required to pay only that part of any losses insured against by this policy which shall exceed the amount, if any, lost to the Company by reason of the impairment by the insured claimant of the Company's right of subrogation.

(c) The Company's Rights Against Non-insured Obligors.

The Company's right of subrogation against non-insured obligors shall exist and shall include, without limitation, the rights of the insured to indemnities, guaranties, other policies of insurance or bonds, notwithstanding any terms or conditions contained in those instruments which provide for subrogation rights by reason of this policy.

The Company's right of subrogation shall not be avoided by acquisition of the insured mortgage by an obligor (except an obligor described in Section 1(a)(ii) of these Conditions and Stipulations) who acquires the insured mortgage as a result of an indemnity, guarantee, other policy of insurance, or bond and the obligor will not be an insured under this policy, notwithstanding Section 1(a)(i) of these Conditions and Stipulations.

## 13. ARBITRATION.

Unless prohibited by applicable law, either the Company or the insured may demand arbitration pursuant to the Title Insurance Arbitration Rules of the American Arbitration Association. Arbitrable matters may include, but are not limited to, any controversy or claim between the Company and the insured arising out of or relating to this policy, any service of the Company in connection with its issuance or the breach of a policy provision or other obligation. All arbitrable matters when the Amount of Insurance is $1,000,000 or less shall be arbitrated at the option of either the Company or the Insured. All arbitrable matters when the Amount of Insurance is in excess of $1,000,000 shall be arbitrated only when agreed to by both the Company and the insured. Arbitration pursuant to this policy and under the Rules in effect on the date the demand for arbitration is made or, at the option of the insured, the Rules in effect at Date of Policy shall be binding upon the parties. The award may include attorneys' fees only if the laws of the state in which the land is located permit a court to award attorneys' fees to a prevailing party. Judgment upon the award rendered by the Arbitrator(s) may be entered in any court having jurisdiction thereof.

The law of the situs of the land shall apply to an arbitration under the Title Insurance Arbitration Rules.

A copy of the Rules may be obtained from the Company upon request.

## 14. LIABILITY LIMITED TO THIS POLICY; POLICY ENTIRE CONTRACT.

(a) This policy together with all endorsements, if any, attached hereto by the Company is the entire policy and contract between the insured and the Company. In interpreting any provision of this policy, this policy shall be construed as a whole.

(b) Any claim of loss or damage, whether or not based on negligence, and which arises out of the status of the lien of the insured mortgage or of the title to the estate or interest covered hereby or by any action asserting such claim, shall be restricted to this policy.

(c) No amendment of or endorsement to this policy can be made except by a writing endorsed hereon or attached hereto signed by either the President, a Vice President, the Secretary, an Assistant Secretary, or validating officer or authorized signatory of the Company.

## 15. SEVERABILITY.

In the event any provision of this policy is held invalid or unenforceable under applicable law, the policy shall be deemed not to include that provision and all other provisions shall remain in full force and effect.

## 16. NOTICES, WHERE SENT.

All notices required to be given the Company and any statement in writing required to be furnished the Company shall include the number of this policy and shall be addressed to the Company at the issuing office or to:

UNITED CAPITAL TITLE INSURANCE COMPANY™
Claims Department
3250 Wilshire Blvd., 18th Floor
Los Angeles, CA  90010

20050323-0000845

Assessor's Parcel Number:
139-19-410-023
Return To:
Argent Mortgage Company, LLC
P.O. Box 5047 Rolling Meadows, IL 60008

Prepared By:Argent Mortgage Company, LLC
Heather Heiman
2603 Main Street,Irvine, CA 92614

Recording Requested By:
Argent Mortgage Company, LLC

Fee: $36.00
N/C Fee: $0.00

03/23/2005                  09:14:14
T20050051828

Requestor:
    LAND TITLE OF NEVADA

Frances Deane              JKA
Clark County Recorder   Pgs: 23



—————[Space Above This Line For Recording Data]—————

## DEED OF TRUST

### DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

(A) "Security Instrument" means this document, which is dated March 16, 2005
together with all Riders to this document.
(B) "Borrower" is BRIAN HEE, A Married Man, As His Sole and Separate Property

Borrower is the trustor under this Security Instrument.
(C) "Lender" is Argent Mortgage Company, LLC

Lender is a Limited Liability Company
organized and existing under the laws of Delaware

NEVADA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                Form 3029  1/01

—6(NV) (0005)
Page 1 of 15                Initials:                              03/14/2005 1:37:43

VMP MORTGAGE FORMS - (800)521-7291

Lender's address is **One City Boulevard West   Orange, CA 92868**

Lender is the beneficiary under this Security Instrument.
(D) "Trustee" is **Town and Country Title Services, Inc.**

(E) "Note" means the promissory note signed by Borrower and dated **March 16, 2005**
The Note states that Borrower owes Lender **two hundred eighty thousand and 00/100**
**Dollars**
(U.S. $**280,000.00**          ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than **April 1, 2035**
(F) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☒ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☒ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | ☐ Other(s) [specify] |

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.
(L) "Escrow Items" means those items that are described in Section 3.
(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to
time, or any additional or successor legislation or regulation that governs the same subject matter. As used
in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard

VMP®-6(NV) (0005)                      Page 2 of 15      03/14/2005 1:37:43      Form 3029   1/01

to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the
                    County              of              CLARK              :
            [Type of Recording Jurisdiction]           [Name of Recording Jurisdiction]
LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF:

Parcel ID Number: 139-19-410-023                          which currently has the address of
1628 CORDOBA LANE                                                                   [Street]
LAS VEGAS                                      [City], Nevada 89108              [Zip Code]
("Property Address"):

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

    THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

    UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

    **1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items

VMP -6(NV) (0005)                  Page 3 of 15    Initials: _____    03/14/2005 1:37:43   Form 3029   1/01

pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be

|  | Initials: _____ |
|---|---|

-6(NV) (0005)          Page 4 of 15     03/14/2005 1:37:43    Form 3029  1/01

in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than twelve monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than twelve monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

Initials: _____

-6(NV) (0005)          Page 9 of 15    03/14/2005 1:37:43    Form 3029   1/01

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

Initials: _____

VMP®-6(NV) (0005)     Page 10 of 15     03/14/2005  1:37:43     Form 3029   1/01

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be

one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

Initials: 

-6(NV) (0005)                 Page 12 of 15    03/14/2005 1:37:43   Form 3029   1/01

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option, and without further demand, may invoke the power of sale, including the right to accelerate full payment of the Note, and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold, and shall cause such notice to be recorded in each county in which any part of the Property is located. Lender shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. **Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Such person or persons shall pay any recordation costs. Lender may charge such person or persons a fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law.

24. **Substitute Trustee.** Lender at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

25. **Assumption Fee.** If there is an assumption of this loan, Lender may charge an assumption fee of U.S. $ 0.00

Initials:

-6(NV) (0005)          Page 13 of 15    03/14/2005 1:37:43    Form 3029   1/01

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____          _____ (Seal)
D. Moss                                     BRIAN HEE                          -Borrower


_____          _____ (Seal)
                                                                               -Borrower


_____ (Seal)   _____ (Seal)
                         -Borrower                                             -Borrower


_____ (Seal)   _____ (Seal)
                         -Borrower                                             -Borrower


_____ (Seal)   _____ (Seal)
                         -Borrower                                             -Borrower

-6(NV) (0005)              Page 14 of 16  03/14/2005  1:37:43 PM  Form 3029  1/01

STATE OF NEVADA  *Calif.*
COUNTY OF  *SF*

This instrument was acknowledged before me on    *3-16-05*    by
Day/Month/Year

*Brian Hee*

_____
Notary Public

My Commission Expires:  *11-7-08*



D. MOSS
COMM. #1624934
NOTARY PUBLIC – CALIFORNIA
SAN FRANCISCO COUNTY
My Comm. Expires NOV 07, 2008

400-15NV (4/02)                  Page 15 of 15

03/14/2005 1:37:43 PM

Branch :FLV,User :CON2                    Comment:                                    Station Id :BMAG

**PRELIMINARY REPORT**
Order No. 90500380-DW

**Legal Description**

LOT TWENTY THREE (23) IN BLOCK TWO (2), OF WILDWOOD MANOR AS
SHOWN BY MAP THEREOF ON FILE IN BOOK 20 OF PLATS, PAGE 76 IN THE
OFFICE OF THE COUNTY RECORDER OF CLARK COUNTY, NEVADA.

Page 5 of 11

## ADJUSTABLE RATE RIDER
**(LIBOR Six-Month-Index (As Published in the Wall Street Journal)- Rate Caps)**

THIS ADJUSTABLE RATE RIDER is made this 16th day of March , 2005   and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to Argent Mortgage Company, LLC (the "Lender") of the same date and covering the property described in the Security Instrument and located at:

1628 CORDOBA LANE, LAS VEGAS, NV  89108
[Property Address]

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS**. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A.   INTEREST RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for an initial interest rate of  **7.725 %**. The Note provides for changes in the interest rate and the monthly payments, as follows:

**4.   INTEREST RATE AND PAYMENT CHANGES**
   **(A) Change Dates**
The interest rate I will pay may change on the first day of  April, 2008 , and on that day every sixth  month thereafter. Each date on which my interest rate could change is called a "Change Date."

   **(B) The Index**
Beginning with the first Change Date, my interest rate will be based on an Index.  The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as  published in the Wall Street Journal. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

   If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information.  The Note Holder will give me notice of this choice.

Initials _____

Loan Number: ████████████████

**(C) Calculation of Changes**
Before each Change Date, the Note Holder will calculate my new interest rate by adding **six** percentage points ( **6.000 %**) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the maturity date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**
The interest rate I am required to pay at the first Change Date will not be greater than **9.725% or less than 7.725%**. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than One( **1.000 %**) from the rate of interest I have been paying for the preceding   six months. My interest rate will never be greater than 13.725)% or less than 7.725)%.

**(E) Effective Date of Changes**
My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**
The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**
Section 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

Initials _____

Loan Number ████████████

610-2 (Rev 1/01)                          Page 2 of 3

03/14/2005 1:37:43 PM

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by federal law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing. If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)      _____ (Seal)
Borrower BRIAN HEE                           Borrower

_____ (Seal)      _____ (Seal)
Borrower                                     Borrower

Loan Number: ████████████

610-3 (Rev 1/01)                    Page 3 of 3

03/14/2005 1:37:43 PM

# 1-4 FAMILY RIDER
## (Assignment of Rents)

THIS 1-4 FAMILY RIDER is made this 16th      day of March, 2005            ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or
Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to
secure Borrower's Note to Argent Mortgage Company, LLC

(the
"Lender") of the same date and covering the Property described in the Security Instrument and located at:
1628 CORDOBA LANE, LAS VEGAS, NV  89108

[Property Address]

1-4 FAMILY COVENANTS. In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

A. ADDITIONAL PROPERTY SUBJECT TO THE SECURITY INSTRUMENT. In addition to
the Property described in the Security Instrument, the following items now or hereafter attached to the
Property to the extent they are fixtures are added to the Property description, and shall also constitute the
Property covered by the Security Instrument: building materials, appliances and goods of every nature
whatsoever now or hereafter located in, on, or used, or intended to be used in connection with the
Property, including, but not limited to, those for the purposes of supplying or distributing heating,
cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and
access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves,
refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens,
blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling and attached floor coverings,
all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the
Property covered by the Security Instrument. All of the foregoing together with the Property described in
the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to
in this 1-4 Family Rider and the Security Instrument as the "Property."

Initials: ____

MULTISTATE 1- 4 FAMILY RIDER - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Page 1 of 4                                                        Form 3170 1/01
VMP-57R (0008)          VMP MORTGAGE FORMS - (800)521-7291      03/14/2005  1:37:43 PM

**B. USE OF PROPERTY; COMPLIANCE WITH LAW.** Borrower shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Borrower shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

**C. SUBORDINATE LIENS.** Except as permitted by federal law, Borrower shall not allow any lien inferior to the Security Instrument to be perfected against the Property without Lender's prior written permission.

**D. RENT LOSS INSURANCE.** Borrower shall maintain insurance against rent loss in addition to the other hazards for which insurance is required by Section 5.

**E. "BORROWER'S RIGHT TO REINSTATE" DELETED.** Section 19 is deleted.

**F. BORROWER'S OCCUPANCY.** Unless Lender and Borrower otherwise agree in writing, Section 6 concerning Borrower's occupancy of the Property is deleted.

**G. ASSIGNMENT OF LEASES.** Upon Lender's request after default, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph G, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**H. ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.** Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower shall receive the Rents until: (i) Lender has given Borrower notice of default pursuant to Section 22 of the Security Instrument, and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of default to Borrower: (i) all Rents received by Borrower shall be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii)

03/14/2005 1:37:43 PM

Initials: _____

VMP-57R (0008)              Page 2 of 4                   Form 3170 1/01

Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorney's fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by the Security Instrument pursuant to Section 9.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and has not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

**I. CROSS-DEFAULT PROVISION.** Borrower's default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

03/14/2005  1:37:43  PM

Initials: _____

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this 1-4 Family Rider.

_____(Seal)          _____(Seal)
BRIAN HEE                      -Borrower                                       -Borrower


_____(Seal)          _____(Seal)
                               -Borrower                                       -Borrower


_____(Seal)          _____(Seal)
                               -Borrower                                       -Borrower


_____(Seal)          _____(Seal)
                               -Borrower                                       -Borrower


57R (0008)                     Page 4 of 4                    Form 3170 1/01
                                                              03/14/2005 1:37:43 PM

Inst #: 201201190002545
Fee: $18.00
N/C Fee: $25.00
01/19/2012 01:00:06 PM
Receipt #: 1040308
Requestor:
CLARK RECORDING SERVICE
Recorded By: CDE    Pgs: 2

**DEBBIE CONWAY**
CLARK COUNTY RECORDER

When recorded, mail to:
Argent Mortgage Company, LLC
P.O. Box 14130,
Orange, CA 92863-1530
APN# 139-19-410-023
Loan Number: ▓▓▓▓▓▓▓▓
11-16199                    27

## ASSIGNMENT OF DEED OF TRUST
245046    ON BENEFICIARY

FOR VALUE RECEIVED, Argent Mortgage Company, LLC
the beneficiary, under that certain Deed of Trust dated 03/16/05 and delivered by
BRIAN HEE, A Married Man, As His Sole and Separate Property

Trustor to  Town and Country Title Services, Inc.  Trustee ▓▓▓▓▓▓▓▓
and recorded as Instrument No:  ✗      on  03/23/05

in Book  ⌐    at page  ⌐    of the Official Records  in the

office of the County Recorder of  CLARK County, State of Nevada hereby

grants, assigns, transfers and sets over to  Wells Fargo Bank, NA, as Trustee for

the said Deed of Trust, and all right, title and interest in and to the real property thereby conveyed.
together with the Deed of Trust Note therein mentioned and all monies due or that may hereafter become
due thereunder, subject only to the provisions as said Deed of Trust specified.

PROPERTY DESCRIBED AS:
    "LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF"

IN WITNESS WHEREOF, Argent Mortgage Company, LLC. has caused this instrument to be executed
by its duly authorized officer MICHAEL POWELL.

This  03/22/2005.

Argent Mortgage Company, LLC

*& the Pooling and Servicing
Agreement dated as of
April 1, 2005 Asset-Backed
Pass-Through Certificates
Series 2005-WHQ2.*

By: _____
    MICHAEL POWELL - AGENT
    Michael Powell

State of  California
County of  Orange

On  03/22/2005    before me,  MALI WRIGHT
personally appeared  MICHAEL POWELL

personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose
name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed
the same in his/her/their authorized capacity(ies), and that  by his/her/their signature(s) on the instrument
the person(s) or the entity upon behalf of which is the person(s) acted,  executed the instrument.

WITNESS my hand and official seal.

_____    (Seal)
MALI WRIGHT

MALI CALEB WRIGHT
Commission # 1489595
Notary Public - California
Orange County
My Comm. Expires May 15, 2008

May 15, 2008

**Legal Description**

LOT TWENTY THREE (23) IN BLOCK TWO (2), OF WILDWOOD MANOR AS
SHOWN BY MAP THEREOF ON FILE IN BOOK 20 OF PLATS, PAGE 76 IN THE
OFFICE OF THE COUNTY RECORDER OF CLARK COUNTY, NEVADA.

Inst #: 201402250000246
Fees: $18.00
N/C Fee: $25.00
02/25/2014 08:02:21 AM
Receipt #: 1942056
Requestor:
PREMIUM TITLE TSG
Recorded By: GWC   Pgs: 2

DEBBIE CONWAY

CLARK COUNTY RECORDER

APN #: 139-19-410-023
Prepared by: Fred Jenne
When Recorded Mail To:
Mail Tax statements to:
Ocwen Loan Servicing, LLC
5720 Premier Park Dr,
West Palm Beach, FL 33407
Phone Number: 561-682-8835

ASSIGNMENT OF DEED OF TRUST
NEVADA

This ASSIGNMENT OF DEED OF TRUST from WELLS FARGO BANK, N.A., AS TRUSTEE FOR THE POOLING AND SERVICING AGREEMENT DATED AS OF APRIL 1, 2005, ASSET-BACKED PASS-THROUGH CERTIFICATES SERIES 2005-WHQ2, whose address is 9062 Old Annapolis Road Columbia, MD 21045. ("Assignor") to WELLS FARGO BANK, N.A., AS TRUSTEE FOR THE POOLING AND SERVICING AGREEMENT DATED AS OF APRIL 1, 2005 PARK PLACE SECURITIES, INC. ASSET-BACKED PASS-THROUGH CERTIFICATES SERIES 2005-WHQ2, whose address is c/o Ocwen Loan Servicing, LLC. 5720 Premier Park Dr, West Palm Beach, FL 33407 ("Assignee").

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Assignor does by these presents hereby grant, bargain, sell, transfer and set over unto the Assignee, its successors, transferees and assigns forever, in trust, all of the right, title and interest of said Assignor in and to the following deed of trust describing land therein, duly recorded in the Office of the County Recorder of CLARK County, State of NEVADA, as follows;

Trustor: BRIAN HEE
Trustee: TOWN AND COUNTRY TITLE SERVICES, INC.
Beneficiary: ARGENT MORTGAGE COMPANY, LLC
Document Date: MARCH 16, 2005
Amount: $ 280,000.00
Date Recorded: MARCH 23, 2005
Book NO: 20050323          Document/Instrument/Entry Number: 0000845
Property Address: 1628 CORDOBA LANE, LAS VEGAS NV 89108
*Property more particularly described in the above referenced recorded Deed of Trust*

1628 CORDOBA LANE, LAS VEGAS NV 89108

APN #: 139-19-410-023
Prepared by: Fred Jeune
When Recorded Mail To:
Mail Tax statements to:
Ocwen Loan Servicing, LLC
5720 Premier Park Dr,
West Palm Beach, FL 33407
Phone Number: 561-682-8835

This Assignment is made without recourse, representation or warranty.

DATED: FEBRUARY 14, 2014.

**WELLS FARGO BANK, N.A., AS TRUSTEE FOR THE POOLING
AND SERVICING AGREEMENT DATED AS OF APRIL 1, 2005,
ASSET-BACKED PASS-THROUGH CERTIFICATES SERIES 2005-WHQ2
BY ITS ATTORNEY IN FACT
OCWEN LOAN SERVICING, LLC.**

BY: _____
NAME: _____ Leticia N. Arias
TITLE: Contract Manager

**Power of Attorney recorded on : AUGUST 26, 2005**
**Book: 20050826**
**Instrument number : 180**

STATE OF FLORIDA                )
                                )SS.
COUNTY OF PALM BEACH            )

On FEBRUARY 14, 2014, before me, the undersigned, a Notary Public in and for said State, personally
appeared _____ Leticia N. Arias _____ Contract Manager at Ocwen Loan Servicing, LLC, ATTORNEY IN
FACT FOR WELLS FARGO BANK, N.A., AS TRUSTEE FOR THE POOLING AND SERVICING
AGREEMENT DATED AS OF APRIL 1, 2005, ASSET-BACKED PASS-THROUGH CERTIFICATES
SERIES 2005-WHQ2 personally known to me to be the person whose name is subscribed to the within instrument
and acknowledged to me that he/she executed the same in his/her authorized capacity, and that by his/her signature
on the instrument the entity upon behalf of which the person acted, executed the instrument.

    Witness my hand and official seal.

_____
Notary Signature --  Ivelka Angeles

1628 CORDOBA LANE, LAS VEGAS NV 89108

IVELKA ANGELES
Notary Public - State of Florida
My Comm. Expires Jul 23, 2016
Commission # EE 218470
Bonded Through National Notary Assn.

**130 Nev., Advance Opinion 75**

IN THE SUPREME COURT OF THE STATE OF NEVADA

|  |  |
|---|---|
| SFR INVESTMENTS POOL 1, LLC, A NEVADA LIMITED LIABILITY COMPANY, Appellant, vs. U.S. BANK, N.A., A NATIONAL BANKING ASSOCIATION AS TRUSTEE FOR THE CERTIFICATE HOLDERS OF THE BANC OF AMERICA MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2008-A, Respondent. | No. 63078 |

FILED

SEP 18 2014

TRACIE K. LINDEMAN
CLERK OF SUPREME COURT
BY _____
CHIEF DEPUTY CLERK

Appeal from a district court order dismissing a complaint and denying injunctive relief.  Eighth Judicial District Court, Clark County; Nancy L. Allf, Judge.

*Reversed and remanded.*

Howard Kim & Associates and Jacqueline A. Gilbert, Howard C. Kim, and and Diana S. Cline, Henderson, for Appellant.

Akerman LLP and Ariel E. Stern and Natalie L. Winslow, Las Vegas, for Respondent.

BEFORE THE COURT EN BANC.

14-30952

*OPINION*

By the Court, PICKERING, J.:

NRS 116.3116 gives a homeowners' association (HOA) a superpriority lien on an individual homeowner's property for up to nine months of unpaid HOA dues. With limited exceptions, this lien is "prior to all other liens and encumbrances" on the homeowner's property, even a first deed of trust recorded before the dues became delinquent. NRS 116.3116(2). We must decide whether this is a true priority lien such that its foreclosure extinguishes a first deed of trust on the property and, if so, whether it can be foreclosed nonjudicially. We answer both questions in the affirmative and therefore reverse.

I.

This dispute involves a residence located in a common-interest community known as Southern Highlands. The property was subject to Covenants, Conditions, and Restrictions (CC&Rs) recorded in 2000. In 2007 it was further encumbered by a note and deed of trust in favor of, via assignment, respondent U.S. Bank, N.A. By 2010, the former homeowners, who are not parties to this case, had fallen delinquent on their Southern Highlands Community Association (SHHOA) dues and also defaulted on their obligations to U.S. Bank. Separately, SHHOA and U.S. Bank each initiated nonjudicial foreclosure proceedings.

Appellant SFR Investments Pool 1, LLC (SFR) purchased the property at the SHHOA's trustee's sale, which took place on September 5, 2012. SFR received and recorded a trustee's deed reciting compliance with all applicable notice requirements. In the meantime, the trustee's sale on U.S. Bank's deed of trust had been postponed to December 19, 2012. Days before then, SFR filed an action to quiet title and enjoin the sale. SFR

alleged that the SHHOA trustee's deed extinguished U.S. Bank's deed of trust and vested clear title in SFR, leaving U.S. Bank nothing to foreclose.

The district court temporarily enjoined the U.S. Bank trustee's sale pending briefing and argument on SFR's motion for a preliminary injunction. Ultimately, the district court denied SFR's motion for a preliminary injunction and granted U.S. Bank's countermotion to dismiss. It held that an HOA must proceed judicially to validly foreclose its superpriority lien. Since SHHOA foreclosed nonjudicially, the district court reasoned, U.S. Bank's first deed of trust survived the SHHOA trustee's sale and was senior to the trustee's deed SFR received.

SFR appealed. The district court stayed U.S. Bank's trustee's sale pending decision of this appeal.

## II.

### A.

The HOA lien statute, NRS 116.3116, is a creature of the Uniform Common Interest Ownership Act of 1982, § 3-116, 7 U.L.A., part II 121-24 (2009) (amended 1994, 2008) (UCIOA), which Nevada adopted in 1991, 1991 Nev. Stat., ch. 245, § 1-128, at 535-79, and codified as NRS Chapter 116. *See* NRS 116.001. One purpose of adopting a Uniform Act like the UCIOA is "to make uniform the law with respect to [its] subject [matter] among states enacting it." NRS 116.1109(2). Thus, in addition to the usual tools of statutory construction, we have available the comments of the National Conference of Commissioners on Uniform State Laws, national commentary, and other states' cases to explicate NRS Chapter 116. 2A Norman J. Singer & Shambie Singer, *Sutherland Statutory Construction* § 48:11, at 603-08 (7th ed. 2014); *see Casey v. Wells Fargo Bank, N.A.*, 128 Nev. ___, ___, 290 P.3d 265, 268 (2012).

NRS 116.3116(1) gives an HOA a lien on its homeowners' residences—the UCIOA calls them "units," *see* NRS 116.093—"for any construction penalty that is imposed against the unit's owner . . . , any assessment levied against that unit or any fines imposed against the unit's owner from the time the construction penalty, assessment or fine becomes due." NRS 116.3116(2) elevates the priority of the HOA lien over other liens. It states that the HOA's lien is "prior to all other liens and encumbrances on a unit" except for:

> (a) Liens and encumbrances recorded before the recordation of the declaration [creating the common-interest community] . . . ;

> (b) *A first security interest on the unit recorded before the date on which the assessment sought to be enforced became delinquent* . . . ; and

> (c) Liens for real estate taxes and other governmental assessments or charges against the unit or cooperative.

NRS 116.3116(2) (emphasis added). If subsection 2 ended there, a first deed of trust would have complete priority over an HOA lien. But it goes on to carve out a partial exception to subparagraph (2)(b)'s exception for first security interests:

> The [HOA] *lien is also prior to all security interests described in paragraph (b)* to the extent of any [maintenance and nuisance-abatement] charges incurred by the association on a unit pursuant to NRS 116.310312 and *to the extent of the assessments for common expenses* [*i.e.,* HOA *dues*] based on the periodic budget adopted by the association pursuant to NRS 116.3115 which would have become due in the absence of acceleration during the 9 months immediately preceding institution of an action to enforce the lien, unless federal regulations adopted by the Federal Home Loan Mortgage Corporation or the

> Federal National Mortgage Association require a shorter period of priority for the lien. . . . *This subsection does not affect* the priority of mechanics' or materialmen's liens, or *the priority of liens for other assessments made by the association.*

NRS 116.3116(2) (emphases added).[1]

As to first deeds of trust, NRS 116.3116(2) thus splits an HOA lien into two pieces, a superpriority piece and a subpriority piece. The superpriority piece, consisting of the last nine months of unpaid HOA dues and maintenance and nuisance-abatement charges, is "prior to" a first deed of trust. The subpriority piece, consisting of all other HOA fees or assessments, is subordinate to a first deed of trust.

NRS 116.3116 largely tracks section 3-116(a)-(i) of the 1982 UCIOA.[2] But it does not use the language in subsections (j) and (k) of UCIOA § 3-116, which offer alternative HOA lien foreclosure provisions for adaptation to local law. *See* 1982 UCIOA § 3-116(j)(1) ("In a condominium or planned community, the association's lien must be

---

[1]UCIOA § 3-116 differs from NRS 116.3116(1) in that it limits the superpriority to six rather than nine months of unpaid dues, does not make provision for Federal Home Loan Mortgage Corporation and Federal National Mortgage Association regulations, and does not include maintenance and nuisance-abatement charges in the superpriority lien.

[2]NRS 116.3116(3) was added in 2013, 2013 Nev. Stat., ch. 552, § 7, at 3788, and is unique. NRS 116.3116(11) was added in 2011, 2011 Nev. Stat., ch. 389, § 49, at 2450 (renumbered from subsection 10 to 11 by 2013 Nev. Stat., ch. 552, §7 at 3789), and replicates subparagraph (*l*) of the 1994 version and subparagraph (m) of the 2008 version of the UCIOA. *See* UCIOA § 3-116(m) (2008), 7 U.L.A., part IB 377 (2009); UCIOA § 3-116(*l*) (1994), 7 U.L.A., part IB 571-72 (2009). *See* note 1 above for additional variations.

foreclosed in like manner as a mortgage on real estate [or by power of sale under [insert appropriate state statute]]."); *id.* § 3-116(k) (offering an optional fast-track foreclosure method for cooperatives, which often carry substantial debt service obligations). Instead, the Nevada Legislature handcrafted a series of provisions to govern HOA lien foreclosures, NRS 116.31162 through NRS 116.31168, and refashioned 1982 UCIOA §§ 3-116(j)(2) and (3), concerning cooperatives, as NRS 116.3116(10).

To initiate foreclosure under NRS 116.31162 through NRS 116.31168, a Nevada HOA must notify the owner of the delinquent assessments. NRS 116.31162(1)(a). If the owner does not pay within 30 days, the HOA may record a notice of default and election to sell. NRS 116.31162(1)(b). Where the UCIOA states general third-party notice requirements, *see* 1982 UCIOA § 3-116(j)(4) ("In the case of foreclosure under [insert reference to state power of sale statute], the association shall give reasonable notice of its action to all lien holders of the unit whose interest would be affected."), NRS 116.31168 imposes specific timing and notice requirements.

"The provisions of NRS 107.090," governing notice to junior lienholders and others in deed-of-trust foreclosure sales, "apply to the foreclosure of an association's lien as if a deed of trust were being foreclosed." NRS 116.31168(1). The HOA must provide the homeowner notice of default and election to sell; it also must notify "[e]ach person who has requested notice pursuant to NRS 107.090 or 116.31168" and "[a]ny holder of a recorded security interest encumbering the unit's owner's interest who has notified the association, 30 days before the recordation of the notice of default, of the existence of the security interest." NRS 116.31163(1), (2). The homeowner must be given at least 90 days to pay

off the lien. NRS 116.31162. If the lien is not paid off, then the HOA may proceed to foreclosure sale. *Id.* Before doing so, the HOA must give notice of the sale to the owner and to the holder of a recorded security interest if the security interest holder "has notified the association, before the mailing of the notice of sale of the existence of the security interest." NRS 116.311635(1)(b)(2); *see* NRS 107.090(3)(b), (4) (requiring notice of default and notice of sale to "[e]ach other person with an interest whose interest or claimed interest is subordinate to the deed of trust").

NRS 116.31164 addresses the procedure for sale upon foreclosure of an HOA lien and specifies the distribution order for the proceeds of sale. A trustee's deed reciting compliance with the notice provisions of NRS 116.31162 through NRS 116.31168 "is conclusive" as to the recitals "against the unit's former owner, his or her heirs and assigns, and all other persons." NRS 116.31166(2). And, "[t]he sale of a unit pursuant to NRS 116.31162, 116.31163 and 116.31164 vests in the purchaser the title of the unit's owner without equity or right of redemption." NRS 116.31166(3).

### B.

U.S. Bank maintains that NRS 116.3116(2) merely creates a payment priority as between the HOA and the beneficiary of the first deed of trust. If so, then the dues and maintenance and nuisance-abatement piece of the HOA lien does not acquire superpriority status until the beneficiary of the first deed of trust forecloses, at which point, to obtain clear, insurable title, the foreclosure-sale buyer would have to pay off that piece of the HOA lien. But if the superpriority piece is a true priority lien, then it is senior to the first deed of trust. As such, it can be foreclosed and its foreclosure will extinguish the first deed of trust. *See, e.g.,* Restatement (Third) of Prop.: Mortgages § 7.1 (1997) ("A valid foreclosure

of a mortgage terminates all interests in the foreclosed real estate that are junior to the mortgage being foreclosed and whose holders are properly joined or notified under applicable law.").

Nevada's state and federal district courts are divided on whether NRS 116.3116 establishes a true priority lien. *Compare 7912 Limbwood Court Trust v. Wells Fargo Bank, N.A.*, 979 F. Supp. 2d 1142, 1149 (D. Nev. 2013) ("[A] foreclosure sale on the HOA super priority lien extinguishes all junior interests, including the first deed of trust."), *Cape Jasmine Court Trust v. Cent. Mortg. Co.*, No. 2:13-CV-1125-APG-CWH, 2014 WL 1305015, at *4 (D. Nev. Mar. 31, 2014) (same), *and First 100, LLC v. Burns*, No. A677693 (8th Jud. Dist. Ct. May 31, 2013) (order denying motion to dismiss) (same), *with Bayview Loan Servicing, LLC v. Alessi & Koenig, LLC*, 962 F. Supp. 2d 1222, 1225 (D. Nev. 2013) ("The super-priority amount is senior to an earlier-recorded first mortgage in the sense that it must be satisfied before a first mortgage upon its own foreclosure, but it is *in parity with* an earlier-recorded first mortgage with respect to extinguishment, i.e., the foreclosure of neither extinguishes the other.") (emphasis in original); *Weeping Hollow Ave. Trust v. Spencer*, No. 2:13-CV-00544-JCM-VCF, 2013 WL 2296313, at *6 (D. Nev. May 24, 2013) (same), *and Diakonos Holdings, LLC v. Countrywide Home Loans, Inc.*, No. 2:12-CV-00949-KJD-RJJ, 2013 WL 531092, at *3 (D. Nev. Feb. 11, 2013) (similar).

Textually, NRS 116.3116 supports the *Limbwood*, *Cape Jasmine*, and *First 100* view that it establishes a true priority lien. NRS 116.3116(2) does not speak in terms of *payment* priorities. It states that the HOA "lien . . . is *prior to*" other liens and encumbrances "except . . . [a] first security interest," then adds that, "The lien is *also prior to* [first]

security interests" to the extent of nine months of unpaid HOA dues and maintenance and nuisance-abatement charges. *Ibid.* (emphases added). "Prior" refers to the lien, not payment or proceeds, and is used the same way in both sentences, a point the phrase "*also* prior to" drives home. And "priority lien" and "prior lien" mean the same thing, according to *Black's Law Dictionary* 1008 (9th ed. 2009): "A lien that is superior to one or more other liens on the same property, usu. because it was perfected first."

The official comments to UCIOA § 3-116 confirm its text. Payment priority proponents insist that the statute cannot mean what it says because the result—a split lien, a piece of which has priority over a first deed of trust—is unprecedented. *Cf. Bayview Loan Servicing*, 962 F. Supp. 2d at 1226 (observing that, "the real estate community in Nevada clearly understands the statutes to work the way the Court finds," that is to say, as establishing only a payment priority). But the official comments to UCIOA § 3-116 forthrightly acknowledge that the split-lien approach represents a "significant departure from existing practice." 1982 UCIOA § 3-116 cmt. 1; 1994 & 2008 UCIOA § 3-116 cmt. 2. It is a specially devised mechanism designed to "strike[ ] an equitable balance between the need to enforce collection of unpaid assessments and the obvious necessity for protecting the priority of the security interests of lenders." *Id.* The comments continue: "As a practical matter, secured lenders will most likely pay the 6 [in Nevada, nine, *see supra* note 1] months' assessments demanded by the association *rather than having the association foreclose on the unit.*" *Id.* (emphasis added). If the superpriority piece of the HOA lien just established a payment priority, the reference to a first security

holder paying off the superpriority piece of the lien to stave off foreclosure would make no sense.[3]

"An official comment written by the drafters of a statute and available to a legislature before the statute is enacted has considerable weight as an aid to statutory construction." *Acierno v. Worthy Bros. Pipeline Corp.*, 656 A.2d 1085, 1090 (Del. 1995). The comments to the 1982 UCIOA were available to the 1991 Legislature when it enacted NRS Chapter 116. Even though the comments emphasize that the split-lien approach is "[a] significant departure from existing practice," 1982 UCIOA § 3-116 cmt. 1, the Legislature enacted NRS 116.3116(2) with UCIOA § 3-116's superpriority provision intact. From this it follows that, however unconventional, the superpriority piece of the HOA lien carries true priority over a first deed of trust.

The Uniform Law Commission (ULC) has established a Joint Editorial Board for Uniform Real Property Acts (JEB), made up of members from the ULC; the ABA Section of Real Property, Probate and Trust Law; and the American College of Real Estate Lawyers, which "is responsible for monitoring all uniform real property acts," of which the UCIOA is one, http://www.uniformlawcommission.com/Committee.aspx?title=Joint Editorial Board for Uniform Real Property Acts. The JEB's 2013 report entitled, *The Six-Month "Limited Priority Lien" for Association Fees Under the Uniform Common Interest Ownership Act*,

---

[3]The lion's share of most HOA liens will be the unpaid dues, which have superpriority status. This does not make NRS 116.3116(2)(b) superfluous as U.S. Bank suggests, citing *Bayview Loan Servicing*, 962 F. Supp. 2d at 1227. It simply reflects the policy choices underlying the statute as structured.

also supports that § 3-116(b) establishes a true priority lien.[4] Addressing the recent foreclosure crisis and the incentives the crisis created for first security holders to strategically delay foreclosure, this report canvasses the case law construing the UCIOA's superpriority lien. It endorses the decision in *Summerhill Village Homeowners Ass'n v. Roughley*, 289 P.3d 645, 647-48 (Wash. Ct. App. 2012), which, addressing a statute using the same superpriority language as NRS 116.3116(2), holds that an HOA's judicial foreclosure of the superpriority piece of its lien extinguished the first deed of trust. JEB, *The Six-Month "Limited Priority Lien*," at 8-9. The report then criticizes by name two of the three Nevada federal district court cases cited above as being on the payment-priority side of the NRS 116.3116(2) split—*Weeping Hollow* and *Diakonos*—saying they "misread and misinterpret the Uniform Laws limited priority lien provision,

---

[4]The dissent dismisses the work of the ULC JEB as "post-hoc commentary" that is "not persuasive" with respect to the judicial v. nonjudicial foreclosure issue addressed in Section II.C, *infra*. These observations mistake our reliance on the 2013 ULC JEB report for guidance as a legislative-intent analysis, which it is not—the "intent" of the 1991 Legislature that adopted the 1982 UCIOA could hardly be affected by comments 20+ years in the future. Courts often rely on post-enactment ULC Editorial Board commentary as persuasive, though not mandatory, precedent; doing so here is consistent with the mandate that we interpret the UCIOA, like other Uniform Acts, "to make uniform the law with respect to the subject of [the act] among states enacting it." NRS 116.1109(2); *e.g.*, *Chase Plaza Condo. Ass'n v. JPMorgan Chase Bank, N.A.*, ___ A.3d ___, ___, 2014 WL 4250949, at *10 n.5 (D.C. Aug 28, 2014) (relying on the ULC JEB report cited in the text as persuasive authority); *Export-Import Bank of United States v. Asia Pulp & Paper Co.*, 609 F.3d 111, 119-20 & 119 n.8 (2d Cir. 2010) (consulting post-enactment commentary by the ULC's Permanent Editorial Board for the Uniform Commercial Code (UCC) in interpreting a particular UCC provision).

which . . . constitutes a true lien priority, [such that] the association's proper enforcement of its lien . . . extinguish[es] the otherwise senior mortgage lien." *Id.* at 10 n.9.

The comments liken the HOA lien to "other inchoate liens such as real estate taxes and mechanics liens." 1994 & 2008 UCIOA § 3-116 cmt. 1. An HOA's "sources of revenues are usually limited to common assessments." JEB, *The Six-Month "Limited Priority Lien,"* at 4. This makes an HOA's ability to foreclose on the unpaid dues portion of its lien essential for common-interest communities. *Id.* at 1-2. Otherwise, when a homeowner walks away from the property and the first deed of trust holder delays foreclosure, the HOA has to "either increase the assessment burden on the remaining unit/parcel owners or reduce the services the association provides (e.g., by deferring maintenance on common amenities)." *Id.* at 5-6. To avoid having the community subsidize first security holders who delay foreclosure, whether strategically or for some other reason, UCIOA § 3-116 creates a true superpriority lien:

> A foreclosure sale of the association's lien (whether judicial or nonjudicial) is governed by the principles generally applicable to lien foreclosure sales, i.e., a foreclosure sale of a lien entitled to priority extinguishes that lien and any subordinate liens, transferring those liens to the sale proceeds. Nothing in the Uniform Laws establishes (or was intended to establish) a contrary result.

*Id.* at 9 (footnotes omitted); *accord* Memorandum from the JEB to the Comm'rs for the Unif. Law Comm'n 3 (June 11, 2014) (noting that, "[a]s originally drafted, § 3-116(c) was intended to create a true lien priority, and thus the association's foreclosure properly should be viewed as extinguishing the lien of the otherwise first mortgagee (to the same extent

that foreclosure of a real estate tax lien would extinguish that same mortgage)," citing *7912 Limbwood Court Trust*, 979 F. Supp. 2d at 1149).

U.S. Bank's final objection is that it makes little sense and is unfair to allow a relatively nominal lien—nine months of HOA dues—to extinguish a first deed of trust securing hundreds of thousands of dollars of debt. But as a junior lienholder, U.S. Bank could have paid off the SHHOA lien to avert loss of its security; it also could have established an escrow for SHHOA assessments to avoid having to use its own funds to pay delinquent dues. 1982 UCIOA § 3-116 cmt. 1; 1994 & 2008 UCIOA § 3-116 cmt. 2. The inequity U.S. Bank decries is thus of its own making and not a reason to give NRS 116.3116(2) a singular reading at odds with its text and the interpretation given it by the authors and editors of the UCIOA. *See* NRS 116.1109 (obligating this court to interpret its version of the UCIOA so as to "make uniform the law . . . among states enacting it").

## C.

Since NRS 116.3116(2) establishes a true superpriority lien, the next question we must decide is whether the lien may be foreclosed nonjudicially or requires judicial foreclosure. NRS Chapter 116 answers this question directly: An HOA may foreclose its lien by nonjudicial foreclosure sale. Thus, NRS 116.3116(1) defines what an HOA lien covers, while NRS 116.31162(1) states that "in a planned community"—a "planned community" is any type of "common-interest community that is not a condominium or a cooperative," NRS 116.075—"the association may foreclose its lien by sale." To "foreclose [a] lien by sale" under NRS 116.31162(1) encompasses an HOA's conducting a nonjudicial foreclosure sale. This is evident from the remainder of NRS 116.31162, which speaks to the statutory notices of delinquency, default and election to sell required of a nonjudicial foreclosure sale, and the sections that follow,

NRS 116.31163 through NRS 116.31168, all of which concern the mechanics and requirements of nonjudicial foreclosure sales of HOA liens. The only limits Chapter 116 places on HOA lien foreclosure sales appear in NRS 116.31162(5) and (6), which restrict foreclosure of HOA liens for certain fines and penalties and liens on homes in Nevada's foreclosure mediation program (FMP). *See also State v. Javier C.*, 128 Nev. ___, ___, 289 P.3d 1194, 1197 (2012) ("Nevada follows the maxim 'expressio unius est exclusio alterius,' the expression of one thing is the exclusion of another."). Given this statutory text, we cannot agree with our dissenting colleagues that NRS Chapter 116 requires judicial foreclosure of the superpriority piece of an HOA lien but authorizes nonjudicial foreclosure of everything else.

Together, NRS 116.3116(1) and NRS 116.31162 provide for the nonjudicial foreclosure of the whole of an HOA's lien, not just the subpriority piece of it. U.S. Bank and our dissenting colleagues do not come to terms with NRS 116.31162. Instead, they focus on a single phrase in NRS 116.3116(2) which defines the superpriority piece of the lien as comprising "assessments for common expenses . . . which would have become due in the absence of acceleration during the 9 months immediately preceding *institution of an action to enforce the lien.*" (Emphasis added.) Not acknowledging that NRS 116.3116(2) only discusses lien priority, not foreclosure methods, they maintain that the phrase "institution of an action to enforce the lien" suggests a civil action, a lawsuit brought in a court of law. But the phrase is not so narrow that it excludes nonjudicial foreclosure proceedings. *Black's Law Dictionary* 869 (9th ed. 2009) defines "institution" as "[t]he commencement of something, *such as* a civil or criminal action." (Emphasis added.) As *Black's*

recognizes, "foreclosure" proceedings are "instituted" and include both "judicial foreclosure" and "nonjudicial foreclosure" methods. *Id.* at 719 (defining "foreclosure," "judicial foreclosure," and "nonjudicial" or "power-of-sale foreclosure"). And in the context of foreclosures, "action" appears to be commonly used in connection with nonjudicial as well as judicial foreclosures. *See In re Bonner Mall P'ship*, 2 F.3d 899, 902 (9th Cir. 1993) (referring to a bank "commenc[ing] a nonjudical foreclosure action"); *Santiago v. BAC Home Loans Servicing, L.P.*, ___ F. Supp. 2d ___, ___, 2014 WL 2075994, at *3 (W.D. Tex. 2014) (holding an assignee to be "an appropriate party to initiate a nonjudicial foreclosure action against the Property"); *In re Beach*, 447 B.R. 313, 316 (D. Idaho 2011) ("[T]he Bank initiated a nonjudicial foreclosure action . . . ."); *Bowmer v. Dettelbach*, 672 N.E.2d 1081, 1086 (Ohio Ct. App. 1996) (discussing a "nonjudicial foreclosure action . . . instituted" in California); *Klem v. Wash. Mut. Bank*, 295 P.3d 1179, 1189 (Wash. 2013) (addressing the powers of the trustee in "a nonjudicial foreclosure action").

The argument that NRS 116.3116(2)'s use of the word "action" means "that an HOA must foreclose judicially to invoke the superpriority" lien provision was considered and rejected in *Nationstar Mortgage, LLC v. Rob and Robbie, LLC*, No. 2:13-cv-01241-RCJ-PAL, 2014 WL 3661398, at *4 (D. Nev. July 23, 2014). The court gave "two independent reasons" for its holding. "First, 'action' does not include only civil actions. The Legislature could easily have said 'civil action' or 'judicial action,' but it used the broader term 'action.'" *Id.* In the lien foreclosure context, "where the statutes . . . provide for either judicial or non judicial foreclosure,

'action' is most reasonably read to include either." *Id.*[5]  Second, NRS 116.3116(2) does not "use the word 'action' in a way that makes the super-priority status depend[e]nt upon whether an 'action' has been instituted. Rather, the word 'action' is used (in the subjunctive mode, not the indicative mode) as a way to measure the portion of an HOA lien that has super-priority status." *Id.*

UCIOA § 3-116(b) uses the phrase "institution of an action to enforce the lien" in describing the superpriority lien, exactly as NRS 116.3116(2) does.  Section 3-116(j) of the 1982 and 1994 UCIOA (and with minor alteration, section 3-116(k) of the 2008 UCIOA) prompt the adopting state to choose and insert its authorized foreclosure method, be it judicial or nonjudicial:

> (j) The association's lien may be foreclosed as provided in this subsection:
>
>> (1) In a condominium or planned community, the association's lien must be foreclosed in like manner as a mortgage on real estate [or by power of sale under [insert appropriate state statute]];
>>
>> (2) In a cooperative whose unit owners' interests in the units are real estate (Section 1-105), the association's lien must be

---

[5]We recognize that NRS 116.3116 uses "action" to signify civil action in NRS 116.3116(8) (a "judgment or decree in any action brought under this section must include costs and reasonable attorney's fees") and NRS 116.3116(11) (authorizing appointment of a receiver "[i]n an action by an association to collect assessments or to foreclose a lien").  But we accept that "action" includes civil court actions.  The point is that "institution of an action to enforce the lien" is not restricted to judicial actions but, rather, includes nonjudicial foreclosure actions as well.

foreclosed in like manner as a mortgage on real estate [or by power of sale under [insert appropriate state statute]] [or by power of sale under subsection (k)]; or

(3) In a cooperative whose unit owners' interests in the units are personal property (Section 1-105), the association's lien must be foreclosed in like manner as a security interest under [insert reference to Article 9, Uniform Commercial Code.]

[(4) In the case of foreclosure under [insert reference to state power of sale statute], the association shall give reasonable notice of its action to all lien holders of the unit whose interest would be affected.]

1982 UCIOA § 3-116(j). If the UCIOA meant "institution of an action to enforce the lien" in § 3-116(b) to signify that all superpriority HOA lien foreclosures must proceed judicially, § 3-116(j)'s repeated references to the foreclosure of "the association's lien" by judicial or nonjudicial foreclosure, depending on the enacting state's local laws, is inexplicable. And, indeed, the Joint Editorial Board for Uniform Real Property Acts has confirmed that, in the context of an HOA's superpriority lien specifically, "[a] foreclosure sale of the association's lien (*whether judicial or nonjudicial*) is governed by the principles generally applicable to lien foreclosure sales, i.e., a foreclosure sale of a lien entitled to priority extinguishes that lien and any subordinate liens." JEB, *The Six-Month "Limited Priority Lien,"* at 9 (emphasis added) (footnote omitted).

Nevada did not enact subsection (j) of § 3-116. Instead, it enacted a series of separate, consecutively numbered statutes, NRS 116.31162 through NRS 116.31168, each addressing a specific aspect of the nonjudicial foreclosure process NRS 116.31162 authorizes for HOA liens. These statutes use "enforce" throughout with reference to an HOA's

nonjudicial foreclosure of its lien. *See* NRS 116.31162(1)(b)(2) (the notice of delinquent assessment must identify "the person authorized by the association to enforce the lien by sale"); NRS 116.31162(1)(c); NRS 116.31164(2) (discussing costs, fees, and expenses incident to an HOA's nonjudicial "enforcement of its lien"). Nothing in these statutes suggests that, by adopting them in lieu of the more abbreviated § 3-116(j), Nevada was *sub silentio* rejecting the UCIOA's use of "institution of an action to enforce the lien" as applying to either judicial or nonjudicial foreclosures— much less distinguishing, though without saying so, between the subpriority piece of an HOA's lien, to which the nonjudicial foreclosure procedures detailed in NRS 116.31162 through NRS 116.31168 would apply, and the superpriority piece of an HOA's lien, which would require a judicial foreclosure proceeding not actually mentioned in Chapter 116. If anything, Nevada's elaborate nonjudicial foreclosure provisions signal the Legislature's embrace of nonjudicial foreclosure of HOA liens, not the opposite.

Recall that, unlike § 3-116(b), which currently limits the superpriority piece of an HOA's lien to six months of unpaid dues, Nevada's superpriority lien covers nine months of dues as well as maintenance and nuisance-abatement charges "incurred . . . pursuant to NRS 116.310312." NRS 116.3116(2); *see supra* note 1. Addressing maintenance and nuisance-abatement charges, NRS 116.310312(4) expressly cross-references Chapter 116's nonjudicial foreclosure provisions, stating that "[t]he lien may be foreclosed under NRS 116.31162 to 116.31168, inclusive." The maintenance and nuisance-abatement statute borrows the phrase "institution of an action to enforce the lien" from NRS 116.3116 in explaining that even if federal law requires a

shorter period of priority, "the period of priority of the lien must not be less than the 6 months immediately preceding the institution of an action to enforce the lien." NRS 116.310312(6). This phrasing is underinclusive and beyond confusing unless read to encompass judicial and nonjudicial foreclosures alike, both in NRS 116.310312(6) and in its statute of origin, NRS 116.3116(2).

The Nevada Real Estate Division of the Department of Business and Industry (NRED) is charged with administering Chapter 116. NRS 116.615; *see State, Dep't of Bus. & Indus. v. Nev. Ass'n Servs., Inc.*, 128 Nev. ___, ___, 294 P.3d 1223, 1227-28 (2012). NRS 116.623(1)(a) tasks NRED with issuing "advisory opinions as to the applicability or interpretation of . . . [a]ny provision of this chapter." On December 12, 2012, NRED issued Advisory Opinion No. 13-01. The opinion addresses, among other questions, whether NRS 116.3116(2) requires a civil action by an HOA to foreclose the superpriority piece of its lien. NRED opines that it does not: "The association is not required to institute a civil action in court to trigger the 9 month look back provided in NRS 116.3116(2)." 13-01 Op. Dep't of Bus. & Indus., Real Estate Div. 18 (2012). Elaborating, the NRED opinion states, "NRS 116 does not require an association to take any particular action to enforce its lien, but [only] that it institutes 'an action,'" which includes the HOA taking action under NRS 116.31162 to initiate the nonjudicial foreclosure process. *Id.* at 17-18. NRED's interpretation is persuasive, as it comports with both the statutory text and the JEB's interpretation of the UCIOA. *See Int'l Game Tech., Inc. v. Second Judicial Dist. Court*, 122 Nev. 132, 157, 127 P.3d 1088, 1106 (2006).

U.S. Bank and the dissent argue that judicial foreclosure should be required as a matter of policy because of the safeguards it offers—notice and an opportunity to be heard, court supervision of the sale, judicial review of the amount of the lien comprising the superpriority piece, and a one-year redemption period. *See* NRS 40.430-.463; NRS 21.190-.210. But this argument assumes that requiring the superpriority piece of an HOA lien to be judicially foreclosed will actually afford such protections without need of further amendment to Chapter 116, and this is far from clear. To allow nonjudicial foreclosure of the subpriority piece, which is where the dissent would draw the judicial v. nonjudicial foreclosure line, produces the same difficulties for the homeowners and junior lienholders that are cited as policy reasons for requiring judicial foreclosure of the superpriority piece of the lien; the only difference is the benefit that would inure to first security holders under the dissent's interpretation of Chapter 116. Surely, if the Legislature intended such an unusual distinction, it would have said so explicitly, but it did not.

We recognize that "there has been considerable publicity across the country regarding alleged abuse in the foreclosure process when unit owners fail to pay sums due" their HOA, prompting amendments to the UCIOA that "propose[ ] new and considerable restrictions on the foreclosure process as it applies to common interest communities." *Prefatory Note to the 2008 Amendments to the UCIOA*, 7 U.L.A., part IB, at 225 (2009). But the choice of foreclosure method for HOA liens is the Legislature's, and the Nevada Legislature has written NRS Chapter 116 to allow nonjudicial foreclosure of HOA liens, subject to the special notice requirements and protections handcrafted by the Legislature in NRS 116.31162 through NRS 116.31168. Countervailing policy arguments

exist in favor of allowing nonjudicial foreclosure, including that judicial foreclosure takes longer to accomplish, thereby delaying the common-interest community's receipt of needed HOA funds.  The consequences of such delays can be "devastating to the community and the remaining residents," who must either make up the dues deficiencies, arguably unjustly enriching the delaying lender, or abandon amenities and maintenance, thereby impairing the value of their homes.  JEB, *The Six-Month "Limited Priority Lien,"* at 4-5.  If revisions to the foreclosure methods provided for in NRS Chapter 116 are appropriate, they are for the Legislature to craft, not this court.

D.

U.S. Bank makes two additional arguments that merit brief discussion.  First, the lender contends that the nonjudicial foreclosure in this case violated its due process rights.  Second, it invokes the mortgage savings clause in the Southern Highlands CC&Rs, arguing that this clause subordinates SHHOA's lien to the first deed of trust.  Neither argument holds up to analysis.

1.

SFR is appealing the dismissal of its complaint for failure to state a claim upon which relief can be granted.  NRCP 12(b)(5).  The complaint alleges that "the HOA foreclosure sale complied with all requirements of law, including but not limited to, recording and mailing of copies of Notice of Delinquent Assessment and Notice of Default, and the recording, posting and publication of the Notice of Sale." It further alleges that, "prior to the HOA foreclosure sale, no individual or entity paid the super-priority portion of the HOA Lien representing 9 months of assessments for common expenses."  In view of the fact that the "requirements of law" include compliance with NRS 116.31162 through

NRS 116.31168 and, by incorporation, NRS 107.090, *see* NRS 116.31168(1), we conclude that U.S. Bank's due process challenge to the lack of adequate notice fails, at least at this early stage in the proceeding.[6]

The contours of U.S. Bank's due process argument are protean. To the extent U.S. Bank argues that a statutory scheme that gives an HOA a superpriority lien that can be foreclosed nonjudicially, thereby extinguishing an earlier filed deed of trust, offends due process, the argument is a nonstarter. As discussed in *7912 Limbwood Court Trust*, 979 F. Supp. 2d at 1152:

> Chapter 116 was enacted in 1991, and thus [the lender] was on notice that by operation of the statute, the [earlier recorded] CC&Rs might entitle the HOA to a super priority lien at some future date which would take priority over a [later recorded] first deed of trust . . . . Consequently, the conclusion that foreclosure on an HOA super priority lien extinguishes all junior liens, including a first deed of trust recorded prior to a notice of delinquent assessments, does not violate [the lender's] due process rights.

*Accord Nationstar Mtg.,* 2014 WL 3661398, at *3 (rejecting a due process challenge to nonjudicial foreclosure of a superpriority lien).

U.S. Bank further complains about the content of the notice it received. It argues that due process requires specific notice indicating the

---

[6]On a motion to dismiss, a court must take all factual allegations in the complaint as true and not delve into matters asserted defensively that are not apparent from the face of the complaint. *See Buzz Stew, LLC v. City of N. Las Vegas,* 124 Nev. 224, 227-28, 181 P.3d 670, 672 (2008). Consistent with this standard, we note but do not resolve U.S. Bank's suggestion that we could affirm by deeming SFR's purchase "void as commercially unreasonable."

amount of the superpriority piece of the lien and explaining how the beneficiary of the first deed of trust can prevent the superpriority foreclosure sale. But it appears from the record that specific lien amounts were stated in the notices, ranging from $1,149.24 when the notice of delinquency was recorded to $4,542.06 when the notice of sale was sent. The notices went to the homeowner and other junior lienholders, not just U.S. Bank, so it was appropriate to state the total amount of the lien. As U.S. Bank argues elsewhere, dues will typically comprise most, perhaps even all, of the HOA lien. *See supra* note 3. And from what little the record contains, nothing appears to have stopped U.S. Bank from determining the precise superpriority amount in advance of the sale or paying the entire amount and requesting a refund of the balance. *Cf. In re Medaglia*, 52 F.3d 451, 455 (2d Cir. 1995) ("[I]t is well established that due process is not offended by requiring a person with actual, timely knowledge of an event that may affect a right to exercise due diligence and take necessary steps to preserve that right."). On this record, at the pleadings stage, we credit the allegations of the complaint that SFR provided all statutorily required notices as true and sufficient to withstand a motion to dismiss. *See 7912 Limbwood Court Trust*, 979 F. Supp. 2d at 1152-53.

2.

U.S. Bank last argues that, even if NRS 116.3116(2) allows nonjudicial foreclosure of a superpriority lien, the mortgage savings clause in the Southern Highlands CC&Rs subordinated SSHOA's superpriority lien to the first deed of trust. The mortgage savings clause states that "no lien created under this Article 9 [governing nonpayment of assessments], nor the enforcement of any provision of this Declaration shall defeat or render invalid the rights of the beneficiary under any Recorded first deed

of trust encumbering a Unit, made in good faith and for value." It also states that "[t]he lien of the assessments, including interest and costs, shall be subordinate to the lien of any first Mortgage upon the Unit."

NRS 116.1104 defeats this argument. It states that Chapter 116's "provisions may not be varied by agreement, and rights conferred by it may not be waived . . . [e]xcept as *expressly* provided in" Chapter 116. (Emphasis added.) "Nothing in [NRS] 116.3116 expressly provides for a waiver of the HOA's right to a priority position for the HOA's super priority lien." *See 7912 Limbwood Court Trust,* 979 F. Supp. 2d at 1153. The mortgage savings clause thus does not affect NRS 116.3116(2)'s application in this case.[7] *See Boulder Oaks Cmty. Ass'n v. B & J Andrews Enters., LLC,* 125 Nev. 397, 407, 215 P.3d 27, 34 (2009) (holding that a CC&Rs clause that created a statutorily prohibited voting class was void and unenforceable).

III.

NRS 116.3116(2) gives an HOA a true superpriority lien, proper foreclosure of which will extinguish a first deed of trust. Because Chapter 116 permits nonjudicial foreclosure of HOA liens, and because

---

[7] *Coral Lakes Community Ass'n v. Busey Bank, N.A.,* 30 So. 3d 579 (Fla. Dist. Ct. App. 2010), on which U.S. Bank relies, does not suggest a different result. The CC&Rs that contained the subordination clause in *Coral Lakes* were in place before the statute that limited the ability to subrogate association liens took effect. *Id.* at 581-84 & 582 n.3. The court refused to enforce the statute because disturbing the prior, contractual relationship "would implicate constitutional concerns about impairment of vested contractual rights." *Id.* at 584. Here, however, the Southern Highlands CC&Rs were recorded after the Legislature adopted and enacted Chapter 116, so no similar concerns about impairment of any party's vested contractual rights arise.

SFR's complaint alleges that proper notices were sent and received, we reverse the district court's order of dismissal. In view of this holding, we vacate the order denying preliminary injunctive relief and remand for further proceedings consistent with this opinion.

_____, J.
Pickering

We concur:

_____, J.
Hardesty

_____, J.
Douglas

_____, J.
Saitta

GIBBONS, C.J., with whom PARRAGUIRRE and CHERRY, JJ., agree, concurring in part and dissenting in part:

While I concur with the majority that NRS 116.3116(2) establishes a true superpriority for an HOA's lien, the enforcement of the superpriority portion of the lien requires institution of an action. I would conclude that this statutory language mandates that a civil judicial foreclosure complaint be filed in order to extinguish a first deed of trust.

*The Legislature's use of the term "action" indicates that a superpriority lienholder must file a judicial foreclosure complaint*

The phrase "institution of an action" may not inherently mean the filing of a judicial action. *See Black's Law Dictionary* 800 (6th ed. 1990) (defining "institution" as "[t]he commencement or inauguration of anything, as the commencement of an action"); *id.* at 28 (defining "action" as "[c]onduct; behavior; something done; the condition of acting; an act or series of acts"). But when used in "its usual legal sense," "action" means "a lawsuit brought in a court." *Id.; see also BP Am. Prod. Co. v. Burton,* 549 U.S. 84, 91 (2006) ("The key terms in this provision—'action' and 'complaint'—are ordinarily used in connection with judicial, not administrative, proceedings.").

In my view, NRS 116.3116 is using "action" in its usual legal sense. Other subsections in NRS 116.3116 reference concepts specific to judicial proceedings in relation to the word "action." NRS 116.3116(8) states that a "judgment or decree in any action brought under this section must include costs and reasonable attorney's fees for the prevailing party." NRS 116.3116(11) states:

> In an action by an association to collect assessments or to foreclose a lien created under this section, the court may appoint a receiver to collect all rents or other income from the unit

> alleged to be due and owing to a unit's owner
> before commencement or during pendency of the
> action . . . . The court may order the receiver to
> pay any sums held by the receiver to the
> association during pendency of the action to the
> extent of the association's common expense
> assessments . . . .

The way NRS 116.3116 uses action to indicate a court action demonstrates that "institution of an action" means the filing of a judicial proceeding. *See Savage v. Pierson*, 123 Nev. 86, 94 & n.32, 157 P.3d 697, 702 & n.32 (2007) ("[I]f a word is used in different parts of a statute, it will be given the same meaning unless it appears from the whole statute that the Legislature intended to use the word differently.").

To be sure, Chapter 116 does not consistently use "action" to mean a judicial action. *See, e.g.,* NRS 116.2119 (the association's declaration may require that the lenders who hold security interests in the units "approve specified actions of the units' owners or the association as a condition to the effectiveness of those actions" but it may not require approval for certain specified nonjudicial "actions"); NRS 116.785(1) (giving the Commission for Common-Interest Communities and Condominium Hotels, if it finds a violation of NRS Chapter 116, the authority to "take any or all of the following actions," and providing various nonjudicial actions). But when Chapter 116 uses a phrase akin to "institution of an action," it signals the filing of an action in court. *See, e.g.,* NRS 116.2124 (any person holding an interest in a common interest community "may *commence an action* in the district court" to terminate the community in the event of a catastrophe (emphasis added)); NRS 116.31088 (discussing rules for when the association is considering "*the commencement of a civil action*" (emphasis added)); NRS 116.320(3) ("In *any action commenced to enforce* the provisions of this section, the

prevailing party is entitled to recover reasonable attorney's fees and costs." (emphasis added)); NRS 116.795(1) (the regulatory agency "may *bring an action* in . . . any court of competent jurisdiction" to enjoin further continuing violations of Chapter 116 (emphasis added)).   The specific phraseology used in NRS 116.3116(2), "institution of an action," demonstrates that a judicial action, rather than just any enforcement action, was what the Legislature contemplated as the method for extinguishing a first deed of trust.  *See also Benson v. Zoning Bd. of Appeals of Town of Westport*, 873 A.2d 1017, 1021-24 (Conn. App. Ct. 2005) (concluding that although the phrase "institution of an action" as used in the statute at issue was ambiguous, the phrase had "never been held to mean anything other than the filing of a civil action in court" and that the legislature had not made it clear that other proceedings would suffice).

I recognize that Chapter 116 gives the association the option to enforce its lien through nonjudicial foreclosure by following the procedures provided in NRS 116.31162 to 116.31168.  The association may even nonjudicially foreclose on its lien for maintenance and abatement charges, charges that may be included in the superpriority portion of the association's lien.  *See* NRS 116.310312(4).  But, as explained, the lien's superpriority is tied to the "institution of an action to enforce the lien." NRS 116.3116(2); NRS 116.310312(6).  Thus, I would conclude that while the association has the option to nonjudicially foreclose on its lien, it must foreclose through judicial action in order to trigger the extinguishing effect of the superpriority portion of its lien.

*The NRED advisory opinion should not be given deference because it conflicts with NRS 116.3116(2)'s statutory language*

This conclusion is in disagreement with the agency charged with regulating and administering Chapter 116, the Nevada Department of Business and Industry's Real Estate Division (NRED). *See* NRS 116.615; NRS 116.623; *State, Dep't of Bus. & Indus. v. Nev. Ass'n Servs., Inc.*, 128 Nev. ___, ___, 294 P.3d 1223, 1227 (2012). NRED has interpreted "action to enforce the lien" as being met by an association taking action to nonjudicially foreclose on its lien pursuant to NRS 116.31162; thus, according to NRED, an association need not file a civil judicial action to trigger the superpriority portion of the association's lien under NRS 116.3116(2). *See* 13-01 Op. Dep't of Bus. & Indus., Real Estate Div. 17-18 (2012).

However, only agency interpretations that are within the statutory language are afforded deference, *Taylor v. State, Dep't of Health & Human Servs.*, 129 Nev. ___, ___, 314 P.3d 949, 951 (2013), and NRED's interpretation is not within NRS 116.3116's language. Although NRS Chapter 116's statutory scheme allows an association to nonjudicially foreclose on its lien, it must judicially foreclose to trigger the superpriority effect of its lien. *See* NRS 116.3116(2).

*The Nevada Legislature intentionally departed from the model code to require institution of a judicial action in NRS 116.3116*

I also recognize that NRS 116.3116(2)'s proclamation that the association must file a judicial action to trigger the superpriority effect of its lien is at odds with the uniform act upon which the statute was based. The Joint Editorial Board for Uniform Real Property Acts, which counsels the Uniform Law Commission on uniform real estate laws, has stated that an association may foreclose on superpriority portions of its lien and

extinguish the first security "in the manner in which a mortgage is foreclosed"; so, "an association may foreclose its lien by nonjudicial proceedings if the state permits nonjudicial foreclosure." Joint Editorial Board for Uniform Real Property Acts, *The Six-Month "Limited Priority Lien" for Association Fees Under the Uniform Common Interest Ownership Act*, at 9 n.8 (2013).

This interpretation is consistent with the UCIOA section upon which NRS 116.3116 is based. The uniform act allows for an adopting state to insert its authorized foreclosure method, whether it be judicial foreclosure or by power of sale. But once the adopting state chooses a method, it becomes mandatory:

> (1) In a condominium or planned community, the association's lien *must be foreclosed* in like manner as a mortgage on real estate [or by power of sale under [insert appropriate state statute]];

> (2) In a cooperative whose unit owners' interests in the units are real estate (Section 1-105), the association's lien *must be foreclosed* in like manner as a mortgage on real estate [or by power of sale under [insert appropriate state statute]] [or by power of sale under subsection (k)]; or

> (3) In a cooperative whose unit owners' interests in the units are personal property (Section 1-105), the association's lien *must be foreclosed* in like manner as a security interest under [insert reference to Article 9, Uniform Commercial Code].

1982 UCIOA § 3-116(j) (emphases added).

NRS 116.3116 departed from the uniform act in that it permits, but does not mandate, nonjudicial foreclosure. *See* NRS 116.3116(7) ("This section does not prohibit actions to recover sums for which subsection 1 creates a lien or prohibit an association from taking a deed in lieu of foreclosure."). And, NRS 116.3116(2), as well as NRS

116.310312(6), tie the "institution of an action" to the triggering of the lien's superpriority effect. NRS 116.3116's variance from the uniform act renders the Joint Editorial Board's report interpreting the uniform act's intentions not informative on the proper reading of "institution of an action" as used in NRS 116.3116(2). *See Sallee v. Stewart*, 827 N.W.2d 128, 142 (Iowa 2013) (citing 2B Norman J. Singer & J.D. Shambie Singer, *Statutes & Statutory Construction* § 52:5, at 370 (rev. 7th ed. 2012), for "noting that ordinarily 'when a legislature models a statute after a uniform act, but does not adopt particular language, courts conclude the omission was "deliberate" or "intentional," and that the legislature rejected a particular policy of the uniform act'").

Furthermore, the report post-dates the Legislature's adoption of the UCIOA. And while preenactment official commentary to uniform acts, including the UCIOA, generally may inform this court's understanding of the Legislature's codification of that uniform act, *see Boulder Oaks Cmty. Ass'n v. B & J Andrews Enters., LLC*, 125 Nev. 397, 405-06, 215 P.3d 27, 32-33 (2009) (considering the UCIOA's official comments when interpreting Nevada's codification of the uniform act), this post-hoc commentary is not persuasive, especially in the face of statutory language that states otherwise. *Cf. Ybarra v. State*, 97 Nev. 247, 249, 628 P.2d 297, 297-98 (1981) (noting that generally, "a statute adopted from another jurisdiction will be presumed to have been adopted with the construction placed upon it by the courts of that jurisdiction *before* its adoption" (emphasis added)); 2B Norman J. Singer & J.D. Shambie Singer, *Statutes & Statutory Construction* § 52:2 (rev. 7th ed. 2012) ("When the state of origin interprets a statute after the adopting

state statute has been enacted, courts do not presume the adopting state also adopted the subsequent construction.").

*Policy considerations*

In my view, the Legislature's decision to require associations to judicially foreclose their lien to extinguish the first security interest alleviates potential problems that could arise under the majority's holding that nonjudicial foreclosures are enough. As the majority points out, by incorporating certain notice provisions from Chapter 107, Chapter 116 appears to mandate that the association mail the notice of default and notice of sale to the first security holders who have recorded their security interest when the association is foreclosing on its lien. NRS 116.31168(1); NRS 107.090. But what the majority fails to adequately address is that the association is not required to indicate in its notices that superpriority portion of its lien being foreclosed on, let alone what the amount of the superpriority portion is: the association's notice of delinquent assessment and notice of default and election to sell need only state "the assessments and other sums which are due in accordance with subsection 1 of NRS 116.3116." NRS 116.31162(1)(a); NRS 116.31162(1)(b); *see also* NRS 116.311635(3)(a) (notice of sale must provide "the amount necessary to satisfy the lien"). Although the first security holder could prevent the extinguishment of its interest by purchasing the property at the association's foreclosure sale, *see Carrillo v. Valley Bank of Nev.*, 103 Nev. 157, 158, 734 P.2d 724, 725 (1987), *Keever v. Nicholas Beers Co.*, 96 Nev. 509, 515, 611 P.2d 1079, 1083 (1980), in the nonjudicial foreclosure setting, first security interest holders have no means by which to determine whether an association is even foreclosing on superpriority portions of its lien such as to prompt it to purchase the property at the association's sale. Thus, in my view, the majority fails to give adequate

consideration to the due process implications of its holding. *Cf. Kotecki v. Augusztiny*, 87 Nev. 393, 395, 487 P.2d 925, 926 (1971) ("'(W)hen notice is a person's due, process which is a mere gesture is not due process. The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it.'" (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 315 (1950))).

Relatedly, after the first deed of trust loses its security in the property pursuant to the association's foreclosure of its superpriority lien, the former homeowner generally will be liable for the amount still owed on the debt. NRS 40.455. Under the majority's holding, in the nonjudicial foreclosure setting, the owner will be left with no mechanism by which to obtain the property's value as an offset against the amount still owed. For example, even if the foreclosure-sale purchaser took the property for an amount significantly lower than its fair market value, the owner would not have an unjust enrichment action against that purchaser; a sale under the nonjudicial foreclosure scheme for an association's lien "vests in the purchaser the title of the unit's owner without equity or right of redemption." NRS 116.31166(3). This also means that the owner, as well as the first security, will have no right to redeem the property under the majority's holding. NRS 116.31166(3); *see also Bldg. Energetix Corp. v. EHE, LP*, 129 Nev. ___, ___, 294 P.3d 1228, 1233 (2013) (recognizing that there is no right to redeem after a Chapter 107 nonjudicial foreclosure sale because a sale under that chapter "'vests in the purchaser the title of the grantor and any successors in interest without equity or right of redemption'" (quoting NRS 107.080(5))).

But if the association follows the Legislature's directive and forecloses through court action, *see* NRS 116.3116(2), then the rules governing civil proceedings, *see generally* NRS Title 2, Chapters 10-22, and specifically the rules governing actions affecting real property, as well as the Nevada Rules of Civil Procedure, would govern.[1]   A specific protection that comes with judicial foreclosure is the one-year right of redemption that is available to both the property owner and the otherwise-extinguished junior lienholders, which includes the first security interest in this context.   NRS 21.190; 21.200; 21.210; *see also Bldg. Energetix Corp.*, 129 Nev. at ___, 294 P.3d at 1233.   If the owner or junior lienholders pay what the purchaser at the judicial foreclosure sale paid to acquire the property, plus any other statutorily required amounts, they can redeem the property, NRS 21.200; 21.210; 21.220, allowing the property's value to be applied to the first security interest's outstanding loan amount.   The full adjudication of the rights between the pertinent parties and as to the property, including the association, the owner, and the first security interest, as well as any other pertinent party, combined

---

[1]NRS 40.430's "one action" rule for recovery of debt or enforcement of rights secured by a mortgage or other lien upon real property would not govern the association's judicial foreclosure action, as liens that arise pursuant to an assessment under Chapter 116 are not considered a "mortgage or other lien." NRS 40.433.

with the statutory protections afforded with a judicial foreclosure, further demonstrate that judicial foreclosure on an association's lien is necessary to trigger its superpriority effect under NRS 116.3116(2).

_____, C.J.
Gibbons

We concur:

_____ J.
Parraguirre

_____ J.
Cherry

# EXHIBIT 18

# EXHIBIT 18



# Fidelity National Title®
## Insurance Company

May 25, 2017

*Via Email and US Mail*

Wright Finlay & Zak LLP
Attn. Yanxiong Li
4665 MacArthur Court, Ste. 200
Newport Beach, CA 92660
yli@wrightlegal.net

|   |   |
|---|---|
| Claim Number: | **585493** |
| Policy/Escrow No: | A92-210014567, 90500380-DW |
| Lender: | Argent Mortgage Company, LLC |
| Insured: | Wells Fargo Bank, N.A. as Trustee for the Pooling and Servicing Agreement Dated as of April 1, 2005 Park Place Securities Inc. Asset-Backed Pass-Through Certificates, Series 2005-WHQ1, et al. |
| Property: | 1628 Cordoba Lane Las Vegas, NV 89108 |

Dear Mr. Li,

This letter is to inform you that Fidelity National Title Insurance Company (the "Company"), as successor in interest to United Capital Title Insurance Company has reviewed the documents submitted with the above-referenced claim. As discussed below, the Policy does not afford coverage for the claimed matter.

The facts surrounding the claim, as understood by the Company, are as follows:

On or about March 16, 2005, Brian Hee (the "Borrower") executed a deed of trust (the "Insured DOT") in favor of Argent Mortgage Company (the "Lender") that encumbered property located at 1628 Cordoba Lane, Las Vegas, Nevada (the "Property"), and was recorded on March 23, 2005, in the Official Public Records of Clark County, Nevada as instrument number 200503230000845. In connection with this transaction, the Lender obtained a 1992 ALTA Loan Policy (the "Policy") which contains a Date of Policy of March 23, 2005, and is underwritten by the Company. The Lender assigned the Insured DOT to Wells Fargo Bank, NA, as Trustee for the Pooling and Servicing Agreement Dated as of April 1, 2005 Asset-Backed Pass-Through Certificates Series 2005-WHQ2 (the "Insured") via Assignment of Deed of Trust recorded on January 19, 2012, as instrument number 201201190002545.

On June 12, 2012, Wildwood Manor Owners Association (the "Association") recorded a Notice of Claim of Lien-Homeowner Assessment (The "Association Lien") as instrument number 201206120001303, pursuant to the Association's recorded Covenants, Conditions and Restrictions recorded on January 18, 1978 (the "CC&Rs"). On November 6, 2013, the Association recorded a

Notice of Default and Election to Sell (the "Notice of Default") as instrument number 201311060001785. On April 21, 2014, the Homeowner Association Services, Inc. (the "Agent"), as agent for the Association recorded a Notice of (the "Notice of Sale") as instrument number 201404210000836. On June 19, 2014, the Agent recorded a Foreclosure Deed as instrument number 2014-6190002246, foreclosing the Association Lien and conveying the Property to Star Golden Enterprises (the "Buyer").

On August 27, 2014, the Buyer filed a complaint (the "Complaint") against the Insured, which was assigned Case No. A-14-706221-C in the Eight Judicial District Court for Clark County, Nevada (the "Litigation").  In the Complaint, the Buyer asserted causes of action for Quiet Title and Declaratory Relief.  The Buyer filed a motion for summary judgment, which the Court granted. The Court entered a Judgment in which it determined that the Insured was "permanently enjoined from asserting any estate, right, title, interest or claim in the Property."  The Insured appealed from this judgment, but the appeal was dismissed without prejudice when the Buyer filed a Bankruptcy Petition.

As a result of the Association Lien, the foreclosure of the Association Lien, and the Litigation, you submitted this claim on behalf of the Insured seeking defense of the Litigation and indemnification for any loss resulting from the foreclosure of the Association Lien.

Please refer to the Policy which states in part:

> *SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS FROM COVERAGE CONTAINED IN SCHEDULE B AND THE CONDITIONS AND STIPULATIONS, COMMONWEALTH LAND TITLE INSURANCE COMPANY... insures, **as of Date of Policy shown in Schedule A**, against loss or damage ...*
>
> [Emphasis added]

Please also refer to the Exclusions from Coverage within the Policy, which states in part:

> *The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:*
>      *...*
>      *3.  Defects, liens, encumbrances, adverse claims or other matters:*
>           *...*
>           *(d) attaching or created subsequent to Date of Policy....*

Please also refer to the CLTA Form 100.2 Endorsement attached to the Policy, which states in part:

> *The Company insures the Insured against loss or damage sustained by reason of:*
>      *...*
>      *1.    The existence at Date of Policy of any of the following:*

> (a)    *Covenants, conditions or restrictions under which the lien of the mortgage referred to in Schedule A can be divested, subordinated or extinguished, or its validity, priority, or enforceability impaired.*

[Emphasis added]

Please also refer to the CLTA Form 100 Endorsement attached to the Policy, which state in part:

> *This endorsement is made a part of the policy and is subject to all of the terms and provisions thereof and of any prior endorsements thereto. Except to the extent expressly stated, it neither modifies any of the terms and provisions of the policy and any prior endorsements, nor does it extend the effective date of the policy and any prior endorsements, nor does it increase the face amount thereof.*

Finally, please also refer to Schedule B Part I, which states in part:

> *This policy does not insure against loss or damage (and the Company will not pay cost, attorneys' fees or expenses) which arise by reason of:*
> ...
> 5.   *Covenants, conditions, restrictions, association lien rights, reservations and easements, if any affecting title, which may appear in the public record, including those shown on any recorded plat or survey, but deleting any covenant, condition or restriction indicating a preference, limitation or discrimination based on race, color, religion, sex, handicap, familial status, or national origin . . . .*

The Policy has a Date of Policy of March 23, 2005. The Association Lien was not recorded untilJune 12, 2012. The Notice of Default, Notice of Sale, and Trustee's Deed were recorded after this time.   Each of these encumbrances were recorded more than seven years after the Date of Policy. As all of the above-referenced matters related to this claim occurred after the Date of Policy, this claim does not fall within the initial insuring provisions of the Policy or the Policy's CLTA Form 100.2 Endorsement.   Even if these items did fall within the Policy's coverage provisions, they would not be covered pursuant to Exclusion 3(d) because this claim pertains to matters that arose after the Policy Date.

In addition, this claim does not fall within the Policy's Covered Risks because, to the extent the Association Lien may have priority over the Insured DOT, this priority is unrelated to title. There is no provision in the CC&Rs or any other recorded document that allows for the Association Lien to take priority over the lien of the Insured DOT, and CLTA Form Endorsement 100 is thus inapplicable to this claim. Rather, any loss or potential loss would result from i) unpaid post-policy assessments; ii) the application of NRS 116.3116(2) (the "Statute"); and iii) the Nevada Supreme Court's interpretation of the Statute.   Although the assessments are permitted by the CC&Rs (which are excepted from coverage as discussed below), the priority of such assessments is granted by the Statute as interpreted by the Nevada Supreme Court.   Absent the Statute and the Nevada Supreme Court's interpretation of the same, there would still be no coverage for the additional reasons stated herein.

Even assuming, *arguendo*, the CLTA Form 100 Endorsement was applicable, the Endorsement's provision cited above provides that it does not modify any of the terms and provisions of the Policy except to the extent expressly stated. As this Endorsement does not expressly state that it is modifying Exclusion 3(d) of the Policy or the effective date of the Policy, this Exclusion still applies and this matter is therefore specifically excluded from coverage under Exclusion 3(d).

Finally, the Association Lien resulted from assessments made pursuant to CC&Rs that were listed in Schedule B as exceptions from coverage. As such, this claim is excepted from coverage under Schedule B Exception No. 5.

Notwithstanding the above and presuming this matter was afforded policy coverage, which it is not, to the extent the Insured received notice of the Association Lien's foreclosure, the Company's liability for this claim would be limited in any event because it was prejudiced by the Insured's late notice of the claim. Section 3 of the Policy's Conditions and Stipulations provides as follows:

> 3.     *NOTICE OF CLAIM TO BE GIVEN BY INSURED CLAIMANT.*
>
> *The insured shall notify the Company promptly in writing (i) in case of any litigation as set forth in Section 4(a) below, (ii) in case knowledge shall come to an insured hereunder of any claim of title or interest which is adverse to the title to the estate or interest or the lien of the insured mortgage, as insured, and which might cause loss or damage for which the Company may be liable by virtue of this policy, or (iii) if title to the estate or interest or the lien of the insured mortgage, as insured, is rejected as unmarketable. If prompt notice shall not be given to the Company, then as to the insured all liability of the Company shall terminate with regard to the matter or matters for which prompt notice is required; provided, however, that failure to notify the Company shall in no case prejudice the rights of any insured under this policy unless the Company shall be prejudiced by the failure and then only to the extent of the prejudice.*

The Insured did not file a claim with the Company until April 24, 2017, which was more than two years after the foreclosure of the Association Lien and after the Buyer initiated the Lawsuit. Therefore, to the extent the Insured received notice of the Association Lien's foreclosure, the Claimant's late notice prejudiced the Company's ability to satisfy the Association Lien or initiate an action to resolve the potential priority dispute.

For the reasons set forth above, coverage is not afforded for this matter. Accordingly, the Company respectfully denies this claim.

Please note that reference to any particular provision of the Policy in this letter shall not be construed as a waiver of any other term or provision. The Company retains the right to supplement this letter. Also, please be advised that the Company reserves the right to deny this claim based on additional grounds.

If there are any facts which were unknown to the Company upon making this coverage determination, and which may alter such determination, please provide this information or documentation as soon as possible and your claim will be reevaluated. If additional information or documentation is not received, your claim file will be closed. Please contact the undersigned at Anneliese.Czarnick@fnf.com or 402-498-7520 should you have any questions or concerns regarding this matter. Please reference the above claim number in all communications with this office.

Sincerely,

Anneliese Czarnick
AVP | Claims Counsel